## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC, | C.A. No. 18-2032-CFC |
| Plaintiffs, | (Consolidated) |
| v. | ██████████ |
| AMPHASTAR PHARMACEUTICALS INC., | |
| Defendant. | |

## JOINT CLAIM CONSTRUCTION BRIEF

## **<u>TABLE OF CONTENTS</u>**

**TABLE OF CONTENTS** ................................................................. i

**INTRODUCTION AND BACKGROUND** ....................................1

    A.    PAR'S OPENING STATEMENT ....................................1

           1.    Background ................................................1

           2.    Representative Patent Claims .......................3

           3.    Claim Terms in Dispute ..............................4

    B.    DEFENDANTS' ANSWERING STATEMENT ................5

           1.    Disputed Claim Terms ...............................6

    C.    PAR'S REPLY STATEMENT .......................................9

    D.    DEFENDANTS' SUR-REPLY STATEMENT ...............9

I.        **AGREED UPON CONSTRUCTIONS** ..........................9

II.       **DISPUTED CONSTRUCTIONS** ................................10

    A.    "VASOPRESSIN" ....................................................10

           1.    Par's Opening Position ..............................10

           2.    Defendants' Answering Position: ...............14

           3.    Par's Reply Position:.................................18

           4.    Defendants' Sur-Reply Position: ...............25

    B.    CLAIM LIMITATIONS RECITING A RANGE OF pH VALUES ....................28

           1.    Par's Opening Position: .............................29

           2.    Defendants' Answering Position: ...............32

            3.    Par's Reply Position:.................................38

           4.    Defendants' Sur-Reply Position: ...............44

C.    "WHEREIN THE IMPURITIES ARE DETERMINED BASED ON:
      [RECITED HPLC METHOD]"................................................................48

      1.    Par's Opening Position: ............................................................48

      2.    Defendants' Answering Position: ............................................54

      3.    Par's Reply Position:.................................................................61

      4.    Defendants' Sur-Reply Position: .............................................65

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Advanced Fiber Techs. (AFT) Trust v. J&L Fiber Svcs., Inc.*,
  674 F.3d 1365 (Fed. Cir. 2012) ..........................................................27

*Agilent Techs., Inc. v. Affymetrix, Inc.*,
  567 F.3d 1366 (Fed. Cir. 2009) ..........................................................55

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
  657 F.3d 1264 (Fed. Cir. 2011) ................................................... 51, 60

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (2007).........................................................................36

*Aro Mfg., Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336, 339-40 (1961) ..............................................................65

*Astrazeneca AB, Akteibolaget Hassle, KBI-E, Inc. v. Mutual Pharma Co., Inc.*,
  384 F.3d 1333 (Fed. Cir. 2004) ..........................................................11

*Beachcombers, Int'l v. Wildewood Creative Prod., Inc.*,
  31 F.3d 1154 (Fed. Cir. 1994) ............................................................59

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ................................................... 51, 60

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ..........................................................19

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004) ..................................................... 8, 61

*Cobalt Boats, LLC v. Brunswick Corp.*,
  773 F. App'x 611 (Fed. Cir. 2019) .............................................. 35, 40

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3d 1556 (Fed. Cir. 1994) ..................................................... 36, 44

*Continental Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..................................................... 11, 18

*Epistar Corp. v. Int'l Trade Comm'n,*
    566 F.3d 1321 (Fed. Cir. 2009) ...................................................................32

*Fortinet, Inc. v. SRI Int'l, Inc.,*
    No. C 12-02540 JSW, 2013 WL 12174686 (N.D. Cal. Oct. 22, 2013)...............56

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
    527 F.3d 1379 (Fed. Cir. 2008) .................................................................. 14, 34

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n,*
    341 F.3d 1332 (Fed. Cir. 2003) ...................................................................47

*In re Kollar,*
    286 F.3d 1326 (Fed.Cir. 2002) ...................................................................56

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*
    381 F.3d 1111 (Fed. Cir. 2004) ...................................................................55

*Int'l Rectifier Corp. v. IXYS Corp.,*
    361 F.3d 1363 (Fed. Cir. 2004) ...................................................................14

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
    383 F.3d 1295 (Fed. Cir. 2004) ...................................................................19

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.,*
    205 F.3d 1377 (Fed. Cir. 2000) .......................................................... 34, 35, 40

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996)...................................47

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005) ...................................................................29

*Noven Pharm., Inc. v. Amneal Pharm. LLC,*
    No. CV 18-699-LPS, 2019 WL 1102681 (D. Del. Mar. 8, 2019)........... 35, 41, 47

*Nystrom v. TREX Co.,*
    424 F.3d 1136 (Fed. Cir. 2005) .............................................................. 45, 46

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.,*
    476 F.3d 1321 (Fed. Cir. 2007) ...................................................................44

*Perdiem Co LLC v. GPS Logic, LLC*,
    Case No. 2:15-cv-1216, 2016 WL 4013987 (E.D. Tex. July 27, 2016)........ 64, 67

*Perdiem Co. LLC v. IndusTrack LLC*,
    C.A. 2:15-cv-727, 2016 WL 3633627 (E.D. Tex. July 7, 2016)............. 63, 64, 66

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................... passim

*Purdue Pharm LP v. Intellipharmaceutics Int'l Inc.*,
    C.A. 17-392-RGA, 2018 WL 3323525 (D. Del. July 6, 2018) .................... 65, 67

*Schoenhaus v. Genesco, Inc.*,
    440 F.3d 1354, 1357 (Fed. Cir. 2006) ..................................................................51

*SkinMedica, Inc. v. Histogen, Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) ...........................................................................25

*Spherix Inc. v. Vtech Telecomms. Ltd*,
    No. 3:13-CV-3494-M, 2015 WL 9311489 (N.D. Tex. Mar. 19, 2015) ..............55

*Takeda Pharm. Co., Ltd. v. Zydus Pharm. USA, Inc.*,
    743 F.3d 1359 (Fed. Cir. 2014) ............................................... 34, 35, 40

*Tandon Corp. v. U.S. Int'l. Trade Comm'n*,
    831 F.2d 1017 (Fed. Cir. 1987) .................................................... 58, 59

*U.S. Philips Corp. v. Iwasaki Elec. Co., Ltd.*,
    505 F.3d 1371 (Fed. Cir. 2007) ....................................... 36, 38, 39, 47

*Viskase Corp. v. Am. Nat. Can Co.*,
    261 F.3d 1316 (Fed. Cir. 2001). ..................................... 30, 31, 41, 46

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................ 14, 18, 55

**Statutes**

35 U.S.C. § 271(a) ...................................................................................................51

35 U.S.C. § 112(d) ...................................................................................................58

**Regulations**

37 C.F.R. § 1.821 ........................................................................ 17, 22, 27

## INTRODUCTION AND BACKGROUND

### A.   PAR'S OPENING STATEMENT

### 1.   Background

This is a consolidated Hatch-Waxman case in which Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Par Innovation Company, LLC (collectively, "Par") assert claims for infringement of five patents.[1] Defendants Amphastar Pharmaceuticals Inc. ("Amphastar"), Amneal Pharmaceuticals GmbH, Amneal Pharmaceuticals of New York, LLC, Amneal Biosciences LLC, Amneal Pharmaceutical Pvt. Ltd. (collectively "Amneal"), American Regent, Inc. ("American Regent"), and Fresenius Kabi USA, LLC ("Fresenius") (collectively, "Defendants") seek FDA approval to sell proposed generic versions of Par's VASOSTRICT® products prior to the expiration of Par's patents.

The active ingredient in VASOSTRICT® is vasopressin, a synthetic polypeptide used to raise a patient's blood pressure, in part, by constricting blood vessels throughout the body.  Certain illnesses, such as sepsis (a life-threatening

---

[1] They are U.S. Patent Nos. 9,375,478 ("the '478 patent"), 9,687,526 ("the '526 patent"), 9,750,785 ("the '785 patent"), 9,744,209 ("the '209 patent"), and 9,937,223 (the "the '223 patent").  Defendants assert declaratory judgment counterclaims regarding U.S Patent No. 9,744,239 ("the '239 patent").  All six of the above patents are from the same patent family, and are continuations or continuations-in-part from the same ultimate parent application (US Application No. 14/610,499).  There is therefore substantial overlap amongst the specifications of each patent.

complication of an infection), can result in dangerously low blood pressure due to dilation of blood vessels (among other things). Vasopressin, together with other interventions, may be used to return a patient's blood pressure to less dangerous levels. *See, e.g.*, '478 patent (Ex. 1) at 1:18-25, 2:16-44, 4:1-5:30, 23:20-26.

The patentees do not claim to have invented vasopressin itself. Instead, the patents-in-suit teach and claim vasopressin formulations that have enhanced stability and lower impurity levels as compared to those of prior art vasopressin formulations. One of the difficulties associated with developing such formulations is that vasopressin degrades in aqueous solutions, and that the degradation gets worse over time. *See, e.g.*, '209 patent (Ex. 5) at 3:23-4:39. As is described throughout the specifications, Par undertook extensive work to identify, characterize, and quantify various vasopressin degradants and the extent of vasopressin degradation, including by measuring how the levels of vasopressin and various vasopressin degradation products change over time and vary with different formulations. *Id.* at 3:23-4:39, 52:5-116:45.

The claimed vasopressin formulations are aqueous solutions intended for intravenous administration. Vasopressin is typically administered using an IV drip, in which the vasopressin is diluted before use. *Id.* at 59:8-60:57.

## 2.    Representative Patent Claims

Broadly speaking, the patents-in-suit claim vasopressin formulations with specified components, pH values, and particular amounts of specified impurities and degradation, as well as methods of treating patients using the claimed vasopressin formulations.

The parties have identified three claim terms/phrases for the Court to construe: (i) "vasopressin," (ii) limitations that refer to a range of pH values (*e.g.*, "pH of 3.7-3.9"), and (iii) the phrase "wherein the impurities are determined based on [a specified method]."

The first two disputed terms appear, for example, in representative claim 1 of the '209 patent (emphasis added):

> 1. A method of increasing blood pressure in a human in need thereof, the method comprising
> administering to the human a unit dosage form,
> wherein the unit dosage form comprises from about 0.01 mg/mL to about 0.07 mg/mL of ***vasopressin*** or a pharmaceutically acceptable salt thereof, wherein:
> the unit dosage form has a ***pH of 3.7-3.9***;
> the unit dosage form further comprises impurities that are present in an amount of 0.9% - 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1;
> the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

The third term appears in '209 claim 11 which depends from this exemplary claim (and also appears in dependent claim 2 of the '785 patent), and recites "[t]he

3

method of claim 1, wherein the impurities comprise a plurality of peptides, wherein the impurities are determined based on" a specified detection method.

### 3.    Claim Terms in Dispute

"Vasopressin" is the active ingredient in the accused products, and is defined in the patents to be the peptide identified therein as Sequence ID NO. 1, which is:

```
                          SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 17

<210> SEQ ID NO 1
<211> LENGTH: 9
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
      peptide
<220> FEATURE:
<223> OTHER INFORMATION: C-term NH2

<400> SEQUENCE: 1

Cys Tyr Phe Gln Asn Cys Pro Arg Gly
1               5
```

*See, e.g.*, '478 patent (Ex. 1) at cols. 25-26.  The Court should construe the term "vasopressin," as the patentees did, by reference to that sequence listing.

With respect to the claimed pH ranges, the parties agree that the recited numerical values recited for the range should be given their ordinary meaning. However, Defendants seek to impose an unwarranted degree of precision on those numerical values by ignoring standard rounding principles.  Defendants insist, for example, that the recited range of 3.7-3.9 be construed as effectively being 3.70000000… to 3.90000000…, rather than encompassing pH values that would

be reported as 3.7, 3.8 or 3.9.  Nothing in the specification or prosecution history supports Defendants' restrictive interpretation of the recited numerical values.

Finally, with respect to the term "wherein the impurities are determined based on [a specified method]," the parties do not dispute the actual meaning of any of the words used.  Rather, the dispute is whether the recited detection method is just that, the method by which the identity and amount of impurities present in a vasopressin composition is to be determined (as Par contends), or is instead an actual part of the method of treating patients (as Defendants contend).  Defendants' construction is based on a misguided reading of the claim intended to conflate the language of the claim so as to render it nonsensical and seemingly impossible to infringe.

