# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PAR PHARMACEUTICAL, INC. PAR STERILE PRODUCTS, LLC, and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMPHASTAR PHARMACEUTICALS, INC., et al.<br><br>Defendants.<br>—————————————————<br>AMPHASTAR PHARMACEUTICALS, INC.,<br>        Counterclaimant,<br><br>v.<br><br>PAR PHARMACEUTICAL, INC. PAR STERILE PRODUCTS, LLC, and ENDO PAR INNOVATION COMPANY, LLC,<br><br>        Counterdefendants. | C.A. No. 18-2032-CFC<br>(Consolidated)<br><br>████████████<br><br>Hon. Judge Colm F. Connolly |

**DEFENDANT AMPHASTAR PHARMACEUTICALS, INC.'S
FIRST AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS**

Defendant Amphastar Pharmaceuticals, Inc. ("Amphastar"), through its undersigned counsel, hereby amends its answers to the Complaint of Plaintiffs Par Pharmaceutical, Inc. Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively, "Plaintiffs") as follows:

To the extent not specifically admitted herein, the allegations of the Complaint are denied.

## PARTIES[1]

1.      Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 1 of the Complaint and, therefore, denies each and every allegation in Paragraph 1.

2.      Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 2 of the Complaint and, therefore, denies each and every allegation in Paragraph 2.

3.      Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 3 of the Complaint and, therefore, denies each and every allegation in Paragraph 3.

4.      Amphastar admits that Amphastar Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Delaware, having its corporate offices and principal place of business at 11570 6th Street, Rancho Cucamonga, California.  Amphastar admits that Amphastar Pharmaceuticals, Inc. develops and manufactures pharmaceutical products for the U.S. market.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 4 of the Complaint.

## NATURE OF ACTION

5.      Paragraph 5 of the Complaint contains legal conclusions and allegations to which no answer is required.  To the extent that an answer is required, Amphastar admits that the Complaint filed by Plaintiffs purports to state a civil action for patent infringement of U.S. Patent Nos. 9,375,478 ("the '478 patent"), U.S. Patent Nos. 9,687,526 ("the '526 patent"), U.S. Patent

---

[1] For the Court's convenience, Amphastar has incorporated the section titles that appear in the Complaint.  Amphastar does not necessarily agree with the characterizations of such section titles and does not waive any right to object to those characterizations.

Nos. 9,744,209 ("the '209 patent"), U.S. Patent Nos. 9,744,239 ("the '239 patent"), U.S. Patent Nos. 9,750,785 ("the '785 patent"), and U.S. Patent Nos. 9,937,223 ("the '223 patent") (collectively, "the patents-in-suit") under the Patent Laws of the United States, Title 35. Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.     Amphastar admits that Plaintiffs purport to bring this action under 28 U.S.C. §§ 1331 and 1338(a). The remaining allegations contained in Paragraph 6 of the Complaint contain legal conclusions and allegations to which no answer is required. To the extent that an answer is required, Amphastar admits that this Court has subject matter jurisdiction over matters brought pursuant to 28 U.S.C. §§ 1331 and 1338(a). Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 6 of the Complaint.

7.     Paragraph 7 of the Complaint contains legal conclusions to which no answer is required. To the extent that an answer is required, for purposes of this case only, Amphastar does not contest venue in this judicial district. Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 7 of the Complaint.

8.     Paragraph 8 of the Complaint contains legal conclusions to which no answer is required. To the extent that an answer is required, for purposes of this case only, Amphastar does not contest personal jurisdiction in this Court. Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 8 of the Complaint.

## THE DRUG APPROVAL PROCESS

9.      Paragraph 9 contains legal conclusions to which no answer is required.  To the extent that an answer is required, 21 U.S.C. §§ 355(a), (b)(1) and (c)(2) speak for themselves. Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 9 of the Complaint.

10.      Paragraph 10 contains legal conclusions to which no answer is required.  To the extent that an answer is required, 21 U.S.C. §§ 355(j) speaks for itself.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 10 of the Complaint.

11.      Paragraph 11 contains legal conclusions to which no answer is required.  To the extent that an answer is required, 21 U.S.C. §§ 355(j)(2)(A)(vii) and 21 C.F.R. § 314.94(a)(12) speak for themselves.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 11 of the Complaint.

12.      Paragraph 12 contains legal conclusions to which no answer is required.  To the extent that an answer is required, 21 U.S.C. §§ 355(j)(2)(B) and 21 C.F.R. § 314.95 speak for themselves.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 12 of the Complaint.

13.      Paragraph 13 contains legal conclusions to which no answer is required.  To the extent that an answer is required, 21 U.S.C. §§ 355(j)(2)(B)(iii) and 21 C.F.R. § 314.107(b)(3) speak for themselves.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 13 of the Complaint.

## FACTUAL BACKGROUND

### The Patents-in-Suit

14.     Paragraph 14 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '478 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension." Amphastar admits that the '478 patent, on its face, lists an issue date of June 28, 2016.  Amphastar admits that what purports to be a copy of the '478 patent is attached to the Complaint as Exhibit A. Amphastar denies that the '478 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 14 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 14.

15.     Paragraph 15 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '526 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension." Amphastar admits that the '526 patent, on its face, lists an issue date of June 27, 2017.  Amphastar admits that what purports to be a copy of the '526 patent is attached to the Complaint as Exhibit B.  Amphastar denies that the '526 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 15 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 15.

16.     Paragraph 16 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '209 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension."  Amphastar admits that the '209 patent, on its face, lists an issue date of August 29, 2017.  Amphastar admits that what purports to be a copy of the '209 patent is attached to the Complaint as Exhibit C.  Amphastar

denies that the '209 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 16 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 16.

17.     Paragraph 17 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '239 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension."  Amphastar admits that the '239 patent, on its face, lists an issue date of August 29, 2017.  Amphastar admits that what purports to be a copy of the '239 patent is attached to the Complaint as Exhibit D.  Amphastar denies that the '239 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 17 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 17.

18.     Paragraph 18 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '785 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension."  Amphastar admits that the '785 patent, on its face, lists an issue date of September 5, 2017.  Amphastar admits that what purports to be a copy of the '785 patent is attached to the Complaint as Exhibit E.  Amphastar denies that the '785 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 18 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 18.

19.     Paragraph 19 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that, the '223 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension."  Amphastar admits that the '223 patent, on its face, lists an issue date of April 10, 2018.  Amphastar admits that what

purports to be a copy of the '223 patent is attached to the Complaint as Exhibit F.  Amphastar denies that the '223 patent was "duly and legally issued."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 19 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 19.

20.     Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 20 of the Complaint and, therefore, denies each and every allegation in Paragraph 20.

### VASOSTRICT®

21.     Amphastar admits that the electronic version of the FDA's publication Approved Products and Therapeutic Equivalence Evaluations ("the Orange Book") identifies vasopressin as the active ingredient in a drug product with the proprietary name "Vasostrict."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 21 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 21.

22.     Amphastar admits that the Orange Book identifies vasopressin as the active ingredient in New Drug Application ("NDA") No. 204485.  Amphastar further admits that the Orange Book identifies the dosage form of NDA No. 204485 as a solution and the route of administration as "IV (infusion)."  Amphastar admits that the Orange Book indicates that NDA No. 204485 was approved by the FDA on April 17, 2014.  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 22 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 22.

23.      Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations in Paragraph 23 of the Complaint and, therefore, denies each and every allegation in Paragraph 23.

24.      Amphastar denies that the FDA approved NDA No. 204485/S-003 on March 18, 2016.  The FDA website indicates that the FDA approved NDA No. 204485/S-003 on March 21, 2016.   Amphastar admits that the FDA website indicates that NDA No. 204485/S-004 was approved on December 17, 2016.  Amphastar admits that the Orange Book indicates that the NDA No. 204485 is available in dosage strengths of 20 units/mL and 200 units/10mL. Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 24 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 24.

25.      Amphastar admits that the Orange Book identifies Par Sterile Products LLC as the "Applicant Holder" in connection with NDA No. 204485.   Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 25.

26.      Paragraph 26 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies that '223 patent is listed in the Orange Book in connection with the 20 unit/mL Vasostrict product (NDA No. 204485).  Amphastar admits that the '478, '526, '209, '239, and '785 patents are listed in the Orange Book in connection with the 20 unit/mL Vasostrict product (NDA No. 204485).  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 26 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 26.

27.     Amphastar admits that the Orange Book indicates that Vasostrict (NDA No. 204485) was approved on April 17, 2014.  Amphastar admits that the Prescribing Information for Vasostrict states that "Vasostrict® is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypertensive despite fluids and catecholamines."  Amphastar lacks sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations in Paragraph 27 of the Complaint and, therefore, denies each and every remaining allegation in Paragraph 27.

### Amphastar's Vasopressin Injection Product

28.     Paragraph 28 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that it submitted ANDA No. 211857 ("Amphastar ANDA") to the FDA under 21 U.S.C. § 355(j) to obtain approval to engage in the commercial manufacture, use, and sale of Vasopressin Injection USP, 20 units/1 mL vials ("ANDA Product") and that the Amphastar ANDA references Vasostrict®.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 28 of the Complaint.

29.     Amphastar admits that it sent a letter dated November 14, 2018 ("the Notice Letter") to Par Pharmaceutical, Inc., Par Sterile Products, LLC, and EPIC.  Amphastar admits that the Notice Letter provided written notice, pursuant to 21 U.S.C. § 355(j)(2)(B), that Amphastar submitted the Amphastar ANDA to the FDA seeking approval to manufacture, use or sell Amphastar's ANDA Product.   Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 29 of the Complaint.

30.     Amphastar admits that the Notice Letter provided written notification that the Amphastar ANDA was submitted with Paragraph IV Certifications that in the opinion of

Amphastar, no valid, enforceable claim of any of the '478, '526, '209, '239, or '785 patents will be infringed by the manufacture, importation, use, sale, or offer for sale of Amphastar's ANDA Product.  Amphastar denies that the Notice Letter advised that the Amphastar ANDA included a Paragraph IV Certification regarding the '223 patent.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 30 of the Complaint.

## COUNT I
## INFRINGEMENT OF THE '239 PATENT

31.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-30 of the Complaint as if fully set forth herein.

32.     Amphastar denies each and every allegation in Paragraph 32 of the Complaint.

33.     Amphastar denies each and every allegation in Paragraph 33 of the Complaint.

34.     Amphastar denies each and every allegation in Paragraph 34 of the Complaint.

35.     Amphastar denies each and every allegation in Paragraph 35 of the Complaint.

36.     Amphastar denies each and every allegation in Paragraph 36 of the Complaint.

37.     Paragraph 37 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies each and every allegation in Paragraph 37 of the Complaint.

38.     Amphastar denies each and every allegation in Paragraph 38 of the Complaint.

## COUNT II
## INFRINGEMENT OF THE '223 PATENT

39.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-38 of the Complaint as if fully set forth herein.

40.     Amphastar denies each and every allegation in Paragraph 40 of the Complaint.

41.     Amphastar denies each and every allegation in Paragraph 41 of the Complaint.

42.     Amphastar denies each and every allegation in Paragraph 42 of the Complaint.

43.     Amphastar denies each and every allegation in Paragraph 43 of the Complaint.

44.     Amphastar denies each and every allegation in Paragraph 44 of the Complaint.

45.     Paragraph 45 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies each and every allegation in Paragraph 45 of the Complaint.

46.     Amphastar denies each and every allegation in Paragraph 46 of the Complaint.

**COUNT III**
**INFRINGEMENT OF THE '478 PATENT**

47.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-46 of the Complaint as if fully set forth herein.

48.     Amphastar denies each and every allegation in Paragraph 48 of the Complaint.

49.     Amphastar denies each and every allegation in Paragraph 49 of the Complaint.

50.     Amphastar denies each and every allegation in Paragraph 50 of the Complaint.

51.     Amphastar denies each and every allegation in Paragraph 51 of the Complaint.

52.     Amphastar denies each and every allegation in Paragraph 52 of the Complaint.

53.     Paragraph 53 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies each and every allegation in Paragraph 53 of the Complaint.

54.     Amphastar denies each and every allegation in Paragraph 54 of the Complaint.

**COUNT IV**
**INFRINGEMENT OF THE '526 PATENT**

55.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-54 of the Complaint as if fully set forth herein.

56.     Amphastar denies each and every allegation in Paragraph 56 of the Complaint.

57.     Amphastar denies each and every allegation in Paragraph 57 of the Complaint.

58.     Amphastar denies each and every allegation in Paragraph 58 of the Complaint.

59.     Amphastar denies each and every allegation in Paragraph 59 of the Complaint.

60.     Amphastar denies each and every allegation in Paragraph 60 of the Complaint.

61.     Paragraph 61 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar admits that it was aware of the existence of the '526 patent on the date that it submitted the Amphastar ANDA to the FDA.  Except as expressly admitted, Amphastar denies each and every remaining allegation in Paragraph 61 of the Complaint.

62.     Amphastar denies each and every allegation in Paragraph 62 of the Complaint.

### COUNT V
### INFRINGEMENT OF THE '785 PATENT

63.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-62 of the Complaint as if fully set forth herein.

64.     Amphastar denies each and every allegation in Paragraph 64 of the Complaint.

65.     Amphastar denies each and every allegation in Paragraph 65 of the Complaint.

66.     Amphastar denies each and every allegation in Paragraph 66 of the Complaint.

67.     Amphastar denies each and every allegation in Paragraph 67 of the Complaint.

68.     Amphastar denies each and every allegation in Paragraph 68 of the Complaint.

69.     Paragraph 69 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies each and every allegation in Paragraph 69 of the Complaint.

70.     Amphastar denies each and every allegation in Paragraph 70 of the Complaint.

## COUNT VI
## INFRINGEMENT OF THE '209 PATENT

71.     Amphastar restates and incorporates by reference its responses to Paragraphs 1-70 of the Complaint as if fully set forth herein.

72.     Amphastar denies each and every allegation in Paragraph 72 of the Complaint.

73.     Amphastar denies each and every allegation in Paragraph 73 of the Complaint.

74.     Amphastar denies each and every allegation in Paragraph 74 of the Complaint.

75.     Amphastar denies each and every allegation in Paragraph 75 of the Complaint.

76.     Amphastar denies each and every allegation in Paragraph 76 of the Complaint.

77.     Paragraph 77 contains legal conclusions to which no answer is required.  To the extent that an answer is required, Amphastar denies each and every allegation in Paragraph 77 of the Complaint.

78.     Amphastar denies each and every allegation in Paragraph 78 of the Complaint.

## RESPONSE TO PRAYER FOR RELIEF

Amphastar denies all allegations not specifically admitted herein, and further denies that Plaintiffs are entitled to the judgment and relief requested in Paragraphs A-K of the Complaint or to any other relief.

## DEFENSES

Without prejudice to the denials set forth in its responses to Paragraphs 1 through 78 of the Complaint, and without undertaking any of the burdens imposed by law on the Plaintiffs, Amphastar avers and asserts the following separate defenses to the Complaint.  Amphastar expressly reserves the right to allege additional defenses as they become known through the course of discovery.

## FIRST AFFIRMATIVE DEFENSE
(Non-Infringement)

The manufacture, use, sale, offer for sale, and/or importation of the Amphastar ANDA Product does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid, enforceable claim of the '478 patent, the '526 patent, the '209 patent, the '239 patent, the '785 patent, or the '223 patent. For example, without limitation, the manufacture, use, sale, offer for sale, and/or importation of the Amphastar ANDA Product would not infringe any valid claim of the Patents-in-Suit for at least the reasons set forth in the Notice Letter.  The Amphastar ANDA would not infringe any valid claim of the '223 patent for at least the additional reason that the Amphastar ANDA Product is a single dose vial,  and the package insert instructs the user to discard the vial 48 hours after the first puncture.

## SECOND AFFIRMATIVE DEFENSE
(Invalidity)

One or more claims of the '478 patent, the '526 patent, the '209 patent, the '239 patent, the '785 patent, or the '223 patent are invalid for failure to comply with one or more of the conditions set forth in Title 35 of the United States Code, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112 and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or the defenses recognized in 35 U.S.C. § 282.  For example, without limitation, the Patents-in-Suit are invalid for at least the reasons set forth in Amphastar's Notice Letter.

## THIRD AFFIRMATIVE DEFENSE
(Failure to State a Claim for Direct Infringement)

Plaintiffs have failed to state a claim for which relief can be granted with respect to purported direct infringement.  The Complaint fails to allege that Amphastar would directly

infringe any claim of the '478 patent, the '526 patent, the '209 patent, the '239 patent, the '785 patent, or the '223 patent if Amphastar's ANDA Product is approved and marketed.

## FOURTH AFFIRMATIVE DEFENSE
(Failure to State a Claim for Indirect Infringement)

Plaintiffs have failed to state a claim for which relief can be granted with respect to purported indirect infringement.  The Complaint contains only conclusory allegations that "Amphastar would actively and intentionally induce such infringement" for each of the Patents-in-Suit and that Amphastar's activities "would lead to direct infringement, contributory infringement, and/or active inducement of infringement" of each of the Patents-in-Suit under 35 U.S.C. §§ 271(a)-(c).  As such, the Complaint fails to state a claim for either induced infringement or contributory infringement.