### B.   DEFENDANTS' ANSWERING STATEMENT

Vasopressin is not a new drug.  Vasopressin has been sold for decades to treat multiple indications, including hypotension.  Indeed, over a century ago, researchers discovered that intravenous injections of extracts from the pituitary gland, namely vasopressin, raised blood pressure in patients.  *See* Ex. 33 (Oliver & Shafer 1895) at 277.  Researchers thereafter characterized and synthesized the nine amino acid sequences and structures of vasopressin, which eventually led to the discovery of the vasopressin gene.  *See* Ex. 32 (du Vigneaud 1953) at 956; Ex. 31 (Ivell and Richter

1983) at 2006.  The patents-in-suit[2] do not claim to have invented vasopressin itself, nor do the patents-in-suit claim or disclose a novel use for the purported inventions described therein.  Nor could they.

The patents-in-suit, instead, claim a vasopressin formulation with a specific pH range.  The purported "novelty" of Par's formulation—which uses identical components to products sold before the filing of the patents-in-suit—is that the claimed pH range provides "enhanced stability" and "lower impurity levels" compared to other vasopressin formulations.  Joint Claim Construction Brief ("JCCB") at 2.  With its claim construction positions, Par seeks to buttress the patents-in-suit against the forthcoming onslaught of prior art which renders them invalid.

### 1.    Disputed Claim Terms

To achieve its goal of protecting the patents-in-suit, Par attempts to narrow the scope of the term "vasopressin" and depart from its plain language.  If successful, Par's construction of "vasopressin" would import limitations into the claims for the purpose of reading out disclosures of naturally occurring vasopressin, in an attempt to avoid certain prior art cited by Defendants.  Par's opening position provides no principled reason to deviate from the language of the claim itself.

---

[2] The "patents-in-suit" refer to the '478 patent, the '526 patent, the '785 patent, the '209 patent, the '223 patent, and the '239 patent.

Moreover, the intrinsic record lacks any basis (by express definition, disavowal, or otherwise) for limiting "vasopressin" in the claims of the patents-in-suit to SEQ. ID NO. 1 as Par now contends. At the outset, Par asks this Court to disregard the actual words of the claims. Then Par fails to identify any support in the specification for a unique definition of the term. Nor can it; nowhere in the cited passages does the specification identify the referenced "vasopressin" as being limited to any particular type of vasopressin (*e.g.*, synthetic, artificial, or naturally occurring). Defendants respectfully request that the Court construe "vasopressin" as the patentees intended, instead of adopting the litigation-driven construction that Par now presents.

As to the pH ranges recited in the claims of the patents-in-suit, the parties do not dispute that the concept of pH, in and of itself, is well understood. The parties, however, dispute the scope of the pH ranges claimed in Par's purported invention. Well before the filing of the patents-in-suit, multiple prior art vasopressin products were sold with pH ranges that overlapped with the ranges claimed in the patents-in-suit—including Par's prior art product, Pitressin. Par, to overcome obviousness rejections, submitted extensive declarations from the named inventors of the patents-in-suit arguing the criticality of the claimed pH ranges (*e.g.*, 3.8 and 3.7-3.9). The constructions Par now seeks extend beyond the literal scope of the claims and improperly attempt to capture additional claim scope by including values that would

"round" to the claimed pH.  Contrary to Par's assertion now, the named inventor

declarations asserting the criticality of these pH values for the claimed vasopressin

formulations show that the named inventors intended the claimed pH ranges to be

narrow, specific, and critical.  Adopting Par's construction would fly in the face of

these declarations concerning the criticality of the precise pH ranges of the claimed

vasopressin formulations.

Finally, with respect to the term "wherein the impurities are determined based

on [Recited HPLC Method]," Defendants ask the Court to apply the plain and

ordinary meaning of the claim language.  Claim 11 of the '209 patent and claim 2 of

the '785 patent claim a method of increasing blood pressure of a human where the

vasopressin formulation has a specific impurity profile that is determined based on

a recited HPLC method.  '209 patent (Ex. 5), claim 11; '785 (Ex. 4), claim 2.  These

claims are clear and unequivocal that both the method of treatment and HPLC

determination must occur to practice the claims.

Alternatively, Par improperly invites this Court to rewrite the claims through

claim construction, by effectively removing the HPLC method limitations from the

claim, to preserve its infringement arguments.  *Chef Am., Inc. v. Lamb-Weston, Inc.*,

358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and

consistently has recognized that courts may not redraft claims, whether to make them

operable or to sustain their validity.").  The Court should reject Plaintiffs' litigation-

inspired position and accord the terms their plain and ordinary meaning consistent with well-settled Federal Circuit precedent as Defendants propose.

### C.   PAR'S REPLY STATEMENT

Defendants' introduction tries to "poison the water" by addressing issues not ripe for resolution—novelty/obviousness.  That same strategy is reflected in many of the arguments below, which raise arguments for a future time when a full evidentiary record, including expert evidence, is presented.  For the reasons discussed in detail below, the Court should adopt Par's proposed constructions for each of the disputed terms.

### D.   DEFENDANTS' SUR-REPLY STATEMENT

Par continues to ignore clear intrinsic evidence that rebuts its positions and instead asks the Court to rewrite the claim language through claim construction.  For the reasons stated in Defendants' responsive and sur-reply brief, the Court should adopt Defendants' proposed constructions.

## I.   AGREED UPON CONSTRUCTIONS

The parties have agreed that the claim term "each of the first and second mobile phase are run at a flow rate of 1 mL/min" (which appears in '785 claim 2 and '209 claim 11) should be construed as having its plain and ordinary meaning, which is "the first mobile phase is run at a flow rate of 1 mL/min and the second mobile phase is run at a flow rate of 1 mL/min."

9

The parties have also agreed that the Court's claim constructions from *Par Pharmaceutical, Inc., et al. v. Eagle Pharmaceuticals Inc.*, C.A. No. 18-823-CFC shall apply in this litigation as well, *see* C.A. No. 18-823-CFC at D.I. 71 (the "Eagle Litigation"), subject to Defendants' right to appeal those constructions based on the briefing and record established in the ruling in the Eagle Litigation.

The parties agree that no construction of the term "units" is necessary at this time.  In light of issues the parties have raised through expert disclosure during the course of claim construction briefing and exchanges, the parties have agreed to postpone disputation regarding Defendants' indefiniteness defense with respect to the term "units" until trial as is consistent with the Court's preferences.  This issue will be the subject of further fact and expert discovery.

## II.   DISPUTED CONSTRUCTIONS

### A.   "VASOPRESSIN"

| Par's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Arginine vasopressin as described in SEQ. ID. NO. 1 (*see, e.g.*, '478 patent at cols. 25-26) | Plain and ordinary meaning |

### 1.   Par's Opening Position

Par's proposed construction of "vasopressin" mirrors the express definition provided in the specifications of the patents-in-suit.  In particular, each of the patents expressly states that "Vasopressin is a nonapeptide, *illustrated below (SEQ*

10

*ID NO. 1)*" and repeatedly refers to vasopressin as SEQ ID NO. 1 in various Figures and Tables. *See, e.g.*, '478 patent (Ex. 1) at 2:45-46, Figs. 2-6, Tables 1, 3 (emphasis added). The specifications further describe "[t]he structural formula of vasopressin" by reference to "SEQ ID NO.: 1," and "SEQ ID NO. 1" is used in place of "vasopressin" in various discussions regarding vasopressin, including, for example, sequence homology. *See, e.g.*, *id.*, at 14:1-18, 23:32-39.

Thus, Par has acted as its own lexicographer in defining this term, and it should be defined in terms of the listing of what "SEQ. ID NO. 1" is. *See Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("When the patentee acts as its own lexicographer, that definition governs") (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc)); *Astrazeneca AB, Akteibolaget Hassle, KBI-E, Inc. v. Mutual Pharma Co., Inc.*, 384 F.3d 1333, 1338-41 (Fed. Cir. 2004) (reversing the district court's claim construction based upon its failure to adopt the express definition provided by the patentee in the specification).

Par's construction refers to "*arginine* vasopressin" because the specification repeatedly makes clear that that is the form of vasopressin that is depicted as SEQ. ID NO. 1 and is used to make the claimed compositions. *See, e.g.*, '478 patent (Ex. 1) at 23:20-25 ("Vasopressin is a polypeptide hormone . . . which can be formulated as a sterile, aqueous solution of synthetic *arginine vasopressin* for intravenous

11

administration.") (emphasis added); Table 1 at 3:44-45 (referring to "Vasopressin (AVP, arginine vasopressin)" as shown in SEQ ID NO. 1); Table 3 at 18:48-49 (same).[3]

Moreover, Par's proposed construction refers to "*e.g.*, '478 patent at cols. 25-26" because that is where the sequence listing for each of the various "SEQ ID NOs.," including most pertinently SEQ ID NO. 1, can be found:

```
                            SEQUENCE LISTING

    <160> NUMBER OF SEQ ID NOS: 17

    <210> SEQ ID NO 1
    <211> LENGTH: 9
    <212> TYPE: PRT
    <213> ORGANISM: Artificial Sequence
    <220> FEATURE:
    <223> OTHER INFORMATION: Description of Artificial Sequence: Synthetic
          peptide
    <220> FEATURE:
    <223> OTHER INFORMATION: C-term NH2

    <400> SEQUENCE: 1

    Cys Tyr Phe Gln Asn Cys Pro Arg Gly
    1               5
```

'478 patent (Ex. 1) at cols. 25-26. Thus, that is the sequence listing information that is being referenced when the specification refers to "SEQ ID NO. 1."

---

[3] "Arginine vasopressin" is so-defined to distinguish vasopressin in humans from vasopressin in other animals, such as pigs, which may have a different amino acid at the 8-position in the peptide structure. *See, e.g.*, Ex. 24 (USP38-NF33-Vasopressin Monograph) at 5752 (noting that "in pig vasopressin, R is K," meaning that arginine is replaced with lysine in pigs such that pig vasopressin is referred to as "lysine vasopressin").

Indeed, this definition from the specification is consistent with the U.S. Pharmacopeia ("USP") monograph for vasopressin at the time of the invention. *See* Ex. 24 (USP38-NF33-Vasopressin Monograph) at 5752.[4]  It describes the compound using the same chemical structure recited in the specification, and describes it as "Vasopressin, 8-L-arginine"—*i.e.*, as arginine vasopressin.  *Id.* Likewise, just as the Sequence Listing reproduced above refers to "ORGANISM: Artificial Sequence" and makes clear that it is a "Synthetic peptide," so too, the USP monograph notes that vasopressin "is prepared by chemical synthesis."  *Id.* Thus, although vasopressin occurs naturally, the claimed vasopressin as shown in SEQ ID NO. 1 is synthetic arginine vasopressin.

The Court should adopt the patentee's clear and unmistakable lexicography, as reflected in Par's proposed construction.

---

[4] The U.S. Pharmacopeia National Formulation ("USP" or "USP-NF") is a private, non-governmental organization that develops and publishes monographs and compendial standards regarding a product's strength, quality, and purity. Monographs include the name of the ingredient or preparation; the definition; packaging, storage, and labeling requirements; and a series of tests, procedures for the tests, and acceptance criteria called the specification, which must also follow official USP standards.  Ex. 25, https://www.uspnf.com/.  The USP compendia is recognized as the official compendium for the FDA, and any "drug with a name recognized in" the USP compendia (such as vasopressin) "must comply with compendial identity standards or be deemed adulterated, misbranded, or both" by the FDA.  *See, e.g.*, Ex. 26 (FDA Draft Guidance: Harmonizing Compendial Standards with Drug Application Approval Using the USP Pending Monograph Process Guidance for Industry, July 2019) at 1-2.

### 2.     Defendants' Answering Position:

Par's construction attempts to improperly restrict the meaning of "vasopressin" to one embodiment discussed in the patent specification—synthetic vasopressin with a particular amino acid sequence—and exclude naturally derived vasopressin.  Such a construction does not comport with the plain meaning of the claim terms and is not supported by the intrinsic evidence.