## FIFTH AFFIRMATIVE DEFENSE
(Failure to State a Claim for Willful Infringement)

Plaintiffs have failed to state a claim for which relief can be granted with respect to purported willful infringement.  The Complaint contains only the conclusory allegation that "Amphastar's infringement of the [Patents-in-Suit] is willful."  The only allegedly infringing act performed by Amphastar is the filing of the Amphastar ANDA, which is insufficient as a matter of law to support a claim for willful infringement under 35 U.S.C. § 284.   *See Glaxo Group v. Apotex*, 376 F.3d 1339, 1351 (Fed. Cir. 2004); *Celgene Corp. v. Teva Pharms. USA*, 412 F. Supp. 2d 439, 445 (D.N.J. 2006).

## SIXTH AFFIRMATIVE DEFENSE
(Failure to State a Claim for Exceptional Case)

To the extent the Complaint purports to seek an "exceptional case" determination, the Complaint fails to state a claim for exceptional case under 35 U.S.C. § 285 and/or 35 U.S.C.

§ 271(e)(4).   Moreover, Amphastar's actions in defending this case do not constitute an exceptional case under 35 U.S.C. § 285.

<u>SEVENTH AFFIRMATIVE DEFENSE</u>
(Inequitable Conduct and/or Unclean Hands)

Plaintiffs' claims based on the Patents-in-Suit are barred because the Patents-in-Suit are unenforceable for inequitable conduct and/or unclean hands as a result of the conduct of one or more of Plaintiffs, the named inventors of the Patents-in-Suit, their attorneys, representatives, predecessors in interest, and/or other persons with a duty of candor to the PTO.  The factual basis for the allegations in this paragraph is described below in Amphastar's counterclaims, which are incorporated herein by reference.

<u>EIGHTH AFFIRMATIVE DEFENSE</u>
(Additional Defenses)

Amphastar reserves the right to present any additional defenses or counterclaims that discovery may reveal.

<u>COUNTERCLAIMS</u>

Defendant/Counterclaimant Amphastar Pharmaceuticals, Inc. ("Amphastar") brings the following Counterclaims against Plaintiffs/Counterdefendants Par Pharmaceutical, Inc. Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively, "Counterdefendants").

<u>NATURE OF THE ACTION</u>

1.     These Counterclaims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.* (including 35 U.S.C. §271(e)(5)) and/or 21 U.S.C. § 355(j)(5)(C).

2.      Amphastar seeks declaratory judgement that U.S. Patent Nos. 9,375,478 ("the '478 patent"), U.S. Patent Nos. 9,687,526 ("the '526 patent"), U.S. Patent Nos. 9,744,209 ("the '209 patent"), U.S. Patent Nos. 9,744,239 ("the '239 patent"), U.S. Patent Nos. 9,750,785 ("the '785 patent"), and U.S. Patent Nos. 9,937,223 ("the '223 patent") (collectively, "the Patents-in-Suit"), are invalid and/or not infringed by the manufacture, use, sale, offer for sale, or importation of Amphastar's ANDA Product.

## PARTIES

3.      Amphastar is a corporation organized and existing under the laws of Delaware, having its corporate offices and principal place of business at 11570 6th Street, Rancho Cucamonga, California.

4.      On information and belief, and based on Counterdefendants' allegations, Par Pharmaceutical, Inc. ("Par Pharmaceutical") is a corporation organized and existing under the laws of the State of New York, having a principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.

5.      On information and belief, and based on Counterdefendants' allegations, Par Sterile Products, LLC ("Par Sterile Products") is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.

6.      On information and belief, and based on Counterdefendants' allegations, Endo Par Innovation Company ("EPIC") is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35 U.S.C. § 271(e)(2).

8.      Venue is proper under 28 U.S.C. §§ 1391 and 1400(b), and by Counterdefendants' choice of forum.

9.      This is an action based upon an actual controversy between the parties concerning the invalidity and/or non-infringement of the '478, '526, '209, '239, '785, and '223 patents and Amphastar's right to continue to seek approval of ANDA No. 211857 ("the Amphastar ANDA") for Vasopressin Injection USP, 20 units/1 mL vials ("ANDA Product").

10.     Amphastar has been and presently is engaged in the submission of documents to the FDA, and those documents seek approval to engage in the commercial manufacture, importation, use, offer for sale, or sale of Amphastar's ANDA Product.  Counterdefendants have alleged that the submission of the Amphastar ANDA infringes, will infringe, will induce infringement, or will contribute to infringement of one or more claims of the '478, '526, '209, '239, '785, and '223 patents.

11.     Counterdefendants have filed in this Court an infringement action to enforce the '478, '526, '209, '239, '785, and '223 patents against Amphastar.

12.     Amphastar has denied that it has, continues to, or will infringe, induce infringement of, and/or contribute to the infringement of, any valid and enforceable claim of the '478, '526, '209, '239, '785, and '223 patents.

13.     Amphastar has further asserted that the '478, '526, '209, '239, '785, and '223 patents are invalid for failure to satisfy one or more of the provisions of Title 35 of the United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine

of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents, and the defenses recognized in 35 U.S.C. § 282.

14.     Amphastar's ANDA No. 211857 includes a certification under FDCA Section 505(J)(2)A)(vii)(IV), with respect to the '478, '526, '209, '239, and '785 patents, that no valid, enforceable claim of the patents will be infringed by the manufacture, importation, use, sale, or offer for sale of the drug product for which ANDA No. 211857 has been submitted.   On November 14, 2018, pursuant to Section 505(j)(2)(B) of the FDCA, Amphastar provided written notification to Counterdefendants ("Notice Letter") that Amphastar filed ANDA No. 211857 with the FDA containing certifications pursuant to FDCA Section 505(j)(2)(A)(vii)(IV) that the '478, '526, '209, '239, and '785 patents are invalid and/or would not be infringed by Amphastar's ANDA Product.

15.     Amphastar's Notice Letter included an Offer of Confidential Access to Application ("OCA"), which allowed Counterdefendants access to Amphastar's confidential materials, including the ANDA (collectively, "Confidential Materials"), "for the sole purpose of evaluating whether to bring a civil action under 35 U.S.C. § 271(e)(2)(A)" and specifically barred Counterdefendants from using "any Confidential Material for any other purpose." Following Counterdefendants' acceptance of these terms, Amphastar provided Confidential Material to Counterdefendants.

16.     On December 20, 2018, Counterdefendants filed suit against Amphastar alleging infringement of the '478, '526, '209, '239, '785, and '223 patents.

17.     In view of the foregoing, a conflict of asserted rights has arisen between Amphastar and Counterdefendants with respect to the non-infringement and invalidity of the relevant claims of the '478, '526, '209, '239, '785, and '223 patents, and as to Amphastar's right

to obtain FDA approval to engage in the commercial manufacture, importation, use, offer for sale, or sale of its Amphastar's ANDA Product.  An actual controversy therefore exists between Counterdefendants and Amphastar.

## BACKGROUND

18.     The '478 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of June 28, 2016.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '478 patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '478 patent.

19.     The '526 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of June 27, 2017.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '526 patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '526 patent.

20.     The '209 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of August 29, 2017.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '209 patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '209 patent.

21.     The '239 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of August 29, 2017.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '239

patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '239 patent.

22.     The '785 patent, on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of September 5, 2017.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '785 patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '785 patent.

23.     The '223 patent on its face, is entitled "Vasopressin Formulations for Use in Treatment of Hypotension" and lists an issue date of April 10, 2018.  Upon information and belief, and according to Counterdefendants' allegations, Par Pharmaceutical owns the '223 patent. On information and belief, and according to Counterdefendants' allegations, EPIC holds an exclusive license to the '223 patent.

24.     On information and belief, and according to Counterdefendants' allegations, Par Sterile Products, LLC holds New Drug Application ("NDA") No. 204485 Vasostrict®.

25.     The Notice Letter, dated November 14, 2018, in accordance with 21 U.S.C. § 355(j)(2)(B), provided written notice to Counterdefendants that Amphastar had submitted ANDA No. 211857 to the FDA seeking approval to manufacture, use or sell Amphastar's ANDA Product.  The Notice Letter also informed  Counterdefendants that ANDA No. 211857 included a Paragraph IV certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '478, '526, '209, '239, and '785 patents are invalid, unenforceable, and/or will not be infringed by the Amphastar ANDA Product.

26.     In accordance with 21 U.S.C. § 355(j)(2)(B)(iv)(ii), the Notice Letter included a detailed statement of the factual and legal bases for the certification that the '478, '526, '209,

'239, and '785 patents are invalid, unenforceable, and/or will not be infringed by the Amphastar ANDA Product.

27.     On information and belief, and according to Counterdefendants' allegations, Counterdefendants received the Notice Letter.

28.     Amphastar's Notice Letter included an OCA, permitting Counterdefendants access to Amphastar's Confidential Materials, "for the sole purpose of evaluating whether to bring a civil action under 35 U.S.C. § 271(e)(2)(A)" and specifically barred Counterdefendants from using "any Confidential Material for any other purpose."  Following Counterdefendants' acceptance of these terms, Amphastar provided Confidential Material to Counterdefendants.

29.     On December 20, 2018, Counterdefendants initiated this action against Amphastar alleging infringement of the Patents-in-Suit.

30.     On information and belief, Counterdefendants misused Amphastar's Confidential Material to allege infringement of the '223 patent which is not Orange Book listed with respect to the 20 unit/mL Vasostrict product (NDA No. 204485) and for which Amphastar's ANDA does not include a Paragraph IV Certification.

**A.     Vasopressin Products Available Prior to the Patents-in-Suit**

31.     Vasopressin injections have been on the market for over 100 years. Pitressin®, first manufactured and marketed by Parke-Davis, was on sale at least as early as the 1920s.  *See, e.g.*, Ex. 1, EAGLEVAS0014308.

32.     Pitressin® was marketed without FDA approval because it predated the institution of the FDA's current drug approval process.  ███████████████████ Specifically, under the pre-1938 grandfather clause pursuant to Title 21, Section 32l(p)(l), a drug product that was on the market prior to passage of the 1938 Federal Food, Drug, & Cosmetic Act with the same formulation and the same conditions of use in its labeling as it did prior to passage

of that Act was not considered a new drug and therefore was exempt from the requirement of having an approved new drug application.

33. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ ████████████████████████████

████████████████████████████

34. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

35. On or about February 20, 2014, JHP was acquired by Par Pharmaceutical Holdings, Inc. Par Pharmaceutical Holdings, Inc., General Form for Registration of Securities Under the Securities Act of 1933 (Form S-1) F-21 (March 12, 2015), Ex. 4, https://www.sec.gov/ Archives/edgar/data/l 559149/0001193125 1 5089746/d880840dsl.htm. JHP was renamed to Par Sterile Products, LLC, and is a wholly owned subsidiary of Par Pharmaceutical. *Id.*; *see also* Ex. 5, EAGLEVAS0034180.

36. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

37. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

38. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████

39. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



40. ████████████████████████████████████████████

41. ████████████████████████████████████████████

42. ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████

43.   ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████   A pH of 2.5 to 4.5 is the range for vasopressin formulations specified by the United States Pharmacopeia Monograph.   *See, e.g.*, Ex. 16, 3 U.S. Pharmacopeia, National Formulary 3849-50 (2009).

44.   ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███

45.   ███████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

46.   ███████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████

47.     Upon information and belief, Par, through its acquisition of Par Sterile Products, formerly known as JHP Pharmaceuticals, acquired Pitressin® and NDA No. 204485 for Vasostrict®, as well as employees, know-how and other intellectual property, goodwill, and a sterile manufacturing facility for these and other products.  Ex. 4, Par Pharmaceutical Holdings, Inc., General Form for Registration of Securities Under the Securities Act of 1933 (Form S-1) 128, F-21 (March 12, 2015).

48.     On or about April 17, 2014, NDA No. 204485 was approved under the name Vasostrict®.     Ex.     21,     FDA,     Drugs@FDA:     NDA     No.     204485, http://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo =204485; ████████████████████████

49.     Par Sterile Products is the holder of approved NDA No. 204485.  Ex. 21, FDA, Drugs@FDA:                     NDA                     No.                     204485, http://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&varApplNo =204485; ████████████████████████

50.     The package insert for Vasostrict® approved by the FDA in April 2014 ("April 2014 Vasostrict® Label") describes the formulation as "contain[ing] vasopressin 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and Water for Injection, USP adjusted with acetic acid to pH 3.4 - 3.6."  Ex. 23, PAR-VAS 0008354; ████████████████████████     The April 2014 Vasostrict® Label was also published in April 2014.  ████████████████ ████████████  Ex. 23, PAR-VASO-0008384 ("The Label was published in April of 2014 ....").

51.     ████████████████████████████████████
████████████████████████████████████

███████████████████████████ the April 2014 Vasostrict® Label as approved specified that the pH of the product was "adjusted with acetic acid to pH 3.4-3.6," ███████████████

████████████████████████████████████████████████

██████████ ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

52.      The asserted claims of the Patents-in-Suit generally recite broad concentrations of vasopressin that ███████████████████████████████████████████

██████████ and there is no specified requirement for the amount of chlorobutanol, to the extent it is required by the claims:

| | Asserted Patents | Pitressin® | | Vasostrict® | |
|---|---|---|---|---|---|
| Vasopressin (mg/mL) | 0.01-0.07[2] | ████████████ | █ | ██████████████ | █ |
| Chlorobutanol (mg) | No specified amount | ████████████ | █ | ██████████████ | █ |

████████████████████████████████████████

████████████████████

53.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[2] The independent claims for each of the Patents-in-Suit require 0.01 to 0.07 mg/mL of vasopressin. Claim 17 of the '526 patent, which depends from claim 1, recites a dilution of this vasopressin composition to give a final concentration of 0.21 to 2.1 μg/mL of vasopressin, or 0.00021 to 0.0021 mg/mL: of vasopressin.

54. ██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████ ████████████████

████████████████████████████████████

55. ██████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████

56. ██████████████████████████████████████████████

███████████████████████████████████ the first publication date of the April

2014 Vasostrict® Label █████████████████████████████████████████

██████████████████████ predate the earliest possible effective filing date of the Patents-in-

Suit, January 30, 2015. █████████████████████████████████████ Ex. 23, PAR-

VASO_0008384 ("The Label was published in April of 2014 ...."). Therefore, pursuant to Title

35, Section 102(b )(l)(A), unless Par could show that ███████████████████████████

██ all of the subject matter set forth in the April 2014 Vasostrict® Label, ████████████████

the label must qualify as prior art to the Patents-in-Suit.

57.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ none of the named inventors of the Patents-in-Suit could

have invented Vasostrict® or the subject matter of the April 2014 Vasostrict® Label. However,

as set forth herein, during the prosecution of the '239 patent, one of the named inventors

Vinayagam Kannan-as well as prosecuting attorney Craig Kenesky and Par employee Michelle

Bonomi-Huvala-represented to the Patent Office that Kannan and Matthew Kenney invented

"the subject matter" set forth in the April 2014 Vasostrict® Label that the examiner had relied

upon to reject the then-pending claims. Ex. 23, PAR-VASO_0008389, ¶ 7.

58.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

59.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**B.     Inequitable Conduct During Prosecution of the Patents-in-Suit**

**1.     Vinayagam Kannan, Craig Kenesky, and Michelle Bonomi-Huvala Intentionally Submitted Unmistakably False Declarations During the Prosecution of the '239 Patent.**

60.     The '239 patent claims priority to U.S. Application No. 14/610,499 (the " '499

Application"), filed January 30, 2015.  The application that issued as the '239 patent was filed at

the PTO on May 20, 2015, as U.S. Application No. 14/717,877 (the " '877 Application").  The

'877 Application is a continuation of the '499 Application and shares a specification with the

'499 Application.

61.    Claim 1 of the '239 patent recites a method of increasing blood pressure in a

human in need thereof by administering vasopressin:

1. A method of increasing blood pressure in a human in need thereof, the method comprising:

a) providing a pharmaceutical compos1t10n for intravenous administration consisting of, in a unit dosage form: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) optionally chlorobutanol; iii) acetic acid, acetate, or a combination thereof; iv) 0-2% vasopressin degradation products; and v) water;

b) diluting the unit dosage form in a diluent to provide a concentration from about 0.1 units/mL to about 1 unit/mL of vasopressin or the pharmaceutically acceptable salt thereof; and

c) administering the diluted unit dosage form to the human by intravenous administration; wherein:

the unit dosage form has a pH of 3 .5 to 4.1;

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

Ex. 30, PAR-VASO-0000230.

62.    The named inventors on the face of the '239 patent are Matthew Kenney and

Vinayagam Kannan.

63.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

64.     Christina Bradley was the examiner of record during prosecution of the '239 patent at the PTO. Ex. 30, PAR-VASO-0000199.