### a.     The Intrinsic Evidence Does Not Support a Construction of Vasopressin Limited to Synthetic Vasopressin Only

The claim construction analysis begins by examining the intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Unless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to have their "ordinary and customary meanings attributed to them by those of ordinary skill in the art."  *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004).  To be his own lexicographer, a patentee must clearly express an intent in the written description to assign a unique definition to a term that is different from its ordinary and customary meaning.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc)).

The specifications of the patents-in-suit do not clearly express an intent by the patentees to assign a unique definition to "vasopressin" that is different from the ordinary meaning in the art.  The detailed description in the patent specification

describes vasopressin in terms of its biological origins and role.  The specification states that vasopressin is a pro-hormone made in "neurosecretory cells of the hypothalamus, and is subsequently transported to the pituitary gland for storage." *See, e.g.*, '785 patent (Ex. 4) at 2:41-44.  The specification further describes how vasopressin is released in the body and its role in regulating blood pressure.  *Id.* at 2:44-51.  Thus, the specification explicitly acknowledges that vasopressin includes naturally occurring forms and there is no express language limiting the term only to synthetic forms.

In an attempt to narrow the definition of vasopressin, Par improperly argues the term is limited to a single embodiment described in the specification.  The listing of an exemplary amino acid sequence in the specification does not, however, express a clear intent to limit the claims to a particular form of synthetic vasopressin— particularly when the claims themselves contain none of the sequence information, and other portions of the specification contain broader descriptions of the term.  *See, e.g.*, '785 patent (Ex. 4) at 62:11-25 (multiple references to "exogenous vasopressin").  Par also relies on an illustration of vasopressin's chemical structure as definitional.  *See, e.g., id.* at 2:66-3:21.  The depiction of a structure, however, does not amount to a clearly expressed special definition of "vasopressin" limiting it to a particular synthetic form.  The intrinsic record does not support assigning

"vasopressin" a unique meaning; therefore, the Court should adopt its plain and ordinary meaning.

> **b.    The Patentees Chose Not to Use "SEQ ID NO.: 1" in the Claim Language and Vasopressin Should Not Be So Limited**

The Court also should reject Par's proposed special definition because the patentees clearly knew how to describe specific forms of "vasopressin" but elected not to use any of that special terminology in the claims.  When referring to synthetic forms of vasopressin, for instance, the patentees described it as "synthetic vasopressin." *See, e.g.*, '785 patent (Ex. 4) at 61:47-48 (stating vasopressin *can be* formulated as "synthetic arginine vasopressin").  When referring to a particular amino acid sequence, the patentees expressly referred to that particular sequence in both the specification or claims. *See, e.g.,* '785 patent (Ex. 4), claim 1 (describing impurities in terms of their sequence homology to "SEQ. ID NO. 1").  Yet they did not employ Par's proposed construction in the claims, which supports adopting the plain-language construction proposed by Defendants. *See, e.g.*, '209 patent (Ex. 5), claim 1.  The patentee's choice to refer to the impurities in the dependent claims using their SEQ ID NO. identifiers, instead of their chemical names, further supports this distinction. *See, e.g.*, *id*., claims 2-8.

If the patentees intended to limit the claims to a particular amino acid sequence, they were required to explicitly set forth that sequence in the claims.  Part

I, Subchapter A, Chapter I of Title 37 of the Code of Federal Regulations lays out the rules of practice which govern patent application before the United States Patent and Trademark Office.  Pursuant to 37 C.F.R. § 1.821, "[w]here the description or claims of a patent application discuss a sequence that is set forth in the "Sequence Listing" . . . , reference must be made to the sequence by use of the sequence identifier, preceded by 'SEQ ID NO:' in the text of the description or claims. . . ." 37 C.F.R. § 1.821(d).  In other words, if the patentees were referring to SEQ ID NO.: 1 in the claims or in the patent specification, they were required to specifically identify it as "SEQ ID NO.: 1."  Instead, the patentees chose to use the term "vasopressin," a term with a well-understood meaning in the field.[5]

### c.    Par's Reliance on the United States Pharmacopeia Is Improper

Par's reliance on the United States Pharmacopeia ("USP") is misplaced and disregards other parts of the USP supporting Defendants' construction of "vasopressin."  As an initial matter, it is improper to rely on extrinsic evidence when the intrinsic evidence alone resolves any ambiguity in a disputed claim term.  *See*

---

[5] Even if SEQ ID NO.: 1 were incorporated into the claim term "vasopressin," SEQ. ID. NO. 1 is not limited to synthetic vasopressin, as Par suggests.  Whether naturally derived or synthetic, vasopressin has a specific sequence of amino acids, and that is what SEQ ID NO.: 1 represents.  Therefore, even if Par could establish that the patentees intended to define "vasopressin" as SEQ ID NO.: 1, there would still be no basis for limiting the claims to synthetic vasopressin only.

*Vitronics*, 90 F.3d at 1583.  As discussed above, the intrinsic evidence supports Defendants' construction that the claim term "vasopressin" is not limited to synthetic vasopressin.  Par's reliance on the USP is therefore improper.

However, even if it is proper to rely on the USP, Par ignores other parts of the USP which clearly illustrate that "vasopressin" encompasses both animal origin and synthetic vasopressin.   The USP Monograph for Vasopressin states that the "Labeling" for Vasopressin Injection should indicate its "origin (animal or synthetic)."  Ex. 30 (USP37-NF32 Vasopressin Monograph) at 5126.  Additionally, in the Impurities section, specifically the "Microbial Enumeration Tests and Tests for Specified Microorganisms" section, it gives a total bacterial count and then states "for products of animal origin . . ."  *Id.*  A person of ordinary skill in the art would therefore understand from these passages in the USP that a formulation of injectable vasopressin could be made using synthetic or animal-derived vasopressin, and not just synthetic vasopressin.   Much like with its citations to the intrinsic evidence, Par's attempts to cherry pick extrinsic evidence to support its construction should be rejected.

### 3.   Par's Reply Position:

#### a.   *The Patentees Defined "Vasopressin" by Reference to its Listing as SEQ ID NO. 1*

"When the patentee acts as its own lexicographer, that definition governs." *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019).  It is

well-established that a patentee's lexicography need not be in "explicit definitional format," but instead may be "by implication" based on the patentee's "consistent use in the specification." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300-1302 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).  That is what we have here—the patentees repeatedly and consistently defined the vasopressin of their inventions by reference to its listing as "SEQ ID NO. 1":





'478 patent (Ex. 1) at 1:45-65, 3:36-45, 18:40-52, 23:27-38 (redlining added).

Defendants' counter-arguments are unavailing.  Their assertion that Par's

construction would limit the claims to but "one embodiment" taught in the

specification ignores the patentees' consistent reference to the vasopressin of their

inventions by reference to SEQ ID NO. 1.  Indeed, although the patentees note that

vasopressin naturally occurs in humans ('478 patent (Ex. 1) at 2:22-25), when

describing the vasopressin of their claimed formulations, they uniformly refer to it

by reference to its SEQ ID NO.  Defendants cite no embodiment—because there is

none—in which anything other than vasopressin as shown in SEQ ID NO. 1 (*i.e.*,

synthetic arginine vasopressin) is used.

Defendants' citation to references to "exogenous" vasopressin supports Par's

construction, not theirs.  *See supra* at 15 (citing '785 patent at 62:11-25).  Those

references appear as part of Example 7 ("Illustrative Regimen for Therapeutic Use

of a Vasopressin Formulation").  *Id.* at 59:40-62:50.  The term "exogenous" refers

to vasopressin produced outside of the body, and the cited references immediately

follow the last of the disclosures excerpted above—*i.e.*, that "[t]he structural



formula of vasopressin is:                                            ." *Id.* at 61:54-

65 (redlining added).  Thus, the cited "exogenous" vasopressin is, consistent with

Par's construction, vasopressin as defined by SEQ ID NO. 1.

> **b.** *Nothing in the Claims Contradicts the Patentees'*
> *Lexicography*

Defendants argue that the Court should reject this lexicography because the

claims refer to vasopressin, rather than to SEQ ID NO. 1.  However, having

already defined vasopressin by reference to listing as SEQ ID NO. 1 throughout

the specification, there was no need to repeat it in the claims.

Defendants' cite to a reference to "synthetic arginine vasopressin," as if that

somehow detracts from the patentees' lexicography.  It does not.  SEQ ID NO. 1

expressly reflects that the vasopressin of the patentees' invention is synthetic

arginine vasopressin:

*Id.* at col. 107-108 (redlining added). Indeed, the cited reference, like the one to "exogenous" vasopressin, is part of Example 7 and is immediately followed by the description of the chemical structure of vasopressin by reference to SEQ ID NO. 1 excerpted above. *Id.* at 61:45-65.

Likewise, Defendants' citation to PTO regulations similarly supports Par's construction, not theirs. *See supra* at 16-17. The cited regulation states that "[w]here the description or claims of a patent application discuss a sequence that is set forth in the 'Sequence Listing' in accordance with paragraph (c) of this section, reference must be made to the sequence by use of the sequence identifier, preceded by 'SEQ ID NO:' in the text of the description or claims." 37 CFR §1.821(d). The evident purpose is to ensure clarity as to the chemical formula and structure of any amino acid sequences taught and claimed in a patent, and that is why the patentees defined the vasopressin of their invention by reference to SEQ ID NO. 1. The reference to the SEQ ID NO. need not be included in the claims themselves—the regulation provides that "reference must be made to the sequence by use of the sequence identifier, preceded by 'SEQ ID NO:' *in the text of the description* **or** *claims*." *Id.* (emphasis added).

### c.   *The USP Monograph Supports Par's Construction*

The Federal Circuit's seminal *Phillips* decision made clear that extrinsic evidence "can be useful to a court for a variety of purposes," including "to provide

background on the technology at issue, … to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art," and/or "to establish that a particular term in the patent or the prior has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Thus, district courts may, in their "sound discretion," admit and use such evidence in deciphering what a POSA would understand a disputed claim term to mean. *Id.* at 1319.

Defendants cite pre-*Phillips* case law to argue that Par's reliance on the USP Monograph is "improper." To the extent inconsistent with *Phillips*, that case law has been overruled. Moreover, Defendants mischaracterize Par's reliance on the USP Monograph. Par does not rely on it to alter the way that the patentees used the term "vasopressin"—rather, it provides confirmation that a POSA, knowledgeable about the USP and the development of pharmaceutical formulations in accordance therewith, would understand the claimed "vasopressin" to have the meaning that Par proffers.

Defendants argue that Par has "cherry-picked" its citations to the USP Monograph. Not so. Just like the patentees, the USP Monograph Defendants cite explicitly defines "Vasopressin" as being arginine vasopressin that is "prepared by chemical synthesis"—*i.e.*, as synthetic arginine vasopressin:

23



Ex. 30 at 5125 (redlining added).

Defendants point to other statements, beyond the "Definition" section that defines what USP "Vasopressin" is, to suggest that a POSA would understand that USP "Vasopressin" as something different.  They are wrong.

Defendants first point to the labeling requirements for "Vasopressin Injections,"[6] and the statement that label should "indicate its origin (animal or synthetic)."  That statement merely acknowledges that someone could seek to market a non-USP-compliant vasopressin product, and because of that, the Monograph requires explicit disclosure on the label of the origin for consumers'

---

[6] This section of the USP Monograph applies to compositions that contain vasopressin as the API (active pharmaceutical ingredient), rather than the section Par cited which directly applies to the vasopressin itself.

benefit.[7]  Likewise, the statement Defendants point to in the "Microbial Enumeration Tests" section of the Monograph merely acknowledges that same fact, and notes that products of animal origin must be tested for the presence of *salmonella* and *e-coli* bacteria which would not be found in synthetic products. Neither statement alters the USP's express definition of "Vasopressin," which is fully consistent with the patentees' lexicography.