### a.     The Examiner Rejected the Pending Claims over the April 2014 Vasostrict® Label.

65.     On October 21, 2015, Examiner Bradley issued a Final Office Action rejecting all pending claims of the '877 Application as both anticipated and obvious over the April 2014 Vasostrict® Label.  Ex. 23, PAR-VASO-0008326; *see also* Ex. 23, PAR-VASO_0008354.

66.     At the time of the rejection, pending independent claim 16 recited:

16. A method of increasing blood pressure in a human in need thereof, the method comprising:

a) providing a pharmaceutical compos1t10n for intravenous administration comprising, in a unit dosage form: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) chlorobutanol; iii) acetic acid; and iv) water, wherein the unit dosage form has a pH of 3.4 to 3.6;

b) storing the unit dosage form at 2-8 °C; and

c) administering the unit dosage form to the human; wherein:

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

Ex. 23, PAR-VASO_0007064.

67.     In the October 21, 2015 Office Action, Examiner Bradley cited to and relied on various portions of the April 2014 Vasostrict® Label, including the description of the Vasostrict® formulation, its indication, and its method of administration, as follows:

The [April 2014 Vasostrict® Label] teaches a method to increase blood pressure in adults with vasodilatory shock ( e.g. post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines (section 1) comprising:

a) providing a pharmaceutical composition containing vasopressin for intravenous administration in a unit dosage form that contains vasopressin at 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and water for Injection, and a pH adjusted with acetic acid to pH 3.4 - 3.6 (section 11);

diluting the vasopressin unit dosage form with normal saline (0.9% sodium chloride) or 5% dextrose in water (D5W) to either 0.1 units/mL or 1 unit/mL for intravenous administration (section 2.1);

b) refrigerating the diluted solution for up to 24 hours (section 2.1); and

c) administering the vasopressin by intravenous route at a dose of 0.03 to 0.1 units/minute for post-cardiotomy shock ... or 0.01 to 0.07 units/minute for septic shock (section 2.2).

Ex. 23, PAR-VASO_0008326.

68.     Examiner Bradley further stated that "the [April 2014 Vasostrict® Label] teaches all of the limitations of claim 16 except for the amount of vasopressin expressed in mg/ml.  In contrast, the [April 2014 Vasostrict® Label] reports the amount as 20 units/ml and is silent on how to convert from units/ml to mg/ml."  *Id*.  The Examiner further stated that:

In the instant case, the Examiner is shifting the burden to Applicant to provide for a conversion between the units/ml taught by the [April 2014 Vasostrict® Label] and the mg/ml recited in the instant claims. If the 20 units/ml disclosed in the [April 2014 Vasostrict® Label] falls within the claimed range, the claim is anticipated by the reference. If the 20 units/ml taught by the [April 2014 Vasostrict® Label] overlaps with or touches the claimed range, the claim is obvious over the reference.

Ex. 23, PAR-VASO_0008326-27.

69.     Because 20 units/ml of vasopressin falls within the "0.01 mg/mL to about 0.07 mg/mL" range in the then-pending claims of the '877 Application, Examiner Bradley's rejection was that the [April 2014 Vasostrict® Label] anticipated pending claim 16 of the '877 Application.  Ex. 23, PAR-VASO_0008326-27.

70.     Examiner Bradley also stated in the October 21, 2015 Office Action that the April 2014 Vasostrict® Label disclosed the limitations of pending dependent claims 17-28 and 30 of the '877 Application as well.  Ex. 23, PAR-VASO_0008327-28.

**b.      The Applicants Sought to Overcome the Examiner's Rejection by Representing That the Named Inventors Invented the Subject Matter of the April 2014 Vasostrict® Label.**

71.     The applicants sought to overcome Examiner Bradley's October 21, 2015 rejection by invoking the exception of Section 102(b )(1 )(A).

72.     At all relevant times, Section 102(b )(l)(A) provided that:

(1) DISCLOSURES MADE 1 YEAR OR LESS BEFORE THE EFFECTIVE FILING DATE OF THE CLAIMED INVENTION.-A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(l) if-

(A) the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

73.     In support of this effort to overcome Examiner Bradley's rejection, on November 24, 2015, Par's prosecution counsel, Craig Kenesky, participated in an Applicant-Initiated Interview. Ex. 23, PAR-VASO_0008404.

74.     Prior to the interview, Mr. Kenesky sent to Examiner Bradley two unexecuted declarations, purportedly prepared pursuant to 37 C.F.R. § l.130(a), from named inventor Vinayagam Kannan and from Michelle Bonomi-Huvala, Senior Vice President of Regulatory Affairs at Par Pharmaceutical. Mr. Kenesky represented that the unexecuted declarations were designed to "explain how the FDA obtained the subject matter of the [April 2014 Vasostrict® Label] from the inventors." Ex. 23, PAR-VASO_0008407-412; *see also, e.g.*, Ex. 23, PAR-VASO_0008406.

75.     The unexecuted draft Kannan declaration stated that Mr. Kannan was employed by Par Sterile Products, LLC "[a]t the time of the invention." Ex. 23, PAR-VASO_0008408, ¶ 2. Mr. Kannan's draft declaration also stated:

I am inventor of the '877 Application and I am familiar with the contents and the pending claims.

* * *

I have reviewed the Final Office Action of October 21st, 2015 (the "Office Action"). As I understand, the Office Action alleges that the FDA label for Vasostrict® (the "Label") qualifies as prior art against the pending claims under 35 U.S.C.§ 102(a)(l).

Ex. 23, PAR-VASO_0008408-09, ¶¶ 3-4.

76.    Mr. Kannan's draft declaration further stated that, as part of his employment, he and Matthew Kenney "jointly invented the subject matter of the currently-pending claims" of the '239 patent, and that he "forwarded the details of the joint invention to the regulatory team" at Par Sterile Products. Ex. 23, PAR-VASO-0008409, ¶ 6. Mr. Kannan then represented that Par's regulatory department "submitted the details of the joint invention to the FDA in the filings directed toward regulatory approval of the Vasostrict® product manufactured by" Par. Ex. 23, PAR-VASO_0008409 at ¶ 6.

77.    Mr. Kannan's draft declaration set forth various information from the April 2014 Vasostrict® Label that had been relied upon by Examiner Bradley in her October 21, 2015 Office Action as follows:

> The Label discloses part of the subject matter of the claims, including a method of increasing blood pressure in a hypotensive human. The Label recites that, "[v]asostrict is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive ...." Label, page 1 (parentheticals omitted). The Label further recites a pharmaceutical composition for intravenous administration having 20 units of vasopressin per mL ...." Label, page 3. The Label further recites that the vasopressin formulation comprises "chlorobutanol [and] Water for Injection, USP adjusted with acetic acid to pH 3.4-3.6." Label, page 6. The Label recites the infusion rate of the claim by stating that "[f]or post-cardiotomy shock start with a dose of 0.03 units/minute. For septic shock, start with a dose of 0.01units/minute." Label, page 3.

Ex. 23, PAR-VASO_0008409, ¶ 7. Mr. Kannan represented that "[t]he FDA obtained this information from me and the other joint inventors." *Id.*

78.     Mr. Kannan's draft declaration went on to represent that "[t]he FDA obtained the subject matter disclosed in the Label directly from the regulatory team at PAR STERILE, who obtained the subject matter directly from the inventors.  Thus, the FDA obtained the subject matter disclosed in the Label from the inventors."  Ex. 23, PAR-VASO_0008409, ¶ 7.

79.     The unexecuted draft declaration of Michelle Bonomi-Huvala stated:

In my position at PAR PHARM, I direct and oversee regulatory filings to FDA on behalf of PAR CO. and its subsidiaries, including PAR STERILE.  The regulatory team at PAR STERILE reports to me, and I direct and oversee regulatory filings to the FDA made by that team.

I have reviewed the Final Office Action of October 21st, 2015 (the "Office Action").  As I understand, the Office Action alleges that the FDA label for Vasostrict® (the "Label") qualifies as prior art against the pending claims under 35 U.S.C. § 102(a)(l).

Ex. 23, PAR-VASO-0008411-12, ¶¶ 3-4.

80.     Ms. Bonomi-Huvala's draft declaration further represented that "the subject matter of the currently pending claims" was "jointly invented by Matthew Kenney and Vinayagam Kannan, while the inventors were employed at PAR STERILE."  Ex. 23, PAR-VASO_0008412, ¶ 5.

81.     The draft Bonomi-Huvala declaration also represented that the inventors of the '239 patent—Mr. Kannan and Matthew Kenney—"forwarded the details of the joint invention to the regulatory team at PAR STERILE," (Ex. 23, PAR-VASO_0008412, ¶ 6), who then submitted the information to the FDA for inclusion in the April 2014 Vasostrict® Label:

The FDA obtained the subject matter disclosed in the Label directly from a member of the regulatory team, who obtained the subject matter from the inventors.  Thus, the FDA obtained the subject matter recited in the Label from the inventors.

Ex. 23, PAR-VASO_0008412, ¶ 7.

82.     According to an Interview Summary in the prosecution history for the '239 patent,  during the November 24, 2015 Interview, Mr. Kenesky and Examiner Bradley discussed the exception under Section 102(b)(l)(A).  *See, e.g.*, Ex. 23, PAR-VASO_0008383 ("November 24, 2015 Interview Summary"); Ex. 23, PAR-VASO_0008406.   Examiner Bradley recommended including "an unequivocal statement" in the Kannan declaration that the inventors invented all of the subject matter relied upon in the rejection:

> The Examiner stated that the declaration by Inventor Vinayagam Kannan clearly provides a reasonable explanation of how the subject matter in the reference was transferred by the Inventors to the FDA, thus explaining the presence of the FDA as an author of the reference.  The Examiner recommended amending paragraph 7 to include a reference to all of the subject matter from the FDA reference relied upon in the rejection and an unequivocal statement that one or more joint inventors invented all of the subject matter relied upon, if possible.

Ex. 23, PAR-VASO-0008406.

83.     According to the November 24, 2015 Interview Summary, Mr. Kenesky, as the applicants' representative and prosecution counsel, "asserted that the Inventor is responsible for all of the subject matter in the FDA reference and would be able to make this statement."  *Id.*

84.     Upon information and belief, ████████████████████████████████████████
████████████████████████████████████████████████████████████████

85.     Thereafter, on November 24, 2015, Mr. Kenesky submitted a Response to the October 21, 2015 Office Action along with executed declarations pursuant to 37 C.F.R. § l.130(a) from Mr. Kannan and Ms. Bonomi-Huvala.  These declarations attested that the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley to reject the claims originated with, and was invented by, the named inventors, Mr. Kannan and Matthew Kenney.  Ex. 23, PAR-VASO_0008379-387; *see also, e.g.*, Ex. 23, PAR-VASO_0008388-390 (executed declaration of Vinayagam Kannan, dated November 24, 2015); Ex. 23, PAR-

VASO_0008391-392 (executed declaration of Michelle Bonomi-Huvala, dated November 24, 2015).

86.     Upon information and belief, the executed Kannan declaration submitted with the November 24, 2015 Response was amended following the November 24, 2015 Interview based on Examiner Bradley's recommendations "to include a reference to all of the subject matter from the FDA reference relied upon in the rejection and an unequivocal statement that one or more joint inventors invented all of the subject matter relied upon." *See supra*, ¶ 82.

87.     Specifically, the executed Kannan declaration as submitted stated as follows:

> The Label discloses part of the subject matter of the claims, including a method of increasing blood pressure in a hypotensive human. The Label recites that, "[v]asostrict is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive ...." *Label*, page 1 (parentheticals omitted). The Label further recites a pharmaceutical composition for intravenous administration having 20 units of vasopressin per mL ...." *Label*, page 3. The Label further recites that the vasopressin formulation comprises "Chlorobutanol [and] Water for Injection, USP adjusted with acetic acid to pH 3.4-3.6." *Label*, page 6. The Label recites the infusion rate of the claim by stating that "[f]or post-cardiotomy shock start with a dose of 0.03 units/minute. For septic shock, start with a dose of 0.01 units/minute." *Label*, page 3. The Label recites refrigeration of the diluted vasopressin for up to 24 hours. *Label*, page 1.

Ex. 23, PAR-VASO-0008389, ¶ 7. The declaration further represented that "[t]he FDA obtained this information from me and Matthew Kenney, as we invented this subject matter." *Id.*

88.     Upon information and belief, the executed Bonomi-Huvala declaration submitted with the November 24, 2015 Response was also amended to clarify that the details of the joint invention were forwarded to Ms. Bonomi-Huvala's department.  Compare Ex. 23, PAR-VASO_0008392, ¶ 6, with Ex. 23, PAR-VASO_0008412, ¶ 6.

89.     Both the Kannan declaration and the Bonomi-Huvala declaration included the following statement:

> I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that any willful false statements and the like so made are punishable by fine or imprisonment of not more than five (5) years, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent(s) issuing therefrom.

Ex. 23, PAR-VASO_0008390, ¶ 9; Ex. 23, PAR-VASO_0008392, ¶ 8.

90.     In the accompanying Response, prosecution counsel Kenesky represented that the Kannan and Bonomi-Huvala declarations "describe[] that the disclosure of the [April 2014 Vasostrict® Label] was obtained from the inventors of the present application."  Ex. 23, PAR-VASO_0008383.  Mr. Kenesky further asserted that the April 2014 Vasostrict® Label:

> is not prior art under 35 U.S.C. § 102(a)(l) against the present invention based on the exception of 35 U.S.C. § 102(b )(l)(A).  The disclosure was made by another (the FDA) less than one year before the effective filing date of the claimed invention.  The FDA obtained the subject matter of the Label from the regulatory team at PAR STERILE, who received the subject matter from the inventors of the present application.  Thus, the Label satisfies the provisions of 35 U.S.C.§ 102(b )(l)(A).  Applicant respectfully requests withdrawal of the rejection because the claims have not been rejected over any eligible prior art.

Ex. 23, PAR-VASO_0008386.

91.     The November 24, 2015 Response relied solely on the Kannan and Bonomi-Huvala declarations to support the necessary elements of the Section 102(b)(1)(A) exception, disqualifying the April 2014 Vasostrict® Label as prior art to the pending claims, and thereby overcoming Examiner Bradley's final rejection of the pending claims.  Ex. 23, PAR-VASO_0008383-86.

### c.   The Examiner Withdrew the Rejection Based on the Representations that the Named Inventors Invented the Subject Matter of the April 2014 Vasostrict® Label.

92.     On January 11, 2016, in light of the representations made in the November 24, 2015 Response and accompanying Kannan and Bonomi-Huvala declarations, Examiner Bradley withdrew the final rejection of the pending claims over the April 2014 Vasostrict® Label:

> The declarations under 37 CFR l.130(a) filed November 24, 2015 are sufficient to overcome the rejection of claims 16-29 based upon FDA label for VASOSTRICT™ (NPL U PTO-892, published 4/2014). The declaration by Inventor Vanayagam [sic] Kannan includes an unequivocal statement that he and Matthew Kenney invented the subject matter disclosed in the FDA Label and relied upon in the rejection (¶ 6-7), and a reasonable explanation for the presence of the FDA as an author of the prior art disclosure (¶ 6, 8). The declaration by Michelle Bonomi-Huvala supports the explanation that the subject matter in the prior art was invented by Vanayagam [sic] Kannan and Matthew Kenney and provided to the FDA as part of the regulatory filings (¶ 6-7). Accordingly, the rejection of claims 16-29 under 35 U.S.C. 102(a)(l) as anticipated by or, in the alternative, under 25 U.S.C. 103 [sic] as obvious over the FDA label for VASOSTRICT™ is withdrawn.

Ex. 23, PAR-VASO_0008419-20.

93.     Upon information and belief, the representation that the named inventors had invented the subject matter of the April 2014 Vasostrict® Label made in the November 24, 2015 Response and accompanying Kannan and Bonomi-Huvala declarations was the sole reason for Examiner Bradley's withdrawal of these rejections.

### d.   The Declarations Submitted, and Representations Made, to Overcome the Examiner's Rejections over the April 2014 Vasostrict® Label Were False.

94.     Upon information and belief, named inventors Vinayagam Kannan and Matthew Kenney, declarant Michelle Bonomi-Huvala, and prosecuting attorney Craig Kenesky knew that the executed Kannan and Bonomi-Huvala declarations, and Mr. Kenesky's representations based on them in the November 24, 2015 Response and the Applicant-Initiated Interview, were false.





100.

101.

102.    No limitation on refrigerated storage of diluted vasopressin for up to 24 hours is found in the issued claims of the '239 patent.  Ex. 30, PAR-VASO_0000198 at 230-231.[3]

103.   

104.

[3] Indeed, no limitation on refrigerated storage of diluted vasopressin for up to 24 hours is fund in the issued claims of any of the Patents-in-Suit.

105. 

106.

107.



*see also, e.g.*, Ex. 36, PAR-VASO_0000001 at 027.

108.



109. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ As set

forth above, refrigerated storage of diluted vasopressin for up to 24 hours is not a limitation in

the issued claims of the '239 patent. *See supra*, ¶ 102.