### 4. Defendants' Sur-Reply Position:

#### a. *The Specification Does Not Limit the Definition of "Vasopressin."*

A definition for a term in the patent specification is imported into a claim when that definition is used throughout the entire specification, in a manner consistent with only a single meaning.  *See SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1203 (Fed. Cir. 2013).  As Defendants have pointed out, and Par implicitly acknowledges, the specification describes "vasopressin" in many ways throughout the entire specification —and "vasopressin" is not consistently described only with reference to SEQ ID NO.: 1.  Nor is it consistently described as "synthetic" vasopressin.  Par omits the word "synthetic" from its proposed construction, yet it

---

[7] As noted *supra* at n.4, FDA Guidance provides that for any products requiring FDA approval, a product using a name recognized in the USP which does not comply with its requirements would be deemed adulterated, misbranded, or both.

intends to bootstrap that additional requirement into the claims in an effort to avoid prior art containing non-synthetic forms of vasopressin.

The patents discuss both synthetic and naturally-derived vasopressin throughout the specification. *See* JCCB at 14-16. Par mischaracterizes the specification's discussion of "exogenous" vasopressin. *See* '785 patent (Ex. 4) at 62:11-25; JCCB at 20-21. Exogenous vasopressin refers to vasopressin "originating or produced outside the organism." *See* Ex. 47, Stedman's Medical Dictionary at 683; *see also id.* at 640 (endogenous definition). This includes *natural vasopressin derived from a different organism*. For example, all vasopressin derived from animals, such as bovine vasopressin, is exogenous vasopressin when introduced to a human. Reference to "exogenous" vasopressin in the patent specification, therefore, undermines a construction of "vasopressin" limited to synthetic forms.

The specification passages Par relies on support, at most, the notion that vasopressin refers to the following sequence of amino acids: Cys-Tyr-Phe-Gln-Asn-Cys-Pro-Arg-Gly-$NH_2$. But synthetic and naturally-derived vasopressin both can have this amino acid sequence. The patent specification does not limit vasopressin to synthetic vasopressin, by implication or otherwise.

### b.   *Par Misinterprets Section 1.821*

Par suggests that a patent applicant is not required to use the "SEQ ID NO." identifier in claims referring to a specific sequence as long as that identifier has been

used somewhere in the specification under 37 C.F.R. § 1.821. But Section 1.821

requires a patent applicant to use the sequence identifier "SEQ ID NO." whenever a

sequence is discussed in ***either*** the claims or the patent specification—"*even if the*

*sequence is also embedded in the text of the description or claims of the patent*

*application.*" 37 C.F.R. § 1.821(d) (emphasis added). Regardless of whether the

specification refers to SEQ ID NO.: 1, if the patentees intended to limit the claims,

they should have used the sequence identifier in the claim language. Par's choice to

use "vasopressin" instead therefore supports adopting the plain meaning of

"vasopressin" as Defendants propose.

> c.   The USP Supports Defendants' Proposed Construction,
>       Not Plaintiffs

Par's reply argument concerning the USP entry on vasopressin

mischaracterizes Federal Circuit precedent. Par mistakenly argues that the Federal

Circuit mandated the use of extrinsic evidence in *Phillips*. *See* JCCB at 22-23

(quoting *Phillips*, 415 F.3d at 1318-19). *Phillips* recognized, however, that extrinsic

evidence is "less reliable than the patent and its prosecution history in determining

how to read claim terms" and "less significant than the intrinsic record." *Id.* Courts

have consistently held that extrinsic evidence informs, but does not displace, or

supersede the intrinsic evidence. *See, e.g.*, *Advanced Fiber Techs. (AFT) Trust v.*

*J&L Fiber Svcs., Inc.*, 674 F.3d 1365, 1372-76 (Fed. Cir. 2012). As stated above,

the intrinsic evidence supports the plain and ordinary meaning of "vasopressin" as

encompassing both synthetic and naturally-derived forms and there is no need to counsel extrinsic evidence. Thus, the Court should reject Par's use of the USP to justify its narrow construction.

Even if extrinsic evidence were necessary to instruct the Court on the meaning of "vasopressin," the USP does not limit "vasopressin" to synthetic vasopressin. As Defendants point out above, the USP expressly recognizes "vasopressin" as encompassing both synthetic and naturally-derived vasopressin. Ex. 30 (USP37-NF32 Vasopressin Monograph) at 5126. Par's argument merely relies on a single section from the reference, out of context, that refers to the synthetic preparation of vasopressin. The USP is therefore entirely consistent with the varied descriptions of "vasopressin" in the intrinsic record and supports Defendants' proposed construction.

## B.    CLAIM LIMITATIONS RECITING A RANGE OF pH VALUES

| Par's Proposed Constructions | Defendants' Proposed Constructions |
|---|---|
| **"the unit dosage form has a pH of 3.7-3.9"** ('785 claim 1 (Ex. 4); '209 claim 1 (Ex. 5)) | |
| Ordinary meaning, no construction necessary | Plain and ordinary meaning, which is "a unit dosage form having a pH of no less than 3.7 and no more than 3.9." As applied to the respective claims and any dependent claims, Defendants reserve the right to contend the claims as a whole are indefinite. |

| "the unit dosage form has a pH of 3.5 to 4.1"<br>('239 claim 1 (Ex. 2)) | |
|---|---|
| Ordinary meaning, no construction necessary | Plain and ordinary meaning, which is "the unit dosage form has a pH of no less than 3.5 and no more than 4.1." As applied to the respective claims and any dependent claims, Defendants reserve the right to contend the claims as a whole are indefinite. |
| "the pharmaceutical composition has a pH from about 3.7 to about 3.8"<br>('223 claim 1 (Ex. 6))[8] | |
| Ordinary meaning, no construction necessary | Plain and ordinary meaning.  As applied to the respective claims and any dependent claims, Defendants reserve the right to contend the claim as a whole is indefinite |

### 1.    Par's Opening Position:

The pH-related limitations in dispute recite that the claimed vasopressin compositions have a pH value within a specified range.  The parties agree that the patentees did not provide any special definition or lexicography with respect to these limitations, and that they therefore should be given their ordinary meaning.

---

[8] Defendants do not present an alternate construction for this term.  Because there apparently is no dispute between the parties, Par contends that construction of this term is not necessary, and that the term should be given its plain and ordinary meaning, i.e. that "about" means "approximately."  *See Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1369 (Fed. Cir. 2005) (holding that the term "about" has an ordinary meaning of "approximately").

During the meet and confer, process, however, Par learned that Defendants seek to interpret the recited numerical values in a non-ordinary way, which ignores standard rounding principles—*e.g.*, they interpret the recited pH value of 3.7 as being 3.7000000 (with decimals extending ad infinitum) and not including, *e.g.*, 3.6999, which would ordinarily be reported as 3.7.  That is error.

As the Federal Circuit has recognized, rounding of numerical values "is a standard scientific convention when a number has not been carried to the next mathematically significant figure." *Viskase Corp. v. Am. Nat. Can Co.*, 261 F.3d 1316, 1322 (Fed. Cir. 2001).  Here, the examples disclosed in the patents in suit consistently report pH test values going out only to the tenths decimal place. *See, e.g.*, '785 patent (Ex. 4) at 57:48-56, 58:58-63, 59:1-4, 96:45-98:37 (Examples 9 and 10, including Table 43); cols. 103-06 (Tables 53 and 54).  There is nothing in the intrinsic evidence to suggest that those values were not rounded to the nearest decimal place in accordance with the standard scientific convention (and in fact, the underlying documents confirm that they were).  Nor is there any reason to conclude that a pH value reported in the examples as 3.7 would not be within the range of 3.7 – 3.9 as recited in the asserted claims, regardless of whether it was a value that was below 3.70000000… but was rounded up to 3.7 for reporting purposes.

Furthermore, claim 1 of the '478 patent (Ex. 1) recites that the claimed unit dosage form "has a pH of 3.8." Defendants have not asked the Court to construe that term as meaning exactly 3.8000000…, and so it retains its ordinary meaning and would include, for example, 3.7999. There is no reason to apply the ordinary meaning, including any standard rounding, to the recited pH value in the '478 patent, but not to those in the other patents-in-suit.

Nothing in the intrinsic evidence supports Defendants' restrictive reading of the claimed ranges as being, *e.g.*, 3.70000000… to 3.90000000…, rather than encompassing pH values that would be reported as 3.7, 3.8 or 3.9. Compare the present situation, for instance, to the one presented in *Viskase*, where the Federal Circuit construed a limitation reciting a film having a density "below about 0.91 g/cm$^3$" to mean "below about 0.910 g/cm$^3$" (and thus excluding, *e.g.*, a value of 0.912 that would be rounded to 0.91). *Viskase*, 261 F.3d at 1321-22. That decision was based on the fact that the patentee had expressly distinguished a prior art reference disclosing a density range of "0.910 to 0.940" by arguing that it did not disclose a density "below about 0.910 g/cm$^3$ as defined in all pending claims." *Id.* Thus, during prosecution, the patentees unequivocally surrendered claim scope by expressly treating the claimed numerical value in a manner different than its

ordinary meaning.[9]  There is nothing similar in the intrinsic evidence here demonstrating the surrender of pH values that would be rounded up or down to the recited values of the asserted claims.

### 2.     Defendants' Answering Position:

The claimed pH ranges should be limited to the precise values claimed in view of the specification, prosecution history and other claims in related patents.  First, the specification makes clear that the patentees understood the claimed pH values were precise and that a formulation with a pH of 3.7 was different than a formulation with a pH of 3.65 or 3.75.  Second, Plaintiffs' proposed construction effectively imports approximation into all of the pH range claims despite the fact that some of those claims already expressly use approximate modifiers like the term "about."  Claim differentiation principles thus support limiting the claimed ranges to their precise values as Defendants propose.   Finally, the patentees' repeated representation to the Patent Office that the claimed pH ranges were "critical" to vasopressin's stability also supports construing these range limitations narrowly under relevant Federal Circuit law.

---

[9] *See, e.g., Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (noting that there is "a heavy presumption that claim terms carry their full ordinary and customary meaning," which should apply "unless [Defendants] can show the patentee expressly relinquished claim scope.").

a.    *The Specification Supports Construing the pH Values Precisely Without Importing Rounding Principles*

The plain meaning of a numerical value like "3.7" is the numeral itself, not a range of rounded values extended to the next decimal.  The intrinsic evidence makes clear that the patentees understood the claimed pH ranges in the patent were precise values that did not incorporate "rounding principles" as Plaintiffs suggest.  Indeed, the specification treats approximate pH values differing by 0.05 as different embodiments.   Specifically, the specification states that "[t]he pH can be, for example, . . . about 3.65, about 3.7, about 3.75, about 3.8, about 3.85, about 3.9, [or] about 3.95" and that "[t]he pH can be, for example, from . . . about 3.65 to about 3.85, about 3.7 to about 3.9, about 3.7 to about 3.8, about 3.75 to about 3.95, about 3.75 to about 3.8, about 3.8 to about 3.85, [or] about 3.75 to about 3.85. . ."  *E.g.*, '785 patent (Ex. 4) at 47:29-48:4.   All of these values are listed separately as representing different embodiments of the claimed invention.  *See id.*  For example, based on the disclosure of a pharmaceutical composition with a pH range from about 3.75 to about 3.8, the patentees clearly intended a pH of about 3.75 to be a separate value from a pH of about 3.8.  But under Plaintiffs' construction, these pH values would be the same.  Thus, the claimed pH ranges should be interpreted precisely as Defendants propose and should not be impermissibly broadened, as Plaintiffs advocate, to incorporate rounding.

Resolving this dispute is important for infringement and invalidity purposes. The specific ranges of pH values literally covered by the claims impacts Par's infringement claims and Defendants' noninfringement defenses. The Court's interpretation of the claims similarly affects the scope of available prior art, which is relevant for Defendants' invalidity case.

   b.  *Plaintiffs' Construction Improperly Imports the Modifier "About" Into the pH Claim Terms*

   An established principle of claim construction is that "different claim terms are presumed to have different meanings." *Helmsderfer*, 527 F.3d at 1382. When a claim term reciting a quantitative value for a specified parameter uses qualifying language, such as "about" or "approximately,"[10] and a second claim term does not use a qualifier to describe the same parameter, the absence of the modifier supports narrowly construing the second term to its precise recitation. *See Takeda Pharm. Co., Ltd. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014) (construing "400 μm or less" to mean "precisely 400 μm or less" where the inventors did use the term "about" to describe other numerical parameters in the claim); *see also Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1381 (Fed. Cir. 2000); *see also Cobalt Boats, LLC v. Brunswick Corp.*, 773 F. App'x 611, 616 (Fed. Cir.