110.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

111.   Specifically, contrary to Mr. Kannan's declaration, neither Mr. Kannan nor Mr.

Kenney invented or contributed to at least the following subject matter of the April 2014

Vasostrict® Label relied upon in Examiner Bradley's October 21, 2015 rejection and

subsequently recited in the Kannan Declaration:

- "Vasostrict is indicated to increase blood pressure in adults with vasodilatory
  shock who remain hypotensive ...." Ex. 23, PAR-VASO 0008349 (April 2014
  Vasostrict® Label at l);

- "a pharmaceutical composition for intravenous administration having 20 units of vasopressin per mL ...."  Ex. 23, PAR-VASO_0008351 (April 2014 Vasostrict® Label at 3);

- "that the vasopressin formulation comprises 'Chlorobutanol [and] Water for Injection, USP adjusted with acetic acid to pH 3.4 - 3.6.'"  Ex. 23, PAR-VASO_0008354 (April 2014 Vasostrict® Label at 6); and

- "the infusion rate of the claim ... that '[f]or post-cardiotomy shock start with a dose of 0.03 units/minute.   For septic shock, start with a dose of 0.01 units/minute.'"  Ex. 23, PAR-VASO_0008351 (April 2014 Vasostrict® Label at 3).

Ex. 23, PAR-VASO_0008409, ¶ 7.

112.    Upon information and belief, Mr. Kannan knew that he and Mr. Kenney did not invent the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in her October 21, 2015 Office Action and set forth in the Kannan Declaration.

113.    Upon information and belief, prosecuting attorney Craig Kenesky also knew that Mr. Kannan and Mr. Kenney did not invent the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in her October 21, 2015 Office Action and set forth in the Kannan Declaration.

114.    Upon information and belief, Michelle Bonomi-Huvala also knew that Mr. Kannan and Mr. Kenney did not invent the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in her October 21, 2015 Office Action and set forth in the Kannan Declaration.

115.    Moreover, upon information and belief, the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in the October 21, 2015 Office Action and set forth in the Kannan Declaration was not forwarded to JHP's regulatory department by either Mr. Kannan or Mr. Kenney.

116.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

117.    The Bonomi-Huvala declaration did not identify any documents, communications, or other basis to corroborate or demonstrate that the subject matter of the April 2014 Vasostrict® Label was invented and forwarded to JHP's regulatory department by Mr. Kannan and/or Mr. Kenney.

118.    ████████████████████████████████████████
████████████████████████████████████████   Therefore, Mr. Kannan could not have forwarded the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in her October 21, 2015 Office Action to JHP's regulatory department for inclusion in the April 2014 Vasostrict® Label.

119.    ████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████
████████████████████

-48-

[REDACTED]

120.    Therefore, Mr. Kenney could not have forwarded the subject matter of the April 2014 Vasostrict® Label relied upon by Examiner Bradley in the October 21, 2015 Office Action to JHP's regulatory department for inclusion in the April 2014 Vasostrict® Label.  [REDACTED]

[REDACTED]

121.    Therefore, Ms. Bonomi-Huvala's declaration that the named inventors "forwarded the details of the joint invention to the regulatory team at PAR STERILE" was false.  *See* Ex. 23, PAR-VASO_0008412, ¶ 6.

122.    Upon information and belief, Ms. Bonomi-Huvala knew that Mr. Kannan and Mr. Kenney did not forward the subject matter of the April 2014 Vasostrict® Label to JHP's regulatory department.

123.    Upon information and belief, Craig Kenesky also knew that Mr. Kannan and Mr. Kenney did not forward the subject matter of the April 2014 Vasostrict® Label to JHP's regulatory department.

124.    [REDACTED]

[REDACTED]

125.   Upon information and belief, prosecuting attorney Mr. Kenesky was aware and understood that to disqualify the April 2014 Vasostrict® Label as prior art, it was necessary to show that Mr. Kannan and/or Mr. Kenney had actually invented all the subject matter described in the April 2014 Vasostrict® Label relied upon by Examiner Bradley in the October 21, 2015 Office Action.

126.   Upon information and belief, despite his knowledge that neither Mr. Kannan nor Mr. Kenney invented all of the subject matter described in the April 2014 Vasostrict® Label and relied upon by Examiner Bradley in the October 21, 2015 Office Action, Mr. Kenesky nevertheless knowingly submitted the unmistakably false Kannan and Bonomi-Huvala declarations to the PTO to overcome Examiner Bradley's anticipation and obviousness rejections over the April 2014 Vasostrict® Label.

> e.   **The False Declarations Submitted, and Representations Made to Overcome the Examiner's Rejections over the April 2014 Vasostrict® Label Were Material to the Prosecution of the '239 Patent.**

127.   Upon information and belief, Craig Kenesky, Vinayagam Kannan, and Michelle Bonomi-Huvala have never advised the PTO about the false representations in the Kannan and Bonomi-Huvala declarations submitted during prosecution of the '239 patent.

128.   Upon information and belief, Craig Kenesky has never advised the PTO about the false representations made in the November 24, 2015 Response submitted during prosecution of the '239 patent.

129.   Upon information and belief, Craig Kenesky, Vinayagam Kannan, and Michelle Bonomi-Huvala have never cured their misconduct.

130.   Craig Kenesky, Vinayagam Kannan, and Michelle Bonomi-Huvala engaged in affirmatively egregious misconduct by filing unmistakably false declarations, which is necessarily material to the prosecution of the '239 patent.  *See Therasense, Inc. v. Becton,*

*Dickinson and Co.*, 649 F.3d 1276, 1292-93 (Fed. Cir. 2011) ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.").

131.    Moreover, in rejecting the then-pending claims of the '877 Application, Examiner Bradley found that the April 2014 Vasostrict® Label disclosed each and every limitation of at least claims 16, 17-28, and 30, and therefore anticipated them.  Ex. 23, PAR-VASO_0008327-28.

132.    Upon information and belief, Examiner Bradley withdrew the rejection of the then pending claims over the April 2014 Vasostrict® Label pursuant to Section 102(b)(l)(A) based solely on the false Kannan and Bonomi-Huvala declarations.

133.    The April 2014 Vasostrict® Label also discloses, either explicitly or inherently, additional limitations that were added to the claims that ultimately issued with the '239 patent after Examiner Bradley had disqualified the Label as prior art.

134.    For example, the April 2014 Vasostrict® Label disclosed "diluting the unit dosage form in a diluent to provide a concentration from about 0.1 units/mL to about 1 unit/mL of vasopressin":

Dilute Vasostrict in normal saline (0.9% sodium chloride) or 5% dextrose in water (D5W) prior to use.  Discard unused diluted solution after 18 hours at room temperature or 24 hours under refrigeration.

**Table 1 Preparation of diluted solutions**

| Fluid restriction? | Final concentration | Mix | |
|---|---|---|---|
| | | Vasostrict | Diluent |
| No | 0.1 units/mL | 2.5 mL (50 units) | 500 mL |
| Yes | 1 unit/mL | 5 mL (100 units) | 100 mL |

\*        \*        \*

For post-cardiotomy shock, start with a dose of 0.03 units/minute.  For septic shock, start with a dose of 0.01 units/minute. . . . The maximum dose for post-cardiotomy shock is 0.1 units/minute and for septic shock 0.07 units/minute.

Ex. 23, PAR-VASO_0008351.

135.    The April 2014 Vasostrict® Label also disclosed "administering the diluted unit dosage form to the human by intravenous administration":

Dilute Vasostrict with normal saline (0.9% sodium chloride) or 5% dextrose in water (D5W) to either 0.1 units/mL or 1 unit/mL for intravenous administration.

Ex. 23, PAR-VASO_0008349.

136.    The April 2014 Vasostrict® Label further disclosed "the unit dosage form has a pH of 3. 5 to 4.1":

The 1 mL solution contains vasopressin 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and Water for Injection, USP adjusted with acetic acid to pH 3.4 - 3.6.

Ex. 23, PAR-VASO_0008354.  Indeed, the pH range taught by the April 2014 Vasostrict® Label anticipates the broader pH range claimed by the '239 patent.  *See, e.g.*, *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985) ("It is also an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art").

137.    Examiner Bradley's finding that the April 2014 Vasostrict® Label disclosed the presence of certain impurities inherently applies equally to the "0-2% vasopressin degradation products" limitation in issued claim 1 of the '239 patent because the amount of degradation products "in the formulation is an inherent feature of the prior art formulation which contains the same chemical components as required by the [issued] claims."  *See, e.g.*, Ex. 23, PAR-VASO_0008327.

138.    Thus, the April 2014 Vasostrict® Label disclosed each and every limitation of claim 1 of the '239 patent as issued, either explicitly or inherently.

139.    As set forth above, the Examiner also rejected pending claims 17-28 over the April 2014 Vasostrict® Label during prosecution.  *See supra*, ¶ 70.  Claims 2-13 of the '239 patent are not substantively distinct from claims 17-28, which were rejected by the Examiner during prosecution.  *Compare* Ex. 23, PAR-VASO_0008381-382, *with* Ex. 30, PAR-VASO_0000229-30 ('239 patent).

140.    Therefore, the April 2014 Vasostrict® Label disclosed each and every limitation of claims 2-13 of the '239 patent as issued, either explicitly or inherently.

141.    The April 2014 Vasostrict® Label also disclosed limitations of the dependent claims that were added after the Label was disqualified as prior art.

142.    For example, the April 2014 Vasostrict® Label disclosed "discarding a vial containing the unit dosage form at least 48 hours after a first puncture of the vial": "[d]iscard vial after 48 hours after first puncture."  Ex. 23, PAR-VASO-0008356; *see also* Ex. 30, PAR-VASO_0000230 ('239 patent claim 14).

143.    As set forth above, the April 2014 Vasostrict® Label also disclosed diluting the unit dosage form, "wherein the diluent is 0.9% saline" and/or "wherein the diluent is 5%

-53-

dextrose in water." *See supra*, ¶135; *see also* Ex. 30, PAR-VASO_0000230 ('239 patent claims 16 and 17).

144.    The April 2014 Vasostrict® Label also disclosed that "the unit dosage form is not lyophilized": "Vasostrict is a sterile, aqueous solution of synthetic arginine vasopressin for intravenous administration."   Ex. 23, PAR-VASO_0008354; Ex. 30, PAR-VASO_0000230 ('239 patent claim 18).

145.    The April 2014 Vasostrict® Label further disclosed that "the unit dosage form is not frozen": "[s]tore between 15°C and 25°C (59°F and 77°F).  Do not freeze."  Ex. 23, PARVASO_0008356; Ex. 30, PAR-VASO_0000230 ('239 patent claim 19).

146.    Thus, the April 2014 Vasostrict® Label disclosed each and every limitation of at least dependent claims 14 and 16-19 of the '239 patent as issued, either explicitly or inherently.

147.    Upon information and belief, had Mr. Kannan, Ms. Bonomi-Huvala, and Mr. Kenesky not submitted the false Kannan and Bonomi-Huvala declarations and made the false representations in the November 24, 2015 Response, Examiner Bradley never would have disqualified the April 2014 Vasostrict® Label as prior art during prosecution of the '239 patent.

148.    Furthermore, upon information and belief, had Examiner Bradley not disqualified the April 2014 Vasostrict® Label as prior art, she would not have allowed the claims of the '239 to issue, because the April 2014 Vasostrict® Label disclosed each and every element of the claims and therefore anticipated them.

149.    Under these circumstances, the false Kannan and Bonomi-Huvala declarations, and the false representations in the November 24, 2015 Response, were necessarily material to the patentability of the '239 patent.

**f.    The False Declarations Were Submitted, and Representations Were Made, to Overcome the Examiner's Rejections over the April 2014 Vasostrict® Label with Intent to Deceive the Patent Office.**

150.    Under the circumstances set forth above, the only reasonable inference is that Craig Kenesky, Vinayagam Kannan, and Michelle Bonomi-Huvala submitted the unmistakably false Kannan and Bonomi-Huvala declarations, and made the unmistakably false representations in the November 24, 2015 Response, with an intent to deceive the PTO.

151.    As set forth above, the Kannan and Bonomi-Huvala declarations were false.  Each declaration falsely represented that Vinayagam Kannan and Matthew Kenney had invented the cited subject matter of the April 2014 Vasostrict® Label and submitted that joint invention to the regulatory department at Par, who in turn provided it to the FDA, resulting in the April 2014 Vasostrict® Label.  Vinayagam Kannan and Matthew Kenney, however, did not invent the subject matter of the cited subject matter of the April 2014 Vasostrict® Label or provide the relevant subject matter to Par's regulatory department.

152.    The false Kannan and Bonomi-Huvala declarations and the related statements in the corresponding Office Action Response were highly material to the prosecution of the '239 patent because their representations that Vinayagam Kannan and Matthew Kenney invented the cited subject matter of the April 2014 Vasostrict® Label were the sole reason the Examiner withdrew the anticipation and obviousness rejections of the pending claims over that reference. Had the April 2014 Vasostrict® Label not been disqualified as prior art, the claims of the '239 patent would not have issued.

153.    Vinayagam Kannan, Craig Kenesky, and Michelle Bonomi-Huvala were each aware of the materiality of these false representations.  As set forth above, each of the Kannan and Bonomi-Huvala declarations stated unequivocally that each affiant was aware of the Examiner's final rejection of the pending claims over the April 2014 Vasostrict® Label.  Further,

Craig Kenesky discussed the final rejection of the pending claims over the April 2014 Vasostrict® Label and how these declarations should be worded in order to defeat that rejection in an interview with the Examiner.

154. ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████   As stated above, none of these individuals has corrected or attempted to correct the material falsehoods submitted during prosecution of the '239 patent.

155. Examiner Bradley had no ability to independently examine the facts of the Kannan and Bonomi-Huvala declarations because they relied on research and development and communications that were internal and confidential to Par.

**2.      The Submission of the False Kannan and Bonomi-Huvala Declarations and the False Statements Made During Prosecution of the '239 Patent Tainted the Prosecution of the '478, '526, '209, and '785 patents.**

156. The applications for each of the '526, '209, and '785 patents were filed after Examiner Bradley had disqualified the April 2014 Vasostrict® Label during prosecution of the '239 patent.

157. The application for the '478 patent was pending before Examiner Bradley when she disqualified the April 2014 Vasostrict® Label during prosecution of the '239 patent. *See, e.g.*, Ex. 39 at PAR-VASO_0002541-54.

158. The '478, '526, '209, and '785 patents, like the '239 patent, each claim priority to the same parent application, the '499 Application. *See, e.g.*, Ex. 40, PAR-VASO_0000035; Ex. 41, PAR-VASO_0000115; Ex. 42, PAR-VASO_0000233; Ex. 36 at PAR-VASO_0000002.

159. The '526, '209, and '785 patents are each continuations-in-part of the '239 patent. *See, e.g.*, Ex. 40, PAR-VASO_0000035; Ex. 41, PAR-VASO_0000115; Ex. 42, PAR-VASO_0000233.

160.    Like the '239 patent, both Vinayagam Kannan and Matthew Kenney are named as inventors on each of the '478, '526, '209, and '785 patents.  *See, e.g.*, Ex. 40, PAR-VASO_0000035; Ex. 41, PAR-VASO_0000115; Ex. 42, PAR-VASO_0000233; Ex. 36 at PAR-VASO_0000002.

161.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

162.    As with the '239 patent, Christina Bradley was the examiner of record during prosecution of each of the '478, '526, '209, and '785 patents.  Ex. 30, PAR-VASO_0000199; Ex. 41, PAR-VASO_0000115; Ex. 42, PAR-VASO_0000233; Ex. 36 at PAR-VASO_0000002.

163.    The '478, '526, '209, and '785 patents each share overlapping claim elements with the '239 patent.  Ex. 40, PAR-VASO_0000112-13; Ex. 41, PAR-VASO_0000196-97; 42, PAR-VASO_0000313-14; Ex. 36 at PAR-VASO_0000033.

164.    For example, the '526 patent, like the '239 patent, claims administering a vasopressin formulation comprising: (1) about 0.01 to about 0.07 mg/mL vasopressin; (2) acetic acid; and (3) water.  *See, e.g.*, Ex. 40, PAR-VASO_0000112-13.  The '526 patent recites a pH of 3.8, which falls within the pH range of 3.5 to 4.1 claimed in the' patent.  *See, e.g.*, *id*.  The '526 patent recites the same rate of administration as the '239 patent: 0.01 to 0.1 units of vasopressin per minute.  *See, e.g.*, *id*.  The '526 patent, like the '239 patent, requires that the human be hypotensive.  *See, e.g.*, *id*.

165.    The '209 patent, like the '239 patent, claims administering a vasopressin formulation comprising about 0.01 to about 0.07 mg/mL vasopressin.  *See, e.g.*, Ex. 41,

PARVASO 0000196-97.  The '209 patent recites a pH of 3.7-3.9, which falls within the pH range of 3.5 to 4.1 claimed in the '239 patent.  *See, e.g.*, *id*.  The '209 patent recites the same rate of administration as the '239 patent: 0.01 to 0.1 units of vasopressin per minute.  *See, e.g.*, *id*.  The '209 patent, like the '239 patent, requires that the human be hypotensive. *See, e.g.*, *id*.