---

[10] Defendants agree that the plain and ordinary meaning of "about" is "approximately," and that construction of this term is not needed.

2019) ("Where a precise value is included in the claim without a term such as 'about,' we interpret the claim language as imposing a strict numerical boundary, absent evidence that such a construction would be inconsistent with the intrinsic evidence.").

Here, there are claims that recite "about" with respect to pH and there are claims that do not—claim 1 of the '223 patent, for example, recites "a pH from <u>about</u> 3.7 to <u>about</u> 3.8" (emphasis added), while the claims of the '785, '209, and '239 patents recite pH ranges without the "about" qualifier.  These two sets of claims must be construed differently, and the pH limitations without "about" must be construed more narrowly.  Yet, Plaintiffs' "ordinary rounding principle construction" seeks to import a ±0.05 approximation to pH values in all of these claims, despite the fact that certain claims contain no approximating limitations.  This runs afoul of basic claim construction principles and should be rejected.  *See Takeda Pharm. Co.*, 743 F.3d at 1365; *Jeneric/Pentron*, 205 F.3d at 1381; *see also Noven Pharm., Inc. v. Amneal Pharm. LLC*, No. CV 18-699-LPS, 2019 WL 1102681, at *4 (D. Del. Mar. 8, 2019) (rejecting, in light of the absence of "about," the proposed construction that "coat weight of greater than 10 mg/cm$^2$" means "coat weight of greater than or equal to 9.5 mg/cm$^2$").[11]

---

[11] Plaintiffs' proposed construction also improperly results in a range between two values, which are themselves ranges.  The term "the unit dosage form has a pH of 3.7-3.9" would mean "the unit dosage form has a pH of [3.650 to 3.749]-[3.850 to

c.      *The Purported Criticality of the Claimed pH Ranges
        Require Narrow Constructions*

The patentees' arguments during prosecution regarding pH criticality further support a precise construction of the claimed pH ranges.[12]  Where a claimed numerical parameter is alleged by the patentee to be critical to the purported invention, that numerical parameter should be narrowly construed.  *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1561 (Fed. Cir. 1994) (finding error with the district court's broad construction of "about 40:1," when the patentees "emphasized the criticality of the claimed ratio" during prosecution); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367 (2007) (citations omitted) (narrowly construing "composite composition" to require a specific processing step where the specification stated that the step was a "critical element").

During prosecution, the patentees distinguished a prior-art vasopressin formulation by repeatedly focusing on their "surprising and unexpected" finding that

3.949]" and the term "the unit dosage form has a pH of 3.5 to 4.1" would mean "the unit dosage form has a pH of [3.450 to 3.549] to [4.050 to 4.149]."  As the Federal Circuit has observed, a claim directed to a quantity between a lower and upper numeral "implies a specific range . . . [i]t does not imply a range between two values which are themselves ranges."  *U.S. Philips Corp. v. Iwasaki Elec. Co., Ltd.*, 505 F.3d 1371, 1376 (Fed. Cir. 2007).

[12] Defendants do not necessarily agree that the claimed pH ranges are critical to the stability of vasopressin formulations but cite to the prosecution history here because it can often demonstrate how the patentee understood the scope of the purported invention, which may inform the meaning of the claim language.  *Phillips*, 415 F.3d at 1317.

"pH 3.8 provided the greatest stability to a vasopressin formulation, and demonstrate the criticality of this pH for the stability of vasopressin." '485 Patent Prosecution History (Ex. 7), January 22, 2016 Response to Final Office Action at 7.  In order to cover this "critical" pH, the patentees also claimed the pH ranges 3.7 to 3.9 and 3.5 to 4.1, arguing that these pH ranges were "critical" for "limiting the amount of impurities in a vasopressin formulation," and for providing "the most consistent stability." '785 Patent Prosecution History (Ex. 10), June 28, 2017 Response to Non Final Office Action at 7; '209 Patent Prosecution History (Ex. 11), June 28, 2017 Response to Non Final Office Action at 8; '239 Patent Prosecution History (Ex. 8), May 22, 2017 Response to Office Action at 8-9.  In light of these arguments and supporting affidavits, the examiner allowed the claims, accepting the patentees' allegations regarding the "criticality" of the claimed pH ranges.  '785 Patent Prosecution History (Ex. 10), July 20, 2017 Notice of Allowance at 2; '209 Patent Prosecution History (Ex. 11), July 11, 2017 Notice of Allowance at 2; '239 Patent Prosecution History (Ex. 8), July 11, 2017 Notice of Allowance at 2.  This prosecution history supports a narrow construction of the pH ranges as Defendants propose.  Plaintiffs should not be allowed to escape their representations during prosecution regarding the criticality of the claim pH ranges—made to secure issuance of their patents—by seeking a broader construction here.

### 3.     Par's Reply Position:

The recited pH range of "3.7-3.9" is straightforward, readily understandable, and should be given its ordinary meaning, without further construction. Defendants essentially ask the Court to construe "3.7–3.9" as "3.70000…-3.9000…," and thereby impose a degree of precision not supported by the case law or intrinsic evidence.  Accordingly, the Court should reject their construction.

The *U.S. Philips* case cited by Defendants is instructive.  There, the Federal Circuit affirmed the district court's construction of the term "between $10^{-6}$ and $10^{-4}$ μmol/mm$^3$" as "between $1 \times 10^{-6}$ and $1 \times 10^{-4}$ μmol/mm$^3$."  *U.S. Philips*, 505 F.3d at 1376.  In doing so, it noted that because of rounding issues, "there remains the question of how this construction is to be applied to the accused lamps."  *Id.* at 1377.  And it further "emphasize[d] that the claim construction we affirm today should not be read to state the endpoints of the claimed range with greater precision than the claim language warrants."  *Id.*  That is because "[i]n some scientific contexts, '1' represents a less precise quantity than '1.0,' and '1' may encompass values such as 1.1 that '1.0' may not"; and "[i]n other words, '1.0' may be said to have more significant digits than '1' with no decimal point."  *Id.*  Accordingly, the Federal Circuit rejected the defendant's argument that the endpoints of the disputed term should be construed as "1.0 x 10$^x$" rather merely than "1 x 10$^x$."  *Id.* at 1377-1378.  Thus, the court ultimately held that "[w]e leave

for another day the question of whether this claim construction is sufficient to answer the infringement questions presented by a future record." *Id.* at 1378.[13]

The same logic compels rejection of Defendants' overly-restrictive construction of the term "3.7-3.9" as "3.7000…-3.9000…." As with the construction the Federal Circuit rejected in *U.S. Philips*, Defendants seek to read the endpoints of the claimed range with greater precision than the claim language warrants. Whether the accused products have a pH that falls within the claimed range of "3.7-3.9" is a scientific question that will be addressed by the parties respective experts based on scientific principles at the infringement trial. The Court can then decide the relevant infringement question based on the ordinary meaning of "3.7-3.9" and that future trial record.

---

[13] The district court had held that in the circumstances presented, the issue of rounding was properly considered as part of its claim construction and did not present a fact issue for the jury. *U.S. Philips*, 505 F.3d at 1377. Plaintiff did not argue that issue on appeal, and accordingly, the Federal Circuit considered it "waived as to the [particular products] that the district court considered," and therefore the court "d[id] not reach [plaintiff's] argument that the question of rounding should have been presented to the jury" and did not "determine … where the process of claim construction ends and the literal infringement analysis begins." *Id*. Nevertheless, as noted above, the Federal Circuit rejected the assertion that the term at issue should be construed as "1.0 x 10ˣ" rather merely than "1 x 10ˣ." Like the Federal Circuit, this Court should not construe the term "3.7-3.9" with a greater degree of precision than the language warrants, and should leave for another day on a future record whether the Defendants' accused products fall within that claimed range.

The principal cases cited by Defendants are inapposite, as they did not involve the issue presented here—*i.e.*, whether rounding principles may apply to the endpoints of a stated range:

> ➢ In *Takeda*, the patentee argued that the term "average particle diameter of 400 μm or less" should be construed to "include a deviation of ±10%, because it is 'universally accepted' that there is a 10% standard of error for particle size measurements." *Takeda Pharm. Co., Ltd.*, 743 F.3d at 1362. The district court agreed, but the Federal Circuit reversed, holding that "the district court erred in reading a margin of error into the disputed claim term." *Id.* at 1363.

> ➢ In *Jeneric/Pentron*, the issues were whether 1.61% of $CeO_2$ fell within the claimed range of 0–1%, whether 0.41% $Li_2O$ fell within the recited range of 0.5–3%, and whether 15.97% of $Al_2O_3$ fell within the recited range of 7–15%. *See Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 1999 WL 66537, *3-*4 (D. Conn. Feb. 3, 1999). Thus, in each instance, the accused product had values outside of the claimed ranges, even applying rounding principles. The district court rejected Jeneric's argument that those elements "are not limited to the ranges set forth [in the claim]," and therefore found that Jeneric was unlikely to succeed in proving literal infringement. *Id.* at *9-*10. The Federal Circuit affirmed. *Jeneric/Pentron*, 205 F.3d 1377.

> ➢ In *Cobalt Boats*, the patentee argued that the term "capable of being rotated 180°" should be construed to mean "flipped or turned over," such that something that "cannot rotate a full 180 degrees could meet the limitation." *Cobalt Boats*, 773 F. App'x at 614. The district court rejected that construction, holding that the term should be given its "plain and ordinary meaning." *Id.* The Federal Circuit agreed, holding that "the '180 degrees' limitation requires that the step be capable of rotating at least 180 degrees, not merely 'flipping over' as Cobalt contends." *Id.* at 615.[14]

---

[14] The accused devise had a rigid stop that prevented it from rotating more than 172-179 degrees, such that it was undisputed at trial that the accused device was incapable of rotating 180 degrees. *Id.* at 617.

In each case, the issue was whether the claims should be interpreted to extend beyond the numerical values of those endpoints.  It was not, as here, whether any rounding could be applied to the recited endpoints of the range.[15]

Par does not assert that the endpoints of the disputed pH ranges should be extended beyond what is recited in the claims, but rather, that the ranges should not be construed to have a degree of precision beyond what the claim language warrants.  As Par pointed out in its Opening statement, the Federal Circuit has recognized that rounding of numerical values "is a standard scientific convention when a number has not been carried to the next mathematically significant figure." *Viskase Corp. v. Am. Nat. Can Co.*, 261 F.3d 1316, 1320 (Fed. Cir. 2001). Defendants do not address *Viskase* or present any evidence to suggest that the application of rounding principles is inappropriate in this instance, akin to the evidence presented in *Viskase* itself.  If, for example, the evidence at trial shows

---

[15] Defendants also cite to *Noven Pharm.,* 2019 WL 1102681 at *4, in which the court construed the term "coat weight of greater than 10 mg/cm²" to have its ordinary meaning, with no construction required.  Although the court rejected Actavis' proposed construction of "greater than or equal to 9.5 mg/cm²," it is unclear whether the court's ordinary meaning construction meant greater than 10.0000… mg/cm², or allowed some rounding (albeit not to 9.5).  Nor did the court cite to *Viskase* or provide any detailed explanation as to why the "standard scientific conventions" cited in *Viskase* should not apply.  In any event, to the extent *Noven* suggests that in this case, "3.7-3.9" should be interpreted as "3.70000…-3.90000…," Par respectfully submits that it is wrongly decided for the reasons set forth herein.

that one of the Defendants' accused products has a pH of 3.6995, and that based on standard scientific rounding conventions in the art, a POSA would consider that value to fall within the range of 3.7-3.9, why should that not satisfy the claim limitation?