166.    The '785 patent, like the '239 patent, claims a vasopressin formulation comprising about 0.01 to about 0.07 mg/mL vasopressin.  *See, e.g.*, Ex. 42, PAR-VASO_0000313-14.  The '785 patent recites a pH of 3.7-3.9, which falls within the pH range of 3.5 to 4.1 claimed in the '239 patent.  *See, e.g., id.*

167.    The '478 patent, like the '239 patent, claims administering a vasopressin formulation with about 0.01 to about 0.07 mg/mL vasopressin.  The '478 patent recites a pH of 3.8, which falls within the pH range of 3.5 to 4.1 claimed in the '239 patent.  The '478 patent recites the same rate of administration as the '239 patent: 0.01 to 0.1 units of vasopressin per minute.  The '478 patent, like the '239 patent, requires that the human be hypotensive.  Ex. 36 at PAR-VASO_0000033.

168.    The '478, '526, '209, and '785 patents are directly and necessarily related to the '239 patent.

169.    The prosecutions of the '478, '526, '209, and '785 patents are directly and necessarily related to the '239 patent.

        a.      **The Prosecution of the '478 patent**

170.    The application for the '478 patent was filed at the PTO on May 20, 2015, as U.S. Application No. 14/717,882 ("the '882 Application").  The '882 Application is a continuation of the '499 Application.  The '478 patent, like the '239 patent, purports to claim priority to the '499 Application.

171.    The named inventors on the face of the '478 patent are Matthew Kenney, Vinayagam Kannan, Sunil Vandse, and Suketu Sanghvi.

172.    Claim 1 of the '478 patent, like the '239 patent recited a method of increasing blood pressure in a human in need thereof by administering vasopressin:

1. A method of increasing blood pressure in a human in need thereof, the method comprising administering to the human a unit dosage form, wherein the unit dosage form consists essentially of:

a) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof;

b) 10 mM acetate buffer; and

c) water,

wherein:

the unit dosage form has a pH of 3.8;

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and

the human is hypotensive.

Ex. 36 at PAR-VASO_0000033.

173.    ███████████████████████████████████████████████
███████████████████████████████████████

174.    Christina Bradley was the examiner of record during prosecution of the '478 patent.  Ex. 36.  Christina Bradley is the same examiner who prosecuted the '239 patent.  Ex. 30, PAR-VASO_0000198 at 199.

**i.      The Examiner Rejected the Pending Claims over Pharmaceutical Partners of Canada and other References**

175.    In a non-final rejection dated June 8, 2015, the Examiner rejected the pending claims as obvious in view of Pharmaceutical Partners of Canada, *Vasopressin Injection, USP* (2009) ("PPC") and other references. Ex. 39 at PAR-VASO_0000977-1001.

**ii.      The Applicants Sought to Overcome the Examiner's Rejection by Asserting Criticality of pH 3.8.**

176.    In response, on August 14, 2015, the applicants canceled the pending claims and added new claims. Ex. 39 at PAR-VASO_0001028-1046. The claims specified a pH of 3.75 to 3.85. *Id*. at PAR-VASO_0001030. The applicants argued based on a declaration from Sunil Vandse that the "present invention provides surprising and unexpected results" over PPC's disclosure of a pH of 2.5-4.5 because "results obtained at pH 3.8 provided the greatest stability to a vasopressin formulation." *Id*. at PAR-VASO_0001033.

177.    The applicants argued that the pH limitations claimed were surprising and unexpected in view of PPC's "broad pH range of 2.5-4.5." *Id*. at PAR-VASO_0001033-34. The applicant stated:

> The claims submitted herewith cover a vasopressin formulation at a pH of 3.75 to 3.85. The most favorable results described above were obtained at pH 3.8. At 25°C, pH 3.7 provided the highest stability for vasopressin (**FIGURE 1**) but pH 3.7 also provided higher levels of impurities as compared to the formulation at pH 3.8 (**FIGURE 2**). *Vandse*, paragraph 8. At 40°C, pH 3.6 provided the highest stability for vasopressin (**FIGURE 3**), but pH 3.6 also provided higher levels of impurities as compared to the formulation at pH 3.8 (**FIGURE 4**). *Vandse*, paragraph 9. The formulation at pH 3.8 provided higher stability of vasopressin than did the formulation at pH 3.7, and lower levels of impurities than did the formulations at pH 3.6 or pH 3.7 at 40°C. *Vandse*, paragraph 9. Thus, pH 3.8 provided the best overall results because pH 3.8 provided excellent stability, and lower levels of impurities compared to the results at pH 3.6 or pH 3.7

*Id*.

178.    On October 22, 2015, the Examiner issued a Final Rejection of the claims. *Id.* at PAR-VASO_0002241-58.  The Examiner again rejected the pending claims as obvious in view of PPC, this time in combination with Treschan & Peters, *The Vasopressin System: Physiology & Clinical Strategies,* 105 Anesthesiology 599-612 (2006) ("Treschan").  *Id.* at PAR-VASO_0002250.  The Examiner rejected the sufficiency of the Vandse declaration to show unexpected results because it did not present data for the full range of pHs disclosed in PPC.  *Id.* at PAR-VASO_0002254.

179.    The applicants filed a request for continued examination and responded to the Examiner's rejection on January 1, 22.  *Id.* at PAR-VASO_0002280-2317.  The applicants amended the claims to recite a pH of "about 3.8."  *Id.* at PAR-VASO_0002284.  The applicants submitted a second Vandse declaration and argued that in combination with the first Vandse declaration it showed the criticality of pH 3.8 compared to the broad disclosure of PPC:

> The results are surprising and unexpected in light of the cited references, and provide evidence of the criticality of pH 3.8 for vasopressin stabilization.  Of the references cited, only PPC discloses pH for vasopressin formulation.  PPC discloses a broad pH range of pH 2.5-4.5 (*PPC*, page 1), which does not provide guidance for selection of a pH of the claims for a vasopressin formulation.  A person of ordinary skill in the art would not have reasonable expectation of obtaining the above-described level of stabilization at pH of the claims based on PPC.

*Id.* at PAR-VASO_0002290.

180.    Examiner Bradley maintained the rejection in an office action dated February 2, 2016.  *Id.* at PAR-VASO_0002541-64.  The Examiner determined that the Sunil Vandse declarations were insufficient to overcome the rejection, because, inter alia, the applicants did not provide "evidence that the difference [in] stability alleged at pH 3.8 is significant enough to result in a practical benefit to the user."  *Id.* at PAR-VASO_0002550.  Examiner Bradley also determined that "[i]n contrast to Applicant's assertions regarding the criticality of pH 3.8, the

data appears to be relatively constant from pH 3.5-4.5," and faulted the lack of statistical analysis for the data.  *Id*. at PAR-VASO_0002551.  The Examiner also faulted the declarant because there was no consideration of whether chlorobutanol in PPC would impact stability.  *Id*. at PAR-VASO_0002553.

181.   On March 11, 2016, an Applicant-Initiated Interview was held.  *Id*. at PAR-VASO_0002561-62.  According to the interview summary, the Examiner expressed a belief that the data submitted to the PTO failed to show criticality of 3.8 pH over the prior art range of 2.5-4.5:

> The Examiner reiterated questions raised in the previous Office action regarding the declaration filed 1/22/2016.  Specifically, the Examiner asked for Applicant to account for what appears to be break in the data between pH 3.4 and 3.5 and whether or not this break could be attributed to the fact that the data above and below 3.4 and 3.5 were collected on different days.  The Examiner asked whether there is significant difference between the stability between pH 3.5 and 4.5, and possibly between pH 3.1 and 4.5.  The Examiner stated that this is relevant because the claim is directed to pH 3.8 and that the data relied upon must show criticality of this value.  The Examiner asked whether the results in Figures 1-4 have been reproduced and stated that ideally the entire range would be evaluated on the same day with the same batch of sample to remove any variability attributable to the different samples.  The Examiner stated that more evidence and explanation regarding this data is needed to fully reconsider the rejection

*Id*. at PAR-VASO_0002561.

182.   On March 31, 2016, applicants responded to the February 2, 2016 office action. *Id*. at PAR-VASO_0002565-90.  Included with the response was a declaration from named inventor Vinayagam Kannan purporting to establish the criticality of a pH of 3. 8 ("Kannan Criticality Declaration").  *Id*. at PAR-VASO_0002580-90.  The Kannan Criticality Declaration relied on the previous Vandse declarations.

183.   The Kannan Criticality Declaration stated:

> I am named as an inventor of the '882 Application, and I am familiar with the contents and the pending claims.  I have reviewed the Non-Final Office Action of February 2, 2016 (the "Office Action"), and I understand the nature of the rejections therein.  As I understand, the pending claims are rejected as allegedly

being obvious over Pharmaceutical Partners of Canada Inc. (Vasopressin Injection, USP. June 2009; "PPC") in view of Treschan (Anethesiology [sic] Volume 105, No. 3. September 2006, pages 599-612; "Treschan"), Amorij et al (US 2011/0237508; "Amorij"), Hong et al. (US 2013/0115231; "Hong"), Harris et al (US 5,482,931, "Harris"), and Puri et al. (US 2006/0293243; "Puri").

*Id*. at  PAR-VASO  0002580 at ¶ 2.

184.    The Kannan Criticality Declaration and the data submitted therewith included the purported results of stability testing of a series of compositions comprising vasopressin and acetate buffer adjusted to an initial pH value from 2.5 to 4.5.  *Id*. at  PAR-VASO_0002580-81, ¶¶ 3-6.

185.    The  Kannan  Criticality  Declaration  reported  assay  values—a  measure  of  the amount  of  vasopressin  in  the  formulation—and  total  impurity  levels  for  each  of  these formulations at an initial time point and after storage for four weeks at either 25°C or 40°C.  *Id*. at  PAR-VASO_0002582, ¶ 7.

186.    The  Kannan  Criticality  Declaration  stated  that  "[a]t  25 °C,  pH  3.7  provided  the highest stability for vasopressin" and that "[a]t 40 °C, pH 3 .6 and 3 .8 provided similar stability for vasopressin."  *Id*. at  PAR-VASO  0002583, ¶¶ 10-11.

187.    The  Kannan  Criticality  Declaration  concluded  that  a  vasopressin  composition  at pH 3.8 provided lower levels of impurities after storage for four weeks at 25°C and 40°C than other pH values.  *Id*. at  PAR-VASO  0002583, ¶ 12.

188.    The  Kannan  Criticality  Declaration  informed  the  Examiner  that  "normalization  is a standard technique used by analytical chemists that allows direct comparison between two data sets by removing systematic differences due to, for example, the starting amount of a sample." *Id*.    at    PAR-VASO_0002584,  ¶  15.  The  Kannan  Criticality  Declaration  averred  that normalization of assay data permits a "direct comparison in the difference in vasopressin assay over time was possible without regard to the starting assay amount."  *Id*.

189.    The Kannan Criticality Declaration represented that "pH was the only variable not normalized."  Ex. 43, *Id*. at PAR-VASO_0002584-85, ¶ 16.   On that basis, the Kannan Criticality Declaration "conclude[d] that the differences in the assay (% label claim; vasopressin remaining) and % total impurities results for each formulation were attributable to changes in pH." *Id*.

190.    In response to the Kannan Criticality Declaration, Examiner Bradley issued a Notice of Allowance of the claims.  *Id*. at  PAR-VASO_0002594-96.  Examiner Bradley did not cite a basis for the allowance, but it is apparent that the alleged criticality of pH 3.8 for a vasopressin composition in view of a pH range of 2.5 to 4.5 is therefore the sole cited reason the claims of the is the sole reason the claims of the '478 patent issued.

### b.     The Prosecution of the '526 patent

191.    The application for the '526 patent was filed at the PTO on October 10, 2016, as U.S. Application No. 15/289,640 ("the '640 Application").   The '640 Application is a continuation-in-part of the '877 Application (the '239 patent), which is a continuation of the '499 Application.   The '526 patent, like the '239 patent, purports to claim priority to the '499 Application.

192.    The named inventors on the face of the '526 patent are Matthew Kenney, Vinayagam Kannan, Sunil Vandse, and Suketu Sanghvi.

193.    Claim 1 of the '526 patent, like the '239 patent, recites a method of increasing blood pressure in a human in need thereof by administering vasopressin:

1. A method of increasing blood pressure in a human in need thereof, the method comprising:

a) providing a pharmaceutical composition for intravenous administration comprising: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) acetic acid; and iii) water,

-64-

wherein the pharmaceutical composition has a pH of 3.8;

b) storing the pharmaceutical composition at 2-8° C. for at least 4 weeks; and c) intravenously administering the pharmaceutical composition to the human, wherein the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute,

wherein the human is hypotensive,

wherein the pharmaceutical composition exhibits less than about 5% degradation after storage at 2-8° C. for about four weeks.

Ex. 40, PAR-VASO_0000112-13.

194. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

195.   Christina Bradley was the examiner of record during prosecution of the '526 patent at the PTO.  Ex. 40, PAR-VASO_0000034 at 035.  Christina Bradley is the same examiner who prosecuted the '239 patent.  Ex. 30, PAR-VASO_0000198 at 199.

**i.    The Examiner Rejected the Pending Claims over Treschan and Pharmaceutical Partners of Canada**

196.   In the only Office Action entered during the prosecution of the '526 patent, on February 22, 2017, Examiner Bradley rejected the pending claims as obvious under Section 103 in view of Treschan & Peters, *The Vasopressin System: Physiology & Clinical Strategies,* 105 Anesthesiology 599-612 (2006) ("Treschan"), and Pharmaceutical Partners of Canada, *Vasopressin Injection, USP* (2009) ("PPC"), among other references.   Ex. 43, PAR-VASO_0004767-70.

197.    Examiner Bradley stated that Treschan and PPC taught all of the elements of pending claim 16 except the claimed refrigerated storage conditions, which she found obvious in view of other art of record. Ex. 43, PAR-VASO_0004767-770.

198.    With respect to PPC, Examiner Bradley stated that:

Pharmaceutical Partners of Canada teaches that Vasopressin Injection, USP is a sterile, nonpyrogenic solution of synthetic vasopressin of the posterior pituitary gland.  It is substantially free from the oxytocic principle and is standardized to contain 20 pressor units posterior structural formula is identical to instant SEQ ID NO: 1.  Each mL contains 20 USP vasopressin units, chlorobutanol (anhydrous) 5 mg as preservative, water for injection q.s. glacial acetic acid and/or sodium hydroxide for pH adjustment (2.5-4.5).

Ex. 43, PAR-VASO_0004767-68.

199.    Upon information and belief, PPC—which discloses a pH range of 2.5 to 4.5 for a vasopressin composition—is the only prior art reference cited by the Examiner that discloses the pH of a vasopressin composition.

200.    Regarding refrigerated storage of vasopressin, Examiner Christina Bradley found:

It would have been obvious to add the refrigeration step included in the instant claims in order to provide long-term storage stability, as taught by Scott (a minimum target shelf life of two years, p. 47, col 3), and as exemplified for liraglutide (up to 30 months, p. 20) and triptorelin acetate (up to 3 years, p. 4). There is a reasonable expectation of success given that the prior art discloses assays for measuring the stability of vasopressin formulations, and that it is within the ordinary skill of the art to optimize storage temperature to improve stability of peptide pharmaceuticals, as evidenced by Scott, and Chang et al.  The rationale to support a conclusion that the claim would have been obvious is that "a method of enhancing a particular class of devices (methods, or products) has been made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in other situations.  One of ordinary skill in the art would have been capable of applying this known method of enhancement to a "base" device (method, or product) in the prior art and the results would have been predictable to one of ordinary skill in the art."

Ex. 43, PAR-VASO-0004769-70 (citation omitted).

201.    Relatedly, with respect to percent degradation during refrigerated storage, Examiner Bradley found:

> Finally, the clause "wherein the unit dosage form exhibits less than about 5% degradation after storage at 2-8° C for about four weeks", does not change the scope of the claims because it does not require an additional active step. Rather, this new clause recites a property of the product utilized in the claimed method that is obvious over the prior art for the reasons presented above. The fact that applicant has recognized another advantage which would flow naturally from following the suggestion of the prior art cannot be the basis for patentability when the differences would otherwise be obvious.

Ex. 43, PAR-VASO_0004771.

### ii.     The Applicants Sought to Overcome the Examiner's Rejection by Asserting Criticality of pH 3.8.

202.    On April 3, 2017, Par's prosecution counsel, Craig Kenesky and Trisha Agrawal, and Examiner Bradley participated in an Applicant-Initiated Interview. Ex. 43, PAR-VASO_0004851. The Interview Summary states that the "Applicant proposed adding a limitation ... requiring the pH of the composition to be 3.8." Ex. 43, PAR-VASO_0004851. Thereafter, the applicants amended pending claim 16 to recite "wherein the pharmaceutical composition has a pH of 3.8." Ex. 43, PAR-VASO_0004863. No other claims or limitations were added. *See id*.