Nor does the intrinsic evidence support Defendants' restrictive construction. Defendants argue that Par's arguments during the prosecution regarding the criticality of the claimed pH range requires "precise construction of the claimed pH ranges." *Supra* at p. 36-37.  What Defendants fail to mention, however, is that ███

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████



Defendants' citation to references in the specification to pH values in 0.05 increments is of no help to them, as it does not imply any greater specificity than the actual language of the claims (in 0.1 increments) suggests.  Nor does it in any way suggest that the claims exclude rounding principles.



*See also* Ex. 44 (Kannan 5/22/17 Decl.); Ex. 45 (Vandse 8/14/15 Decl.); Ex. 46 (Vandse 1/22/16 Decl.);'785 patent (Ex. 4) at 96:43-97:6).

The fact that the disputed claim limitations do not use the term "about" also does not support Defendants' overly-restrictive construction. Defendants agree that "about" means "approximately," which would potentially expand the scope of a recited pH value even beyond what ordinary rounding would support. In *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327-28 (Fed. Cir. 2007), for example, notwithstanding its finding that the claimed ratio between two substances of "about 1:5" should be construed narrowly because of its criticality to the claimed invention, the Federal Circuit construed it encompassing a range of ratios from 1:3.6 to 1:7.1. That determination was based on expert evidence and data showing that values within that range would be statistically indistinguishable from the claimed ratio, and resulted in a range far greater than would have been supported by ordinary rounding principles. *See also Conopco*, 46 F.3d at 1561-62 (case cited by Defendants in which the Federal Circuit held that a claim requiring a concentration of between "about 25 and 40%" encompassed a concentration as high as 50%). Thus, the failure to use the term "about" does not negate the application of rounding principles.

### 4. Defendants' Sur-Reply Position:

Defendants rely on clear and unambiguous intrinsic evidence to support their proposed construction of the pH terms. Meanwhile, Par cites ███████████ ███████████████ for expanding the claim scope beyond the claimed

numerical bounds and refuses to grapple with Defendants' cited intrinsic evidence. The Court should reject Par's invitation to ignore the intrinsic evidence and blindly apply "ordinary rounding principles."

### a.     Par Ignores Clear Intrinsic Evidence

The specification supports a precise construction of the pH terms because pH values separated by 0.05 are different embodiments in the specification.  JCCB at 33.  Unable to reconcile this intrinsic evidence with their construction, Par simply ignores it.

Applying Par's construction to the specification's embodiments leads to nonsensical results.  For example, the specification lists pH ranges of "about 3.65 to about 3.85" and "about 3.7 to about 3.9" as separate embodiments.  *E.g.*, '785 patent (Ex. 4) at 47:58-59.  But under Par's construction, these two distinct embodiments both literally mean "about 3.7 to about 3.9."  This cannot be correct.  *See* JCCB at 33.

"Broadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended violates the principles articulated" by the Federal Circuit.  *Nystrom v. TREX Co.*, 424 F.3d 1136, 1145–46 (Fed. Cir. 2005).  Yet Par seeks to impermissibly expand the scope of the pH terms beyond the claim's plain meaning as reflected by the intrinsic record.  *See id. at* 1145 ("[I]n the absence of something in the written description and/or

prosecution history to provide explicit or implicit notice to the public . . . that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a[n] . . . extrinsic source.").  There is no intrinsic evidence to support construing the pH range broader than what is claimed.

### b.     Par's Cited Cases Support Defendants' Claim Construction

Par faults Defendants for "not address[ing] *Viskase*."  *See* JCCB at 41.  But Par merely isolates a single line of dicta in *Viskase* while ignoring the Federal Circuit's actual analysis.  In *Viskase*, the Federal Circuit *rejected* ordinary rounding principles for the term "below about 0.91" in view of the intrinsic evidence.[17]  261 F.3d at 1322.  There, the intrinsic evidence compelled the Federal Circuit to conclude that "[a]t a minimum . . . a [POSA], reading the first family specifications and prosecution histories, would not view 'below about 0.91' as extending to an upper limit of 0.914."  *Id*.  Here, as in *Viskase*, the specification (JCCB at 33) and the patentee's statements during prosecution regarding criticality (JCCB at 36-37) show that the patentee "itself set the boundary."  *Id*.  Therefore, a precise construction of

---

[17] A term with "about," as in *Viskase*, would be afforded a broader construction than a term without "about," as is the case here.

46

the pH terms is correct given the unrebutted intrinsic evidence supporting Defendants' construction.

Plaintiffs' reliance on *U.S. Philips* is also inapposite. *See* JCCB at 38-39. First, the Federal Circuit did not reach the issue of rounding with respect to claim construction. *U.S. Philips*, 505 F.3d at 1377. Second, unlike here, there was no intrinsic evidence in *U.S. Philips* to reject the application of rounding. In reaching its conclusion, the Court cited "[t]he way that power-of-ten quantities *are used in the specification*, [which] confirm[ed] that the quantities of halogen described by the claims are not intended to be more precise." *Id*. (emphasis added).

Par also criticizes Defendants' cited case law, which supports general claim construction principles, as not factually identical to this case. *See* JCCB at 40-41. Yet Par relegates to a footnote and summarily dismisses the most factually relevant case. *See Noven Pharm.,* 2019 WL 1102681 at *4.

     c.    █████████████████████ *Should Be Afforded No Weight*

The claims, specification, and file history constitute the public record of intrinsic evidence on which the public is entitled to rely. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979-80 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Conversely, information unavailable to the public should not be considered when construing claims. *See Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003) (rejecting patentee's reliance on its internal confidential files

to support its claim construction and definiteness argument).  A POSA trying to determine the metes and bounds of the claims at issue would not have the benefit of ███████████████████████████████████ which were not before the patent office.  Such confidential information cannot inform the proper construction of the claim language much less support a departure from unambiguous intrinsic evidence.

C.   **"WHEREIN THE IMPURITIES ARE DETERMINED BASED ON: [RECITED HPLC METHOD]"**

| **Par's Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Ordinary meaning, no construction necessary | This phrase requires a step of determining the impurities based on the HPLC method recited in the claim.  As applied to the respective claims and any dependent claims, Defendants reserve the right to contend the claim as a whole is indefinite. |

1.   **Par's Opening Position:**

The '785 and '209 patents each include a dependent claim that includes the disputed limitation, which recites a particular detection method for determining the presence and amount of impurities in the claimed vasopressin compositions.

Defendants' proposed construction is not a construction at all—it does not attempt to construe the meaning of the terms, but instead mischaracterizes the claims and seeks a "construction" purposefully designed to render the affected

48

claims nonsensical, invalid, and seemingly impossible to infringe.  The Court

should reject this gambit and find that the term has its plain and ordinary meaning.

The disputed limitation appears only in '785 claim 2 and '209 claim 11, each

of which depends from an independent claim that recites a vasopressin

pharmaceutical composition that includes specified amounts of particular

impurities (those with "from about 85% to about 100% sequence homology to

SEQ ID NO.: 1").  Those dependent claims recite, in turn, that the impurities are

peptides and "are determined based on" a lengthy description of a particular

method of HPLC testing.[18]  *See, e.g.,* '785 patent (Ex. 4), claims 1 and 2.[19]

Thus, although lengthy and seemingly complex, these claims are

straightforward—the independent claims require that certain impurities be present

in a specified percentage, and the dependent claims specify a particular method by

---

[18] "HPLC" stands for high-performance liquid chromatography, which is "a
technique in analytical chemistry used to separate, identify, and quantify each
component in a mixture.  It relies on pumps to pass a pressurized liquid solvent
containing the sample mixture through a column filled with a solid adsorbent
material.  Each component in the sample interacts slightly differently with the
adsorbent material, causing different flow rates for the different components and
leading to the separation of the components as they flow out of the column."  *See*
Ex. 29 (HPLC Wikipedia Page).

[19] Claim 11 of the '209 patent is substantially similar, except that claim 1 of that
patent is a method of treatment claim comprised of administering the recited "unit
dosage form" to a hypotensive patient at a specified rate.  *See* '209 patent (Ex. 5),
claims 1 and 11.

which the presence and amount of those impurities can be determined. The claims are infringed when one makes or sells the specified pharmaceutical with the impurities present, or uses it to treat a hypotensive patient. The HPLC detection method is not part of the method for treating patients, and one need not perform the HPLC test to infringe either dependent claim. Instead, the HPLC detection method is used to determine whether the specified impurities are present in the recited amounts in a product accused of infringement.[20] Indeed, the specified HPLC test is a destructive test—it separates, identifies, and quantifies the components of the composition—such that the solution that is tested via HPLC no longer exists once the test has been performed on it.

Defendants' contention would require that the recited HPLC detection be part of the method of treating patients recited in claims 1 and 11 of the '209 patent. That is nonsensical—no one would think that HPLC testing is part of the claimed treatment regimen.

Defendants' contention is also seemingly designed to ensure that the claim could never be infringed. If one actually had to perform the specified HPLC test on the pharmaceutical composition that is actually administered to patients, then

---

[20] For example, if one prepares an experimental or commercial batch of a pharmaceutical composition, one can take samples from the batch and test them via the specified HPLC to determine whether the composition as a whole includes the specified impurities.

there could never be infringement because the test is a destructive test, such that the solution tested cannot thereafter be sold, offered for sale or used (*i.e.*, be administered to a patient).  *See* 35 U.S.C. § 271(a) (a patent is infringed when one someone, without authority, "makes, uses, offers to sell, or sells" the claimed invention).

The Court should reject Defendants' nonsensical construction, in favor of its evident ordinary meaning, as a description of the properties of the pharmaceutical composition (for the '785 patent) or unit dosage form that is administered to the patient (for the '209 patent).[21]  The independent claims recite a property of the claimed vasopressin compositions—the identity and amount of certain impurities—and the disputed limitations in the dependent claims simply describe how to determine whether a particular composition has that property.  A generic manufacturer infringes the patents-in-suit so long as it makes, uses, sells, or offers to sell vasopressin products that have the recited properties, including having the specified impurities.

---

[21] *See AIA Eng'g Ltd. v. Magotteaux Int'l, S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011 (declining to adopt defendant's construction for the reason that "[w]e strive, where possible, to avoid nonsensical results in construing claim language"); *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'") (quoting *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)).

By way of analogy, if a claim recites a widget that weighs 10 pounds, the accused infringer infringes the patent when it sells a widget that weighs 10 pounds, regardless whether the infringer actually weighed the widget to determine that it had the property recited in the claim.  Here, the claims at issue simply recite a particular method for determining whether or not a vasopressin product has the specified impurities—*i.e*., for purposes of those claims, the existence or not of that property is to be determined using a particular, specified HPLC method.  For the hypothetical claim to a widget that weighs 10 pounds, that would be akin to a dependent claim saying that the weight of the widget is determined using a particular type of scale, or using a specified make and model scale sold by a particular company.  The act of infringement is selling the 10-pound widget, regardless of whether the infringer weighed it using the specified scale and determined that it weighed 10 pounds.  If the infringer sold a widget, and it can be determined using the specified scale that the widget weighed 10 pounds, the sale infringed the patent, even if the infringer did not weigh the widget or know that it weighed 10 pounds.

The same is true here.  A party infringes the dependent claims at issue if it makes, uses, or sells a vasopressin product that has the specified properties, including a plurality of impurities whose presence can be determined via the

specified HPLC method, regardless whether that party itself ever actually utilizes that HPLC method or knows that those impurities are there.

The specifications of the patents confirm this plain reading of the patent claims.  They explain that the patents teach "several embodiments of pharmaceutical formulations that provide advantages in stability, administration, [and] efficacy." '478 patent (Ex. 1) at 15:26-28.  They further describe peptide impurities that may be present in those formulations (*e.g.*, *id.* at 24:56-32:67), and go on to describe various "non-limiting examples of methods that can be used to identify" those impurities, including the HPLC method specified in the claims at issue here.  *Id.* at 14:50-52, 15:44-19:5.  The patents explain that this HPLC method is used "[t]o analyze degradation products of vasopressin that can be present in an illustrative formulation of vasopressin" (*id.* at 15:47-48), not as part of making those formulations or using them to treat patients.