203.    In response to the Examiner's rejections under Section 103, the applicants argued that the pH limitation of 3. 8 was not taught, or suggested, by the art of record:

> The criticality of pH 3.8 in stabilizing vasopressin, while providing the lowest amount of impurities, is not evident from the disclosures of PPC, Treschan, Scott, Chang, the Liraglutide Label, or the Triptorelin Label because Treschan, Scott, Chang, the Liraglutide Label, and the Triptorelin Label do not disclose a pH for vasopressin storage, and PPC provides no guidance for the selection of a specific pH from the disclosed range of 2.5-4.5.

Ex. 43, PAR-VASO_0004869.

204.    In support of their response to Examiner Bradley's rejection over Treschan and PPC, the applicants resubmitted the declaration from named inventor Vinayagam Kannan

previously filed during prosecution of the '478 patent purporting to establish the criticality of a pH of 3. 8 ("Kannan Criticality Declaration").

205.    The applicants had previously submitted two declarations from named inventor Sunil Vandse setting forth the data on which the Kannan Criticality Declaration relied.  Ex. 43, PAR-VASO_004878-910; *see also, e.g.*, Ex. 39, PAR-VASO_0001039-46; Ex. 39, PAR-VASO_0002304-17.

206.    The Kannan Criticality Declaration stated:

I am named as an inventor of the '882 Application, and I am familiar with the contents and the pending claims.  I have reviewed the Non-Final Office Action of February 2, 2016 (the "Office Action"), and I understand the nature of the rejections therein.  As I understand, the pending claims are rejected as allegedly being obvious over Pharmaceutical Partners of Canada Inc. (Vasopressin Injection, USP. June 2009; "PPC") in view of Treschan (Anethesiology [sic] Volume 105, No. 3. September 2006, pages 599-612; "Treschan"), Amorij et al (US 2011/0237508; "Amorij"), Hong et al. (US 2013/0115231; "Hong"), Harris et al (US 5,482,931, "Harris"), and Puri et al. (US 2006/0293243; "Puri").

Ex. 43, PAR-VASO_0004878, ¶ 2.

207.    The Kannan Criticality Declaration and the data submitted therewith included the purported results of stability testing of a series of compositions comprising vasopressin and acetate buffer adjusted to an initial pH value from 2.5 to 4.5.  Ex. 43, PAR-VASO_0004878-79, ¶¶ 3-6.

208.    The Kannan Criticality Declaration reported assay values—a measure of the amount of vasopressin in the formulation—and total impurity levels for each of these formulations at an initial time point and after storage for four weeks at either 25°C or 40°C.  Ex. 43, PAR-VASO_0004880, ¶ 7.

209.    The Kannan Criticality Declaration stated that "[a]t 25 °C, pH 3.7 provided the highest stability for vasopressin" and that "[a]t 40 °C, pH 3 .6 and 3 .8 provided similar stability for vasopressin."  Ex. 43, PAR-VASO_0004880, ¶¶ 10-11.

210.    The Kannan Criticality Declaration concluded that a vasopressin composition at pH 3.8 provided lower levels of impurities after storage for four weeks at 25°C and 40°C than other pH values.  Ex. 43, PAR-VASO_0004881, ¶ 12.

211.    The Kannan Criticality Declaration informed the Examiner that "normalization is a standard technique used by analytical chemists that allows direct comparison between two data sets by removing systematic differences due to, for example, the starting amount of a sample." Ex. 43, PAR-VASO_0004882, ¶ 15. The Kannan Criticality Declaration averred that normalization of assay data permits a "direct comparison in the difference in vasopressin assay over time was possible without regard to the starting assay amount." *Id.*

212.    The Kannan Criticality Declaration represented that "pH was the only variable not normalized."  Ex. 43, PAR-VASO_0004882-83, ¶ 16.  On that basis, the Kannan Criticality Declaration "conclude[d] that the differences in the assay (% label claim; vasopressin remaining) and % total impurities results for each formulation were attributable to changes in pH." *Id.*

213.    On May 12, 2017, Examiner Bradley allowed the claims on the basis that the applicants had established "criticality of pH 3.8" over the pH range 2.5 to 4.5 disclosed in the PPC reference.  Ex. 43, PAR-VASO_0005382.  In the Notice of Allowance, Examiner Bradley stated that:

> The claims are allowable over the prior art of record in view of the amendment to claim 16 filed May 2, 2017, that requires that the pharmaceutical composition has a pH of 3.8.  The criticality of pH 3.8 is established in declarations filed under 37 CFR 1.132 by Sunil Vandse on August 14, 2015, and January 22, 2016, and by Vinayagam Kannan on March 31, 2016, in Application No. 14/717,882.  A copy of each declaration was filed in the instant case on May 2, 2017.  In addition, the declaration filed under 37 CFR 1.132 by Vinayagam Kannan on May 2, 2017, establishes that the results presented in the previous Vandse and Kannan declarations are applicable to the refrigeration conditions required by the instant claims.

*Id*.  Examiner Bradley did not cite any additional arguments made by the applicants in allowing the claims that issued as the '526 patent.  *See id*.

214.    The alleged criticality of pH 3.8 for a vasopressin composition in view of a pH range of 2.5 to 4.5 is therefore the sole cited reason the claims of the '526 patent issued.  *See, e.g.*, Ex. 43, PAR-VASO_0005382.

### c.      The Prosecution of the '209 and '785 Patents

215.    The application for the '209 patent was filed at the PTO on February 7, 2017, as U.S. Application No. 15/426,693 ("the '693 Application").  The '693 Application is a continuation-in-part of the '640 Application (the '526 patent), which is a continuation-in-part of the '877 Application (the '239 patent), which is a continuation of the '499 Application. The '209 patent, like the '239 patent, purports to claim priority to the '499 Application.

216.    The application for the '785 patent was also filed at the PTO on February 7, 2017, as U.S. Application No. 15/426,703 ("the '703 Application").  The '703 Application is a continuation-in-part of the '640 Application (the '526 patent), which is a continuation-in-part of the '877 Application (the '239 patent), which is a continuation of the '499 Application.  The '785 patent, like the '239 patent, purports to claim priority to the '499 Application.

217.    The named inventors on the face of the '209 and '785 patents are Matthew Kenney, Vinayagam Kannan, Sunil Vandse, and Suketu Sanghvi.

218.    Claim 1 of the '209 patent, like the '239 patent, recites a method of increasing blood pressure in a human in need thereof by administering vasopressin:

1. A method of increasing blood pressure in a human in need thereof, the method comprising administering to the human a unit dosage form, wherein the unit dosage form comprises from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically acceptable salt thereof, wherein:

the unit dosage form has a pH of 3.7-3.9;

the unit dosage form further comprises impurities that are present in an amount of 0.9% - 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1;

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and

the human is hypotensive.

Ex. 41, PAR-VASO_0000196.

219.    Claim 1 of the '785 patent claims a vasopressin pharmaceutical composition:

1. A pharmaceutical composition comprising, in a unit dosage form, from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof, wherein the unit dosage form further comprises impurities that are present in an amount of 0.9% to 1. 7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, and wherein the unit dosage form has a pH of 3.7-3.9.

Ex. 42, PAR-VASO_0000313.

220.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

221.    Christina Bradley was the examiner of record during prosecution of the '209 and '785 patents at the PTO.    Ex. 41, PAR-VASO 0000115 ('209 patent); Ex. 42, PAR-VASO_0000233 ('785 patent).  Christina Bradley is the same examiner who prosecuted the '239 patent.  Ex. 30. PAR-VASO_0000199.

222.    On February 27, 2017, the applicants submitted a preliminary amendment to the '209 patent application to present new claims 16-35.  Ex. 44, PAR-VASO_0005405-09.  The applicants also submitted a preliminary amendment to the '785 patent application to present new claims 16-32.  Ex. 45, PAR-VASO_0009344-347 (February 27, 2017 Preliminary Amendment).

-71-

Claim 16 of both the '209 and '785 patent applications recited, inter alia, a unit dosage form with a pH of 3.75 to 3.85. Ex. 44, PAR-VASO_0005405 ('209 patent); Ex. 45, PAR-VASO_0009344 ('785 patent).

223. In the only Office Action entered during the prosecution of the '209 and '785 patents, on March 29, 2017, Examiner Bradley rejected the pending claims under Section 103 in view of PPC and Treschan, among other references, as evidenced by the April 2014 Vasostrict® Label. Ex.46, P AR-VASO_0005732-735 ('209 patent); Ex. 45, PAR-VASO_0009649-651 ('785 patent).

224. Examiner Bradley relied on the April 2014 Vasostrict® Label as "evidence that 1 mg is equivalent to 530 units of vasopressin. Therefore, the composition taught by [PPC] contains 0.038 mg/ml vasopressin, which falls within the claimed range (this is an evidentiary reference and does not need to be prior art)." Ex. 44, PAR-VASO_0005734 ('209 patent); Ex. 45, PAR-VASO_0009650 ('785 patent). Upon information and belief, this indicates that Examiner Bradley believed, based on the declarations submitted during prosecution of the '239 patent, that she could not rely on the April 2014 Vasostrict® Label as prior art against the '239, '478, '526, '209, and '785 patents.

225. Examiner Bradley then stated that the pH of 3.75 to 3.85 was *prima facie* obvious in view of the pH range of 2.5 to 4.5 disclosed in the PPC reference. Ex. 44, PAR-VASO_0005734-735 ('209 patent); Ex. 45, PAR-VASO_0009650 ('785 patent).

226. On June 21, 2017, Par's prosecution counsel, Trisha Agrawal and Craig Kenesky, and Examiner Bradley participated in an Applicant-Initiated Interview. Ex. 44, PAR-VASO_0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).

227.    The Interview Summary states that the "Applicant proposed amending claim 16 by deleting the pH limitation, and requiring that the unit dosage form 'further comprises impurities that are present in an amount of 0.5%-6%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO: I.'"  Ex. 44, PAR-VASO_0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).  The Interview Summary also states that the "Applicant argued that none of the cited references require that the formulation comprise impurities of the claimed structure at the claimed amount."  Ex. 44, PAR-VASO-0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).

228.    The Interview Summary then states that Examiner Bradley "disagreed" with the applicants, arguing that:

> [T]he composition in Pharmaceutical Partners of Canada meets all of the structural requirements of the amended claim except for the property that the formulation comprise a particular degradation product at a particular concentration.  The Examiner argued that this degradation product would form through the normal storage and handling of the prior art composition.  The Examiner stated that a rejection under 35 U.S.C. 103 would be made, shifting the burden to Applicant to establish with evidence that the claimed composition is unobvious over the prior art.

Ex. 44, PAR-VASO_0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).

229.    The Interview Summary states that the "[a]pplicant suggested adding a limitation requiring pH 3.7 to 3.9, the pH range tested in the specification in the experiments evaluating the presence of the impurities."  Ex. 44, PAR-VASO_0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).  In response, "[t]he Examiner stated that more time and evidence would be required to establish whether this pH range is critical given that it overlaps with the pH range taught by Pharmaceutical Partners of Canada."  Ex. 44, PAR-VASO_0006429 ('209 patent); Ex. 45, PAR-VASO_0010342 ('785 patent).

230.    Thereafter, the applicants amended pending claim 16 to recite "wherein: the unit dosage form has a pH of 3.7-3.9."  Ex. 44, PAR-VASO_0005810 ('209 patent); *see also* Ex. 45, PAR-VASO_0009716 ('785 patent ("wherein the unit dosage form has a pH of 3.7-3.9")).

231.    In response to Examiner Bradley's rejections under Section 103, the applicants argued that the pH limitation of 3.7-3.9 was not taught, or suggested, by the art of record:

> PPC and Amorij both teach broad pH ranges, but do not provide guidance to a person of ordinary skill in the art to use pH 3.7 to 3.9 for a vasopressin formulation.  For example, PPC teaches a range of pH 2.5-4.5 (*PPC*, page 1), and Amorij teaches a preferred range of pH 3 .8-4.8 (*Amorij*, paragraph [0021 ]).  In fact the examples of Amorij only use a pH of 4.5 or 6.4.  *Amorij*, paragraphs [0048]-[0063].  Thus, a person of ordinary skill in the art would [not] be motivated to use a pH of 4.5 or 6.4 in a formulation disclosed therein, and would [not] be guided to obtain the amount of impurities at pH 3.7 to 3.9 as provided in the claims as amended.

Ex. 44, PAR-VASO_0005815 ('209 patent); Ex. 45, PAR-VASO_0009720 ('785 patent).

232.    In support of their response to Examiner Bradley's rejection over Treschan, PPC, and Amorij, the applicants relied on the data and subject matter included in Example 10 and Figures 15-18 of the specification of the '209 and '785 patents purporting to establish the criticality of a pH of 3.7-3.9.  Ex. 44, PAR-VASO_0005816-517 ('209 patent); Ex. 45, PARVASO_0009721-722 ('785 patent).

233.    Upon information and belief, the data included in Example 10 and Figures 15-18 of the '209 and '785 patents were the same data that had previously been submitted with the Kannan Criticality Declaration and prior Vandse declarations.  Example 10 reaches the same conclusion regarding impurity levels at pH 3.8 as in the Kannan Criticality Declaration.

234.    The applicants also amended the independent claims to require between 0.9 and 1.7% of impurities having between 85% to 100% sequence homology to SEQ ID NO. 1. Ex. 44, PAR-VASO_0005810 ('209 patent); Ex. 45, PAR-VASO_0009716 ('785 patent).  The

applicants did not rebut Examiner Bradley's finding that such a limitation would be obvious over PPC as expressed during the June 21, 2017 Interview.

235.    On July 11, 2017, Examiner Christina Bradley allowed the claims on the basis that the applicants had established "the criticality of the claimed pH range of 3. 7 to 3 .9" over the pH range 2.5 to 4.5 disclosed in the PPC reference.  Ex. 44, PAR-VASO_0006436 ('209 patent); Ex. 45, PAR-VASO_0010349 ('785 patent).

236.    The false Kannan and Bonomi-Huvala declarations, and false statements made in the November 24, 2015 Response, during prosecution of the '239 patent have an immediate and necessary relation to the '479, '526, '209, and '785 patents.  The unmistakably false Kannan and Bonomi-Huval a declarations submitted during prosecution of the '239 patent were material to, and tainted, the prosecution of the '479, '526, '209, and '785 patents as well.

### d.    The April 2014 Vasostrict® Label Would Have Invalidated the Claims of the '479, '526, '209, and '785 Patents if Relied on During Prosecution

237.    Having disqualified the April 2014 Vasostrict® Label as prior art under Section 102(b )(1 )(A) based on the representation that named inventors Kannan and Kenney invented its subject matter during prosecution of the '239 patent, Examiner Bradley never cited the April 2014 Vasostrict® Label as prior art during the prosecution of the '479, '526, '209, and '785 patents.

238.    Upon information and belief, having disqualified the April 2014 Vasostrict® Label as prior art based on the representation that named inventors Kannan and Kenney had invented its subject matter during prosecution of the '239 patent, Examiner Bradley believed she could not cite the April 2014 Vasostrict® Label as prior art during the prosecution of the '526, '209, and '785 patents, on which Kannan and Kenney were also named inventors.

239.   Thus, during prosecution of the '526, '209, and '785 patents, Examiner Bradley cited only prior art that was not as close to the pending claims of those patents as the April 2014 Vasostrict® Label.

240.   For example, during prosecution of each of the '526, '209, and '785 patents, Examiner Bradley rejected the pending claims as obvious under Section 103 in view of PPC, which discloses a pH of 2.5 to 4.5.  Examiner Bradley withdrew the rejections based on the data submitted in the Kannan Criticality Declaration and supporting Vandse declarations.

241.   The April 2014 Vasostrict® Label is closer prior art to the issued claims of the '526, '209, and '785 patents than the combination of Treschan and PPC.  Unlike Treschan and PPC, the April 2014 Vasostrict® Label discloses the formulation, including the pH of 3.4 to 3.6, as well as the indications and method of administration steps of the claims in a single reference.

242.   For example, rather than disclosing a broader pH range of 2.5 to 4.5, the April 2014 Vasostrict® Label discloses a narrower pH range of 3.4-3.6, close to the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '526, '209, and '785 patents.

243.   The Federal Circuit has held that "a prima facie case of obviousness exists when the claimed range and the prior art range do not overlap but are close enough such that one skilled in the art would have expected them to have the same properties."  *E.g.*, *In re Peterson*, 315 F.3d 1325, 1339 (Fed. Cir. 2003).  In addition, "[w]here a claimed range abuts a prior art range, the claimed range is also prima facie obvious."  *Tris Pharma, Inc. v, Actavis Labs. FL, Inc.*, 276 F.Supp. 3d 226, 254 (D. Del. 2017), *vacated on other grounds*, 755 F. App'x 983 (Fed. Cir. 2019).

244.   Because pH 3.4 to 3.6 is close to and/or abutting the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '526, '209, and '785 patents, the pH limitations in

the '526, '209, and '785 patents are *prima facie* obvious over the pH range in the April 2014 Vasostrict® Label.

245.    Had Examiner Bradley cited the April 2014 Vasostrict® Label as prior art against the claims of the '526, '209, and '785 patents, therefore, the applicants would have needed to show the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '526, '209, and '785 patents, over the pH range 3.4-3.6 in the April 2014 Vasostrict® Label.