The Court should construe the phrase "wherein the impurities are determined based on [the specified HPLC method]" to have its plain and ordinary meaning, and reject Defendants' efforts to have it construed in a manner that seemingly renders the claims nonsensical and impossible to infringe.

##### 2.      Defendants' Answering Position:

The '785 [22] and '209 [23] patents contain dependent claims 2 and 11, respectively, which recite "wherein the impurities are determined based on [the specified HPLC method]."  The parties dispute whether these additional dependent elements are actually limiting and must be performed by an accused defendant for there to be infringement—and similarly whether these elements should be given any patentable weight in an obviousness analysis.

Par asks the Court to find that the dependent HPLC claims merely specify the method by which the presence and amount of impurities *can be* determined.  *See* JCCB at 49-50.  Par argues that the HPLC detection, as described in the dependent claims, is not, for example, a part of the method for treating patients, as described in the independent claim.  *Id.*  And that therefore the HPLC detection *need not be performed to* infringe either dependent claim.  *Id.*  Par's proposed construction ignores the intrinsic evidence and the basic principles of claim construction.

---

[22] Claim 1 of the '785 patent is directed to a "pharmaceutical composition …of vasopressin or a pharmaceutically-acceptable salt-thereof." Claim 2 of the '785 patent is directed to "[t]he pharmaceutical composition of claim 1, wherein the impurities comprise a plurality of peptides, wherein the impurities are determined based on: [the specified HPLC method]."

[23] Claim 1 of the '209 patent is directed to a method of treatment comprised of administering a unit dosage form.  Claim 11 of the '209 patent is directed to "[t]he method of claim 1, wherein the impurities comprise a plurality of peptides, wherein the impurities are determined based on: [the specified HPLC method]."

Defendants ask the Court to construe the dependent HPLC claims in a manner that affords meaning to the claim terms, such that they require actually determining the impurities based on the claimed HPLC method.

> a.   *Intrinsic Evidence Supports Defendants' Proposed Construction*

As stated above, the claim construction analysis begins by examining the intrinsic evidence. *Vitronics*, 90 F.3d at 1582. The analysis starts, and must remain centered, on the claim language itself. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.* 381 F.3d 1111, 1116 (Fed. Cir. 2004). The claim language here supports Defendants' proposed construction that the HPLC method must actually be performed by an accused infringer or at its direction.

First, the language chosen in the dependent HPLC claims indicates that the steps (a) to (f) must be performed. The patentees chose to require that the plurality of peptides "are determined" using the HPLC method, as opposed to "are capable of being determined" or "are determinable." Such language does not reflect mere capability. *See Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) (finding error with a construction that "equates the term 'closed' with 'closable,' contrary to the plain language of the claim"); *Spherix Inc. v. Vtech Telecomms. Ltd*, No. 3:13-CV-3494-M, 2015 WL 9311489, at *27-28 (N.D. Tex. Mar. 19, 2015) (holding that a claim required "step of half duplex radio communication, not just the capability of half duplex radio communication" wherein

the claim stated half duplex "is performed"); *Fortinet, Inc. v. SRI Int'l, Inc.*, No. C 12-02540 JSW, 2013 WL 12174686, at *5 (N.D. Cal. Oct. 22, 2013) (finding that "[t]he language patentee chose [i.e., 'adapted to'] does not reflect mere capability" because "the patentee chose to describe the claimed invention using past or present tense language"). The plain and ordinary meaning of "are determined" requires that the steps of the recited HPLC method be actually performed to determine the plurality of peptides contained in the claimed vasopressin formulation.

Second, a process, or a series of acts or steps, consists of doing something and "therefore has to be carried out or performed." *In re Kollar*, 286 F.3d 1326, 1332 (Fed.Cir. 2002). The claim language explicitly recites a process by enumerating steps (a)-(f) that describe the HPLC method, which instruct one to "do something" such as inject, run, elute, pass, identify, and calculate. *See e.g.,* '209 patent (Ex. 5), claim 11; '785 patent (Ex. 4), claim 2. Thus, the claim language demands that the HPLC method actually be performed. The specifications of the '209 and '785 patents also support this construction by repeatedly describing HPLC as something that is actually performed. *See e.g.*, '209 patent (Ex. 5) at 53:14-21 ("Example 1 Impurities of Vasopressin as Detected by HPLC"); *see also* '785 patent (Ex. 4) at 53:14-21 (same).

Defendants' proposed construction also construes the dependent HPLC claims to require that the method of detection is the method recited in the patent

claims (i.e. HPLC). Par does not dispute this. As Par states above, HPLC "is used to determine whether the specific impurities are present in the recited amounts in a product accused of infringement." *See* JCCB at 50. Indeed, the specification supports this reading as well. The specification identifies several methods by which the impurities are determined but only claims HPLC and only provides examples where impurities are detected using HPLC. *See* '209 patent (Ex. 5) at 53:14-21 (identifying *inter-alia* HPLC, MS, GC-MS, MALDI-TOF, ESI-TOF); *see also* '785 patent (Ex. 4) at 53:14-21 (same).

### b.   *Par's Proposed Construction Renders the HPLC Steps Superfluous*

Par contends that the HPLC detection method is not part of the method for treating patients, and one need not perform the HPLC test to infringe either dependent claim. *See* JCCB at 49-50. Par's construction renders the HPLC limitation superfluous and therefore should not be adopted.

First, as a dependent claim, the HPLC claim limitation necessarily includes the limitations of the independent claim. *See* 37 CFR 1.75 (c) ("One or more claims may be presented in dependent form, *referring back to and further limiting another claim* or claims in the same application."). Therefore, in the '209 patent, for example, the HPLC detection method is necessarily a part of the method of treatment as claimed in claim 1. If the HPLC detection method is not required, then the dependent claims fail to narrow the independent claims and would violate section

112(d), which requires that such claims contain additional limitations. *See* 35 U.S.C. 112(d). Patentees wrote dependent claim 2 of the '785 patent and claim 11 of the '209 patent in this manner and the Court should give meaning to these claims as written.

Second, there is a rebuttable presumption that each claim in a patent has a different scope. *Tandon Corp. v. U.S. Int'l. Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). The independent claims (claims 1 of the '785 and '209 patents) recite, *inter alia*, "the unit dosage form further comprises impurities that are present in an amount of 0.9% - 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1." The unit dosage form claimed in the independent claims inherently comprises a "plurality of peptides."

Par's proposed construction essentially rewrites the dependent claims such that they ignore the claimed steps after "plurality of peptides." Claims 2 and 11 of the '785 and '209 patents, respectively, would therefore read "The [pharmaceutical composition or method] of claim 1, wherein the impurities comprise a plurality of peptides." These dependent claims, as rewritten by Par, would cover exactly what the independent claims do; rendering the steps of the dependent claims superfluous. Where a construction renders a claim superfluous, "the doctrine of claim

differentiation states the presumption that the difference between claims is significant." *See Tandon Corp.*, 831 F.2d at 1023.  A proposed construction that renders another claim superfluous to another is "presumptively unreasonable" and should be avoided where possible. *See Beachcombers, Int'l v. Wildewood Creative Prod., Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994).  The more reasonable construction is one that "gives significance to the distinction" between claims 1 and the HPLC dependent claims. *Id.*

> c.    *Par Is Incorrect that Defendants' Proposed Construction Is "Nonsensical"*

Par's assertion that Defendants' proposed construction is "nonsensical" is incorrect.   Par argues that under the Defendants' proposed construction, the dependent claims could not be infringed because if one performed the HPLC test, then the solution would necessarily be destroyed such that it could not be administered.   *See* JCCB at 50-51.   But Par admits that "if one prepares an experimental or commercial batch of a pharmaceutical composition, one can take samples from the larger batch and test them via the specific HPLC to determine whether the composition as a whole include the specified impurities." *See* JCCB at 50, n.20.  The specification also supports this understanding. *See e.g.*, '209 patent (Ex. 5) at 55:13-16 ("*A portion* of the vasopressin control sample was transferred to an HPLC vial and injected." (emphasis added)).   Thus, an accused infringer could run the HPLC method on a sample from a larger batch to determine whether the

composition as a whole includes the specific impurities and then market the remainder of that batch for administration to patients. Defendants' construction thus reflects a reasonable and ordinary understanding of the claim language.

The cases cited by Par in support of its assertion that Defendants' construction would lead to nonsensical results are inapposite. First, in *AIA Eng'g Ltd. v. Magotteaux Int'l S/A,* the "nonsensical" construction was not merely atypical. 657 F.3d 1264, 1276 (Fed. Cir. 2011). The patent-in-suit claimed a "homogeneous solid solution of 20 to 80% of $Al_2O_3$ and 80 to 20% of $ZrO_2$," and the court construed solid solution as having the same meaning as "ceramic composite." The court found that had it rigidly confined "homogenous solid solution" to its ordinary meaning, the result would give rise to a contradiction in terms. Thus, the court avoided adopting a "nonsensical" construction that would have rendered the claim contradictory and ultimately absurd. *Id.* Second, in *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, the court avoided construing a claim in a manner that would have rendered it a "physical impossibility." 616 F.3d 1249, 1255 (Fed. Cir. 2010) (finding the proposed construction that a hinged arm and spring were the same structure was nonsensical as the claims describe the springs as being "connected to" the hinged arm and also "extending between" the hinged arms and a mounting means). These

cases represent instances where the courts avoided legitimate "nonsensical" constructions. That is not the case is here.[24]

### 3.   Par's Reply Position:

Defendants fundamentally mischaracterize Par's position. Par does not assert, as Defendants contend, that the HPLC limitations are meaningless or superfluous. Rather, those limitations describe a required attribute of the accused products—*i.e.*, that they have the specified impurities as measured by the recited HPLC method.

The disputed HPLC limitation appears in two dependent claims, each of which depends from an independent claim that recites a particular property of the claimed vasopressin compositions—*i.e.*, that they have specified impurities in amounts that fall within a particular concentration range. To infringe, the accused products must have that property, meaning that they must have the specified impurities in the specified amounts. The HPLC limitations set forth in the dependent claims specify a particular test methodology to be used to determine whether a product has that property, for purposes of evaluating whether it is encompassed within the scope of the claims.

---

[24] Even if Defendants' construction would render the claim inoperable, as Par suggests, it is not the Court's burden to redraft the claims "to make them operable or to sustain their validity." *Chef Am.*, 358 F.3d at 1373-74.

Par does *not* dispute that to prove infringement of these dependent claims, it will have to establish by a preponderance of the evidence that the Defendants' accused products have the specified impurities as measured by the recited HPLC test. What Par does dispute is Defendants' assertion that the accused infringer must itself perform the HPLC test as part of the act of infringement. Thus, the question at hand is whether the HPLC limitations recite a requirement that is part of the act of infringement itself (Defendants' position) or specify the proof required to demonstrate that a particular product has the specified impurities at a concentration within the range recited in the claims (Par's position). It is the latter.

This is clear from the structure of the claims. Claim 1 of the '785 patent is a composition claim that is infringed when someone makes, uses or sells a vasopressin product that has the recited properties, including the specified impurities. Dependent claim 2 then recites that the presence of those impurities is to be "determined based on" a particular HPLC test. Infringement occurs when someone makes, uses or sells a vasopressin product that has the recited attributes— including that it have the specified impurities as measured by the recited HPLC detection methodology. It does not add a method step to the composition claim; it simply recites the type of proof that is to be used to determine whether a formulation at issue has the required properties. Likewise, '209 claim 1 recites a method of treating patients that have low blood pressure (are "hypotensive"), and

the HPLC test of dependent claim 2 is not part of the method of treating patients; it specifies how one is to determine whether an accused formulation used to treat patients has the required impurity properties.

Case law confirms this reading of the claims.