246.    Upon information and belief, the applicants would have been unable to show criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '526, '209, and '785 patents, over the pH range 3.4-3.6 in the April 2014 Vasostrict® Label.

247.    The specifications of the '526, '209, and '785 patents teach that pH ranges of 3.4 to 3.6 are suitable for "Clinical Use":

Example 6

Illustrative Vasopressin Formulation for Clinical Use

A formulation for vasopressin that can be used in the clinic is detailed in TABLE 5 below:

TABLE 5

| Ingredient | Function | Amount (per mL) |
|---|---|---|
| Vasopressin, USP | Active Ingredient | 20 Units (~0.04 mg) |
| Chlorobutanol, Hydrous NF | Preservative | 5.0 mg |
| Acetic Acid, NF | pH Adjustment | To pH 3.4-3.6 (~0.22 mg) |
| Water for injection, USP/EP | Diluent | QS |

Example 7

Illustrative Regimen for Therapeutic Use of a Vasopressin Formulation

\*\*\*

The 1 mL solution contains vasopressin 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and water for injection, USP adjusted with acetic acid to pH 60 3.4-3.6.

Ex. 40, PAR-VASO 0000087-88; Ex. 41, PAR-VASO 0000168-69; Ex. 42, PAR-VASO_0000286.

248.   Furthermore, the '526, '209, and '785 patents demonstrate stability during refrigerated storage using vasopressin formulations with a pH of 3.6.   Ex. 40, PAR-VASO_0000088-105; Ex. 41, PAR-VASO_0000170-87; Ex. 42, PAR-VASO_0000287-304.

249.   The '526, '209, and '785 patents also teach that "[a]t 25° C., pH 3.7 provided the highest stability for vasopressin (Fig. 11 )," while "[a]t 40° C., pH 3 .6 provided the highest stability for vasopressin." Ex. 40, PAR-VASO_0000106; Ex. 41, PAR-VASO_0000187; Ex. 42, PAR-VASO_0000304-05.  The '526, '209, and '785 patents therefore teach that a pH of 3.6 or 3.7 provides maximum stability for vasopressin compositions.

250.   Because the '526, '209, and '785 patents teach that pHs in the range of 3.4-3.6 are suitable and effective for use in the claimed vasopressin compositions, pH 3.8 cannot be critical. *See, e.g.*, *Tris Pharma*, 276 F. Supp. 3d at 254 ("The patents-in-suit make clear that 'the product is most stable at pH between 3.5 and 5.0.'  Mr. Mehta and Dr. Jacobs both admitted that the claimed formulation is stable across the full pH range of 3.5 to 5.  Thus, there is nothing critical about the narrower range of 4 to 4.5."); *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 89 F. Supp. 3d 641, 655-56 (D.N.J. 2015) ("Similarly, the '460 patent asserts that EDTA between 75 mg and 250 mg will produce 'pharmaceutically effective absorption.' ... In sum, the evidence showed that the claimed amount of 100 mg was not critical compared to the prior art's disclosure of between 20 and 175 mg EDTA."); *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 642 F. App'x 996, 1002 (Fed. Cir. 2016) ("Moreover, in view of the broad disclosures in the specification providing embodiments with varying amounts of EDTA, and nothing in the asserted claims teaching one of skill in the art that or how only the specific 100 mg amount produces pharmaceutically effective absorption, Warner Chilcott failed to show the criticality of the claimed amount.").

251.   The data submitted in the Kannan Criticality Declaration and prior Vandse declarations also does not demonstrate criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '526, '209, and '785 patents, over the pH range 3.4-3.6 in the April 2014 Vasostrict® Label.

252.   After four weeks of storage at 25°C, the formulation at pH 3.6 had an impurity level of 1.15% while the formulation at pH 3.8 had an impurity level of 1.02%. Ex. 43, PAR-VASO_0004901; ███████████████████████████████████████████████ Therefore, any purported difference in impurity levels in the data reported by the Kannan Criticality Declaration between pH 3.8 and pH 3.6 is no more than 0.13% after storage at 25°C. Ex. 43, PAR-VASO_0004901; ███████████████████████████████████████████ ██████████████

253.   A difference in impurity levels between pH 3.6 and pH 3.8 of 0.13% is one of kind, not degree.

254.   ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ █████ █████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ █████████████████████████████████████████

255.   ███████████████████████████████████████████████ █████████████████████████████████████████



256. █████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

257.    Additionally, a person of ordinary skill in the art would not find a difference of 0.13% in impurity levels between pH 3.6 and pH 3.8 unexpected or surprising.  A difference of 0.13% in impurity levels between pH 3 .6 and pH 3 .8 does not establish criticality.

258.    █████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████



259.

260. the data submitted to establish criticality of the claimed pH value and range before the PTO cannot reliably establish any difference between the pHs of the claims and that of the April 2014 Vasostrict® Label.

261.

262.



263.

264.

265.



266.    The Kannan Criticality Declaration does not identify any benefit to the purported lower impurity levels of vasopressin formulations at pH 3.8, or pH 3.7-3.9.

267.

268.

269.



270. ████████████████████████████████████

271. ████████████████████████████████████

272. ████████████████████████████████████



273.

274.

275.

276.    The false Kannan and Bonomi-Huvala declarations, and false statements made in the November 24, 2015 Response, during prosecution of the '239 patent have an immediate and necessary relation to the '526, '209, and '785 patents.

277.    Under these circumstances, the false Kannan and Bonomi-Huvala declarations, and false statements made in the November 24, 2015 Response, during prosecution of the '239 patent were material to, and tainted, the prosecution of the '526, '209, and '785 patents as well.

**3.    The Named Inventors Made False Statements, and Omitted Material Information in Asserting That the Claimed pH Values Were Critical.**

**a.    'The Named Inventors Withheld from the PTO ████████ ████████████████████████ That Was Material to the '239, '478, '526, '209, and '785 patents**



-86-

██████████████████████████████████████████████

██████

███████████████████████████████████████████████

██████████████████████████████████

██████████████████████

281.    ███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

282.    ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████

283.    The following table provides a summary of the comparisons between the formulations:



| Property (per vial) | Pitressin® | Vasostrict® |
|---|---|---|
| Vasopressin (mg/mL) | ██████████ | ████████ |
| Chlorobutanol (mg) | ██████████ | ████ |
| Acetic Acid | ████████ | ████████ |
| Water for Injection (mL) | ██████████ | ████████ |
| pH | ████████ | ████████ |

████████████████████████████████████████████████████

████████████████ Ex. 23, PAR-VASO-0008354.

284.    Upon information and belief, Mr. Kannan, Mr. Kenney, and Dr. Sanghvi withheld information about the prior art Pitressin® product, ████████████████ from the PTO during prosecution of the Patents-in-Suit.

285.    Although the Pitressin® Label was submitted to the PTO during prosecution of each of the Patents-in-Suit, ████████████████████████████████████

██████████████ *See, e.g.*, Ex. 23, PAR-VASO_0008354.

286.    Because the Examiner was not provided with. Pitressin®'s full composition,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

287.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ the Examiner accepted the false declaration by the inventors that they invented the subject matter set forth in the April 2014 Vasostrict® Label, including the Vasostrict® formulation.

288.    Additionally, because the April 2014 Vasostrict® Label was disqualified as prior art during prosecution of the '239, '478, '526, '209, and '785 patents, and the ████████████

████████████████████████████████████████ the applicants were not required to establish the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '478, '526, '209, and '785 patents, over the pH range 3.4-3.6.  Instead, the inventors were

only required to establish the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, over the broader pH range of 2.5-4.5.

289.    As discussed above, the data submitted by the applicants in the Kannan Criticality Declaration does not show the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '478, '526, '209, and '785 patents, ████████████████████████

████████████████

290.    As discussed above, upon information and belief, the applicants would have been unable to show the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '478, '526, '209, and '785 patents, ████████████████████████

████████

291.    Upon information and belief, the applicants were aware that they could not show the criticality of the claimed pH value of 3.8, or range of 3.7-3.9, in the issued claims of the '478, '526, '209, and '785 patents, ████████████████████████████████

████████████████  Accordingly, the inventors submitted a false declaration to claim that the April 2014 Vasostrict® Label, which teaches the pH range of 3.4-3.6 is not prior art, and at the same time withheld the pH of Pitressin®, ████████████████

292.    ████████████████████████████████████████████

████████████████████████████████████████  cited by the Examiner, anticipates the claims of the '239 patent.

293.    Had the Examiner known of the pH of Pitressin®, the claims of the '239 patent would have been rejected as anticipated.

294.    Moreover, at least inventors Vinayagam Kannan and Matthew Kenney were aware that, ████████████████████████████████████████████



295. ███████████████████████████████████

296. ███████████████████████████████████

297. ███████████████████████████████████

298. ███████████████████████████████████

██████████████████████  Yet, neither Kannan nor Kenney disclosed that information to the PTO during prosecution of the Patents-in-Suit.

299.   As set forth above, the applicants would not have been able to establish criticality of the claimed pH value of 3.8, or range of 3.7-3.9, over Pitressin® ████████████  The applicants also would not have been able to establish ███████████████████ ██████ for at least the same reasons.

300.   ███████████████████████████████████████████

███████████████████████████████████████████

301.   The omission of information regarding the prior art Pitressin® compositions,

██████████████████████████████████████ is material to the patentability of the '239,

'478, '526, '209, and '785 patents.

302.   Upon information and belief, Mr. Kannan, Mr. Kenney, and Dr. Sanghvi were

aware that this information would have been material to the patentability of the '239, '478, '526,

'209, and '785 patents.  Indeed, as set forth above, Mr. Kannan submitted a declaration during

prosecution of the '239 patent averring that he and Matthew Kenney invented, *inter alia*, the

Vasostrict® formulation disclosed in the April 2014 Vasostrict® Label to disqualify this

reference—which discloses a pH of 3.4 to 3.6—as prior art to the pending claims.

303.   Pitressin® and the prior art use thereof met the other limitations set forth in the

'239, '478, '526, '209, and '785 patents.  As set forth above, ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

304.   Examiner Bradley found that the method of treatment steps recited by the claims

of the '478, '239, '526 and '209 patents were otherwise taught explicitly in the prior art. Ex. 43,

PAR-VASO_0004767-70; Ex. 44, PAR-VASO_0005732-35.

305.   Furthermore, Pitressin® met the other formulation limitations in the '239, '478,

'526, '209, and '785 patents.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████  Ex. 40, PAR-VASO_0000112-13; Ex. 41, PAR-VASO-0000196-97; Ex. 30, PAR-VASO-0000230-31; Ex. 42, PAR-VASO-0000313-14; *see also Titanium Metals*, 778 F.2d at 782 ("It is also an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art.").

306.    Additionally, as set forth above, Pitressin® was formulated with acetic acid, as required by claim 1 of the '526 patent.  Ex. 40, PAR-VASO_0000112-13.

307.    As set forth above, Examiner Bradley found in each case that the degradation products or impurities limitations of the '239, '526, '209, and '785 patent claims were inherent in, or obvious over, prior art formulations.

308.    In addition, █████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████

309.    The only reasonable inference is that Vinayagam Kannan, Matthew Kenney, and Suketu Sanghvi withheld the material Pitressin® formulation, █████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████

310.    The inventors also withheld material information regarding the original Vasostrict® formulation.  As set forth above, the original Vasostrict® formulation was described by, *inter alia*, the April 2014 Vasostrict® Label.  ██████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████  Because the inventors did not invent the original Vasostrict® formulation, it is prior art to the Patents-in-Suit.

311.    As set forth above, the named inventors—particularly Matthew Kenney and Vinayagam Kannan—were aware that they did not invent the original Vasostrict® formulation and that it is prior art to the '526, '478, '209, '239, and '785 patents.

312.   ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████

313.   ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████

314.   ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████

315.   ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████



316. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

317. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

318.   Upon  information  and  belief,  had  Examiner  Bradley  known ████████████

████████████████████████████████████████████ the claims of the '239,

'478, '526, '209, and '785 patents would have been rejected over the original Vasostrict®

product.

319.   Thus, ████████████████████████████████████████████ was

necessarily  material  to  the  patentability  of  the  claims  of  the  '239,  '478,  '526,  '209,  and  '785

patents.

320.   The only reasonable inference that can be drawn from the selective withholding of

████████████████████████████████████ is that the inventors concealed

material information concerning the prior art with an intent to deceive the PTO.

b.    **The Named Inventors Withheld from the PTO ▮▮▮▮▮▮▮▮▮ ▮▮ That Was Material to Prosecution of the '239, '478, '526, '209, and '785 Patents**

321.    As discussed above, during the prosecution of the '239, '478, '526, '209, and '785 patents, Examiner Bradley recited a prior art vasopressin formulation, PPC, as a basis for rejecting the claims of the '239, '478, '526, '209, and '785 patents.  Upon information and belief, PPC—which discloses a pH range of 2.5 to 4.5 for a vasopressin composition—is the only prior art reference cited by the Examiner that discloses the pH of a vasopressin composition.

322.    Facing the Examiner's rejections under Section 103, the applicants argued that the pH limitations recited in the pending claims of the '239, '478, '526, '209, and '785 patents were not taught, or suggested, by the art of record.  Specifically, during the prosecution of the '239 patent, the applicants argued that the claimed pH range of 3.5-4.1 was not taught by the prior art.  *See, e.g.*, Ex. 23, PAR-VASO_0008791-792.   During the prosecution of the '478 and '526 patents, the applicants argued that the claimed pH of 3.8 was not taught by the prior art.  *See, e.g.*, Ex. 43, PAR-VASO_0004869.   During the prosecution of the '209 and '785 patents, the applicants argued that the claimed pH range of 3.7-3.9 was not taught by the prior art.  *See, e.g.*, Ex. 44, PAR-VASO_0005816-17 ('209 patent); Ex. 45, PAR-VASO_0009721-22 ('785 patent).

323.    Upon information and belief, the inventors were aware that they needed show that the claimed pH and ranges were not obvious over PPC's pH of 2.5 to 4.5.  Each declaration submitted to support the criticality of the claimed pH value expressly referenced pending rejections over *inter alia* PPC and stated that the inventors were familiar with the pending rejections.  *See, e.g.*, Ex. 43, PAR-VASO_0004878, ¶ 2; Ex. 43, PAR-VASO_0004889, ¶ 2; Ex. 43, PAR-VASO_0004903, ¶ 2.

324.    Upon information and belief, the inventors were also aware that they needed to demonstrate that the claimed pH and ranges are more stable than PPC's pH of 2.5 to 4.5.  Indeed,

during the prosecution of the '239, '478, '526, '209, and '785 patents, in support of their arguments that the claimed pH ranges and pH are nonobvious over PPC, the inventors submitted declarations ( or relied on identical data added to the patent specifications) to demonstrate the criticality of the claimed pH ranges of 3.5-4.1 (for the '239 patent) and 3.7-3.9 (for the '209 and '785 patents), and claimed pH of 3.8 (for the '526 and '478 patents), in each case over PPC's teaching of pH 2.5 to 4.5.  *See, e.g.*, Ex. 43, PAR-VASO 0004876-910; Ex. 44, PAR-VASO_0005816-17 ('209 patent); Ex. 45, PAR-VASO_0009721-22 ('785 patent).

325.   Each declaration submitted to support patentability over PPC also expressly references the "criticality" of the claimed pH value based on stability and impurity levels.  *See, e.g.*, Ex. 43, PAR-VASO_0004887, ¶ 30 ("Thus, the criticality of pH 3.8 in stabilizing a vasopressin formulation would be desirable to the FDA and ICH, and therefore would result in a practical benefit to a user of a vasopressin."); Ex. 43, PAR-VASO_0004892, ¶ 15 ("The criticality of pH 3. 8 in stabilizing vasopressin, while providing the lowest amount of impurities, is not evidence from the disclosures of PPC or Treschan ....").

326.



███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

327.    In order to show that the claimed pH and ranges are more stable than PPC's pH of 2.5 to 4.5, the inventors submitted vasopressin assay data and impurities data at both 25°C and 40°C to the Patent Office.  *See, e.g.*, Ex. 43, PAR-VASO 0004878, ¶ 2; Ex. 43, PAR-VASO_0004889, ¶ 2; Ex. 43, PAR-VASO_0004903, ¶ 2.  The Kannan Criticality Declaration informed the Examiner that "[ n ]ormalization is a standard technique used by analytical chemists that allows direct comparison between two data sets by removing systematic differences due to, for example, the starting amount of a sample."  Ex. 43, PAR-VASO 0004882, ¶ 15.  The Kannan Criticality Declaration averred that normalization of assay data permits a "direct comparison in the difference in vasopressin assay over time was possible without regard to the starting assay amount."  *Id.*

328.    The Kannan Criticality Declaration's statement that "pH was the only variable not normalized" was false.  As evidenced by the data included with the Kannan Criticality Declaration, each test composition also had different impurity levels at the beginning of the study.  *See, e.g.*, Ex. 43, PAR-VASO_0004882, ¶ 16.  However, impurity levels were not normalized.