In *Perdiem Co. LLC v. IndusTrack LLC*, C.A. 2:15-cv-727, 2016 WL 3633627 (E.D. Tex. July 7, 2016), for instance, a system claim included the following limitation: "wherein the one or more levels of administrative privilege *are used to specify* one or more levels of location information access privilege …" In construing the italicized phrase, the court held that "the disputed term refers to configuration [*i.e.* a property of the accused system] rather than an actual action that must be performed, particularly in light of the disputed term appearing in a 'wherein' clause." *Id.* at *20 (internal citation omitted).  Thus, notwithstanding the use of the active phrase "are used to specify," the court rejected the defendant's argument that it recited a required method step that had to be performed as part of the infringement.  *Id.*

The court also rejected a similar argument with respect to the italicized phrase of the following limitation: "conveying the object location information to a third user based on an information access code *specified by said first user* …"  *Id.* at *12, *18 (italics added).  It held that the phrase described an attribute of the recited access code, "but this does not amount to a separate method step."  *Id.*

Accordingly, the court found that the phrase "refers to how an information code has been specified rather than itself being a required method step." *Id.*[25]

Likewise, in *Perdiem Co LLC v. GPS Logic, LLC*, Case No. 2:15-cv-1216, 2016 WL 4013987 (E.D. Tex. July 27, 2016), the court held that the italicized phrase in the limitation "event information *defined by the first user*" (italics added) "is merely an attribute of the event information and does not amount to an actual method step." *Id.* at *15.

As in those cases, the HPLC limitations at issue here recite an attribute/property that the Defendants' ANDA products must have in order to infringe those claims. Defendants cannot avoid infringement by choosing not to test their products using the specified HPLC test. If testing of their products using the HPLC test would reveal that they have the specified impurities, and all other limitations of the claims at issues are also met, then Defendants infringe— regardless of whether they themselves performed that test prior to selling the product, or the test is done after the fact as proof of their infringement.

Indeed, this Court construed a similar claim phrase requiring that a composition have a particular attribute "as measured by HPLC," and neither the

---

[25] The court similarly found other claim phrases using active action words were not required steps of the claimed method, including the phrases "authorizes a first user" and "to access an object location information from a location information source." *Id.* at *14-18.

Court nor the parties suggested that performing HPLC testing was an actual method step that had to be performed as part of the act of infringement itself. *Purdue Pharm LP v. Intellipharmaceutics Int'l Inc.*, C.A. 17-392-RGA, 2018 WL 3323525, *5 (D. Del. July 6, 2018) (construing "wherein the ratio of [an impurity] to oxycodone HCl is 0.04% or less as measured by HPLC").

### 4.    Defendants' Sur-Reply Position:

Under Par's asserted construction, the recited HPLC methods are substantive claim elements for Defendants' invalidity case; yet Par does not want to shoulder the burden of actually proving that a defendant performs these claim steps for purposes of infringement.  Such a construction would be fundamentally unfair and contrary to the plain meaning and structure of these claims, which list a detailed set of steps and parameters in the active voice.

Patent claims delineate the patentee's right to exclude others from making and using the invention.  *See, e.g.*, *Aro Mfg., Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961).  The dependent HPLC claims of the '209 and '785 patents are clearly intended to protect the specific HPLC methodology that the named inventors used to characterize the impurity profile of the vasopressin formulations described in the patent.  *See, e.g.,* '209 patent (Ex. 5) at 54:1-56:67 (Example 1).  The claims list six different method steps in the active voice ("injecting", "running", "eluting", "passing", "identifying", "calculating") as well as a series of different conditions to

be used for purposes of conducting the HPLC analysis of the specified impurities. For instance, the claims specify that (a) the first mobile phase of the HPLC column be a "phosphate buffer at pH 3", (b) a second mobile phase of "50:50 acetonitrile:water solution", (c) the claimed dosage form is run through the HPLC for "55 minutes", and (d) the HPLC is run at a "flow rate of 1 mL/min." *See e.g.*, '209 patent (Ex. 5) at claim 11.   This active and detailed description should be interpreted as affirmative claim limitations intended to *exclude others* from performing the same analytical method—not merely a methodology that Par may elect to use in order to prove infringement of the impurity elements already found in the independent claims of the '209 and '785 patents.   The lengthy list of steps and parameters found in the dependent HPLC claims clearly was not intended—and would not be understood by a POSA—as mere additional detail concerning the impurity attributes of the claimed formulation as Par suggests.

Par cites to two independent claims from *IndusTrack*, a case involving software technology, to support its position that the "are determined" claim language does not require an active step.   JCCB at 63-64.   The claims from the *IndusTrack* case cited by Par do not inform the issues here.[26]   First, neither of these *IndusTrack*

---

[26] The first claim term "are used to specify," described levels of administrative privilege.   The second claim term from the method claim, "specified by first user," described a condition of the information access code.

claims contained claim language enumerating a specific series of steps, as the patents here require.  Second, the terms include "wherein" language, are phrased in the past tense, and contain other context not present in the claims at issue.  The claim term cited from *GPS Logic* is similarly distinguishable from the dependent HPLC limitations here.  2016 WL 4013987 at *15; *see also* JCCB at 64.

Likewise, *Purdue* has no bearing on this case because it does not address the issue the parties are disputing here, namely whether the accused infringer must perform the claimed analytical steps or the patentee may satisfy the claim elements by performing them itself.  2018 WL 3323525 at *6; *see also* JCCB at 64-65.  Moreover, unlike in *Purdue* where the claim stated, "as measured by HPLC," the dependent claims here enumerate detailed steps (a)-(f) of the HPLC method, which instruct one to inject, run, elute, pass, identify, and calculate using specified conditions.  For the reasons set forth above, this supports construing these terms as affirmative limitations that must be performed.

Under a fair and plain reading of the dependent HPLC claims, an infringer must therefore actually determine the impurities based on the claimed HPLC method.

67

Respectfully submitted,

DATED:  February 25, 2020

OF COUNSEL:

Martin J. Black
Sharon K. Gagliardi
Brian M. Goldberg
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
martin.black@dechert.com
sharon.gagliardi@dechert.com
brian.goldberg@dechert.com

/s/ *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St.
12th Floor
Wilmington, DE 19801
Tel: 302-777-0300
Fax: 320-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

/s/ *Kelly E. Farnan*
Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
920 N. King St.
Wilmington, DE 19801
Tel: 302-651-7705
Farnan@rlf.com

*Attorneys for Plaintiffs Par
Pharmaceutical, Inc., Par Sterile
Products, LLC, and Endo Par
Innovation Company, LLC*

Robert D. Rhoad
DECHERT LLP
502 Carnegie Center, Suite 104
Princeton, NJ 08540-7814
Tel: (609) 955-3200
robert.rhoad@dechert.com

Jonathan D.J. Loeb, Ph.D
DECHERT LLP
2400 W. El Camino Real, Suite 700
Mountain View, CA 94040-1499
Tel: (650) 813-4995
jonathan.loeb@dechert.com

Blake B. Greene
DECHERT LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
Tel: (512) 394-3000
blake.greene@dechert.com

OF COUNSEL:

Huiya Wu
Linnea Cipriano
Tiffany Mahmood
Jacqueline Genovese Bova
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
hwu@goodwinlaw.com
lcipriano@goodwinlaw.com
tmahmood@goodwinlaw.com
jbova@goodwinlaw.com
Tel: (212) 813-8800

YOUNG CONAWAY STARGATT &
 TAYLOR, LLP

 */s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
302-571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendants Amneal*
*Pharmaceuticals Company GmbH et al.*

OF COUNSEL:

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Daryl L. Wiesen                         */s/ Anne Shea Gaza*
John T. Bennett
Shaobo Zhu                              Anne Shea Gaza (No. 4093)
GOODWIN PROCTER LLP                     Robert M. Vrana (No. 5666)
100 Northern Avenue                     Rodney Square
Boston, Massachusetts 02110             1000 North King Street
dwiesen@goodwinlaw.com                  Wilmington, DE 19801
jbennett@goodwinlaw.com                 (302) 571-6600
szhu@goodwinlaw.com                     agaza@ycst.com
(617) 570-1000                          rvrana@ycst.com


                                        *Attorneys for Defendant*
                                        *Fresenius Kabi USA, LLC*


                                              STAMOULIS & WEINBLATT LLC

*Of Counsel:*
   Dennies Varughese, Pharm.D.          By: */s/ Stamatios Stamoulis*
   Uma N. Everett                           Stamatios Stamoulis (#4606)
   Charles T. Wysocki                        800 N. West Street
   Sterne Kessler Goldstein & Fox,           Third Floor
   P.L.L.C.                                   Wilmington, DE 19801
   1100 New York Ave., N.W.                   (302) 999-1540
   Washington, DC 20005                       stamoulis@swdelaw.com
   Tel: (202) 371-2600
   dvarughese@sternekessler.com         *Attorneys for Defendant/Counter Plaintiff*
   ueverett@sternekessler.com           *American Regent, Inc.*
   cwysocki@sternekessler.com

Of Counsel
William R. Zimmerman (Pro Hac
Vice)
Jonathan E. Bachand (Pro Hac Vice)
Catherine R. Gourash (Pro Hac Vice)
KNOBBE, MARTENS, OLSON &
BEAR, LLP
1717 Pennsylvania Ave. N.W., Ste.
900
Washington D.C. 20006
202-640-6412 - Direct
Tel: (202) 640-6400
Fax: (202) 640-6401
Bill.Zimerman@knobbe.com
Jonathan.Bachand@knobbe.com
Cassie.Gourash@knobbe.com


William O. Adams (Pro Hac Vice)
Karen M. Cassidy (Pro Hac Vice)
KNOBBE, MARTENS, OLSON &
BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Tel: (949) 760-0404
Fax: (949) 760-9502
William.Adams@knobbe.com
Karen.Cassidy@knobbe.com

Phillips Goldman McLaughlin & Hall,
P.A.


By : */s/ Megan C. Haney*
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE  19806-4204
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210
jcp@pgmhlaw.com
mch@pgmhlaw.com

Attorneys for Defendant/Counterclaimant
Amphastar Pharmaceuticals, Inc.

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to paragraph 10 of the Court's Scheduling Order (D.I. 47) the

undersigned hereby certify that this brief complies with the type and number

limitations of the Scheduling Order.


Dated: February 25, 2020                    Respectfully submitted,

FARNAN LLP                                   YOUNG CONAWAY STARGATT
                                              & TAYLOR, LLP


/s/ Brian E. Farnan                          /s/ Anne Shea Gaza
Brian E. Farnan (Bar No. 4089)               Anne Shea Gaza (Bar No. 4093)
Michael J. Farnan (Bar No. 5165)             Robert M. Vrana (Bar No. 5666)
919 N. Market St., 12th Floor                Rodney Square
Wilmington, DE 19801                         1000 North King Street
Telephone: (302) 777-0300                    Wilmington, DE 19801
Fax: (302) 777-0301                          (302) 571-6600
bfarnan@farnanlaw.com                        agaza@ycst.com
mfarnan@farnanlaw.com                        rvrana@ycst.com

RICHARDS, LAYTON & FINGER,                   *Counsel for Defendants Amneal*
P.A.                                         *Pharmaceutical Company GmbH,*
                                             *Amneal Pharmaceuticals of New York,*
/s/ Kelly E. Farnan                          *LLC, Amneal Biosciences LLC,  and*
Kelly E. Farnan (#4395)                      *Amneal Pharmaceuticals Pvt. Ltd.*
Valerie A. Caras (#6608)
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
caras@rlf.com

*Attorneys for Plaintiffs Par*
*Pharmaceutical, Inc., Par Sterile*
*Products, LLC, and Endo Par*

*Innovation Company, LLC*

PHILLIPS GOLDMAN
MCLAUGHLIN &HALL, P.A.

/s/ Megan C. Haney
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 North Broom Street
Wilmington, DE 19806-4204
Tel: (302) 655-4200
jcp@pgmhlaw.com
mch@pgmhlaw.com

*Attorneys for Defendant Amphastar*
*Pharmaceuticals, Inc.*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

/s/ Anne Shea Gaza
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com

*Attorneys for Defendant*
*Fresenius Kabi USA, LLC*

STAMOULIS & WEINBLATT LLC

/s/ Stamatios Stamoulis
Stamatios Stamoulis (#4606)
800 N. West Street
Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Defendant/Counter*
*Plaintiff American Regent, Inc.*