329.    █████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

330. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ ████████████████

████████████████████████████████████

331.  ███████████████████████████████████

████████████████████████████████████████

332.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████ which

supported their allegation during prosecution that pH 3.8 is critical:

- "At 25 °C, ... pH 3.7 also provided higher levels of impurities as compared to the formulation at pH 3.8";

- "At 40 °C, ... pH 3.6 also provided higher levels of impurities as compared to the formulations at pH 3.7 and pH 3.8"; and

- "The formulation at pH 3.8 provided ... lower levels of impurities than did the formulations at pH 3.6 or pH 3.7 at 40 °C."

Ex. 43, PAR-VASO 0004881, ¶¶ 10-12.  Based on the ████████████████ Mr. Kannan concluded that "pH 3.8 provided the best overall results," based in part on the lower level of impurities.  *Id.*, ¶ 12.

333.  ████████████████████████████████████

████████████████████ contradicts the applicants' arguments that pH 3.5 to 4.1, pH 3.8 and pH 3.7 to 3.9 are critical.

334.  ████████████████████████████████████

████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

335. 

336.

*See, e.g.*, Ex. 43, PAR-VASO_0004881-81, ¶¶ 10-13; Ex. 43, PAR-VASO_0004891-92, ¶¶ 11-15; Ex. 43, PAR-VASO_0004910, ¶¶ 8-10.

337.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ the rate of change in assay values at 25°C was

lowest at pH 3.7 and 3.8, which supported the applicants' argument that pH 3.8 and pH 3.7 to 3.9

are critical.   *See, e.g.*, Ex. 43, PAR-VASO-0004881-81, ¶¶ 10-13; Ex. 43, PAR-

VASO_0004891-92, ¶¶ 11-15; Ex. 43, PAR-VASO_0004910, ¶¶ 8-10.  ██████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

338.   The only reasonable inference that can be drawn from this ██████████████

████████████████████████████████████████████████████████

████████████████████████

339.   Because the ██████████████████ was withheld from the Patent Office

contradicts the applicants' arguments that the claimed pH ranges are critical based on the lower

levels of impurities at the desired value, upon information and belief, Examiner Bradley would

not have found the claimed values critical if ████████████████ had been disclosed

during prosecution of the '478, '526, '209, and '785 patents.

340.   Under these circumstances, ████████████████████████ was

necessarily material to the patentability of the '239 patent.

      **c.   The Named Inventors Withheld from the PTO Other Information Relevant to Criticality That Was Material to Prosecution of the '289, '478, '526, '209, and '785 Patents.**

341.   As discussed above, during the prosecution of the '239, '478, '526, '209, and '785

patents, Examiner Bradley recited a prior art vasopressin formulation, PPC, which had a pH of

2.5 to 4.5, as a basis for rejecting the claims of the '239, '478, '526, '209, and '785 patents.  Also

as discussed above, to overcome the Examiner's rejection, the applicants submitted supporting declarations and argued that the claimed pH ranges and pH are critical for stability of vasopressin formulations.

342. Upon information and belief, in addition to the normalized impurity data discussed in the preceding section, the inventors omitted and withheld from the Patent Office other information material to their allegation that the claimed pH ranges and pH are critical for stability of vasopressin formulations.

343. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████

344. As set forth above, the purported difference in impurity levels in the data reported by the Kannan Criticality Declaration between pH 3.8 and pH 3.6 is no more than 0.13% after storage at 25°C. Ex. 43, PAR-VASO_0004901; █████████████████████████
████████████████████

345. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████

346. █████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████

347. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

348. ████████████████████████████████████████

████████████████████████████████████████ Examiner Bradley

would not have accepted the applicants' representation that the claimed pH ranges and pH are

critical over the prior art pH range of 3.4-3.6. Indeed, the purported difference in impurity levels

of pH 3.8 and pH 3.6, which is no more than 0.13% based on the data provided in the Kannan

Criticality Declaration, ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

349.   Upon information and belief, although the inventors were aware of ████████████

███████████  they did not inform the Examiner of the same because such information would

directly undermine the applicants' arguments that pH 3.5 to 4.1, pH 3.8, and pH 3.7 to 3.9 are

each critical over the pH range of PPC.

350.   Upon information and belief, the inventors withheld information regarding ████

███████████████████████████████████████████ with

the specific intent to deceive the Patent Office.  In addition, as set forth above, the pH

optimization study recited in the Kannan Criticality Declaration was not the only pH

optimization study that the inventors had performed before the Declaration ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



351. ████████████████████████████████████

352. ████████████████████████████████████

353. ████████████████████████████████████

354. ████████████████████████████████████

355. ████████████████████████████████████████████

████████████

████████████████████████████████████████

████████████████████████████████

356. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

357.    The Kannan Criticality Declaration does not disclose ████████████████████

████████████████████████████████████████████████████████

████

358.    Upon information and belief, had Examiner Bradley ████████████████████████

███████████████████████████████ Examiner Bradley would not have accepted

the inventors' representation to the Patent Office that the claimed pH ranges and pH are critical.

Under these circumstances, ███████████████████████ was necessarily material to the

patentability of the '239, '478, '526, '209, and '785 patents.

359.    Upon  information  and  belief,  although  the  inventors  were  aware  of ████

████████████████████████ they did not inform Examiner Bradley of the same because

such information would directly undermine the applicants' arguments that pH 3.5 to 4.1, pH 3.8

and pH 3.7 to 3.9 are critical.

**4.      Inequitable Conduct During the Prosecution of the '239, '478, '526, '209 and '785 patents renders the '223 patent unenforceable**

360.    The application for the '223 patent was filed at the PTO on May 26, 2017, as U.S. Application No. 15/606,442 ("the '442 Application").  The '442 Application is a continuation in part of the '693 patent, which is a continuation-in-part of the '640 Application (the '526 patent), which is a continuation-in-part of the '877 Application (the '239 patent), which is a continuation of the '499 Application. The '209 patent, like the '239 patent, purports to claim priority to the '499 Application.

361.    The named inventors on the face of the '223 patent are Matthew Kenney, Vinayagam Kannan, Sunil Vandse, and Suketu Sanghvi.

362.    Claim 1 of the '223 patent, like the '239 patent, recites a method of increasing blood pressure in a human in need thereof by administering vasopressin.

1. A method of increasing blood pressure in a human in need thereof, the method comprising:

a) providing a pharmaceutical composition for intravenous administration comprising: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically acceptable salt thereof; ii) acetate buffer; and iii) water, wherein the pharmaceutical composition has a pH from about 3.7 to about 3.8,

wherein the pharmaceutical composition is provided in a container;

b) puncturing a dispensing region of the container a first time and drawing from the container a portion of the pharmaceutical composition;

c) intravenously administering the portion of the pharmaceutical composition to the human,

wherein the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically acceptable salt thereof per minute,

wherein the human is hypotensive;

d) puncturing the dispensing region of the container a second time and drawing from the container a second portion of the pharmaceutical composition,

wherein the second time that the dispensing region of the container is punctured occurs at least 48hours after the first time that the dispensing region of the container is punctured;

e) intravenously administering the second portion of the pharmaceutical composition to the human,

wherein the administration of the second portion of the pharmaceutical composition provides to the human from about 0.01 units of vasopressin or the pharmaceutically acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically acceptable salt thereof per minute.

Ex. 58 [223 patent] at.

363.   ██████████████████████████████████████████████████

██████████████████████████████████████████████

364.    Christina Bradley was the examiner of record during prosecution of the '223 patent at the PTO.  Ex. 58.  Christina Bradley is the same examiner who prosecuted the '239 patent.  Ex. 30, PAR-VASO_0000199.

365.    The '223 patent claims administering a vasopressin formulation comprising about 0.01 to about 0.07 mg/mL vasopressin.  The '223 patent recites a pH from about 3.7 to about 3.8.  The '223 patent recites a rate of administration of 0.01 to 0.1 units of vasopressin per minute.  The '223 patent requires that the human be hypotensive.

366.    The '223 patent is directly and necessarily related to the '239, '478, '526, '209, and '785 patents.

367.    The prosecution of the '223 patent is directly and necessarily related to the '239, '478, '526, '209, and '785 patents.

368.    On information and belief, because the '223 patent contained claims to a pH "from about 3.7 to about 3.8" the Examiner concluded the claims were allowable in part because of the false statements and material omissions of applicants described in detail above.

-107-

369.   Because patents related to the '223 patent were obtained after the inventors and/or their attorneys committed clear inequitable conduct, the Court should also find the '223 patent is unenforceable.

**FIRST COUNTERCLAIM**
(Declaration of Non-Infringement)

31.370.      Amphastar realleges Paragraphs 1-30369 as though fully set forth herein.

32.371.      A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaration of rights by this Court exists between Counterdefendants and Amphastar concerning the non-infringement of the Patents-in-Suit.

33.372.      The manufacture, use, sale, offer for sale, and/or importation of the Amphastar ANDA Product does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid, enforceable claim of the Patents-in-Suit.

34.373.      Amphastar's Notice Letter included a detailed statement of the factual and legal bases for why Amphastar's ANDA Product does not infringe the Patents-in-Suit. Amphastar incorporates by reference the factual and legal bases provided in the Notice Letter. Amphastar's ANDA Product would not infringe any valid claim of the '223 patent for at least the additional reason that it is a single dose vial, and the package insert instructs the user to discard the vial 48 hours after the first puncture.  Amphastar expressly reserves the right to assert additional grounds of non-infringement.

35.374.      Amphastar is entitled to a judicial determination that the sale, offer for sale, manufacture, importation, or use of Amphastar's ANDA Product does not, and would not if

marketed, infringe any valid and enforceable claim of the '478, '526, '209, '239, '785, and '223 patents.

## SECOND COUNTERCLAIM
(Declaration of Invalidity)

36.375.        Amphastar Pharmaceuticals, Inc. realleges Paragraphs 1-35374 as though fully set forth herein.

37.376.        A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaration of rights by this Court exists between Counterdefendants and Amphastar concerning the invalidity of the Patents-in-Suit.

38.377.        The claims of the '239 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.  The claims of the '239 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus® Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med.* 2007, 2280-85; Dünser et al., *Anaesthet. Analg*. 2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

39.378.          The claims of the '223 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.  The claims of the '223 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus® Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med.* 2007, 2280-85; Dünser et al., *Anaesthet. Analg.* 2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

40.379.          The claims of the '478 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.  The claims of the '478 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus® Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med.* 2007, 2280-85; Dünser et al., *Anaesthet. Analg.*

2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

41.380.     The claims of the '526 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.  The claims of the '526 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus® Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med*. 2007, 2280-85; Dünser et al., *Anaesthet. Analg*. 2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

42.381.     The claims of the '785 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282.  The claims of the '785 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus®

Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med.* 2007, 2280-85; Dünser et al., *Anaesthet. Analg.* 2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

43.382.     The claims of the '209 patent are invalid for failure to satisfy one or more of the provisions set forth in 35 U.S.C. §§ 100 *et seq.*, including, without limitation, the requirements of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting and/or any other judicially created requirements for patentability and enforceability of patents and/or in view of the defenses recognized in 35 U.S.C. § 282(b).  The claims of the '209 patent are invalid at least under 35 U.S.C. § 103 in view of at least the prior art cited in the Notice Letter, alone or in combination with one or more of the others, including:  Novaplus® Package Insert (Fresenius Kabi); International Patent Publication No. WO 2010/030180; Kanagarajian et al., *Clinical Toxicology* 2007, 45, 56-59; Luckner et al., *Crit. Care Med.* 2005, 33:2659-66; Luckner et al., *Crit. Care Med.* 2007, 2280-85; Dünser et al., *Anaesthet. Analg.* 2001, 93:7-13; Remington's Pharmaceutical Sciences, 20th Ed.; European Patent No. 2185170; Kumar et al., *J. Chem. Pharm. Res.*, 2010, 2(3):424-432; Hedge, et al., *Endocrinology* 1996, 79, 328-340.

44.383.     The Notice Letter included a detailed statement of the factual and legal bases for why the Patents-in-Suit are invalid.  Amphastar incorporates by reference the factual and legal bases provided in the Notice Letter and expressly reserves the right to assert additional grounds of invalidity.

45.384.	Amphastar is entitled to a judicial declaration that the claims of the '239, '223, '478, '526, '785, and '209 patents are invalid.

**THIRD COUNTERCLAIM**
(Declaration of Unenforceability)

385.	Amphastar Pharmaceuticals, Inc. realleges Paragraphs 1-384 as though fully set forth herein.

386.	A case of actual, substantial and continuing justiciable controversy having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaration of rights by this Court exists between Counterdefendants and Amphastar concerning the unenforceability of the Patents-in-Suit.

387.	One or more of Plaintiffs, the named inventors of the Patents-in-Suit, their attorneys, representatives, predecessors in interest, and/or other persons with a duty of candor to the PTO failed to disclose to the Patent and Trademark Office (PTO) material information regarding the Patents-in-Suit and did so with an intent to deceive as discussed above.

388.	As a result of the actions of one or more of Plaintiffs, the named inventors of the Patents-in-Suit, their attorneys, representatives, predecessors in interest, and/or other persons with a duty of candor to the PTO, each of the Patents-in-Suit is unenforceable for inequitable conduct and/or unclean hands.  Amphastar is entitled to a judicial declaration that the Patents-in-Suit are unenforceable

**DEMAND FOR JUDGMENT**

WHEREFORE, Amphastar Pharmaceuticals, Inc. prays for the following relief:

A.	That the Court order the Complaint dismissed with prejudice and judgment be entered in favor of Amphastar Pharmaceuticals, Inc.;

B.      That a judgment be entered declaring that the manufacture, import, use, sale, and/or offer to sell Amphastar Pharmaceuticals, Inc.'s ANDA Product, has not infringed, does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily) any valid, enforceable claim of U.S. Patent Nos. 9,375,478, 9,687,526, 9,744,209, 9,744,239, 9,750,785 and 9,937,223;

C.      That a judgment be entered declaring the claims of U.S. Patent Nos. 9,375,478, 9,687,526, 9,744,209, 9,744,239, 9,750,785 and 9,937,223 invalid;

D.      That a judgment be entered declaring U.S. Patent Nos. 9,375,478, 9,687,526, 9,744,209, 9,744,239, 9,750,785 and 9,937,223 unenforceable for inequitable conduct and/or unclean hands;

E.      That the Court declare that Amphastar Pharmaceuticals, Inc. has the lawful right to manufacture, import, use, sell, and/or offer to sell Amphastar Pharmaceuticals, Inc.'s ANDA Product in the United States once the product is approved by the FDA;

EF.     That Counterdefendants and their agents, representatives, attorneys, and those persons in active concert or participation with them who receive actual notice thereof, be preliminarily and permanently enjoined from threatening or initiating infringement litigation against Amphastar Pharmaceuticals, Inc. or any of its customers, dealers, or suppliers, or any prospective or present sellers, dealers, distributors, or customers of Amphastar Pharmaceuticals, Inc., or charging any of them either orally or in writing with infringement of U.S. Patent Nos. 9,375,478, 9,687,526, 9,744,209, 9,744,239, 9,750,785 and 9,937,223;

FG.     That a judgment be entered, declaring that this action is an exceptional case within the meaning of 35 U.S.C. § 285 and that Amphastar Pharmaceuticals, Inc. is therefore entitled to recover its reasonable attorneys' fees upon prevailing in this action;

~~G~~H.    That Amphastar Pharmaceuticals, Inc. be awarded costs, attorney's fees, and other relief, both legal and equitable, to which it may be justly entitled; and

~~H~~I.    That Amphastar Pharmaceuticals, Inc. be awarded such other and further relief as is just and proper.

Dated:  June 26, 2020                        PHILLIPS ~~GOLDMAN~~ MCLAUGHLIN & HALL, P.A.

                                             By : _____
                                                  John C. Phillips, Jr. (#110)
                                                  Megan C. Haney (#5016)
                                                  1200 North Broom Street
                                                  Wilmington, DE  19806-4204
                                                  Telephone:  (302) 655-4200
                                                  Facsimile:  (302) 655-4210
                                                  jcp@p~~g~~mh<u>de</u>law.com
                                                  mch@p~~g~~mh<u>de</u>law.com

                                             *Attorneys for Defendant<u>/Counterclaimant</u>
                                             Amphastar Pharmaceuticals, Inc.*

*Of Counsel*

William R. Zimmerman (*Pro Hac Vice ~~Pending~~*)
<u>Jonathan E. Bachand (*Pro Hac Vice*)</u>
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave. N.W., Ste. 900
Washington D.C. 20006
202-640-6412 - Direct
Tel: (202) 640-6400
Fax: (202) 640-6401
Bill.Zimerman@knobbe.com
<u>Jonathan.Bachand@knobbe.com</u>

William O. Adams (*Pro Hac Vice ~~Pending~~*)
Karen M. Cassidy (*Pro Hac Vice ~~Pending~~*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor

Irvine, CA 92614
Tel: (949) 760-0404
Fax: (949) 760-9502
William.Adams@knobbe.com
Karen.Cassidy@knobbe.com

31515432
33057428