## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>██████████████ |

## AMENDED JOINT [PROPOSED] PRETRIAL ORDER

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure.  Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively "Plaintiffs" or "Par") and Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York LLC, Amneal Biosciences LLC, and Amneal Pharmaceutical Pvt. Ltd.'s ("Defendants" or "Amneal"), by their undersigned counsel, collectively submit this proposed Joint Pretrial Order pursuant to D. Del. L.R. 16.3.  The parties attempted in good faith to reach consensus on the following issues.  To the extent the parties had differing

positions, each parties' respective proposal is explained for the Court's consideration.  A Pretrial Conference was held on January 5, 2021, but the trial scheduled for January 11, 2021 was postponed.  Trial was rescheduled for February 1, 2021 before being further postponed until July 7, 2021.  On June 9, 2021, the Court severed the infringement portion of the case and ordered that the July 7, 2021 trial proceed only with respect to Amneal's invalidity and unenforceability defenses.  Accordingly, the issues in this case relating to Amneal's allegations that the Asserted Claims are invalid and unenforceable, which are described in the following Exhibit sections:

- Exhibit 3, Sections I, II, IV-VIII;

- Exhibit 5, Substantive Issues of Law Remaining to be Litigated Sections I, III-V; Legal Authority Sections I, II, IV-VI; and

- Exhibit 14, Sections I, III-V[1],

are to be tried along with *Par Pharmaceutical, Inc., et al. v. Eagle Pharmaceuticals, Inc.,* C.A. No. 18-cv-823-CFC (the "Eagle Action").[2]  The issues

---

[1] While Amneal's exhibits to this Amended Pre-trial Order may at times address both infringement and invalidity issues, for purposes of this Amended Pretrial Order, Amneal relies on its disclosures with respect to invalidity issues.  Amneal reserves the right to amend any amended or supplemental pretrial order filed with respect to alleged infringement issues.

[2] Amneal intends to rely on the evidence presented by Eagle's expert witnesses with respect to issues regarding invalidity and unenforceability.

in this case relating to Par's allegations that Amneal infringes the Asserted Claims will be tried at a later date.[3]  In addition to the revisions to the body of the Pretrial Order below, amended versions of Exhibits 1, 2, 4, 7, 9, and 13 are submitted herewith.

## I.   NATURE OF THE CASE AND PLEADINGS

### A.   Nature of the Action

1.     This is a Hatch-Waxman patent infringement action in which Par asserts that Amneal has infringed and will infringe U.S. Patent Nos. 9,744,209 ("the '209 patent") and 9,750,785 ("the '785 patent") (collectively, the "Asserted Patents").  These actions arise under the Patent Laws of the United States, 35 U.S.C. § 100, *et seq.*  The accused products are described in two Abbreviated New Drug Applications ("ANDAs") Nos. 212944 and 212945, filed under 21 U.S.C. § 355(j) seeking approval from the United States Food and Drug Administration ("FDA") to engage in the commercial manufacture, use, and sale of two proposed generic Vasopressin Injection USP products.  Amneal's ANDA No. 212944 seeks FDA approval to engage in the commercial manufacture, use, and sale of a proposed generic Vasopressin Injection USP, 20 units/1 mL (1 mL) product (the

---

[3] This Amended Pretrial Order will be subject to further amendments prior to any such trial addressing Amneal's alleged infringement of the Asserted Claims. [**Amneal's proposal**]: Should the Eagle Action resolve before the issues of invalidity and unenforceability of the Asserted Claims are tried, Amneal reserves the right to further amend this Amended Pretrial Order.

"SDV ANDA").  Amneal's ANDA No. 212945 seeks FDA approval to engage in the commercial manufacture, use and sale of a proposed Vasopressin Injection USP, 20 units/1mL (10 mL product) (the "MDV ANDA" and, collectively with the SDV ANDA, "Amneal's ANDAs").  Par asserts that Amneal infringes claims 1-2 and 4-8 of the '209 patent and claims 1, 5, and 8 of the '785 patent (the "Asserted Claims").  Amneal asserts that it does not infringe any of the Asserted Claims and that the Asserted Claims are invalid and unenforceable.

2.     The operative pleadings are Par's Complaint (D.I. 1), Amneal's Amended Answer, Defenses, and Counterclaims (D.I. 145), and Par's Answer to Amneal's Amended Counterclaims (D.I. 183).

3.     The Court issued an Order on claim construction on May 11, 2020 (D.I. 105).  The Court also entered an Order on claim construction on July 22, 2020 (D.I. 179, so ordered on July 22, 2020).

## II.     JURISDICTION

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), 21 U.S.C. § 355(j)(5)(C), and 28 U.S.C. §§ 2201 and 2202. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1400(b), and 21 U.S.C. § 355(j)(5)(C)(i)(II).  Jurisdiction and venue are not disputed.

## III.   STATEMENT OF ADMITTED FACTS

5.     The parties stipulate to the facts listed in the attached **Exhibit 1**.

These proposed stipulated facts require no proof at trial and will become part of the

evidentiary record in this case.

## IV.   STATEMENTS OF CONTESTED ISSUES OF FACT

6.     Plaintiffs' statement of contested issues of fact is attached as

**Exhibit 2**.

7.     Defendants' statement of contested issues of fact is attached as

**Exhibit 3**.

## V.   STATEMENTS OF CONTESTED ISSUES OF LAW

8.     Plaintiffs' statement of contested issues of law is attached as

**Exhibit 4**.

9.     Defendants' statement of contested issues of law is attached as

**Exhibit 5**.

## VI.   EXHIBITS

### A.   Exhibit Lists

10.     The parties' joint list of exhibits is attached as **Exhibit 6**.

11.     Plaintiffs' list of exhibits and Defendants' objections thereto is

attached as **Exhibit 7**.

12.     Defendants' list of exhibits and Plaintiffs' objections thereto is

attached as **Exhibit 8**.

13.     Subject to the remaining provisions of this Order, no party may add to its exhibit list or use at trial an exhibit not present on its list absent good cause. Each party reserves the right to offer exhibits from any other party's trial exhibit list, even if not separately listed on its own exhibit list.  The demonstrative exhibits the parties intend to use at trial do not need to be included on their respective exhibit lists.  The parties also agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding the document.

14.     Exhibits to be used solely for impeachment need not be included on the lists of trial exhibits or disclosed in advance of being used at trial.  Such exhibits used solely for impeachment and not included on an exhibit list may not be admitted into evidence.

15.     Statements from any request for admission responses, interrogatory responses, or pleadings may be read at trial and need not be included on the exhibit lists.

**B.     Demonstratives and Summary Exhibits**

16.     Notwithstanding any contrary provisions in this Order, the parties will disclose and exchange copies of demonstrative and summary exhibits in accordance with the following procedure.

17.     Plaintiffs' demonstratives will be identified with PDX numbers.

18.     Defendants' demonstratives will be identified with DDX numbers.

19.     The parties shall exchange complete color representations of all demonstrative exhibits, excluding those for opening and closing statements, no later than 7:00 p.m. the night before they will be used in Court and any objections thereto will be lodged by 9:00 p.m. that same night.[4]  The parties shall meet and confer at 10:00 p.m. that night to resolve the objections.

20.     By no later than 5:00 p.m. on the calendar day before the opening statements, the Parties shall exchange color copies of demonstrative exhibits that they intend to use in their respective opening statements.  By no later than 7:00 p.m. that same day, any objections to the demonstrative exhibits shall be lodged. By no later than 8:00 p.m. that same day, the parties shall meet and confer to resolve any objections, which if necessary will be raised with the Court the following morning.

21.     The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF form.  However, for video or animations, the party seeking to use the demonstrative will provide it to the other side via DVD, CD, flash drive, email, or secure FTP or Box website.  For irregularly sized physical exhibits, the party seeking to use the demonstrative will

---

[4] All times set forth herein refer to Eastern Daylight Time (EDT).

provide a color representation as a PDF or 8.5 x 11 copies of the exhibits, in addition to making them available for inspection.

22.    The provisions in this section do not apply to demonstratives created during testimony or argument at trial or to demonstratives to be used for cross examination, neither of which need to be provided to the other side in advance of their use.  In addition, ballooning, blow-ups, excerpting, or highlighting of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

23.    If good faith efforts to resolve objections to demonstrative or physical exhibits fail, the objecting party shall raise its objections with the Court prior to their anticipated use.

24.    Any exhibit identified on a party's exhibit list and not objected to is deemed to be authentic and admissible and may be entered into evidence by the party, except that nothing herein shall be construed as a stipulation or admission that the document is entitled to any weight in deciding the merits of this case.

25.    The parties stipulate to the authenticity of the documents listed in the attached exhibit lists unless such objections are specifically and expressly preserved therein.  The parties further agree that they will not dispute the authenticity of any document that was produced during discovery, which on its face appears to have been authored by an employee, officer or agent of the

producing party in the ordinary course of business, and that such documents shall be deemed prima facie authentic, subject to the right of the party against whom such a document is offered to adduce evidence to the contrary or to require the offering party to provide authenticating evidence if the opposing party has a reasonable basis to believe the document is not authentic and subject to any contrary determination or ruling by the Court.

26.    Complete legible copies of documents may be offered and received in evidence to the same extent as an original unless a genuine question is raised as to the authenticity of the original, or in the circumstances it would be unfair to admit the copy in lieu of the original.  Legible copies of United States patents may be offered and received in evidence in lieu of certified copies thereof, subject to all other objections that might be made to the admissibility of certified copies.

## VII.    **WITNESSES & EXHIBIT DISCLOSURE PROCEDURE**

### A.    **Live Witnesses & Exhibits**

27.    Plaintiffs' list of the names of the fact and expert witnesses that they intend to call at trial is attached as **Exhibit 9**.

28.    Defendants' list of the names of the fact and expert witnesses that they intend to call at trial is attached as **Exhibit 10**.

29.    Any witness not listed in the exhibits referenced above will be precluded from testifying absent good cause shown, except that each party reserves

the right to call such rebuttal witnesses (who are not presently identifiable) as may be necessary.  Defendants shall identify any such un-listed rebuttal witnesses that they intend to call no later than the close of Plaintiffs' case-in-chief.  Plaintiffs shall identify any such un-listed rebuttal witnesses that they intend to call no later than the close of Defendants' rebuttal.  Subject to the notice requirements adopted by the Court, the listing of a witness on a party's pre-trial witness list does not require that party to call that witness to testify, and does not necessarily mean that the listing party has the power to compel the live testimony of that witness.

30.     For those depositions that have been videotaped, to the extent admissible, a party may introduce the deposition excerpt by videotape instead of, or in addition to, by transcript.  If a party opts to introduce deposition testimony by videotape, any counter-designations of that same witness's deposition testimony must also be submitted by videotape.

31.     When deposition designation excerpts are introduced, all admissible deposition counter-designation excerpts, whether offered by videotape or by transcript, will be introduced simultaneously in the sequence in which the testimony was originally given.  To the extent such designations are read or played in open court, each party will be charged for the time taken to read or play its designations.  If the parties cannot agree on an appropriate time apportionment for the designations, each party will be charged for the proportion of lines of testimony

for its designations to the total number of lines of testimony read or played.  The parties agree to edit out deposition objections and long pauses between the end of an answer and the start of the next question from the clips of the deposition designations to be played to the Court, and further agree to meet and confer regarding any designated colloquy, i.e., between counsel.

32.     Each side will provide to the other side the name of any witness that it intends to call to testify, whether live or by deposition testimony, the exhibits to be introduced through each such witness, and the order of presentation of those witnesses, by no later than 7:00 p.m. two days before the day the witness is expected to testify.  Thereafter, each side shall update its expected witnesses at the end of each trial day by 7:00 p.m.  If later events cause the need to remove a witness from a party's witness list, the parties agree to notify the other side as soon as possible.  Objections to the identified exhibits to be introduced on direct examination shall be provided by 7:00 p.m. the following evening.  The parties shall meet-and-confer by 10:00 p.m. the same day regarding any objections to the identified exhibits.  Thus, for example, the parties will provide notice of what witness they intend to call live and the exhibits they will use on direct examination on a Monday by the previous Saturday at 7:00 p.m. and objections thereto shall be provided by 7:00 p.m. Sunday, with a meet-and-confer to occur as necessary by 10:00 p.m. Sunday.  Any disputes or objections that cannot be resolved shall be

raised with the Court before calling such witnesses or using any such exhibits during examination of the witness.

33.     The parties agree that this provision does not require the disclosure of exhibits to be used for cross examination or redirect examination.

34.     The parties have met and conferred to develop protocols for the remote examination of Dr. Winter.

35.     For a witness who is to testify out of order or has limitations or requirements with regard to timing or availability, the sponsoring party must, if possible, raise these issues no later than two calendar days prior to the day said witness is to testify in order for the Court to have sufficient time to resolve any issues, as necessary. The parties agree to be reasonable and cooperate in permitting witnesses to testify out of order due to scheduling issues outside of the witness' or parties' controls.

36.     The parties understand that Defendants' expert witness, Gerhard Winter, Ph.D. will be testifying remotely from Belgium.  In order to account for the difference in time zone and allow Dr. Winter to testify at a reasonable local time, the parties agree that Defendants may amend the order of presentation of Defendants' rebuttal cases, so long as the disclosures under this section are otherwise timely made, including the advance notice required by Paragraph 36.

37.     The parties will meet and confer on specific procedures to ensure that binders can be printed and delivered to Dr. Winter, or otherwise agree to use electronic documents. The boxes or other packages containing the cross-examination exhibits will be sealed and shall remain sealed until Opposing Counsel instructs the witness and Examining Counsel to open them during the trial on camera.

### B.     Deposition Designations

38.     Plaintiffs' list of deposition designations, Defendants' objections to Plaintiffs' designations, Defendants' counter-designations, and Plaintiffs' objections to such counter-designations are attached as **Exhibit 11**.

39.     Defendants' list of deposition designations, Plaintiffs' objections to Defendants' designations, Plaintiffs' counter-designations, and Defendants' objections to such counter-designations are attached as **Exhibit 12**.

40.     Absent good cause shown, no deposition testimony not previously designated pursuant to this Order may be later added for these witnesses.

41.     The deposition testimony taken by defendants in both *Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals Inc.*, C.A. No. 18-cv-823-CFC (D. Del.) and *Par Pharmaceutical, Inc. et al. v. Sandoz Inc.*, 18-cv-14895-BRM-DEA (D.N.J.) may be used as if taken in this case.

42.     With respect to those witnesses who will be called to testify at trial (designated in the Pretrial Order as "will call"), no deposition designations or counter-designations are required.  A party shall promptly provide notice if for any reason it does not intend to call live a witness who is so identified on the list of trial witnesses. To the extent a party gives notice that a fact witness identified as a live witness on the list of trial witnesses is not going to be called live, the opposing party may designate specific pages and lines of transcript that it intends to read or play in lieu of the witness's appearance at least 72 hours prior to introducing the deposition testimony.

43.     Each party reserves the right to offer testimony designated by any other party (whether as a designation or counter-designation), even if not separately listed on its own deposition designation list.

44.     The parties may offer some or all of the deposition testimony set forth herein at trial.  A party's decision not to introduce some or all of the testimony of a witness designated by that party herein shall not be commented upon by the other party at trial.  However, for those witnesses to be presented via deposition testimony, the parties agree that the proffering party will provide the initial deposition designations (by page and line number) that are actually intended to be played or read at trial, or a disclosure that all pages and lines previously designated will be played by 6:30 p.m. three days prior to the day that testimony will be

- 14 -

offered.  By 6:30 p.m. the following day (two days prior to the day that the testimony will be offered), the other party will provide the specific pages and lines it counter-designates and any objections.  By 8:30 p.m. the same day, the proffering party will provide objections.  The parties shall meet-and-confer by 10:00 p.m. the same day regarding any objections to the deposition designations.  If the objections to the disputed testimony cannot be resolved by the parties, the objections will be presented to the Court as appropriate before trial resumes on the day the testimony is expected to be introduced.  By 6:30 p.m. the day before the witness will be offered by videotaped deposition, the offering party will provide to all parties the transcript clip and a copy of the video containing the designations from all parties for that witness.

45.     For rebuttal deposition testimony where compliance with the three-day deadline in the preceding paragraph is impracticable, such deadline shall not apply, and the parties will act in good faith to designate rebuttal testimony in time to allow for counter-designations, and any objections, and the parties will meet and confer to resolve the objections and to give the introducing party time to prepare any necessary video/DVD of the testimony.   [**Amneal's proposal**: Further, if any non-rebuttal witness that a party intended to call live unexpectedly becomes unavailable through no fault of that party such that compliance with the three-day deadline in the preceding paragraph becomes impracticable, the parties agree to

- 15 -

cooperate in good faith to allow for deposition designations, counter-designations, and any objections thereto for such witness to be made, and the parties will meet and confer to resolve the objections and to give the introducing party time to prepare any necessary video/DVD of the testimony.]

46.     Copies of exhibits referred to during the introduction of deposition testimony will be offered into the trial evidence record to the extent admissible. Where a video recording of a deposition is available, the offering party shall play portions of the video containing the designated testimony at trial.  Where a video recording of the deposition is not available, the offering party shall read the designated testimony into the record at trial.  Whether introduced via video recording or read into the record, deposition testimony shall count toward the offering party's total allotted time in Court.  The parties shall provide the Court with a stipulated record of the total time allocated to each party's designations.

47.     Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

## VIII.   BRIEF STATEMENT OF WHAT PLAINTIFFS INTEND TO PROVE

48.     A brief statement of what Plaintiffs intend to prove in support of Plaintiffs' claims is attached as **Exhibit 13**.

## IX.   BRIEF STATEMENT OF WHAT DEFENDANTS INTEND TO PROVE

49.    A brief statement of what Defendants intend to prove as defenses is

attached as **Exhibit 14**.

## X.   AMENDMENTS TO PLEADINGS

50.    The parties do not seek to amend the pleadings.

## XI.   MOTIONS *IN LIMINE*

51.    The parties have agreed not to submit motions *in limine*.  The parties

reserve all rights to make objections to exhibits and to fact and expert testimony

during the course of trial.

## XII.   CERTIFICATION REGARDING SETTLEMENT

52.    The parties certify that they have engaged in a good-faith effort to

explore the resolution of the controversy by settlement.  The parties have been

unable to reach agreement.

## XIII.   OTHER MATTERS

53.    The Court has entered a Stipulated Protective Order to safeguard the

confidentiality of certain of the parties' business and technical information, as well

as that of third parties.  All outside counsel shall handle such protected information

in accordance with the terms of the Protective Order and shall not disclose such

Confidential Information to persons not authorized to view such information under

the terms of the Protective Order.  Nonetheless, the presentation of evidence at trial

shall take place in open court, unless a party specifically requests, and the Court agrees, that the Court be closed to the public during presentation of certain portions of the evidence.

54.     Corporate Representatives:  Each party may have up to three corporate representatives (total) attend the entire July 7, 2021 trial, including any closed portions.  The parties have agreed that corporate representatives attending the trial need not have been listed in the Protective Order.  However, if a corporate representative is not listed in the Protective Order, that representative may not have access to the other party's confidential information except for that presented at trial.  The corporate representatives must agree to maintain in confidence the confidential information of the opposing party and all third parties that is presented during any closed portion of the trial, and to use such information only in connection with this litigation and not for any other purpose, including competitive decision making, communications with FDA, and/or patent applications or prosecution relating to any products.  Fact witnesses other than corporate representatives shall not be present in the courtroom during the presentation of evidence or arguments until they are called to testify.  Expert witnesses and outside counsel may be present in the courtroom at any time during trial.

55.     Subject to the approval of the Court, the parties propose the following order for the July 7, 2021 trial:

Plaintiffs then Defendants shall present their opening statements.  Plaintiffs

will then present their case-in-chief on infringement against Eagle. Eagle

will present its rebuttal case on infringement, and Defendants will present

their case-in-chief on invalidity and unenforceability.  Plaintiffs will then

present their rebuttal case on validity and enforceability.

56.     [**Par Proposal:**]  In the event the trial proceeds as a consolidated trial,

Par will not object to Eagle and Amneal presenting consolidated invalidity and

unenforceability arguments at trial, provided that Par shall be permitted to present

consolidated rebuttals thereto and that each expert will be permitted to testify only

about opinions and evidence that are within the scope of his/her report(s).  The

parties shall be permitted to rely on any testimony and evidence presented at trial,

even if, for example, it is testimony from an expert whose opinions were disclosed

in the other case.

[**Amneal Proposal:**]  Par will not object to Eagle and Amneal presenting

consolidated invalidity and unenforceability arguments at trial. Par will also not

object to Amneal and/or Eagle relying on testimony and evidence presented by

experts who disclosed opinions in Par's case against the other defendant.

57.     Plaintiffs and Amneal have entered into the following agreements for

the purposes of this case:

a.  

58.   [**Par Proposal**]:  Given the overlap in opinions expressed by Defendants' respective experts regarding issues of invalidity and unenforceability, and Defendants' representations that they did not intend to present duplicative expert testimony, Par requests that the Defendants disclose specific information concerning what topics will be addressed by which expert.  [**Amneal Proposal**]: Defendants have already disclosed to Par the topics that each expert witness is expected to address at trial in e-mail communications dated January 8, 2021 and June 23, 2021.

59.     [**Par Proposal**]:  Par respectfully requests a modification to the post-trial briefing schedule as follows:

| Event | Current Due Date | Proposed Modified Due Date |
|---|---|---|
| Opening Post-Trial Briefs | July 19, 2021 | July 29, 2021 |
| Responsive Post-Trial Briefs | July 26, 2021 | August 13, 2021 |

## XIIV.   <u>ORDER CONTROLS</u>

60.     This order shall control the subsequent course of the action with respect to the trial scheduled to commence on July 7, 2021, unless modified by the Court to prevent manifest injustice.

Respectfully submitted,

| | |
|---|---|
| DATED:  June 25, 2021 | FARNAN LLP |
| OF COUNSEL: | By:  /s/ Michael J. Farnan |
| | Brian E. Farnan (Bar No. 4089) |
| Martin J. Black | Michael J. Farnan (Bar No. 5165) |
| Sharon K. Gagliardi | 919 North Market St. |
| Brian M. Goldberg | 12th Floor |
| DECHERT LLP | Wilmington, DE 19801 |
| Cira Centre | Tel: 302-777-0300 |
| 2929 Arch Street | Fax: 320-777-0301 |
| Philadelphia, PA 19104 | bfarnan@farnanlaw.com |
| Tel: (215) 994-4000 | mfarnan@farnanlaw.com |
| martin.black@dechert.com | |
| sharon.gagliardi@dechert.com | *Attorneys for Plaintiffs Par* |
| brian.goldberg@dechert.com | *Pharmaceutical, Inc., Par Sterile* |
| | *Products, LLC, and Endo Par* |
| Robert D. Rhoad | *Innovation Company, LLC* |
| DECHERT LLP | |
| 502 Carnegie Center, Suite 104 | |
| Princeton, NJ 08540-7814 | |
| Tel: (609) 955-3200 | |
| robert.rhoad@dechert.com | |
| | |
| Jonathan D. J. Loeb, Ph.D | |
| DECHERT LLP | |
| 2400 W. El Camino Real, Suite 700 | |
| Mountain View, CA 94040-1499 | |
| Tel: (650) 813-4995 | |
| jonathan.loeb@dechert.com | |
| | |
| Blake B. Greene | |
| DECHERT LLP | |
| 300 W. 6th Street, Suite 2010 | |
| Austin, TX 78701 | |
| Tel: (512) 394-3000 | |
| blake.greene@dechert.com | |

| OF COUNSEL: | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
|---|---|
| Huiya Wu | /s/ Anne Shea Gaza |
| Linnea Cipriano | Anne Shea Gaza (No. 4093) |
| Tiffany Mahmood | Robert M. Vrana (No. 5666) |
| Jacqueline Genovese Bova | Rodney Square |
| Grace Peace Truong | 1000 North King Street |
| GOODWIN PROCTER LLP | Wilmington, DE 19801 |
| The New York Times Building | 302-571-6600 |
| 620 Eighth Avenue | agaza@ycst.com |
| New York, NY 10018 | rvrana@ycst.com |
| 212.813.8800 | |
| hwu@goodwinlaw.com | *Attorneys for Defendants* |
| lcipriano@goodwinlaw.com | |
| tmahmood@goodwinlaw.com | |
| jbova@goodwinlaw.com | |
| gtruong@goodwinlaw.com | |
| | |
| John T. Bennett | |
| Shaobo Zhu | |
| GOODWIN PROCTER LLP | |
| 100 Northern Avenue | |
| Boston, MA 02210 | |
| 617.570.8712 | |
| jbennett@goodwinlaw.com | |
| szhu@goodwinlaw.com | |

SO ORDERED this ___ day of _____, 2021


_____
The Honorable Colm F. Connolly
Judge, U.S. District Court for the District of Delaware

EXHIBIT 1

# EXHIBIT 1

EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>               Plaintiffs,<br><br>   v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br><br>               Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>███████████████ |

## STATEMENT OF THE FACTS
## WHICH ARE ADMITTED AND REQUIRE NO PROOF

EXHIBIT 1

# TABLE OF CONTENTS

I.    **THE PARTIES**................................................................................1

II.    **TECHNOLOGY BACKGROUND**..............................................3

III.    **PAR'S VASOSTRICT® PRODUCTS** ......................................4

    A.    Original VASOSTRICT®.........................................4

    B.    Reformulated VASOSTRICT® ................................5

IV.    **PATENT CLAIMS ASSERTED BY PAR** ..............................6

V.    **AMNEAL'S PROPOSED ANDA PRODUCTS** ....................10

VI.    **CLAIM CONSTRUCTION**....................................................12

VII.    **AMNEAL'S INVALIDITY DEFENSES**................................12

    A.    Anticipation/Obviousness ....................................12

        1.    Primary Asserted References...................13

        2.    Prior Art ...................................................15

    B.    Section 112 ...........................................................19

VIII.    **AMNEAL'S UNENFORCEABILITY DEFENSE**........................19

EXHIBIT 1

## I.   THE PARTIES

1.      Plaintiff Par Pharmaceutical, Inc. ("Par Pharmaceutical") is a corporation organized and existing under the laws of the State of New York, having a principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.  Par Pharmaceutical develops, manufactures, and markets pharmaceutical products in the United States.

2.      Plaintiff Par Sterile Products, LLC ("Par Sterile Products") is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.  Par Sterile Products develops, manufactures, and markets injectable pharmaceutical products, and provides manufacturing services to the biopharmaceutical and pharmaceutical industry.

3.      Plaintiff Endo Par Innovation Company ("EPIC") is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 1 Ram Ridge Road, Chestnut Ridge, New York 10977.

4.      Plaintiffs Par Pharmaceutical, Par Sterile Products, and EPIC are referred to collectively as "Par."

5.      Defendant Amneal EU, Limited ("Amneal EU") is a limited liability company organized and existing under the laws of the Switzerland, having its principal place of business at Turmstrasse 30 6312, Steinhausen, Switzerland.

1

EXHIBIT 1

Amneal EU develops, manufactures, markets and distributes pharmaceutical

products, including injectable pharmaceutical products, for sale in the State of

Delaware and throughout the United States.

6.     Defendant Amneal Pharmaceuticals of New York, LLC ("Amneal

New York") is a limited liability company organized and existing under the laws of

the State of Delaware having its principal place of business at 50 Horseblock Road,

Brookhaven, New York 11719.  Amneal New York develops, produces, and

distributes pharmaceutical products, including injectable pharmaceutical products,

for sale in the State of Delaware and throughout the United States.

7.     Defendant Amneal Biosciences, LLC ("Amneal Biosciences") is a

limited liability company organized and existing under the laws of the State of

Delaware having its principal place of business at 400 Crossing Boulevard, Floor

3, Bridgewater, New Jersey 08807.  Amneal Biosciences distributes

pharmaceutical products, including injectable pharmaceutical products, for sale in

the State of Delaware and throughout the United States.

8.     Defendant Amneal Pharmaceutical PVT. LTD. ("Amneal India") is a

limited liability company organized and existing under the laws of the India having

a principal place of business at Plot No. 15, PHARMEZ Special Economic Zone,

Sarkhej-Bavia N.H., No. 8A, Vil.: Matoda, Tal.:Sanand, Ahmedabad, Gujarat,

EXHIBIT 1

382213, India.  Amneal India manufactures, packages, tests, and ships

pharmaceutical products to the United States.

9.      Collectively, Defendants Amneal EU, Amneal Pharma NY, Amneal

Biosciences, and Amneal PVT are referred to collectively as "Amneal."

## II.      TECHNOLOGY BACKGROUND

10.     Vasopressin is a peptide drug that causes contraction of vascular and

other smooth muscle cells.

11.     FDA reviews ANDAs submitted by industry sponsors seeking

marketing authorization to manufacture and sell generic drug products in the

United States as part of the process to approve a generic drug product.

12.     FDA requires stability testing before drug product approval.  Stability

testing is used to evaluate the appropriate shelf-life for a new product.  It is

conducted on (among other things) samples of the final packaged proposed

pharmaceutical product.  The samples are either stored under the label-specified

storage conditions or under harsher conditions.  Samples are withdrawn

periodically and tested for, among other things, the amount of the active ingredient,

the pH, and/or the presence of impurities.  The results may be used to set the

storage conditions and the product specifications, which include pH, active

ingredient assay, and impurities.

EXHIBIT 1

13.    Typically, drug companies place the first three batches of any new product on long-term stability testing.  After approval, the FDA requires drug companies to place samples from at least one commercial batch on stability testing each year.  Any failure to meet specifications during stability testing requires investigation.

## III.    PAR'S VASOSTRICT® PRODUCTS

### A.    Original VASOSTRICT®

14.    On September 25, 2012, JHP Pharmaceuticals, LLC submitted NDA No. 204485 under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, seeking approval from the United States Food and Drug Administration ("FDA") for a vasopressin injection product to increase blood pressure in adults with vasodilatory shock.

15.    On February 20, 2014, Par Pharmaceutical Companies, Inc. acquired JHP Pharmaceuticals, LLC.  On February 26, 2014, JHP Pharmaceuticals, LLC changed its name to Par Sterile Products, LLC.

16.    On April 17, 2014, FDA approved NDA No. 204485.  The trade name for the approved vasopressin product was VASOSTRICT®.

17.    The parties refer to the formulation as described in NDA 204485, NDA 204485/S-001, and NDA 204485/S-002 and approved on April 17, 2014, September 18, 2014, and May 7, 2015 as "Original VASOSTRICT."

EXHIBIT 1

18.    Original VASOSTRICT was first sold and offered for sale in November 2014, with the approved September 2014 label.  That label (DTX-1044 at AMPHPA0006831-832) discloses that the 1 mL solution of Original VASOSTRICT "contains vasopressin 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and Water for Injection, USP adjusted with acetic acid to pH 3.4 – 3.6."

19.    Original VASOSTRICT was indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

## B.    Reformulated VASOSTRICT®

20.    Subsequently, Par Sterile Products filed a further supplement to its NDA (204485/S-003) seeking approval for a new 1 mL formulation of VASOSTRICT.  Changes to the formulation of VASOSTRICT in this supplement included addition of a sodium acetate buffer and change in pH—from 3.4 to 3.6 in Original VASOSTRICT to 3.8 in Reformulated VASOSTRICT.  On March 18, 2016, FDA approved NDA 204485/S-003.

21.    Thereafter, Par Sterile Products filed an additional supplement to its NDA (204485/S-004) seeking approval for a 10 mL multi-dose formulation of VASOSTRICT with the same concentration of vasopressin as the 1 mL formulation

EXHIBIT 1

(i.e., 20 units of vasopressin/mL). On December 17, 2016, FDA approved NDA 204485/S-004.

22. The parties refer to the current formulation of VASOSTRICT—first approved on March 18, 2016 (1 mL presentation) and December 17, 2016 (10 mL presentation)—as "Reformulated VASOSTRICT."

23. The approved label for Reformulated VASOSTRICT (PTX-469 at PAR-VASO_0014615-616) discloses that it "is a sterile, aqueous solution of synthetic arginine vasopressin for intravenous administration. The 1 mL solution contains vasopressin 20 units/mL, Water for Injection, USP and, sodium acetate buffer adjusted to a pH of 3.8."

24. Reformulated VASOSTRICT is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

25. Par first sold Reformulated VASOSTRICT in September 2016.

26. Par Sterile Products is the holder of NDA No. 204485 for VASOSTRICT, including all supplements thereto.

## IV. PATENT CLAIMS ASSERTED BY PAR

27. On August 29, 2017, the PTO issued U.S. Patent No. 9,744,209 ("the '209 patent"), entitled "Vasopressin Formulations for Use in Treatment of

EXHIBIT 1

Hypotension," to Par Pharmaceutical as assignee.  Matthew Kenney, Vinayagam

Kannan, Sunil Vandse, and Suketu Sanghvi are named as inventors.

28.     The '209 patent was filed on February 7, 2017, as U.S. Application

No. 15/426,693 (the "'693 Application").  The '693 Application is a continuation-

in-part of the '640 Application, which is a continuation-in-part of the '877

Application.

29.     Amneal alleges that the effective filing date for the Asserted Claims of

the '209 patent is February 7, 2017.  For purposes of this case only, Par accepts

that date as the effective filing date.

30.     On September 5, 2017, the PTO issued U.S. Patent No. 9,750,785

("the '785 patent"), entitled "Vasopressin Formulations for Use in Treatment of

Hypotension," to Par Pharmaceutical as assignee.  Matthew Kenney, Vinayagam

Kannan, Sunil Vandse, and Suketu Sanghvi are named as inventors.

31.     The '785 patent was also filed on February 7, 2017, as U.S.

Application No. 15/426,703 (the "'703 Application").  The '703 Application is a

continuation-in-part of the '640 Application, which is a continuation-in-part of the

'877 Application.

32.     Amneal alleges that the effective filing date for the Asserted Claims of

the '785 patent is February 7, 2017.  For purposes of this case only, Par accepts

that date as the effective filing date.

EXHIBIT 1

33.     Par Pharmaceutical is the assignee and owner of the '209 and '785 patents (collectively, "the Asserted Patents").  EPIC is the exclusive licensee of the '209 and '785 patents.

34.     Craig Kenesky and Trisha Agrawal participated in the prosecution of the Asserted Patent and the '239 patent.  Mr. Kenesky oversaw the work of Ms. Agrawal.

35.     Christina Bradley was the examiner of record during prosecution of the Asserted Patents and the '239 patent.

36.     The '209 and '785 patents are listed in the FDA publication, the Approved Drug Products with Therapeutic Equivalence Evaluations (which is referred to as the "Orange Book"), with respect to Reformulated VASOSTRICT.

37.     Par asserts that Amneal infringes claims 1-2 and 4-8 of the '209 patent.  Those claims read as follows:

**Claim 1**: A method of increasing blood pressure in a human in need thereof, the method comprising administering to the human a unit dosage form, wherein the unit dosage form comprises from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically acceptable salt thereof, wherein:

the unit dosage form has a pH of 3.7-3.9;

the unit dosage form further comprises impurities that are present in an amount of 0.9% - 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1;

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and

EXHIBIT 1

the human is hypotensive.

**Claim 2**: The method of claim 1, wherein the impurities comprise SEQ ID NO.: 2, and SEQ ID No.: 2 is present in the unit dosage form in an amount of 0.1% to 0.3%.

**Claim 4**: The method of claim 1, wherein the impurities comprise SEQ ID NO.: 4, and SEQ ID NO.: 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

**Claim 5**: The method of claim 1, wherein the impurities comprise SEQ ID NO.: 7, and SEQ ID NO.: 7 is present in the unit dosage form in an amount of 0.3% to 0.6%.

**Claim 6**: The method of claim 1, wherein the impurities comprise SEQ ID NO.: 10, and SEQ ID No.: 10 is present in the unit dosage form in an amount of 0.1%.

**Claim 7**: The method of claim 1, wherein the impurities comprise SEQ ID NO.: 2 and SEQ ID NO.: 4, and SEQ ID NO.: 2 is present in the unit dosage form in an amount of 0.1% to 0.3% and SEQ ID NO.: 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

**Claim 8**: The method of claim 7, wherein the impurities further comprise SEQ ID NO.: 3, SEQ ID NO.: 7 and SEQ ID NO.: 10, and SEQ ID No.: 3 is present in the unit dosage form in an amount of 0.1%, SEQ ID NO.: 7 is present in the unit dosage form in an amount of 0.3% to 0.6%, and SEQ ID NO.: 10 is present in the unit dosage form in an amount of 0.1%.

38.    Par asserts that Amneal infringes claims 1, 5, and 8 of the '785 patent.

Those claims read as follows:

**Claim 1**: A pharmaceutical composition comprising, in a unit dosage form, from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof, wherein the unit dosage form further comprises impurities that are present in an amount of 0.9% to 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, and wherein the unit dosage form has a pH of 3.7-3.9.

EXHIBIT 1

**Claim 5**: The pharmaceutical composition of claim 1, wherein the impurities comprise SEQ ID NO.: 4, and SEQ ID NO.: 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

**Claim 8**: The pharmaceutical composition of claim 1, wherein the impurities comprise SEQ ID NO.: 2 and SEQ ID NO.: 4, and SEQ ID NO.: 2 is present in the unit dosage form in an amount of 0.1% to 0.3% and SEQ ID NO.: 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

39.     As defined in the asserted '209 and '785 patents:

- SEQ ID NO.: 1 refers to vasopressin;

- SEQ ID NO.: 2 refers to Gly9-vasopressin (Gly9);

- SEQ ID NO.: 3 refers to Asp5-vasopressin (Asp5);

- SEQ ID NO.: 4 refers to Glu4-vasopressin (Glu4);

- SEQ ID NO.: 7 refers to Acetyl-vasopressin (Acetyl);

- SEQ ID NO.: 10 refers to D-Asn-vasopressin (DAsn).

40.     On June 9, 2021, Judge Connolly severed issues of infringement from the July 7, 2021 trial.  Accordingly, Par's allegations of infringement will be tried, if necessary, at a later date to be determined.

## V.     AMNEAL'S PROPOSED ANDA PRODUCTS

41.     On December 21, 2018, Amneal submitted ANDA No. 212944 ("Amneal's SDV ANDA") pursuant to 35 U.S.C. § 355(j), seeking approval to engage in the commercial manufacture, use, and sale of a proposed generic vasopressin product, Vasopressin Injection USP, 20 units/1 mL (20 units/mL) (1

EXHIBIT 1

mL) ("Amneal's SDV Proposed ANDA Product"), identifying VASOSTRICT as the reference listed drug.

42.     On December 21, 2018, Amneal submitted ANDA No. 212945 ("Amneal's MDV ANDA") pursuant to 35 U.S.C. § 355(j), seeking approval to engage in the commercial manufacture, use, and sale of a proposed generic vasopressin product, Vasopressin Injection, USP, 20 units/1 mL (20 units/mL) (10 mL)  ("Amneal's Proposed MDV ANDA Product"), identifying VASOSTRICT as the reference listed drug.

43.     Pursuant to its ANDAs, Amneal is seeking FDA approval to make, use, and sell both of its Proposed ANDA Products before expiration of the Asserted Patents.

44.     Amneal's SDV ANDA includes Paragraph IV certifications to the Asserted Patents pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), certifying that Amneal believes the Asserted Patents are invalid or will not be infringed by the commercial manufacture, use, or sale of Amneal's Proposed SDV ANDA Product.

45.     Amneal's MDV ANDA includes Paragraph IV certifications to the Asserted Patents pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), certifying that Amneal believes the Asserted Patents are invalid or will not be infringed by the commercial manufacture, use, or sale of Amneal's Proposed MDV ANDA Product. AMVAS0000296, at 302 (Amneal SDV Quality Overall Summary) (PTX-611)

11

EXHIBIT 1

## VI.   CLAIM CONSTRUCTION

46.    The parties stipulated that the Court's claim constructions in *Par Pharmaceutical, Inc. et al v. Eagle Pharmaceuticals, Inc.*, Civil Acton No. 1:18-cv-00823-CFC ("the Eagle Litigation") shall apply in this litigation as well.  *See* D.I. 179.  Only one of those constructions pertains to the Asserted Claims and is reproduced below:

| Claim Term | Court's Construction (Eagle Litigation) |
|---|---|
| "administering to the human a unit dosage form"  '209 patent | Plain and ordinary meaning, no construction necessary |

47.    The Court ordered that the claim term "vasopressin" in all of the Asserted Claims should be construed to mean "arginine vasopressin as described in SEQ. ID. NO. 1."  D.I. 105 at 2.

48.    The Court also ordered that the claim term "the unit dosage form has a pH of 3.7-3.9" in claim 1 of the '209 and '785 patents be given its "ordinary meaning."  D.I. 105 at 2.  No other claim term of the Asserted Claims was construed by the Court.

## VII.   AMNEAL'S INVALIDITY DEFENSES

### A.   Anticipation/Obviousness

49.    Amneal contends that the Asserted Claims are invalid as anticipated by Original VASOSTRICT.

EXHIBIT 1

50.     Amneal also contends that the Asserted Claims are invalid as obvious

in view of the following grounds:

| Patent | Claims | Obviousness Grounds |
|--------|--------|---------------------|
| '209 patent | 1-2, 4-8 | Obvious over PITRESSIN®, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of Gahart and/or Russell 2008 and the general knowledge in the art |
| '785 Patent | 1, 5, 8 | Obvious over PITRESSIN, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of the general knowledge in the art |

51.     Par denies that the asserted references anticipate or render obvious

any of the Asserted Claims.

### 1.     Primary Asserted References

52.     PITRESSIN products that were on sale and in public use before

February 7, 2017 are prior art to the Asserted Patents.

53.     Original VASOSTRICT products that were on sale and in public use

before February 7, 2017 are prior art to the Asserted Patents.

54.     The vasopressin products marketed by American Regent, Inc. and the

vasopressin products marketed by Luitpold Pharmaceuticals, Inc. (referred to

collectively by Amneal as "Luitpold (American Regent) Vasopressin Product") that

were on sale and in public use before February 7, 2017 are prior art to the Asserted

Patents.

EXHIBIT 1

55.     The PITRESSIN formulation contained vasopressin, acetic acid, chlorobutanol, and water.  Prior art to the Asserted Patents disclosed that the pH of PITRESSIN was adjusted to pH 3.6 with acetic acid.

56.     For purposes of this case only, Par does not dispute that the September 2014 (DTX-1044 at AMPHPA0006831-832) and May 2015 (DTX-1043 at PAR-VASO_0014785-786) approved labels for Original VASOSTRICT are prior art to the Asserted Patents.  The April 2014 VASOSTRICT Label (PAR-VASO_0254534-542, DTX-1042) and the September 2014 VASOSTRICT Label were before the Patent Office during prosecution of the Asserted Patents.

57.     Lithuanian Patent No. 4487, titled "Antidiuretic Preparation and Its Manufacturing Method" (translated) ("Lithuanian Patent") (AMPHPA0006289-300, DTX-1016), identifies the "date of publication of patent" as April 26, 1999.  The Lithuanian Patent discloses that the "purpose of the invention is to increase pharmaceutical activity of antidiuretic preparation and to improve its manufacturing method."  *Id.* at AMPHPA0006289.  It describes using a preparation containing animal-derived arginine vasopressin.

58.     Bi and Singh, "HPLC Method for Quantification of Arginine Containing Vasopressin," J. Liq. Chrom. & Rel. Technol. 22(4):551-60 (1999), ("Bi 1999") (AMPHPA0005652-661, DTX-248) is prior art to the Asserted

14

EXHIBIT 1

Patents.  Bi 1999 discloses an isocratic HPLC method for quantification of vasopressin.

59.     A. Russell et al., *Vasopressin versus Norepinephrine Infusion in Patients with Septic Shock*, N. Eng. J. Med. 358(9):877-87 (2008) ("Russell 2008") (AMPHPA0006646-656, DTX-232) is prior art to the Asserted Patents.  Russell 2008 was before the Patent Office during prosecution of the Asserted Patents.  Russell 2008 compares vasopressin with norepinephrine infusion in patients with septic shock.

60.     Intravenous Medications (B. L. Gahart & A. R. Nazareno *et al.*, eds. 29th ed. 2013) ("Gahart") (AMPHPA0006081-100, DTX-206) is prior art to the Asserted Patents.  Gahart is a handbook of drugs for intravenous administration.  Gahart contains an entry for Vasopressin Injection.

## 2.     Prior Art

61.     Adamsons et al, *The Stability of Natural and Synthetic Neurophysial Hormones in Vitro*, Endocrinology, 63(5):679-87 (1958) ("Adamsons") (EAGLEVAS0038897-905, PTX-153) is prior art to the Asserted Patents.

62.     Kirsch, L. E., Notari, R., *Theoretical Basis for the Detection of General-Base Catalysis in the Presence of Predominating Hydroxide Catalysis*, Journal of Pharmaceutical Sciences, 73(6):724-727 (1984) ("Kirsch 1984") (PAR-VASO_0298225-228, PTX-418) is prior art to the Asserted Patents.

15

EXHIBIT 1

63.     Lawrence, C.E., Reilly, A. A., *Maximum Likelihood Estimation of Subsequence Conservation*, J. Theor. Biol., 113:425-439 (1985) ("Lawrence") (PAR-VASO_0298726-740, PTX-423) is prior art to the Asserted Patents.

64.     Kirsch, L. E., Riggin, R., Gearhart, D., LeFeber, D., Lytle, D., *In-process Protein Degradation by Exposure to Trace Amounts of Sanitizing Agents*, Journal of Parenteral Science & Technology, 47(4):155-160 (1993) ("Kirsch 1993") (PAR-VASO_0298219-224, PTX-417) is prior art to the Asserted Patents.

65.     Jens Brange and Lotte Langkjaer, "Insulin Structure and Stability," in Stability and Characterization of Protein and Peptide Drugs: Case Histories, eds. Y. John Wang and Rodney Pearlman, Plenum Press, New York, 1993 ("Brange") (PAR-VASO_0298412-450, PTX-420) is prior art to the Asserted Patents.

66.     Joost J. M. Holthuis and Reinoud J. Driebergen, "Chromatographic Techniques for the Characterization of Proteins," in Physical Methods to Characterize Pharmaceutical Protein, eds. James N. Herron, Wim Jiskoot, Daan J.A. Crommelin, Plenum Press, New York, 1995 ("Holthuis") (PAR-VASO_0298229-302, PTX-419) is prior art to the Asserted Patents.

67.     W. Wang, *Instability, stabilization, and formulation of liquid protein pharmaceuticals*, International Journal of Pharmaceutics 185:129-188 (1999) ("Wang") (PTX-381) is prior art to the Asserted Patents.  Wang was before the Patent Office during prosecution of the Asserted Patents.

16

EXHIBIT 1

68.     M. Bi & J. Singh, *Effect of Buffer pH, Buffer Concentration and Skin with or Without Enzyme Inhibitors on the Stability of [Arg8]-vasopressin*, Int'l J. Pharmaceut. 197:87-93 (2000) ("Bi 2000") (PAR-VASO_0089744-750, PTX-275) is prior art to the Asserted Patents.  Bi 2000 was before the Patent Office during prosecution of the Asserted Patents.

69.     A. Joshi, E. Rus, L. Kirsch, *The degradation pathways of glucagon in acidic solutions*, International Journal of Pharmaceutics 203 (2000) 115-125 ("Joshi") (PTX-320) is prior art to the Asserted Patents.

70.     L. Stratton et al., *Controlling Deamidation Rates in a Model Peptide: Effects of Temperature, Peptide Concentration, and Additives*, Journal of Pharmaceutical Sciences 90(12):2141-2148 (2001) ("Stratton") (PTX-374) is prior art to the Asserted Patents.

71.     Development and Manufacture of Protein Pharmaceuticals (Nail & Akers, eds., 2002) ("Nail") (PAR-VASO_0298451-599, PTX-421) is prior art to the Asserted Patents.

72.     S. Yoshioka & V. Stella, Stability of Drugs and Dosage Forms (2002) ("Yoshioka") (EAGLEVAS0058064-337, PTX-232) is prior art to the Asserted Patents.

EXHIBIT 1

73.     Manning et al., *Stability of Protein Pharmaceuticals: An Update*, Pharm. Research, 27:544–75 (2010) ("Manning") (EAGLEVAS0038359-390, DTX-254) is prior art to the Asserted Patents.

74.     Avanti et al., "Innovative Strategies for Stabilization of Therapeutic Peptides in Aqueous Formulations," University of Groningen, 54-55 (2012) ("Avanti 2012") (AMPHPA0005495-651, DTX-263) is prior art to the Asserted Patents.

75.     Biopharmaceutics Review for NDA 204485, Center for Drug Evaluation and Research (March 2013) ("FDA Biopharmaceutics Review") (EAGLEVAS0014051, EAGLEVAS0014351-355, PTX-146) is prior art to the Asserted Patents.

76.     Chemistry Review(s) for NDA 204485, Center for Drug Evaluation and Research ("FDA Chemistry Review") (PAR-VASO_0238720-757, PTX-309) is prior art to the Asserted Patents.

77.     Pharmaceutical Formulation Development of Peptides and Proteins, 149-192 (Hovgaard *et al.*, eds.) (2013) ("Hovgaard") (AMPHPA0006136-184, DTX-1028) is prior art to the Asserted Patents.

78.     The vasopressin products Fresenius Kabi USA, LLC marketed under the trademark Novaplus® ("FK Vasopressin") that were on sale and in public use before February 7, 2017 are prior art to the Asserted Patents.  The label for the FK

EXHIBIT 1

Vasopressin product, dated October 2013 (AMPHPA0006560-565, DTX-368), was

before the Patent Office during prosecution of the Asserted Patents.

**B.     Section 112**

79.     Amneal contends that the Asserted Claims are invalid for lack of

written description and lack of enablement under 35 U.S.C. § 112 based on the

following grounds:

- Lack of written description because a POSA would not understand the patentees of the '209 and '785 patents to be in possession of the "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" limitation; and

- Lack of enablement because a POSA would not understand how to practice the "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" limitation.

80.     Par denies that Amneal's Section 112 invalidity theories render any of

the Asserted Claims invalid.

**VIII.  AMNEAL'S UNENFORCEABILITY DEFENSE**

81.     Amneal contends that the Asserted Claims are unenforceable for

inequitable conduct based on the alleged intentional withholding of material prior

art during prosecution of the Asserted Patents, and the alleged submission to the

PTO of unmistakably false declarations during prosecution of the '239 patent.

82.     Par denies the factual assertions that underlie Amneal's inequitable

conduct defense and denies that Amneal's inequitable conduct theories render any

of the Asserted Claims unenforceable.

# EXHIBIT 2

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br> v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>████████████ |

## PLAINTIFFS' STATEMENT OF CONTESTED ISSUES OF FACT

EXHIBIT 2

Pursuant to Local Rule 16.3(c)(4), Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC and Endo Par Innovation Company, LLC (collectively "Plaintiffs") submit the following statement of issues of fact that remain to be litigated.  The following statements are meant to serve as an overview of the contested facts to be litigated at trial.  Accordingly, Par reserves the right to prove additional details regarding the below facts that have been identified throughout the discovery process including facts identified in expert reports.  Plaintiffs further intend to offer evidence to rebut evidence offered by Defendants.  Plaintiffs reserve the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court, and to supplement or amend this Statement to fairly respond to any new issues that Defendants may raise.  To the extent Plaintiffs' statement of the issues of law that remain to be litigated, which is submitted as **Exhibit 4** hereto, contains issues of fact, those issues are incorporated herein by reference.  Moreover, if any issue of fact identified below should properly be considered an issue of law, then such statement should be considered to be part of Plaintiffs' statement of issues of law that remain to be litigated.  Plaintiffs incorporate by reference their expert reports in support of any proof to be presented by expert testimony.  Plaintiffs' Statement of Intended Proofs is submitted as **Exhibit 13** hereto.

EXHIBIT 2

## I.      PERSON OF ORDINARY SKILL IN THE ART

1.      A person of ordinary skill in the art ("POSA") to whom the Asserted

Patents are directed would have a Master's, Pharm.D., or Ph.D. in the field of

pharmaceutical sciences or a related discipline and several years of experience in

the development of pharmaceutical dosage forms.  The amount of experience

would vary in relation to the level of formal education and depth of experience

with pharmaceutical dosage development.  A person of ordinary skill in the art

may also have less formal education and a greater amount of experience.  Further,

a POSA would have had access to and would have worked in collaboration with

persons who have several years of experience in the formulation of drug products

as well as other professionals in the drug development field, such as

pharmacologists, chemists, biologists, or clinicians.

## II.     TECHNOLOGY BACKGROUND

2.      A peptide is a molecule comprised of a (generally linear) sequence of

amino acids joined together via peptide bonds.  The vasopressin peptide is

comprised of nine amino acids.  The Asserted Patents relate to "arginine

vasopressin" which has the peptide sequence CYFQNCPRG-NH$_2$.  The below

table summarizes the amino acids that make up peptides, along with their

abbreviations:

2

EXHIBIT 2

TABLE 2.2  Abbreviations for amino acids

| Amino acid | Three-letter abbreviation | One-letter abbreviation | Amino acid | Three-letter abbreviation | One-letter abbreviation |
|---|---|---|---|---|---|
| Alanine | Ala | A | Methionine | Met | M |
| Arginine | Arg | R | Phenylalanine | Phe | F |
| Asparagine | Asn | N | Proline | Pro | P |
| Aspartic acid | Asp | D | Serine | Ser | S |
| Cysteine | Cys | C | Threonine | Thr | T |
| Glutamine | Gln | Q | Tryptophan | Trp | W |
| Glutamic acid | Glu | E | Tyrosine | Tyr | Y |
| Glycine | Gly | G | Valine | Val | V |
| Histidine | His | H | Asparagine or aspartic acid | Asx | B |
| Isoleucine | Ile | I | | | |
| Leucine | Leu | L | Glutamine or glutamic acid | Glx | Z |
| Lysine | Lys | K | | | |

Table 2-2
*Biochemistry, Sixth Edition*
© 2007 W.H.Freeman and Company

The "NH$_2$" at the terminus of the peptide sequence indicates that the arginine vasopressin peptide is modified by the addition of an amino group.

3.      Peptide drugs can undergo various chemical degradation processes including hydrolysis, oxidation, isomerization, polymerization, and photochemical decomposition, which result in a decrease in amount of the active pharmaceutical ingredient ("API").  These processes can occur after synthesis of the API, during storage of the API prior to drug product manufacture, during manufacture of the drug product, and over the shelf-life of the manufactured drug product, resulting in the generation and growth of unwanted impurities in the drug product.

4.      In view of the prior art, a POSA would have understood that the levels of impurities and amount of degradation in a given formulation can be affected by many different factors, including, for example, how the formulation is

manufactured, storage conditions (such as temperature), the amount of time the formulation is stored, the pH of the formulation, as well as the other ingredients or excipients in a formulation.

5.      Because of degradation of vasopressin, the levels of impurities in vasopressin formulations increase over time.

6.      pH is the measure of the acidity or alkalinity of a solution.  The pH value is related to the concentration of hydrogen ions in a solution.  pH is one of many parameters that can be adjusted in a pharmaceutical formulation.

7.      A person of ordinary skill in the art ("POSA") would have understood 2-8°C to refer to refrigerated temperature and 15-30°C to refer to room temperature in the context of storing and stability testing of vasopressin formulations.

## III.   TERMINOLOGY

8.      The asserted '209 and '785 claims require a "pH of 3.7-3.9."  These limitations are referred to herein collectively as the "pH limitations."

9.      The asserted '209 and '785 claims require "impurities that are present in an amount of 0.9% to 1.7%, wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1."  Dependent claims 2 and 4-8 of the '209 patent and dependent claims 5 and 8 of the '785 patent further narrow the amount of certain impurities present—namely, 0.1-0.3% SEQ ID NO. 2 (Gly9),

EXHIBIT 2

0.1% SEQ ID NO. 3 (Asp5), 0.2-0.4% SEQ ID NO. 4 (Glu4), 0.3-0.6% SEQ ID

NO. 7 (Acetyl), and 0.1% SEQ ID NO. 10 (D-Asn), alone or in certain

combinations.  Below is a chart that summarizes these claimed values:

| Impurity | Claimed Range | Asserted Claims |
|---|---|---|
| Impurities have from about 85% to about 100% sequence homology to SEQ ID NO. 1 | 0.9 – 1.7% | All '209 and '785 claims |
| SEQ ID NO. 2 (Gly9) | 0.1 – 0.3% | '209 patent claims 2 & 7 '785 patent claim 8 |
| SEQ ID NO. 3 (Asp5) | 0.1% | '209 patent claim 8 |
| SEQ ID NO. 4 (Glu4) | 0.2 – 0.4% | '209 patent claims 4 & 7 '785 patent claims 5 & 8 |
| SEQ ID NO. 7 (Acetyl) | 0.3 – 0.6% | '209 patent claims 5 & 8 |
| SEQ ID NO. 10 (D-Asn) | 0.1% | '209 patent claims 6 & 8 |

These limitations are referred to herein collectively as the "impurity limitations."

      10.    The asserted '209 claims contain the following limitations, which are

directed to clinical elements:

- "A method of increasing blood pressure in a human in need thereof, the method comprising";

- "administering to the human a unit dosage form";

- "wherein . . . the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute"; and

- "wherein . . . the human is hypotensive."

These limitations are referred to herein collectively as the "clinical limitations."

EXHIBIT 2

## IV.   INFRINGEMENT

11.     On June 9, 2021, Judge Connolly severed issues of infringement from the July 7, 2021 trial.  Accordingly, Par's allegations of infringement will be tried, if necessary, at a later date to be determined.

12.     When Par's allegations of infringement are tried, Amneal has agreed that it will not dispute that the proposed ANDA products that are accused of infringement in this case meet all limitations of the asserted claims except for the limitation in each independent claim "wherein the unit dosage form has a pH of 3.7-3.9."  D.I. 233.

## V.   VALIDITY[1]

### A.   State of the Prior Art

13.     Vasopressin products had a long history of successful and safe use in the prior art.

---

[1] The Sections herein relating to Validity and Enforceability are set forth in response to Amneal's Statement of Contested Issues of Fact on Invalidity and Unenforceability.  Rather than setting forth the contested issues of fact, Amneal has provided a putative statement of asserted facts, the majority of which appears to be copied directly from its expert reports.  Par hereby responds to those statements by identifying facts it contends to be relevant to Amneal's allegations of invalidity and unenforceability, and which demonstrate that Amneal has failed to prove by clear and convincing evidence that any Asserted Claim is either invalid or unenforceable.  However, Par has not attempted to respond on a point-by-point basis to all of the facts set forth in Amneal's statement, and it should not be interpreted as such.  Any failure to respond to any particular alleged fact set forth in Amneal's statement is not an admission as to the truth of that fact or an indication that Par does not dispute it.  Par also incorporates by reference herein

EXHIBIT 2

14.     There were no reported issues, problems, or concerns in the prior art with the stability of vasopressin products, such as Original VASOSTRICT, PITRESSIN, and the Luitpold (American Regent) Vasopressin Product.

15.     There were no reported efforts in the prior art to try to improve the stability of Original VASOSTRICT, PITRESSIN, or the Luitpold (American Regent) Vasopressin Product.

16.     There were no reported issues, problems, or concerns in the prior art with the levels of impurities within vasopressin formulations.

17.     There were no reported disclosures in the prior art about the impurity content and amount of impurities within vasopressin formulations.

18.     Although the technology needed to measure and characterize vasopressin degradation products was known in the prior art, there were no reported disclosures about the characterization of the degradation products of vasopressin.

---

the Expert Report of Lee E. Kirsch, Ph.D Regarding Validity and Enforceability (dated October 31, 2020) (PTX-805), the Supplemental Expert Report of Lee E. Kirsch, Ph.D. Regarding Validity (dated November 11, 2020) (PTX-845), and the Second Supplemental Expert Report of Lee E. Kirsch, Ph.D Regarding Validity (dated May 17, 2021) (PTX-959).

EXHIBIT 2

19.     Before Par's patents, there was no appreciation in the prior art that the claimed pH 3.7-3.9 range would provide a vasopressin product with an enhanced stability and impurity profile.

20.     The optimal pH for vasopressin formulations had already been determined as of the effective filing date of the Asserted Patents, and the optimal pH was believed to be below that of the claimed pH 3.7-3.9 range—namely, pH 3.4-3.6 or even lower.  *See, e.g.*, Adamsons (PTX-153); Bi 2000 (PTX-275), FDA Biopharmaceutics Review (PTX-146); FDA Chemistry Review (PTX-309).

21.     The prior art taught away from the claimed pH 3.7-3.9 range because of the likelihood of enhanced degradation.

22.     The prior art taught many different strategies for trying to improve peptide stability other than optimizing the pH, including without limitation: ionic strength optimization; cosolvents; optimizing buffer choice and concentration; inert gas overlay; inclusion of antioxidants and/or chelating agents; selection of appropriate polyols; protection against radiant energy; and inclusion of various reported peptide stabilizers.

**B.     Primary Asserted References**

23.     Amneal contends that the Asserted Claims are invalid as anticipated by Original VASOSTRICT.

EXHIBIT 2

24.     Amneal also contends that the Asserted Claims are invalid as obvious in view of the following grounds:

| Patent | Claims | Obviousness Grounds |
|---|---|---|
| '209 patent | 1-2, 4-8 | Obvious over PITRESSIN, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of Gahart and/or Russell 2008 and the general knowledge in the art |
| '785 Patent | 1, 5, 8 | Obvious over PITRESSIN, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of the general knowledge in the art |

25.     Par denies that the asserted references anticipate or render obvious any of the Asserted Claims.

### 1.     Original VASOSTRICT

26.     No Original VASOSTRICT was sold with the April 2014 VASOSTRICT Label.  Original Vasostrict was first sold in November 2014, with the September 2014 VASOSTRICT Label.

27.     The Original VASOSTRICT product that was sold starting in November 2014 had a shelf life of 24 months at refrigerated conditions (2-8°C).  In May 2015, FDA approved a revised label with new storage conditions for Original VASOSTRICT, specifically, up to 12 months room temperature storage after removal from refrigeration, not to exceed the original assigned expiry period (24 months).

EXHIBIT 2

28.     There were no reported issues, problems, or concerns in the prior art with access to Original Vasostrict or storing it at refrigerated conditions.

29.     The prior art taught that the pH of Original VASOSTRICT was 3.4-3.6.

30.     Of the many lots of Original VASOSTRICT from which vials were sold before the effective filing date of the Asserted Patents, the only lot of Original VASOSTRICT identified by Amneal's expert as purportedly having a pH within the claimed pH 3.7-3.9 range when it was on sale or in public use is lot 788436.

31.     Original VASOSTRICT lot 788436 was manufactured on February 24, 2015, and vials from that lot were first sold 260 days later, on November 11, 2015.  There are no pH or impurity measurements for Original VASOSTRICT lot 788436 at the time it was on sale and in public use.

32.     To try to predict the pH of and amount of impurities within Original VASOSTRICT lot 788436 when it was on sale and in public use, Amneal's expert relies on stability data for Original VASOSTRICT lots 310571, 310573, and 310574, which were registration batches submitted with NDA 204485 ("Original VASOSTRICT Registration Batches").  The Original VASOSTRICT Registration Batches were neither sold nor publicly used before the effective filing date of the Asserted Patents.  The Original VASOSTRICT Registration Batches expired before Original VASOSTRICT was first sold in November 2014.  The stability

10

EXHIBIT 2

data for the Original VASOSTRICT Registration Batches were not publicly known.

Issues Presented:

33.     Whether Amneal can demonstrate by clear and convincing evidence that Original VASOSTRICT from lot 788436 exhibited the same pH behavior as the Original VASOSTRICT Registration Batches.

34.     Whether Amneal can demonstrate by clear and convincing evidence that Original VASOSTRICT from lot 788436 exhibited the same impurity behavior as the Original VASOSTRICT Registration Batches.

35.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, when it was on sale and in public use before the effective filing date of the Asserted Patents.

36.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, when it was administered to a patient before the effective filing date of the Asserted Patents.

EXHIBIT 2

37.     Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, had a pH of 3.7-3.9 when it was on sale or in public use before the effective filing date of the Asserted Patents.

38.     Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, had a pH of 3.7-3.9 when it was administered to a patient before the effective filing date of the Asserted Patents.

39.     Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied the impurity limitations of the Asserted Claims when it was on sale or in public use before the effective filing date of the Asserted Patents.

40.     Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied the impurity limitations of the Asserted Claims when it was administered to a patient before the effective filing date of the Asserted Patents.

41.     Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims were inherent properties of Original VASOSTRICT, including Original VASOSTRICT from lot 788436.

EXHIBIT 2

42.    Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when it was on sale or in public use before the effective filing date of the Asserted Patents.

43.    Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when it was administered to a patient before the effective filing date of the Asserted Patents.

## 2.    PITRESSIN

44.    Certain vasopressin products were sold under the trade name PITRESSIN.

45.    PITRESSIN was indicated for the prevention and treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows and in diabetes insipidus.  PITRESSIN was not indicated for the treatment of hypotensive patients.

46.    The prior art taught that the pH of PITRESSIN was 3.6.

EXHIBIT 2

47.     PITRESSIN was sold for over 100 years.  Par stopped selling PITRESSIN in the fall of 2014, more than 2 years before the effective filing date of the Asserted Patents.

48.     PITRESSIN had a shelf life of 24 months at room temperature.

49.     Of the many lots of PITRESSIN from which vials were sold before the effective filing date of the Asserted Patents, the only lot of PITRESSIN identified by Amneal's expert as having a pH within the claimed pH 3.7-3.9 range when it was on sale or in public use is lot 78495.

50.     PITRESSIN lot 78495 was manufactured on ███████, and vials from that lot were first sold on April 18, 2008.  PITRESSIN lot 78495 expired in February 2010, 7 years before the Asserted Patents were filed.

51.     The PITRESSIN formulation is different than the Original VASOSTRICT formulation.  For example, PITRESSIN contained overages of vasopressin and chlorobutanol, whereas Original VASOSTRICT did not. Specifically, the target vasopressin concentration in PITRESSIN was ███ Units/mL compared with 20.0 Units/mL in Original VASOSTRICT, and the target chlorobutanol concentration in PITRESSIN was ██ mg/mL compared with 5.0 mg/mL in Original VASOSTRICT.

EXHIBIT 2

Issues Presented:

52.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any PITRESSIN product, including PITRESSIN from lot 78495, when it was on sale and in public use before the effective filing date of the Asserted Patents.

53.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any PITRESSIN product, including PITRESSIN from lot 78495, when it was administered to a patient before the effective filing date of the Asserted Patents.

54.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, other than PITRESSIN from lot 78495, had a pH of 3.7-3.9 when it was on sale or in public use before the effective filing date of the Asserted Patents.

55.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, including PITRESSIN from lot 78495, had a pH of 3.7-3.9 when it was administered to a patient before the effective filing date of the Asserted Patents.

EXHIBIT 2

56.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, including PITRESSIN from lot 78495, satisfied the impurity limitations of the Asserted Claims when it was on sale or in public use before the effective filing date of the Asserted Patents.

57.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, including PITRESSIN from lot 78495, satisfied the impurity limitations of the Asserted Claims when it was administered to a patient before the effective filing date of the Asserted Patents.

58.     Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims were inherent properties of PITRESSIN, including PITRESSIN from lot 78495.

59.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, including PITRESSIN from lot 78495, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when it was on sale or in public use before the effective filing date of the Asserted Patents.

60.     Whether Amneal can demonstrate by clear and convincing evidence that any PITRESSIN product, including PITRESSIN from lot 78495, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when

EXHIBIT 2

it was administered to a patient before the effective filing date of the Asserted Patents.

### 3.    Luitpold (American Regent) Vasopressin Product

61.    Amneal has not demonstrated by clear and convincing evidence that the vasopressin product marketed by American Regent, Inc. and the vasopressin product marketed by Luitpold Pharmaceuticals, Inc. are the same product.

62.    Although Par disputes that the vasopressin product marketed by American Regent, Inc. and the vasopressin product marketed by Luitpold Pharmaceuticals, Inc. are the same product, for purposes of addressing Amneal's contentions, Par will refer herein to the vasopressin product marketed by American Regent, Inc. and the vasopressin product marketed by Luitpold Pharmaceuticals, Inc. collectively as "Luitpold (American Regent) Vasopressin Product."

63.    Amneal's expert identifies only four documents concerning Luitpold (American Regent) Vasopressin Product: ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ Although Amneal has provided no evidence to authenticate the foregoing confidential documents, for purposes of addressing Amneal's

17

EXHIBIT 2

contentions, Par will assume herein (but does not admit) that the documents are what Amneal claims them to be.

64.     There is no evidence that Luitpold (American Regent) Vasopressin Product ███████████████████████████████████████████████ ███████████████████████████

65.     Luitpold (American Regent) Vasopressin Product was indicated for the prevention and treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows and in diabetes insipidus.  It was not indicated for the treatment of hypotensive patients.

66.     The label for the vasopressin product marketed by American Regent, dated November 2011 (DTX-1041) instructed storage of the product solely at room temperature.

67.     The prior art taught that the pH of Luitpold (American Regent) Vasopressin Product was 2.5-4.5.

68.     It was not known in the prior art that any ████████████████ ██████████████████████████████████

69.     It was not known in the prior art that any ████████████████ ████████████████████████████████

70.     ███████████████████████████████████████ ███████████████████████████████████████████████

EXHIBIT 2

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████

71.  █████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

72.  █████████████████████████████████████████████████████

███████████████████████████

73.  Luitpold (American Regent) Vasopressin Product contained sodium chloride, which can affect drug stability by primary and/or secondary kinetic salt effects.

74.  █████████████████████████████████████████████████████

██████████████████████████████████████████

75.  ███████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

EXHIBIT 2

<u>Issues Presented</u>:

76.     Whether Amneal can demonstrate by clear and convincing evidence that the manufacturing target pH and manufacturing pH limits for Luitpold (American Regent) Vasopressin Product ███████ applied to any other lot of Luitpold (American Regent) Vasopressin Product.

77.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ████████, when it was on sale and in public use before the effective filing date of the Asserted Patents.

78.     Whether Amneal can demonstrate by clear and convincing evidence the pH of and amount of impurities having from about 85% to about 100% sequence homology to SEQ ID NO. 1 within any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ████████, when it was administered to a patient before the effective filing date of the Asserted Patents.

79.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, other than Luitpold (American Regent) Vasopressin Product from ████████, had a pH of 3.7-3.9 when

20

EXHIBIT 2

it was on sale or in public use before the effective filing date of the Asserted Patents.

80.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████, had a pH of 3.7-3.9 when it was administered to a patient before the effective filing date of the Asserted Patents.

81.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████, satisfied the impurity limitations of the Asserted Claims when it was on sale or in public use before the effective filing date of the Asserted Patents.

82.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████, satisfied the impurity limitations of the Asserted Claims when it was administered to a patient before the effective filing date of the Asserted Patents.

83.     Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims were inherent properties of

EXHIBIT 2

Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████.

84.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when it was on sale or in public use before the effective filing date of the Asserted Patents.

85.     Whether Amneal can demonstrate by clear and convincing evidence that any Luitpold (American Regent) Vasopressin Product, including Luitpold (American Regent) Vasopressin Product from ███████, satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9 and when it was administered to a patient before the effective filing date of the Asserted Patents.

### 4.   Lithuanian Patent

86.     The Lithuanian Patent, entitled "Antidiuretic Preparation and Its Manufacturing Method," appears to be a patent issued by the Republic of Lithuania.

87.     The Lithuanian Patent identifies the "date of publication of patent" as April 26, 1999, which precedes the effective filing date of the Asserted Patents by nearly 18 years.

EXHIBIT 2

88.     The Court ordered that the claim term "vasopressin" in all of the Asserted Claims should be construed to mean "arginine vasopressin as described in SEQ. ID. NO. 1." D.I. 105 at 2. The vasopressin as described in SEQ ID. NO. 1 is synthetic vasopressin. Claim Construction Hearing Tr. (Apr. 29, 2020) at 23:7-11.

89.     The Lithuanian Patent describes an antidiuretic preparation containing animal-derived vasopressin, not synthetic vasopressin as claimed in the Asserted Claims.

90.     The use of animal-derived vasopressin was the essence of the purported invention disclosed in the Lithuanian Patent.

91.     The vasopressin preparation disclosed in the Lithuanian Patent contained sodium chloride, which can affect drug stability by primary and/or secondary kinetic salt effects.

92.     The Lithuanian Patent provides no information for determining the amount of impurities within the disclosed vasopressin preparation.

93.     There is no evidence that anyone used the vasopressin preparation disclosed in the Lithuanian Patent or relied upon the reference in making a vasopressin formulation.

EXHIBIT 2

Issues Presented:

94.     Whether Amneal can demonstrate by clear and convincing evidence that the Lithuanian Patent disclosed a preparation with the vasopressin claimed in the Asserted Patents.

95.     Whether Amneal can demonstrate by clear and convincing evidence that the Lithuanian Patent disclosed a preparation with from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin.

96.     Whether Amneal can demonstrate by clear and convincing evidence that the Lithuanian Patent disclosed that the vasopressin preparation had a pH of 3.7-3.9.

97.     Whether Amneal can demonstrate by clear and convincing evidence that the Lithuanian Patent disclosed that the vasopressin preparation satisfied the impurity limitations of the Asserted Claims.

98.     Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims were inherent properties of the vasopressin preparation disclosed in the Lithuanian Patent.

99.     Whether Amneal can demonstrate by clear and convincing evidence that the Lithuanian Patent disclosed that the vasopressin preparation satisfied the impurity limitations of the Asserted Claims when it had a pH of 3.7-3.9.

EXHIBIT 2

### 5.   Bi 1999

100.   Bi 1999 discloses an isocratic HPLC method for quantification of vasopressin.

101.   Although the disclosed HPLC method purports to separate vasopressin from its degradation products, the Bi 1999 researchers did not characterize the degradation products of vasopressin.

### 6.   Gahart

102.   Gahart is a handbook of drugs for intravenous administration that contains an entry to Vasopressin Injection.

103.   The Vasopressin Injection entry in Gahart is directed primarily to the administration of intravenous Vasopressin Injection products.  Gahart discloses that all intravenous doses and uses of Vasopressin Injection are unlabeled.  Gahart does not identify any Vasopressin Injection product that was actually administered intravenously to treat hypotensive patients.

104.   Gahart makes one reference to PITRESSIN in the heading of the Vasopressin Injection entry.  Gahart does not mention Luitpold (American Regent) Vasopressin Product.

105.   Other than generally noting that Vasopressin Injection had a pH of 2.5 to 4.5, Gahart does not disclose the pH or impurity properties of any Vasopressin Injection product.

25

EXHIBIT 2

106.   Gahart notes that unopened vials of Vasopressin Injection products are stored at room temperature.

### 7.   Russell 2008

107.   Russell 2008 is directed to comparing vasopressin with norepinephrine infusion in patients with septic shock.

108.   Russell 2008 does not identify any vasopressin product that was actually administered intravenously to treat hypotensive patients, nor does Russell 2008 disclose which vasopressin product was used in the reported study.

109.   Russell does not disclose the pH or impurity properties of any vasopressin product.

### C.   Anticipation

110.   Par incorporates by reference herein the issues of fact listed above in the Validity Section.

Issues Presented:

111.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid as anticipated.

112.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid as anticipated by the prior sale or public use of Original VASOSTRICT with its prescribing information.

26

EXHIBIT 2

113.   Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied every limitation of each of the Asserted Claims when it was on sale or in public use before the effective filing date of the Asserted Patents.

114.   Whether Amneal can demonstrate by clear and convincing evidence that any Original VASOSTRICT product, including Original VASOSTRICT from lot 788436, satisfied every limitation of each of the Asserted Claims when it was administered to a patient before the effective filing date of the Asserted Patents.

## D.   Obviousness

115.   Par incorporates by reference herein the issues of fact listed above in the Validity Section.

<u>Issues Presented</u>:

116.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid as obvious in view of any of its proposed prior art combinations.

117.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid as obvious over the prior sale and public use of Original VASOSTRICT with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

EXHIBIT 2

118.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '209 patent is invalid as obvious over the prior sale and public use of PITRESSIN with its prescribing information in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

119.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '785 patent is invalid as obvious over the prior sale and public use of PITRESSIN with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

120.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '209 patent is invalid as obvious over the prior sale and public use of Luitpold (American Regent) Vasopressin Product with its prescribing information in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

121.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '785 patent is invalid as obvious over the prior sale and public use of Luitpold (American Regent) Vasopressin Product with

EXHIBIT 2

its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

122.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '209 patent is invalid as obvious over the Lithuanian Patent in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

123.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims of the '785 patent is invalid as obvious over the Lithuanian Patent in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

124.   Whether Amneal can demonstrate by clear and convincing evidence that each claim limitation of the Asserted Claims was in the prior art.

125.   Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims are inherent properties of the claimed vasopressin formulation.

126.   Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations of the Asserted Claims are necessarily present in a formulation that has from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin and a pH of 3.7-3.9.

127.   Whether Amneal can demonstrate by clear and convincing evidence that the impurity limitations were inherent properties of Original VASOSTRICT, PITRESSIN, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation as modified in the manner that Amneal proposes.

128.   Whether Amneal can demonstrate by clear and convincing evidence that Bi 1999, Gahart, or Russell 2008 discloses claimed subject matter which is absent from the primary references upon which Amneal relies.

129.   Whether Amneal can demonstrate by clear and convincing evidence which particular teachings in the asserted prior art references would have been modified or combined to achieve the claimed inventions.

130.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to modify or combine the prior art to achieve the claimed inventions in the manner that Amneal proposes.

131.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to select any Original VASOSTRICT product, PITRESSIN product, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation for the modifications and prior art combinations that Amneal proposes.

132.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to select Original VASOSTRICT from lot

7884346, PITRESSIN from lot 78495, or Luitpold (American Regent) Vasopressin

Product from ████████ for the modifications and prior art combinations that

Amneal proposes.

133.   Whether a POSA would have considered the Lithuanian Patent, which

is directed to an animal-derived vasopressin formulation, relevant to making a

synthetic vasopressin formulation, as claimed in the Asserted Claims, or found its

teachings to be instructive.

134.   Whether Amneal can demonstrate by clear and convincing evidence

that a POSA would have been motivated to substitute the animal-derived

vasopressin in the Lithuanian Patent preparation with synthetic vasopressin.

135.   Whether the Lithuanian Patent taught away from using synthetic

vasopressin within the disclosed preparation.

136.   Whether a POSA would have expected that the composition of the

Lithuanian Patent preparation—including its pH—was designed specifically for

animal-derived vasopressin.

137.   Whether a POSA would have been motivated to adapt the

composition disclosed in the Lithuanian Patent for use with animal-derived

vasopressin to practice the claimed inventions, which require synthetic

vasopressin.

EXHIBIT 2

138.   Whether the stability of Original VASOSTRICT, PITRESSIN, or Luitpold (American Regent) Vasopressin Product was an issue, concern, or problem to be solved in the prior art.

139.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to improve the stability of Original VASOSTRICT, PITRESSIN, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation.

140.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to optimize the pH of Original VASOSTRICT, PITRESSIN, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation.

141.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to optimize the pH of vasopressin to improve stability.

142.   Whether Amneal can demonstrate by clear and convincing evidence that adjusting the pH of prior art vasopressin formulations to the claimed pH 3.7-3.9 range would have been obvious to try.

143.   Whether pH studies for vasopressin formulations in the prior art would have directed a POSA away from the pH 3.7-3.9 range claimed in the Asserted Claims and towards a lower pH value.

32

EXHIBIT 2

144.   Whether the prior art taught away from the pH 3.7-3.9 range claimed in the Asserted Claims.

145.   What the prior art taught was the optimal pH for the stability of vasopressin.

146.   Whether, in view of the prior art, a POSA would have considered it counterproductive to conduct a pH optimization study for vasopressin formulations.

147.   Whether because the pH of vasopressin formulations was understood to have already been optimized, there would have been a reason for a POSA to optimize the pH.

148.   Whether, even assuming that there was a motivation to modify prior art vasopressin formulations to improve their stability, a POSA would have considered strategies other than optimizing the pH, including without limitation: ionic strength optimization; cosolvents; optimizing buffer choice and concentration; inert gas overlay; inclusion of antioxidants and/or chelating agents; selection of appropriate polyols; protection against radiant energy; and inclusion of various reported peptide stabilizers.

149.   Whether reduced impurity levels within vasopressin products was an actual perceived need amongst skilled artisans in the prior art.

150.    Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to reduce the levels of impurities within Original VASOSTRICT, PITRESSIN, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation.

151.    Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to achieve the specific impurity levels claimed in the impurity limitations of the Asserted Claims.

152.    Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to treat patients and administer PITRESSIN, Luitpold (American Regent) Vasopressin Product, or the Lithuanian Patent preparation according to the clinical limitations of the Asserted '209 Claims.

153.    Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have been motivated to treat patients and administer PITRESSIN from lot 78495 or Luitpold (American Regent) Vasopressin Product from ██████ according to the clinical limitations of the Asserted '209 Claims.

154.    Whether Amneal can demonstrate by clear and convincing evidence that there would have been a reasonable expectation of success in achieving the claimed inventions by modifying or combining the prior art in the manner that Amneal proposes.

155.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have reasonably expected to arrive at the claimed pH 3.7-3.9 range in the course of trying to improve the stability of prior art vasopressin formulations or otherwise modifying such formulations.

156.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have reasonably expected that a pH optimization study would identify a pH value within the claimed pH 3.7-3.9 range as the optimal pH for vasopressin formulations.

157.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have reasonably expected that the claimed pH 3.7-3.9 range would enhance the stability of vasopressin.

158.   Whether, in view of the prior art, a POSA would have considered a pH optimization study for vasopressin formulations to be unlikely to identify an optimal pH within the claimed 3.7-3.9 range.

159.   Whether there was any appreciation in the prior art that the claimed pH 3.7-3.9 range provided a vasopressin product with an enhanced stability and impurity profile.

160.   Whether, in view of the prior art, a POSA would have had any basis to believe that the claimed pH 3.7-3.9 range would improve the stability of vasopressin.

EXHIBIT 2

161.    Whether the claimed pH 3.7-3.9 range is presumptively obvious over any pH range known in the prior art.

162.    Whether the claimed pH 3.7-3.9 range is presumptively obvious over the prior art pH range of 3.4-3.6.

163.    Whether the claimed pH 3.7-3.9 range is critical over any prior art pH range that raises a presumption of obviousness.

164.    Whether the superior stability benefits achieved by Reformulated Vasostrict compared with Original Vasostrict and Amneal's ANDA exhibit batches support the criticality of the claimed pH 3.7-3.9 range.

165.    Whether any presumption of obviousness of the claimed pH 3.7-3.9 range is rebutted by the teaching away in the prior art from the claimed pH range, the criticality of the claimed pH range, and/or other reasons supporting the non-obviousness of the Asserted Claims.

166.    Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have reasonably expected to achieve the specific impurity levels claimed in the impurity limitations of the Asserted Claims.

167.    Whether the prior art gave direction as to which, if any, of the many strategies for potentially reducing impurity levels would be successful for vasopressin formulations.

EXHIBIT 2

168.   Whether the prior art gave direction as to the degree to which impurity levels needed to be reduced to achieve the specific impurity levels claimed in the impurity limitations of the Asserted Claims.

169.   What insight, if any, the prior art provided about the degradation pathways and degradation products of vasopressin.

170.   What insight, if any, the prior art provided about the impurity content and amount of impurities within vasopressin formulations.

171.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would have actually arrived at the claimed inventions by modifying or combining the prior art in the manner that Amneal proposes.

**E.     pH Declarations in Support of Criticality**

**1.     August 11, 2015 Vandse Declaration**

172.   Inventor Sunil Vandse submitted a declaration signed on August 11, 2015 to the PTO under 37 C.F.R. § 1.132 during prosecution of unasserted U.S. Patent No. 9,375,478 (the "'478 patent").

173.   The August 11, 2015 Vandse declaration contained the results of experiments performed by the inventors "[t]o analyze the amount of vasopressin and associated impurities that were present in the Vasopressin Formulations" adjusted to pH 3.5 to 4.5 with 10 mM acetate buffer.

EXHIBIT 2

174.   The August 11, 2015 Vandse declaration reported that "[a]t 25 ºC, the remaining vasopressin after four weeks was highest between pH 3.6 and pH 3.8 (FIGURE 1).  Within the range of pH 3.6 to pH 3.8, the level of impurities was lowest at pH 3.8 (FIGURE 2)."

175.   The August 11, 2015 Vandse declaration reported that "[a]t 40 ºC, the remaining vasopressin after four weeks was highest between pH 3.6 and pH 3.8 (FIGURE 1).  Within the range of pH 3.6 to pH 3.8, the level of impurities was lowest at pH 3.8 (FIGURE 2)."

176.   The August 11, 2015 Vandse declaration concluded that "pH 3.8 provided the best overall results because pH 3.8 provided excellent stability, and lower levels of impurities compared to the results at pH 3.6 or pH 3.7."

## 2.   January 22, 2016 Vandse Declaration

177.   Inventor Sunil Vandse submitted a declaration signed on January 22, 2016 to the PTO under 37 C.F.R. § 1.132 during prosecution of the '478 patent.

178.   The January 22, 2016 Vandse declaration was submitted in response to the examiner's rejection in an Office Action dated October 22, 2015, which stated "Applicant has not provided data for pH values below 3.5 even though the prior art teaches a range of 2.5-4.5."

179.   The January 22, 2016 Vandse declaration contained the results of experiments performed by the inventors to analyze by HPLC "[t]he amount of

EXHIBIT 2

vasopressin and associated impurities that were present in" vasopressin

formulations adjusted to pH 2.5 to 3.4 with 10 mM acetate buffer.

180.    The January 22, 2016 Vandse declaration also contained the results of

the experiments reported in the August 11, 2015 Vandse declaration for

vasopressin formulations adjusted to pH 3.5-4.5.

181.    The January 22, 2016 Vandse declaration reported that "[a]t 25 ºC, the

percent decrease in vasopressin after four weeks was lowest between pH 3.6 and

pH 3.8 (FIGURE 1).  Within the range of pH 3.6 to pH 3.8, the level of impurities

was lowest at pH 3.8 (FIGURE 2)."

182.    The January 22, 2016 Vandse declaration reported that "[a]t 40 ºC, the

percent decrease in vasopressin after four weeks was lowest between pH 3.6 and

pH 3.8 (FIGURE 1).  Within the range of pH 3.6 to pH 3.8, the level of impurities

was lowest at pH 3.8 (FIGURE 2)."

183.    The January 22, 2016 Vandse declaration concluded that "pH 3.8

provided the best overall results because pH 3.8 provided excellent stability, and

lower levels of impurities compared to the results at pH 3.6 or pH 3.7."

184.    The January 22, 2016 Vandse declaration reported, in its two

appendices, starting and ending assay and impurity values for vasopressin

formulations adjusted to pH 2.5 to 4.5 with 10 mM acetate buffer.

### 3.   March 31, 2016 Kannan Declaration

185.   Inventor Vinayagam Kannan submitted a declaration signed on March 31, 2016 to the PTO under 37 C.F.R. § 1.132 during prosecution of the '478 patent.

186.   In the March 31, 2016 Kannan declaration, Vinayagam Kannan "reviewed the procedures for and the results of the stability tests presented in the August 14, 2015 and January 22, 2016 [Vandse] Declarations" and concluded "that the differences in the results of the stability tests for each formulation are attributable to a change in pH."

187.   The March 31, 2016 Kannan declaration presented precision results for the experiments presented in the August 14, 2015 and January 22, 2016 Vandse declarations in the form of intra-assay repeatability and inter-analyst repeatability. Intra-assay repeatability was reported as 0.5% for Chemist 1 and 0.2% for Chemist 2.  Inter-analyst repeatability was reported as 0.5%.  Both intra-assay repeatability and inter-analyst repeatability were reported to meet the acceptance criteria.

188.   The March 31, 2016 Kannan declaration concluded that "pH 3.8 provided the best overall results because pH 3.8 provided excellent stability, and lower levels of impurities compared to the results at pH 3.6 or pH 3.7."

189.   The March 31, 2016 Kannan declaration noted that "[t]he January 22, 2016 Declaration presented plots directly comparing the % total impurities

observed in the Vasopressin 2.5 to 3.4 Formulations with those observed in the Vasopressin 3.5 to 4.5 Formulations."

190.    The March 31, 2016 Kannan declaration noted that "[t]he January 22, 2016 Declaration also contained normalized plots comparing the assay (% label claim; vasopressin remaining) observed in the Vasopressin 2.5 to 3.4 Formulations with those observed in the Vasopressin 3.5 to 4.5 Formulations.  The data were normalized and presented as % assay decrease of vasopressin over the four-week study period, rather than absolute assay, because the amount of starting vasopressin varied between the Vasopressin pH 2.5 to 3.4 Formulations and the Vasopressin pH 3.5 to 4.5 Formulations."

191.    The March 31, 2016 Kannan declaration concluded that "the criticality of pH 3.8 in stabilizing a vasopressin formulation would be desirable to the FDA and ICH, and therefore would result in a practical benefit to a user of a vasopressin."

192.    The August 11, 2015 Vandse declaration, January 22, 2016 Vandse Declaration, and March 31, 2016 Kannan declaration were also filed during prosecution of unasserted U.S. Patent No. 9,687,526 (the "'526 patent).

### 4.    May 1, 2017 Kannan Declaration

193.    Inventor Vinayagam Kannan submitted a declaration signed on May 1, 2017 to the PTO under 37 C.F.R. § 1.132 during prosecution of the '526 patent.

EXHIBIT 2

194.   The May 1, 2017 Kannan declaration concluded that "cooling a vasopressin formulation would not cause an increase in decomposition in comparison to a vasopressin formulation stored at 25 °C or 40 °C.  Thus, the stability of the formulations at 5 °C should not be lesser than the stability of the same formulations at 25 °C or 40 °C.  The stability data obtained at 25 °C or 40 °C are sufficient to show at least a similar level of stability at the claimed temperatures."

### 5.    May 22, 2017 Kannan Declaration

195.   Inventor Vinayagam Kannan submitted a declaration signed on May 22, 2017 to the PTO under 37 C.F.R. § 1.132 during prosecution of unasserted U.S. Patent No. 9,844,239 (the "'239 patent").

196.   The May 22, 2017 Kannan declaration referred to the data from experiments reported in the August 11, 2015 Vandse declaration, January 22, 2016 Vandse Declaration, and March 31, 2016 Kannan declaration.

197.   The May 22, 2017 Kannan declaration reported that the results of the experiments reported in the August 11, 2015 Vandse declaration, January 22, 2016 Vandse Declaration, and March 31, 2016 Kannan declaration "suggest that the stability of a vasopressin formulation is affected by pH" and concluded that "the differences in the results of the stability tests for each formulation are attributable to a change in pH."

EXHIBIT 2

198.   The May 22, 2017 Kannan declaration concluded that "[t]he claimed pH range of 3.5 to 4.1 reflects the good stability of vasopressin provided at pH 3.5 to 4.1 at both temperatures tested."

199.   The May 22, 2017 Kannan declaration presented precision results for the experiments presented in the August 14, 2015 and January 22, 2016 Vandse declarations in the form of intra-assay repeatability and inter-analyst repeatability. Intra-assay repeatability was reported as 0.5% for Chemist 1 and 0.2% for Chemist 2.  Inter-analyst repeatability was reported as 0.5%.  Both intra-assay repeatability and inter-analyst repeatability were reported to meet the acceptance criteria.

200.   The May 22, 2017 Kannan declaration noted that "FIGURES 5-6 provide direct comparisons of the % total impurities observed in the Vasopressin 2.5 to 3.4 Formulations with those observed in the Vasopressin 3.5 to 4.5 Formulations."

EXHIBIT 2

**FIGURE 5**



**FIGURE 6**



201.   The May 22, 2017 Kannan declaration noted that "FIGURES 7-8 provide normalized plots comparing the assay (% label claim; vasopressin

EXHIBIT 2

remaining) observed in the Vasopressin 2.5 to 3.4 Formulations with those

observed in the Vasopressin 3.5 to 4.5 Formulations.  The data were normalized

and presented as % assay decrease of vasopressin over the four-week study period,

rather than absolute assay, because the amount of starting vasopressin varied

between the Vasopressin pH 2.5 to 3.4 Formulations and the Vasopressin pH 3.5 to

4.5 Formulations."

**FIGURE 7**



EXHIBIT 2



**FIGURE 8**

202.    The y-axis of the graphs presented in Figure 5 and Figure 6 is "% Total Impurities."

203.    The y-axis of the graphs presented in Figure 7 and Figure 8 is "% Assay Decrease (Absolute)."

204.    The experiments reported in the aforementioned Kannan and Vandse declarations used the same lot of vasopressin API ███████

**F.    Section 112**

205.    In his opening expert report, Amneal's expert provided opinions that the Asserted Claims were indefinite.  Those opinions violated the parties' agreement to narrow the scope of discovery and were ultimately struck by the Court.  *See* Nov. 16, 2020 Hr'g Tr. at 55:24-59:23.  Although nominally labelled as directed to written description and enablement, Amneal's expert's opinions as to

46

EXHIBIT 2

alleged invalidity on those grounds rest on his stricken indefiniteness opinions that the claim term "% sequence homology" is indefinite.  The fact that Amneal's written description and enablement defenses are merely indefiniteness arguments shoehorned inappropriately into other legal theories is illustrated by the written description section of Amneal's Statement of Contested Issues of Fact, which is expressly based on the stricken defense, concluding that the Asserted Claims "are indefinite."  *See* Pretrial Order Ex. 3 ¶ 343.

Issues Presented:

206.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid for lack of written description.

207.   Whether Amneal can demonstrate by clear and convincing evidence that each of the Asserted Claims is invalid for lack of enablement.

208.   Whether, based on the context of the Asserted Patents and the knowledge of a POSA, a POSA would have understood "from about 85% to about 100% sequence homology to SEQ ID NO.: 1," as it is used in the Asserted Claims, to mean from about 85% to about 100% sequence *identity* to SEQ ID NO. 1.

209.   Whether Amneal can demonstrate by clear and convincing evidence that the determination of whether an impurity has "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" would be different if a sequence similarity calculation would be made in lieu of a sequence identity calculation.

210.   Whether Amneal can demonstrate by clear and convincing evidence that a POSA would not know the identity of all of the impurities to determine if a particular composition was within the scope of the claims where, for example, a POSA could readily determine the chemical structure of all impurities within vasopressin formulations or, if not all impurities have been identified, use the amounts of known impurities and total impurities to assess whether any unidentified impurities with sufficient homology would exceed the claimed range.

211.   Whether a POSA would have understood that the inventors possessed a method of determining whether an impurity has "from about 85% to about 100% sequence homology to SEQ ID NO.: 1."

212.   Whether a POSA would have understood that the inventors possessed vasopressin formulations with 0.9-1.7% impurities having "from about 85% to about 100% sequence homology to SEQ ID NO.: 1."

213.   Whether determining whether a specific vasopressin formulation contains 0.9-1.7% impurities having "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" would have required undue experimentation.

## VI.   ENFORCEABILITY

214.   Whether Amneal can demonstrate by clear and convincing evidence that any of the Asserted Patents is unenforceable.

EXHIBIT 2

### A.    Asserted Patents

215.   The Asserted Patents are part of a family of patents arising from U.S. Patent Application 14/610,499 (the "'499 application").  The '478 and '239 patents are each a continuation of the '499 application.  The '526 patent is a continuation-in-part ("CIP") of the '239 patent.  As such, the '526 patent contains additional matter in the specification as compared to the '239 patent.  For example, the specification of the '526 patent contains more than sixty columns of additional disclosure, eight additional figures, and seven additional examples as compared to the '239 patent.  The '209 and '785 patents are each a CIP of the '526 patent.  The '209 and '785 patents share a common specification with each other, and contain additional matter as compared to the '526 patent.  For example, the specification of the '209 and '785 patents contains 15-month stability data for certain vasopressin formulations.

### B.    Declarations related to the April 2014 VASOSTRICT Label

216.   Inventor Vinayagam Kannan submitted a declaration signed on November 24, 2015 to the PTO under 37 C.F.R. § 1.130(a) during prosecution of the '239 patent.

217.   The Office Action cited in the November 24, 2015 Kannan declaration alleged that the April 2014 VASOSTRICT Label anticipated the invention recited in the pending claims at issue.

49

EXHIBIT 2

218.   The November 24, 2015 Kannan declaration states "Matthew Kenney and I invented the subject matter of the Label that is cited in the Office Action.  As part of my responsibilities, I forwarded the details of the joint invention to the regulatory department of PAR STERILE."

219.   As of November 24, 2015, the relevant pending claim of U.S. Application No. 14/717,877 (the application that led to the '239 patent) recited:

16. (New) A method of increasing blood pressure in a human in need thereof, the method comprising:

a) providing a pharmaceutical composition for intravenous administration comprising, in a unit dosage form:  i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) chlorobutanol; iii) acetic acid; and iv) water, wherein the unit dosage form has a pH of 3.4 to 3.6;

b) storing the unit dosage form at 2-8 °C; and

c) administering the unit dosage form to the human;

wherein:

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and

the human is hypotensive.

220.   Dr. Kannan was an inventor of that subject matter, including without limitation the limitation related to storing the composition in refrigerated conditions.

221.   Michelle Bonomi-Huvala submitted a declaration signed on November 24, 2015 to the PTO under 37 C.F.R. § 1.130(a) during prosecution of the '239 patent.

50

EXHIBIT 2

222.   As of November 24, 2015, Michelle Bonomi-Huvala was "Senior Vice President, Regulatory Affairs at Par Pharmaceutical, Inc."

223.   The November 24, 2015 Bonomi-Huvala declaration states that "[a]s part of the inventors' employment responsibilities, the inventors forwarded the details of the joint invention to my department.  One of the functions performed by my department is the submission of regulatory filings to the FDA.  Upon receiving the details of the joint invention and at my direction, a member of my department submitted the details of the joint invention to the FDA in the filings directed toward regulatory approval of the VASOSTRICT product manufactured by PAR CO."

224.   The November 24, 2015 Bonomi-Huvala declaration further states that "[t]he FDA obtained the subject matter disclosed in the Label directly from a member of my department, who obtained the subject matter directly from the inventors.  Thus, the FDA obtained the subject matter recited in the Label from the inventors."

225.   The Kannan and Bonomi-Huvala declarations are consistent with the practice and procedure followed by Par in connection with the submission of information to the FDA in connection with pending NDAs and ANDAs.  In particular, Dr. Kannan was member of the formulation team at Par working on the development of VASOSTRICT and was a named inventor with respect to the then-

51

pending claims of U.S. Patent Application No. 14/717,877.  Dr. Kannan contributed to the conception of the portion of the April 2014 VASOSTRICT Label that recites refrigeration of the diluted vasopressin for up to 24 hours.  This and other information compiled by the formulation team was incorporated into the proposed label submitted to the FDA by the regulatory department and that was ultimately published by the FDA as the April 2014 VASOSTRICT Label.  Thus, the proposed label submitted to the FDA by the regulatory department at Par was obtained, directly or indirectly, from at least Kannan, one of the joint inventors.

### C.     Alleged Inequitable Conduct

226.   Whether Amneal can demonstrate by clear and convincing evidence that the inventors or prosecuting attorneys of the Asserted Patents knowingly withheld material information from the PTO during prosecution of the Asserted Patents.

227.   Whether any information allegedly not disclosed during prosecution, including alleged prior art or other information, was material to the prosecution of the Asserted Patents.

228.   Whether Amneal can demonstrate by clear and convincing evidence that the April 2014 VASOSTRICT Label was material to the patentability of the Asserted Patents.  The above sections relating to validity of the Asserted Patents are relevant to this issue.

52

EXHIBIT 2

229.   Whether Amneal can demonstrate by clear and convincing evidence that PITRESSIN was material to the patentability of the Asserted Claims.  The above sections relating to validity of the Asserted Patents are relevant to this issue.

230.   Whether Amneal can demonstrate by clear and convincing evidence that the allegedly withheld information about PITRESSIN was material to the patentability of the Asserted Claims.  The above sections relating to validity of the Asserted Patents are relevant to this issue.

231.   Whether Amneal can demonstrate by clear and convincing evidence that the inventors had knowledge of the relevant properties of PITRESSIN during prosecution of the Asserted Patents.

232.   Whether Amneal can demonstrate by clear and convincing evidence that Vinayagam Kannan, Michelle Bonomi-Huvala, or Craig Kenesky knowingly submitted unmistakably false declarations to the PTO during prosecution of the '239 patent, and whether they specifically intended to deceive the PTO by submitting such declarations.

233.   Whether Amneal can demonstrate by clear and convincing evidence that the April 2014 VASOSTRICT Label was material to the patentability of the unasserted '239 patent.  The above sections relating to validity of the Asserted Patents are relevant to this issue.

EXHIBIT 2

234.   Whether Amneal can demonstrate by clear and convincing evidence that the April 2014 VASOSTRICT Label disclosed the "0-2% vasopressin degradation products" limitation of the '239 patent.

235.   Whether, even if there is a finding of inequitable conduct with respect to the '239 patent, Amneal can demonstrate by clear and convincing evidence that such conduct would infect the prosecution of the Asserted Patents.

236.   Whether any material information was withheld from the PTO during prosecution of the Asserted Patents, and whether any of the above-named actors acted with the specific intent to deceive the PTO.

237.   Whether any information allegedly withheld from the PTO was either cumulative of prior art already before the examiner during prosecution or not disclosed for scientific reasons.

### 1.   Par did not commit inequitable conduct during prosecution of the '239 patent

238.   Amneal asserts that Vinayagam Kannan and Michelle Bonomi-Huvala submitted false declarations to the PTO to remove the April 2014 VASOSTRICT Label from consideration as prior art and to secure issuance of the '239 patent. The declarations are not unmistakably false and, even if, *arguendo*, they are proven false by clear and convincing evidence, Amneal cannot prove by clear and convincing evidence that they were submitted with specific intent to deceive the PTO.

54

EXHIBIT 2

239.   The November 24, 2015 Kannan Declaration states that "[t]he FDA obtained the subject matter disclosed in the Label directly from the regulatory department of PAR STERILE, who obtained the subject matter directly from the inventors.  Thus, the FDA indirectly obtained the subject matter disclosed in the Label from the inventors."  Kannan Decl. ¶ 8.  Ms. Bonomi-Huvala's November 24, 2015 Declaration contains a similar statement.  *See* Bonomi-Huvala Decl. ¶¶ 6-7.

240.   The November 24, 2015 Kannan Declaration also contains a listing of administration limitations and limitations related to the composition of the pharmaceutical formulation recited in the Label, for example, "a method of increasing blood pressure in a hypotensive human."  Kannan Decl. ¶ 7.  The final two sentences of this paragraph state "The Label recites refrigeration of the diluted vasopressin for up to 24 hours.  *Label*, page 1.  The FDA obtained this information from me and Matthew Kenney, as we invented this subject matter."  *Id.*

241.   In his deposition, Dr. Kannan stated that he contributed to the April 2014 label by "evaluating that refrigeration of diluted vasopressin" for up to 24 hours.  Kannan Sept. 2019 Dep. 254:19-257:7.  Thus, Dr. Kannan testified that he invented this subject matter of the Label.  Dr. Kannan also testified regarding his other contributions to the April 2014 VASOSTRICT Label and the then-pending

EXHIBIT 2

claims.  *See, e.g.*, Kannan Sept. 2019 Tr. at 257:21-261:2; Kannan Mar. 2020 Tr. at 110:3-112:4.

242.   It is unreasonable to assume that Dr. Kannan or Craig Kenesky intended to represent to the PTO that either Dr. Kannan or Mr. Kenney, both pharmaceutical formulators, invented vasopressin, a method of increasing blood pressure using vasopressin, an administration regime for vasopressin, or an infusion rate for vasopressin.  As the examiner was well-aware, such elements from the April 2014 VASOSTRICT Label were known in the prior art to a POSA at the time of Dr. Kannan's November 24, 2015 declaration.

243.   It is unreasonable to assume that the examiner understood Dr. Kannan to be saying in his declaration that he and Mr. Kenney themselves invented each element of the recited subject matter.

244.   Moreover, in addition to his contributions described above, Dr. Kannan believed at the time he signed his November 24, 2015 declaration that the declaration referred to the version of the Original VASOSTRICT Label that was used with Original VASOSTRICT as sold by Par (that is, the label approved in September 2014 rather than the April 2014 label which was never included with any product actually sold by Par) and that, like the then-pending patent claim being prosecuted, further recited refrigerated storage of the product, to which Dr. Kannan contributed.

56

EXHIBIT 2

245.   The representations in the November 24, 2015 declarations are thus not unmistakably false, because Dr. Kannan invented the subject matter of the Label related to refrigeration of the diluted vasopressin for up to 24 hours, and the declarations can be reasonably read to relate to invention of this inventive subject matter.

246.   The witnesses' and Par's lack of current knowledge regarding the preparation of the April 2014 VASOSTRICT Label and forwarding of the details of the invention does not create a presumption that the November 24, 2015 declarations are unmistakably false.

247.   For example, Ms. Bonomi-Huvala stated ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████

248.   Neither Vinayagam Kannan, Michelle Bonomi-Huvala, nor Craig Kenesky engaged in affirmatively egregious misconduct in connection with the November 24, 2015 declarations.

249.   The April 2014 VASOSTRICT Label was cited as an anticipating reference in an Office Action dated October 21, 2015 during prosecution of the '239 patent.  The anticipation rejection was based on the Label's pH disclosure, which was identical to the pH range recited in the pending claims at the time.

57

EXHIBIT 2

However, the pH limitation in the claims was later amended to recite a range of 3.5-4.1 and degradation-related limitations were added to the claims.

> **2.    The alleged inequitable conduct during prosecution of the '239 patent, even if proven, would not infect the Asserted Patents**

250.   Amneal asserts that any alleged inequitable conduct during prosecution of the '239 patent, if proven by clear and convincing evidence, would render the Asserted Patents unenforceable under the doctrine of infectious unenforceability.  However, at least because there is no immediate and necessary relation between this alleged conduct and the prosecution of the Asserted Patents, the Asserted Patents cannot be found unenforceable under this doctrine.

251.   Neither Vinayagam Kannan, Michelle Bonomi-Huvala, nor Craig Kenesky engaged in inequitable conduct during prosecution of the '239 patent. However, a finding of inequitable conduct against the '239 patent does not and would not infect the Asserted Patents for at least the following reasons.  There is no immediate and necessary relation between the alleged misconduct and the prosecution of the Asserted Patents, at least because the claims of the Asserted Patents are significantly different from the claims that were at issue at the time that the alleged inequitable conduct in the '239 prosecution took place, and because the April 2014 VASOSTRICT Label is merely cumulative of other art cited during prosecution of the Asserted Patents (including the PPC and Treschan references)

EXHIBIT 2

and would not have anticipated or rendered obvious, and does not anticipate or render obvious, any claim of any Asserted Patent.

252.   For example, the claims pending at the time of the November 2015 Kannan and Bonami-Huvala declarations during prosecution of the '239 patent recited a pH of 3.4-3.6.  This was the same pH range disclosed in the April 2014 VASOSTRICT Label.  However, the pH range recited in the Asserted Claims is 3.7-3.9, which does not overlap with the pH range of 3.4-3.6 disclosed in the April 2014 VASOSTRICT Label.  Thus, the pH 2.5-4.5 range disclosed in the PPC reference and cited by the examiner during prosecution of the Asserted Patents is closer to the pH 3.7-3.9 range claimed in the Asserted Patents than the 3.4-3.6 pH range disclosed in the April 2014 VASOSTRICT Label.  In addition, Par incorporates by reference the above sections relating to validity of the Asserted Patents into its response to Amneal's inequitable conduct defense.

### 3.   The inventors did not withhold material information during prosecution of the Asserted Patents

#### a)   *The allegedly withheld information about PITRESSIN is not but-for material*

253.   Amneal asserts that Par committed inequitable conduct by intentionally withholding information regarding a prior art PITRESSIN formulation with the specific intent to deceive the PTO, but Amneal cannot prove

EXHIBIT 2

by clear and convincing evidence that this information is but-for material, nor that it was withheld with specific intent to deceive the PTO.

254.   Amneal cannot meet its burden of proving by clear and convincing evidence that any prior art sale or use of PITRESSIN anticipated or rendered obvious any Asserted Claim.

255.   The examiner had information about PITRESSIN through at least the "Product Insert for Pitressin" reference that was before the Patent Office.

256.   Amneal asserts that the inventors would not have been able to show the criticality of the claimed pH values over the target manufacturing ███████ range for PITRESSIN.  However, the target manufacturing ██████ range for PITRESSIN does not raise a presumption of obviousness for the pH 3.7-3.9 range claimed in the Asserted Patents.  Accordingly, the inventors would not have had to demonstrate criticality over the target manufacturing pH range for PITRESSIN.

257.   PPC, the primary reference relied on by Examiner Bradley in initially rejecting the claims of each of the Asserted Patents, disclosed a pH range of 2.5-4.5.  This range encompasses the pH 3.7-3.9 range claimed in the Asserted Patents, whereas the target manufacturing ██████ range for PITRESSIN does not even overlap with the claimed range.  Thus, for purposes of the materiality analysis here, the pH range disclosed in PPC is closer to the claimed pH range than the target manufacturing pH range for PITRESSIN.

258.   The pH 2.5-4.5 range disclosed in PPC contains the target

manufacturing ███████ range for PITRESSIN.  Therefore, the target

manufacturing ███████ range for PITRESSIN is cumulative of the 2.5-4.5 range

of PPC.

259.   Amneal cannot prove by clear and convincing evidence that the

information allegedly withheld regarding PITRESSIN is but-for material to the

prosecution of any of the Asserted Patents.

260.   Additionally, Amneal cannot demonstrate by clear and convincing

evidence that the inventors had knowledge of the relevant properties of

PITRESSIN, including the pH values of particular batches thereof, during

prosecution of the Asserted Patents.

> b)     *The April 2014 VASOSTRICT Label is not but-for*
>        *material.*

261.   Amneal asserts that Par committed inequitable conduct by

intentionally removing the April 2014 VASOSTRICT Label from consideration as

prior art under Section 102(b)(1), but Amneal cannot prove by clear and

convincing evidence that this information was but-for material to the patentability

of the '239 patent or the Asserted Patents, nor that it was withheld with specific

intent to deceive the PTO.

262.   Amneal asserts that the inventors would not have been able to show

the criticality of the claimed pH values over the pH 3.4-3.6 range disclosed in the

EXHIBIT 2

April 2014 VASOSTRICT Label.  However, the pH 3.4-3.6 range in the label does not raise a presumption of obviousness for the pH 3.7-3.9 range claimed in the Asserted Patents.  Accordingly, the inventors would not have had to demonstrate criticality over the pH range in the April 2014 VASOSTRICT Label.

263.   PPC, the primary reference relied on by Examiner Bradley in initially rejecting the claims of each of the Asserted Patents, disclosed a pH range of 2.5-4.5.  This range encompasses the pH 3.7-3.9 range claimed in the Asserted Patents, whereas the pH 3.4-3.6 range disclosed in the April 2014 VASOSTRICT Label does not even overlap with the claimed range.  Thus, for purposes of the materiality analysis here, the pH range disclosed in PPC is closer to the claimed pH range than the pH range in the April 2014 VASOSTRICT Label.

264.   The pH 2.5-4.5 range disclosed in PPC contains the pH 3.4-3.6 range disclosed in the April 2014 VASOSTRICT Label.  Therefore, the pH 3.4-3.6 range in the April 2014 VASOSTRICT Label is cumulative of the 2.5-4.5 range of PPC.

265.   The examiner also relied upon the Treschan reference in rejecting the then-pending claims of the Asserted Patents as obvious, and Defendants assert that that reference "taught the limitations relating to the clinical administration of vasopressin."  Pretrial Order Ex. 3 ¶ 369.  The alleged disclosure of the claimed clinical indication and administration limitations from the April 2014

62

EXHIBIT 2

VASOSTRICT Label was cumulative of the teachings within Treschan that were before the examiner during prosecution of the Asserted Patents.

266.   Amneal cannot demonstrate by clear and convincing evidence that the April 2014 VASOSTRICT Label is but-for material to the prosecution of the Asserted Patents.

## VII.   EXCEPTIONAL CASE

267.   As an initial matter, exceptional case is not an issue to be tried, but rather an issue for the Court to decide post-trial.

268.   Amneal contends that this case is exceptional and should be awarded attorneys' fees because Par allegedly lacked a reasonable basis to bring and maintain this suit against Amneal and allegedly engaged in inequitable conduct.  None of Amneal's contentions have any merit.  Amneal seeks approval to sell ANDA products that will infringe the Asserted Patents.  Par has not acted in bad faith.  Moreover, Amneal's inequitable conduct allegations fail for at least all the reasons set forth above.  In fact, it is Amneal's litigation conduct during this case that is exceptional, which Par will demonstrate at the appropriate time when seeking to recover its own attorneys' fees.

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>████████████████ |

## DEFENDANTS' STATEMENT OF CONTESTED ISSUES OF FACT

# TABLE OF CONTENTS

I.   Construction Of The Asserted Claims ................................................................. 2

II.  Person Of Ordinary Skill In The Art ("POSA") ............................................... 6

III. Amneal's Proposed ANDA Products Will Not Infringe the Patents-In-Suit ...... 7

   a. Overview of Amneal'S Proposed ANDA Products ........................................ 7

   b. Amneal's Proposed ANDA Product Specifications .......................................... 9

   c. Amneal's Stability Testing .................................................................... 13

   d. Amneal's Manufacturing Process ............................................................ 15

   e. Amneal's Proposed ANDA Products Will Not Satisfy the pH Claim Limitation of the
   '785 and '209 Patents Upon Manufacture or During their Shelf Life ..................... 20

      1. The pH Specification in Amneal's ANDAs Does Not Meet the pH Claim Limitation of
      the '785 and '209 Patents ................................................................... 22

      2. The pH Data for Amneal's ANDA Batches Do Not Meet the pH Claim Limitation of
      the '785 and '209 Patents ................................................................... 23

      3. Amneal's Formulations, Manufacturing, and Packaging Choices Shows That It Did Not
      Intend to Make a Vasopressin Composition with the pH Claim Limitation of the '785 and
      '209 Patents ................................................................................... 56

      4. Amneal Is Unlikely To Market Out-of-Specification ANDA Products That Meet The
      pH Claim Limitations of the '785 and '209 Patents ........................................ 60

      5. Amneal Will Not Induce Infringement of the Asserted Claims ........................ 65

IV.  The Asserted Claims of the Patents-In-Suit Are Invalid ................................... 66

   a. Background ....................................................................................... 66

      i.   Arginine Vasopressin ....................................................................... 66

      ii.  Formulation Development .................................................................. 68

   b. Scope and Content of the Prior Art ........................................................ 84

      i.   Pitressin .................................................................................... 84

      ii.  Original Vasostrict® ....................................................................... 89

      iii. American Regent (Luitpold) Vasopressin Product ..................................... 102

      iv.  FK Vasopressin ............................................................................. 103

      v.   LT '487 ..................................................................................... 104

      vi.  Gahart ....................................................................................... 105

      vii. Russell 2008 ................................................................................ 108

      viii. Martin ...................................................................................... 112

      ix.  Flynn ........................................................................................ 113

Case 1:18-cv-02032-CFC-CJB Document 806-1 Filed 09/30/21 Page 113 of 820 PageID #: 101534

x.   Hovgaard ........................................................................................... 114

xi.   Avanti 2012 ..................................................................................... 115

xii.   Bi 1999 ............................................................................................ 117

xiii.   Bi 2000 ............................................................................................ 119

xiv.   USP Vasopressin .............................................................................. 120

xv.   USP Vasopressin Injection ............................................................... 121

xvi.   WHO Standard ................................................................................. 122

c.   The Asserted Claims of the '209 and '785 Patents Are Anticipated By original vasostrict®
122

i.   Claim 1 of the '209 Patent and Claim 1 of the '785 Patent ........................................ 122

ii.   Claim 2 of the '209 Patent ................................................................. 132

iii.   Claim 3 of the '209 Patent ................................................................. 135

iv.   Claim 4 of the '209 Patent and Claim 5 of the '785 Patent ..................... 138

v.   Claim 5 of the '209 Patent ................................................................. 143

vi.   Claim 6 of the '209 Patent ................................................................. 145

vii.   Claim 7 of the '209 Patent and Claim 8 of the '785 Patent ..................... 148

viii.   Claim 8 of the '209 Patent ................................................................. 149

d.   The Asserted Claims of the '209 and '785 Patents Would Have Been Obvious ............. 150

i.   The Prior Art Taught the Clinical and Formulation Limitations of the Asserted Claims
150

ii.   A POSA Would Have Been Motivated to Modify the Formulation of Existing Vasopressin Products and/or Vasopressin Compositions Taught in the Prior Art .............. 164

iii.   A POSA Would Have Expected to Be Able to Successfully Improve the Stability of Vasopressin Formulations by Optimizing the pH ............................................................ 179

iv.   Claims 1-8 of the '209 Patent Are Obvious Over Pitressin®, Original Vasostrict®, the American Regent Vasopressin Product, and/or LT '487 in View of Bi 1999, and in Further View of Gahart and/or Russell 2008 and the General Knowledge in the Art ........ 181

v.   Claims 1, 5, and 8 of the '785 Patent Are Obvious Over Pitressin®, Original Vasostrict®, the American Regent Vasopressin Product, and/or LT '487 in View of Bi 1999, and in Further View of the General Knowledge in the Art ......................................... 214

V.   Certain Asserted Claims are Invalid under 35 U.S.C. § 112 ........................................ 215

a.   The asserted claims of the '209 and '785 patents are invalid for lack of written description because specification does not convey possession of full scope of impurity properties......... 215

b.   The asserted claims of the '209 and '785 patents are invalid for lack of enablement because it would require undue experimentation to practice the full scope of the claims ...... 218

VI.   Inequitable Conduct ................................................................................. 220

a.   Prosecution History of the Patents-in-Suit and Their Parent '239 Patent ....................... 220

Case 1:18-cv-05035-CLC-CJB   Document 309   Filed 09/30/21   Page 11 of 850 PageID #:

b. (DTX-1075) PAR-VASO_0259744 0008388 at 745389. The Named Inventors' Disqualification of the Vasostrict® April 2014 Label During Prosecution Was Material to the Patentability of the '785 and '209 Patents ................................................................ 225

c. The Named Inventors' Failure to Disclose Prior Art Pitressin® Was Material to the Patentability of the Patents-in-Suit ........................................................................................ 230

d. The Disclosure of Vasostrict® April 2014 Label and Pitressin® Would Not Have Been Cumulative of the Prior Art Already Before the Examiner ................................................... 231

VII. This Case is Exceptional and Amneal Should Be Awarded its Reasonable Attorney Fees 233

a. Par Lacked a Reasonable Basis to Bring and Maintain this Suit Against Amneal .......... 233

b. Par brought this suit in Bad Faith ................................................................................ 236

c. Par engaged in inequitable conduct to procure the patents-in-suit ................................. 236

VIII. Par is not entitled to injunctive or monetary relief ...................................................... 237

iv

Pursuant to Local Rule 16.3(c)(4) and the Court's Scheduling Order (D.I. 47), Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York, LLC, Amneal Biosciences LLC, and Amneal Pharmaceutical Pvt. Ltd. ("Defendants" or "Amneal") (collectively, "Amneal") submit this Statement of Contested Issues of Fact ("Statement"). Amneal incorporates by reference any issues of fact set forth in its responsive papers to any comparable material filed or submitted by Plaintiffs Par Pharmaceuticals, Inc., Par Sterile Product, LLC., and Endo Par Innovation Co., LLC (collectively, "Plaintiffs").

In this action, Plaintiffs are currently asserting U.S. Patent No. 9,744,209 ("the '209 patent") and U.S. Patent No. 9,750,785 ("the '785 patent") (collectively, the "Patents-in-Suit"). Specifically, Plaintiffs are asserting claims 1-8 of the '209 patent and claims 1, 5, and 8 of the '785 patent (the "Asserted Claims").

Amneal reserves all rights with respect to these disclosures, including the right to amend, supplement, or otherwise modify these disclosures without prejudice according to the schedule set forth by the Parties for pre-trial exchanges, the local

rules, the Federal Rules of Civil Procedure, and any other basis in fact or law. Amneal reserves the right to affirmatively use, elaborate upon, or dispute any fact cited by Plaintiffs, including the scientific bases for such fact or Plaintiffs' application of such fact in this case.

1

By including a fact herein, Amneal does not assume the burden of proof or production with regard to that fact. For instance, Plaintiffs bear the burden of proof with respect to infringement. As such, Amneal reserves the right to object to and/or contest those alleged facts and present any and all rebuttal evidence in response to those alleged facts when identified by Plaintiffs. Any fact not specifically admitted in the parties' Statement of Uncontested Facts should be considered contested, even if not specifically enumerated herein. Amneal's following statement is based, in relevant part, on its current understanding of Plaintiffs' positions and the prior proceeding in this litigation.

To the extent Amneal's Statement of Contested Issues of Law contains issues of fact, those issues are incorporated herein by reference. If the Court determines that any issue identified in this list as an issue of fact is more properly considered an issue of law, Amneal incorporates such issue by reference into its Statement of Issues of Law. Amneal incorporates by reference its expert reports in support of any proof to be presented by expert testimony. To the extent that a fact or an issue of fact in one section applies to another section, claim or theory, it is incorporated therein as

well without separate repetition. Amneal incorporates by reference the Statement of Uncontested Facts.

## I.   CONSTRUCTION OF THE ASSERTED CLAIMS

1.   All Asserted Claims of the '785 and '209 patents require the claimed

vasopressin formulation to have "a pH of 3.7-3.9." A person of ordinary skill in the art (POSA) would have understood that the plain and ordinary meaning of "a pH of 3.7-3.9" would exclude any pH value below 3.7 or above 3.9.

2. The prosecution history makes clear that the applicants understood the claimed pH range of "3.7-3.9" would not encompass pH values outside of that range. The applicants originally sought patent claims on a formulation with a pH of "3.75 to 3.85" and subsequently reworded the range as "3.7-3.9." *See* U.S. Application No. 15/426,693 File History, (JTX-0008) PAR-VASO-0005400-6452 at PAR-VASO-0005810, June 28, 2017 Amendments to the Claims (hereinafter, "'209 patent file history"); U.S. Application No. 15/426,703 File History, (JTX-0009) PARVASO-0009319-10365 at PAR-VASO-009716, June 28, 2017 Amendments to the Claims (hereinafter, "'785 patent file history"). Not only does this demonstrate that the claimed range would begin at 3.7 and end at 3.9, but also that the scope of this range is nowhere near a pH of 3.6.

3. The applicants also sought to overcome the patent examiner's obviousness rejection by arguing that the pH range claimed was critical to the

Case 1:18-cv-02032-CFC-CJB Document 302 Filed 08/30/21 Page 118 of 820 PageID #: 101558

claimed invention. *See* '209 patent file history at (JTX-0008) PAR-VASO-0005816-17, June 28, 2017 Response to Non-Final Office Action at 8-9; '785 patent file history at (JTX-0009) PAR-VASO-0009721-22, June 28, 2017, Response to Non-Final Office Action at 7-8. During the prosecution history of the patents-in-

suit, the applicants argued that total impurities were greater in vasopressin formulations with when the pH was below 3.7 or above 3.9.  *See* '209 patent file history at (JTX-0008) PAR-VASO-0005816, June 28, 2017 Response to Non-Final Office Action at 8; '785 patent file history at (JTX-0009) PAR-VASO-0009721, June 28, 2017, Response to Non-Final Office Action at 7.  The applicants also described the claimed range as "narrowly drawn" around a formulation with a pH of 3.8.  *See* '209 patent file history at (JTX-0008) PAR-VASO-0005816, June 28, 2017 Response to Non-Final Office Action at 8; '785 patent file history at (JTX-0009) PAR-VASO-0009721, June 28, 2017, Response to Non-Final Office Action at 7.

4. The patent specification further confirms that a POSA would understand "a pH of 3.7-3.9" to exclude pH values outside that range.  The patent specification describes a comparison formulation with a pH of "about 3.4 to about 3.6," that is used to compare with the claimed formulation.  '209 patent at 12:17-24; '785 patent at 12:16:23.  A comparison formulation must be considered different from the claimed formulation.  Here, the comparison formulation described in the Asserted Patents was the formulation of Pitressin®.  *See* Section 3.2.P.2.2

Pharmaceutical Development Drug Product- Pitressin®, NDA No. 204485, (DTX-1303) PAR-VASO_0072798-803 at PAR-VASO_0072800.  By using this comparison formulation in the patents, a POSA would understand that the patentees considered a pH of "about 3.6" to be different from a pH of 3.7.

5.     The patent specification also lists different embodiments of the claimed formulation using different pH ranges which differ in increments of 0.05.  '209 patent at 47:44-48:5; '785 patent at 47:43-48:4.  This list of possible pH ranges describes different embodiments and indicates to a POSA that the patentees were differentiating between embodiments with pH ranges such as "about 3.65 to about 3.85" and "about 3.7 to about 3.9."  '209 patent at 47:59-60; '785 patent at 47:58-59.

6.     In addition, U.S. Patent No. 9,937,223, a patent in the same family as the Patents-in-Suit, claims a formulation with a pH of "about 3.7 to about 3.8."  U.S. Patent No. 9,937,223 at claim 1.  A POSA would understand that the fact that the patentees chose to use the term "about" in a related patent means that the term "about" cannot be implied or incorporated into claim limitations which expressly do not use the term "about."  Therefore, a POSA would not understand "a pH of 3.7-3.9" to include anything outside the scope of that numerical range.

7.     This understanding of "a pH of 3.7-3.9" is further consistent with the fact that a pH of 3.6 has 26% more protons than a pH of 3.7, and therefore would be

Case 1:18-cv-02023-CFC-CJB   Document 302   Filed 08/30/21   Page 120 of 820 PageID #: 10707

different.  Because pH is based on a logarithmic scale, a construction of "a pH of 3.7-3.9" that encompass pH values of 3.65 to 3.94 would result in a 51% increase in the claimed range of proton concentrations, and incorporate prior art formulations.

## II.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")

8.      A POSA would possess a relatively high level of skill, such as an M.D. and several years of experience in cardiovascular medicine and pulmonary and critical care and/or clinical research in those areas, or with several years of experience treating patients with vasopressin or other antidiuretic hormones, including regarding their use to increase blood pressure, treat vasodilatory shock, septic shock and other related conditions, their mechanism of action, and clinical and laboratory experience with their use. The amount of post-graduate experience would depend on the level of formal education and amount of experience treating cardiovascular and pulmonary conditions such as vasodilatory shock, and/or clinical research. A POSA to the clinical aspects of the claim limitations would have had access to and would have worked in collaboration with persons having several years of experience in drug development and/or the formulation of drug products.

9.      A POSA would include a person having a Ph.D. in pharmacy, biochemistry, chemistry, chemical engineering or a related field and at least two years of experience in working with parenteral formulations and protein

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 151 of 820 PageID #: 10745

Diagram 305   Filed 08/30/21   Page 151 of 820 PageID #:

formulations. A POSA may have a Master's Degree in pharmacy, biochemistry, chemistry, chemical engineering or a related field and at least five years of experience in parenteral formulations and peptide formulations. Additionally, a POSA would have had access to and would have worked in collaboration with

6

persons having several years of experience in clinical medicine as well as other professions in the drug development field, such as pharmacologists, chemists, or biologists.

## III. AMNEAL'S PROPOSED ANDA PRODUCTS WILL NOT INFRINGE THE PATENTS-IN-SUIT

### A. OVERVIEW OF AMNEAL'S PROPOSED ANDA PRODUCTS

10. Amneal submitted two ANDAs seeking approval of a generic Vasopressin Injection, ANDA No. 212944 for its single-dose 1 mL vial product ("SDV Product") and ANDA No. 212945 for its multi-dose 10 mL vial product ("MDV Product"). The ingredients of both formulations are outlined in the below table:





Section 2.3.S Quality Overall Summary, ANDA No. 212944, (DTX-1177)

AMVAS0000296-456 at AMVAS0000302 (hereinafter, "SDV Quality Overall

Summary").





Section 2.3.S Quality Overall Summary, ANDA No. 212945, (DTX-1199)

AMVAS0009368-544 at AMVAS0009374 (hereinafter, "MDV Quality Overall

Summary").

### B. AMNEAL'S PROPOSED ANDA PRODUCT SPECIFICATIONS

11.    The Amneal ANDAs both provide specifications for the quality attributes of the SDV Product and MDV Product upon release.   Among several attributes, specifications are provided for pH and impurity levels.  The specifications for these attributes upon release are summarized below:





Section 3.2.P.5.1 Specification, ANDA No. 212944, (DTX-1263)

AMVAS0132440-55 at AMVAS0132443-44 (hereinafter, "SDV Specification");

Section 3.2.P.5.1 Specification, ANDA No. 212945, (DTX-1270)

AMVAS0134689-706 at AMVAS0134692-94 (hereinafter, "MDV Specification").

12.    In its original submission to the FDA, ████████████████

████████████████████.    SDV Quality Overall Summary at (DTX-1177)

AMVAS0000314;   MDV    Quality    Overall    Summary    at    (DTX-1199)

AMVAS0009386. ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████. *See* (DTX-1220) AMVAS0018322 at

AMVAS0018323; (DTX-1224) AMVAS0018470 at AMVAS0018471 (███████

██████████████████   ███████████████████████

███████████████████████



SDV Quality Overall Summary at (DTX-1177) AMVAS0000314 (emphasis

added); MDV Quality Overall Summary at (DTX-1199) AMVAS0009386

(emphasis added).

13.   ██████████████████████████████████

████████████████████



11

Section 3.2.P.5.6 Justification of Specification, ANDA No. 212944, (DTX-1106) AMVAS0018354 at AMVAS0018357 (hereinafter, "Sept. 2019 SDV Justification of Specification"); Section 3.2.P.5.6 Justification of Specification, ANDA No. 212945, (DTX-1227) AMVAS0018502 at AMVAS0018505 (hereinafter, "Sept. 2019 MDV Justification of Specification").

14. 

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

## C. AMNEAL'S STABILITY TESTING

15.     The proposed storage conditions for both SDV and MDV products are to "[s]tore between 2º to 8º C (36º to 46º F)," which are considered refrigerated conditions.   Section 3.2.P.8.1 Stability Summary and Conclusions, ANDA No. 212944, (DTX-1264) AMVAS0132632-34 at AMVAS0132634 (hereinafter, "SDV Stability Summary"); Section 3.2.P.8.1 Stability Summary and Conclusions, ANDA No. 212945, (DTX-1271) AMVAS0134908-10 at AMVAS0134910 (hereinafter, "MDV Stability Summary"). [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

16.     As part of its ANDAs, Amneal has conducted stability testing through the proposed shelf life of its SDV and MDV Products under its proposed storage conditions to demonstrate that pH and impurities, as well as other quality attributes, remain within Amneal's proposed finished product specifications.  *See, e.g.*, Stability Protocol, ANDA No. 212944 at (JTX-0008) AMVAS0005552 at AMVAS0005554-55; Section 3.2.P.8.3 Stability Report for Additional Study, ANDA No. 212944, (DTX-1266) AMVAS0132645-65 (hereinafter, SDV Additional Stability Report);  Stability Protocol, ANDA No. 212945,  (DTX-1368) AMVAS0134808-907 at AMVAS0134900-01; Additional Study Protocol, ANDA No. 212945, (DTX-1387) AMVAS0134891-97 at  AMVAS0134893-95.  ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████. Three batches for each of the Amneal Products (SDV and MDV) were monitored for stability testing:  ████████ ████████████████████████ were  monitored  for ANDA  No. 212944  and  ████████████████████████████████  were

monitored for ANDA No. 212945.  The results of Amneal's stability testing is discussed in greater detail below.

### D. AMNEAL'S MANUFACTURING PROCESS

17.    Amneal's manufacturing process consists of several steps which require the monitoring of pH, including a pH adjusting step.  Amneal's ANDAs describe the manufacturing process as follows:







███████████████████████████████████████████████

██████████████████████████        ████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████

19.     The bulk solution is subsequently analyzed to determine whether it meets the specification for certain parameters.     *See* SDV Description of Manufacturing Process at (DTX-1182) AMVAS0001456-57; MDV Description of Manufacturing  Process  at  (DTX-1203)  AMVAS0010636.     ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

20.     ████████████████████████████████████████

█████████████████████████████        ████████████████

████████████████████████████████████████████████

███████████████████████████████████

21.     ████████████████████████████████████████

22. ████████████████████████████████████████████

23.     Batch manufacturing records were submitted as part of both Amneal ANDAs which demonstrate all the relevant quality attributes which were recorded during the manufacturing process ████████████████████████████

19

**E. AMNEAL'S PROPOSED ANDA PRODUCTS WILL NOT SATISFY THE pH CLAIM LIMITATION OF THE '785 AND '209 PATENTS UPON MANUFACTURE OR DURING THEIR SHELF LIFE**

24.     All Asserted Claims of the '785 and '209 patents require the claimed vasopressin formulation to have "a pH of 3.7-3.9."  A POSA would not understand any pH value below 3.7 or above 3.9 to be encompassed by the claimed range.

25.     Under a POSA's understanding of the claimed pH range, Amneal's ANDA Products would not literally infringe the Asserted Claims.  First, the pH specification for Amneal's ANDA Products upon release and throughout stability testing does not overlap with the claimed range.  Second, the pH values recorded for Amneal's ANDA batches upon release and throughout their shelf life have consistently demonstrated pH values that fall outside of the claimed range, and it would be expected that the pH behavior recorded is representative of Amneal's future batches. And third, the formulation, manufacturing, and packaging choices made by Amneal show that it does not intend to make a vasopressin product with a pH of 3.7-3.9.  For example, Amneal's manufacturing process reflects ████████

████████████████████████████████████████████████████

████████████████████████████████████████████

26.     Amneal is not seeking FDA approval to market a vasopressin product with a pH between 3.7 and 3.9, nor does Amneal intend that its proposed products will have a pH between 3.7 and 3.9 during the shelf life. ████████████████

████████████████████████████████████████ and the

stability specification for Amneal's proposed ANDA Products, Amneal has given

21

adequate control with respect to both manufacturing as well as finished product specification to ensure that the products will remain within the specification limit. Furthermore, Joshi testified ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████.

27.     Par's expert Dr. Kirsch relies on pH data for development batches that are not representative of Amneal's proposed ANDA Products.   Dr. Kirsch's infringement analysis also relies on hypothetical batches released at the upper end of Amneal's specification.████████████, but Dr. Kirsch does not explain how a vasopressin formulation ███████████████████, and he has not determined the likelihood of such an event occurring.

> **1.     The pH Specification in Amneal's ANDAs Does Not Meet the pH Claim Limitation of the '785 and '209 Patents**

28.     As discussed above, pH is a quality attribute for Amneal's proposed ANDA Products which is measured and recorded to characterize Amneal's proposed ANDA Products upon manufacture and for stability testing during the products' proposed shelf life. ████████████████████████████████

████████████████████████████. *See* SDV Specification at (DTX-1263) AMVAS0132443; MDV Specification at (DTX-1270) AMVAS0134692.   This same specification for pH is also used for each measured time point in the stability study described in Amneal's ANDAs.   *See* SDV Specification at (DTX-1263)

AMVAS0132443; MDV Specification at (DTX-1270) AMVAS0134692.   Put another way, Amneal has told the FDA that it will manufacture a product that has a

████████████████████████████████████████████████████████████████

throughout its shelf life, as stored per the instructions in its proposed label.  Amneal's proposed ANDA products will not deviate from this pH specification during their shelf life, as discussed below.

29.    A pH of 3.60 has 26% more protons than a pH of 3.7; therefore, a POSA would not consider 3.7 the same as a pH of 3.60.  Furthermore, even assuming Dr. Kirsch's interpretation of the pH limitations is correct and ordinary rounding principles apply, a POSA would not consider 3.65 —the lowest pH value that rounds to 3.7—to be the same as a pH of 3.60 because a pH of 3.60 has 12% more protons than a pH of 3.65.

### 2.    The pH Data for Amneal's ANDA Batches Do Not Meet the pH Claim Limitation of the '785 and '209 Patents

30.    In its ANDAs, Amneal has also provided pH data for exhibit batches that have been monitored upon manufacture and for 24 months, in line with the products' shelf life.  That data consistently reflects that Amneal's products do not meet the pH claim limitation of the '785 and '209 patents, under either party's understanding of the ordinary meaning of the limitation.

**(a)**    ████████████████████

31.    ████████████████████ was manufactured according to Amneal's

manufacturing process as described in ANDA No. 212944.  *See* ██████████



32. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ therefore

are not within the claimed range of 3.7 to 3.9.

33. ████████████████████████████████████████

████████████████████

This data is charted below:



34. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████ therefore do not fall within the claimed range.

35. ███████████████████████████████████████

████████████████████████████



36.     While only two data points are collected in this study, they reflect that

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████. The pH therefore does not fall

within the claimed pH range of 3.7-3.9.

37.     As demonstrated above, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ regardless of whether it is considered

to encompass 3.65-3.94 or 3.70-3.90.

**(b)** 

38. 





39. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ therefore do not fall within the claimed

pH range of 3.7-3.9.

40. ███████████████████████████████████████████████████

████████████████████████

███████████████████████████.

This data is charted below:



41.   

therefore do not fall within the claimed pH range of 3.7-3.9.

42.

.



43.  The data points in this study reflect that the ██████████████

███████████████████████████████████████████████████████████

████████████  The pH therefore does not fall within the claim pH range of 3.7-3.9.

44.  ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████  None of the pH values for ███████████

████████████  fall within the claimed pH range of 3.7-3.9, regardless of whether it is

considered to encompass 3.65-3.94 or 3.70-3.90.

**(c)**  ████████████████████████

45.  ███████████████████████████████████████████████████████

███████████████████████████████████████████     ██████████████



46.   As can be seen from the table and chart above, ███████████

███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ therefore do not fall within the

claimed pH range of 3.7-3.9.

47.   ████████████████████████████████████████████

████████████████████████

████████████████████████

48. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ and therefore do not fall

within the claimed pH range of 3.7-3.9.

49. ███████████████████████████████████████████

████████████████████████████████████.



███████████████████████████████████████████████

███████████████████████████████████:



50. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. The pH therefore does not fall within the claimed pH range of

3.7-3.9.

51. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. None of the pH values ████████████████████

fall within the claimed pH range of 3.7-3.9, regardless of whether it is considered to

encompass 3.65-3.94 or 3.70-3.90.

███   █████████████████████

52. ████████████████████████████████████████████████████

████████████████████████████████████████   ███████████████

████████████████████████████████████████████████████████████



53.     As can be seen from the table and chart above, ███████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ therefore do not fall within the

claimed pH range of 3.7-3.9.

54.   ██████████████████████████████████████

████████████████████



████████████████████████████████

████████████████████



55.     The results from this study show that ███████████████

████████████████████████████████████████████████

████████████████████████████████████ The pH

therefore does not fall within the claimed pH range of 3.7-3.9.

56.     ███████████████████████████████████████

█████████████████████



57.    The data points in this study reflect that ███████████████

███████████████████████████████████████████████████████

███████████████    The pH therefore does not fall within the claimed pH range of

3.7-3.9.

58.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████    None of the pH values ████████████████

███████████████████████████████████████████████████████

███████████████████████

**(e)** 

59.

60.

therefore do not fall within the claimed pH range of 3.7-3.9.

61.

62. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■ and therefore does not fall within the claimed pH

range of 3.7-3.9.

63. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■



■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■



64. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

65.     As demonstrated above, none of the stability studies conducted on

████████████████████████████████████████████████

███████████████████████████ None of the pH values █████████████████

fall within the claimed pH range of 3.7-3.9, regardless of whether it is considered to

encompass 3.65-3.94 or 3.70-3.90.

        **(f)** ████████████████████████

66. ██████████████████████████████████████████

████████████████████████████████████   ████████████████

██████████████████████████████████████████████████,



67.    As can be seen from the table and chart above,

██████████████████████████████████████████

████████████   ██████████████████████████████████████

████████████ and therefore do not fall within the claimed pH range of 3.7-3.9.

68.   ██████████████████████████████████████

████████████████



████████████████████████████

████████████████

---

[1] ██████████████████████████████████████████

████████████████



69. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ therefore does not fall within the claimed pH range

of 3.7-3.9.

70. ████████████████████████████████████

████████████████████████



71. █████████████████████████████████████████

█████████████████████████████████████████████

████████████████ The pH therefore does not fall within the claimed pH range of

3.7-3.9.

72. █████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████ None of the pH values ████████████████

██████ fall within the claimed pH range of 3.7-3.9, regardless of whether it is

considered to encompass 3.65-3.94 or 3.70-3.90.

73.     The data provided in both Amneal's ANDAs overwhelmingly reflect that the pH of Amneal's proposed ANDA products will not meet the pH claim limitation of the '785 and '209 patent, under either party's understanding of the limitation. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

74.     Dr. Kirsch's statistical analyses and conclusions regarding infringement are framed entirely in terms of his assessments, based on hypothetical data for fictitious Amneal product batches, of probabilities that an individual pH measurement, rather than the mean pH of a batch, might reach a pH of 3.65. The basic distinction between a batch-level mean pH and an isolated, single pH measurement for a specimen from that batch is important because Dr. Kirsch's statistical analyses rest on the assumption that individual pH measurements may deviate essentially randomly from the mean of all potential, comparable pH measurements. This mean value is a stable property of the batch, unlike any single pH measurement subject to the idiosyncratic random variation assumed by Dr.

Kirsch's models.  Accordingly, it is reasonable to interpret the concept of "the pH of a batch" as referring to the mean pH of the batch and—conversely—unreasonable to interpret it as referring to any individual pH measurement, which may differ from other, comparable pH measurements for the same batch.  This logical defect alone renders his analyses irrelevant to his purported conclusion concerning infringement and incapable of supporting Par's infringement claims.

75.    Dr. Kirsch's statistical analyses focus on a fictitious Amneal product batch ███████████████████████████████████████████████████ However, he fails to consider what Amneal's test data teaches about the probability of such a batch being released.  By a standard statistical calculation, the estimated probability of obtaining a batch ██████████████████████████ is approximately 0.069%.  Dr. Kirsch's statistical analyses describing a hypothetical extreme batch which is expected to occur 0.069% of the time, if ever, have little relevance for characterizing a randomly chosen, representative batch of Amneal's ANDA Products.

76.    Statistical logic dictates that a *conditional* conclusion, such as that "a batch manufactured *at the top end of Amneal's release specification* would more likely than not reach a pH value of 3.7-3.9 at some point during its shelf-life," does not imply that, *unconditionally*, "A batch manufactured [in compliance with] Amneal's release specification would more likely than not reach a pH value of 3.7-

3.9 at some point during its shelf-life."  The mathematics of probabilities holds that the *unconditional* probability of a proposition P (that an Amneal batch will reach pH 3.7) can generally be calculated from its *conditional* probability assuming a condition C (that the initial pH of that batch was at the top end of Amneal's pH specification), by multiplying the conditional probability (of P given C) by the probability that condition C will occur, i.e., that the initial pH of a batch will attain the top end of Amneal's pH specification.  Thus, the probability that a batch of Amneal's ANDA Products would be released at the upper limit of Amneal's specifications imposes an upper bound (i.e. 0.069%) on unconditional probabilities that falls far short of a preponderance threshold.

77.     Dr. Kirsch's time-dependent statistical analysis of the pH data, in which he shifts the entire ensemble of observed and calculated pH values up to set the shifted initial pH value (representing measured pH at product age zero) equal to ███ is not a routinely used, standard statistical method; rather it is a novel, pseudo-statistical, ad hoc device, for which there is no support in the literature.  For the data for which Dr. Kirsch claims a time-dependent relationship, Dr. Kirsch's analysis shows a downward trend in pH over time.

78.     Dr. Kirsch also errs in his use of prediction intervals rather than confidence intervals.  There are two distinct kinds of statistical intervals can be used to describe two logically distinct ranges of uncertainty: (1) "confidence intervals"

50

quantify our uncertainty about the level, at a given age, of the regression line and, hence, about the expected (average) level of a new pH measurement at that age; and (2) "prediction intervals" account, in addition, for the fact that a single new pH measurement will fall not necessarily *on* the regression line but could deviate from it to the same extent as do the actual data points. The confidence and prediction intervals at a given age will both be centered on and symmetrical around the regression line, but the prediction interval will be wider than the confidence interval because it accounts for the idiosyncratic random variation of individual pH measurements. This distinction between confidence and prediction intervals is the computational statistical counterpart of the distinction set forth above between a batch-level pH and a single, individual pH measurement. Because the upper limit of a *prediction* interval is necessarily greater than upper limit of a *confidence* interval, all else being equal, reliance on prediction intervals improves the chances of a finding at or above any given threshold, including the pH claim threshold of 3.7 (or 3.65, if Dr. Kirsch is correct that rounding principles apply).

79. A fundamental conceptual distinction between the two kinds of intervals is that only the narrower confidence intervals can be interpreted as quantifying a stable, intrinsic characteristic of Amneal's product specifications and production method per se. Meanwhile, the wider prediction intervals represent a mixture of such stable, intrinsic characteristics with essentially random measurement

51

error of the kind that leads to differences among replicate pH measurements for the same product stored and tested under the same conditions. An infringement determination should reflect stable, intrinsic product characteristics rather than, say, happenstance variability in laboratory procedure; therefore, it follows that the relevant metrics for assessing Par's claims in this dispute are confidence bounds for the true mean pH of the product rather than prediction bounds for individual pH measurements. Moreover, the ICH statistical testing guidelines cited by Dr. Kirsch himself favor the use of confidence intervals, as opposed to prediction intervals.

80.     The 95% confidence intervals calculated using the pH data for Amneal's exhibit batches and shifting the initial pH to a value at the upper limit of Amneal's specification never reach a pH of 3.7 over 24 months storage at both room temperature and refrigerated storage conditions. This indicates that that a batch manufactured at the top end of Amneal's release specification would be *unlikely* to reach a pH value of 3.7–3.9 because the probability of obtaining a value at or above the 95% upper bound is only 2.5%, not 51%.

81.     Dr. Kirsch's time-independent statistical analysis of the pH data for Amneal's exhibit batches is likewise also flawed. By pegging the imputed hypothetical lifespan-*average* pH ███████, Dr. Kirsch artificially increases the likelihood that some individual imputed pH measurement(s) during the product lifespan will reach or exceed 3.7 (since *some* measured pH values *must* exceed the

52

average—unless all are identical).  Furthermore, Dr. Kirsch ignores that Amneal would not release any batch having pH exceeding the product specifications.

82.    The table below shows (in the second column from the right) the implied (conditional) probabilities, by Dr. Kirsch's time-independent logic and methods, that "a batch manufactured at the top end of Amneal's release specification" would achieve a true mean pH at or above 3.7.  This probability is below one percent for all 24 test setups; for eight of 24 it is no greater than one hundredth of one percent (i.e., less than 0.01%).  Here, the *unconditional* probabilities of obtaining a batch with true mean of 3.7 or higher can be calculated by multiplying the conditional probabilities by 0.001% or 0.069% (the estimated probabilities of obtaining a batch with release ███████████████).  Even the highest conditional probability in the table below, 0.589%, would translate into an unconditional probability of only 0.00000589%.).  The table also shows (in the rightmost column) parallel estimates ████████████████████████████ ████████████████████).  *All* are below 0.1%. Here again the unconditional probabilities can be approximated by multiplying the conditional probabilities by 0.069%, the probability of obtaining a batch with release ████████████.  The highest conditional probability ████████████████ in Table 3, 0.064%, would translate into an unconditional probability of only 0.000044%.



**Sources:** AMVAS0120290-385.

83.     If the following corrections and reasonable alternatives are applied to Dr. Kirsch's statistical analysis, in no scenario would there be support for Dr. Kirsch's infringement opinion regarding pH:

- Calculating conceptually appropriate confidence intervals for the *mean* predicted value of a future pH measurement (as recommended by the statistical guidance cited by Dr. Kirsch);

- Calculating conceptually appropriate *one*-sided 95% intervals (Dr. Kirsch's assignment is intrinsically one-sided);

- ███████████████████████████████ ███████████ and

- Applying a pH claim limitation lower bound pH of 3.7.

84.    Dr. Kirsch's calculation of  the "likelihood that Amneal could release an MDV or SDV batch based on a pH value at the upper acceptable limit of Amneal's pH specification ██████████████████ when the true mean pH value for the batch was actually within the ██████████████████ ████████ is flawed.  First, Dr. Kirsch does not account for the probability of an Amneal batch being released at the upper end of the specification, which as discussed above is less than 0.1%.  Second, if this analysis is applied in view of Amneal's ██████████████████ the probability estimates decrease significantly from 36% and 41% to 0.04% and 1.2% (based on MDV or SDV exhibit batches, respectively).

85.    Dr. Kirsch's very-recent calculation of the number of vials from a batch of Amneal's ANDA Products that would alleged meet the pH limitations ignores the actual data from Amneal's exhibit batches.  T██████████████████ ████████████ which if applied to Dr. Kirsch's analysis and calculations (see table below), would result in 0 vials per batch having a pH of 3.65 or greater.



    **3.**    **Amneal's Formulations, Manufacturing, and Packaging Choices Shows That It Did Not Intend to Make a Vasopressin Composition with the pH Claim Limitation of the '785 and '209 Patents**

86.    Unlike Par's Vasostrict® product, Amneal's ANDA Products are

████████████████████████████████████████████████. SDV

Quality Overall Summary at (DTX-1177) AMVAS0000302. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ███████████    This choice of buffer supports the fact that

Amneal has no intent to manufacture ANDA Products which could infringe the pH

claim limitation either upon manufacture or during the proposed shelf life.

87.    The pH adjusting step in Amneal's manufacturing process further

supports that the pH of Amneal's ANDA Products are not designed to rise above

██ during the course of their shelf life.  In its manufacturing process, ████

████████████████████████████████████████████

████████████████ *See* SDV 2020 Amendment at (DTX-1261) AMVAS0131456;

MDV 2020 Amendment at (DTX-1268) AMVAS0133720.  Manufacturing batch

records submitted by Amneal to the FDA reflect the pH recorded and adjusted, and

this process demonstrates ████████████████████████████████

████████████████████████████████████████████

██   The pH adjustment step used in Amneal's manufacturing process and its

express goal ████████████████████████████████████████

████████████████████████ and not the claimed pH range of 3.7 to 3.9, under

either party's understanding of the claimed range.

88.   Below is a chart that provides the pH values before and after the pH

adjustment step for Amneal's ANDA batches submitted to the FDA:



---

2 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████ *Compare, e.g.,* SDV 2020 Amendment at (DTX-1261)
AMVAS0131456 *with, e.g.,* ████████ Manufacturing Record at (DTX-1194)
AMVAS0006375.



89.    As can be seen for each batch,

Carrying out this step allows for the pH of Amneal's ANDA batches to stay within the pH specification upon manufacture and throughout its shelf life.  Amneal's clear

intent to manufacture a product at this pH supports the fact that Amneal has no intent to release a product within the claimed pH range, and further undermines any argument or speculation that Amneal's ANDA Products are made to have a pH of 3.7 to 3.9—under either party's understanding of the claimed range—during their shelf life.

90.    Finally,  . *See* SDV Packaging Specification at (DTX-1187) AMVAS0005531-37; MDV Packaging Specification at (DTX-1209) AMVAS0014975-81; *see also* ████████████ at (DTX-1186)  AMVAS0005526;  ████  ████  ████████  ████  at  (DTX-1208) AMVAS0014972.

91.    Overall, the evidence contained in Amneal's ANDAs, through actual data of its proposed products from their manufacture and throughout their entire shelf life, through the pH specification, and through an evaluation of their formulation, manufacturing, and packaging choices, supports a finding that Amneal's proposed ANDA Products do not meet the pH claim limitation of the '785 and '209 patents, regardless of whether "pH of 3.7-3.9" is considered to encompass 3.65-3.94 or 3.70-3.90, and therefore will not infringe any of the Asserted Claims of those patents.

92.     In addition, given the manufacturing process and, in particular, the pH adjusting step, ███████████████████████████████████████████████ ███ Amneal does not intend to release a product with a pH above ████ including a pH of 3.7-3.9.  Furthermore, Amneal is not seeking FDA approval to market a vasopressin product with a pH between 3.7 and 3.9, and Amneal does not intend that its proposed products will have a pH between 3.7 and 3.9 during the shelf life.  Based on the batch manufacturing record ████████████████████████████████████ and the stability specification for Amneal's ANDA Products, Amneal has given adequate control with respect to both manufacturing as well as finished product specification to ensure that the products will remain within the specification limit. Amneal will not release any batches that have ████████████████.  (DTX-1261) AMVAS0131386 at AMVAS0131456-57; (DTX-1268) AMVAS0133654 at AMVAS0133720-21.

### 4.     Amneal Is Unlikely To Market Out-of-Specification ANDA Products That Meet The pH Claim Limitations of the '785 and '209 Patents

93.     Amneal is unlikely to avoid a recall of out-of-specification products. First, if the a product failure is discovered, there will be a Field Alert, the communication to the FDA within three days after discovering a product that is on the market has failed to meet a quality attribute or specification.  Once the failure is confirmed, the company must notify the FDA of the resolution.  For drug products,

resolution means the product is recalled from the market. Companies typically engage in discussion with the FDA during the confirmatory testing and subsequent investigation as well as during the recall process. The FDA must agree to the recall announcement, proposed classification (Class 1, 2 or 3) and plan. While a company may choose to ignore the FDA's wishes (the FDA does not have mandatory recall power over drug products unless they are a serious risk to patient health), it is not in a company's best interest to do so.

94.     Second, Amneal is likely to recall an out of specification product before it expires. The FDA's position has been that if any product is likely to remain on the market and it is within its labeled expiry, then the product must be recalled. However, a firm may notify the FDA that a product's supply turnover rate is so high, that product at or near expiration is highly unlikely to remain on the market. If the FDA agrees and the company can prove that the recalled lot was distributed months or even years before the Field Alert and that product inventory history and orders show the speed in which it is sold or replaced, the FDA may forgo recall of such a lot. This scenario and FDA decision are highly unlikely, however, as the FDA is

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 176 of 820 PageID #: 10769

risk averse and does not assume all vials of an "older" lot of product have indeed been used or replaced.

95.     Third, Amneal is unlikely to avoid a recall for out of specification drug products due to a drug shortage within the United States. Vasopressin is not

currently on the drug product shortage list and does not appear to have been on this list previously. *FDA Drug Shortages*, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/scripts/drugshortages/ (last visited Oct. 28, 2020). In addition, alternative treatments are available (e.g. epinephrine). Similarly, Amneal is unlikely to avoid a recall for out of specification drug products due to a determination that vasopressin is considered a critical medical necessity in treating certain diseases or conditions. There are a variety of drugs on the market that can be used as alternatives to vasopressin. For instance, norepinephrine, epinephrine, and angiotensin II are drugs that can be used instead of vasopressin. This is a non-exhaustive list of drugs that could be used instead of vasopressin, a second-line vasopressor, to achieve similar clinical results. In light of these alternatives, a shortage in the supply of vasopressin would not cause a significant risk to patient safety. Therefore, it is highly unlikely that vasopressin would avoid a recall on the basis that it is critical given its use as a second line treatment and the availability of other drugs that could be used instead.

96. Fourth, Amneal is unlikely to avoid a recall for out of specification drug

products by seeking a meeting with the FDA by justifying the failure as presenting minimal or low risk to patients' health. Again, the FDA would have to agree to this which is highly unlikely. Companies who present such justifications to the FDA for product recalls would also likely to be regarded suspiciously by the FDA for other

issues and other products in the future – an outcome that most generic companies are not willing to accept given the constant need to obtain approvals for new generic products.

97.     Amneal is also likely to investigate any drug products with specifications at the high end of a specified range.  Values that are just below or just above a drug product specification are likely to be considered "out-of-trend" (OOT) or out of the norm.  Such results are always investigated in the same way as a result that fails to meet acceptance criteria ("out of specification" or "OOS").  This type of investigation requires extensive and additional testing of the final product, review of the laboratory analyses to ensure the sample, preparation, instrumentation and testing were all proper, and review of the manufacturing batch record to verify operations were performed correctly.  This investigation would either confirm the original results or nullify them with additional test results and analyses.  Thus, even if a pH specification ███████████████████████████████████████ ██████████████████████████, such results will still be investigated.

98.     The requirement for testing one lot per year for stability is sufficient and would not lead to potential OOS products on the market.  First, any stability lot that fails to meet any single specification would be reported to the FDA via Field Alert and may result in a product recall.  The language in the Vasopressin ANDAs states that "[i]f the deviation is a single occurrence that does not affect the safety and

efficacy of the product, it will be promptly discussed" with FDA. *See* Section 3.2.P.8.2 Post-approval Stability Commitment, ANDA No. 212944, (DTX-1265) AMVAS0132635-644 at AMVAS0132640; Section 3.2.P.8.2 Post-approval Stability Commitment, ANDA No. 212945, (DTX-1272) AMVAS0134911-20 at AMVAS0134916.

99. Second, the number of lots placed in a stability program has been established by the FDA and other regulatory agencies worldwide and is a firm standard. A single lot per year is sufficient because it is representative of all batches of a product the company is selling. Conducting stability testing on one lot per year is standard because other GMP regulations require that stringent manufacturing controls must be in place that ensure every lot consistently meets specifications and quality expectations. Such controls include process validation, change control (to verify any change made does not impact on the product), equipment qualification, cleaning validation, in-process sampling and testing, verification of acceptability of all raw materials, etc. As long as these controls and company practices are well designed, implemented and documented, testing one randomly selected lot of

product per year for stability testing is sufficient evidence that the company's personnel, systems, facility, equipment and process are functioning as designed, producing a quality product that meets approved specifications and FDA requirements.

64

100. Third, in reality, most companies place more than one lot per year on stability as issues occur on occasion whereby a company may decide that other lots should also be tested for stability. Events such as minor changes to a process or equipment, or deviations during manufacture may lead to questions as to whether the product's stability may or may not have been affected. When such questions arise, the FDA expects and most companies place any such lot impacted by an event on stability.

101. Fourth, the FDA requires that all drug companies submit an Annual Report for each approved drug product. *See* 21 CFR 314.81(b)(2). This report must include ongoing stability data for all lots undergoing such testing. *See* 21 CFR 314.81(b)(2)(viii). Thus, FDA sees all stability data on an ongoing basis during the lifespan of the product. Any year that is missing at least one lot of a product placed on stability or any change in the stability profile, including a trend of increasing pH over time, would be noticed and questioned by the FDA.

## 5. Amneal Will Not Induce Infringement of the Asserted Claims

Case 1:18-cv-03065-CLC-CHB Document 306 Filed 08/30/21 Page 180 of 820 PageID #:

102. Amneal did not know and would not have known that acts of any third party would result in direct infringement of the Asserted Claims.

103. Amneal did not have an intent to cause any acts that would constitute infringement.

104. Because Amneal's ANDA products to be sold and used are not the

products described in Asserted Claims, Amneal's proposed package inserts would not encourage, promote, or recommend nurses or other medical professionals administering Amneal's ANDA products to perform the claimed methods. The Original Vasostrict® Labels recited a pH of 3.4-3.6, and therefore Amneal's ANDA products, ███████████████████, are within the pH range of prior art Original Vasostrict®. Physicians administering the Amneal ANDA products would be practicing the same method that was practiced with the prior art products.

## IV.  THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID

### A. BACKGROUND

#### i. Arginine Vasopressin

105.   As of January 2015, vasopressin was known to be a hormone crucial for osmoregulation, cardiovascular control, and homeostasis. Treschan 2006[3] at 599. The structure of arginine vasopressin and structurally-related analogs are presented in Figure 1.

---

[3] Treschan and Peters, "The Vasopressin System," Anesthesiology 105:599-612 (2006), (DTX-0238) AMPHPA0006695-708 ("Treschan 2006").



Arginine Vasopressin (AVP)

Desmopressin (1-Desmopressin-8-D-Arginine Vasopressin, DDAVP)

Terlipressin (Triglycyl-8-Lysin Vasopressin)

**Fig. 1. Amino acid sequence of vasopressin and synthetic vasopressin agonists.**

*Id*. at 600.  Vasopressin is a nine amino acid peptide.[4]  The sulfur-containing side chains of both cysteine amino acids form a disulfide bond, a chemical bond between the sulfurs in their side chains, resulting in a cyclic structure.  The human hormone has an arginine ("Arg") in position 8, italicized in the figure above.  Due to this arginine, the human hormone is specifically called "arginine vasopressin" ("AVP") to distinguish it from related analogs, peptides having a similar structures.

106.  Vasopressin was marketed for therapeutic use by Parke-Davis for nearly 100 years.  In 1928, Parke-Davis first introduced naturally-derived bovine vasopressin under the name Pitressin® to treat diabetes insipidus and raise blood

Case 1:18-cv-02023-CFC-CJB   Document 302   Filed 08/30/21   Page 182 of 820 PageID #: 10303

---

[4] Proteins are comprised of fundamental building blocks called amino acids connected in a linear fashion by chemical bonds.  Amino acids differ from each other in the chemical composition of their side chains which branch from a common amino acid backbone.  When 50 or fewer amino acids are connected, they are collectively referred to as a "peptide."  Amino acids (e.g. Glycine or Arginine) can be referred to by a three-letter designation (e.g. Gly or Arg).

pressure. FDA NDA Review,[5] Clinical Pharmacology Review at 6. Parke-Davis and others have since marketed Pitressin® until shortly before Vasostrict® was approved and launched. Other marketed vasopressin products included those marketed by, among others, American Regent and Fresenius Kabi. These marketed vasopressin products are discussed in more detail below.

107. As discussed in more detail below, by January 2015, vasopressin had been formulated for nearly a century as an injectable solution containing water, acetic acid and chlorobutanol. It was therefore known to be adequately stable in solution to be marketed. It was also known to be compatible with these excipients.

108. There were multiple publications investigating the use of AVP for vasodilatory shock and hypotension that took place in the 1990's and early 2000's. These studies examined the outcomes of hypotensive patients who were administered vasopressin to increase blood pressure. In these studies, vasopressin was administered intravenously at infusion rates ranging from 0.01 to 0.1 units per minute.

### ii. Formulation Development

#### 1. Parenteral Drug Formulation Development

109. The Patents-in-Suit are directed to intravenous formulations of

---

[5] FDA Clinical Pharmacology Review of NDA No. 204485, (DTX-1024) PAR-VASO_0240262-575 ("FDA NDA Review").

vasopressin or a pharmaceutically-acceptable salt thereof. A POSA would have well-understood the principles of parenteral drug developments by the priority date of the Patents-in-Suit.

110. By 2015, it was understood that the intended use of the drug product informs the target profile of the formulated drug product. For example, the route of administration determines the final characteristics of the drug product, including dosage form, vehicle, volume, and tonicity requirements. Hovgaard[6] at 151.

111. After identifying the formulated drug product's target profile, a POSA would have methodically screened different formulation parameters for their effect on the stability and solubility on the drug substance. *Id*. It was essential to have a thorough understanding of the physical and chemical properties of the peptide drug substance, including the effects of temperature, pH, buffer type and concentration, ionic strength, and peptide concentration, while developing a pharmaceutical formulation. *Id*. at 150.

112. For some drug products, formulation studies may have already been performed and published in the literature. These studies, in addition to existing

Case 1:18-cv-02023-CFC-CJB   Document 305   Filed 08/30/21   Page 184 of 820 PageID #: 101302

formulations, may have offered insight into an initial set of formulation conditions. However, if the studies were performed with outdated techniques or were

---

[6] Pharmaceutical Formulation Development of Peptides and Proteins, 149-192 (Hovgaard et al., eds.) (2013), (DTX-1028) AMPHPA0006136-184 ("Hovgaard").

inconclusive, a POSA would have considered designing and performing his/her own formulation studies. To the extent that existing studies were incomplete, a POSA would have supplemented their understanding with additional studies as well.

## 2. Liquid Peptide Formulations

113. A POSA would have understood by 2015 that therapeutic peptides generally lacked oral efficacy. Avanti 2012[7] at 15. Orally administered peptides were known to be prone to degradation in the gastrointestinal tract and poorly absorbed, resulting in poor bioavailability. *Id*. Intravenous administration would have been the preferred administration route due to the direct delivery of peptide drugs to the circulatory system, bypassing the gastrointestinal absorption process. *Id*.

### a. Peptide Stability

114. As of the earliest priority date of the asserted patents, a POSA would have known that peptide solutions required additional considerations in their formulation. By 2015 it was appreciated that the stability of peptide drugs in liquid formulation was the most important factor to consider during formulation development. *Id*. at 17. Having an understanding of the mechanisms underlying

---

[7] Avanti et al., Innovative Strategies for Stabilization of Therapeutic Peptides in Aqueous Formulations, University of Groningen, 54-55 (2012), (DTX-0263) AMPHPA0005495-651 ("Avanti 2012").

instability would have been essential to developing a pharmaceutical formulation with optimized stability. *Id*. A POSA would have understood that peptide instability can be broadly categorized as chemical instability or physical instability. Manning 2010[8] at 544. Chemical instability involves processes that make or break chemical bonds, whereas physical instability includes changes to the physical state without changing its chemical composition. *Id*.

115. A POSA would have been concerned with the stability of a peptide as it directly impacts its utility as a therapeutic. As the stability of a peptide drug decreases, the amount of peptide also effectively decreases and the peptide may exhibit lower potency. *Id*. at 554. Further, peptide instability may have implications for patient safety if any of the degradation products are toxic or have other side effects. *Id*.

116. A POSA would have had initial hypotheses of degradation products based on a peptide's amino acid sequence and chemical structure. By 2015, a POSA would have understood that the most common chemical degradation pathway for peptides and proteins was deamidation, or the loss of a nitrogen-containing amide

Case 1:18-cv-02032-CFC-CJB    Document 305    Filed 08/30/21    Page 186 of 820 PageID #:
10130

group, of asparagine (Asn) or glutamine (Gln) side chains. *Id*. at 544. Under acidic

---

[8] Manning et al., "Stability of Protein Pharmaceuticals: An Update," Pharmaceutical Research 27(4):544-575 (2010), (DTX-0254) PAR-VASO_0256577-608 ("Manning 2010").

conditions (pH < 3),[9] deamidation occurs by direct hydrolysis[10] of the side chain amide.  Manning 2010 at 545; Avanti 2012 at 19.  Under neutral or basic conditions (pH > 6), deamidation occurs through the formation of a cyclic succinimide intermediate followed by hydrolysis.  Manning 2010 at 545; Avanti 2012 at 19. The mechanism of asparagine (Asn) deamidation is presented in Figure 1.



**Figure 1.** Deamidation pathways of Asn residue via A. direct hydrolysis and B. succinimide mediation [64].

Avanti 2012 at 20.  It would have been appreciated that deamidation is practically

Case 1:22-cv-00252-MSG   Document 00-00   Filed 00/00/00   Page 00 of 000

irreversible as ammonia ($NH_3$) rapidly dissipates once liberated as a gas.  Manning

---

[9] pH is a measure of how acidic or basic a solution is.  It is calculated using the formula: pH = -log([H+]), where [H+] is the concentration of hydrogen ions in the solution.

[10] A hydrolysis reaction is one in which water is used to break chemical bonds of another molecule.

2010 at 545.

117. Another type of chemical instability is disulfide exchange, in which alternative disulfide bonds form through mismatched cysteine pairs. Avanti 2012 at 23; Manning 2010 at 552. As discussed above, the sulfur-containing sidechain of a cysteine amino acid can form a disulfide bond, a chemical bond with other cysteines, which can influence a peptide or protein's structure. If a peptide or protein has more than 2 cysteines, a disulfide bond may incorrectly form between an alternative pair of cysteines which could alter the protein or peptide's structure. Further, cysteines can form disulfide bonds with cysteines of other peptides, resulting in dimers and potentially large aggregates. Avanti 2012 at 23; Manning 2010 at 552.

118. Elevated temperatures were well-known to increase reaction kinetics, thus increasing the rate of peptide degradation. The degradation of vasopressin had previously been demonstrated to show a marked dependence on temperature. Bi 2000[11] at 90. Indeed, it was well understood that one way of reducing degradation is to store the peptide formulation at reduced temperatures. Specifically, it was known that vasopressin could be stored at refrigerated conditions. For example, USP

Vasopressin[12] instructs storage of vasopressin in a refrigerator, and the WHO

---

[11] Bi and Singh, "Effect of Buffer pH, Buffer Concentration and Skin with or Without Enzyme Inhibitors on the Stability of [Arg8]-vasopressin," Int'l J. Pharmaceut. 197:87-93 (2000), (DTX-1002) AMPHPA0005662-668 ("Bi 2000").
[12] USP Vasopressin Monograph, USP 38-NF 33, Vol. 3, (DTX-1039) AMPHPA0006744-747 ("USP Vasopressin").

Standard[13] states that "solutions of the standard (pH 3.0-4.0) containing a suitable preservative (eg 0.2% chlorbutol [sic]) may be stored at +4°C in tightly-closed containers for at least 3 months." USP at 5753; WHO Standard at 1. Furthermore, Original Vasostrict® required refrigerated storage between 2°C and 8°C. Vasostrict® September 2014 Label[14].

119. Unlike proteins, which are large and complex, peptides are smaller and typically lack a defined tertiary structure. Avanti 2012 at 15. Therefore, physical stability is less of a concern for peptides than it is for proteins. In the context of peptides, a POSA would have understood physical instability to include aggregation and precipitation, the formation of soluble and insoluble protein complexes, respectively. Manning 2010 at 553-555. A POSA would have further understood physical instability to be exacerbated by elevated temperature. *Id*. at 553.

120. A POSA would have understood that chemical and physical stability are operably linked. *Id*. at 562. For example, it has been reported that deamidation can result in a protein species with a higher propensity to aggregate than the native species. *Id*.

---

[13] WHO International Standard, Arginine Vasopressin (AVP), Instructions for Use (Version 6.0, dated April 4, 2013), (DTX-0201) AMPHPA0006833-834 ("WHO Standard").

[14] Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc.(May 2014), (DTX-1044) AMPHPA0006829-832 ("Vasostrict® September 2014 Label").

121.   By 2015, the degradation pathways for vasopressin were known from the literature.   For example, it was taught, based on the peptide structure of vasopressin, that vasopressin may undergo degradation via deamidation of the glutamine and/or asparagine residues; hydrolysis of the HN-CO bond; oxidation and photooxidation of the tyrosine and/or phenylalanine residues; and β-elimination of the cystine residue.   Bi 1999 at 557; *see also* Robinson[15] at 178.   The Patents-in-Suit reflect that a POSA would have known that "[t]he glycine, glutamine, and asparagine residues can undergo deamidation to yield the parent carboxylic acid and several degradation products as detailed in EXAMPLE 1 and TABLE 1 below."   *See, e.g.*, '478 patent at 3:4-10.

Case 1:18-cv-02023-CFC-CJB   Document 305   Filed 08/30/21   Page 190 of 820 PageID #: 10711

---

[15] Noah E. Robinson, Arthur B. Robinson, Molecular Clocks: Deamidation of Asparaginyl and Glutaminyl Residues in Peptides and Proteins (2004) ("Robinson").

TABLE 1

| Name | Sequence | SEQ ID NO. |
|---|---|---|
| Vasopressin (AVP; arginine vasopressin) | CYFQNCPRG-NH$_2$ | 1 |
| Gly9-vasopressin (Gly9-AVP) | CYFQNCPRG | 2 |
| Asp5-vasopressin (Asp5-AVP) | CYFQDCPRG-NH$_2$ | 3 |
| Glu4-vasopressin (Glu4-AVP) | CYFENCPRG-NH$_2$ | 4 |
| Glu4Gly9-vasopressin (Glu4Gly9-AVP) | CYFENCPRG | 5 |
| AcetylAsp5-vasopressin (AcetylAsp5-AVP) | Ac-CYFQDCPRG-NH$_2$ | 6 |
| Acetyl-vasopressin (Acetyl-AVP) | Ac-CYFQNCPRG-NH$_2$ | 7 |
| His2-vasopressin (His2-AVP) | CHFQNCPRG-NH$_2$ | 8 |
| Leu7-vasopressin (Leu7-AVP) | CYFQNCLRG-NH$_2$ | 9 |
| D-Asn-vasopressin (DAsn-AVP) | CYFQ(D-Asn)CPRG-NH$_2$ | 10 |
| D-Cys1-vasopressin | (D-Cys)YFQNCPRG-NH$_2$ | 11 |
| D-Tyr-vasopressin | C(D-Tyr)FQNCPRG-NH$_2$ | 12 |
| D-Phe-vasopressin | CY(D-Phe)QNCPRG-NH$_2$ | 13 |
| D-Gln-vasopressin | CYF(D-Gln)NCPRG-NH$_2$ | 14 |
| D-Cys6-vasopressin | CYFQN(D-cys)PRG-NH$_2$ | 15 |
| D-Pro-vasopressin | CYFQNC(D-pro)RG-NH$_2$ | 16 |
| D-Arg-vasopressin | CYFQNCP(D-Arg)G-NH$_2$ | 17 |

*Id.* at Table 1. Additionally, it was appreciated that vasopressin could form dimers through "the formation of disulfide bridges that bind a pair of vasopressin monomers together." *Id*. at 3:30-34. Furthermore, it was known that vasopressin was less likely to degrade through dimerization within the pH range of 3.0-4.0. WHO Standard at 1.

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 191 of 850 PageID #: 11931

### b. Formulation Optimization for Peptide Stability

122. A POSA would have been familiar with several formulation strategies to optimize peptide stability in liquid formulations. The pH, buffer composition, and

ionic strength were routinely optimized during development of peptide formulations to increase peptide stability. Avanti 2012 at 24; Hovgaard at 152-157.

123. A POSA would have understood that optimizing the pH of a peptide formulation could reduce both chemical and physical instabilities. Accordingly, a POSA would have considered it important to investigate pH during the early stages of formulation development. Hovgaard at 152. When optimizing pH, a POSA would have first determined the pH range with acceptable peptide solubility for the target dosage followed by determining the pH within this range with the greatest stability. *Id*. There is often a trade-off between solubility and stability as a pH with high peptide solubility often will demonstrate lower chemical stability while a pH with low peptide solubility will often demonstrate lower physical stability. *Id*.

124. As of January 2015, vasopressin was known to be soluble in aqueous solutions having acidic pH (such as, between pH 2.5-4.5). For example, USP Vasopressin Injection[16] describes a preparation of vasopressin solution at pH 2.5 to 4.5. USP Vasopressin Injection at 5753. Similarly, the WHO Standard describes making a vasopressin standard solution at pH 3.0 to 4.0. WHO Standard at 1.

Case 1:81-cv-02032-CFC-CJB Document 305 Filed 08/30/21 Page 192 of 820 PageID #:

Indeed, the prior art taught formulations that contained 20 unit/mL vasopressin in aqueous solutions of pH ranging from 2.5 to 4.5.

---

[16] USP Vasopressin Injection Monograph, USP 38-NF 33, Vol. 3, (DTX-1039) AMPHPA0006744-747 ("USP Vasopressin Injection").

125. A POSA would have known that modifying the pH is the most effective approach to limit peptide deamidation. Manning 2010 at 547. The deamidation of a single reactive Asn displays "a V-shaped pH-rate profile" with minimal deamidation "between pH 3 and 6." *Id*. The rate of deamidation is affected by amino acid sequence, particularly the amino acids adjacent to the reactive Asn or Gln. Hovgaard at 154. Accordingly, the pH with the minimal deamidation rate constant will also depend on the adjacent amino acids.

126. To optimize the pH, a POSA would have known to design a set of experimental formulations that vary only in their pH. A POSA would have looked to existing marketed formulations or formulations published in the literature when selecting a range of pH values to evaluate. At a minimum, the existing formulations would have informed a POSA of the known range of pH values for which the peptide displays an appreciable stability.

127. In addition to pH, a POSA would have known that the selection of buffer components can affect peptide stability. Buffers are compounds or mixtures of compounds which resist changes in pH upon the addition of acid or base. Martin[17]

at 237. The use of buffers to stabilize proteins had often been attributed to their ability to regulate changes in pH. Manning 2010 at 557. Since peptide stability is

---

[17] Martin et al. "Buffers and Buffered Isotonic Systems," Physical Pharmacy: Physical Chemical Principles in the Pharmaceutical Sciences, 236-263 (1969), (DTX-1020) AMPHPA0006326-356 ("Martin").

often dependent on pH, the ability of a buffer to maintain a narrow pH range is critical for maintaining the integrity of the peptide drug. Each buffer system has a pH range in which it can most effectively resist changes in pH. A list of the commonly used buffers for parenteral solutions are listed in Table 8.2.

**TABLE 8.2**
**Most Common Buffers Used in Sterile Drug Solutions**

| Buffer System | pKa | Typical Buffer pH Range |
|---|---|---|
| Lactic acid/lactate | 3.1 | 2.0–4.0 |
| Tartaric acid/tartrate | 3.0, 4.2 | 2.0–5.3 |
| Glutamic acid/glutamate | 2.1, 4.3, 9.7 | 2.0–5.3 |
| Malic acid/malate | 3.4, 5.1 | 2.5–5.0 |
| Citric acid/citrate | 3.1, 4.8, 5.2 | 2.5–6.0 |
| Gluconic acid/gluconate | 3.6 | 2.6–4.6 |
| Benzoic acid/benzoate | 4.2 | 3.2–5.2 |
| Succinic acid/succinate | 4.2, 5.6 | 3.2–6.6 |
| Acetic acid/acetate | 4.8 | 3.5–5.7 |
| Histidine | 1.8, 6.1, 9.2 | 5.5–7.4 |
| Phosphoric acid/phosphate | 2.1, 7.2, 12.7 | 6.0–8.2 |
| Glycine/glycinate | 2.4, 9.8 | 6.5–7.5 |
| Trometamine (TRIS, THAM) | 8.1 | 7.1–9.1 |
| Diethanolamine | 8.0 | 8.0–10.0 |
| Carbonic acid/carbonate | 6.4, 10.3 | 5.0–11.0 |

Hovgaard at 155. The most common buffers are acetate, citrate, and phosphate buffers. *Id.*

128. In determining the appropriate buffer concentration to use in a formulation, a formulator would typically start by examining a few different physiologically-acceptable concentrations and select one providing optimal stability. A formulator would test a finite number of concentrations, typically at 10 mM, 20 mM and 100 mM and assess which is best. He would in general use the lowest amount of buffer that is able to keep the pH in the desired range, particularly

79

when the pH is away from the physiological pH, to keep tissue irritation at a minimum.

129. By 2015, a POSA would have appreciated that not only the buffer pH but also the buffer components could influence peptide stability. Manning 2010 at 557; Avanti 2012 at 24. For example, it had been reported that the rate of peptide deamidation is faster in phosphate and bicarbonate buffers than in acetate and pyruvate buffers. Avanti 2012 at 24.

130. A POSA would have looked to existing marketed formulations or formulations published in the literature when selecting the buffer components. At a minimum, the existing formulations would have informed a POSA of the known buffer components that are compatible with the peptide drug. Indeed, the prior art marketed vasopressin products' inclusion of acetic acid in their formulations indicated that acetate is compatible with vasopressin. Furthermore, the pH of the prior art marketed vasopressin products overlaps with the typical buffer pH range for acetic acid/acetate.

131. Ionic strength is the measure of the electrical field intensity of a given

Case 1:18-cv-02023-CFC-CJB Document 302 Filed 08/30/21 Page 195 of 820 PageID #: 10316

solution and depends the total concentration of ions as well as valence, or charge, of each ion. Hovgaard at 157. A POSA would have known that ionic strength could affect the solubility of the peptide and effect peptide stability within the formulation. *Id*. Increasing the ionic strength of a solution typically lowers the peptide's

solubility although it may have either stabilizing or destabilizing effects on the peptide, dependent on the nature of the charge-charge interactions that take place with the peptide. Hovgaard at 157; Avanti 2012 at 24. However, it has been reported that ionic strength did not have a significant effect on the rate of deamidation in small peptides. Avanti 2012 at 24.

### c. Peptide Assay and Impurity Measurement

132. To methodically screen formulation conditions, a formulator would have prepared a set of test formulations designed to investigate a given parameter, *e.g.* pH, or the compatibility of a certain excipient with the drug substance. The test formulations were then placed on a stability study and their properties assayed after set periods in specific conditions. At a minimum, the formulations would be assayed for the amount of intact drug substance as well as the amount of impurities. Measuring these values across different times would enable a POSA to calculate the rate of drug substance degradation as well as the rate of impurity formation. Stability studies for early formulation development were typically performed under accelerated conditions. Accelerated stability conditions include elevated

Case 1:18-cv-02032-CFC-CJB Document 302 Filed 08/30/21 Page 196 of 820 PageID #: 10371

temperatures which typically increase the rate of degradation. Accelerated stability studies provide information for short-term assessment of proposed formulations and

may help elucidate degradation profiles. Nail[18] at 110. Performing these types of stability studies were routine as of 2015.

133.   A POSA would have understood that impurities in the formulated drug product could have originated from two sources – in-process impurities resulting from the synthesis of the drug substance or degradation impurities arising from the degradation, or decay, of the drug substance over time. By 2015, it was understood that the identity of an impurity or degradation product could be determined by techniques such as liquid chromatography-mass spectrometry/mass spectrometry (LC-MS/MS). Avanti 2012 at 54-55. Further, a POSA would have been able to determine the source of a given impurity by monitoring its formation during short term stability studies. A POSA would also have known that generally, the amount of an in-process impurity is unlikely to increase over time whereas a degradation impurity would increase throughout the duration of the stability study.

134.   A POSA would have monitored impurities during the formulation stage of drug development in order to comply with FDA guidelines. The FDA guidance for impurities in new drug substances require that "the actual and potential impurities

Case 1:18-cv-02023-CFC-CJB   Document 305   Filed 08/30/21   Page 197 of 820 PageID #: 10378

most likely to arise during the synthesis, purification, and storage of a new drug substance" be quantified and potentially identified if present in sufficient quantities.

---

[18] Development and Manufacture of Protein Pharmaceuticals (Nail & Akers, eds., 2002), (DTX-1007) AMPHPA0006362-559 ("Nail").

FDA Q3A Impurities Guidance[19] at 3. Specifically, any impurity measured in an amount greater than 0.05% must be reported and any impurity measured as greater than 0.10% must be identified. *Id*. at 11. Further, the impurity measurements "should be presented numerically" which would necessitate an accurate method to quantify them. *Id*. at 4.

135. By 2015, it was well understood that drug product impurities could be measured by techniques such as reverse-phase high performance liquid chromatography (RP-HPLC). Bi 1999[20] at 551-560. During RP-HPLC, a drug product sample is applied to a non-polar, hydrophobic stationary phase, i.e. an adsorbent column. A polar solvent mobile phase is pumped across the column, separating the compounds in the drug product based on their hydrophobic properties. The API and impurities elute from the column and pass through a UV detector to generate a UV spectrum as a function of chromatography run time. This UV spectrum may look like Figure 4:

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 198 of 820 PageID #: 10139

---

[19] FDA Guidance for Industry: Q3A Impurities in New Drug Substances (June 2008), (DTX-1009) AMPHPA0006019-035 ("FDA Q3 Impurities Guidance").
[20] Bi and Singh, "HPLC Method for Quantification of Arginine Containing Vasopressin," Journal of Liquid Chromatography & Related Technologies 22(4):551-560, (DTX-0248) AMPHPA0005652-661 (1999).



'478 patent, Figure 4. The API and impurities are then identified by comparing the elution time of each compound to the elution times of a set of reference compounds. The amount of impurity can then be calculated by the area of its peak from the UV spectrum. By 2015, a POSA would have also been able to use a gradient elution technique in which the mobile phase comprises two buffers in a proportion that is varied throughout the duration of the chromatography run. Avanti 2012 at 38, 54, 82-83.

## B. SCOPE AND CONTENT OF THE PRIOR ART

Case 1:18-cv-00303-CFC-CJB   Document 302   Filed 08/30/21   Page 199 of 820 PageID #:

### i. Pitressin

#### 1. Pitressin Formulation

136. Vasopressin was marketed for therapeutic use by Parke-Davis for nearly 100 years. In 1928, Parke-Davis first introduced naturally-derived bovine

vasopressin under the name Pitressin® to treat diabetes insipidus and raise blood pressure. FDA NDA Review, Clinical Pharmacology Review at 6. This pre-dates the Federal Food, Drug, and Cosmetic Act ("FDCA") of 1938 so Pitressin® was not subject to the FDA approval process.

137. JHP Pharmaceuticals ("JHP") acquired the manufacturing site and vasopressin formulation from Parke-Davis and continued to market the product under the name Pitressin®. *Id*. The formulation marketed by JHP was the same formulation initially marketed by Parke-Davis. FDA Biopharmaceutics Review[21] at 2. Pitressin® was formulated as a solution for intravenous administration consisting of 20 units/mL of synthetic vasopressin USP, 0.5% chlorobutanol NF, acetic acid NF, and water for injection USP in a 1 mL vial. Pitressin® Label 2012[22] at DESCRIPTION. Pitressin® was to be stored between 20° to 25°C. *Id*. at HOW SUPPLIED. Furthermore, Pitressin® was formulated with slight overages of vasopressin and chlorobutanol. Specifically, Pitressin® contained ██ units/ mL vasopressin and ██ mg/mL chlorobutanol. (DTX-1298) PAR-VASO_0058258 at 277.

---

[21] NDA 204485 Review, Office of New Drug Quality Assessment (E. Chickhale), Biopharmaceutics Review (dated Mar. 15, 2013), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2014/204485Orig1s000ClinPharmR.pdf, AMPHPA0006005-6010 ("FDA Biopharmaceutics Review").
[22] Pitressin® (Vasopressin Injection, USP) Package Insert, JHP Pharmaceuticals, LLC, (Oct. 2012), (DTX-0178) AMPHPA0006579-583 ("Pitressin® Label 2012").

138.   Pitressin® was formulated with a target ███████ and had a product specification for pH of 2.5-4.5.   (DTX-1314) PAR-VASO_0078041 at 147. Therefore, batches manufactured having pH within those specifications, could be sold.  For example, lot number 78495 of Pitressin® was sold no later than April 18, 2008. (DTX-1119) PAR-VASO_0297181.  Lot number 78495 was manufactured on ████████. (DTX-1316) PAR-VASO_0108645.  On March 17, 2008 the pH of the lot was measured at 3.7 but the pH was measured at 3.8 on June 25, 2008, after it was stored at 25 ° C. *Id*. ████████████████

████████████████████████████████

████████████████████████████████

███████████████████████ (DTX-1310)  PAR-VASO_0088553  at  569;  (DTX-1313)  PAR-VASO_0095102;  (DTX-1315)  PAR-VASO_0108554  at  556-559;  (DTX-1316)  PAR-VASO_0108640  at  645,  650; (DTX-1121)  PAR-VASO_0108703  at  705,  707,  709;  (DTX-1318)  PAR-VASO_0108711 at 711, 713-716, 720; (DTX-1319) PAR-VASO_0108983 at 983-985; (DTX-1320) PAR-VASO_0108986 at 986.

## 2.  Knowledge in the Art Concerning Use of Pitressin in the Treatment of Vasodilatory Shock

139.   Pitressin® was first manufactured and marketed by Parke-Davis at least as early as the 1920's, before the establishment of the FDA and the regulatory

approval scheme for drug products.  *See* (DTX-1323) PAR-VASO_0241702 at 706-07; (DTX-1298) PAR-VASO_0058258 at 266.

140.   When the FDCA was passed in 1938, it included a "grandfather clause," which exempted a previously marketed drug product from the new approval requirements if the product maintained the same formulation and conditions of use in the labeling.  *See* (DTX-1323) PAR-VASO_0241702 at 706-07.  As a result, Pitressin® and other vasopressin products were marketed throughout the twentieth century and up until 2014 without FDA approval.  *See* (DTX-1323) PAR-VASO_0241702 at 706-09;  *see also id*. at 729-730; (DTX-1298) PAR-VASO_0058258 at 266.

141.   JHP acquired ownership of Pitressin® in 2007, *see* (DTX-1298) PAR-VASO_0058258 at 266, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

142.   ████████████████████████████████████████████████

████████████████   the original trademark for PITRESSIN, issued in 1929 to Parke-Davis, which covered chemicals, medicines, and pharmaceutical preparations "for the  PRESSOR  PRINCIPLE  OF  THE  PITUITARY  GLAND,  FOR  THE

TREATMENT OF DIABETES INSIPIDUS, AND FOR THE TREATMENT OF SURGICAL SHOCK AND FOR RAISING BLOOD PRESSURE GENERALLY."

*See* (DTX-1323) PAR-VASO_0241702 at 734, 708.

143.  ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

144.  ███████████████████████████████████████

references describing vasopressin's ability to increase blood pressure and its use in the treatment of hypotensive states such as vasodilatory shock.  (DTX-1323) PAR-VASO_0241702 at 749 ("Although optimum vasopressin dosage for the treatment of vasodilatory shock remains to be established, clinical studies have reported continuous IV infusion of doses [of vasopressin] from 0.02-0.1 units/minute."); *see*

*id*. at 724-726 ("Pitressin stimulates contraction and increases the tone of smooth muscle. . . . It sustains blood pressure by stimulation of the peripheral blood-vessels . . ."; "In shock and collapse, the dose is 0.05 to 1 cc., repeated at hourly intervals as needed during the critical period; concurrent administration of fluids (glucose solution or physiologic saline) by hypodermoclysis or intravenously is suggested.")).

145.   The references ███████████████████ also described Pitressin® as a safe and stable drug product with few side effects.  *See* (DTX-1323) PAR-VASO_0241702 at 724 ("Pitressin is relatively free from protein; absorption is rapid and side reactions are reduced to a minimum.  Pitressin is remarkable stable, assuring uniformity of action.").

146.   Pitressin® was accepted in the medical community as safe and effective.  (DTX-1298) PAR-VASO_0058258 at 266.  The prior art also did not suggest that the stability of Pitressin® had any appreciable impact on its safety or efficacy.

147.   Pitressin®, both the product and its prescribing information, is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

### ii.  Original Vasostrict®

### 1.  Original Vasostrict ® Formulation

148.   JHP, now Par Pharmaceutical Companies, Inc. ("Par"), sought approval for Vasostrict®, a vasopressin product with the same formulation as the marketed Pitressin® product but without overages, in 2012 ████████████████████ Original Vasostrict® was approved by the FDA on April 17, 2014, and was first launched on November 12, 2014 ("Original Vasostrict").

149.   Original Vasostrict® was formulated as a solution for intravenous administration consisting of 20 units/mL of synthetic vasopressin, chlorobutanol NF 0.5% as a preservative, and water for injection USP, adjusted with acetic acid to pH 3.4 – 3.6, and provided in a 1 mL vial.   Vasostrict® April 2014 Label[23] at DESCRIPTION; Vasostrict® September 2014 Label at DESCRIPTION.

150.   As originally approved in April 2014, Original Vasostrict® could be stored between 15 °C and 25 °C for up to 12 months.  Vasostrict® April 2014 Label at HOW SUPPLIED/STORAGE AND HANDLING.  The Vasostrict® label was later updated to require storage under refrigeration (for up to 24 months). Vasostrict® September 2014 Label at HOW SUPPLIED/STORAGE AND HANDLING; *see also* (DTX-1372) PAR-VASO_0080154; (DTX-1373) PAR-VASO_0014805.  Additionally,  Original Vasostrict® could be stored at room temperature up to 12 months following removal from refrigeration (with the total

---

[23] Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc.(April 2014), (DTX-1042) PAR-VASO_0254534-542 ("Vasostrict® April 2014 Label").

room temperature and refrigerated storage not exceeding 24 months).  Vasostrict®

March 2015 Label[24] at HOW SUPPLIED/STORAGE AND HANDLING.

151.   Vasostrict® was to be stored between 2° and 8°C and discarded 48

hours after the first puncture of the vial.  Vasostrict® September 2014 Label at HOW

SUPPLIED/STORAGE AND HANDLING.

152.   Original Vasostrict® was formulated with a target pH of 3.4-3.6, it had

a product specification for pH of ███.  Vasostrict® April 2014 Label at

DESCRIPTION; (DTX-1403) PAR-VASO_0014742 at 743; (DTX-1374) PAR-

VASO_0078041 at 147.  Therefore, batches manufactured having pH within those

specifications, could be and were sold.  For example, Original Vasostrict® Lot

788436 had a pH of 3.7 at the time of manufacture, on February 24, 2015.  (DTX-

1314) PAR-VASO_0096688 at 688.  Lot 788436 was first sold on November 11,

2015, and was sold through at least November 20, 2015.  *See* (DTX-1119) PAR-

VASO_0297182 at 190-191; *see also* Plaintiffs' Objections and Responses to

Defendants' Joint Interrogatory No. 12.

153.   Vasostrict® April 2014 Label and Vasostrict® September 2014 Label

(collectively, the "Original Vasostrict® Labels") disclose the prescribing

information for the Original Vasostrict® formulation initially marketed by Par.  The

---

[24] Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical
Companies, Inc.(March 2015), (DTX-1043) PAR-VASO_0014782-787
("Vasostrict® March 2015 Label").

DESCRIPTION section states:

> Vasopressin is a polypeptide hormone that causes contraction of vascular and other smooth muscles and antidiuresis. Vasostrict is a sterile, aqueous solution of synthetic arginine vasopressin for intravenous administration. The 1 mL solution contains vasopressin 20 units/mL, chlorobutanol, NF 0.5% as a preservative, and Water for Injection, USP adjusted with acetic acid to pH 3.4-3.6

(DTX-1042) PAR-VASO_0254534 at 539; (DTX-1044) AMPHPA0006829 at 832.

The DESCRIPTION section further discloses that "One mg is equivalent to 530 units." (DTX-1042) PAR-VASO_0254534 at 539; (DTX-1044) AMPHPA0006829 at 832.

154. The Original Vasostrict® Labels all disclose that Original Vasostrict® is indicated "to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines." PAR-VASO_0254534 at 536; AMPHPA0006829 at 831.

155. Original Vasostrict® Labels at INDICATIONS AND USAGE. Original Vasostrict® is to be diluted with normal saline (9% sodium chloride) or 5% dextrose in water to either 0.1 units/mL or 1 unit/mL for intravenous administration.

Id. at DOSAGE AND ADMINISTRATION. The Original Vasostrict® Labels instruct that it should be administered to patients with post-cardiotomy shock at a rate of 0.03 to 0.1 units/minute and to patients with septic shock at a rate of 0.01 to 0.07 units/min. Id.

156.   Original Vasostrict® was generally considered safe and effective by the FDA.  PAR-VASO_0266141 at 144.  The prior art also did not suggest that the stability of Original Vasostrict® had any appreciable impact on its safety or efficacy.

157.   The Vasostrict® April 2014 Label would have been publicly available shortly after Vasostrict® was approved by the FDA in April 2014.  Furthermore, Plaintiffs have stated that Original Vasostrict® was first sold and offered for sale in November 2014 with the Vasostrict September 2014 Label.  *See* Plaintiffs' Responses to Defendants' Joint Interrogatory No. 13.  Therefore, Original Vasostrict® (both the product and the Original Vasostrict® April 2014 and September 2014 Labels) is prior art to all of the Asserted Claims under 35 U.S.C. § 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.  Additionally, the Vasostrict® March 2015 Label is prior art to the Asserted Claims of the '526, '209, '785, and '223 patents under 35 U.S.C. § 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of these patents.

158.   Furthermore, the named inventors of the Patents-in-Suit did not develop the formulation of Original Vasostrict®.  Therefore, the exception under § 102(b)(1) does not apply to Original Vasostrict® because the disclosures relating to Original

Vasostrict® and in the Original Vasostrict Labels were not made by the named inventors or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the named inventors or a joint inventor.

## 2. Par's Vasostrict® NDA and its Reliance on the Knowledge of Vasopressin and its Use as Discussed in the Medical Literature

159.   As noted above, JHP filed New Drug Application ("NDA") No. 204485 with the FDA on September 25, 2012, seeking regulatory approval to market a vasopressin injection product for the treatment of vasodilatory shock.  *See* (DTX-1301) PAR-VASO_0072406.  While the NDA was pending at the FDA, JHP was acquired by Par Pharmaceutical Holdings, Inc., along with ownership of Pitressin® and NDA No. 204485.  *See* Par Pharmaceutical Holdings, Inc., General Form for Registration of Securities Under the Securities Act of 1933 (Form S-1) F-21 (March 12, 2015), https://www.sec.gov/Archives/edgar/data/1559149/000119312515089746/d880840 ds1.htm.  For the sake of simplicity, JHP will be referred to as "Par" in the context of NDA No. 204485.

160.   The vasopressin product for which Par sought approval was nearly identical to the unapproved Pitressin® product already on the market.  ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████[25]   *See* (DTX-1297)

PAR-VASO_0037497 at 503-04. ████████████████████████████████

████████████████████████████████████████████████████████

████████████   *See* (DTX-1307) PAR-VASO_0077369; (DTX-1308) PAR-

VASO_0077570.

161.   Typically, the FDA requires a sponsor seeking approval of a new drug

or a new indication to conduct clinical studies to establish efficacy and safety. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████   *See* (DTX-1297) PAR-VASO_0037497 at

500, 503-04, 507-08; (DTX-1298) PAR-VASO_0058258 at 266, 271-273.

162.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[25] Although the labeling for the unapproved Pitressin® product stated that it contained 20 units/mL (0.038 mg/mL) of vasopressin and 5 mg/mL of chlorobutanol, Pitressin® actually contained ████ units/mL (0.041 mg/mL) of vasopressin and ████ mg/mL of chlorobutanol.   *See* (DTX-1298) PAR-VASO_0058258 at 271, 277.

163. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

164. █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

165. █████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---



166.

167.



169.   The above recommended practices are generally consistent with medical practice and the clinical use of vasopressin dating back to the 1990s.

### 3.  Prior Art "Off-Label" Use of Vasopressin Injections to Treat Vasodilatory Shock

170.   As noted above, Vasopressin was first sold in 1928 under the trade name Pitressin®.  Pitressin® was used for the treatment of diabetes insipidus (among other conditions), and was known to cause constriction of blood vessels based on contraction of  the smooth muscles surrounding them.  *See* Pitressin® Label 2012, (DTX-0178) AMPHPA0006579 at 579, 581.  Clinicians and members of the critical care community have been using Pitressin® to treat vasodilatory shock since the

1990s and continued to use prior art vasopressin products in this way, including up until January 30, 2015.

171. Due to the knowledge of vasopressin's natural mechanism of action and the role it plays in modulating blood pressure, it has been used "off-label" since at least the 1990s to treat hypotension in patients suffering from vasodilatory shock who do not otherwise respond to fluids and/or catecholamines.

172. Vasopressin has been used "off-label" to treat vasodilatory shock through intravenous ("IV") administration. For IV administration, the drugs often must be diluted to ensure that they are given at the appropriate dose. Clinicians also want to ensure that the patient receives the drug in a physiologically-acceptable form to avoid tissue irritation or hemotoxicity, and with an appropriate osmotic pressure. Clinicians have used saline or 5% dextrose in water ("D5W") for dilution. These are the two diluents (i.e., solutions within which drugs are mixed to dilute them prior to administration) that are most commonly used in IV bags.

173. Clinicians typically administer vasopressin at the rate and for the length of time appropriate for each individual patient. It is common to administer

vasopressin intravenously at a rate of 0.03-0.04 units/minute to treat vasodilatory shock, but it has been known to be administered at a rate of up to 0.4 units per minute, prior to January 30, 2015. It is possible to either start at this dose range, or incrementally increase it based on the patient's response. If it is administered with

100

an incremental increase, the drug is administered at a starting rate of around 0.01 units/minute and the administration rate is increased by 0.005 units/minute every 10-15 minutes until the desired administration rate is reached.  However, depending on the patient's response, the administration rate can be increased or decreased as needed to reach the target blood pressure.  IV administration may be continued for hours, days, or weeks, depending on the patient's state.  When clinicians begin to wean the patient off of vasopressin, they gradually decrease the administration rate to avoid a shock to the patient's system.  It is typical to decrease administration at a rate of 0.005 to 0.01 units/minute.  This is done over several minutes.  After each decrease, clinicians assess the patient's blood pressure for a period of time (around 10-15 minutes).  They then continue to decrease or increase the administration rate based on the patient's response.

174.  The "off-label" prior art uses of vasopressin injections to treat vasodilatory shock are described above.  Par relied on these prior art uses in the prosecution history of the Patents-in-Suit ████████████████████████ ████████████

175.  Before Vasostrict® was approved, vasopressin injections had been sold for decades.  As noted above, these were not approved formally by the FDA, but instead were sold legally under a regulatory framework that allowed for old, unapproved drugs to be sold.  These are often referred to as "grandfathered"

products.

### iii. American Regent (Luitpold) Vasopressin Product

176.   American Regent, Inc. and its predecessor Luitpold Pharmaceuticals, Inc. manufactured and sold vasopressin for over a decade prior to the launch of Original Vasostrict®.  Luitpold Vasopressin Label 2011[29] published in November 2011.

177.   Luitpold Vasopressin Label, (DTX-1041) AMPHPA0006315-16, provides the prescribing information for one of the unapproved vasopressin injection products sold prior to Vasostrict®'s entry into the market.  The Luitpold Vasopressin Label is dated November 2011.  Vasopressin Injection, USP, Luitpold Vasopressin is "a sterile, aqueous solution of synthetic vasopressin (8-L-arginine vasopressin)." Luitpold Vasopressin Label 2011 at DESCRIPTION.  Luitpold Vasopressin was formulated "to contain 20 pressor units/mL.  Each mL contains: Vasopressin 20 units, Sodium Chloride 9 mg, Chlorobutanol 0.5% (as a preservative), Water for Injection q.s. pH (range 2.5 -4.5) adjusted with Acetic Acid." *Id*.  According to the manufacturing specifications, ███████████████████████████████ ████████████████████████████ VAS0000011 at 013.

178.   Luitpold Vasopressin was also indicated for the prevention and

---

[29] Vasopressin Injection, USP Package Insert, American Regent, Inc. (Nov. 2011), (DTX-1041) AMPHPA0006315-316 ("Luitpold Vasopressin Label 2011").

treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows, and in diabetes insipidus. Luitpold Vasopressin Label at INDICATIONS AND USAGE. Luitpold Vasopressin was supplied in various packages: 10 units per 0.5 mL multiple dose vial; 20 units per 1 mL multiple dose vial; and 200 units per 10 mL multiple dose vial. *Id*. at HOW SUPPLIED. As with other prior art vasopressin products, Luitpold Vasopressin was used "off label" to increase blood pressure in patients with hypotension.

179. The prior art did not suggest that the stability of Luipold Vasopressin had any appreciable impact on its safety or efficacy.

180. Luitpold Vasopressin (both the product and its prescribing information) is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

### iv. FK Vasopressin

181. Fresenius previously manufactured and marketed a vasopressin formulation under the trademark Novaplus® ("FK Vasopressin"). The prescribing

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 218 of 820 PageID #: 10338

information for FK Vasopressin, Novaplus® Label 2013[30] published in October 2013. Therefore, FK Vasopressin and Novaplus® Label 2013 is prior art to all of

---

[30] Novaplus® (Vasopressin Injection, USP) Package Insert, Fresenius Kabi USA, LLC (Oct. 2013), (DTX-0368) AMPHPA0006560-565 ("Novaplus® Label 2013").

the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

182. FK Vasopressin was formulated to contain "20 USP Vasopressin Units, chlorobutanol (anhydrous) 5 mg as preservative; Water for Injection q.s. Glacial acetic acid and/or sodium hydroxide may have been added for pH adjustment (2.5-4.5)." Novaplus® Label 2013 at DESCRIPTION. FK Vasopressin was supplied as 1 mL in a 2 mL flip-top vial. *Id*. at HOW SUPPLIED. The Novaplus® Label 2013 further instructed that FK Vasopressin should be stored "at 20° to 25°C (68° to 77°F)." *Id*. FK Vasopressin had a shelf life of 18 months when stored between 68° and 77°F. (DTX-1275) FKSS0000095.

### v. LT '487

183. Lithuanian Patent No. 4487 ("LT '487"), titled "Antidiuretic Preparation and Its Manufacturing Method" (translated), (DTX-1016) AMPHPA0006289-300, published on April 26, 1999. Therefore, LT '487 is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was

"patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

184. LT '487 is directed to an "antidiuretic preparation comprised of an active ingredient derived from an animal posterior lobe pituitary extract [purified

HPLC vasopressin]." LT '487 at Summary.

185. LT '487 teaches formulations containing chromatographically purified vasopressin, chlorobutanol hydrate, sodium acetate, acetic acid, sodium chloride, and injection water. *Id.* Specifically, LT '487 describes a vasopressin formulation containing 0.01 g vasopressin, 5.0 g chlorobutanol, 2.2 g sodium acetate, 6.8 g sodium chloride, 836.60 mL of 0.1 mol/L acetic acid, and injection water up to 1000 total mL solution, which is then filled in 1.1 mL ampoules. *Id.* at 5. LT '487 teaches that the pH of the solution must be in the range of 3.80-3.95. *Id.* LT '487 also teaches that the formulations have a purity of at least 95% and an oxytocin content of no more than 0.1%. *Id.* at 4. LT '487 teaches preparing formulations with 0.01 g vasopressin in 1000 mL of solution. *Id.* at 2.

186. LT '487 further provides "[a]n example [] manufacturing method" for a vasopressin formulation, which is packaged in 1.1 mL glass vials. *Id.* The formulation includes an acetate buffer with a pH "in the range of 3.80 – 3.95" and 0.01 g of vasopressin (i.e., 10 mg). *Id.*

### vi. Gahart

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 220 of 820 PageID #:

187. "Vasopressin Injection," 2013 Intravenous Medications (29th Ed., 2013), (DTX-0206) AMPHPA0006081-100 ("Gahart") published in 2013. Therefore, Gahart is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale,

or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

188.   Gahart is a handbook for nurses and health professionals and contains an entry for "VASOPRESSIN INJECTION."  Gahart at 1167.

189.   Gahart teaches that vasopressin is indicated to have a pH of 2.5 to 4.5 and is sold under tradenames such as Pitressin® and Pressyn.  *Id*.  Gahart teaches that vasopressin has been administered intravenously for several unlabeled indications, including vasodilatory shock and septic shock.  *Id.*

190.   For vasodilatory shock, *e.g.* septic shock, Gahart teaches that "AHA guidelines recommend a continuous infusion of 0.02 to 0.04 units/min."  *Id*.  Gahart also teaches "not [to] discontinue abruptly" and instead "tapering over 2 to 3 hours while monitoring effects."  *Id*. at 1168.  Gahart teaches that vasopressin should be diluted in normal saline (0.9%) or 5% dextrose in water for intravenous administration.  *Id*. at 1167.  Further, Gahart discloses that vasopressin increases blood pressure in hypotensive patients.  *Id.*

191. Gahart states that vasopressin is an antidiuretic and "a potent

vasoconstrictor," which "[c]auses smooth muscle contraction of all parts of the vascular bed (e.g., capillaries, small arterioles, and venules)."  (DTX-0206) AMPHPA0006081 at 099.  Gahart discloses that vasopressin's "IV use is as an alternative pressor agent to epinephrine[,]" which "promotes an effective increase in

BP in hypotensive patients, even when other agents have failed." *Id*.

192. Gahart describes several intravenous uses of vasopressin to increase blood pressure in hypotensive patients, including providing "[h]emodynamic support during vasodilatory shock (e.g., septic shock)" and treating "[h]ypotension unresponsive to norepinephrine following cardiopulmonary bypass," (i.e., postcardiotomy shock) (DTX-0206) AMPHPA0006081 at 098.

193. As stated above, for septic shock, Gahart states: "AHA guidelines recommend a continuous infusion of 0.02 to 0.04 units/min. Other sources in the literature recommended low-dose vasopressin infusions in vasodilatory shock refractory to catecholamines. 0.04 units/min as an infusion (range was 0.01 to 0.1 units/min). . . ." *Id*. Gahart also describes a 2002 study by Masetti and colleagues, in which vasopressin was administered to patients with hypotension following cardiopulmonary bypass at rates of 0.1 to 1 unit/min. *Id*.

194. Gahart states that "All IV Doses and Uses are Unlabeled", *id*., which a POSA would have understood to mean that the listed IV doses and uses were not approved at that time by a regulatory agency such as the FDA, and were therefore

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 222 of 820 PageID #: 10319

"off-label." This is further clarified in the "Indications and Uses" section of the monograph, in which Gahart discloses that vasopressin is indicated for use as an antidiuretic in patients with diabetes insipidus, but that "[t]he AHA Handbook of Emergency Cardiovascular Care recommends use [of vasopressin] in the treatment

of adult shock-refractory ventricular fibrillation (class IIb) (an alternative pressor agent to epinephrine) and for hemodynamic support in vasodilatory shock (e.g., septic shock)." (DTX-0206) AMPHPA0006081 at 099.

195. While Gahart discusses Pitressin® specifically, a POSA would have understood that Gahart's teachings regarding administration of vasopressin apply to all prior art formulations of vasopressin unless otherwise contraindicated in their respective label.

### vii. Russell 2008

196. Russell et al., "Vasopressin Versus Norepinephrine Infusion in Patients with Septic Shock," New Eng. J. Med. 358:877-87 (2008), (DTX-0232) AMPHPA0006646-656 ("Russell 2008") published February 28, 2008. Therefore, Russell 2008 is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

197. Russell 2008 describes a study investigating the use of low-dose vasopressin infusion in patients with septic shock. Russell 2008 at 877.

198. Russell 2008 reports "studies involving the use of vasopressin infusion rates below 0.1 U per minute in patients with vasodilatory shock have repeatedly shown improved short-term blood pressure responses." *Id*. at 878. Russell 2008

discloses that vasopressin was mixed with "5% dextrose in water with [a] final concentration[] of 0.12 U of vasopressin per milliliter." *Id*. at 879.

199.   Russell 2008 teaches that vasopressin was administered "at 5 ml per hour and increased by 2.5 ml per hour every 10 minutes during the first house to achieve a constant target rate of 15 ml per hour." *Id*.   This is equivalent to administering vasopressin at a rate of 0.01 U per minute up to a maximum of 0.03 U per minute.

200.   Russell 2008 set out to determine, through a multi-center, double-blind clinical trial, whether administration of a low dose of vasopressin would decrease mortality compared with norepinephrine in patients suffering from septic shock. *See* (DTX-0232) AMPHPA0006646.  The study was conducted from July 2001 to April 2006.  *See* (DTX-0232) AMPHPA0006646 at 647.

201.   Russell 2008 discloses that vasopressin had been used at infusion rates below 0.1 units/minute in treating vasodilatory shock.  *See id*.  It was clinicians' practice to use vasopressin in this manner before 2001, when the study began.

202.   Russell 2008's description of the dilution and administration of

Case 1:18-cv-02032-CFC-CJB  Document 302  Filed 08/30/21  Page 224 of 820 PageID #: 10345

vasopressin to the study subjects is also consistent with general practice prior to 2001.

203.   First, Russell 2008 describes mixing vasopressin in an IV bag.  Russell 2008 refers to "Vasopressin (30 U) . . .  Mixed in . . . 250-ml intravenous bags of 5%

dextrose in water, with [a] final concentration[] of 0.12 U of vasopressin per milliliter . . . ."[31]  *Id*. at 648.  It is necessary to dilute prepared injections of vasopressin prior to IV administration to avoid irritation and to avoid administering too high of a dose.  Clinicians have commonly used either 5% dextrose in water or 9% saline (two conventionally used IV diluents) to dilute vasopressin injections before IV administration.

204.  Russell 2008 discloses that, after dilution, vasopressin was infused at a rate of "5 ml per hour and increased by 2.5 ml per hour every 10 minutes during the first hour to achieve a constant target rate of 15 ml per hour.  Thus, the blinded vasopressin infusion was started at 0.01 U per minute and titrated to a maximum of 0.03 U per minute . . . ."  *Id*.  it was conventional to administer an infusion rate of about 0.03 or 0.04 units per minute in patients with vasodilatory shock (including septic shock and post-cardiotomy shock patients).

205.  ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[31] When converted, 0.12 units/mL corresponds to a concentration of 0.23 μg/mL. (1 mg = 530 units (*see* Vasostrict® September 2014 Label, Vasostrict® April 2014 Label);  0.12 unit/mL * 1 mg/530 units * 1000 μg/mg = 0.23 μg/mL)

███████████████████ █████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

206.   Russell 2008 notes that a recommended MAP was 65 to 75 mm Hg, but that the target MAP could be varied for each patient as determined by the physician. *See* (DTX-0232) AMPHPA0006646 at 648.   This is consistent with conventional practice.   The goal is to reach a target MAP quickly, and keep the patient on the vasopressor until he or she has stabilized.

207.   Russell 2008 states that "[t]apering of the study drug was commenced only when the target mean arterial pressure had been maintained for 8 hours without any open-label vasopressors."   *Id.*   8 hours would be a minimum time at which to taper off the vasopressin because many patients are not stabilized within this time. Many patients will remain on vasopressin for even longer.

208.   Russell 2008 also discloses tapering of the administration rate, in a manner consistent with conventional practice.   Russell 2008 explains that "[w]eaning of the study medication was commenced when the target MAP was maintained while off all open-label vasopressors for eight hours.   The infusion of study medication was decreased in 2.5 mL decrements every hour while the target

---

[32] 2.5 mL/hr * 0.12 units/mL = 0.3 units/hr; 0.3 units/hr * 1 hr/60 min = 0.005 units/min.

MAP was maintained." (DTX-1031) AMPHPA0006628 at 631. ███████████

████████ this corresponds to a reduction rate of 0.005 units per minute. (DTX-1305) PAR-VASO_0077264 at 265 ("In the VASST study, vasopressin was diluted with 250 mL dextrose in water yielding 0.12 U per mL; therefore, 2.5 mL 0.3 U per hour (0.005 U per minute).").

209. While the Russell 2008 study involved the use of Pitressin®, a POSA would have understood that the same teachings and applications contained in Russell could be applied to any other prior art vasopressin formulation unless otherwise contraindicated in their respective label.

### viii. Martin

210. Martin et al. "Buffers and Buffered Isotonic Systems," Physical Pharmacy: Physical Chemical Principles in the Pharmaceutical Sciences, 236-263 (1969), (DTX-1020) AMPHPA0006326-356 ("Martin") published in 1969. Therefore, Martin is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

211. Martin is a pharmaceutical science text describing pharmaceutical science principles.

212. Martin describes an example buffer solution containing "0.01 molar

solution [10 mM] containing equal quantities of acetic acid and sodium acetate." Martin at 237. Martin also teaches that an "acetate buffer should be effective over a pH range of about 3.8 to 5.8." *Id.* at 247.

### ix. Flynn

213. Flynn, G.L., "Buffers – pH Control Within Pharmaceutical Systems," PDA *J. Pharmaceut. Sci and Technol.*, 34: 139-62 (1980), (DTX-1012) AMPHPA0006054-080 ("Flynn") published in 1980. Therefore, Flynn is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

214. Flynn is a publication describing the use of buffers to control pH in pharmaceutical applications. Flynn at 139.

215. Flynn teaches that a "buffer is a solution of chemicals (buffering agents) which imparts an ability to resist change in the effective acidity or alkalinity of a medium upon the addition of increments of acid or base" and is used to stabilize dosage forms with respect to pH. *Id.* Flynn further teaches that "pH is a critical

variable in most studies involving aqueous systems as both chemical reaction rates and the positions of diverse equilibria . . . are *directly* affected by the acidity of the media." *Id.* at 140.

216. Flynn discloses that in pharmaceutical formulations, "[t]he first and

113

most general purpose of buffering agents in pharmaceutical systems is to establish and sustain a precise chemical environment consistent with maintaining the highest possible degree of physical and chemical integrity of the dosage form, that is, a chemical environment consistent with "good stability." *Id.* at 144.

217. Flynn teaches that buffer selection "depends on the desired pH of the system to be buffered and the compatibility of the buffer with all other formulation ingredients." *Id.* at 155. Flynn further teaches that acetic acid buffers have an approximate buffering range of 3.8-5.8. *Id.* at 154.

218. Flynn discloses that pharmaceutical buffer concentrations typically "lie between 0.01 and 0.1 molar," or 10 and 100 mM. *Id.* at 157.

### x. Hovgaard

219. Pharmaceutical Formulation Development of Peptides and Proteins (Lars Hovgaard et al., eds., 2013), (DTX-1028) AMPHPA0006136-184 ("Hovgaard") published in 2013. Therefore, Hovgaard is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

Case 1:18-cv-02022-CFC-CJB Document 305 Filed 08/30/21 Page 229 of 820 PageID #: 10130

220. Hovgaard is a textbook describing the development of peptide and protein formulations. Chapter 8, "Peptides and Proteins as Parenteral Solutions," was written to "provide practical guidance to formulation scientists charged with the

development of stable, manufacturable, and elegant sterile solution dosage forms of peptides and proteins." Hovgaard at 150.

221.   Hovgaard explains that the "effect of solution pH is a very important factor to study in early protein solution development." *Id.* at 152.  Hovgaard teaches that pH studies are conducted early in formulation development "to understand protein solubility and stability over an appropriate pH range." *Id.*

222.   Hovgaard teaches that "[h]ydrolysis or deamidation occurs with peptides and proteins containing susceptible Asn and Gln amino acids."  *Id*. at 154. Hovgaard further teaches that hydrolytic instability can be minimized by formulating "at optimal solution pH." *Id.* Additionally, hydrolytic instability can be minimized by "[s]tor[ing] at low temperatures," noting that "the market prefers ready-to-use solutions that should be refrigerated over lyophilized dosage forms that can be stored at room temperatures." *Id.*

223.   Hovgaard discloses that buffers "are used to prevent small changes in solution pH that can affect protein solubility and stability."  *Id*. at 155.  Further, Hovgaard describes acetate as one of the most common buffers and that the typical buffer pH range is 3.5-5.7.  *Id.*

Case 1:18-cv-2022-CFC-CJB   Document 305   Filed 08/30/21   Page 230 of 820 PageID #:
10125

### xi.  Avanti 2012

224.   Avanti et al., "Innovative Strategies for Stabilization of Therapeutic Peptides in Aqueous Formulations," University of Groningen (2012), (DTX-0263)

AMPHPA0005495-651 ("Avanti 2012") published in 2012. Therefore, Avanti 2012 is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

225.  Avanti 2012 is a thesis investigating the stabilization of therapeutic peptides in aqueous formulations.

226.  Avanti 2012 teaches that peptide stability is the most important factor in developing liquid peptide formulations. Avanti 2012 at 17. Avanti 2012 discusses chemical and physical stability as the major degradation pathways for peptides in aqueous formulations. *Id*. at 18-23.

227.  Avanti 2012 discloses a number of methods to improve the stability of peptide formulations, which first require "knowledge of the peptide's structure and thorough understanding of the possible degradation pathways of the specific peptide." *Id*. at 23. Avanti 2012 teaches that the "[s]tability of peptides depends on the pH, therefore the common strategy to avoid instability of peptides in aqueous solution is adjusting the pH using buffers." *Id*. at 24. Avanti 2012 further teaches that pH can affect multiple degradation pathways, including deamidation. *Id*. Deamidation is minimized in formulations with a pH of 3 - 5. *Id*. Avanti 2012 also describes that the buffer species can affect deamidation as deamidation has been

116

demonstrated to be faster in phosphate and bicarbonate buffers relative to acetate and pyruvate buffers. *Id.*

228. Avanti 2012 describes that "most peptide drugs have to be stored and transported at low temperatures" because of their instability. *Id* at 17. Avanti 2012 summarizes information for known peptide-formulations in Table, which includes "[v]asopressins and analog" and "[o]xytocins," describing that "the majority of the formulations [are] to be stored under refrigerated conditions." *Id.* at 15-16, 17.

229. Avanti 2012 also discloses the effect of several variables on oxytocin stability. *Id.* at 34-48, 51-77, 79-93, 95-118, 121-134. Avanti 2012 teaches that peptide stability can be monitored in several ways although "HPLC with UV/vis detection is the most frequently used physiochemical method." *Id.* at 61. Avanti 2012 further discloses several HPLC methods to monitor stability. *Id.* at 38, 54, 82-83, 126. These HPLC methods can be run with a gradient elution method in which the mobile phase comprises two buffers in a proportion that is varied throughout the duration of the chromatography run. *Id.* at 38, 54, 83.

### xii. Bi 1999

Case 1:18-cv-02032-CFC-CJB Document 306 Filed 08/30/21 Page 232 of 820 PageID #: 101323

230. Bi and Singh, "HPLC Method for Quantification of Arginine Containing Vasopressin," J. Liq. Chrom. & Rel. Technol. 22(4):551-60 (1999), (DTX-0248) AMPHPA0005652-661 ("Bi 1999") published in 1999. Therefore, Bi 1999 is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because

it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

231. Bi 1999 is directed to the development of "a simple and fast HPLC separation method for the quantification of [vasopressin ("AVP")] that could be used in the stability testing of AVP in various pharmaceutical dosage and delivery systems." Bi 1999 at 552.

232. The method was developed by investigating "[t]he effect of flow rates, columns, mobile phase compositions, and temperatures on the resolution of AVP and its degradation products[.]" *Id*. at 553. The study was conducted with a high pressure liquid chromatography (HPLC) instrument outfitted with one of three chromatography column containing an adsorbent stationary phase - C18 MICROSORB-MV™ column (silica 5 μm, 100 Å, 25 cm x 4.6 mm); ZORBAX C8 (silica 5 μm, 100 Å, 15 cm x 4.6 mm); or Brownlee Spheri-ODS column (5 μm, 100 Å, 25 cm x 4.6 mm). *Id*. at 552-556. Bi 1999 discloses that the optimal flow rate of the liquid mobile phase was 1.5 mL/min. *Id*. at 556. Bi 1999 further discloses AVP and degradation products were detected by UV detector as they eluted from the chromatography columns. *Id*. at 552-553.

Case 1:81-cv-0202S-CFC-CJB Document 302 Filed 08/30/21 Page 233 of 850 PageID #: 701394

233. Although Bi 1999 did not characterize the vasopressin degradation products that were studied, it teaches that based on vasopressin's structure, "several reactions might occur, such as deamidation (Gln, Asn), hydrolysis (HN-CO bond),

oxidation and photooxidation (Tyr, Phe), and β-elimination (Cys). *Id*. at 557.

### xiii. Bi 2000

234. Bi and Singh, "Effect of Buffer pH, Buffer Concentration and Skin with or Without Enzyme Inhibitors on the Stability of [Arg8]-vasopressin," Int'l J. Pharmaceut. 197:87-93 (2000), (DTX-1002) AMPHPA0005662-668 ("Bi 2000") published in 2000. Therefore, Bi 2000 is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

235. Bi 2000 investigates the stability of vasopressin "as a function of buffer pH, temperature, buffer concentration, salt concentration, and skin with or without enzyme inhibitors." Bi 2000 at 88.

236. Bi 2000 teaches that "[p]eptides and proteins are inherently unstable molecules, which presents unique difficulties in their formulation, storage, and delivery." *Id*. at 87. Bi 2000 further teaches that "the physicochemical stability of peptides and proteins in formulations and delivery systems should be considered carefully in order to improve their systemic bioavailability." *Id*.

237. Bi 2000 discloses that buffer pH, type of buffer, and temperature have been shown to affect the stability of proteins and peptides. *Id*. at 88. Based on the results of a study investigating the effect of pH on vasopressin formulations prepared

119

in 0.1 M phosphate buffer at 50º C, Bi 2000 reports that "AVP is most stable at pH 3.35 among pH values tested and its degradation rate is highly pH-dependent." *Id*. at 90. Bi 2000 further teaches that "AVP degradation shows a marked dependence on temperature" and "[b]uffer concentrations did not influence the degradation of AVP." *Id*. Bi 2000 reports that the shelf-life of AVP at 25° C and pH 3.35 is calculated to be 1.38 years. *Id*. at 91.

### xiv. USP Vasopressin

238. USP Vasopressin Monograph, USP 38-NF 33, Vol. 3, (DTX-1039) AMPHPA0006744-747 ("USP Vasopressin") was released on November 1, 2014. Therefore, USP Vasopressin is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

239. USP Vasopressin is an official United States Pharmacopeia-National Formulary monograph and articulates the quality expectations for Vasopressin.

240. USP Vasopressin discloses that "[v]asopressin is a polypeptide
hormone having properties of causing the contraction of vascular and other smooth muscles, and of antidiuresis." USP Vasopressin at 5752.

241. USP Vasopressin teaches a chromatographic method to assay the amount of vasopressin. *Id*. at 5752-53.

242. Furthermore, USP Vasopressin teaches that vasopressin should be stored in a refrigerator. *Id*. at 5753.

### xv. USP Vasopressin Injection

243. USP Vasopressin Injection Monograph, USP 38-NF 33, Vol. 3, AMPHPA0006744-747 ("USP Vasopressin Injection") (DTX-1039) was released on November 1, 2014. Therefore, USP Vasopressin Injection is prior art to all of the Asserted Claims under 35 U.S.C. 102(a)(AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

244. USP Vasopressin Injection is an official United States Pharmacopeia-National Formulary monograph and articulates the quality expectations for Vasopressin Injection.

245. USP Vasopressin Injection discloses that "Vasopressin injection is a sterile solution of Vasopressin in a suitable diluent." USP Vasopressin Injection at 5753. USP Vasopressin Injection further discloses that the Vasopressin injection "may contain a suitable preservative." *Id*.

246. USP Vasopressin Injection teaches that the vasopressin injection should be "[p]reserve[d] in single-dose or multiple-dose containers, preferably of Type 1 glass. Do not freeze." *Id*.

247. USP Vasopressin Injection further teaches that the vasopressin

injection should have a pH "between 2.5 and 4.5." *Id.*

### xvi. WHO Standard

248. WHO International Standard, Arginine Vasopressin (AVP), Instructions for Use (Version 6.0, dated April 4, 2013), AMPHPA0006833-834 ("WHO Standard") (DTX-0201) published on April 30, 2013. Therefore, WHO Standard is prior art to all of the Asserted Claims under 35 U.S.C. 102(a) (AIA) because it was "described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of" each of the Patents-in-Suit.

249. WHO Standard teaches that "[a]rginine vasopressin is less likely to dimerize within the pH range 3.0-4.0." WHO Standard at 1. WHO Standard further teaches to store "a solution of the standard (pH 3.0-4.0) containing a suitable preservative (e.g., 0.2% chlorobutol [sic]) by be stored at +4°C in tightly-closed containers for at least 3 months." *Id.*

### C. THE ASSERTED CLAIMS OF THE '209 AND '785 PATENTS ARE ANTICIPATED BY ORIGINAL VASOSTRICT®

#### i. Claim 1 of the '209 Patent and Claim 1 of the '785 Patent

Case 1:18-cv-02032-CFC-CJB Document 305 Filed 08/30/21 Page 237 of 820 PageID #:

250. Independent claim 1 of the '785 patent claims a pharmaceutical composition, in a unit dosage form, from about 0.01 mg/ml to about 0.07 mg/mL of vasopressin or pharmaceutically-acceptable salt thereof, wherein the unit dosage form comprises impurities that are present in an amount of 0.9% to 1.7% wherein

the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, and wherein the unit dosage form has a pH of 3.7-3.9.

251. Independent claim 1 of the '209 patent claims a method of increasing blood pressure in a human in need thereof, comprising administering to the human a unit dosage form having identical limitations as what is claimed in claim 1 of the '785 patent, wherein the administration provides the human from about 0.01 units per minute to about 0.1 units per minute of vasopressin or the pharmaceutically-acceptable salt thereof.

252. Original Vasostrict® was indicated to increase blood pressure in adults with vasodilatory shock (*e.g.*, post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. (DTX-1042) Original Vasostrict® Labels at INDICATIONS AND USAGE. The prescribing information for Original Vasostrict® instructed that for post-cardiotomy shock, the starting dose should be 0.03 units per minute and for septic shock the starting dose should be 0.01 units per minute. Furthermore, the maximum dose is 0.1 units per minute for post-cardiotomy shock and 0.07 units per minute for septic shock. *Id*. at INDICATIONS AND USAGE. Therefore, the administration of Original Vasostrict® as instructed by the prescribing information provided the human from about 0.01 units per minute to about 0.1 units per minute of vasopressin. Accordingly, the administration of Original Vasostrict® satisfies the limitations in claim 1 of the '209 patent relating to

123

the method of administration of the claimed formulation.

253.   With respect to the formulation limitations, Original Vasostrict® was provided as a unit dosage form in vial containing 1 mL of the vasopressin formulation. *Id*. at HOW SUPPLIED/STORAGE AND HANDLING.  The Original Vasostrict® formulation contained 20 units/mL synthetic arginine vasopressin having the sequence:

H-Cys-Tyr-Phe-Glu(NH$_2$)-Asp(NH$_2$)-Cys-Pro-Arg-Gly-NH$_2$

which is the same sequence as that described in SEQ ID NO. 1 of the '478 patent[33]:

```
<400> SEQUENCE: 1

Cys Tyr Phe Gln Asn Cys Pro Arg Gly
1               5
```

*Id*. at DESCRIPTION; '209 Patent at col. 103-104.  Additionally, 20 units/mL vasopressin is the same as 0.038 mg/mL synthetic vasopressin,[34] which is within "from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin" as claimed in claim 1 of the '785 and claim 1 of the '209 patents.

254.   Certain lots of Original Vasostrict® were sold with a formulation

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 239 of 820 PageID #: 101360

---

[33] Glu(NH$_2$) and Asp(NH$_2$) are notations for glutamine and asparagine, respectively, that were formerly used; the recommended notation for these residues are now Gln and Asn.

[34] The Original Vasostrict® Label indicates that there are 530 units per mg vasopressin; therefore 20 units/mL vasopressin is 0.038 mg/mL vasopressin. (DTX 1042) Vasostrict® April 2014 Label at DESCRIPTION.

having pH within the range 3.7 to 3.9.  For example, Original Vasostrict® from Lot 788436 had a pH of 3.7 at the time of manufacture, which was on February 24, 2015.[35]  (DTX-1314) PAR-VASO_0096688 at 688; *see also* (DTX-1378) PAR-VASO_0065296 at 333, (DTX-1060) Plaintiffs' Supplemental Response to Defendants' Joint Interrogatory No. 17.  Lot 788436 was first sold on November 11, 2015, and was sold through at least November 20, 2015.  See (DTX-1362) PAR-VASO_0297182 at 190-191; *see also* (DTX-1053) Plaintiffs' Objections and Responses to Defendants' Joint Interrogatory No. 12.  This means that Lot 788436 was in public use, on sale, or otherwise available to the public approximately 9 months after it was manufactured.

255.  ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  (DTX-1293) PAR-VASO_0028307 at 328-333.

████████████████████████████████████████████

████████████████████████████████████████████

---

[35] The Certificate of Analysis for lot no. 788436 was signed on May 4, 2015.  To the extent the analytical tests described in this Certificate of Analysis were not performed on February 24, 2015, and were instead performed at some point between February 24, 2015 and May 4, 2015, the analysis would not change.  For example, assuming that month 0 were instead May 2015, it would only shift the stability data by about 2 months, which would not change the conclusions from these data.

 (DTX-1314)  PAR-VASO_0096688  at  688;  (DTX-1293)  PAR-VASO_0028307 at 313; (DTX-1361) PAR-VASO_0272691 at 723-734 ████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Furthermore,  the purpose of performing stability studies on registration batches, is to provide the FDA with data that is representative of the stability behavior expected for the commercial product.

256.   Data from Original Vasostrict® registration batches 310571, ████████ ████████  stored  at  the  same  conditions  as  that  instructed  by  the  Original Vasostrict® prescribing information (i.e. at 5 C, with the vial positioned upright and inverted) ████████████████████████████████████

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | pH (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | 3.5 | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.8 ■ | 3.5 (0.0) |
| 310571 (inverted) | 3.5 | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.5 (0.0) | 3.8 ■ | 3.5 (0.0) |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

257.  (DTX-1293) PAR-VASO_0028307 at 328-333.  ■



258. ████████████████████████████████████████████

259.   Data from Original Vasostrict® registration batches 310571, ████████

---

[36] The Patents-in-Suit identify the peptide sequences for only the impurities listed in Table 3.  To the extent the impurities identified in Table 3 have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, the total impurities having from about 85% to about 100% sequence homology to SEQ ID NO.: 1 have been calculated to include the impurity measurements for Gly9-AVP, Glu4-AVP, D-Asn-AVP, AVP-Dimer, and Acetyl-AVP.  *See* PAR-VASO_0096688 at 688.

███████████ stored at the same conditions as that instructed by the Original

Vasostrict® prescribing information (i.e. at 5°C, with the vial positioned upright and

inverted) showed that all batches had ████████████████████████████

████████████████████████████████████████████

█ total of impurities identified in Table 3 of the '209 and '785 patents over 24

months (for batch 310571):

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | **Total Impurities** (As identified in Table 3 of the Patents-in-Suit) (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | 2.6% | ■ |
| 310571 (inverted) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | 2.6% | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | | | | | | | | | |
| ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

(DTX-1293) PAR-VASO_0028307 at 328-333. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

260.   To the extent this impurity limitation is not an inherent property of the claimed vasopressin composition, for the same reasons above, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

261.   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

### ii. Claim 2 of the '209 Patent

262.   Claim 2 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 2, and SEQ ID NO. 2 is present in the unit dosage form in an amount of 0.1% to 0.3%.

263.   There are no limitations in claim 2 indicating any difference between the formulation of claim 1 and claim 2.   Therefore, there is nothing in claim 2 to account for the additional claimed impurity limitation and no limitations in the claim to bring about the stated stability further claimed in claim 2.   Accordingly, claim 2 merely recites an inherent property of the vasopressin composition claimed in claim 1.

264.   Original Vasostrict® contained an impurity having SEQ ID NO. 2., which is Gly9-AVP.   '209 Patent at Table 3; (DTX-1314) PAR-VASO_0096688 at 688.   Original Vasostrict® meets each of the formulation limitations of claim 1, and therefore, to the extent the impurity limitation is infringed by Defendants, Original Vasostrict® would have inherently contained between 0.1% to 0.3% Gly9-AVP. The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 2 as well. ████████████████████████████████



265.  Data from Original Vasostrict® registration batches 310571, ███████ ███████ stored at the same conditions as that instructed by the Original Vasostrict® prescribing information (i.e. at 5°C, with the vial positioned upright and inverted) showed that Original Vasostrict® ███████████████████ ███████████████████

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | Amount of Gly9-AVP (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.8% | ▮ |
| 310571 (inverted) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.8% | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | | | | | | | |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

(DTX-1293) PAR-VASO_0028307 at 328-333. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



266.  To the extent the impurity limitation of claim 2 is not an inherent property of the claimed vasopressin composition, as discussed above, ▮▮▮▮▮

### iii.  Claim 3 of the '209 Patent

267.  Claim 3 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 3, and SEQ ID NO. 3 is present in the unit dosage form in an amount of 0.1%.

268.  There are no limitations in claim 3 indicating any difference between the formulation of claim 1 and claim 3.  Therefore, there is nothing in claim 3 to account for the additional claimed impurity limitation and no limitations in the claim to bring about the stated stability.  Accordingly, claim 3 merely recites an inherent property of the vasopressin composition claimed in claim 1.

269.    Original Vasostrict® contained an impurity having SEQ ID NO. 3., which is Asp5-AVP.  '209 Patent at Table 3; (DTX-1314) PAR-VASO_0096688 at 688.  Original Vasostrict® meets each of the formulation limitations of claim 1, and therefore, to the extent the impurity limitation is infringed by Defendants, Original Vasostrict® would have inherently contained 0.1% Asp5-AVP.  The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 3 as well. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

270.    Data from Original Vasostrict® registration batches 310571, ███████ ███████ stored at the same conditions as that instructed by the Original Vasostrict® prescribing information (i.e. at 5 C, with the vial positioned upright and inverted) showed that Original Vasostrict® ███████████████████████████ ███████████████████████

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | Amount of Asp5-AVP (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.2% | ▮ |
| 310571 (inverted) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.2% | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | | | | | | | |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

(DTX-1293) PAR-VASO_0028307 at 328-333. ▮▮▮▮▮▮▮

---

[37] Not Reported.

[38] The reporting limit is 0.1%. *See, e.g.*, PAR-VASO_0030161 at 182.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

271.   To the extent the impurity limitation of claim 3 is not an inherent property of the claimed vasopressin composition, as discussed above, ████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

272.   ██████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

### iv.  Claim 4 of the '209 Patent and Claim 5 of the '785 Patent

273. Claim 4 of the '209 Patent depends from claim 1 of the '209 patent. Claim 5 of the '785 patent depends from claim 1 of the '785 patent. Both claim 4 of the '209 patent and claim 5 of the '785 patent add the limitations that the impurities comprise SEQ ID NO. 4, and SEQ ID NO. 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

274. There are no limitations in claim 4 of the '209 patent and claim 5 of the '785 patent indicating any difference between the formulation of claim 1 and the respective dependent claims. Therefore, there is nothing in claim 4 of the '209 patent and claim 5 of the '785 patent to account for the additional claimed impurity limitation and no limitations in the claim to bring about the stated stability. Accordingly, claim 4 of the '209 patent and claim 5 of the '785 patent merely recite an inherent property of the vasopressin composition claimed in claim 1 of the respective patents.

275. Original Vasostrict® contained an impurity having SEQ ID NO. 4., which is Glu4-AVP. '209 Patent at Table 3; (DTX-1314) PAR-VASO_0096688 at 688. Original Vasostrict® meets each of the formulation limitations of claim 1, and therefore, to the extent the impurity limitation is infringed by Defendants, Original Vasostrict® would have inherently contained between 0.2% to 0.4% Glu4-AVP. The formulation limitations are the only factors recited in claim 1 of the '209 and '785 patents that govern impurity formation; therefore, because Original

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 254 of 820 PageID #: 10312

139

Vasostrict® met the formulation limitations of claim 1 of the '209 and '785 patents, it inherently met the impurity limitations of claims 1 and 4 of the '209 patent and claims 1 and 5 of the '785 patent as well. ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

276.   Data from Original Vasostrict® batches 310571, ████████████ stored at the same conditions as that instructed by the Original Vasostrict® prescribing information (i.e. at 5°C, with the vial positioned upright and inverted) showed that Original Vasostrict® ██████████████████████

████████████████████████████████

████████████ :

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | **Amount of Glu4-AVP** (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.9% | ▮ |
| 310571 (inverted) | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | 0.9% | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | | | | | | | |
| | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

(DTX-1293) PAR-VASO_0028307 at 328-333. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████

277.   To the extent the impurity limitation of claim 4 of the '209 patent and claim 5 of the '785 patent is not an inherent property of the claimed vasopressin composition, as discussed above, ██████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████

278.   █████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████

### v.  Claim 5 of the '209 Patent

279.   Claim 5 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 7, and SEQ ID NO. 7 is present in the unit dosage form in an amount of 0.3% to 0.6%.

280.   There are no limitations in claim 5 indicating any difference between the formulation of claim 1 and claim 5.  Therefore, there is nothing in claim 5 to account for the additional claimed impurity limitation and no limitations in the claim to bring about the stated stability.  Accordingly, claim 5 merely recites an inherent property of the vasopressin composition claimed in claim 1.

281.   Original Vasostrict® contained an impurity having SEQ ID NO. 7., which is Acetyl-AVP.  '209 Patent at Table 3; (DTX-1314) PAR-VASO_0096688 at 688.  Original Vasostrict® meets each of the formulation limitations of claim 1, and therefore, to the extent the impurity limitation is infringed by Defendants, Original Vasostrict® would have inherently contained 0.3% to 0.6% Acetyl-AVP.  The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 5 as well. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

282.   Data from Original Vasostrict® batches 310571, ███████████ stored at the same conditions as that instructed by the Original Vasostrict® prescribing information (i.e. at 5°C, with the vial positioned upright and inverted) showed that Original Vasostrict® ████████████████████

████████████████

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | Amount of Acetyl-AVP (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | 0.3% | ██ |
| 310571 (inverted) | ██ | ██ | ██ | ██ | ██ | ██ | ██ | 0.3% | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| | | | | | | | | | |
| ██ | ██ | ██ | ██ | ██ | | | | | |

(DTX-1293) PAR-VASO_0028307 at 328-333. ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

283.   To the extent the impurity limitation of claim 5 is not an inherent property of the claimed vasopressin composition, as discussed above, ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

### vi.  Claim 6 of the '209 Patent

284.   Claim 6 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 10, and SEQ ID NO. 10 is present in the unit dosage form in an amount of 0.1%.

285.   There are no limitations in claim 6 indicating any difference between the formulation of claim 1 and claim 6.  Therefore, there is nothing in claim 6 to

account for the additional claimed impurity limitation and no limitations in the claim to bring about the state stability.  Accordingly, claim 6 merely recites an inherent property of the vasopressin composition claimed in claim 1.

286.   Original Vasostrict® contained an impurity having SEQ ID NO. 10., which is D-Asn-AVP.  '209 Patent at Table 3; (DTX-1314) PAR-VASO_0096688 at 688.  Original Vasostrict® meets each of the formulation limitations of claim 1, and therefore, to the extent the impurity limitation is infringed by Defendants, Original Vasostrict® would have inherently contained 0.1% D-Asn-AVP.  The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 6 as well.

287.

| Batch | Time (Months) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 6 | 9 | 12 | 18 | 24 |
| | Amount of D-Asn-AVP (Change compared to Month 0) | | | | | | | | |
| 310571 (upright) | █ | █ | █ | █ | █ | █ | █ | 0.4% | █ |
| 310571 (inverted) | █ | █ | █ | █ | █ | █ | █ | 0.4% | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |

(DTX-1293) PAR-VASO_0028307 at 328-333. ██████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

288.   To the extent the impurity limitation of claim 6 is not an inherent property of the claimed vasopressin composition, as discussed above, ████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

### vii.   Claim 7 of the '209 Patent and Claim 8 of the '785 Patent

289.   Claim 7 of the '209 Patent depends from claim 1 of the '209 patent. Claim 8 of the '785 patent depends from claim 1 of the '785 patent. Both claim 7 of the '209 patent and claim 8 of the '785 patent add the limitations that the impurities comprise SEQ ID NO. 2 and SEQ ID NO. 4, and SEQ ID NO. 2 is present in the unit dosage form in an amount of 0.1% to 0.3% and SEQ ID NO. 4 is present in an amount of 0.2% to 0.4%.

290.   The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 7 of the '209 patent and claims 1 and 8 of the '785 patent as well.

291.   As discussed above, Original Vasostrict®, ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



292.   To the extent the impurity limitation of claim 7 is not an inherent property of the claimed vasopressin composition, as discussed above.

#### viii.   Claim 8 of the '209 Patent

293.   Claim 8 of the '209 Patent depends from claim 1 of the '209 patent, and adds the limitations that the impurities comprise SEQ ID NO. 3, SEQ ID NO. 7, and SEQ ID NO. 10, and  SEQ ID NO. 3 is present in the unit dosage form in an amount of 0.1%; SEQ ID NO. 7 is present in an amount of 0.3 to 0.6%, and SEQ ID NO. 10 is present in an amount of 0.1%.

294.   The formulation limitations are the only factors recited in claim 1 that govern impurity formation; therefore, because Original Vasostrict® met the formulation limitations of claim 1, it inherently met the impurity limitations of claims 1 and 8 as well.

295.    As discussed above, Original Vasostrict®, ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

296.    To the extent the impurity limitation of claim 8 is not an inherent

property of the claimed vasopressin composition, as discussed above, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

## D. THE ASSERTED CLAIMS OF THE '209 AND '785 PATENTS WOULD HAVE BEEN OBVIOUS

### i. The Prior Art Taught the Clinical and Formulation Limitations of the Asserted Claims

#### 1. The Prior Art Taught Each of the Formulation Limitations of the Asserted Claims

297.    As of the earliest priority date of the Patents-in-Suit, a formulator would

have considered several factors when developing a peptide-based drug formulation. These include: (1) the known physicochemical properties of the API, such as, its solubility, excipient compatibility, stability and degradation profile, (2) the known formulations of the API and (3) the required or preferred delivery method.

298.    At the time of the earliest priority date of the Patents-in-Suit in 2015, vasopressin was already a well-known and established drug.  As discussed above, an injectable vasopressin product called Pitressin® had been marketed by Parke-Davis for nearly a century.  Because Pitressin® had been marketed since before the institution of the FDA drug approval process in 1938, it was permitted to remain on the market as a "grandfathered" product, which means that the composition and labeling must remain unchanged.

299.    Prior to the earliest priority date of the asserted Patents-in-Suit (January 30, 2015), there were several vasopressin products on the market, all of which had similar compositions or formulations.  For example, the Pitressin® vasopressin product marketed by Parke-Davis (and later, King Pharmaceuticals, Parkdale, and JHP Pharmaceuticals)[39] was a an aqueous solution supplied in 1 mL vials containing 20 units/mL synthetic 8-arginine vasopressin, along with 0.5% chlorobutanol, and acetic acid for adjusting the pH to ███████ (DTX-1141) Pitressin® Label 2012 at

---

[39] Par Pharmaceutical Companies, Inc. acquired JHP Pharmaceuticals in January 2014.

DESCRIPTION; (DTX 1023) FDA Biopharmaceutics Review at 2.   Although Pitressin®'s prescribing information states that it contains 20 mg/mL vasopressin and 0.5% cholorobutanol, Pitressin® was formulated with slight overages of these components.   Specifically, Pitressin® contains ███ units/ mL vasopressin and ███ mg/mL chlorobutanol.  (DTX-1298) PAR-VASO_0058258 at 277.  Pitressin® was indicated for the prevention and treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows, and in diabetes insipidus.  (DTX-1141) Pitressin® Label 2012 at DESCRIPTION.

300.   American Regent also marketed a vasopressin injection product before 2014, manufactured by Luitpold Pharmaceuticals, Inc.  Based on the prescribing information for Luitpold Vasopressin, the product contained 20 units/mL synthetic 8-L-arginine vasopressin, 9 mg/mL sodium chloride, 0.5% chlorobutanol, water for injection and acetic acid for adjusting the pH to 2.5 to 4.5.  (DTX-1041) Luitpold Vasopressin   Label at DESCRIPTION.   According to the manufacturing specifications,  the  target  pH  for  Luitpold  Vasopressin  was  pH  ███████ ████████████████████████  (DTX-1366) VAS0000011 at 013.  Luitpold Vasopressin was also indicated for the prevention and treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows, and in diabetes insipidus.  (DTX-1041) Luitpold Vasopressin   Label at DESCRIPTION.  Luitpold vasopressin was supplied in various packages:  10 units

per 0.5 mL multiple dose vial; 20 units per 1 mL multiple dose vial; and 200 units per 10 mL multiple dose vial. (DTX-1041) Luitpold Vasopressin Label at HOW SUPPLIED.

301. Fresenius Kabi also marketed a vasopressin product prior to 2014 ("FK Vasopressin"). FK vasopressin contained 20 units/mL synthetic 8-L-arginine vasopressin, 5 mg/mL chlorobutanol, water for injection and glacial acetic acid and/or sodium hydroxide for adjusting the pH to 2.5 to 4.5. (DTX-0368) FK Vasopressin Label at DESCRIPTION. FK vasopressin was indicated for the prevention and treatment of postoperative abdominal distention, in abdominal roentgenography to dispel interfering gas shadows, and in diabetes insipidus. (DTX-0368) FK Vasopressin Label at DESCRIPTION.

302. In April 2014, FDA approved Vasostrict®, which contained 20 units/mL synthetic arginine vasopressin, 0.5% chlorobutanol, NF as a preservative, water for injection, and acetic acid for adjusting the pH to 3.4 to 3.6 ("Original Vasostrict®"). (DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION. Original Vasostrict® had an essentially identical formulation as Pitressin®, except

Case 1:18-cv-02023-CFC-CJB Document 302 Filed 08/30/21 Page 268 of 820 PageID #: 101388

that the vasopressin and chlorobutanol overages were removed. (DTX-1023) FDA Biopharmaceutics Review at 2.

303. Vasopressin formulations were also described in the literature. In addition to the prescribing information for each of the prior art marketed vasopressin

products, other printed publications also teach vasopressin formulations. For example, LT '487 describes a vasopressin formulations containing 0.01 g vasopressin, 5.0 g chlorobutanol, 2.2 g sodium acetate, 6.8 g sodium chloride, 836.60 mL of 0.1 mol/L acetic acid, and injection water up to 1000 total mL solution. (DTX-1176) LT '487 at 5. LT '487 teaches that the pH of the solution must be in the range of 3.80-3.95. *Id*.

304.   As discussed in more detail below, the prior art marketed vasopressin products are similar in many respects. They all contain approximately 20 units/mL synthetic arginine vasopressin; water; approximately 0.5% chlorobutanol; and acetic acid for pH adjustment. ██████████████████████████████████

████████████████████

### a. About 0.01 mg/mL to about 0.07 mg/mL of vasopressin

305.   The vasopressin formulations that were marketed—Pitressin®, Original Vasostrict®, and Luitpold Vasopressin—and prior art printed publications concerning vasopressin formulations each taught unit dosage forms (such as in 1 mL vials or ampoules) containing from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof.

306.   As discussed above, Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each contained 20 units/mL synthetic 8-arginine vasopressin. (DTX-1041) Luitpold Vasopressin   Label at DESCRIPTION; (DTX-1141) Pitressin®

Label 2012 at DESCRIPTION; (DTX-1042) Vasostrict® April 2014 Label at DOSAGE FORMS AND STRENGTHS.

307. Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each contained 20 units/mL synthetic arginine vasopressin having the sequence:

H-Cys-Tyr-Phe-Glu(NH$_2$)-Asp(NH$_2$)-Cys-Pro-Arg-Gly-NH$_2$

which is the same sequence as that described in SEQ ID NO. 1 of the '478 patent[40]:

```
<400> SEQUENCE: 1

Cys Tyr Phe Gln Asn Cys Pro Arg Gly
1               5
```

308. (DTX-1041) Luitpold Vasopressin Label at DESCRIPTION; (DTX-1141) Pitressin® Label 2012 at DESCRIPTION; (DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION; (DTX-1139) '478 patent at col. 25-26. Therefore, Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each taught vasopressin compositions containing arginine vasopressin as described in SEQ. ID NO. 1 of the Patents-in-Suit.

309. Additionally, 20 units/mL vasopressin is the same as 0.038 mg/mL synthetic vasopressin, which is within from about 0.01 mg/mL to about 0.07

Case 1:18-cv-02032-CFC-CJB Document 333 Filed 09/18/19 Page 270 of 820 PageID #: 10161

---

[40] Glu(NH$_2$) and Asp(NH$_2$) are notations for glutamine and asparagine, respectively, that were formerly used; the recommended notation for these residues are now Gln and Asn.

[41] The Original Vasostrict® Label indicates that there are 530 units per mg vasopressin. Additionally, the Patents-in-Suit state that one mg of vasopressin is equivalent to 530 units. *See, e.g.*, (DTX-1139) '478 patent at 23:42. Therefore 20

mg/mL of vasopressin" as claimed in claim 1.   Therefore, Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each contains from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof and water.

310.   With respect to LT '487, it teaches that the arginine vasopressin used has the general formula:

## <u>Cys-Tyr-Phe-Gln-Asn-Cys</u>-Pro-Arg-Gly-NH$_2$.

(DTX-1176) LT '487 at 1-2.  This is the same sequence as SEQ ID NO. 1 described in the Patents-in-Suit:

```
<400> SEQUENCE: 1

Cys Tyr Phe Gln Asn Cys Pro Arg Gly
1               5
```

*See, e.g.*, (DTX-1139) '478 Patent at Table 1.  To the extent the arginine vasopressin as described in SEQ. ID NO. 1 must be synthetic, although LT '487 does not teach using synthetic vasopressin, for the reasons described in more detail below, it would have been obvious to use synthetic arginine vasopressin in the formulation taught by LT '487.

311.   LT '487 discloses a vasopressin formulation containing 0.01 g

---

units/mL vasopressin is 0.038 mg/mL vasopressin.  Furthermore, to the extent Pitressin® was manufactured to contain an overage of vasopressin of ▮▮ units/mL, Pitressin® contained an amount equivalent to 0.041 mg/mL vasopressin.

vasopressin in a 1000 total mL solution. LT '487 at 5. A 1000 mL solution containing 0.01 g vasopressin has 0.01 mg per milliliter vasopressin. Therefore, the formulation of LT '487 contains from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof.

### a. Water

312. The vasopressin formulations that were marketed—Pitressin®, Original Vasostrict®, and Luitpold Vasopressin—and prior art printed publications concerning vasopressin formulations each taught unit dosage forms containing water. Not only are these prior art marketed vasopressin products aqueous solutions—meaning that they are solutions containing water—the Pitressin®, Original Vasopressin®, and Luitpold Vasopressin prescribing information also indicate that these products contain "water for injection."

313. LT '487 also teaches a vasopressin formulation containing water. Specifically, this reference teaches the addition of "injection water" to the formulation "up to 1000 mL of solution." (DTX-1176) LT '487 at 5.

### b. pH

314. The vasopressin formulations that were marketed—Pitressin®, Original Vasostrict®, and Luitpold Vasopressin—and prior art printed publications concerning vasopressin formulations each taught vasopressin compositions having pH ranges that encompass, overlap with, or are close to the pH ranges and values

claimed in the Patents-in-Suit (i.e. "pH of 3.8," "pH of 3.7-3.9," and "pH from about 3.7 to about 3.8").

315. ███████████████████████████████████████████████

████ *See* (DTX-1023) FDA Biopharmaceutics Review at 2; (DTX-1374) PAR-VASO_0078041 at 076; (DTX-1321) PAR-VASO_0120243 at 271, 278; (DTX-1312) PAR-VASO_0095005. ██████████████████████████████

████████████████████████████████████████ *See* (DTX-1374) PAR-VASO_0078041 at 147; (DTX-1321) PAR-VASO_0120243 at 349. █████████

███████████████████████████████████████████████

█████████████████████

316. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

317.   Lot No. 78495, for example, was manufactured on ████████████, and was sold ███████████████████ on April 18, 2008.   (DTX-1316) PAR-VASO_0108640 at 645; (DTX-1119) PAR-VASO_0297181.   Stability testing showed that lot No. 78495 had a pH of 3.8 after 3 months storage at 25 ºC.  (DTX-1316) PAR-VASO_0108640 at 645.  Therefore, Pitressin® having pH 3.8 was in public use, on sale, or otherwise available to the public before the earliest priority date of the Patents-in-Suit.

318.   Similarly, Original Vasostrict® was formulated and manufactured with a pH of 3.4 to 3.6.  *See, e.g.*, (DTX-026) PAR-VASO_0072472 at 474,  478-79; *see also* (DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION; (DTX-1044) Vasostrict® September 2014 Label at DESCRIPTION.  The pH release specification for Vasostrict®, which is 3.3 to 4.0, fully encompasses the claimed ranges.  *See* (DTX-026) PAR-VASO_0072472 at 497.  This means that a particular batch or lot of Original Vasostrict® could be sold as long as the pH of that lot was between 3.3 and 4.0 at the time of manufacture.

319.   Furthermore, Par's internal  testing  of commercially-sold  Original

Vasostrict® batches reflect pH values within the claimed ranges. For example, Original Vasostrict® from Lot 788436 had a pH of 3.7 at the time of manufacture, which was on February 24, 2015. (DTX-1314) PAR-VASO_0096688 at 688; *see also* (DTX-1378) PAR-VASO_0065296 at 333, (DTX-1060) Plaintiffs' Supplemental Response to Defendants' Joint Interrogatory No. 17. Lot 788436 was first sold on November 11, 2015, and was sold through at least November 20, 2015. *See* (DTX-1362) PAR-VASO_0297182 at 190-191; *see also* (DTX-1053) Plaintiffs' Objections and Responses to Defendants' Joint Interrogatory No. 12. This means that Lot 788436 was in public use, on sale, or otherwise available to the public approximately 9 months after it was manufactured. Therefore, Original Vasostrict® having pH overlapping with the claimed pH ranges of pH 3.7-3.9 and pH from about 3.7 to about 3.8 was in public use, on sale, or otherwise available to the public before the priority dates of the '785 and '209 patents. Likewise Original Vasostrict® having pH close to the claimed pH value of 3.8 was in public use, on sale, or otherwise available to the public before the priority dates of the '785 and '209.

320. The Luitpold Vasopressin Label indicates that acetic acid is used to adjust the pH of the formulation to a range of 2.5-4.5, which fully encompasses the claimed ranges. (DTX-1041) Luitpold Vasopressin Label at DESCRIPTION.



321.   LT '487 teaches that the pH of the vasopressin composition it describes is tested after the components are combined together, and that the pH value must be in the range of 3.80-3.95.  Therefore, LT '487 discloses a vasopressin composition with pH overlapping with each of the claimed pH ranges and values.

322.   As discussed above, the prior art taught pH ranges and values that encompass, overlap with, or are close to the pH ranges and values claimed in the Patents-in-Suit.  Therefore, claimed values are presumptively obvious.

### 2.  The Prior Art Taught Each of the Clinical Limitations of the Asserted Claims

323.   The clinical administration aspects of this claim were known in the art well before the earliest priority date of the Patents-in-Suit.  Specifically, vasopressin was known to increase the blood pressure in a hypotensive human and that intravenous administration of vasopressin to such hypotensive humans at between about 0.01 units per minute to about 0.1 units per minute of vasopressin was known. As discussed, each of Russell 2008 and Gahart discloses every one of the clinical

limitations of the Asserted Claims. Moreover, while Russell 2008 and Gahart discussed Pitressin® specifically, a POSA would have understood that these same teachings and applications contained in could be applied to any other prior art vasopressin formulations.

324. Although each of the vasopressin products marketed before 2014 were indicated for treating postoperative abdominal distention, dispelling interfering gas shadows, and treating diabetes insipidus, numerous clinical studies had demonstrated the safety and efficacy for increasing blood pressure in patients with vasodilatory shock (such as post-cardiotomy or sepsis) and are hypotensive. (DTX-0232) Russell 2008 at 877; (DTX-0206) Gahart at 1167. Vasopressin products, such a Pitressin®, were intravenously administered off-label by clinicians in emergency situations to increase the blood pressure of patients in vasodilatory shock. Indeed. Gahart, a handbook for nurses and health professionals, teaches such off-label use of Pitressin®. (DTX-0206) Gahart at 1167.

325. Furthermore, Original Vasostrict®, first approved in April 2014, was indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-

cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE. The prescribing information for Original Vasostrict® instructed that for post-cardiotomy shock, the starting dose should be 0.03 units per minute and for septic shock the

162

starting dose should be 0.01 units per minute. Furthermore, the maximum dose is 0.1 units per minute for post-cardiotomy shock and 0.07 units per minute for septic shock. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE.

### 3. Stability Limitations Would Have Been Inherently Met

326. The only limitations that accounts for the stability limitation of the Asserted Claims (*i.e.* the limitations concerning percent degradation after storage or amount of impurities) are the limitations relating to the formulation. That is, the limitations described above with respect to concentration of vasopressin; acetic acid or acetate buffer; water; and pH of the unit dosage or pharmaceutical composition of vasopressin, are the only parameters recited in the asserted patents that would have an effect on the amount of vasopressin degradation or impurities. Aside from these limitations, there are no other limitations in the Asserted Claims that would bring about the stated stability limitation (i.e. amount of degradation or impurities). Thus, as described in further detail below, to the extent a vasopressin composition meets the formulation limitations, it would inherently meet the degradation and impurity limitations. Alternatively, the Asserted Claims are not enabled, lack adequate written description, and/or are indefinite.

327. If the prior art discloses a range or genus that overlaps with or is very close to a range or species claimed in a patent, the patent claim can be presumed to

Case 1:18-cv-03024-CCC-CJB Document 305-1 Filed 08/30/21 Page 535 of 830 PageID #:

be obvious without a rebuttal showing of secondary considerations or a teaching away. As set forth above, the prior art disclosures overlap or encompass the Asserted Claims of the Patents-in-Suit almost entirely. Indeed, in some instances, the prior art is identical to what is claimed. In other instances, the claims fall within a small range or genus known in the art or overlap or are close to values that were either reported in the art or reflected in prior art products sold prior to the applicable priority dates. There is significant, if not complete, overlap between the prior art and the Asserted Claims of the Patents-in-Suit. As set forth below, there is no evidence of criticality, or teaching away, that would rebut a finding of prima facie obviousness as a result of the extreme closeness of the prior art to the Asserted Claims.

### ii. A POSA Would Have Been Motivated to Modify the Formulation of Existing Vasopressin Products and/or Vasopressin Compositions Taught in the Prior Art

#### 1. Alleged Problem to be Solved by the Asserted Patents

328. The obviousness analysis requires consideration of an alleged problem in the art that was to be solved by the alleged invention. The alleged problem to be

solved identified in the asserted patents is: to improve the stability of existing vasopressin injections.

329. The asserted patents state that the named inventors worked to address the alleged problem of poor long-term stability during a vasopressin injection's shelf





Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 279 of 820 PageID #: 10700

164

life due to degradation of vasopressin. *See, e.g.*, (DTX-1139) '478 patent at 1:22-25 ("Current formulations of vasopressin require refrigeration for maintenance or reconstitution of lyophilized powders due to vasopressin's *poor long-term stability*." (emphasis added)), Abstract (discussing decrease in degradation), 15:26-27 (noting that the claimed inventions allegedly "provide advantages in stability," among other things); (DTX-1173) '526 patent at 1:19-21 ("Current formulations of vasopressin suffer from poor long-term stability."); '209 patent at 1:23-25 (same); (DTX-1145) '785 patent at 1:19-21 (same).

330. Vasopressin injections have been on the market since the early 1900s, and were known to be safe and effective in treating low blood pressure in humans. A POSA seeking to administer a vasopressin injection to treat low blood pressure could therefore focus on optimizing the formulation of these long-existing products. It is common to try to enhance stability of pharmaceuticals so that they have a longer shelf-life. Because stability, and therefore, shelf-life, is related to the degradation of the active ingredient, one obvious approach to extending shelf life is to reduce degradation. It was known that the stability of products like the prior art vasopressin

injections could be improved through the optimization of pH of the formulation (including through the use of excipients like buffers) as well as through refrigeration.

## 2. A POSA Would Have Been Motivated to Improve the Stability of Existing Vasopressin Formulations

331. Starting around the mid-2000s, the FDA issued guidance encouraging

165

companies to seek approval of previously unapproved grandfathered products, such as the grandfathered vasopressin products. The FDA issued an additional guidance in 2011 to clarify its enforcement priorities with respect to unapproved products. Specifically, FDA stated that in situations where it has granted approval to a previously unapproved grandfathered drug product, the FDA is more likely to take enforcement action against remaining unapproved drugs of that type. These actions by the FDA would have motivated POSAs to develop improved formulations of vasopressin. In September 2012, JHP (which Par later acquired), submitted a New Drug Application under section 505(b)(2) of the Food, Drug, and Cosmetic Act for an FDA-approved version of Pitressin®. *See* (DTX-1301) PAR-VASO_0072406.

332. In April 2014, FDA approved Vasostrict®,[42] which, as discussed above, contained 20 units/mL synthetic arginine vasopressin, 0.5% chlorobutanol, NF as a preservative, water for injection, and acetic acid for adjusting the pH to 3.4 to 3.6 ("Original Vasostrict®").

333. As discussed above, Original Vasostrict® was indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis)

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 281 of 820 PageID #:

who remain hypotensive despite fuilds and catecholamines. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE. The prescribing

---

[42] During the approval process, JHP changed the brand name of its proposed vasopressin product from Pitressin® to Vasostrict®. *See* PARVASO_0077369; PAR-VASO_0077570.

166

information for Original Vasostrict® instructed that for post-cardiotomy shock, the starting dose should be 0.03 units per minute and for septic shock the starting dose should be 0.01 units per minute. Furthermore, the maximum dose is 0.1 units per minute for post-cardiotomy shock and 0.07 units per minute for septic shock. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE.

334. Original Vasostrict®, as approved in April 2014, had a shelf life of 12 months when stored between 15°C and 25°C. (DTX-1042) Vasostrict® April 2014 Label at HOW SUPPLIED/STORAGE AND HANDLING; (DTX-1358) PAR-VASO_0037819 at 819. In September 2014, Par updated the prescribing information for Original Vasostrict® to specify that the product should be stored between 2°C and 8°C (i.e. refrigerated conditions). (DTX-1044) Vasostrict® September 2014 Label at HOW SUPPLIED/STORAGE AND HANDLING.

335. Original Vasostrict® had to be stored under refrigerated conditions. A POSA would have wanted to improve the stability of Original Vasostrict® such that it would be stable without requiring storage at low temperatures. This is because it is often more difficult to transport drug products requiring storage at low temperatures. Access to drug products that require refrigeration can be limited, especially for rural or tropical areas where it may be difficult to maintain a cold supply chain. (DTX-0263) Avanti 2012 at 17. Due to the preference for room temperature storage rather than refrigerated storage of drug products, Avanti 2012

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 282 of 820 PageID #: 107403

suggests that "an urgent need exists for new strategies to tackle the problems associated with peptide instability." *Id*. at 17. Avanti 2012 provides a table of the shelf-life and storage conditions of various marketed peptide products. *Id*. at 16-17. Avanti states that the requirement for many of these peptide products to be stored at refrigerated conditions indicates that these products have poor stability. *Id*. at 17. Furthermore, because vasopressin is used in emergency circumstances, a POSA would have recognized that it is particularly helpful to be able to store a vasopressin formulation at room temperature. Accordingly, a POSA would have been motivated to improve the stability of existing vasopressin formulations through the use of routine formulation optimization.

336. Furthermore, many of the peptide products listed in Table 1 of Avanti 2012 have a shelf life of 3 to 4 years under refrigerated conditions, including compounds that are similar to vasopressin, such as desmopressin, felypressin, and oxytocin. *Id*. at 16. The fact that Original Vasostrict® was only approved for a shelf-life of 24 months under refrigerated conditions would have further motivated a POSA to improved stability of existing vasopressin products.

337. In optimizing a vasopressin formulation to improve product stability, a POSA would have considered existing vasopressin formulations as starting points with respect to formulation components, the amounts of those components, and the pH to target. This is especially true for a drug like vasopressin, where there have

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 283 of 820 PageID #:

been existing products on the market, such as Pitressin®, Original Vasostrict®, and Luitpold Vasopressin, all of which, for the reasons discussed above, have very similar or nearly identical formulations and had been successfully used clinically in thousands of patients for decades. A POSA also would have considered printed publications such as LT '487, which also has a very similar formulation as the existing marketed vasopressin products. Based on these existing formulations, both marketed and described in the literature, a POSA would have understood that chlorobutanol, acetic acid, and sodium acetate are likely compatible with vasopressin.

### 3. A POSA Would Have Been Motivated to Optimize the pH of the Vasopressin Formulation to Improve Stability

338. To the extent the pH ranges and values taught in the prior art do not render the claimed pH ranges and values presumptively obvious, a POSA would have been motivated to optimize the pH of the prior art vasopressin formulations to improve stability. As discussed above, stability of the peptide drug in the liquid formulation is one of the most important factors to consider when designing and

developing a liquid parenteral peptide formulation. (DTX-0263) Avanti 2012 at 17; (DTX-0247) Carpenter[43] at 13 ("The optimization of formulation variables for

---

[43] Rational Design of Stable Protein Formulations (J. F. Carpenter & M. C. Manning, eds., 2002), AMPHPA0005693-914 ("Carpenter").

169

product stability is the most critical part of protein formulation development"). Of the potential variables for a POSA to choose and optimize to improve the stability and activity of the final drug product, "the most powerful one is pH." (DTX-0247) Carpenter at 13; *see also* . (DTX-0263) Avanti 2012 at 24-25; (DTX-1028) Hovgaard at 152-57.

339.  A POSA would have known that pH is a critical parameter to adjust because several common chemical degradation pathways and mechanisms, such as acid/base catalyzed hydrolysis, deamidation, and oxidation, depend on pH. (DTX-0263) Avanti 2012 at 24; (DTX-0247) Carpenter at 13-14; (DTX-1028) Hovgaard at 152-54. Because stability of peptides depends on the pH, "the common strategy to avoid instability of peptides in aqueous solution is adjusting the pH using buffers." (DTX-0263) Avanti 2012 at 24; (DTX-0247) Carpenter at 13 ("Most chemical reaction also are affected by pH."); (DTX-1028) Hovgaard at 153 (Figure 8.1 below; showing "protein reactions as a function of pH").



**FIGURE 8.1**  Protein reactions as a function of pH. (Courtesy of Dr. Lee Kirsch.)

340.   In view of the importance of pH to peptide stability, pH stability studies are one of the primary studies carried out early during the formulation development process to understand how the stability of a given peptide drug product is affected by pH.  (DTX-1028) Hovgaard at 152-54.

341.   In order to understand the potential stability behavior of a drug product, a POSA would have hypothesized the most likely potential degradation pathways for that drug API based on its chemical structure.  As discussed above, of the primary degradation pathways for peptides and protein drug products, deamidation of asparagine (Asn) and glutamine (Gln) residues is regarded as the most common chemical degradation pathway.   (DTX-0263) Avanti 2012 at 19; (DTX-0247) Carpenter at 13 (Table 6 listing deamidation as one of the "typical stability problems observed in protein pharmaceuticals.").

**Table 6.**
Typical Stability Problems Observed in Protein Pharmaceuticals

| Problems | Potential causes | Possible solutions |
|---|---|---|
| Non-covalent aggregation | Solubility, structural changes, heat, shear, surface, denaturants, impurities | pH, ionic additives, amino acids, surfactants, protein concentration, raw material purity |
| Covalent aggregation | Disulfide scrambling, other unknown mechanisms | pH, inhibit non-covalent aggregation |
| Deamidation | pH < 5.0 or pH > 6.0 | pH optimization |
| Cyclic imide | pH around 5 | pH optimization |
| Cleavages | Protease impurity, other unknown mechanisms | pH, product purity, inhibitors |
| Oxidation | Active oxygen species, free radicals, metals, light, impurity | Excipient purity, free-radical scavenger, active oxygen scavengers |
| Surface denaturation, adsorption | Low protein concentration, specific affinity, protein hydrophobicity | Surfactants, protein concentration, pH |

The named inventors of the Patents-in-Suit agreed that deamidation was known as a common degradation pathway.

342. With respect to vasopressin, a POSA would have known that deamidation was degradation pathway because vasopressin contains asparagine and glutamine residues at the fourth and fifth positions:[44]

H-Cys-Tyr-Phe-**Glu(NH₂)**-**Asp(NH₂)**-Cys-Pro-Arg-Gly-NH₂

(DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION; *see also* (DTX-0263) Avanti 2012 at 19 ("Peptides containing asparagine and glutamine residues are known to undergo spontaneous deamidation."); (DTX-1028) Hovgaard at 154 ("Hydrolysis or deamidation occurs with peptides and proteins containing susceptible Asn and Gln amino acids, the only two amino acids that are primary amines."). Indeed, Bi 1999, which discussed the development of an HPLC method for quantifying vasopressin and its degradation product, taught that "several reaction might occur, such as deamidation (Gln, Asn), hydrolysis (HN-CO bond), oxidation and photooxidation (Tyr, Phe), and β-elimination (Cys)." (DTX-0248) Bi 1999 at

343. Furthermore, the Patents-in-Suit reflect that a POSA would have known that "[t]he glycine, glutamine, and asparagine residues can undergo deamidation to yield

Case 1:18-cv-00500-CFC Document 808 Filed 03/04/20

---

[44] Glu(NH₂) and Asp(NH₂) are notations for glutamine and asparagine, respectively, that were formerly used; the recommended notation for these residues are now Gln and Asn.

the parent carboxylic acid and several degradation products." *See, e.g.*, (DTX-1363) '239 patent at 2:38-44.

343. A POSA would have known that nearly all of the degradation reactions identified by Bi 1999 are affected by pH. Specifically, a POSA would have known that these reactions tend to occur under neutral or basic conditions. Hovgaard at 153 (Figure 8.1). Furthermore, Bi 2000 teaches that the stability of vasopressin is dependent on the pH of the formulation. (DTX-1002) Bi 2000 at 90.

344. Based on the structure of vasopressin, and as confirmed by the teachings of Bi 1999 and Bi 2000, a POSA would have known that vasopressin may be susceptible to pH-dependent degradation reactions, in particular, deamidation of the Gln and Asn residues

345. A POSA would have known that one of the most basic and common strategies for solving problems with pH-dependent peptide degradation reactions is to optimize pH. (DTX-0263) Avanti 2012 at 24 ("Stability of peptides depends on the pH, therefore the common strategy to avoid instability of peptides in aqueous solution is adjusting the pH using buffers….The pH of the formulation can also substantially affect deamidation. Deamidation is known to be sensitive to both the pH and the composition and concentration of the buffer."); (DTX-0247) Carpenter at 13 (Table 6 listing "pH optimization" as a possible solution for deamidation and Table 7 listing pH as a formulation variable for minimizing degradations); (DTX-

Case 1:18-cv-02023-CFC-CJB   Document 305   Filed 08/30/21   Page 288 of 820 PageID #: 40700

1028) Hovgaard at 154 ("Hydrolytic instability of peptides and proteins can be minimized through one or more of the following approaches:…Formulate at optimal solution pH.").

346.   Accordingly, a POSA would have been motivated to determine the optimal pH for vasopressin through routine pH-stability studies, which are described above.  Given that the prior art taught various vasopressin formulations having pH within a relatively narrow window—pH 3.4 to 3.6 for ███████████ Original Vasostrict®; pH 2.5 to 4.5 and more specifically pH ████████████████████ ████████████████████████; pH 3.80 to 3.95 for the formulation of LT '487 –a POSA would have focused pH optimization efforts within that window.  A POSA would have identified a narrow pH range such as pH 2.5 to 4.5 or pH 3.0 to 4.0 as the range on which to focus for pH optimization.  As part of this focused effort, a POSA would have been motivated to perform pH stability studies using relatively small pH increments (such at 0.1 pH unit increments) as opposed to the larger pH increments used in the prior art literature when studying larger pH ranges.  *See, e.g.*, (DTX-0361) Adamsons,[45] (DTX-1002) Bi 2000 at 88.  It would have been typical to for a POSA to vary pH in 0.1 increments when performing routine pH-stability testing over a narrow range of pH values.

---

[45] Adamsons et al., "The Stability of Natural and Synthetic Neurohypophysial Hormones In Vitro," *Endocrinology* 63(5):679-87 (1958), AMPHPA0005427-437 ("Adamsons").

347.   The fact that vasopressin products were sold having specific pHs would not have discouraged a POSA from optimizing the pH of a vasopressin formulation to improve stability because a POSA would have known of the incremental differences and variations in pH of the prior art vasopressin formulation, and would have been further motivated to find an optimal pH within the pH ranges taught in the prior art to improve stability.  Additionally, while a POSA would have relied on stability data and information reported in the literature, to the extent such data or information was outdated or incomplete, a POSA would have been motivated to perform his own studies, including, for example, pH-stability studies.

348.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

349.   Accordingly, in view of the prior art vasopressin formulations, which had incremental differences in pH, a POSA would have been motivated to optimize the formulation of vasopressin, through routine pH-stability studies, to improve the stability of the formulation.

350.   Additionally, to the extent a POSA would not have been motivated

optimize the pH through the use of routine experimentation, adjusting the pH to the claimed pH ranges and values would have been obvious to try. For the reasons discussed above, there would have been a design need to improve the stability of existing vasopressin formulations, which had to be refrigerated. As discussed, pH is the main parameter out of a finite set of strategies a formulator would try to modify to improve stability of vasopressin formulations.

351. Given the relatively narrow pH range for optimization suggested by the prior art, and the practical limits of controlling the pH to increments below 0.1 pH units, there would have been a finite number of predictable pH values that a POSA would try. A POSA would have anticipated being able to improve stability through pH modifications. Therefore, the claimed pH ranges and values, in addition to being obvious, would have been obvious to try.

352. In view of the importance of pH for the stability of peptide drug products generally, and specifically with respect to vasopressin, a POSA would have also been motivated to add a buffer to the vasopressin formulation. A POSA would have known that adding a buffer would help the vasopressin drug product resist any

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 291 of 820 PageID #:

changes in pH during storage and thereby result in a more stable product.

353. When selecting the buffer, a POSA would have considered the pH range of the solution and any information regarding the compatibility of vasopressin with potential buffer systems. (DTX-1012) Flynn at 155. A POSA would have

known that a buffer solution is typically useful within a range of about one pH unit of the pK$_a$ of its acid. (DTX-1020) Martin at 247. A POSA would have considered an acetate buffer because it is one of the most common buffers used in sterile drug solutions, and it has a pK$_a$ of 4.76, which means that it is effective over the range of around pH 3.5 to 5.8. (DTX-1020) Martin at 238, 247; (DTX-1028) Hovgaard at 155.

354. Furthermore, acetate buffer is created by mixing acetic acid with one of its salts (i.e. an acetate salt). Thus, a POSA would have been especially interested in an acetate buffer given the inclusion of acetic acid in the prior art marketed formulations, which indicated vasopressin's compatibility with acetate. Indeed, as Dr. Kirsch recognized, acetic acid has some minimal buffering capacity, and a POSA would have wanted to increase that buffering capacity by adding an acetate salt to the acetic acid that was already in the formulation. .

355. A POSA would have been motivated to select an acetate buffer because its typical buffer pH range only overlapped with a portion of the 2.5-4.5 pH range described for vasopressin in some of the prior art. A POSA would have been

motivated to first determine the optimal pH, which would then influence the POSA's choice of buffer. Thus, to the extent the claimed pH ranges and values minimized degradation and impurities, a POSA would have arrived at those pHs. Then, based on those pH ranges and values, which overlaps with the typical buffer pH range for

177

an acetate buffer, a POSA would have considered and selected the acetate buffer. Additionally, all of the vasopressin products marketed in the prior art were formulated successfully with acetic acid, and thus the proven compatibility between vasopressin and acetate would have further motivated a POSA to start with an acetate buffer even if pH were set toward the edge of its buffering capacity.

### 4. A POSA Would Have Been Motivated to Detect, Quantify, and Identify Impurities and/or Degradation Products

356. Furthermore, acetate buffer is created by mixing acetic acid with one of its salts (i.e. an acetate salt). Thus, a POSA would have been especially interested in an acetate buffer given the inclusion of acetic acid in the prior art marketed formulations, which indicated vasopressin's compatibility with acetate. Indeed, as Dr. Kirsch recognized, acetic acid has some minimal buffering capacity, and a POSA would have wanted to increase that buffering capacity by adding an acetate salt to the acetic acid that was already in the formulation.

357. In the course of performing pH-stability and degradation studies, a POSA would have been motivated to detect, quantify, and identify impurities and/or

degradation products. The recommendations for identifying and quantifying impurities in drug products is outlined in the FDA's Guidance for Industry Q3B(R2)

178

Impurities in New Drug Products ("FDA Q3B Impurities Guidance") (DTX 1010).[46]

358. FDA Q3B Impurities Guidance recommends summarizing the degradation products observed during manufacture and/or stability studies of a new drug product. A POSA would have been motivated to seek regulatory approval for marketing and optimized vasopressin formulation, and therefore would have been motivated to follow the FDA Q3B Impurities Guidance, and detect, quantify, and identify any impurities and degradation products.

359. Specifically, considering a maximum daily dose of 0.27 mg vasopressin[47], the FDA Q3B Impurities Guidance recommends a reporting threshold of 0.1% impurity and an identification threshold of 1.0% impurity. (DTX 1010) FDA Q3B Impurities Guidance at Attachment 1. Therefore, to the extent the formulation could not be optimized to reduce the levels of specific impurities below these thresholds, a POSA would have been motivated to detect, quantify and identify any impurities and degradation products exceeding these limits.

### iii. A POSA Would Have Expected to Be Able to Successfully Improve the Stability of Vasopressin Formulations by Optimizing the pH

---

[46] FDA Guidance for Industry: Q3B(R2) Impurities in New Drug Products (July 2006), AMPHPA0006036-053 ("FDA Q3B Impurities Guidance").

[47] Original Vasostrict® Label indicates that the maximum dose is 0.1 units per minute infusion. Using this maximum dose, a maximum daily dose of 144 units per day or approximately 0.27 mg per day (assuming that there are 530 units per mg):

(0.1 units/minute) (1440 minutes/day) / (530 units/mg) = 0.27 mg/day

360.   In view of the above, a POSA would have been motivated to optimize the pH to improve stability of a vasopressin formulation.  A POSA would have expected optimizing the pH and buffer system could improve vasopressin stability. A POSA would have understood that the formulation for Pitressin® and Original Vasostrict® were identical or nearly identical:

| Component | Pitressin® | Original Vasostrict® |
|---|---|---|
| Synthetic arginine vasopressin | 20 units/mL (label)<br>█████ unit/mL (overage) | 20 units/mL |
| Chlorobutanol | █████% (label)<br>█████% (overage) | 0.5% |
| Acetic acid | For pH adjustment to 3.6 | For pH adjustment to 3.4-3.6 |

(DTX-1141) Pitressin® Label 2012; (DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION;  (DTX-1044)  Vasostrict®  September  2014  Label  at DESCRIPTION; (DTX-1043) Vasostrict® March 2015 Label at DESCRIPTION. Given that the formulation of Original Vasostrict® formulation remained essentially unchanged from the Pitressin® formulation, a POSA would have expected that stability could be improved through routine formulation optimization experiments.

361.   Furthermore, the prior art suggested that the pH of vasopressin formulations may be optimized to improve stability.  Bi 2000 describes the

optimization of a vasopressin formulation with respect to stability in a formulation containing 2.5 mg vasopressin per mL (i.e. approximately 1325 units/mL, assuming a conversion factor of 530 units/mg vasopressin); 0.1 M phosphate buffer, and 0.3 M NaCl. (DTX-1002) Bi 2000 at 88. Bi tested the stability of this formulation at various pH values from 2.6 to 8.5. *See id.* Bi 2000 found that for this particular formulation, of the pH values tested, a pH of 3.35 provided maximum stability.[48] *Id.* at 90. A POSA would have understood from Bi 2000 that the pH of a vasopressin formulation can be successfully optimized in improve stability.

362. Accordingly, a POSA would have expected that stability could be improved compared to formulations in the prior art through adjustment of pH and buffers.

### iv. Claims 1-8 of the '209 Patent Are Obvious Over Pitressin®, Original Vasostrict®, the American Regent Vasopressin Product, and/or LT '487 in View of Bi 1999, and in Further View of Gahart and/or Russell 2008 and the General Knowledge in the Art

#### 1. Claim 1 of the '209 Patent

363. Independent claim 1 of the '209 patent claims a method of increasing blood pressure in a hypotensive human in need thereof comprising administering to

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 296 of 820 PageID #: 17101

---

[48] A POSA would not have understood Bi 2000 to teach that pH 3.35 is the optimal pH for vasopressin generally with respect to maximizing stability. A POSA would have understood that the type of buffer can also affect stability. *See* Avanti 2012 at 24. Accordingly, a POSA would still have performed pH stability studies for the buffer system that is ultimately chosen.

the human a unit dosage form comprising from about 0.01 mg/ml to about 0.07 mg/mL of vasopressin or pharmaceutically-acceptable salt thereof, wherein the unit dosage form comprises impurities that are present in an amount of 0.9% to 1.7% and have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, and wherein the unit dosage form has a pH of 3.7-3.9.  Claim 1 further requires that the administration provides the human from about 0.01 units per minute to about 0.1 units per minute of vasopressin or the pharmaceutically-acceptable salt thereof.

### a. The clinical administration aspects of Claim 1 of the '209 Patent were known in the art

364.   The clinical administration aspects of this claim were known in the art well before the Feb 17, 2017 priority date of the '209 patent.  Vasopressin was known to increase the blood pressure in a hypotensive human and that administration of vasopressin to such hypotensive humans at between about 0.01 units per minute to about 0.1 units per minute of vasopressin was known.  Russell 2008 and Gahart each disclose every one of the clinical limitations of claim 1.

365.   From a clinical POSA's perspective, all of the limitations concerning the claimed methods of administering vasopressin injections were known in the prior art before 2015.  ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████  The NDA

submissions also indicate that the instructions for use included in the package insert for Original Vasostrict® were based on the literature. This included a discussion of Russell 2008, in addition to many other references discussing uses of vasopressin to treat vasodilatory shock. The FDA ultimately agreed that this prior art was an acceptable method of establishing safety and efficacy, and did not require clinical trials to prove either parameter.

366. As discussed above, the literature, and Par's justifications for relying on it to support its Vasostrict® filing, are consistent with a clinical POSA's medical practice of administering vasopressin injections to patients in vasodilatory shock dating back to the 1990s. Clinicians used unapproved vasopressin injection products "off-label" in the manner claimed in the Method Patents since the 1990s. Indeed, Vasostrict® is currently being used in exactly the same way as earlier vasopressin products to increase blood pressure in patients with hypotension.

367. Finally, during the prosecution of the Method Patents, Par did not dispute that the claim limitations related to the administration of the vasopressin injection were disclosed in the literature. Instead, Par focused on arguing that its

claims were allegedly not obvious based on the "criticality" of the pH of the injections. *See id*.

368. The Asserted Method Claims include the following clinical elements:

- "A method of increasing blood pressure in a human in need thereof, the

method comprising"

- "wherein the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute;" and

- "wherein the human is hypotensive"

369. As explained further below, these elements were explicitly disclosed and/or rendered obvious by the prior art. Indeed, these claim elements reflect uses of vasopressin that were well known and commonly practiced by healthcare professionals since at least the early 1990s and continued to be practiced up to at least January 30, 2015

### i. "A method of increasing blood pressure in a human in need thereof, the method comprising"

370. It has been known for decades that vasopressin has the physiological effects on the body of increasing fluid retention and constricting blood vessels, both of which were known to increase blood pressure. Before 2015, it was also known

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 299 of 820 PageID #: 10420

that vasopressin could be administered to humans with low blood pressure for the purpose of increasing their blood pressure. Indeed, the administration of vasopressin to increase blood pressure in hypotensive patients has been a typical practice of healthcare professionals since at least the early 1990s.

371.  Such practices are also described in the medical literature published before 2015.  For example, Russell 2008 and Gahart each disclose the administration of vasopressin to humans in hypotensive states, such as vasodilatory shock.  *See* (DTX-10230) AMPHPA0006646 at 647 (Russell 2008); (DTX-0206) AMPHPA0006081 at 099 (Gahart).  Additionally, the Vasostrict® April 2014 Label and Vasostrict® September 2014 Label explicitly teach the administration of Original Vasostrict® for the claimed use.  *See* (DTX-1042) PAR-VASO_0254534 at 536 (disclosing that Original Vasostrict® is "indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines."), (DTX-1044) AMPHPA0006829 at 831 (same).

372.  This element was therefore explicitly disclosed and/or rendered obvious by the prior art.  Indeed, this claim element reflect uses of vasopressin that were well known and commonly practiced by healthcare professionals since at least the early 1990s.

ii. **"the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute"**

373.  Before 2015, the prior art disclosed the intravenous administration of

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 185 of 820   PageID #: 10747

vasopressin at rates encompassed by or overlapping with the claimed range of about 0.01 to about 0.1 units per minute.

374.   Russell 2008 discloses a study in which vasopressin was administered intravenously at an infusion rate of 0.01 to 0.03 units per minute.  *See* (DTX-0232) AMPHPA0006646 at 648.

375.   Gahart discloses that, for the treatment of vasodilatory shock, AHA guidelines recommend administering vasopressin in "a continuous infusion of 0.02 to 0.04 units/min."  *See* (DTX-0206) AMPHPA0006081 at 098.   Gahart also discloses that "[o]ther sources in the literature recommended low-dose vasopressin infusions in vasodilatory shock refractory to catecholamines" at "0.04 units/min as an infusion (range was 0.01 to 0.1 units/min)."  *Id.*

376.   The Vasostrict® April 2014 Label and Vasostrict® September 2014 Label teach intravenous administration of vasopressin to treat vasodilatory shock.  *See* (DTX-1042) PAR-VASO_0254534 at 534 (disclosing that Original Vasostrict® is  "for intravenous use" and "for intravenous administration."); (DTX-1044) AMPHPA0006829 at 831-32 (same).

377.   Furthermore, it was conventional practice before 2015 to administer vasopressin at an infusion rate between 0.03 to 0.04 units per minute to increase blood pressure in patients experiencing vasodilatory shock.  It was also known before 2015 to administer vasopressin at an infusion rate up to 0.4 units per minute.

378. This element was therefore explicitly disclosed and/or rendered obvious by the prior art. Indeed, this claim element reflect uses of vasopressin that were well known and commonly practiced by healthcare professionals since at least the early 1990's

### iii. "The human is hypotensive"

379. Before 2015, the prior art disclosed the administration of vasopressin to increase blood pressure in humans experiencing various hypotensive states. For example, Russell 2008 and Gahart both disclose the administration of vasopressin to treat hypotension, including hypotension associated with vasodilatory shock. *See* (DTX-0232) AMPHPA0006646 at 647 (Russell 2008); (DTX-0206) AMPHPA0006081 at 099 (Gahart). Additionally, the Vasostrict® April 2014 Label and the Vasostrict® September 2014 Label disclose that Original Vasostrict® is "indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines." *See* (DTX-1042) PAR-VASO_0254534 at 536; (DTX-1044) AMPHPA0006829 at 831.

380. Furthermore, as discussed above, the administration of vasopressin to increase blood pressure of hypotensive patients has been known and commonly practiced by healthcare professionals since at least the early 1990s and continued to be practice up to at least January 30, 2015. This element was therefore

187

explicitly disclosed and/or rendered obvious by the prior art.

### b. The formulation aspects of Claim 1 of the '209 Patent were known in the art

381. Original Vasostrict® was indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE. The prescribing information for Original Vasostrict® instructed that for post-cardiotomy shock, the starting dose should be 0.03 units per minute and for septic shock the starting dose should be 0.01 units per minute. Furthermore, the maximum dose is 0.1 units per minute for post-cardiotomy shock and 0.07 units per minute for septic shock. (DTX-1042) Vasostrict® April 2014 Label at INDICATIONS AND USAGE. Therefore, the administration of Original Vasostrict® as instructed by the prescribing information provided the human from about 0.01 units per minute to about 0.1 units per minute of vasopressin. Accordingly, Original Vasostrict® discloses the limitations in claim 1 of the '209 patent relating to the method of administration of the claimed formulation.

382. With respect to the formulation aspects of claim 1, as set forth above, LT '487 discloses a vasopressin formulations containing 0.01 mg/mL vasopressin, 5.0 mg/mL chlorobutanol, 2.2 mg/mL sodium acetate, 6.8 g/mL sodium chloride, glacial acetic acid, and injection water up to 1000 total mL solution. (DTX-1176) LT '487 at 5. LT '487 teaches that the pH of the solution must be in the range of

Case 1:18-cv-03093-CLC-CJB   Document 302   Filed 06/30/22   Page 303 of 820 PageID #:

3.80-3.95. *Id*. Therefore, the formulation of LT '487 contains from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof and had a pH of 3.7-3.9.

383. With respect to the vasopressin drug substance, as discussed above, LT '487 teaches a formulation containing arginine vasopressin having the same sequence as SEQ ID NO. 1 described in the '209 patent. '209 patent at cols. 107-08.

384. Accordingly, the formulation disclosed in LT '487 differs from the formulation of claim 1 of the '209 patent in only one aspect: LT '487 does not specify that the vasopressin used is synthetic. Additionally, LT '487 does not expressly disclose that the unit dosage comprise impurities that are present in an amount of 0.9% -1.7%, wherein the impurities have from about 85% to 100% sequence homology to SEQ ID NO. 1.[49]

385. Given that the marketed vasopressin products—Pitressin®, Original Vasostrict®, Luitpold Vasopressin, and FK Vasopressin—all use synthetic vasopressin, it would have been obvious for a POSA to use a synthetic vasopressin

Case 1:18-cv-02032-CFC-CJB Document 302 Filed 12/30/21 Page 304 of 820 PageID #: 10432

as the drug substance in LT '487. A formulator would have known that a synthetic version of a peptide could be used in place of a naturally-derived one in a

---

[49] For the reasons discussed above, the formulation limitations are the only claim element that affect the amount of vasopressin impurities present in the unit dosage, and this limitation is an inherent property of the claimed vasopressin formulation.

formulation.  This is especially true where, as is the case for the arginine vasopressin disclosed in LT '487, the naturally-derived peptide and the synthetic peptide have identical peptide sequences and are otherwise chemically identical or nearly identical.  Additionally, for the same reason, a POSA would have reasonably expected to be able to use synthetic arginine vasopressin instead of a naturally-derived arginine vasopressin in the formulation.

386.  As discussed above, Pitressin® contained 20 units/mL synthetic 8-arginine vasopressin, along with 0.5% chlorobutanol, and acetic acid for adjusting the pH to ███████ (DTX-1141) Pitressin® Label 2012 at DESCRIPTION.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████

387.  As discussed above, Luitpold Vasopressin contained 20 units/mL

synthetic 8-L-arginine vasopressin, 9 mg/mL sodium chloride, 0.5% chlorobutanol, water for injection and acetic acid for ███████████████. (DTX-1041)Luitpold Vasopressin Label at DESCRIPTION; (DTX-1366) VAS0000011 at 013.

388.  As discussed above, Original Vasostrict® contained 20 units/mL synthetic arginine vasopressin, 0.5% chlorobutanol, NF as a preservative, water for injection, and acetic acid for adjusting the pH to 3.4 to 3.6.  However, the pH release specification for Original Vasostrict® was between 3.3 and 4.0,  *See* (DTX-026) PAR-VASO_0072472 at 497, and batches of Original Vasostrict were manufactured that had pH between 3.7 to 3.9 (e.g., 310571).  (DTX-1293) PAR-VASO_0028307 at 328.

389.  As discussed above, Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each contained 20 units/mL synthetic arginine vasopressin having the same sequence as that described in SEQ ID NO. 1 of the '209 patent.  (DTX-1041) Luitpold Vasopressin Label at DESCRIPTION; (DTX-1141) Pitressin® Label 2012 at DESCRIPTION; (DTX-1042) Vasostrict® April 2014 Label at DESCRIPTION; '209 patent at cols. 107-08.  Additionally, as discussed above, 20 units/mL vasopressin is the same as 0.038 mg/mL synthetic vasopressin.  Therefore, Pitressin®, Original Vasostrict®, and Luitpold Vasopressin each contains from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof and water. ████████████████████████

█████████████ (DTX-1365) VAS0000009; (DTX-1366) VAS0000011 at 013.

390.   Accordingly, certain batches of Pitressin® and Original Vasostrict® differed from the claimed pharmaceutical composition of claim 1 of the '209 patent in only one respect:  the pH of Pitressin® and Original Vasostrict® were not actually adjusted to between 3.7 and 3.9.  ███████████████████

███████████████████████████

391.   With respect to the pH, to the extent the pH ranges and values taught by Pitressin®, Original Vasostrict®, and Luitpold Vasopressin do not render the claimed pH of 3.7-3.9 presumptively obvious, a POSA would have been motivated to optimize the pH of the these formulations to improve the stability of vasopressin and would have reasonably expected that optimizing the pH could improve the stability for the reasons discussed above.  To the extent pH 3.7 to 3.9 is critical to the stability of vasopressin, a POSA would have arrived at that pH through routine optimization of the Pitressin® and/or Original Vasostrict® formulations.

392.   Additionally, the impurity levels in the optimized formulations would be an inherent property of the optimized formulation.  First, the formulation components and pH of claim 1 are the only recited means of controlling the impurities contained in the claimed vasopressin composition of claim 1.

393.   Furthermore, the formulation of LT '487 with synthetic vasopressin and formulations of vasopressin optimized to pH 3.7 to 3.9 from the formulations of

Pitressin®, Original Vasostrict®, and Luitpold Vasopressin would result in a formulation that would necessarily exhibit impurities that are present in an amount of 0.9% to 1.7% wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO. 1.  Claim 1 does not specify a time point or storage condition for meeting amount of impurity claimed, and an optimized vasopressin formulation would likely have met the impurity amount limitation at some point in time during storage.  ███████████████████████████

████████████████████████████████████  PAR-VASO_0073585 at 622, 625, 628.

394.   Additionally, as discussed in detail above, lots of Original Vasostrict® actually contained the claimed amount of impurities.  The formulation of Original Vasostrict® is identical or nearly identical to that of LT '487, Pitressin®, and Luitpold Vasopressin.  This provides further support that the formulation of LT '487 with synthetic vasopressin and formulations of vasopressin optimized to pH 3.7 to 3.9 from the formulations of Pitressin®, Original Vasostrict®, and Luitpold Vasopressin would inherently exhibit the claimed impurity levels.

395.   Accordingly, it would have been obvious for a POSA to combine the teaching of LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin with the general knowledge in the art to modify and optimize the stability of the formulation disclosed in LT '487 and/or the formulations of Pitressin®, Original

Vasostrict®, and/or Luitpold Vasopressin. In doing so, a POSA would have modified the prior art LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin formulation in the ways described above. The resulting vasopressin formulation would have inherently met the impurity limitations claimed in claim 1. If not inherent, the Asserted Claims would not be enabled, lack adequate written description, and/or are indefinite. It also would have been obvious to administer such optimized formulation to a hypotensive human at a rate of about from about 0.01 units per minute to about 0.1 units per minute of vasopressin (or the pharmaceutically-acceptable salt thereof) in order to increase the human's blood pressure. (DTX-0232) Russell 2008 at 879; (DTX-0206) Gahart at 1167. Therefore, claim 1 of the '209 patent is obvious over LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin in view of Bi 1999, Gahart and/or Russell 2008 and in further view of the general knowledge in the art.

### c. There is No Evidence to Rebut the Prima Facie Case That the Claimed pH Range Is Obvious

#### i. Claimed pH Range is Not Critical to Stability

396. Par argues that the claimed pH range (i.e. pH 3.7-3.9) is critical to the stability of vasopressin. During the prosecutions of the Patents-in-Suit, Plaintiffs asserted that the claimed pH ranges were "critical" to their invention. *See*, for example, (DTX-1364) PAR-VASO-0000422 at 2290, 2580-90 ('478 Patent File

History); (JTX-0007) PAR-VASO-0002629 at 4869, 4881 ('526 Patent File History); (JTX-0008) PAR-VASO-0005400 at 5816-17 ('209 Patent File History).

397. Par submitted two declarations from named inventor Sunil Vandse purporting to demonstrate the stability of vasopressin formulations across a range of pH from 2.5 to 4.5. Declaration of Inventor Sunil Vandse, August 11, 2015, PAR-VASO-0001039-46 ("Vandse Declaration I") (DTX-1339) ; Declaration of Inventor Sunil Vandse, January 22, 2016, PAR-VASO-0002304-17 ("Vandse Declaration II") (DTX-1340) . Par also submitted a declaration from named inventor Vinayagam Kannan, relying on the data set forth in the two Vandse declarations and purporting to establish that pH 3.8 was critical to the claimed formulation. (DTX-1292) PAR-VASO_0004878-88; (DTX-1074) PAR-VASO-0002580-590. These declarations reported vasopressin assay values and total impurity levels for each test formulation at an initial time point and after storage for four weeks at either 25°C or 40°C.

398. In the test data provided to the Patent Office, both vasopressin assays and the percent total impurities for a given test formulation were captured at specified time points. ███████████████████████

███████████  ██████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████

399.   These data can be combined and are depicted in the following Figures[50]:







400.   Using standard statistical method of linear regression analysis, the statistical significance of the apparent differences between pH 3.6 and pH 3.8 can be analyzed.   This analysis shows there is no statistically reliable evidence of a true stability difference between these values.   *See, e.g.,* Tables below.







401.   A p-values of less than 0.05 is deemed a statistically significant finding, i.e., an indication that an observed difference instability is unlikely to result from chance alone and therefore provides good evidence of a true stability difference.

402.   These analyses of the Par data provide no reliable statistical evidence that test formulations with pH in the range of 3.7–3.9 achieve stability measurements superior to those of formulations with the prior-art pH of 3.6. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

403.   The FDA-approved shelf-life for Vasostrict® supports the assertion

that the claimed pH range is not critical to stability. The Original Vasostrict®

formulation, which was formulated with a target pH of 3.4 to 3.6, was FDA approved

for storage up to 24 months under refrigerated conditions. The product could also

be stored for up to 12 months at room temperature following storage at refrigerated

conditions (with the combined refrigerated and room temperature storage time not

exceeding 24 months total). (DTX-1043) PAR-VASO_0014782 at 782, 786.

Specifically, the March 2015 Original Vasostrict® Label states:

> Vials may be held up to 12 months upon removal from refrigeration to room temperature storage conditions (20°C to 25°C [68°F to 77°F], USP Controlled Room Temperature, anytime within the labeled shelf life [i.e. 24 months]. Once removed from refrigeration, unopened vial should be marked to indicate the revised 12 month expiration date. If the manufacturer's original expiration date is shorter than the revised expiration date, then the shorter date must be used. Do not use Vasostrict® beyond the manufacturer's expiration date stamped on the vial.

*Id*. As the approval letter for the March 2015 label states, the Original Vasostrict®

product can be stored at refrigerated conditions for up to 24 months.

404. Reformulated Vasostrict®, which is formulated with a target pH of 3.8,

has the exact same shelf life specifications. It must be stored at refrigerated

conditions (for up to 24 months) and may be stored for up to 12 months at room

temperature after removing from refrigerated conditions. (DTX-1165) Vasostrict®

April 2020 Label at HOW SUPPLIED/STORAGE AND HANDLING.

Specifically, the Vasostrict® April 2020 Label also states:

> Vials may be held up to 12 months upon removal from refrigeration to room temperature storage conditions (20°C to 25°C [68°F to 77°F], USP Controlled Room Temperature), anytime within the labeled shelf life. Once removed from refrigeration, unopened vial should be marked to indicate the revised 12 month expiration date. If the manufacturer's original expiration date is shorter than the revised expiration date, then the shorter date must be used. Do not use Vasostrict® beyond the manufacturer's expiration date stamped on the vial.

*Id*. To the extent Plaintiffs attempt to rely on some internal evidence of a possible incremental improvement in shelf life for Vasostrict, the FDA approved shelf-life for the product remains the same as what was known in the prior art. Without a rigorous regulatory review of Par internal stability data, there is no reliable evidence that data would support a longer shelf life, which requires FDA approval. Even if there were some theoretical improvement in shelf life of several months, however, that is not something that would be unexpected to a POSA seeking to improve vasopressin formulations. A POSA would expect slight modifications to formulation characteristics could lead to incremental differences in shelf-life behavior. This shelf-life difference is one of degree, and not a difference in kind.

405. Reformulated Vasostrict® product did not show any practical difference with respect to storage conditions and shelf life compared to Original Vasostrict®. Therefore, for this additional reason, pH 3.8 is not critical to the stability of vasopressin compared to the stability of the prior art products, formulated at pH 3.4-3.6.

406. ███████████████████████████████████████████████



(DTX-1378)  PAR-VASO_0065296-341. ▮▮▮▮▮▮▮▮▮▮▮

---

[51] None Reported.  The reporting limit is 0.1%; therefore, where an impurity amount is not reported, that impurity is present at less than 0.1%.  *See, e.g.*, (DTX-1294) PAR-VASO_0030161 at 182.

[52] None Detected.

407.   Furthermore, to the extent Par contends that formulations with the same

ingredients and pH as what is recited in the claims of the Patents-in-Suit do not

necessarily meet the impurity and degradation limitations of the claims, this argument is also inconsistent with any argument that pH 3.8 is critical to the stability of vasopressin formulations.  If the claimed pH range does not necessarily confer the stability benefits that purportedly result from the claims, then these pH values cannot be critical.  Instead, other aspects of these formulations and their manufacture must enable a formulation to satisfy those impurity and degradation limitations

408.   

### ii. Prior Art Did Not Teach Away from the Claimed pH Range

409. First, there are no prior art references that specifically tested a *formulation* of vasopressin, with the claimed formulation components (i.e. 0.01 to 0.07 mg/mL vasopressin, acetic acid/acetate buffer, water) and claimed pH values, and showed that such a *formulation* was inferior to one in the prior art.  For example, although Bi 2000 arrived at a slightly different optimal pH for vasopressin, the formulations tested in that reference contained a different buffer and a much higher

buffer concentration (100 mM phosphate buffer) than the prior art formulations of

██████████████████████████████████████ and LT '487.  Therefore,

the formulation of Bi 2000 and the prior art vasopressin formulations containing

acetic acid and/or sodium acetate are not directly comparable.

410.  Moreover, there is nothing in the Bi 2000 paper that discredits or criticizes vasopressin formulations with pH values incrementally higher than the optimal 3.35 value identified.  Indeed, the formulations with pHs slightly higher than the 3.35 value that were analyzed in Bi generally performed well on the stability metrics identified.  *See* (DTX-1002) Bi 2000 at 89-90.  Particularly in view of prior art products that had been successfully marketed for decades with a target pH above 3.35, a POSA would not have been discouraged from performing pH optimization experimentation at incrementally higher pHs based on the teaching of Bi 2000.

411.  Rather than reduce the pH from that of the prior art vasopressin formulations, a POSA would have in fact favored increasing the pH.  A POSA would have recognized that the pH of the prior art formulations were already low for peptide parenteral formulations.  For example, of the approximately 20 example peptide products Avanti 2012 provides in Table 1, only one product was formulated at a lower pH than that of the prior art vasopressin formulations.  *Id*. at 16. Furthermore, a POSA would have considered that at lower pH, the rate of acid-catalyzed hydrolysis increases. *See* (DTX-0263) Avanti 2012 at 18.

412.    Adamsons does not teach away from the claimed pH range.  Adamsons

tested vasopressin solutions that were adjusted to pH 3, 5, 6.5, 7.5, and 8.5; therefore,

Adamsons did not test a pH value near, or even within the Asserted Claims.

Additionally, only one of the pH values tested—pH 3—is within the broadest pH

range taught by the prior art vasopressin products (i.e. pH 2.5-4.5 as disclosed by the

Luitpold Vasopressin Label).  Adamsons concluded that of the pH values tested,

vasopressin was the most stable at pH 3 and 5, which is not inconsistent with the

Patents-in-Suit's claims that vasopressin formulations with pH 3.7-3.9 is the most

stable.  Furthermore, Adamsons used a different buffer system at each of these pHs,

which makes direct comparison between the formulations tested at different pH

values less reliable.  For the reasons above, neither Bi 2000 nor Adamsons teach

away from the claimed values because they do not criticize, disparage, or otherwise

discuss the claimed pH values.

413.    A POSA would not have understood that the pH of the prior art

vasopressin products is already optimized.  A POSA would have been motivated to

improve the stability of existing vasopressin formulations based on the storage

conditions and shelf-life of the existing vasopressin products.  As discussed above,

a POSA would have known that there were slight pH differences between the

vasopressin formulations taught in the prior art.  In view of these pH differences, a

POSA would have understood that the pH of the formulations taught in the prior art

206

could be further optimized to a specific pH value or narrower pH range. Accordingly, as discussed above, a POSA would have been motivated to perform routine pH optimization experiments to arrive at that pH value or range. In doing so, the POSA would have performed his pH optimization experiments focusing on the pH window for vasopressin taught by the prior art.

### 2. Claims 2-8 of the '209 Patent

414. Claim 2 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 2, and SEQ ID NO. 2 is present in the unit dosage form in an amount of 0.1% to 0.3%.

415. Claim 3 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 3, and SEQ ID NO. 3 is present in the unit dosage form in an amount of 0.1%.

416. Claim 4 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 4, and SEQ ID NO. 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

417. Claim 5 of the '209 Patent depends from claim 1 and adds the

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 12/30/21   Page 322 of 820 PageID #: 10747

limitations that the impurities comprise SEQ ID NO. 7, and SEQ ID NO. 7 is present in the unit dosage form in an amount of 0.3% to 0.6%.

418. Claim 6 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 10, and SEQ ID NO. 10 is

present in the unit dosage form in an amount of 0.1%.

419. Claim 7 of the '209 Patent depends from claim 1 and adds the limitations that the impurities comprise SEQ ID NO. 2 and SEQ ID NO. 4, and SEQ ID NO. 2 is present in the unit dosage form in an amount of 0.1% to 0.3% and SEQ ID NO. 4 is present in an amount of 0.2% to 0.4%.

420. Claim 8 of the '209 Patent depends from claim 1, and adds the limitations that the impurities comprise SEQ ID NO. 3, SEQ ID NO. 7, and SEQ ID NO. 10, and  SEQ ID NO. 3 is present in the unit dosage form in an amount of 0.1%; SEQ ID NO. 7 is present in an amount of 0.3 to 0.6%, and SEQ ID NO. 10 is present in an amount of 0.1%.

421. A POSA would have known from Bi 1999 and the general knowledge in the art that, based on its peptide structure, vasopressin could degrade via a few different pathways.  A POSA would have known that hydrolysis of the HN-CO bond could occur.  Bi 1999 at 557.  Additionally, a POSA would have known that deamidation of the Gln and Asn residues could also be a potential degradation pathway for vasopressin.  *Id.*  A POSA would have known that if vasopressin actually degraded through one of these pathways, then the corresponding degradation product would form.  *Id.*

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 323 of 820 PageID #: 10101

422. The '209 patent specification identifies SEQ ID NO.:2 as "Gly9-vasopressin" with the sequence of CYFQNCPRG.  '209 patent at Tables 1 and 3,

Sequence Listing . SEQ ID NO.:2 is nearly identical to vasopressin (i.e., SEQ ID NO.:1), and the difference is that it has a carboxylic acid group at the C-terminus, rather than the amide group in vasopressin. *See id*. A skilled artisan would have known that degradation of vasopressin via hydrolysis would result in a degradation product having SEQ ID NO.:2. *See, e.g.*, (DTX-0248) Bi 1999 at 557 (identifying potential degradation pathways for vasopressin, including hydrolysis of the NH-CO bond); *see also, e.g.*, (DTX-0263) Avanti 2012 at 18-19 (discussing hydrolysis of peptides in aqueous solutions).

423. The '209 patent specification identifies SEQ ID NO.:3 as "Asp5-vasopressin" with the sequence of CYFQDCPRG-NH$_2$. '209 patent at Tables 1 and 3, Sequence Listing. SEQ ID NO.:3 is nearly identical to vasopressin (i.e., SEQ ID NO.:1), and the difference is that that the 5-position is occupied by an aspartic acid (Asp (D)) residue rather than the asparagine (Asn (N)) residue in vasopressin. *See id*. A POSA would have known that deamidation of the asparagine (Asn) residue in vasopressin would result in a degradation product having SEQ ID NO.:3. *See, e.g.*, (DTX-0248) Bi 1999 at 557 (identifying potential degradation pathways for vasopressin, including deamidation of asparagine); *see also, e.g.*, (DTX-0263) Avanti 2012 at 19 ("Peptides containing asparagine (Asn) and glutamine (Gln) residues are known to undergo spontaneous deamidation to form aspartic acid (Asp) and glutamic acid (Glu) residues under physiological conditions.").

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 324 of 820 PageID #: 101442

424. The '209 patent specification identifies SEQ ID NO.:4 as "Glu4-vasopressin" with the sequence of CYFENCPRG-NH$_2$. '209 patent at Tables 1 and 3, Sequence Listing. SEQ ID NO.:4 is nearly identical to vasopressin (i.e., SEQ ID NO.:1), and the difference is that the 4-position is occupied by a glutamic acid (Glu (E)) residue rather than the glutamine (Gln (Q)) residue in vasopressin. *See id.* A POSA would have known that deamidation of the glutamine (Gln) residue in vasopressin would result in a degradation product having SEQ ID NO.:4. *See, e.g.*, Bi 1999 at 557 (identifying potential degradation pathways for vasopressin, including deamidation of glutamine (Gln)); *see also, e.g.*, Avanti 2012 at 19 ("Peptides containing asparagine (Asn) and glutamine (Gln) residues are known to undergo spontaneous deamidation to form aspartic acid (Asp) and glutamic acid (Glu) residues under physiological conditions.").

425. The '209 patent specification identifies SEQ ID NO.:7 as "Acetyl-vasopressin (Acetyl-AVP)" with the sequence of Ac-CYFQNCPRG-NH2. '209 patent at Tables 1 and 3, Sequence Listing. SEQ ID NO.:7 is nearly identical to vasopressin (i.e., SEQ ID NO.:1), and the difference is that the amide group at the

N-terminus is acetylated in SEQ ID NO.:7. *See id.* A POSA would have understood that SEQ ID NO.:7 describes a molecular variant of vasopressin arising from either manufacturing processes (i.e., from side reactions during the chemical synthesis of the drug substance) or degradation of vasopressin in the unit dosage form during

210

storage.  *See, e.g.*, (DTX-0263) Avanti 2012 at 61 (concluding that acetylated oxytocin derivative identified in HPLC is "an impurity of oxytocin formed during synthesis" rather than "a degradation product formed under stress conditions.").

426.  The '209 patent specification identifies SEQ ID NO.:10 as "D-Asn-vasopressin (DAsn-AVP)" with the sequence of CYFQ(D-Asn)CPRG-NH$_2$.  '209 patent at Tables 1 and 3, Sequence Listing.  SEQ ID NO.:10 is nearly identical to vasopressin (i.e., SEQ ID NO.:1), and the difference is that it has a D-asparagine (D-Asn) residue at the 5-position, rather than the L-asparagine (L-Asn) residue in vasopressin.  *See id*.  A POSA would have understood that SEQ ID NO.:10 describes a molecular variant of vasopressin arising from either manufacturing processes (i.e., from the incomplete separation of the D- and L-Asn isomers during protein synthesis) and/or degradation of vasopressin in the unit dosage form during storage.

427.  As discussed above, a POSA would have been motivated to optimize the vasopressin formulation to improve the stability and reduce the degradation of vasopressin.  However, to the extent a POSA is not able to reduce a particular degradation product to below reporting level, a POSA would have been motivated

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 326 of 820 PageID #: 10141

to detect, identify, and quantify degradation products that are present.  (DTX-1010) FDA Q3B Impurities Guidance at Attachment 1.  A POSA would have reasonably expected that optimizing the formulation could reduce the degradation of vasopressin, and that any degradants present in a sufficient amount could be

detected, identified and quantified using existing analytical techniques. A POSA would have been able to do using standard analytical techniques such as HPLC. (DTX-0248) Bi 1999 at 551-560. The impurity levels for impurities having SEQ ID NO. 2, 3, 4, 7, and 10 in the optimized formulations would be an inherent property of the optimized formulation. First, the formulation components and pH of these claims are the only recited means of controlling the specific impurities contained in the vasopressin composition claimed therein.

428. Furthermore, the formulation of LT '487 with synthetic vasopressin and formulations of vasopressin optimized to pH 3.7 to 3.9 from the formulations of Pitressin®, Original Vasostrict®, and Luitpold Vasopressin would result in a formulation that would necessarily exhibit impurities that are present in an amounts claimed in claims 2-8. These claims do not specify a time point or storage condition for meeting the amount of impurity claimed, and an optimized vasopressin formulation would likely have met each of the impurity limitations at some point in time during storage. For example, ███████████████████████████ ███████████████████████████████████ (DTX-1304) PAR-VASO_0073585 at 611, 617, 620, 622, 625, 628.

429. ████████████████████████████████████ ██████████████████████████ The formulation of Original Vasostrict is identical or nearly identical to that of LT '487, Pitressin®, and Luitpold

Vasopressin.  This provides further support that the formulation of LT '487 with synthetic vasopressin and formulations of vasopressin optimized to pH 3.7 to 3.9 from the formulations of Pitressin®, Original Vasostrict®, and Luitpold Vasopressin would each inherently exhibit the claimed impurity levels.

430.  Accordingly, it would have been obvious for a POSA to combine the teaching of LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin with Bi 1999 and the general knowledge in the art to modify and optimize the stability of the formulation disclosed in LT '487 and/or the formulations of Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin.  In doing so, a POSA would have modified the prior art LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin formulation in the ways described above.  The resulting vasopressin formulation would have inherently met each of the impurity limitations claimed in claims 2-8.  If not inherent, the Asserted Claims are not enabled, lack adequate written description, and/or are indefinite.  It also would have obvious to administer such optimized formulation to a hypotensive human at a rate of about from about 0.01 units per minute to about 0.1 units per minute of vasopressin (or the

Case 1:81-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 328 of 820 PageID #: 10447

pharmaceutically-acceptable salt thereof) in order to increase the human's blood pressure.  (DTX-0232) Russell 2008 at 879; (DTX-0206) Gahart at 1167.  Therefore, claims 2-8 of the '209 patent are obvious over LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin in view of Bi 1999 and in further view of

Gahart and/or Russell 2008 and the general knowledge in the art.

### v. Claims 1, 5, and 8 of the '785 Patent Are Obvious Over Pitressin®, Original Vasostrict®, the American Regent Vasopressin Product, and/or LT '487 in View of Bi 1999, and in Further View of the General Knowledge in the Art

431. Independent claim 1 of the '785 patent claims a pharmaceutical composition, in a unit dosage form, from about 0.01 mg/ml to about 0.07 mg/mL of vasopressin or pharmaceutically-acceptable salt thereof, wherein the unit dosage form comprises impurities that are present in an amount of 0.9% to 1.7% wherein the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.: 1, and wherein the unit dosage form has a pH of 3.7-3.9.

432. Claim 5 of the '785 patent depends from claim 1 of the '785 patent, and adds the limitation that the impurities comprise SEQ ID NO. 4, and SEQ ID NO. 4 is present in the unit dosage form in an amount of 0.2% to 0.4%.

433. Claim 8 of the '785 patent depends from claim 1 of the '785 patent, and adds the limitations that the impurities comprise SEQ ID NO. 2 and SEQ ID NO. 4, and SEQ ID NO. 2 is present in the unit dosage form in an amount of 0.1% to 0.3% and SEQ ID NO. 4 is present in an amount of 0.2% to 0.4%.

Case 1:18-cv-05035-CCC-CJB Document 50b Filed 06/30/21 Page 352 of 839 PageID #: JA1120

434. For the same reasons as discussed above with respect to the '209 patent, it would have been obvious for a POSA to combine the teaching of LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin with Bi 1999 and the general knowledge in the art to modify and optimize the stability of the formulation

disclosed in LT '487 and/or the formulations of Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin.  In doing so, a POSA would have modified the prior art LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin formulation in the ways described above.  The resulting vasopressin formulation would have inherently met each of the impurity limitations claimed in claims 1, 5 and 8.  If not inherent, the Asserted Claims are not enabled, lack adequate written description, and/or are indefinite.  Therefore, claims 1, 5, and 8 of the '785 patent are obvious over LT '487, Pitressin®, Original Vasostrict®, and/or Luitpold Vasopressin in view of Bi 1999 and in further view of the general knowledge in the art.

## V. CERTAIN ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112

### A. THE ASSERTED CLAIMS OF THE '209 AND '785 PATENTS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION BECAUSE SPECIFICATION DOES NOT CONVEY POSSESSION OF FULL SCOPE OF IMPURITY PROPERTIES

435.  The Asserted Claims of the '209 and '785 patent require that the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.:1.  Based on the specifications of the '209 and '785 patents, a POSA would not have understood that the named inventors possessed a method of determining whether an impurity has "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" and therefore would not have possessed a formulations having 0.9%

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 330 of 820 PageID #: 10457

- 1.7% impurities that meet this limitation.

436.   A POSA would not have understood how to determine a percentage value of sequence homology for a small peptide, such as vasopressin, and the specifications of the '209 and '785 patents do not teach or disclose how to determine the sequence homology of the individual impurities.  In fact, ███████████

████████████████████████████████████████████████████████

███████████████████████████████

437.   "Percent sequence homology" is not a meaningful term.  In describing peptide sequence comparisons, several different terms are commonly used (and sometimes mis-used):  identity, similarity and homology.  Each of these terms have different meanings.  Sequence identity refers to the occurrence of *exactly* the same nucleotide or amino acid in the same position within two aligned sequences. Pertsemlidis[53] at 2.  For example, two peptides having ten amino acids each, would have 90% sequence identity if they had exactly identical peptide sequences except for at one position.  Sequence similarity is a slightly different metric that takes *approximate* matches into account; that is, sequence similarity takes into consideration whether the different amino acids at a given position nonetheless have similar properties (e.g., leucine and isoleucine).  *Id*.  In contrast, the term "sequence

---

[53] (DTX-1251) Pertsemlidis, A., Fondon, J.W. Having a BLAST with bioinformatics (and avoiding BLASTphemy). Genome Biol 2, reviews2002.1, AMVAS0129888-897 (2001) ("Pertsemlidis").

homology" refers to the common evolutionary ancestry of two peptide sequences *Id*. Therefore, it is not a percent value, but rather a kind of true or false statement—two peptide sequences are either homologous or they are not.

438. Although "percent sequence homology" is sometimes used in the literature to describe to a comparison of two sequences, that usage is generally incorrect and really refers to sequence identity or sequence similarity. *Id*. As discussed above sequence identity and sequence similarity mean different things and are calculated differently. Therefore, even if a POSA were to understand the "percent sequence homology" term in the claims of the '209 and '785 patents to mean either sequence identity or sequence similarity the POSA would need to know from the specifications which measurement the "percent sequence homology" refers to. Nowhere in the specifications of the '209 and '785 patents is there any guidance on what "percent sequence homology" refers to and how it is calculated or determined. Based on this lack of disclosure a POSA would not have understood the named inventors of the '209 and '785 patents to be in possession of the "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" limitation of those

Case 1:18-cv-02032-CFC-CJB Document 305 Filed 08/30/21 Page 332 of 820 PageID #:

patents because the POSA would not have understood that the named inventors possessed a method for determining whether that limitation is met by a particular formulation.

439. Furthermore, "percent sequence homology" is not a term that is used in

the field of peptide formulation to describe degradation products or impurities. For example, I have never used a percentage value of sequence homology in the context of peptide formulations and degradation products or impurities. I have also never encountered any literature that refers to a percentage value of sequence homology for peptide degradation products or impurities.

440. Moreover, even if a POSA understood how to determine the sequence homology of impurities, a skilled artisan would not know the identity of all of the impurities to determine if a particular composition was within the scope of the claims. Tables 25-42 in the '209 and '785 patents indicate the presence of unidentified impurities (designated as "UI"). A skilled artisan would not have been able to determine whether these unidentified impurities have a "85% to about 100% sequence homology to SEQ ID No.: 1" without analytical work to determine the identity of these unknown impurities. Therefore claims 1-11 are indefinite because the claim language, viewed in light of the specification and the prosecution history, fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." For the reasons above, a POSA would not have understood

the patentees of the '209 and '785 patents to be in possession of the "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" limitation and the claims of the '209 and '785 patents lack written description.

**B. THE ASSERTED CLAIMS OF THE '209 AND '785 PATENTS ARE INVALID FOR LACK OF ENABLEMENT BECAUSE IT**

## WOULD REQUIRE UNDUE EXPERIMENTATION TO PRACTICE THE FULL SCOPE OF THE CLAIMS

441. The Asserted Claims of the '209 and '785 patents require that the impurities have from about 85% to about 100% sequence homology to SEQ ID NO.:1. Based on the specifications of the '209 and '785 patents, a POSA would not have understood how to determine whether an impurity has "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" and therefore, to the extent the percent impurity limitation is not an inherent property of the claimed formulations of the '209 and '785 patents, the Asserted Claims of these patents are not enabled because the POSA would not be able to determine whether a specific formulation has 0.9% - 1.7% impurities that meet this limitation.

442. For the same reasons as described above, a POSA would not know the meaning of the "percent sequence homology" claim term, and the specifications of these patents do not provide any guidance regarding how to determine the "percent sequence homology" for impurities in the claimed vasopressin formulation. To the extent it is possible to determine whether an impurity has about 85% to about 100% sequence homology to SEQ ID NO.:1, it would require undue experimentation because the specifications do not provide such guidance. Accordingly, the Asserted Claims of the '209 and '785 patents are not enabled because the POSA would not be able to determine whether a specific formulation has 0.9% - 1.7% impurities that meet this limitation.

219

Case 1:18-cv-08535-CLC-CJB Document 502   Filed 08/30/51   Page 334 of 836 PageID #

# VI. INEQUITABLE CONDUCT

## A. PROSECUTION HISTORY OF THE PATENTS-IN-SUIT AND THEIR PARENT '239 PATENT

443.    The '209 and '785 patents are continuations-in-part of U.S. Patent No. 9,744,239 ("the '239 patent").  The '239 Patent claims priority to U.S. Application No. 14/610,499 (the "'499 Application"), filed January 30, 2015.  The application that issued as the '239 Patent was filed at the U.S. Patent & Trademark Office ("Patent Office") on May 20, 2015, as U.S. Application No. 14/717,877 (the "'877 Application").  The '877 Application is a continuation of the '499 Application and shares a specification with the '499 Application.

444.    Claim 1 of the '239 patent claims a method of increasing blood pressure in a human in need thereof by administering vasopressin:

> 1. A method of increasing blood pressure in a human in need thereof, the method comprising:
>
> a) providing a pharmaceutical composition for intravenous administration consisting of, in a unit dosage form: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) optionally chlorobutanol; iii) acetic acid, acetate , or a combination thereof; iv) 0.2% or less vasopressin degradation products; and v) water;
>
> b) diluting the unit dosage form in a diluent to provide a concentration from about 0.1 units/mL to about 1 unit/mL of vasopressin or the pharmaceutically- acceptable salt thereof; and
>
> c) administering the diluted unit dosage form to the human by intravenous administration;

220

wherein:

the unit dosage form has a pH of 3.5 to 4.1;

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

'239 Patent at claim 1.

445. On October 21, 2015, the patent examiner issued a Final Office Action rejecting all pending claims of the '877 Application as both anticipated and obvious over the April 2014 Vasostrict® Label. (DTX-1381) PAR-VASO-0008323 at 8326; *see also id.* at 8349.

446. At the time of the rejection, pending independent claim 16 recited:

16. A method of increasing blood pressure in a human in need thereof, the method comprising:

a. providing a pharmaceutical composition for intravenous administration comprising, in a unit dosage form: i) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof; ii) chlorobutanol; iii) acetic acid; and iv) water, wherein the unit dosage form has a pH of 3.4 to 3.6;

Case 1:18-cv-02032-CFC-CJB   Document 305   Filed 08/30/21   Page 336 of 820 PageID #: 10457

b. storing the unit dosage form at 2-8 °C; and

c. administering the unit dosage form to the human;

wherein:

the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof

per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

(DTX-1389) PAR-VASO-0007062 at 7064.

447.   In rejecting the pending claims of the '877 Application, the patent examiner cited to and relied on various portions of the April 2014 Vasostrict® Label, including the description of the Vasostrict® formulation, its indication, and its method of administration, which are described above.

448.   The applicants sought to overcome Examiner Bradley's October 21, 2015 rejection by invoking the exception of Section 102(b)(1)(A), which states that a prior art disclosure made one year or less before the effective filing date of the patent may not be used against that patent if the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.   In attempting to overcome the examiner's rejection, named inventor Vinayagam Kannan submitted a declaration on November 24, 2015, that stated,

The [Vasostrict 2014] Label discloses part of the subject matter of the claims, including a method of increasing blood pressure in a hypotensive human. The Label recites that '[v]asostrict is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive…" Label, page 1 (parentheticals omitted).  The Label thither recites a pharmaceutical composition for intravenous administration having 20 units vasopressin per mL …." Label, page 3.  The Label further recites that the vasopressin formulation comprises 'chlorobutanol [and] Water for Injection, USP adjusted with acetic acid to pH 3.4-3.6…' Label, page 6,  The Label recites the infusion rate of the claim by stating that '[f]or post-cardiotomy shock, start with a dose of 0.03 units/minute.  For septic shock, start with a

dose of 0.01 units/minute." Label, page 3. The Label recites refrigeration of the diluted vasopressin for up to 24 hours. Label, page 1. The FDA obtained this information from me and Matthew Kenney, as we invented this subject matter.

(DTX-1075) PAR-VASO_0008388 at 389.

449. On January 11, 2016, based on named inventor Vinayagam Kannan's November 24, 2015 declaration, the patent examiner withdrew the rejection of the pending claims over the April 2014 Vasostrict® Label, stating:

The declarations under 37 CFR l.130(a) filed November 24, 2015 are sufficient to overcome the rejection of claims 16-29 based upon FDA label for VASOSTRICT™ (NPL USPTO-892, published 4/2014). The declaration by Inventor Vanayagam [sic] Kannan includes an unequivocal statement that he and Matthew Kenney invented the subject matter disclosed in the FDA Label and relied upon in the rejection (¶ 6-7), and a reasonable explanation for the presence of the FDA as an author of the prior art disclosure (¶ 6, 8). The declaration by Michelle Bonomi-Huvala supports the explanation that the subject matter in the prior art was invented by Vanayagam [sic] Kannan and Matthew Kenney and provided to the FDA as part of the regulatory filings (¶ 6-7). Accordingly, the rejection of claims 16-29 under 35 U.S.C. 102(a)(l) as anticipated by or, in the alternative, under 25 U.S.C. 103 as obvious over the FDA label for VASOSTRICT™ is withdrawn.

(DTX-1382) PAR-VASO-0008417 at 8419-20.

Case 1:18-cv-02032-CFC-JLB   Document 388   Filed 08/05/21   Page 338 of 836 PageID #:

450. Mr. Kannan has testified that he did not invent or contribute to the formulation described in the April 2014 Vasostrict® Label.

451. Mr. Kannan has testified that he did not invent or contribute to the clinical aspects of Vasostrict® described in the April 2014 Vasostrict® Label,

including the use and method of administration identified in Paragraph 7 of his declaration:

452. With respect to the subject matter of the April 2014 Vasostrict® Label, Mr. Kannan testified that his only "contribution was related to refrigerated storage." . However, the claims of the '239 patent contain no limitations relating to refrigeration storage of diluted vasopressin for up to 24 hours. (DTX-1363) PAR-VASO-0000198 at 230-231. Furthermore, the issued claims of the '209 and '785 patents also contain no limitation on refrigerated storage of diluted vasopressin for up to 24 hours. (JTX-0004) PAR-VASO_0000034 at 112-113; (JTX-0005) PAR-VASO_0000114 at 196-197; (JTX-0006) PAR-VASO_0000232 at 313-314.

453. Named inventor Matthew Kenney did not work on the Original Vasostrict® formulation, which means that he did not invent or contribute to the formulation described in the April 2014 Vasostrict® Label.

454. Matthew Kenney also did not invent or contribute to the clinical aspects

of Vasostrict® described in the April 2014 Vasostrict® Label, including the use and method of administration identified in Paragraph 7 of the declaration.

455. Matthew Kenney did not contribute to the information in the Original

Vasostrict® April 2014 Label, which means that he did not invent or contribute to any of the subject matter of the April 2014 Vasostrict® Label.

456.   Therefore, contrary to Mr. Kannan's declaration, neither he nor Mr. Kenney invented or contributed to at least the following subject matter of the April 2014 Vasostrict® Label, which the examiner relied on in the October 21, 2015 rejection:

- "[v]asostrict is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive . . . ." PAR-VASO-0006453 at 8351 (Vasostrict® April 2014 Label at INDICATIONS AND USAGE);

- "a pharmaceutical composition for intravenous administration having 20 units of vasopressin per mL. . . . ." *Id*. (Vasostrict® April 2014 Label at DOSAGE FORMS AND STRENGTHS);

- "that the vasopressin formulation comprises 'Chlorobutanol [and] Water for Injection, USP adjusted with acetic acid to pH 3.4- 3.6.'" *Id* . at 8354 (Vasostrict® April 2014 Label at DESCRIPTION); and

- "the infusion rate of the claim . . . that '[f]or post-cardiotomy shock start with a dose of 0.03 units/minute. For septic shock, start with a dose of 0.01 units/minute.'" *Id*. at 8351 (Vasostrict® April 2014 Label at DOSAGE AND ADMINISTRATION).

**B. (DTX-1075) PAR-VASO_0259744 0008388 AT 745389. THE NAMED INVENTORS' DISQUALIFICATION OF THE VASOSTRICT® APRIL 2014 LABEL DURING PROSECUTION WAS MATERIAL TO THE PATENTABILITY OF THE '785 AND '209 PATENTS**

457.   In rejecting the then-pending claims of the '877 Application, the patent

Examiner stated that the Vasostrict® April 2014 Label disclosed each and every limitation of at least then-pending claims 16, 17-28, and 30, and therefore anticipated them. (DTX-1381) PAR- VASO-0008327-28.

458. Furthermore, the Vasostrict® April 2014 Label discloses, either explicitly or inherently, each limitation that ultimately issued with the '239 patent after the patent examiner had disqualified the April 2014 Vasostrict® Label as prior art.

459. For example, the Vasostrict® April 2014 Label disclosed the claim limitation of "diluting the unit dosage form in a diluent to provide a concentration from about 0.1 units/mL to about 1 unit/mL of vasopressin":

Dilute Vasostrict in normal saline (0.9% sodium chloride) or 5% dextrose in water (D5W) prior to use. Discard unused diluted solution after 18 hours at room temperature or 24 hours under refrigeration.

## Table 1 Preparation of diluted solutions

| Fluid restriction? | Final concentration | Mix | |
|---|---|---|---|
| | | Vasostrict | Diluent |
| No | 0.1 units/mL | 2.5 mL(S0 units) | 500mL |
| Yes | 1 unit/mL | 5 mL (100 units) | I00mL |

\*   \*   \*

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 00\30\ST   Page 3TS of 8S0 PageID #: Tomes

For post-cardiotomy shock, start with a dose of 0.03 units/minute. For septic

shock, start with a dose of 0.01 units/minute. . . . The maximum dose for

post-cardiotomy shock is 0.1 units/minute and for septic shock 0.07

units/minute.

(DTX 1140) PAR-VASO-0008349 at 8351.

460. The April 2014 Vasostrict® Label also disclosed the limitation

"administering the diluted unit dosage form to the human by intravenous

administration":

Dilute Vasostrict with normal saline (0.9% sodium chloride) or 5% dextrose

in water (D5W) to either 0.1 units/mL or 1 unit/mL for intravenous

administration.

*Id*. at 8349.

461. The April 2014 Vasostrict® Label further disclosed the limitation "the

unit dosage form has a pH of 3.5 to 4.1":

The 1 mL solution contains vasopressin 20 units/mL, chlorobutanol, NF

Case 1:18-cv-02032-CFC-CJB Document 305 Filed 08/30/21 Page 342 of 820 PageID #: 10703

0.5% as a preservative, and Water for Injection, USP adjusted with acetic

acid to pH 3.4 - 3.6.

*Id*.at 8354.

462. Thus, the Vasostrict® April 2014 Label disclosed each and every

limitation of claim 1 of the '239 patent as issued, either explicitly or inherently.

463.    The Vasostrict® April 2014 Label also was relevant to the patentability of the '209 and '785 patents, which were each filed after the examiner had withdrawn the April 2014 Vasostrict® Label as prior art against the '877 Application, because for the reasons discussed above, each of the Asserted Claims of the Patents-in-Suit are anticipated by and/or obvious in view of the Vasostrict® April 2014 Label.

464.    During prosecution of the '209 and '785 patents, the patent examiner cited only prior art that was not as close to the pending claims of those patents as the Vasostrict® April 2014 Label.  For example, during prosecution of each of the '209 and '785 patents, the patent examiner rejected the pending claims as obvious under Section 103 in view of a reference called "PPC," which discloses a pH of 2.5 to 4.5.

465.    The examiner stated that:

Pharmaceutical Partners of Canada teaches that Vasopressin Injection, USP is a sterile, nonpyrogenic solution of synthetic vasopressin of the posterior pituitary gland. It is substantially free from the oxytocic principle and is standardized to contain 20 pressor units posterior structural formula is identical to instant SEQ ID NO: 1. Each mL contains 20 USP vasopressin units, chlorobutanol (anhydrous) 5 mg as preservative, water for injection q.s. glacial acetic acid and/or sodium hydroxide for pH adjustment (2.5-4.5).

(DTX-1364) PAR-VASO-0000422 at 2250-251.  However, the PPC reference did not disclose the clinical elements of the claims because it has different indications and instructions for use.

228

466. During prosecution of these patents, the examiner also relied on Treschan & Peters, *The Vasopressin System: Physiology & Clinical Strategies*, 105 Anesthesiology 599-612 (2006) ("Treschan 2006"), which taught the limitations relating to the clinical administration of vasopressin.

467. However, the patent examiner eventually withdrew the rejections based on data the named inventors submitted that purportedly showed that pH 3.7-3.9 and 3.8 were critical to the stability of vasopressin.

468. The Vasostrict® April 2014 Label is closer prior art to the issued claims of the '209 and '785 patents than the references (e.g., PPC) cited during those patents' prosecution, which disclosed vasopressin formulations having pH 2.5-4.5. Unlike PPC, the Vasostrict® April 2014 Label discloses the formulation, including the pH of 3.4 to 3.6, as well as the claimed indications and method of administration in a single reference. Furthermore, the Vasostrict® April 2014 Label discloses exactly the claimed clinical indication and administration limitations.

469. Furthermore, rather than disclosing a broader pH range of 2.5 to 4.5, the Vasostrict® April 2014 Label discloses a narrower pH range of 3.4-3.6, which

Case 1:18-cv-02032-CFC-CJB Document 305 Filed 08/30/21 Page 344 of 820 PageID #: 18591

is close to the claimed pH range of 3.7-3.9, in the issued claims of the '209 and '785 patents.

470. The pH limitations in the '209 and '785 patents are *prima facie* obvious over the pH range disclosed in the prior art as a whole, including the

Vasostrict® April 2014 Label.

471.  Therefore, if Vasostrict® April 2014 Label had been before the examiner (as it should have been), for the reasons discussed above, the applicants would have needed to show the criticality of the claimed pH range of 3.7-3.9, over the pH range 3.4-3.6 of the closest prior art in the April 2014 Vasostrict®.

472.  For the reasons set forth above, a pH value of 3.7, 3.8, 3.9 or range of 3.7-3.9, is not critical to the stability of vasopressin as compared to a pH of 3.6 as disclosed in the Vasostrict® April 2014 Label.  Thus, Vasostrict® April 2014 Label would have been material to the prosecution of the '209 and '785 patents.

473.  Furthermore, for the reasons discussed above, the Asserted Claims of the '209 and '785 patents are obvious over the Vasostrict® April 2014 Label in view of the prior art.  A prior art reference that renders the Asserted Claims of '209 and '785 patents invalid is necessarily material to the prosecution of these patents.

## C. THE NAMED INVENTORS' FAILURE TO DISCLOSE PRIOR ART PITRESSIN® WAS MATERIAL TO THE PATENTABILITY OF THE PATENTS-IN-SUIT

474.  With respect to Pitressin®, each of the named inventors had knowledge or would have had access to the Pitressin® formulation.    This information was never disclosed to the Patent Office during the prosecution of any of the Patents-in-

Suit.

475.   As discussed above, ██████████████████████████████████

███████   Additionally, Pitressin® and Original Vasostrict® had nearly the same formulation, except that Original Vasostrict® removed overages for vasopressin and chlorobutanol.  Therefore, for the same reasons as discussed above with respect to the April 2014 Vasostrict® Label, Pitressin®, in view of the prior art would have rendered the Asserted Claims of the '209 and '785 patents obvious.  A prior art reference that renders the Asserted Claims of the '209 and '785 patents invalid is necessarily material to the prosecution of these patents.

476.   ████████████████████████████████████████████

█████████████████████████████████████████████   Additionally, for the reasons discussed above, ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████   Information about the pH of Pitressin® and the impurity levels measured in Pitressin® would support a finding of obviousness for the reasons discussed above.  Accordingly  the Asserted Claims of the '209 and '785 patents are anticipated and/or obvious for the reasons discussed above.  A prior art reference that renders the Asserted Claims of the '209 and '785 patents invalid is necessarily material to the prosecution of these patents.

### D. THE DISCLOSURE OF VASOSTRICT® APRIL 2014 LABEL AND PITRESSIN® WOULD NOT HAVE BEEN

## CUMULATIVE OF THE PRIOR ART ALREADY BEFORE THE EXAMINER

477.   The disclosures of Vasostrict® April 2014 Label and Pitressin® would not have been "cumulative" of the prior art already before the Examiner, because they each contain disclosures that are closer to the claimed inventions than the art cited by the examiner during prosecution of the '209 and '785 patents.

478.   For example, during the prosecution of the '209 and '785 patents, the examiner issued rejections over references that disclosed formulations of vasopressin having pH between 2.5 and 4.5.  Vasostrict® April 2014 Label discloses a different, narrower pH range (i.e. 3.4-3.6) that is close to the claimed pH range of 3.7 to 3.9.  Furthermore, the April 2014 Vasostrict® Label discloses exactly the claimed clinical indication and administration limitations.  Because Vasostrict® April 2014 Label discloses a pH range that is closer to the claimed range than what was disclosed in the prior art before the examiner, and because it is a single reference that discloses both formulation and clinical limitations, Vasostrict® April 2014 Label contains disclosures that are closer to the claimed limitations than the PPC and Treschan 2006 references cited during prosecution.  Accordingly, Vasostrict® April 2014 Label would not have been cumulative of what was already before the examiner during prosecution.

479.   Similarly, the formulation of ███████████████████████ ████████████████████ to the claimed pH range of 3.7 to 3.9 than the pH 2.5 to 4.5

232

disclosed by the prior art before the examiner during prosecution. ████████



████████████ None of this information was part of the

disclosures of the prior art before the examiner.  Accordingly, Pitressin® would not

have been cumulative of what was already before the examiner during prosecution

## VII.   THIS CASE IS EXCEPTIONAL AND AMNEAL SHOULD BE AWARDED ITS REASONABLE ATTORNEY FEES

### A. PAR LACKED A REASONABLE BASIS TO BRING AND MAINTAIN THIS SUIT AGAINST AMNEAL

480.   As Par is well aware—and has been aware over the pendency of this

litigation—in contrast to the claims of the Patents-in-Suit, which require a pH range

of 3.7-3.9, Amneal's ANDA contained specifications directly addressing the pH of

Amneal's proposed products and those specifications set forth a proposed product

████████████████████.  From at least July 14, 2020, when Amneal

produced the 24-month stability data for its exhibit batches, Par knew that its

infringement theory was at odds with its validity theory and contradicted the

representations and arguments Par made to the United States Patent and Trademark

Office during prosecution to secure the Patents-in-Suit.

481.   During prosecution before the Patent Office, Par overcame prior-art-

based rejections by arguing that the pH range of 3.7-3.9 is critical to the stability of its claimed vasopressin formulation compared to other pHs disclosed in the art, including pH 3.4-3.6.  Yet, in clear contradiction to the positions it took during prosecution, Par continues to assert infringement against Amneal's Proposed ANDA Products, ███████████████████████████████████████████

████████████████████████████████████████████████

482.  Par's untenable infringement position is further highlighted by the contrary positions its expert is taking with respect to the validity of the Patents-in-Suit.  First, although Par insists that Amneal infringes the Asserted Claims, its expert has made clear for validity purposes ████████████████████████████

████████████████████████████████████████████████

████████████████████████  Second, Par maintains its infringement position even though its own expert recognizes that the pH of Amneal's Proposed ANDA Products is the same pH found in the prior art.  Indeed, Dr. Kirsch echoes Par's argument made during prosecution that ███████████████████████████████████

█████████████████████████████████████████████.  He even further acknowledges that a prior art vasopressin formulation had been formulated to a pH of 3.6 for over 100 years.  Most significantly, Dr. Kirsch has opined that the pH of Amneal's proposed product reflects the prior art pH range.

483.   Despite these opinions from its own expert, Par continues to maintain

its infringement claims against Amneal, even though Par and its experts can point to no evidence that the pH of Amneal's Proposed ANDA Products ██████████

██  Par's infringement theory is based purely on the unsupported speculation that some undefined hypothetical future batch of Amneal's ANDA Product might fail to meet its shelf-life specifications.  Yet, a Par expert has agreed that approval of Amneal's ANDA Product will be based on a satisfactory showing to the FDA, based on Amneal's manufacturing process and other data and information submitted in the ANDA, that its product will meet the specifications that have been set, including the pH specification.

484.  These glaring inconsistencies go beyond just the credibility of any witness Par may offer to support its infringement case.  They undermine the entire foundation of Par's infringement case.

485.  Par knew or should have known, at least since receiving Amneal's 24-month stability data, the exceptional weakness of its infringement claims, particularly in view of its validity arguments and its knowledge that the prior art taught the same pH range that is exhibited by Amneal's Proposed ANDA Products. Subsequent discovery may make clear whether Par knew about the exceptional weakness of its infringement claims earlier, in view of its prior litigation with Eagle and the similar infringement and invalidity arguments raised in that case, in which Amneal took no part.

## B. PAR BROUGHT THIS SUIT IN BAD FAITH

486.   Par brought this suit in bad faith in order to maintain its monopoly on the supply on vasopressin.  Par has had a monopoly on the supply of vasopressin since December 2014, when, following the approval of Par's NDA for its unapproved vasopressin product, the FDA removed all competing vasopressin products from the market.

487.   During that time, Par has increased the price of vasopressin from approximately five dollars per vial to well over one hundred thirty dollars per vial.  Because vasopressin is a life-saving drug used to treat refractory cases of lethal conditions, hospitals have continued to purchase and use vasopressin notwithstanding Par's monopoly pricing.

488.   By filing and maintaining this baseless suit, Par was able to guarantee that its monopoly would not be broken by Amneal. During that time, Par has continued to increase the price of vasopressin and enjoy monopoly profits.

489.   Because this suit was brought in bad faith, this case is exceptional and Amneal should be awarded its reasonable attorney fees.

Case 1:18-cv-00823-CFC-JLH   Document 306   Filed 09/30/21   Page 351 of 820 PageID #:

## C. PAR ENGAGED IN INEQUITABLE CONDUCT TO PROCURE THE PATENTS-IN-SUIT

490.   As set forth above, Par obtained the Patents-in-Suit through inequitable conduct and, in addition, the Patents-in-Suit are tainted and unenforceable on

236

account of the inequitable conduct that occurred in the parent '239 patent prosecution.

491. Because Par engaged in inequitable conduct, this case is exceptional and Amneal should be awarded its reasonable attorney fees.

## VIII. PAR IS NOT ENTITLED TO INJUNCTIVE OR MONETARY RELIEF

492. Par cannot prove that it is entitled to a judgment against Amneal for infringement of any Asserted Claim.

493. Par cannot prove that it is entitled to any relief because Amneal does not infringe any valid, enforceable claim of the Patents-in-Suit.

494. Par cannot prove that it is entitled to injunctive relief.

495. Par cannot prove that it suffered irreparable injury or harm.

496. Par cannot prove that the legal remedies available to it are inadequate to compensate any alleged injury or harm.

497. Par cannot prove that the balance of hardships favors an injunction.

498. Par cannot prove that an injunction is in the public interest.

Case 1:18-cv-00823-CFC-CJB   Document 502   Filed 08/30/19   Page 352 of 820 PageID #: 70113
499. Par cannot prove that it is entitled to damages or other monetary relief.

500. Par cannot prove that it is entitled to attorneys' fees, filing fees, and any costs of suit incurred by Plaintiffs in this action.

501. In the event that Plaintiffs are found to be the prevailing party in this action, whether Plaintiffs may recover costs under Federal Rule of Civil Procedure

54(d)(1) and D. Del. LR 54.1 and the amount of costs to which they are entitled.

502.   In the event that Amneal is found to be the prevailing party in this action, Whether Amneal may recover costs under Federal Rule of Civil Procedure 54(d)(1) and D. Del. LR 54.1 and the amount of costs to which it is entitled.

# EXHIBIT 4

EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | C.A. No. 18-cv-2032-CFC-CJB (Consolidated)<br><br>█████████████ |

## PLAINTIFFS' STATEMENT OF CONTESTED ISSUES OF LAW THAT REMAIN TO BE LITIGATED

Pursuant to Local Rule 16.3(c)(5), Plaintiffs Par Pharmaceutical, Inc., Par

Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively

"Par") submit the following issues of law that remain to be litigated.  The

following statements are not exhaustive, and Par reserves the right to prove any

matters identified in its pleadings, interrogatory responses, and/or expert reports.

Par reserves the right to modify or amend this Statement to the extent necessary to

reflect any future rulings by the Court, to supplement or amend this Statement to

fairly respond to any new issues that Defendants may raise, to address any new

discovery produced by Amneal, or to address any further amendments to Amneal's

EXHIBIT 4

ANDAs.  To the extent Par's statement of the issues of fact that remain to be litigated, which is submitted as **Exhibit 2** hereto, contains issues of law, those issues are incorporated herein by reference.  Moreover, if any issue of law identified below should properly be considered an issue of fact, then such statement should be considered to be part of Par's statement of issues of fact that remain to be litigated.  Plaintiffs' Statement of Intended Proofs is submitted as **Exhibit 13** hereto.

Further, Par's identification of the issues that remain to be litigated on issues where Amneal bears the burden of proof is based on its understanding of the arguments that Amneal has put forth to date.  To the extent Amneal intends or attempts to introduce different or additional legal arguments to meet their burden of proof, Par reserves its rights to contest those legal arguments, and to present any and all rebuttal evidence in response to those arguments, and will not be bound by this summary of remaining legal issues.

## I.      CLAIM CONSTRUCTION

1.      The infringement analysis involves two steps.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996).  The first step is to define disputed terms of the patent consistent with how those terms would be understood by a person of ordinary skill in the art.  *Id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

EXHIBIT 4

2. "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

3. The ordinary meaning may be determined by reviewing various sources, such as the claims themselves, the specification, the prosecution history, dictionaries, and any other relevant evidence. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

4. Unless there is an express intent to impart a novel meaning to the claim terms, the words of the claim are presumed to have their "ordinary and customary meanings attributed to them by those of ordinary skill in the art." *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004).

5. There is "a heavy presumption that claim terms carry their full ordinary and customary meaning," which should apply "unless [Defendants] can show the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).

6. Rounding of numerical values "is a standard scientific convention when a number has not been carried to the next mathematically significant figure." *Viskase Corp. v. Am. Nat. Can Co.*, 261 F.3d 1316, 1322 (Fed. Cir. 2001).

EXHIBIT 4

7.     Claim language should not be restricted to "an example provided in the specification," particularly when the specification states that "[t]he examples are illustrative and are not to be read as limiting the scope of the invention as it is defined by the appended claims." *Spectrum Pharms., Inc. v. InnoPharma, Inc.*, 12-260-RGA-CJB, 2014 WL 3365684, *5 (D. Del. July 3, 2014) (quoting *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006).

8.     This Court construed the disputed claim terms in a Memorandum Opinion dated May 11, 2020 (D.I. 105).  The parties further agreed to adopt the Court's construction of terms construed by the Court in the related action against Eagle Pharmaceuticals Inc. (*See* D.I 179).  Additionally, there remains a dispute as to the plain and ordinary meaning of the limitation "a pH of 3.7-3.9," which the Court indicated it would resolve at trial.

9.     The second step of the infringement inquiry is to determine whether the accused product infringes the patent, which is done by comparing the accused product with the properly construed claims.  *Markman*, 52 F.3d at 976.

## II.     INFRINGEMENT

10.     On June 9, 2021, Judge Connolly severed issues of infringement from the July 7, 2021 trial.  Accordingly, Par's allegations of infringement—and any associated contested issues of law—will be addressed if necessary, at a later date to be determined.

EXHIBIT 4

## III.   VALIDITY

11.   Whether Amneal has proven by clear and convincing evidence that any of the Asserted Claims are invalid.

12.   The Asserted Claims are presumed to be valid, and the burden of proving invalidity of each claim rests with Amneal.  35 U.S.C. § 282.  The presumption that an issued patent claim is valid requires that an invalidity defense or counterclaim be proven by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).  The presumption of validity and corresponding burden of proof in overcoming that presumption applies to each patent claim independently.  *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050 (Fed. Cir. 1988); *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1581 (Fed. Cir. 1993).

13.   Par's identification of the issues of validity that remain to be litigated is based on its understanding of the arguments that Amneal is likely to make in attempting to establish invalidity, given the pleadings and discovery in the action to date.  To the extent Amneal intends or attempts to introduce different or additional legal arguments to meet their burden of proof, Par reserves its rights to contest those legal arguments, and to present any and all rebuttal evidence in response to those arguments, and will not be bound by this summary of remaining legal issues.

EXHIBIT 4

### A.   <u>**Anticipation**</u>

14.    Whether Amneal has proven by clear and convincing evidence that any Asserted Claim is invalid as anticipated by the prior art.

15.    "A person shall be entitled to a patent unless the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention."  35 U.S.C. § 102(a)(1).

16.    Anticipation is a question of fact, subject to the Court's application of the proper legal standards in making that factual determination.  *See Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1067-68 (Fed. Cir. 2017).

17.    "In order to anticipate the claimed invention, a prior art reference must 'disclose all elements of the claim within the four corners of the document,' and it must 'disclose those elements 'arranged as in the claim.'"  *Id.* at 1063 (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008)); 35 U.S.C. § 102.

18.    To prove anticipation by a prior art product, "the party with the burden of proof must show that 'the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention.'"  *See Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed Cir. 2002) (quoting *Scaltech Inc. v. Retec/Tetra, LLC*, 178 F.3d 1378, 1383 (Fed.

EXHIBIT 4

Cir. 1999)) (reversing a jury verdict of anticipation by a prior art device because the record lacked evidence "regarding at least one limitation of each asserted claim").

19.     In order to prove inherent anticipation, the patent challenger must prove by clear and convincing evidence that the missing element or elements are necessarily present in the allegedly anticipating disclosure.  *See Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991); *see also Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002).  Inherency "may not be established by probabilities or possibilities.  The mere fact that a certain thing may result from a given set of circumstances is not sufficient."  *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (quoting *Continental Can*, 948 F.2d at 1269).

20.     "In order to anticipate a claimed invention, a prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation."  *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008) (citing *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008)).

EXHIBIT 4

**B.**    <u>**Obviousness**</u>

21.    Whether Amneal has proven by clear and convincing evidence that any Asserted Claim is invalid as obvious in view of the prior art to a person of ordinary skill in the art ("POSA") at the time of the claimed inventions.

22.    Whether the definition of a POSA in this case is as follows:

> A person with a Master's, Pharm.D., or Ph.D. in the field of pharmaceutical sciences or a related discipline and several years of experience in the development of pharmaceutical dosage forms.  The amount of experience would vary in relation to the level of formal education and depth of experience with pharmaceutical dosage development.  A POSA may also have less formal education and a greater amount of experience.  Further, a POSA would have had access to and would have working collaboration with persons having several years of experience in the formulation of drug products as well as other professions in the drug development field, such as pharmacologists, chemists, biologists, or clinicians.

23.    Obviousness is a question of law that is based on underlying issues of fact.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

24.    To prove that the asserted claims are obvious, Amneal must prove by clear and convincing evidence that the differences between the claimed subject matter and the prior art are such that the invention would have been obvious to a hypothetical person having ordinary skill in the art at the time of invention.  35 U.S.C. § 103; *Microsoft*, 131 S. Ct. at 2242.

25.    To determine obviousness, the Court must consider: (i) the scope and content of the prior art; (ii) the differences between the prior art and the

EXHIBIT 4

claims at issue; (iii) the level of ordinary skill in the pertinent art; and (iv)

objective or secondary considerations of nonobviousness, if present. *See*

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *In re Rouffet*, 149 F.3d

1350, 1355 (Fed. Cir. 1998).

26.     Even if the prior art discloses all the elements of a claim, the claim is

only obvious if the patent challenger proves by clear and convincing evidence that

a person of ordinary skill in the art would be motivated to combine the elements

and would have a reasonable expectation that the combination would successfully

result in the claimed invention. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352,

1364 (Fed. Cir. 2011); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d

989, 994 (Fed. Cir. 2009).

27.     "[O]bviousness must be judged from the knowledge of one skilled in

the art at the time of invention." *Genetics Inst., LLC v. Novartis Vaccines &*

*Diagnostics, Inc.*, 655 F.3d 1291, 1318 n.6 (Fed. Cir. 2011).  Only art that meets

the requirements of the relevant subsections of 35 U.S.C § 102 qualifies as prior

art for an obviousness analysis under § 103. *See, e.g.*, *Panduit Corp. v. Dennison*

*Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987).

28.     "Patentability shall not be negated by the manner in which the

invention was made."  35 U.S.C. § 103.  A court cannot rely on an inventor's own

efforts to find obviousness, but it can consider an inventor's testimony regarding

EXHIBIT 4

how the invention was made in making a finding of nonobviousness. *E.g.*, *Life Techs., Inc. v. Clontech Labs., Inc*., 224 F.3d 1320, 1325 (Fed. Cir. 2000); *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012).

29.    A defendant's "burden [to prove invalidity by clear and convincing evidence] is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). In that situation:

> [The party asserting invalidity] has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984), *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).

30.    The claimed invention must be viewed "in the state of the art that existed at the time the invention was made." *Sensonics Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996).

31.    The scope and content of the prior art must be considered as a whole. *See In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) ("It is impermissible . . . to pick and choose from any one reference only so much of it as will support a given

EXHIBIT 4

position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one of ordinary skill in the art."); *see also In re Kuderna*, 426 F.2d 385, 389 (C.C.P.A. 1970) ("We must approach the issue of patentability in terms of what would have been obvious to one of ordinary skill in the art at the time the invention was made in view of the sum of all the relevant teachings in the art, not in view of first one and then another of the isolated teachings in the art.").

32.     "[S]ome kind of motivation must be shown from some source, so that the [fact-finder] can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented method." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 (Fed. Cir. 2008).

33.     "[W]hen the prior art as a whole teaches away from combining certain known elements" by discouraging a person of ordinary skill in the art from following the path set out in the prior art or by leading the skilled artisan in a direction divergent from the path that was taken by the inventors of the claimed invention, "a successful means of combining [the known elements] is more likely to be nonobvious." *KSR Intern. Co. v. Teleflex Inc*., 550 U.S. 398, 416 (2007); *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009).  "[A] reference that 'teaches away' from a given combination may

11

EXHIBIT 4

negate a motivation to modify the prior art to meet the claimed invention." *Ormco Corp. v. AlignTech., Inc.*, 463 F.3d 1299, 1308 (Fed. Cir. 2006). "An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements." *Depuy Spine*, 567 F.3d at 1326.

34.     An invention claimed in a patent is not obvious if it is a solution to a problem which does not have a finite number of identified and predictable solutions or if the identified solution was not reasonably predictable. *KSR*, 550 U.S. at 421.

35.     An invention claimed in a patent is not obvious if the prior art gives only general guidance as to the particular form of the claimed invention or how to achieve the invention. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1073 (Fed. Cir. 2012). For "a patent challenger to establish obviousness, it is insufficient to allege a general motivation to discover an undefined solution that could take many possible forms." *In re Armodafinil*, 939 F. Supp. 2d 456, 500, 502 (D. Del. 2002) (internal citations omitted); *see also In re Cyclobenzaprine*, 676 F.3d at 1072 ("Evidence of obviousness, especially when that evidence is proffered in support of an 'obvious-to-try' theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily

EXHIBIT 4

traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention." (quoting *Ortho McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008)).

36.     Hindsight must be avoided in the obviousness analysis.  *KSR*, 550 U.S. at 421.  "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight."  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011).  When fact-finders fall prey to a hindsight-driven obviousness analysis, they often find motivation and a reasonable expectation of success where none existed at the time of the invention.  *See, e.g.*, *Ortho-McNeil*, 520 F.3d at 1364-65; *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998).

37.     That which was unknown cannot have been obvious.  *In re Newell*, 891 F.2d 899, 901-02 (Fed. Cir. 1989); *see also In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993) ("Such a retrospective view of inherency is not a substitute for some teaching or suggestion supporting an obviousness rejection.").

38.     To protect against the "distortion caused by hindsight bias," there must be "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."  *KSR*, 550 U.S. at 418, 421.

EXHIBIT 4

39.     An accused infringer must provide evidence that a "skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed." *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

40.     A patentee may argue objective indicia of non-obviousness, but is not obligated to do so, because objective indicia of non-obviousness are not a requirement of patentability.  Therefore "[s]uch evidence, if present, would weigh in favor of non-obviousness, although the lack of such evidence does not weigh in favor of obviousness." *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 878 (Fed. Cir. 1993); *see also Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) ("[T]he absence of objective evidence does not preclude a holding of nonobviousness because such evidence is not a requirement for patentability . . . . [T]he absence of objective evidence is a neutral factor." (internal quotation marks omitted)).

41.     "[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, a relevant inquiry is whether there would have been a motivation to select the claimed composition from the prior art ranges.  In those circumstances, the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed

EXHIBIT 4

invention; (2) there were new and unexpected results relative to the prior art; or

(3) there are other pertinent secondary considerations." *Allergan, Inc. v. Sandoz*

*Inc.*, 796 F.3d 1293, 1304-05 (Fed. Cir. 2015) (internal citation and quotation

marks omitted) (affirming district court's holding that patentee successfully

rebutted prima facie obviousness case where prior art disclosed range containing

claimed drug concentration).

42.     Where the issue of obviousness is based on overlapping ranges,

"[o]ne way in which the patentee may rebut the presumption of obviousness is by

showing that there is something special or critical about the claimed range."

*Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341 (Fed. Cir. 2020) (internal

citations omitted).

43.     Courts have assessed criticality based on whether the claimed range

is critical to the operability or functionality of the claimed invention.  *See, e.g.*,

*Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 869-71 (Fed. Cir. 2015);

*see also Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006).

44.     The presumption of obviousness for overlapping ranges attaches

only when "the range or value of a particular variable" is "***the* difference** between

the claimed invention and the prior art."  *Tris Pharma, Inc. v. Actavis Labs. Fl.,*

*Inc.*, No. 14-1309-CFC, 2020 WL 7028456, at *15 (D. Del. Nov. 30, 2020)

(emphasis in original) (citing *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1577 n.3 (Fed. Cir. 1993)).

45.     "[I]n order to render a claimed apparatus or method obvious, the prior art must enable one skilled in the art to make and use the apparatus or method." *Endo Pharm. Inc. v. Amneal Pharm., LLC*, 224 F. Supp. 3d 368, 379-80 (D. Del. 2016) (quoting *In re Kumar*, 418 F.3d 1361, 1365 (Fed. Cir. 2005)).

### C.   Written Description

46.     Whether Amneal has proven by clear and convincing evidence that any Asserted Claim is invalid as lacking an adequate written description.

47.     The written description requirement is met if the specification and the existing knowledge in the art reasonably convey "to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1355 (Fed. Cir. 2010).  For a patent claim to be held invalid for lack of written description, it must be proven by clear and convincing evidence that the patent fails to provide a POSA a basis "to recognize that the inventor invented what is claimed."  *Id.* at 1351.  The test for reasonably conveying possession of an invention is a flexible one, "requir[ing] an objective inquiry into the four corners of the specification from the perspective of a [POSA]."  *Id.*

EXHIBIT 4

48.     A failure to "specifically mention a limitation that later appears in the claims is not a fatal one when one skilled in the art would recognize upon reading the specification that the new language reflects what the specification shows has been invented." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002).

49.     "Written description is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date." *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1063 (Fed. Cir. 2020).  "The [written description] requirement is applied in the context of the state of knowledge at the time of the invention." *Zoltek Corp. v. U.S.*, 815 F.3d 1302, 1308 (Fed. Cir. 2016).  The specification therefore "need not include information that is already known and available to the experienced public." *Id.* (quoting *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005)).

50.     A specification implicitly satisfies the written description requirement if a POSA would find it "reasonably clear what the invention is and that the patent specification conveys that meaning." *All Dental Prodx.*, 309 F.3d at 779.  That is, the "reasonably conveys" standard does not require the disclosure and claims to match exactly. *Ariad Pharm.*, 598 F.3d at 1352 ("[T]he [written]

EXHIBIT 4

description requirement does not demand any particular form of disclosure or that the specification recite the claimed invention *in haec verba*").

51.     Nor will a claim be invalidated simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language.  *See Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1575-76 (Fed. Cir. 1985) (holding that specification's disclosure preferring a lower operating range, yet indicating no upper limit, combined with the industry knowledge at the time, was sufficient for a POSA to discern that higher ranges could be used).

52.     A patent applicant need only convey, "with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of *the invention*.  The invention is, for purposes of the 'written description' inquiry, *whatever is now claimed*."  *Vas-Cath v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis in original).

53.     The word "comprising" in a patent claim "suggests that there *may be* additional, unclaimed elements," but such additional elements are not required. *See Technical Consumer Prods., Inc. v. Lighting Sci. Grp. Corp.*, 955 F.3d 16, 2020 WL 1696642, at *4 (Fed. Cir. 2020) (emphasis added) (citing *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001)).

18

EXHIBIT 4

54.     Neither the written description nor enablement requirements of 35 U.S.C. § 112 require support for unclaimed elements.  *See Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 938-39 (Fed. Cir. 2014) (vacating summary judgment of invalidity for lack of written description and agreeing with patentee that "there is no precedent requiring a patentee to disclose or enable unclaimed elements").

55.     "[A] patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." *Martek Biosci. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009). Further, "[a]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention."  *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)); *see also Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) (holding written description sufficient to support claims covering non-identical half-shells where patent drawings, the only cited written description support, only disclosed identical half-shells).

**D.     Enablement**

56.     Whether Amneal has proven by clear and convincing evidence that any Asserted Claim is invalid as not enabled.

EXHIBIT 4

57.     A patent is enabled if a person of ordinary skill in the field could make and use the invention without having to perform undue experimentation.  35 U.S.C. § 112 ¶ 1; *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).

58.     Factors considered in determining whether experimentation is undue or excessive include: (1) the scope of the claimed invention; (2) the amount of guidance presented in the patent; (3) the amount of experimentation necessary; (4) the time and cost of any necessary experimentation; (5) how routine any necessary experimentation is in the applicable field; (6) whether the patent discloses specific working examples of the claimed invention; (7) the nature and predictability of the field; and (8) the level of ordinary skill in the field.  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

59.     Even a considerable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013); *PPG Indus. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1565 (Fed. Cir. 1996).

60.     "[T]he enablement requirement is met if the description enables any mode of making and using the invention."  *Invitrogen Corp. v. Clontech Laboratories Inc.*, 429 F.3d 1052, 1070-71 (Fed. Cir. 2005) (quoting *Johns Hopkins Univ. v. Cellpro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998)).

EXHIBIT 4

61.     The specification preferably omits information that would already be known to a POSA.  *Streck v. Res. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).

## IV.   ENFORCEABILITY

62.     Whether Amneal has proven by clear and convincing evidence that the Asserted Patents are unenforceable based on inequitable conduct.  *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1287-90 (Fed. Cir. 2011); *see also Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012).

63.     To prove inequitable conduct, a challenger must demonstrate both that a person having a duty of candor and good faith to the PTO withheld or misrepresented information, or submitted false information, that was material to the examination of the patent application, and that this individual or individuals acted with the specific intent to deceive or mislead the PTO.  *Therasense*, 649 F.3d at 1287-90, *Outside the Box*, 695 F.3d at 1290-92.

64.     Materiality and intent to deceive are separate requirements that must each be proven by clear and convincing evidence.  *Therasense*, 649 F.3d at 1287. If the accused infringer meets this burden, the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable.  *Id.*

EXHIBIT 4

65.     In its seminal *en banc Therasense* decision, the Federal Circuit noted that the doctrine originated from a line of Supreme Court cases, each dealing with "particularly egregious misconduct, including perjury, the manufacture of false evidence, and the suppression of evidence." *Id.*  Subsequent lower court cases broadening the doctrine had "numerous unforeseen and unintended consequences," including, "[m]ost prominently," that the defense "has become a significant litigation strategy." *Id.* at 1288.  The Court decried the fact that litigants have flooded the courts with inequitable conduct allegations "routinely brought on 'the slenderest grounds,'" finding that this "has plagued not only the courts but also the entire patent system." *Id.* at 1289 (citation omitted).

66.     In an effort to stem that tide, the *en banc* Court "now tightens the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Id.* at 1290.

67.     "[T]he specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. . . .  [W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91 (internal citation omitted).

68.     There can be no inference of intent to deceive based solely on materiality.  There must be a deliberate and conscious decision to withhold or misrepresent the information.  *See id.* at 1290 ("A district court should not use a

22

EXHIBIT 4

'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa.").

69.     Moreover, "[a] finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Id.* at 1290.

70.     "[T]he materiality required to establish inequitable conduct is but-for materiality.  When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291.  "But-for" materiality requires "proof that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013) (citing *Therasense*, 649 F.3d at 1291).  This is a reflection of "basic fairness"—a patent should only be rendered unenforceable "in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." *Therasense*, 649 F.3d at 1292.

71.     *Therasense* recognizes a narrow exception to the requirement of "but for" materiality, which applies when "the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit." 649 F.3d at 1292.  The exception is a reflection of the earlier Supreme Court

23

EXHIBIT 4

cases, "which dealt with 'deliberately planned and carefully executed scheme[s]' to defraud not only the PTO and the courts." *Id.* (citation omitted). It is intended to apply to "extraordinary circumstances" (*id.* at 1293), and as such, it is a narrow exception, reserved for "truly extreme misdeeds." *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 73 (D. Mass. 2013); *see also Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365 (Fed. Cir. 2008) (reversing judgment of unenforceability based on allegedly false affidavit); *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 2:06-CV-381-JRG, 2012 WL 3494366, at *12 (E.D. Tex. Aug. 15, 2012) (noting that this exception "is reserved for extreme behavior").

72.    "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." *Therasense*, 649 F.3d at 1292 (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995)).

73.    "[I]nfectious unenforceability occurs when inequitable conduct renders unenforceable claims in a related application" having an immediate and necessary relation to the inequitable conduct. *Robocast, Inc. v. Apple Inc.*, 39 F. Supp. 3d 552, 570 (D. Del. 2014) (citing *Agfa Corp. v. Creo Prods., Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006)); *Truth Hardware Corp. v. Ashland Prods., Inc.*, 2003 WL 22005839, at *1 (D. Del. Aug. 19, 2003)).

EXHIBIT 4

74.     "The Federal Circuit has indicated that similar subject matter in related patents is not necessarily 'infectious.'" *New Medium LLC v. Barco N.V.*, No. 05 C 5620, 2009 WL 10695784, at *2 (N.D. Ill. Mar. 18, 2009) (citing *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1373-75 (Fed. Cir. 2005) (holding that a finding of inequitable conduct did not infect a later patent defining a very similar invention and joined to the unenforceable patent by a terminal disclaimer)). "An 'immediate and necessary relation' requires a relation between 'the inequitable conduct that occurred earlier in the chain' of the issued patents and the 'targeted claims of the ultimately-issued patent or patents sought to be enforced.'" *Baxalta Inc. v. Bayer Healthcare LLC*, 17-1316-RGA-SRF, 2020 WL 5445375, at *10 (July 13, 2020) (citing *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F. Supp. 2d 580, 595 (D. Del. 2006)).

75.     "Sharing a parent application, sharing similarities in subject matter, and containing a citation to an unenforceable patent are not sufficient to automatically suggest infectious unenforceability." *Baxalta*, 2020 WL 5445375, at *10 (citing *IBM v. Priceline Grp., Inc.*, C.A. No. 15-137-LPS-CJB, 2017 WL 1349175, at *20 (D. Del. Apr. 10, 2017); *Nilssen v. Osram Sylvania, Inc.*, 440 F. Supp. 2d 884, 900 (N.D. Ill. 2006)).

## V.     EXCEPTIONAL CASE

EXHIBIT 4

76.    Whether this case is an exceptional case within the meaning of 35 U.S.C. § 285, such that Par is entitled to recover its attorneys' fees and costs.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

# EXHIBIT 5

EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>██████████ |

## DEFENDANTS' STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED

**SUBSTANTIVE ISSUES OF LAW REMAINING TO BE LITIGATED**.......3

**I.    ISSUES OF CLAIM CONSTRUCTION REMAINING TO BE LITIGATED**..........................................................................3

**II.   ISSUES OF NONINFRINGEMENT REMAINING TO BE LITIGATED**..........................................................................3

**III.  ISSUES OF UNENFORCEABILITY REMAINING TO BE LITIGATED**..........................................................................4

    **A.    Inequitable Conduct**..........................................................4

    **B.    Infectious Unenforceability**................................................5

**IV.   ISSUES OF INVALIDITY REMAINING TO BE LITIGATED** ..........5

    **A.    Anticipation**....................................................................5

    **B.    Obviousness**...................................................................5

    **C.    Written Description**..........................................................6

    **D.    Enablement**....................................................................6

**V.    ISSUES OF REMEDIES REMAINING TO BE LITIGATED**.............6

**LEGAL AUTHORITY**................................................................8

**I.    HATCH-WAXMAN BACKGROUND**......................................8

**II.   CLAIM CONSTRUCTION**...................................................11

**III.  NONINFRINGEMENT**.......................................................15

    **A.    Infringement Under Hatch-Waxman**....................................16

    **B.    Direct Infringement**.........................................................21

    **C.    Induced Infringement**......................................................23

    **D.    Divided Infringement**......................................................27

**IV.   UNENFORCEABILITY**.....................................................30

    **A.    Inequitable Conduct**.......................................................30

        1.    Patentee's Duty of Candor................................32

        2.    Materiality.....................................................33

        3.    Intent to Deceive .............................................35

    **B.    Infectious Unenforceability**................................................41

**V.    INVALIDITY**.................................................................43

A.     Prior Art.................................................................44

B.     Anticipation..........................................................50

C.     Obviousness.........................................................53

D.     Rebuttal To *Prima Facie* Obviousness.................65

     1.     Criticality...............................................65

     2.     Teaching Away .......................................73

E.     Written Description and Enablement....................76

     1.     Written Description..................................77

     2.     Enablement.............................................82

VI.     REMEDIES...............................................................87

A.     Injunctive Relief...................................................87

B.     Costs and Fees ......................................................88

C.     Attorneys' Fees.....................................................89

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re '318 Patent Infringement Litig.*,
  578 F. Supp. 2d 711 (D. Del. 2008) .....................................................55, 87

*In re '318 Patent Infringement Litig.*,
  583 F.3d 1317 (Fed. Cir. 2009) ................................................................ 86

*A.B. Dick Co. v. Burroughs Corp.*,
  798 F.2d 1392 (Fed. Cir. 1986) ................................................................ 34

*Abbott Labs. v. Geneva Pharm., Inc.*,
  182 F.3d 1315 (Fed. Cir. 1999) ................................................................ 46

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
  903 F.3d 1310 (Fed. Cir. 2018) ................................................................ 64

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
  607 F.3d 817 (Fed. Cir. 2010) .................................................................. 39

*Agfa Corp. v. Creo Prods. Inc.*,
  451 F.3d 1366 (Fed. Cir. 2006) ..........................................................41, 42

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  797 F.3d 1020 (Fed. Cir. 2015) (*en banc*).................................. 22, 27, 28, 29

*Alcon Research, Ltd. v. Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ................................................................ 60

*Alcon, Inc. v. Teva Pharm. USA, Inc.*,
  C.A. No. 06-234-SLR, 2010 WL 3081327 (D. Del. Aug. 5, 2010) ................ 88

*In re Aller*,
  220 F.2d 454 (C.C.P.A. 1955)............................................................59, 72

*Allergan Inc. v. Teva Pharm. USA, Inc.*,
  No. 15-cv-1455-WCB, 2017 WL 4803941 (E.D. Tex. Oct. 16,
  2017) (Bryson, J.)..................................................................................... 68

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014) ................................................................ 74

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013) .............................................................. 60

*Allergan, Inc. v. Sandoz, Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015) .............................................................. 58

*In re Alonso*,
   545 F.3d 1015 (Fed. Cir. 2008) .............................................................. 81

*ALZA Corp. v. Andrx Pharm., LLC*,
   603 F.3d 935,940 (Fed. Cir. 2010) ......................................................... 83

*Alza Corp. v. Andrx Pharm., LLC*,
   607 F. Supp. 2d 614 (D. Del. 2009) ........................................... 22, 84, 86

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006) ......................................................... 60, 61

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) .............................................................. 11

*Amgen Inc. v. Apotex Inc.*,
   712 F. App'x 985 (Fed. Cir. 2017) .......................................................... 17

*Amgen, Inc. v. Chugai Pharm. Co.*,
   927 F.2d 1200 (Fed. Cir. 1991) .............................................................. 84

*Anacor Pharm., Inc. v. Iancu*,
   889 F.3d 1372 (Fed. Cir. 2018) .............................................................. 60

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (2007) ............................................................................. 15

*Apotex Inc. v. UCB, Inc.*,
   763 F.3d 1354 (Fed. Cir. 2014) .............................................................. 40

*Apotex USA, Inc. v. Merck & Co.*,
   254 F.3d 1031 (Fed. Cir. 2001) .............................................................. 43

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ........................................................56, 73

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) (*en banc*)...................................... 77, 78, 81

*Art+Com Innovationpool GmbH v. Google LLC*,
   712 F. App'x 976 (Fed. Cir. 2017)............................................................ 47

*AstraZeneca LP v. Apotex, Inc.*,
   633 F.3d 1042 (Fed. Cir. 2010) ............................................................. 8, 9

*AstraZeneca LP v. Breath Ltd.*,
   603 F. App'x 999 (Fed. Cir. 2015)........................................................... 63

*AstraZeneca Pharm. LP v. Apotex Corp.*,
   669 F.3d 1370 (Fed. Cir. 2012) ............................................................... 18

*Atlas Powder Co. v. Ireco, Inc.*,
   190 F.3d 1342 (Fed. Cir. 1999) ..........................................................51, 52

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
   501 F.3d 1274 (Fed. Cir. 2007) ............................................................... 86

*Aventis Pharma S.A. v. Hospira, Inc.*,
   675 F.3d 1324 (Fed. Cir. 2012) ......................................... 33, 34, 36, 38

*Aventis Pharma S.A. v. Hospira, Inc.*,
   743 F. Supp. 2d 305 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir.
   2012)..................................................................................................... 66

*Avid Identification Sys., Inc. v. Crystal Imp. Corp.*,
   603 F.3d 967 (Fed. Cir. 2010) ............................................................32, 39

*Baxter Diagnostics Inc. v. AVL Sci. Corp.*,
   924 F. Supp. 994 (C.D. Cal. 1996).......................................................... 45

*Bayer AG v. Biovail Corp.*,
   279 F.3d 1340 (Fed. Cir. 2002) ..........................................................18, 20

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000) ....................................................*passim*

*Bayer CropScience AG v. Dow AgroSciences LLC*,
    728 F.3d 1324 (Fed. Cir. 2013) ................................................................. 13

*Bayer Pharma AG v. Watson Labs., Inc.*,
    C.A. No. 12-1726-LPS, 2016 WL 7468172 (D. Del. Dec. 28, 2016).............. 88

*Bayer Schering Pharm. AG v. Barr Labs, Inc.*,
    575 F.3d 1341 (Fed. Cir. 2009) ................................................................. 61

*In re Boesch*,
    617 F.2d 272 (C.C.P.A. 1980)................................................................... 69

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*,
    267 F.3d 1370 (Fed. Cir. 2001) ..........................................................33, 35

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
    761 F. App'x 995 (Fed. Cir. 2019)............................................................ 15

*Bristol Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
    752 F.3d 967 (Fed. Cir. 2014)...........................................................67, 68

*In re Brominidine Patent Litig.*,
    643 F.3d 1366 (Fed. Cir. 2011) ................................................................ 19

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd.*,
    394 F.3d 1348 (Fed. Cir. 2005) ................................................... 34, 38, 40

*Cartner v. Alamo Group, Inc.*,
    561 F. App'x 958 (Fed. Cir. 2014)............................................................ 90

*CBA Envtl. Servs., Inc. v. Toll Brothers Inc.*,
    403 F. Supp. 3d 403 (D.N.J. 2019) .............................................. 28, 29, 30

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004) ................................................................ 86

*In re Chupp*,
    816 F.2d 643 (Fed. Cir. 1987).................................................................. 70

*ClearValue Inc. v. Pearl River Polymers Inc.*,
    668 F.3d 1340 (Fed. Cir. 2012) ..........................................................52, 53

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
   560 F.3d 1317 (Fed. Cir. 2009) ............................................................... 56

*Cobalt Boats, LLC v. Brunswick Corp.*,
   773 F. App'x 611 (Fed. Cir. 2019) ........................................................... 14

*Colorado v. New Mexico*,
   467 U.S. 310 (1984) ................................................................................ 43

*Conopco, Inc. v. May Dep't Stores Co.*,
   46 F.3d 1556 (Fed. Cir. 1994) ........................................................... 14, 87

*Constant v. Advanced Micro-Devices, Inc.*,
   848 F.2d 1560 (Fed. Cir. 1988) ............................................................... 44

*In re Corkill*,
   771 F.2d 1496 (Fed. Cir. 1985) ............................................................... 63

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
   120 F.3d 1253 (Fed. Cir. 1997) ......................................................... 38, 39

*Cubist Pharm., Inc. v. Hospira, Inc.*,
   75 F. Supp. 3d 641 (D. Del. 2014) ........................................................... 52

*In re Depomed Patent Litig.*,
   C.A. No. 13-4507, 2016 WL 7163647 (D. N. J. Sept. 30, 2016),
   *aff'd sub. nom. Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d
   1333 (Fed. Cir. 2019) .............................................................................. 26

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   567 F.3d 1314 (Fed. Cir. 2009) ............................................................... 74

*Dome Patent L.P. v. Lee*,
   799 F.3d 1372 (Fed. Cir. 2015) ............................................................... 55

*DS Smith Plastics Ltd. v. Plascon Packaging, Inc.*,
   No. 15 C 5760, 2016 WL 69632 (N.D. Ill. Jan. 6, 2016) ........................... 37

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) ......................................................... 23, 24

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263, 1276 (Fed. Cir. 2004) ...................................................... 24

*E.I. DuPont de Nemours & Co. v. Synvina C. V.*,
904 F.3d 996 (Fed. Cir. 2018) ............................................................ 70, 73

*Eli Lilly & Co. v. Barr Labs., Inc.*,
251 F.3d 955 (Fed. Cir. 2001) .................................................................... 51

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990) .................................................................................. 16

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017) ................................................................ 25

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
323 F.3d 956 (Fed. Cir. 2002) ................................................................... 79

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
424 F.3d 1276 (Fed. Cir. 2005) ................................................................ 47

*In re Epstein*,
32 F.3d 1559 (Fed. Cir. 1994) ................................................................... 47

*eSpeed Inc. v. Brokertec USA LLC*,
417 F. Supp. 2d 580 (D. Del. 2006), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007) ..................................................................................................... 31, 42

*In re Farrenkopf*,
713 F.2d 714 (Fed. Cir. 1983) ................................................................... 74

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1382 (Fed. Cir. 2014) (*Ferring I*) ............................................. 18

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1401 (Fed. Cir. 2014) (*Ferring II*) .............................. 16, 17, 18, 21

*In re Font*,
675 F.2d 297 (C.C.P.A. 1982) ................................................................... 45

*Forest Labs., LLC v. Sigmapharm Labs.*,
LLC, 918 F.3d 928 (Fed. Cir. 2019) ........................................................ 66

*Fox Indus., Inc. v. Structural Pres. Sys., Inc.*,
922 F.2d 801 (Fed. Cir. 1990) ................................................................... 41

*In re Fulton*,
  391 F.3d 1195 (Fed. Cir. 2004) ............................................................... 55

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013) ......................................................*passim*

*Gator Tail, LLC. v. Mud Buddy, LLC*,
  618 F. App'x 992 (Fed. Cir. 2015) ............................................................ 74

*In re Geisler*,
  116 F.3d 1465 (Fed. Cir. 1997) ................................................... 57, 59, 65

*Genentech, Inc. v. Hospira, Inc.*,
  946 F.3d 1333 (Fed. Cir. 2020) ............................................................... 59

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
  655 F.3d 1291 (Fed. Cir. 2011) ........................................................... 70, 71

*Glaxo Grp. Ltd. v. Apotex, Inc.*,
  376 F.3d 1339 (Fed. Cir. 2004) ............................................................... 16

*Glaxo, Inv. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997) .................................................. 17, 21, 22

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) ............................................................... 53

*In re GPAC Inc.*,
  57 F.3d 1573 (Fed. Cir. 1995) ........................................................... 54, 55

*In re Grasselli*,
  713 F.2d 731 (Fed. Cir. 1983) ................................................................ 71

*In re Greenfield*,
  571 F.2d 1185,1189 (C.C.P.A. 1978) ...................................................... 71

*Grunenthal GMBH v. Alkem Labs. Ltd.*,
  919 F.3d 1333 (Fed. Cir. 2019) ............................................................... 25

*GS Cleantech Corp. v. Adkins Energy LLC*,
  951 F.3d 1310 (Fed. Cir. 2020) ............................................................... 37

*Guardant Health, Inc. v. Found. Med., Inc.*,
  1-17-CV-01616, D.I. 343 (D. Del. Jan. 7, 2020) ........................................... 42

*In re Gurley*,
  27 F.3d 551 (Fed. Cir. 1994) ................................................................. 55, 73

*In re Harris*,
  409 F.3d 1339 (Fed. Cir. 2005) ................................................................. 71

*In re Hoeschele*,
  406 F.2d 1403 (C.C.P.A. 1969) ................................................................. 73

*Hoffman-La Roche Inc. v. Apotex Inc.*,
  748 F.3d 1326 (Fed. Cir. 2014) ................................................................. 75

*Hoffman-La Roche, Inc. v. Promega Corp.*,
  319 F. Supp. 2d 1011 (N.D. Cal. 2004) .................................................. 41, 42

*Hoganas AB v. Dresser Indus., Inc.*,
  9 F.3d 948 (Fed. Cir. 1993) ..................................................................... 13

*Hospira, Inc. v. Amneal Pharms., LLC*,
  285 F. Supp. 3d 776 (D. Del. 2018) ........................................................... 63

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
  946 F.3d 1322 (Fed. Cir. 2020) ................................................................. 65

*In re Huai-Hung Kao*,
  639 F.3d 1057 (Fed. Cir. 2011) ................................................................. 64

*In re Huang*,
  100 F.3d 135 (Fed. Cir. 1996) ................................................................... 69

*In re Huston*,
  308 F.3d 1267 (Fed. Cir. 2002) ................................................................. 70

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
  558 F.3d 1368 (Fed. Cir. 2009) ................................................................. 80

*Idemitsu Kosan Co. v. SFC Co.*,
  870 F.3d 1376 (Fed. Cir. 2017) ................................................................. 76

*Impax Labs., Inc. v. Aventis Pharm. Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006) ............................................................... 50

*Impax Labs., Inc. v. Aventis Pharm. Inc.*,
    496 F. Supp. 2d 428 (D. Del. 2007), *aff'd*, 545 F.3d 1312 (Fed. Cir.
    2008)................................................................................................................ 85

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ............................................................... 12

*Intellect Wireless, Inc. v. HTC Corp.*,
    732 F.3d 13392 (Fed. Cir. 2013) .............................................................. 31

*Interspiro USA, Inc. v. Figgie Int'l Inc.*,
    18 F.3d 927 (Fed. Cir. 1994)..................................................................... 89

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005) ............................................................... 46

*J.A. LaPorte, Inc. v. Norfolk Dredging Co.*,
    787 F.2d 1577 (Fed. Cir. 1986) ............................................................... 46

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*,
    205 F.3d 1377 (Fed. Cir. 2000) ............................................................... 14

*Keystone Driller Co. v. Gen. Excavator Co.*,
    290 U.S. 240 (1933) ..........................................................................32, 36

*King Pharms., Inc. v. Eon Labs, Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010) .........................................................51, 52

*Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*,
    863 F.2d 867 (Fed. Cir. 1988) ................................................................. 41

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ...........................................................44, 54, 61, 62

*In re Kubin*,
    561 F.3d 1351 (Fed. Cir. 2009) ............................................................... 64

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*,
    958 F.2d 1066 (Fed. Cir. 1992)..........................................................35, 45

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007) ............................................................. 83

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
   572 U.S. 915 (2014) .............................................................................. 23

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005) ............................................................. 80

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   433 F.3d 1373 (Fed. Cir. 2006) ............................................................. 80

*Lockwood v. Am. Airlines, Inc.*,
   107 F.3d 1565 (Fed. Cir. 1997) ............................................................. 79

*In re Mageli*,
   470 F.2d 1380 (C.C.P.A 1973) .............................................................. 66

*MagSil Corp. v. Hitachi Glob. StorageTechs., Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012) ........................................................ 83, 86

*Manville Sales Corp. v. Paramount Sys., Inc.*,
   917 F.2d 544 (Fed. Cir. 1990) ............................................................... 24

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) .............. 11

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157,1165 (Fed. Cir. 2006) ..................................................... 76

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ........................................................ 59, 63

*In re Merchant*,
   575 F.2d 865 (CCPA 1978) ................................................................... 69

*In re Merck & Co.*,
   800 F.2d 1091 (Fed. Cir. 1986) ............................................................. 68

*Merck & Co. v. Biocraft Labs., Inc.*,
   874 F.2d 804 (Fed. Cir. 1989) .......................................................... 58, 59

*Merck & Co. v. Danbury Pharmacal, Inc.*,
   873 F.2d 1418 (Fed. Cir. 1989) ................................................................ 39

*Microsoft Corp. v. GeoTag, Inc.*,
   817 F.3d 1305 (Fed. Cir. 2016) .............................................................. 22

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) .............................................................................. 43, 44

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
   878 F.3d 1336 (Fed. Cir. 2018) ........................................................ 37, 52

*MorphoSys AG v. Janssen Biotech, Inc.*,
   358 F. Supp. 3d 354 (D. Del. 2019) ...................................................... 82

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.*,
   298 F.3d 1290 (Fed. Cir. 2002) .............................................................. 47

*Nilssen v. Osram Sylvania, Inc.*,
   504 F.3d 1223 (Fed. Cir. 2007) .............................................................. 41

*In re Nomiya*,
   509 F.2d 566 (C.C.P.A. 1975) ................................................................ 48

*Noven Pharm., Inc. v. Amneal Pharm. LLC*,
   No. CV 18-699-LPS, 2019 WL 1102681 (D. Del. Mar. 8, 2019).................. 14

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
   723 F.3d 1336 (Fed. Cir. 2013) .............................................................. 79

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ............................................................................ 89, 90

*Ohio Willow Wood Co. v. Alps South, LLC*,
   735 F.3d 1333 (Fed. Cir. 2013) ................................................... 31, 34, 36

*Ormco Corp. v. Align Tech., Inc.*,
   463 F. 3d 1299 (Fed. Cir. 2006) ............................................................ 56

*Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*,
   99 F. Supp. 3d 461 (D.N.J. 2015) .......................................................... 27

*Par Pharm., Inc. v. Luitpold Pharm., Inc.*,
   2017 WL 452003 (D.N.J. Feb. 2, 2017) .................................................... 19

*PAR Pharm., Inc. v. TWI Pharm., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014) ......................................................... 60, 64

*Par Pharma., Inc. v. TWi Pharm., Inc.*,
   120 F. Supp. 3d 468 (D. Md. 2015), *aff'd without opinion*, 624 F.
   App'x 756 (Fed. Cir. 2015) .................................................................... 83

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
   984 F.2d 1182 (Fed. Cir. 1993) .............................................................. 38

*In re Patel*,
   566 F. App'x 1005 (Fed. Cir. 2014) ....................................................... 65

*Pernix Ire. Pain DAC v. Alvogen Malta Operations Ltd.*,
   323 F. Supp. 3d 566 (D. Del. 2018) ......................................... 27, 29, 81, 82

*In re Peterson*,
   315 F.3d 1325 (Fed. Cir. 2003) .......................................................*passim*

*Petito v. Puritan's Pride, Inc.*,
   35 F. Supp. 3d 494 (S.D.N.Y. 2014) ....................................................... 85

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ............................................... 43, 63, 66, 67

*Pharm. Res., Inc. v. Roxane Labs., Inc.*,
   Civ. No. 03-3357(DRD), 2006 WL 3231427 (D.N.J. Nov. 8,
   2006), *aff'd*, 253 F. App'x 26 (Fed. Cir. 2007) .................................... 84, 86

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
   491 F.3d 1342 (Fed. Cir. 2007) .............................................................. 48

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................... 11, 12

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) .............................................................. 62

*Power Integrations, Inc. v. Fairchild Semiconductor*,
   843 F.3d 1315 (Fed. Cir. 2016) .............................................................. 24

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009) ...............................................................43, 66

*Pronova Biopharm Norge AS v. Teva Pharm. USA, Inc.*,
549 F. App'x 934 (Fed. Cir. 2013) ............................................................. 45

*Purdue Pharma L.P. v. Epic Pharma, LLC*,
811 F.3d 1345 (Fed. Cir. 2016) ................................................................. 50

*Purdue Pharma L.P. v. Recro Tech., LLC*,
694 F. App'x 794 (Fed. Cir. 2017) ............................................................. 79

*Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*,
946 F.2d 870 (Fed. Cir. 1991) ................................................................... 44

*Ralston Purina Co. v. Far-Mar-Co.*,
772 F.2d 1570 (Fed. Cir. 1985) ................................................................. 43

*Rasmusson v. SmithKline Beecham Corp.*,
413 F.3d 1318 (Fed. Cir. 2005) ...........................................................85, 86

*Regeneron Pharm., Inc. v. Merus B.V.*,
144 F. Supp. 3d 530 (S.D.N.Y. 2015), *aff'd*, 864 F.3d 1343 (Fed. Cir. 2017) ................................................................................................ 40

*Regeneron Pharm., Inc. v. Merus N.V.*,
864 F.3d 1343 (Fed. Cir. 2017) ................................................................. 36

*Regeneron Pharm., Inc. v. Merus N. V.*, No. 1:14-cv-01650-KBF,
slip op. (S.D.N.Y. Mar. 26, 2018) ............................................................. 90

*Regents of Univ, of Cal. v. Eli Lilly & Co.*,
119 F.3d 1559 (Fed. Cir. 1997) ................................................................. 56

*Richdel, Inc. v. Sunspool Corp.*,
714 F.2d 1573 (Fed. Cir. 1983) ................................................................. 16

*Robocast, Inc. v. Microsoft Corp.*,
21 F. Supp. 3d 320 (D. Del. 2014) ............................................................ 31

*Route1 Inc. v. AirWatch LLC*,
No. 17-CV-331 (KAJ), 2020 WL 1955436 (D. Del. Apr. 23, 2020) .............. 90

*Santarus, Inc. v. Par Pharm., Inc.*,
    694 F.3d 1344 (Fed. Cir. 2012) .............................................................. 73

*Schering Corp. v. Geneva Pharm., Inc.*,
    339 F.3d 1373 (Fed. Cir. 2003) .............................................................. 50

*Shire LLC v. Amneal Pharm., LLC*,
    C.A. No. 11-3781 (SRC), 2014 WL 2861430 (D.N.J. June
    23, 2014), *aff'd*, 802 F.3d 1301 (Fed. Cir. 2015) ......................................... 26

*Sig Sauer, Inc. v. Freed Designs, Inc.*,
    No. 14-CV-461-SM, 2017 WL 4119046 (D.N.H. Mar. 17, 2017) ................ 37

*SightSound Techs., LLC v. Apple Inc.*,
    809 F.3d 1307 (Fed. Cir. 2015) .............................................................. 75

*Sinclair & Carroll Co. v. Interchemical Corp.*,
    325 U.S. 327 (1945) ("Reading a list and selecting a known
    compound to meet known requirements is no more ingenious than
    selecting the last piece to put into the last opening in a jig-saw
    puzzle. It is not invention.") ...................................................................... 58

*Sjolund v. Musland*,
    847 F.2d 1573 (Fed. Cir. 1988) .............................................................. 48

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) .............................................................. 51

*Sonrai Sys., LLC v. AMCS Grp. Inc.*,
    C.A. No. 16 C 9404, 2017 WL 4281122 (N.D. Ill. Sept. 27, 2017) ........... 28, 29

*In re Sus*,
    306 F.2d 494 (C.C.P.A. 1962) ................................................................ 80

*Takeda Pharm. Co., Ltd. v. Zydus Pharm. USA, Inc.*,
    743 F.3d 1359 (Fed. Cir. 2014) .............................................................. 14

*Takeda Pharm. Co. v. Teva Pharm. USA, Inc.*,
    668 F. Supp. 2d 614 (D. Del. 2009) ........................................................ 15

*Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015) ...................................................... 23, 25, 26

*Taro Pharm. U.S.A., Inc. v. Perrigo Isr. Pharm. Ltd.*,
   C.A. 14-cv-989-RGA, 2015 WL 7737310 (D. Del. Dec. 1, 2015) ............46, 56

*Tech. Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008) ................................................................ 17

*Teva Pharmas. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015) ................................................................ 13

*Therasense Inc. v. Becton Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) ........................................................*passim*

*Tokai Corp. v. Easton Enters., Inc.*,
   632 F.3d 1358 (Fed. Cir. 2011) ................................................................ 62

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
   336 F.3d 1322 (Fed. Cir. 2003) ................................................................ 56

*Trans Web, LLC v. 3M Innovative Props. Co.*,
   16 F. Supp. 3d 385 (D.N.J. 2014), *aff'd*, 812 F.3d 1295 (Fed. Cir.
   2016).......................................................................................................... 32

*Tris Pharma, Inc. v. Actavis Labs. FL, Inc.*,
   276 F. Supp. 3d 226 (D. Del. 2017), *vacated on other grounds*, 755
   F. App'x 983 (Fed. Cir. 2019)....................................................... 57, 58, 71

*Trs. of Columbia Univ. v. Illumina, Inc.*,
   620 F. App'x 916 (Fed. Cir. 2015)........................................................... 69

*Truth Hardware Corp. v. Ashland Prods., Inc.*,
   No. 02-1541 GMS, 2003 WL 22005839 (D. Del. Aug. 19, 2003).................. 42

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen.
   Elec. Co.*,
   264 F.3d 1111 (Fed. Cir. 2001) ................................................................ 78

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*,
   762 F.3d 1338 (Fed. Cir. 2014) ................................................................ 20

*United Therapeutics Corp. v. Sandoz, Inc.*,
   V.S. No. 12-CV-01617, 2014 WL 429153 (D.N.J. Aug. 29, 2014)................ 25

*Univ. Of Rochester v. G.D. Searle & Co.*,
   358 F.3d 916 (Fed. Cir. 2004) ............................................................ 13, 77

*Valeant Pharm. Int'l, Inc. v. Mylan Pharm. Inc.*,
   955 F.3d 25 (Fed. Cir. 2020) ................................................ 57, 61, 64, 65

*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018) ................................................................ 15

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ................................................................ 78

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) ................................................................ 26

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ............................................................ 84, 85

*Warner Chilcott Co., LLC v. Teva Pharm. USA, Inc.*,
   594 F. App'x 630 (Fed. Cir. 2014) ........................................................... 63

*Warner Chilcott Co. v. Teva Pharm. USA, Inc.*,
   89 F. Supp. 3d 641 (D.N.J. 2015), *aff'd*, 642 F. App'x 996 (Fed.
   Cir. 2016) ................................................................ 58, 67, 72, 75

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) ......................................................... 23, 26

*Wavetronix v. EIS Elec. Integrated Sys.*,
   573 F.3d 1343 (Fed. Cir. 2009) ................................................................ 22

*In re Woodruff*,
   919 F.2d 1575 (Fed. Cir. 1990) ......................................................... 57, 69

**Statutes**

21 U.S.C. §§ 331(d), 332(a), 333(a), 334(a)(1), 335b(a)( 1), 335c(a)(l) ............. 10

21 U.S.C. §355(a) ................................................................................................ 8

21 U.S.C. § 355(c)(3)(C) .................................................................................. 11

21 U.S.C. § 355(j)(2)(A)(vii)(i)-(iv) ................................................................ 10

28 U.S.C. § 1828 ................................................................................... 89

28 U.S.C. § 1920 ................................................................................... 88

28 U.S.C. § 1923 ................................................................................... 89

35 U.S.C. § 102 ............................................................................ 5, 45, 54

35 U.S.C. § 102(a)(1) ........................................................................48, 50

35 U.S.C. § 102(b)(1) ........................................................................48, 49

35 U.S.C. § 103 ..........................................................................*passim*

35 U.S.C. § 112(a) .......................................................... 6, 76, 77, 82

35 U.S.C. § 132 ................................................................................... 79

35 U.S.C. § 271(a) ......................................................................16, 21

35 U.S.C. § 271(b) ................................................................................. 23

35 U.S.C. § 271(e)(2) ............................................................. 16, 17, 19

35 U.S.C. §271(e)(2)(A) .......................................................... 3, 20

35 U.S.C. § 271(e)(4)(A) ....................................................................... 87

35 U.S.C. § 271(e)(4)(B) ................................................................87, 88

35 U.S.C. § 271(e)(4)(C) ....................................................................... 87

35 U.S.C. § 285 ............................................................................ 7, 89, 90

AIA .................................................................................................... 49

America Invents Act Section 102(a) ........................................44, 45

FDCA .................................................................................................. 19

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ......................... 8

Federal Food, Drug, and Cosmetic Act section 505(j) ..................... 16

Hatch-Waxman Act ............................................................................ 25

*Invetorship, Double Patenting, and the America Invents Act*, 30 ....................... 49

Patent Act of 1952 ................................................................................ 49

*Understanding the America Invents Act* ........................................... 49

## Other Authorities

21 C.F.R. §211 *et seq*. .......................................................................... 9

21 C.F.R § 314.53(b) ............................................................................. 8

21 C.F.R. § 314.95(a) .......................................................................... 11

21 C.F.R. § 320.22(b)(1) ....................................................................... 9

37 C.F.R. § 1.56 .................................................................................. 32

Berkeley Tech. L.J. 1613, 1616 (2015) ............................................. 49

*Examination Guidelines for Implementing the First Inventor to File Provisions of the Leahy-Smith America Invents Act*, 78 Fed. Reg. 11059, 11064-65 (Feb. 14, 2013) ................................................. 50

Fed. R. Civ. P. 54(d)(1) ...................................................................... 88

Federal Rule of Civil Procedure 54 ................................................... 88

LR 54.1 ............................................................................................... 89

*Patenting*, 40 AIPLA Q. J. 1, 72 (2012) .......................................... 49

U.S. Patent No. 5,524,081 ................................................................. 70

U.S. Patent No. 9,744,209 ........................................................ 1, 4, 5, 6

U.S. Patent No. 9,744,239 .............................................................. 1, 5

U.S. Patent No. 9,750,785 ........................................................ 1, 4, 5, 6

Pursuant to Local Rule 16.3(c)(5) and the Court's Scheduling Order (D.I. 47), Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York, LLC, Amneal Biosciences LLC, and Amneal Pharmaceutical Pvt. Ltd. (collectively, "Amneal" or "Defendants") respectfully submit the following issues of law that remain to be litigated and a citation of representative authorities relied upon. Amneal's submission is based, in part, on its current understanding of the positions of the Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively, "Par" or "Plaintiffs") and the proceedings in this action to date.

In this action, Plaintiffs are currently asserting U.S. Patent No. 9,744,209 ("the '209 patent") and U.S. Patent No. 9,750,785 ("the '785 patent") (collectively, the "Patents-in-Suit").[1]  Specifically, Plaintiffs are asserting claims 1-8 of the '209 patent; and claims 1, 5, and 8 of the '785 patent (the "Asserted Claims").

Amneal reserves the right to amend or supplement this submission after considering Plaintiffs' submissions, including amendments or

---

[1] The Patents-in-Suit share two common inventors and a common chain of priority to U.S. Patent No. 9,744,239 ("the '239 patent"), and therefore may be referred to as the "239 family." Each of these patents also claims priority to U.S. Application 14/610,499. Par has not disputed that the Patents-in-Suit are not entitled to priority dates earlier than their own filing dates, based on their claims of priority to the '239 patent and '499 application.

supplementation made apparent in pre-trial proceedings, the trial itself, post-trial briefing, or otherwise.

The following statements are not exhaustive, and Amneal reserves the right to prove any matters identified in its pleadings, invalidity contentions, interrogatory responses, and/or expert reports.  In addition, the citation of authorities referenced in this document is not intended to be exhaustive. Amneal reserves the right to rely on additional authorities in support of its defenses and intended proofs.  Amneal also reserves the right to rely upon the legal authorities cited by Plaintiffs in their corresponding exhibit.

By including an issue herein, Amneal does not assume the burden of proof or production with regard to that issue.  For instance, Plaintiffs bear the burden of proof with respect to infringement.

To the extent this exhibit contains issues of fact, they are incorporated by reference into Defendants' Statement of Issues of Fact that Remain to be Litigated.  To the extent Defendants' Statement of Issues of Fact that Remain to be Litigated contains issues of law, they are hereby incorporated into this exhibit.

## SUBSTANTIVE ISSUES OF LAW REMAINING TO BE LITIGATED

**I.   ISSUES OF CLAIM CONSTRUCTION REMAINING TO BE LITIGATED**

1.      The scope of the claim term "the unit dosage form has a pH of 3.7-3.9" and whether the claim scope covers what is in the prior art or what has been dedicated to the public.

**II.   ISSUES OF NONINFRINGEMENT REMAINING TO BE LITIGATED**

2.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that submission of Amneal's ANDA No. 212944 (the "SDV ANDA") and ANDA No. 212945 (the "MDV ANDA", and collectively with the SDV ANDA, "Amneal's ANDAs") infringes "the unit dosage form has a pH of 3.7-3.9" limitation of the Asserted Claims of the '209 and '758 patent under 35 U.S.C. §271(e)(2)(A).

3.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that, if Amneal's ANDAs were to be approved by the FDA, the use, sale, offer for sale, or importation of the drug that is the subject of those ANDAs would constitute direct infringement of "the unit dosage form has a pH of 3.7-3.9" limitation of any of the Asserted Claims of the Patents-in-Suit by Amneal.

4.      Whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that, if Amneal's ANDAs were to be

approved by the FDA, the use of the drug that is the subject of that ANDA would constitute direct infringement of "the unit dosage form has a pH of 3.7-3.9" limitation of any of the Asserted Claims of the Patents-in-Suit by any third parties.

5.      To the extent Plaintiffs prove direct infringement of the Asserted Claims by a third party (rather than by Amneal), whether Plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that, if Amneal's ANDAs were to be approved by the FDA, the use, sale, offer for sale, or importation of the drug that is the subject of that ANDA will actively induce infringement of "the unit dosage form has a pH of 3.7-3.9" limitation of any of the Asserted Claims of the Patents-in-Suit.

## III.  ISSUES OF UNENFORCEABILITY REMAINING TO BE LITIGATED

### A.      Inequitable Conduct

6.      Whether Amneal has proven by clear and convincing evidence that the '209 patent is unenforceable due to inequitable conduct before the United States Patent and Trademark Office ("PTO") during prosecution of the '209 patent.

7.      Whether Amneal has proven by clear and convincing evidence that the '785 patent is unenforceable due to inequitable conduct before the PTO during prosecution of the '785 patent.

## B.    Infectious Unenforceability

8.    Whether Amneal has proven by clear and convincing evidence that the '209 patent is unenforceable due to inequitable conduct before the PTO during prosecution of the '239 patent.

9.    Whether Amneal has proven by clear and convincing evidence that the '785 patent is unenforceable due to inequitable conduct before the PTO during prosecution of the '239 patent.

## IV.   ISSUES OF INVALIDITY REMAINING TO BE LITIGATED

### A.    Anticipation

10.    Whether claims 1-8 of the '209 patent are invalid as anticipated pursuant to 35 U.S.C. § 102.

11.    Whether claims 1, 5, and 8 of the '785 patent are invalid as anticipated pursuant to 35 U.S.C. §102.

### B.    Obviousness

12.    Whether claims 1-8 of the '209 patent are invalid for obviousness pursuant to 35 U.S.C. § 103.

13.    Whether claims 1, 5, and 8 of the '785 patent are invalid for obviousness pursuant to 35 U.S.C. § 103.

14.   Whether Plaintiffs have failed to meet their burden of production to demonstrate that the prior art taught away from the claimed inventions recited in the Asserted Claims of the Patents-in-Suit.

15.   Whether Plaintiffs have failed to meet their burden of production to demonstrate criticality to overcome the presumption that the Asserted Claims of the Patents-in-Suit are invalid as obvious.

### C.   Written Description

16.   Whether Amneal has proven by clear and convincing evidence that the asserted claims of the '209 patent and the asserted claims of the '785 patent, reciting "from about 85% to 100% sequence homology to SEQ ID NO.: 1" is invalid for lack of written description pursuant to 35 U.S.C. § 112(a).

### D.   Enablement

17.   Whether Amneal has proven by clear and convincing evidence that the asserted claims of the '209 patent and the '785 patent reciting "from about 85% to 100% sequence homology to SEQ ID NO.: 1" is invalid for lack of enablement pursuant to 35 U.S.C. § 112(a).

## V.   ISSUES OF REMEDIES REMAINING TO BE LITIGATED

18.   Whether Amneal is entitled to a judgment that the Asserted Claims of the Patents-in-Suit are invalid, unenforceable and/or not infringed.

19.     Whether Amneal should be granted an award of Defendant's costs and expenses in this action.

20.     Whether this is an exceptional case under 35 U.S.C. § 285 such that Amneal is entitled to an award of attorneys' fees.

# LEGAL AUTHORITY

## I.   HATCH-WAXMAN BACKGROUND

21.   Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), the FDA must approve all new drugs before they may be distributed in interstate commerce. 21 U.S.C. §355(a).  To secure approval for a new drug, an applicant may file a New Drug Application ("NDA") that includes, for instance, a full description of the drug and data supporting its safety and efficacy, as well as any patents that claim the drug or a method of using the drug if a claim of patent infringement could reasonably be asserted. *Id.* at § 355(b)(1); 21 C.F.R § 314.53(b).  "The FDA publishes the names of approved drugs and their associated patent information in the *Approved Drug Products with Therapeutic Equivalence Evaluations* list, commonly referred to as the 'Orange Book.'" *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1045 (Fed. Cir. 2010).

22.   In an effort to increase competition and reduce drug prices, statute permits others seeking approval to market a generic version of a previously- approved drug ("NDA product") to file an Abbreviated New Drug Application ("ANDA").  An ANDA "allows an applicant to rely on the safety and efficacy information for the listed drug if the applicant can show that the

generic drug is 'bioequivalent' to the listed drug." *Id.* (citing 21 U.S.C. § 355(b)(2), (j)).

23.    If a proposed generic product ("ANDA product") is rated "Q1/Q2" to a NDA product, the FDA has determined that the ANDA product is qualitatively and quantitatively the same as the NDA product, and will not require separate bioequivalence studies.  21 C.F.R. § 320.22(b)(1); *see also id.* § 314.94(a)(9)(iii).

24.    The ANDA must specify the formulation and properties of the proposed ANDA product that will be marketed by the applicant, and provide specifications for parameters such as pH and impurities in accordance with good manufacturing practices.    *Id.* § 314.94(a)(5)-(7), (9); *id.* § 314.50(d)(l)(i)-(ii); *see generally* 21 C.F.R. §211 *et seq.*   (Current Good Manufacturing Practices For Finished Pharmaceuticals).

25.    Manufacturing specifications define properties the product must have throughout the manufacturing process. *Id.* § 211.110(a)-(c).  "Release" specifications define properties the product must have on release from manufacturing.  *Id.* § 211.165(a), (c)-(f).  "Stability" specifications define properties the product must have after release and through its shelf life. *Id.* §211.166(a).

9

26.     An ANDA applicant must conduct stability studies to demonstrate that its proposed ANDA product will meet its specifications over its shelf life.  *Id.* § 211.166.  In such studies, the product may be stored under various conditions and appropriate measurements taken at regular intervals during the product's shelf life, which are reported to the FDA.  *Id.* § 211.166(b).

27.     Once its ANDA is approved, an ANDA applicant may not market a product that does not comply with its ANDA specifications, without being subject to strict sanctions.  *See, e.g.*, 21 U.S.C. §§ 331(d), 332(a), 333(a), 334(a)(1), 335b(a)( 1), 335c(a)(l); *see also Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1249-50 (Fed. Cir. 2000).

28.     Additionally, an ANDA applicant must certify under any one of four bases as to why the ANDA product will not infringe a patent:  "(i) that such patent information has not been filed, (ii) that such patent has expired, (iii). . . [the ANDA product will not be released before] the date on which such patent will expire, or (iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."  21 U.S.C. § 355(j)(2)(A)(vii)(i)-(iv).

29.     A certification of invalidity or noninfringement is called a "paragraph IV certification."  If an ANDA applicant certifies under paragraph

IV, the applicant must also send a Notice Letter to the NDA holder and owner of the patents listed in the Orange Book to inform them of the ANDA and the allegations of invalidity and/or noninfringement. *Id*. § 355(b)(3); 21 C.F.R. § 314.95(a). Upon receiving the Notice Letter, the patent owner then has 45 days in which to bring a patent infringement suit, and FDA approval of the ANDA product is automatically subject to a 30-month stay. 21 U.S.C. § 355(c)(3)(C).

## II.    CLAIM CONSTRUCTION

30.    "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

31.    Claims must be construed the same way for determining validity and infringement. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 996 n. 7 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

32.    The words of a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have

to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313.

33.   "[T]he person of ordinary skill in the art is deemed to read the claim not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

34.   "[T]he court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314 quoting *Innova*, 381 F.3d at 1116.   "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning the relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 quoting *Innova*, 381 F.3d at 1116.

35.   The prosecution history is also part of the intrinsic evidence to be considered during claim construction. *Phillips*, 415 F.3d at 1317.   The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.*   "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.*

36.    "[P]ast and future prosecution of related patents may be relevant to the construction of a given claim term." *Teva Pharmas. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 n.5 (Fed. Cir. 2015) (relying on applicant's attorney's arguments made in subsequent continuation applications).

37.    The court must "construe the claim as written, not as the patentees wish they had written it." *Chef America*, 358 F.3d at 1374; see also *Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324, 1332 (Fed. Cir. 2013) ("[I]t is hardly unknown for a patentee with an invention that could be protected to fail in securing such protection by bad choices in claim drafting); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993) ("If Hoganas, who was responsible for drafting and prosecuting the patent, intended something different, it could have presented this result through clearer drafting. . . . It would not be appropriate for us now to interpret the claim differently just to cure a drafting error made by Hoganas. That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed inventions.").

38.    An established principle of claim construction is that "different claim terms are presumed to have different meanings." *Helmsderfer*, 527 F.3d at 1382. When a claim term reciting a quantitative value for a specified parameter uses qualifying language, such as "about" or "approximately," and

a second claim term does not use a qualifier to describe the same parameter, the absence of the modifier supports narrowly construing the second term to its precise recitation. *See Takeda Pharm. Co., Ltd. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014) (construing "400 μm or less" to mean "precisely 400 μm or less" where the inventors did use the term "about" to describe other numerical parameters in the claim); *see also Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1381 (Fed. Cir. 2000); *see also Cobalt Boats, LLC v. Brunswick Corp.*, 773 F. App'x 611, 616 (Fed. Cir. 2019) ("Where a precise value is included in the claim without a term such as 'about,' we interpret the claim language as imposing a strict numerical boundary, absent evidence that such a construction would be inconsistent with the intrinsic evidence."); *Noven Pharm., Inc. v. Amneal Pharm. LLC*, No. CV 18-699-LPS, 2019 WL 1102681, at *4 (D. Del. Mar. 8, 2019) (rejecting the proposed construction that "coat weight of greater than 10 mg/cm$^2$" means "coat weight of greater than or equal to 9.5 mg/cm$^2$" because "[t]he absence of 'about' gives this term sufficient precision require [*sic*] no additional construction").

39.    Where a claimed numerical parameter is alleged by the patentee to be critical to the purported invention, that numerical parameter should be narrowly construed. *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d

1556, 1561 (Fed. Cir. 1994) (finding error with the district court's broad construction of "about 40:1," when the patentees "emphasized the criticality of the claimed ratio" during prosecution); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1367 (2007) (citations omitted) (narrowly construing "composite composition" to require a specific processing step where the specification stated that the step was a "critical element").

## III.   NONINFRINGEMENT

40.    "The patentee bears the burden of proving infringement by a preponderance of the evidence." *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1125 (Fed. Cir. 2018); *accord, Takeda Pharm. Co. v. Teva Pharm. USA, Inc.*, 668 F. Supp. 2d 614, 619 (D. Del. 2009) ("The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence.").

41.    Mere speculation cannot satisfy the patentee's burden of proof. *See, e.g., Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003-04 (Fed. Cir. 2019) ("At most, the study suggests that Pepcid Complete® might provide immediate and sustained relief; such speculative data, however, cannot sustain Brigham's burden of proof.").

42.     An invalid claim cannot be infringed.  *See Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983) ("The claim being invalid there is nothing to be infringed.").

### A.     Infringement Under Hatch-Waxman

43.     The filing of an ANDA application constitutes an "*artificial* act of infringement for purposes of establishing jurisdiction in the federal courts" under 35 U.S.C. § 271(e)(2), as the ANDA precedes any product that could constitute actual infringement under § 271(a). *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1551 (Fed. Cir. 2004); *see also Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990) (same); 35 U.S.C. § 271(e)(2) ("It shall be an act of infringement to submit (A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent.").

44.     The filing of an ANDA, however, does not by itself prove infringement.  *See Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014) (*Ferring II*) ("The district court here thus erred to the extent that it read § 271(e) to mean that [defendant's] act of filing an ANDA, by itself, established] infringement. . . .  The filing only constituted a technical act of infringement for jurisdictional purposes.").

45.     Nor does the analysis under § 271(e)(2) "alter a patentee's burden of proving infringement" by a preponderance of the evidence. *Glaxo, Inv. v. Novopharm, Ltd.*, 110 F.3d 1562, 1567 (Fed. Cir. 1997).  That burden always remains with the patent owner. *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008) (noting that the "burden to prove infringement" never shifts from the plaintiff); *Amgen Inc. v. Apotex Inc.*, 712 F. App'x 985, 993 (Fed. Cir. 2017) (noting it is not the accused infringer's "burden to prove non-infringement").

46.     In Hatch-Waxman cases, the question of infringement is a hypothetical one; "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will *likely* market an infringing product.  What is likely to be sold, or, preferably, what will be sold, will ultimately determine whether infringement exists." *Glaxo*, 110 F.3d at 1570 (emphasis added).

47.     It is "the ANDA itself [that] dominates th[is] analysis." *Ferring II*, 764 F.3d at 1408; *accord, Glaxo*, 110 F.3d at 1569 ("[T]his hypothetical inquiry is properly grounded in the ANDA application and the extensive materials typically submitted in its support.").

48.     Where "the ANDA is to sell a well-defined compound, then the ultimate question of infringement is usually straightforward." *Bayer AG v.*

*Elan Pharm. Research Corp.*, 212 F.3d 1241, 1249 (Fed. Cir. 2000) (internal quotation marks and brackets omitted) (finding no infringement based entirely on defendant's ANDA).  That is, in instances where the ANDA specification "directly resolves the infringement question because it defines a proposed generic product in a manner that either meets the limitations of an asserted patent claim or is outside the scope of such a claim," the inquiry ends.  *Ferring II*, 764 F.3d at 1408; accord, *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1382, 1389 (Fed. Cir. 2014) (*Ferring I*) (affirming district court's determination of no infringement, finding that the "ANDA specification speaks directly to the question of infringement and would not permit [the ANDA filer] to market an infringing product").

49.  The hypothetical inquiry does not consider speculative allegations that an ANDA product may undergo changes, or the ANDA may be revised, at some point in the future.  *See Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1349 (Fed. Cir. 2002) (endorsing the district court's view that "'[i]t is not enough for [the patentee] to suggest that the accused product may be infringing at some point in the future [due to changes in its properties].  The relevant test is whether [the applicant's] drug, if put on the market, would infringe [the] patent.'"); *see also AstraZeneca Pharm. LP v. Apotex Corp.*, 669 F.3d 1370, 1380-81 (Fed. Cir. 2012) (rejecting arguments that future

amendments to an ANDA may result in infringement, and finding that "[s]ection 271(e)(2) does not encompass 'speculative' claims for infringement. . . . Regardless what may or may not occur in the future, the infringement analysis under § 271(e)(2) is limited to whether the accused infringer's ANDA seeks approval for activities that would constitute infringement of the asserted patents.") (citations omitted); *Par Pharm., Inc. v. Luitpold Pharm., Inc.*, 2017 WL 452003, at *6 (D.N.J. Feb. 2, 2017) ("Because Par's claim is entirely premised on speculation that future, uncertain amendments to Luitpold's ANDA will infringe Par's patents, and there is no question that the drug specified in Luitpold's ANDA does not infringe the Patents-in-Suit, judgment in favor of Luitpold is warranted.").

50.     Data submitted alongside the ANDA, even data tending to show infringement, is generally irrelevant when the specification "directly addresses the question of infringement." *Bayer*, 212 F.3d at 1249 ("[Plaintiff's] focus on the biobatch [data], whose test data was submitted with [defendant's] ANDA, is misplaced for two reasons. First, the [FDCA] specifically provides an ANDA applicant immunity from allegations of infringement for acts that are necessary in preparing an ANDA. . . . Second, the specification in [defendant's] ANDA defines its product in a way that directly addresses the question of infringement."); *see also In re Brominidine*

*Patent Litig.*, 643 F.3d 1366, 1376-77 (Fed. Cir. 2011) (reversing judgment of infringement and rejecting reliance on expert testimony regarding testing data where the ANDA specified a pH outside the claimed range, finding "the highest pH at which Exela will manufacture and sell its proposed product is 6.7 or Exela will not, legally, market anything at all. . . .  We cannot assume that Exela will not act in full compliance with its representations to the FDA.").

51.   In fact, when an ANDA specification does not infringe the patent on its face, one of the only times it may be appropriate to rely on extrinsic data is when such data shows infringement of the "actual commercial product with actual test results," in spite of the non-infringing specification. *Biovail*, 279 F.3d at 1349. In such cases, the inquiry no longer concerns "what [the defendant] will likely market, but what [the defendant] has *actually* marketed." *Id*. (emphasis added); *cf. Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 762 F.3d 1338, 1344 (Fed. Cir. 2014) (noting, in the context of *Noerr-Pennington* immunity from antitrust liability, that "it is not unreasonable for a patent owner to allege infringement under section 271(e)(2)(A) *if the patent owner has evidence that the as-marketed commercial ANDA product will infringe*, even though the hypothetical product specified in the ANDA could not infringe." (emphasis added)).

20

52.     In   the   context   of   the   hypothetical   inquiry   (not   actual infringement by an  actual commercial product), only when "the ANDA specification does not resolve the infringement question in the first instance" do courts look to additional evidence, such as "biobatch data [or] actual samples of the proposed generic composition that the ANDA filer had submitted to the FDA."  *Ferring II*, 764 F.3d at 1409; *see also Bayer*, 212 F.3d at 1250 (if the ANDA specification does "not define the compound in a manner that directly addresse[s] the issue of infringement," other data may then be considered); *Glaxo*, 110 F.3d at 1569-70 (looking to testing data when the  drug  product  could  exist  in  two  forms  only  because  the  ANDA specification did address which form would be present in the likely ANDA product).  Even then, reliance on "outliers" and "anomalies" in biobatch data cannot  satisfy  a  patentee's  burden  to  "prove[]  infringement  by  a preponderance of the evidence. . . ."  *Ferring II*, 764 F.3d at 1409-10.

**B.     Direct Infringement**

53.     Under Section 271(a), "whoever without authority makes, uses, offers to sell, or sells  any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

54.     Determining direct infringement requires a two-step inquiry. Step one is to construe the disputed terms of the patent at issue; step two is to compare the accused products with the properly construed claims of the patent. *Alza Corp. v. Andrx Pharm., LLC*, 607 F. Supp. 2d 614, 623 (D. Del. 2009). Step one is a question of law; step two is a question of fact. *Id.*; *see also Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009).

55.     For method patents, direct infringement can occur only where "all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (*en banc*) (citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1371, 1379-81 (Fed. Cir. 2007)).

56.     "Literal infringement occurs when each element of at least one claim of the patent is found in the alleged infringer's product." *Alza*, 607 F. Supp. 2d at 623; *see also Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *Glaxo Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1566 (Fed. Cir. 1997) ("It is elementary

patent law that all limitations are material," and plaintiffs are "required to establish the presence of each limitation of the asserted claims").

### C.   Induced Infringement

57.   "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

58.   "[Liability for induce[d infringement] must be predicated on direct infringement." *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014).   In other words, the patent owner must show that the alleged infringer, with knowledge of the asserted patents, "knowingly aided and abetted" another's direct infringement. *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015).   "[I]n the ANDA context, it is well-established that 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'" *Id.* at 631; *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.") (internal quotations omitted); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) ("[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").

59.     "[The] sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263,1276 n. 6 (Fed. Cir. 2004) (internal quotation marks and citation omitted).   Rather, "plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).   "[T]he patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement."   *Power Integrations, Inc. v. Fairchild Semiconductor*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *accord, DSU Med.*, 471 F.3d at 1306 (This requires "more than just intent to cause the acts that produce direct infringement"; rather, the patentee must prove that an accused infringer has "an affirmative intent to cause direct infringement") (emphasis added).   Stated differently, the patentee is "required to prove that: (1) a third party directly infringed the asserted claims of the . . . patents; (2) [the alleged infringer] induced those infringing acts; and (3) [the alleged infringer] knew the acts it induced constituted infringement." *Id.*

24

60.   In the ANDA context, "[t]he mere existence of direct infringement by physicians, while necessary to find liability for induced infringement, is not sufficient for inducement." *Takeda*, 785 F.3d at 631; *see also, e.g., United Therapeutics Corp. v. Sandoz, Inc.*, V.S. No. 12-CV-01617, 2014 WL 429153, at \*21 (D.N.J. Aug. 29, 2014) ("It is not enough that 'a user following the instructions may end up' practicing the patented method."). "This requirement of inducing acts is particularly important in the Hatch-Waxman Act context because the statute was designed to enable the sale of drugs for non-patented uses even though this would result in some off-label infringing uses." *Takeda*, 785 F.3d at 631.

61.   As such, "in the Hatch-Waxman Act context where . . . it is alleged that the drug label induces infringement by physicians," "[t]he label must encourage, recommend, or promote infringement." *Takeda*, 785 F.3d at 631.  It is not enough that the "instructions describe the infringing mode." *Id.* (internal quotation marks and brackets omitted); *accord Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017); *Grunenthal GMBH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1339-40 (Fed. Cir. 2019) (claims directed to a method of using tapentadol and tapentadol hydrochloride for the treatment of polyneuropathic pain were not directly or indirectly infringed by drug manufacturer, where the accused infringer's

proposed label did not indicate its drug product was to be used to treat polyneuropathic pain).

62.     "[V]ague label language cannot be combined with speculation about how physicians may act to find inducement." *Takeda*, 785 F.3d at 632. Indeed, "where a product has substantial non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009) (citation omitted); *accord, Warner-Lambert*, 316 F.3d at 1365.  At bottom, there can be no inducement simply because "a user following the instructions may end up using the device in an infringing way."  *Vita-Mix*, 581 F.3d at 1329 n.2.

63.     A use that is permitted but not necessarily required by the label may not amount to inducement.  *See Shire LLC v. Amneal Pharm., LLC*, C.A. No. 11-3781 (SRC), 2014 WL 2861430 at *4-5 (D.N.J. June 23, 2014), *aff'd*, 802 F.3d 1301 (Fed. Cir. 2015) (finding a label that instructed administration with or without food did not induce infringement of a patent that required administration with food*); see also In re Depomed Patent Litig.*, C.A. No. 13-4507 (CCC-MF), 2016 WL 7163647 at *58, *63-64 (D. N. J. Sept. 30, 2016), *aff'd sub. nom. Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333 (Fed.

Cir. 2019) (finding a label that instructed administration for numerous reasons, including polyneuropathic pain, did not induce infringement of a patent that required for polyneuropathic pain, as the label did not *cause* its use for that purpose). Labeling instructions that demonstrate "indifference to the administration of the ANDA products [according to the claimed method]" do not "actively encourage or direct such administration." *Otsuka Pharm. Co. v. Torrent Pharm. Ltd.*, 99 F. Supp. 3d 461, 493-94 (D.N.J. 2015).

### D. Divided Infringement

64. Whereas direct infringement involves a single actor performing the entire claimed method, "[w]here more than one actor is involved in practicing the steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (*en banc*). To establish inducement of claim, a patentee must demonstrate "that joint direct infringement would occur, which requires that 'the acts of one are attributable to the other such that a single entity is responsible for the infringement.'" *Pernix Ire. Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 578 (D. Del. 2018) (quoting *Akamai Techs.*, 797 F.3d at 1022).

65.    A "court will not 'unilaterally restructure the claim or the standards for joint infringement to remedy [ ] ill-conceived claims' requiring multiple parties to perform different acts within one claim." *CBA Envtl. Servs., Inc. v. Toll Brothers Inc.*, 403 F. Supp. 3d 403, 418 (D.N.J. 2019) (alteration in original) (citation omitted).

66.    "[A]n entity responsible for others' performance of method steps in two sets of circumstances:  (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Akamai Techs.*, 797 F.3d at 1022.

67.    To pursue a joint enterprise theory, the patent holder must allege facts sufficient to substantiate four elements:  "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Sonrai Sys., LLC v. AMCS Grp. Inc.*, C.A. No. 16 C 9404, 2017 WL 4281122, at *4 (N.D. Ill. Sept. 27, 2017) (quoting *Akamai Techs.*, 797 F.3d at 1023).

68.    "Under either the agency or joint enterprise theories of direct infringement, [one entity] would have to exercise a degree of control over . . . the other entity allegedly involved in the infringement: for an agency theory,

the authority of a principal, or for a joint enterprise, an equal voice in the direction of the enterprise." *Sonrai Sys.*, 2017 WL 4281122, at *6.

69.      As such, to determine whether the "entity directs or controls" another's performance, courts will apply the general principles of vicarious liability, including whether the entity "acts through an agent (applying traditional agency principles)" or through a contract "to perform one or more steps of the claimed method." *Akamai Techs.*, 797 F.3d at 1022-23.  "The 'control or direction' standard is 'satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method.'" *CBA Envtl.*, 403 F. Supp. 3d at 418 (citation omitted).

70.      "Direction and control can be shown where an actor '(1) conditions participation in an activity or receipt of a benefit" upon others' performance of one or more steps of a patented method,' and (2) 'establishes the manner or timing of that performance.'" *Pernix Ire.*, 323 F. Supp. 3d at 580 (quoting *Akamai Techs.*, 797 F.3d at 1023). "Accordingly, the 'direction or control' test requires the controlling party to be, in effect, the 'mastermind' of the entire process." *CBA Envtl.*, 403 F. Supp. 3d at 418 (citation omitted).

71.      A "contractual relationship between [two entities] is not sufficient, by itself, to state a claim for joint-direct infringement:  the test for

direction and control is analogous to the test for vicarious liability, and a contracting party is not vicariously liable for the actions of an independent contractor unless that party controls the details of the independent contractor's work to such an extent that the contractor cannot perform the work as he chooses." *CBA Envtl.*, 403 F. Supp. 3d at 418. "Moreover, the existence of a contractual relationship may, in some instances, be suggestive of one party's control and direction, but the necessary level of control 'requires more than a general right to order work stopped or resumed, to inspect its process or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations . . . .'" *Id.* at 419 (alterations in original) (citation omitted).

72.    "[M]ere 'arms-length cooperation' will not give rise to a claim for joint- direct infringement." *CBA Envtl.*, 403 F. Supp. 3d at 418.

## IV.   UNENFORCEABILITY

### A.    Inequitable Conduct

73.    Inequitable conduct is an equitable defense to patent infringement. *Therasense Inc. v. Becton Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).   A finding of "fraud," "inequitable conduct," or violation of duty of disclosure with respect to any claim in an application or patent, renders all the claims thereof unpatentable or invalid. *See id.* at 1288.

"[U]nequitable conduct infects the invention itself, and all claims which form a part of that invention." *Robocast, Inc. v. Microsoft Corp.*, 21 F. Supp. 3d 320, 338 (D. Del. 2014). As such, "the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Therasense*, 649 F.3d at 1288 (citing *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808-12 (Fed. Cir. 1990*)); see also eSpeed Inc. v. Brokertec USA LLC*, 417 F. Supp. 2d 580, 595 (D. Del. 2006) (inequitable conduct during the prosecution of a patent application "can therefore render unenforceable . . . claims that issue from related applications as well"), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007).

74.     Evidence "that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive" the PTO requires a finding that the patent is unenforceable due to inequitable conduct. *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1341–42 (Fed. Cir. 2013); *accord, Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). The determination of inequitable conduct is a flexible doctrine based on the Court's equitable powers, which is "not bound by formula or restrained by any limitation that tends to trammel

the free and just exercise of discretion." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933).

1. *Patentee's Duty of Candor*

75.    The duty owed to the PTO includes those whose "involvement relates to the content of the application or decisions related thereto, and . . . is not wholly administrative or secretarial in nature." *Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010).  The person who misrepresents or omits material information can be an inventor, prosecuting attorney, or a person otherwise "substantively involved in the preparation or prosecution of the [patent] application." *Id.* at 973.  The proper resolution of inequitable conduct requires evaluating the actions of all involved.  *See, e.g., Trans Web, LLC v. 3M Innovative Props. Co.*, 16 F. Supp. 3d 385, 406-07 (D.N.J. 2014) ("[T]he actions of other 3M employees— Rousseau, Legare, Nagel, Lyons, and others—provide strong corroborating evidence of the inequitable conduct of Jones and Hanson."), *aff'd*, 812 F.3d 1295 (Fed. Cir. 2016).  The Court's determination of inequitable conduct should not be "bound by formula" and need not be adjudicated with respect to each individual in isolation. *Keystone Driller*, 290 U.S. at 245-46.

76.    All individuals covered by 37 C.F.R. § 1.56 have a duty to disclose to the PTO all material information they are aware of, regardless of

the source of or how they become aware of the information.  *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383 (Fed. Cir. 2001) ("Once an attorney, or an applicant has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her duty to disclose.").

2.     *Materiality*

77.     Materiality is established if the PTO would not have issued the claim if it had been aware of the omitted or misrepresented information. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012) (quoting *Therasense*, 649 F.3d at 1291).

78.     The materiality required to establish inequitable conduct is "but-for" materiality.  *Aventis Pharma*, 675 F.3d at 1334 (citing *Therasense*, 649 F.3d at 1291).   However, but-for materiality need not be shown for "affirmative acts of egregious misconduct." *See Therasense*, 649 F.3d at 1292-93 (contrasting against "mere nondisclosure of prior art" and deliberate omission by "fail[ing] to mention prior art references in an affidavit").  Indeed, but-for materiality is presumed where "the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit." *Therasense*, 649 F.3d at 1292-93 (citing *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983)

33

("there is no room to argue that submission of false affidavits is not material")); *see also Ohio Willow Wood*, 735 F.3d at 1345. "After all, a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent." *Therasense*, 649 F.3d at 1292.

79.    Because the PTO applies a preponderance of the evidence standard and gives claims their broadest reasonable interpretation, a defendant can show materiality under a preponderance of the evidence standard even if the issued claims are not invalidated by clear and convincing evidence at trial. *Aventis Pharma*, 675 F.3d at 1334 (citing *Therasense*, 649 F.3d at 1291-92).

80.    The selective disclosure of material information to other recipients, but not to the PTO, supports the inference that an inventor understood the importance of the material and withheld it from the PTO with deceptive intent. *See Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd.*, 394 F.3d 1348, 1354 (Fed. Cir. 2005); *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1399 (Fed. Cir. 1986).

81.    A finding of patent validity does not bind the Court's decision on materiality. As the Federal Circuit in *American Calcar v. American Honda Motor Co.* stated:

> This court held in *Therasense* that the standard for 'the materiality required to establish inequitable conduct is but-for

34

materiality.'   In particular, undisclosed prior art is 'but-for material if the PTO would not have allowed a claim had it been aware of it.  This means that to assess materiality, the court must look to the standard used by the PTO to allow claims during examination. To wit: 'The court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.'  District courts and the PTO employ different evidentiary standards and rules for claim construction. Therefore, 'even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.'   The jury's verdict finding the patents at issue non-obvious thus does not weigh on the determination of materiality for inequitable conduct, and indeed, Calcar does not make any arguments on appeal that rely on the jury's determination.

768 F.3d 1185, 1189 (Fed. Cir. 2014) (internal citations omitted).

82.    Even though the attorney, agent, or applicant does not consider a reference or information necessarily material, "where the materiality of the information is uncertain, disclosure is required." *Brasseler*, 267 F.3d at 1386; *see also, e.g., LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992).

3.    *Intent to Deceive*

83.    Inequitable conduct has occurred when a patent applicant has "misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011).  The determination of inequitable conduct is a flexible doctrine based on the Court's equitable powers, which is "not bound

by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933).

84. "Inequitable conduct is an equitable defense to patent infringement." *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1350 (Fed. Cir. 2017) (quoting *Therasense*, 649 F.3d at 1285). The defendant proves inequitable conduct "by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). Materiality and intent are separate requirements. *Regeneron Pharm.*, 864 F.3d at 1351 (citing *Therasense*, 649 F.3d at 1290). "The accused infringer must prove both elements—intent and materiality—by clear and convincing evidence." *Therasense*, 649 F.3d at 1287.

85. Materiality is established if the Patent Office would not have issued a claim if it had been aware of the omitted or misrepresented information. *Aventis Pharma S.A.*, 675 F.3d at 1334 (quoting *Therasense*, 649 F.3d at 1291). Prior art that would have anticipated a claim or rendered it obvious is material information. *See Therasense*, 649 F.3d at 1291–92 ("When an applicant fails to disclose prior art to the PTO, that prior art is but-

for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."); *see also Sig Sauer, Inc. v. Freed Designs, Inc.*, No. 14-CV-461-SM, 2017 WL 4119046, at *5 (D.N.H. Mar. 17, 2017) (determining prior art that anticipates asserted claims "is the start and end of the court's materiality analysis"); *DS Smith Plastics Ltd. v. Plascon Packaging, Inc.*, No. 15 C 5760, 2016 WL 69632, at *5 (N.D. Ill. Jan. 6, 2016) ("The fact that the counterclaim does not even recite the words 'anticipated' or 'obvious,' . . . does not alter the basic doctrinal (or common-sense) requirements for but-for materiality.").

86.     Intent is established by a showing of clear and convincing evidence that the patentee: "[1] knew of the reference, [2] knew that it was material, and [3] made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.   "[T]he specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Sci. v. R.J. Tobacco*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)); *see GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1329–32 (Fed. Cir. 2020) (affirming finding of inequitable conduct where material prior art reference was intentionally withheld from the patent office); *Monsanto Co.*, 514 F.3d at 1240–42 (holding that an inference of intent to deceive can be drawn where patent applicant lacks a credible reason for nondisclosure).

87.    "Direct evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997); *see also Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189-91 (Fed. Cir. 1993) ("'[S]moking gun' evidence is not required in order to establish an intent to deceive. Rather, this element of inequitable conduct . . . must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct."). "[A] district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290. "[I]n the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Bruno*, 394 F.3d at 1354. Where the single most reasonable inference from the circumstantial evidence is intent to deceive, specific intent is satisfied. See *Therasense*, 649 F.3d at 1290; *see also Aventis Pharma*, 675 F.3d at 1335 ("specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence" (citations and quotations omitted)).

88.    The Court may take into account circumstances where a witness's "memory of facts was suspiciously selective, and he refused to

acknowledge certain incontrovertible events." *Avid*, 603 F.3d at 975. Contradictions and shifting explanations are strong evidence of deceptive intent. *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 830 (Fed. Cir. 2010) (finding "evasive, argumentative, and at times contradictory testimony" evidence of deceptive intent).

89.     In the absence of a good faith explanation for failing to disclose material information, deceptive intent is the single most reasonable inference. *Critikon*, 120 F.3d at 1256-57 ("[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead."); *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989) (stating intent is often proven by "a showing of acts the natural consequences of which are presumably intended by the actor" (citation omitted)).

90.     "Partial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective." *See Am. Calcar*, 768 F.3d at 1190-91 (finding intent where Calcar's founder, Mr. Obradovich, "was not candid about the inventors' possession of photographs" of the prior art, and "knew the information was

material because he himself acknowledged the importance of the information he possessed").

91.     Where a prosecuting attorney's "statements were not mere advocacy for a preferred interpretation . . . [but] factual in nature and contrary to the true information he had in his possession," those statements cross "the line from legitimate advocacy to genuine misrepresentation of material facts," supporting a finding of inequitable conduct. *See Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014); *see also Regeneron Pharm., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 583 (S.D.N.Y. 2015) (finding that "incomplete and/or inaccurate" statements about scientific data support inequitable conduct), *aff'd*, 864 F.3d 1343 (Fed. Cir. 2017).

92.     "[I]t can be expected that an innocent party will be motivated to try to present convincing reasons for its actions or inaction." *Bruno*, 394 F.3d at 1354. "[A]n inference of deceptive intent may fairly be drawn in the absence of" any "credible explanation" for nondisclosure or material misrepresentation. *Id.* And "[i]n the absence of a credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." *Id.*

93.     If the accused infringer meets its burden to prove inequitable conduct, "then the district court must weigh the equities to determine whether

the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Therasense*, 649 F.3d at 1287.  Inequitable conduct related to even a "single claim renders the entire patent unenforceable." *Id*. at 1288; *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988).

### B.   Infectious Unenforceability

94.   "The duty of candor extends throughout the patent's entire prosecution history. . . .  Therefore, a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 803-04 (Fed. Cir. 1990); *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (holding continuation patent unenforceable based on inequitable conduct found in the prosecution of the parent application); *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007).

95.   "The doctrine[] of infectious unenforceability [is] closely related to the doctrine of inequitable conduct." *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1017 (N.D. Cal. 2004).  Infectious unenforceability may arise when "an unconscionable act that occurs during the prosecution of one patent has an immediate and necessary relation to the

equity sought in the prosecution of another patent." *Id.* As such, "the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Therasense*, 649 F.3d at 1288. Indeed, "a finding of inequitable conduct may endanger a substantial portion of a company's patent portfolio." *Id.*

96.    Infectious unenforceability arises so long as the inequitable conduct as to one patent bears "an immediate and necessary relation" to enforcement of the related patent. *eSpeed*, 417 F. Supp. 2d at 595; *see also* Report and Recommendation, *Guardant Health, Inc. v. Found. Med., Inc.*, 1-17-CV-01616, D.I. 343 at 8-9 (D. Del. Jan. 7, 2020) (quoting *Consol. Aluminum*, 910 F. 2d at 812). That is, "the inequitable conduct that occurred earlier in the chain [of issued patents] 'must be related to the targeted claims of the ultimately-issued patent or patents sought to be enforced.'" *eSpeed*, 417 F. Supp. 2d at 595 (quoting *Semiconductor Energy Lab., Inc. v. Samsung Elecs. Co.*, 24 F. Supp. 2d 537, 543 (E.D. Va. 1998)); *Truth Hardware Corp. v. Ashland Prods., Inc.*, No. 02-1541 GMS, 2003 WL 22005839, at * 1 (D. Del. Aug. 19, 2003). This may include, for instance, a continuation application that is not "sufficiently distinct from its parent." *Agfa*, 451 F.3d at 1379.

## V.    INVALIDITY

97.    The burden rests on a party challenging the patent to show invalidity by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 (2011); *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001).  Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984); *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).

98.    Once the challenging party "has presented a *prima facie* case of invalidity, the patentee has the burden of going forward with rebuttal evidence."  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007).  If the patentee fails to do so, the patent cannot be found valid.  *See, e.g., Ralston Purina Co. v. Far-Mar-Co.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985) ("If this burden [of making a *prima facie* case of invalidity] is met, the party relying on validity is then obligated to come forward with evidence to the contrary.").

99.    "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without

deference to the rulings of the patent examiner." *Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991). Any relevant evidence, whether or not previously considered by the PTO, can be considered by the court in determining validity. *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571-72 (Fed. Cir. 1988).

100. A "commonsense principle that the Federal Circuit has recognized throughout its existence" is "that new evidence supporting an invalidity defense may carry more weight in an infringement action than evidence previously considered by the PTO." *Microsoft Corp.*, 564 U.S. at 110 (quotations omitted). While the Supreme Court has "not reach[ed] the question whether the failure to disclose [an invalidating prior art reference] during the prosecution of [the patent-in-suit] voids the presumption of validity given to issued patents," it "nevertheless . . . note[d] that the rationale underlying the presumption—that the PTO, in its expertise, has approved the claim—seems much diminished" in that context. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007).

## A.  Prior Art

101. Section 102(a) of the America Invents Act (AIA) provides:

A person shall be entitled to a patent unless—
(1) the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or

(2) the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

35 U.S.C. § 102(a).

102.    Section 102 does not state the only sources of prior art.  *In re Font*, 675 F.2d 297, 300-01 (C.C.P.A. 1982).   An inventor's admission that he "had actual knowledge of [a] prior . . . invention . . . constitutes an admission that it is prior art to" him.  *Id.* at 301; *Baxter Diagnostics Inc. v. AVL Sci. Corp.*, 924 F. Supp. 994, 1007 (C.D. Cal. 1996).

103.    "Once [a pharmaceutical] formulation was disclosed in full to [a third party], without any restriction on its use, it had been released into the 'public domain' for purposes of § 102[b]."  *Pronova Biopharm Norge AS v. Teva Pharm. USA, Inc.*, 549 F. App'x 934, 942-43 (Fed. Cir. 2013).

104.    "Section 102 [a] may create a bar to patentability either alone, if the device placed on sale is an anticipation of the later claimed invention or, in conjunction with 35 U.S.C. § 103 (1988), if the claimed invention would have been obvious from the on-sale device in conjunction with the prior art."  *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1071 (Fed. Cir. 1992).

105.    "If a product that is offered for sale inherently possesses each of the limitations of the claims, then the invention is on sale, whether or not the parties to the transaction recognize that the product possesses the claimed characteristics." *Abbott Labs. v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1319 (Fed. Cir. 1999); *see also, e.g., Taro Pharm. U.S.A., Inc. v. Perrigo Isr. Pharm. Ltd.*, C.A. 14-cv-989-RGA, 2015 WL 7737310, at *2 (D. Del. Dec. 1, 2015) ("In response, Hill argues that Derma-Smoothe cannot possibly constitute invalidating prior art, as its formulation was—and still is—secret, and therefore could not be 'known to someone of ordinary skill in the art.' The secret nature of Derma-Smoothe does not foreclose its relevance to the § 103 inquiry."). "[T]he question is not whether the sale, even a third party sale, 'discloses' the invention at the time of the sale, but whether the sale relates to a device that embodies the invention." *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986).

106.    "A bar under § 102[] arises where, before the critical date, the invention is in public use and ready for patenting." *E.g., Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005). "Public use . . . includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor."

*Art+Com Innovationpool GmbH v. Google LLC*, 712 F. App'x 976, 980 (Fed. Cir. 2017).

107.   "The fact that the device was not hidden from view may make the use not secret but non-secret use is not *ipso facto* 'public use' activity. Nor, it must be added, is all secret use *ipso facto* not 'public use' within the meaning of the statute, if the inventor is making commercial use of the invention under circumstances [that] preserve its secrecy." *New Railhead Mfg., LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1299 (Fed. Cir. 2002) (alterations in original) (citations omitted).

108.   "Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry." *In re Epstein*, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994).

109.   Placing a composition on sale, including with instructions to practice a method, places the method of using those compositions on sale. *See, e.g., Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1285 (Fed. Cir. 2005) ("The shipment to Ortho consisted not only of the GC155 probe, but also accompanying instructions as to how to use the probe in the hybridization assay. Moreover, given that the composition claims read on probes that hybridize with *N. gonorrhoeae*, carrying out such a hybridization assay is inseparable from the compositions themselves. Effectively, the offer

47

to sell the compositions invalidates claims 5 and 6 based on those same probes.").

110. Apart from prior art references, "[a]dmissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007); *Sjolund v. Musland*, 847 F.2d 1573, 1577-79 (Fed. Cir. 1988) (admission in the patent specification "must [be] accepted . . . as prior art, as a matter of law"); *In re Nomiya*, 509 F.2d 566, 570-71 (C.C.P.A. 1975) (representations in the specification are "accepted at face value as admissions" of what is "considered 'prior art' for any purpose, including use as evidence of obviousness under § 103").

111. Section 102(b)( 1) sets forth limited exceptions to what constitutes prior art under § 102(a)(1). It provides:

> A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if—
>> (A) the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or
>> (B) the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

35 U.S.C. § 102(b)(1).

112.    Section 102(b)(1) was intended to codify the one-year grace period for public disclosures by or obtained through an inventor. *See* Robert A. Armitage, *Understanding the America Invents Act and Its Implications for Patenting*, 40 AIPLA Q. J. 1, 72 (2012) ("the two subparagraph (A) exceptions [(*i.e.* § 102(b)(1) and (2)] contain no substantive differences from one another in the sense that a disclosure reflecting the work of the inventor (or a joint inventor), rather than an independent creator of the subject matter disclosed, made during the one-year 'grace period' prior to the effective filing date of the inventor's claimed invention, is excepted from prior art . . . [and thus] provide no more and no less than a new codification of the pre-AIA grace period."); N. Scott Lierce, *Invetorship, Double Patenting, and the America Invents Act*, 30 Berkeley Tech. L.J. 1613, 1616 (2015) ("'Grace periods' play an important role under the AIA because disclosure of components that are the work of the same inventive entity as the claimed combination can be excepted from prior art under the AIA, as they were under the provisions of the Patent Act of 1952.").

113.    According to the PTO's interpretation of § 102(b)(1)(A), in cases where the alleged prior art names individuals in addition to the inventors of the patent application, "it is incumbent upon the applicant to provide a satisfactory showing that the additional named authors did not contribute to

49

the claimed subject matter." *Examination Guidelines for Implementing the First Inventor to File Provisions of the Leahy-Smith America Invents Act*, 78 Fed. Reg. 11059, 11064-65 (Feb. 14, 2013).

**B.    Anticipation**

114.    Under 35 U.S.C. § 102(a)(1), a patent claim is invalid if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention."

115.    "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

116.    Anticipation is not limited to what the prior art expressly discloses— anticipation also extends to what the prior art inherently discloses. *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 468 F.3d 1366, 1381 (Fed. Cir. 2006) ("A patent claim is invalid as anticipated if every limitation in a claim is found in a single prior art reference, either explicitly or inherently."). For "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp.*, 339 F.3d at 1337; *see also, e.g., Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1351 (Fed.

50

Cir. 2016) ("A single prior art reference may anticipate without disclosing a feature of the claimed invention if such feature is necessarily present, or inherent, in that reference.").

117.    "[I]nherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005); *see also Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999) ("[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's functioning, does not render the old composition patentably new to the discoverer.").

118.    "[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1276 (Fed. Cir. 2010) (alteration in original) (quoting *Hewlett-Packard Co. v. Mustek Sys.*, Inc., 340 F.3d 1314, 1326 (Fed. Cir. 2003)).

119.    "A reference includes an inherent characteristic if that characteristic is the 'natural result' flowing from the reference's explicitly explicated limitations." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001).

120. "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *E.g., Cubist Pharm., Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 650 (D. Del. 2014).

121. "To anticipate, the prior art need only meet the inherently disclosed limitation to the extent the patented method does." *King Pharms.*, 616 F.3d at 1276.

122. "Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art.  Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *Atlas Powder*, 190 F.3d at 1347 (citing *Titanium Metals v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985)).

123. "Extrinsic evidence 'may be used to interpret the allegedly anticipating reference and [to] shed light on what it would have meant to'" a person of ordinary skill in the art (POSA).  *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018) (alterations in original) (citation omitted).  Such "extrinsic evidence need not antedate the critical date of the patent at issue." *Id.* (citation omitted).

124. A reference that discloses a range that touches or overlaps a claimed value can anticipate the claim.  *ClearValue Inc. v. Pearl River*

*Polymers Inc.*, 668 F.3d 1340, 1344-45 (Fed. Cir. 2012) (the claimed range of 50 ppm or less was anticipated by the prior art disclosure of 150 ppm or less because no demonstration or claim that 50 ppm or less was "'critical,' or that the claimed method works different at different points within the prior art range"). *Perricone v. Medicis Pharmaceutical Corp.* is also instructive. In *Perricone*, the Federal Circuit affirmed the district court's summary judgment of invalidity after finding, inter alia, that the prior art "nonetheless discloses and anticipates [the inventor's] particular claimed 'effective amount' ranges" even though the prior art's disclosed range "does not exactly correspond to [the inventor's] claimed range." 432 F.3d 1368, 1377 (Fed. Cir. 2005). As the Court noted, the prior art's range "entirely encompasses, and does not significantly deviate from, [the inventor's] claimed ranges," therefore warranting a finding of anticipation. *Id.*

125.    Anticipation is a question of fact. *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

### C.    Obviousness

126.    Section 103 provides:

A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the

effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

35 U.S.C. § 103. The prior art that is used for determining if the difference between the claimed subject matter and the prior art is obvious is any of the same prior art that is described in Section 102.

127. Obviousness is a question of law based on four underlying factual determinations: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007) (*citing Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

128. "Nothing in [35 U.S.C. § 103] or [Federal Circuit] case law requires [a defendant] to prove obviousness by starting with a prior art commercial embodiment and then providing motivation to alter that commercial embodiment." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 737 (Fed. Cir. 2013). "This is particularly true where, as here, the prior art teaches a range that encompasses both the prior art commercial embodiment and the claimed invention." *Id.*

129. "[T]he scope of the relevant prior art . . . include[es] that reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995) (quotation

omitted).  "A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."  *Id.* at 1578 (quotation omitted).  "If a reference disclosure relates to the same problem as that addressed by the claimed invention, that fact supports use of that reference in an obviousness [finding]."  *Id.* (quotation omitted).

130.    "A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use."  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  "[A] finding that the prior art as a whole suggests the desirability of a particular combination need not be supported by a finding that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable."  *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004).  "[J]ust because 'better alternatives' may exist in the prior art 'does not mean that an inferior combination is inapt for obviousness purposes.'"  *Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1381 (Fed. Cir. 2015) (quoting *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012)).

131.    Where the prior art alone establishes enablement of the claimed subject matter, "[a] patent cannot both be non-obvious and enabled."  *In re*

*'318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 735 (D. Del. 2008). Conversely, "a description that does not render a claimed invention obvious does not sufficiently describe that invention for purposes of § 112,¶1." *Regents of Univ, of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1567 (Fed. Cir. 1997) (emphasis omitted).

132.    "[I]f a device was in public use or on sale before the critical date, then that device becomes a reference under section 103 against the claimed invention." *E.g., Taro Pharms. U.S.A., Inc. v. Perrigo Isr. Pharms. Ltd.*, No. 14-cv-989-RGA, 2015 WL 7737310, at *2 (D. Del. Dec. 1, 2015). "The court's task upon such a challenge is to determine whether the claimed invention would have been obvious from the on-sale device in conjunction with the prior art." *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1327 (Fed. Cir. 2003).

133.    "[T]he public use bar applies to obvious variants of the demonstrated public use." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1326 (Fed. Cir. 2009) (citing *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002)).

134.    "Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness." *Ormco Corp. v. Align Tech., Inc.*, 463 F. 3d 1299, 1311 (Fed. Cir. 2006); *see also In re Applied Materials,*

*Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (same); *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (same); *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997) (same); *In re Woodruff*, 919 F.2d 1575, 1577-78 (Fed. Cir. 1990) (same); *Tris Pharma, Inc. v. Actavis Labs. FL, Inc.*, 276 F. Supp. 3d 226, 252 (D. Del. 2017) (same), *vacated on other grounds*, 755 F. App'x 983 (Fed. Cir. 2019); *Valeant Pharm. Int'l, Inc. v. Mylan Pharm. Inc.*, 955 F.3d 25, 31 (Fed. Cir. 2020).

135.    This *prima facie* case exists where there is "even a slight overlap in range." *In re Peterson*, 315 F.3d at 1329; *see also, e.g.*, *In re Geisler*, 116 F.3d at 1469 (claimed invention was rendered *prima facie* obvious by a prior art reference whose disclosed range (50-100 Angstroms) overlapped the claimed range (100-600 Angstroms)); *In re Woodruff*, 919 F.2d at 1576-77 (claimed invention was rendered obvious by a prior art reference whose disclosed range of "about l-5%" carbon monoxide abutted the claimed range of "more than 5% to about 25%" carbon monoxide).

136.    Even where the claimed range and the prior art range do not overlap, "a *prima facie* case of obviousness exists when the claimed range and the prior art range . . . are close enough such that one skilled in the art would have expected them to have the same properties." *In re Peterson*, 315 F.3d at 1329.

137.    "[T]he existence of overlapping or encompassing ranges shifts the burden to the applicant to show that his invention would not have been obvious." *In re Peterson*, 315 F.3d at 1329-30; *see also, e.g.*, *Tris Pharma*, 276 F. Supp. 2d at 253; *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 89 F. Supp. 3d 641, 655-56 (D.N.J. 2015), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016). In such cases, "the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1304-05 (Fed. Cir. 2015); *accord, Galderma*, 737 F.3d at 738 (citing *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352-54 (Fed. Cir. 2013)).

138.    "[T]he disclosure in the prior art of overlapping pH ranges would have provided sufficient motivation to optimize the pH, and it was not inventive to do so." *Tris Pharma*, 276 F. Supp. 3d at 253.

139.    Patentability is not imparted where the inventor did no more than engage in routine experimentation. *See Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) ("The evidence at trial showed that, though requiring time and care, the experimentation needed to arrive at the claimed dosages was nothing more than routine."); *see also Sinclair & Carroll Co. v.*

*Interchemical Corp.*, 325 U.S. 327, 335 (1945) ("Reading a list and selecting a known compound to meet known requirements is no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention.").

140.   Furthermore, "[w]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341-42 (Fed. Cir. 2020) (quoting *In re Applied Materials*, 692 F.3d at 1295); *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955) (same); *In re Geisler*, 116 F.3d at 1470 (same); *see also In re Peterson*, 315 F.3d at 1330 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages.").

141.   An obviousness determination requires both "the existence of a motivation to combine elements from different prior art references" and that "a skilled artisan would have perceived a reasonable expectation of success in making the invention via that combination." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006); *Merck & Co.*, 874 F.2d at 809

(explaining that a reasonable expectation of success does not require absolute predictability or certainty).

142.   "Motivation to combine may be found in many different places and forms." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013).   The motivation to combine does not have to be explicitly stated in the prior art. *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1290 (Fed. Cir. 2006) ("[T]he teaching, motivation, or suggestion may be implicit from the prior art as a whole, rather than expressly stated in the references." (citation omitted)); *see also Anacor Pharm., Inc. v. Iancu*, 889 F.3d 1372, 1385 (Fed. Cir. 2018) ("[T]he greater the structural similarity between the compounds, the greater the motivation to combine and reasonable expectation of success.").

143.   When determining obviousness, a court is "not limited to the same motivation that may have motivated the inventors." *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1197 (Fed. Cir. 2014); *see also Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1368 (Fed. Cir. 2012) ("We have repeatedly held that the motivation to modify a prior art reference to arrive at the claimed invention need not be the same motivation that the patentee had."). In that vein, testimony of an expert witness regarding knowledge of a

person of skill in the art at the time of invention "is pertinent to [the] evaluation of a *prima facie* case of obviousness." *Alza*, 464 F.3d at 1294.

144.   Where the prior art would make a technique or combination obvious to try, it is generally obvious, unless the prior art did no more than make it obvious to vary all parameters, with no narrowing of the possibilities, or gave no guidance to a likely solution. *See Bayer Schering Pharm. AG v. Barr Labs, Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009) (noting that an invention is generally obvious to try unless an inventor "would have had to try all possibilities in a field unreduced by direction of the prior art" or the "prior art does not guide an inventor toward a particular solution"). The Supreme Court has explained that:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR*, 550 U.S. at 421. "But there is no requirement that for a variable to be obvious to try, it must be the first variable a person of skill would alter." *Valeant*, 955 F.3d at 34.

145.    To "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue," a court should "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *KSR*, 550 U.S. at 418.  A patent may be obvious if, inter alia, there was a "known problem for which there was an obvious solution encompassed by the patent's claims" or the combination of the patent's claims was "obvious to try." *Id.* at 419—421.

146.    Courts may "find a motivation to combine prior art references in the nature of the problem to be solved." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011) (quoting *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1276 (Fed. Cir. 2004)).  "[M]otivation to combine may be found explicitly or implicitly in market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013).

147.    "Obviousness requires a showing that 'a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art.'" *AstraZeneca LP v. Breath Ltd.*, 603 F. App'x 999, 1002 (Fed. Cir. 2015) (quoting *Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009)).   There need not be a "guarantee" of success. Id. (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007)); *see also Medichem*, 437 F.3d at 1165 ("Obviousness does not require absolute predictability of success ... ." (citation omitted)).  To that end, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art. . . ." *Pfizer*, 480 F.3d at 1364 (Fed. Cir. 2007); *see also Warner Chilcott Co., LLC v. Teva Pharm. USA, Inc.*, 594 F. App'x 630, 635-36 (Fed. Cir. 2014) ("[T]he record shows that there would have been a reasonable expectation of success in pursuing the 150 mg monthly dose . . . [even though] the highest single dose of risedronate that had actually been tested in a patient was 50 mg."); *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although [the inventor] declared that it cannot be predicted how any candidate will work in a detergent composition, but that it must be tested, this does not overcome [the prior art's] teaching that hydrated zeolites will work."); *Hospira, Inc. v. Amneal Pharms., LLC*, 285 F. Supp. 3d 776, 784, 794 (D. Del. 2018) (noting that, as to a reasonable expectation of success,

"that 'expectation of success need only be reasonable, not absolute'" and further stating that "Plaintiffs assertion that the requirement for testing every potential configuration counsels against finding a reasonable expectation of success improperly equates a reasonable expectation with absolute certainty"); *Valeant*, 955 F.3d at 34 ("Absolute predictability that the proposed pH range would yield the exact stability parameters in the claim is not required.").

148.    Although the doctrine of inherency was "originally rooted in anticipation," the Federal Circuit has recognized that "inherency may supply a missing claim limitation in an obviousness analysis." *PAR Pharm.*, 773 F.3d at 1194-95 (collecting cases); *see also Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1328 (Fed. Cir. 2018) (affirming district court's "determination that claim limitations relating to pharmacokinetics—*i.e.*, achieving 4-AP serum levels of 15-35 ng/ml—are inherent in the claimed invention and therefore obvious"); *In re Huai-Hung Kao*, 639 F.3d 1057, 1072 (Fed. Cir. 2011) (affirming the BPAI's finding of inherency where "the only claim element not expressly disclosed in the prior art was the previously-unknown, yet inherent, food-effect property"); *In re Kubin*, 561 F.3d 1351, 1357 (Fed. Cir. 2009) (upholding the BPAI's obviousness determination where, "[e]ven if no prior art of record explicitly discusses the 'wherein the

polypeptide binds CD48' aspect of claim 73, the Kubin-Goodwin application itself instructs that CD48 binding is not an additional requirement imposed by the claims on the NAIL protein, but rather a property necessarily present in NAIL"); *Valeant*, 955 F.3d at 34 ("And, lacking anything in the claim that is a stabilizer, it can be presumed, if the claim is valid, that the stability for up to 24 months must be due to the nature of the compound in the solution and the claimed pH level."). Where a claim limitation is inherent in the prior art, "there is no question of a reasonable expectation of success in achieving it." *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322, 1332 (Fed. Cir. 2020).

### D.    Rebuttal To *Prima Facie* Obviousness

#### 1.    *Criticality*

149.    "When an applicant seeks to overcome a *prima facie* case of obviousness by showing improved performance in a range that is within or overlaps with a range disclosed in the prior art, the applicant must show that the [claimed] range is *critical*, generally by showing that the claimed range achieves unexpected results relative to the prior art range." *In re Patel*, 566 F. App'x 1005, 1011 (Fed. Cir. 2014) (quotation omitted); *see also In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) ("Only if the 'results of

optimizing a variable' are 'unexpectedly good' can a patent be obtained for the claimed critical range." (citations omitted)).

150.   When considering criticality, courts look to "whether 'the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected.'" *Forest Labs., LLC v. Sigmapharm Labs.*, LLC, 918 F.3d 928, 937 (Fed. Cir. 2019) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995)); *accord Procter & Gamble, Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (citations omitted).

151.   "[I]n order to properly evaluate whether a superior property was unexpected" for criticality, the Court must consider "what properties were expected." *Cf. Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007); *see also In re Mageli*, 470 F.2d 1380, 1384-85 (C.C.P.A 1973) ("Unobviousness, however, cannot be predicated on superiority alone. Obviousness depends on what those skilled in the art would expect." (emphasis in original)); *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 348 (D. Del. 2010) ("To show unexpected benefits, the patent owner must first show 'what properties were expected.'" (citation omitted)), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012).   There can be no showing of unexpected results where a patentee provides no evidence of what a POSA would have

expected. *Pfizer*, 480 F.3d at 1371 ("Here, Pfizer's evidence must fail because the record is devoid of any evidence of what the skilled artisan would have expected. We will not simply presume that the skilled artisan would have expected that amlodipine besylate would have the same characteristics as amlodipine maleate, because as Pfizer asserts, its properties are not absolutely predictable.").

152.    In order to demonstrate criticality, it is insufficient to merely demonstrate a difference in degree. Rather, the patentee must demonstrate a difference in kind. *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 89 F. Supp. 3d 641, 674 (D.N.J. 2015) (citation omitted), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016) ("But where selection of the claimed amount within the prior art range results in 'only a difference in degree from the prior art results,' the claimed amount is not critical.'"); *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013); *see also Bristol Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) ("While a 'marked superiority' in an expected property may be enough in some circumstances to render a compound patentable, a 'mere difference in degree' is insufficient . . . . And 'differences in degree' of a known and expected property are not as persuasive in rebutting obviousness as differences in 'kind' – *i.e.*, a new property dissimilar to the known property." (citations omitted)).  "Results

which differ by percentages are differences in degree rather than kind, where the modification of the percentage is within the capabilities of one skilled in the art at the time." *Galderma*, 737 F.3d at 739; *see also In re Merck & Co.*, 800 F.2d 1091, 1099 (Fed. Cir. 1986) (a purported improvement in a known property is not unexpected unless there was an "appreciable degree" of improvement). Accordingly, courts must "evaluate the significance and 'kind' of expected results along with the unexpected results." *Bristol Myers Squibb*, 752 F.3d at 977 (citations omitted).

153. Proving criticality "requires more than a modest deviation from what was disclosed in the prior art." *Allergan Inc. v. Teva Pharm. USA, Inc.*, No. 15-cv- 1455-WCB, 2017 WL 4803941, at *46 (E.D. Tex. Oct. 16, 2017) (Bryson, J.).

154. For there to be a showing of criticality, the results must be truly unexpected and not the product of the desire of a person of ordinary skill to achieve the optimum value of performance for a known range. *See In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003) ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages. We therefore conclude that a prior art reference that discloses a range encompassing a somewhat

narrower claimed range is sufficient to establish a *prima facie* case of obviousness."); *see also In re Boesch*, 617 F.2d 272, 276 (C.C.P.A. 1980) ("[Discovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." (citations omitted)). Further, the superior result must rise to a significant enough level where it can be characterized as being "a new and unexpected result which is different in kind and not merely in degree from the results of the prior art." *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996) (citation omitted).

155.    To assess criticality, one must compare the ***claimed invention*** to the prior art, rather than a narrower embodiment thereof. *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) ("The only test results presented by Woodruff are the results reported by Mr. Bell, comparing Woodruffs claimed invention to the commercial embodiment of McGill's method.    While Woodruffs invention certainly showed superior fungi-inhibiting effect in these tests, the critical comparison is not with the commercial embodiment of McGill's invention, but with the method taught in his patent.").    Further, "there is no requirement that the closest prior art be commercialized." *Trs. of Columbia Univ. v. Illumina, Inc.*, 620 F. App'x 916, 932 (Fed. Cir. 2015); *see also In re Merchant*, 575 F.2d 865, 869 (CCPA 1978) ("In *In re Wright* . . . , failure of a particular reference to constitute 'the commercial standard' did

not diminish its position as the closest prior art." (internal citation omitted)); *In re Chupp*, 816 F.2d 643, 644 (Fed. Cir. 1987) ("To rebut the *prima facie* case of obviousness, Chupp submitted a declaration discussing the results of tests comparing the herbicidal activity of the claimed compound with that of the closest prior art compounds and with two commercial herbicides." (emphasis added)).

156.    The closest prior art can be a patent or publication. *See, e.g.*, *In re Huston*, 308 F.3d 1267, 1281 n.9 (Fed. Cir. 2002) (sustaining the Board's obviousness rejection and discussing the ways in which it relied "on the Paul reference [U.S. Patent No. 5,524,081] (cited by the Board itself as the 'closest prior art')" for its analysis); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 595 (D. Del. 1997) (holding the asserted patent obvious and noting that "[t]he Court finds particularly persuasive the fact that the Enloe patent, the closest prior art reference, expressly teaches away from the use of liquid impermeable materials for the BLC").

157.    In order to establish criticality, the alleged criticality must be commensurate in scope with the claims. *E.I. DuPont de Nemours & Co. v. Synvina C. V.*, 904 F.3d 996, 1012 (Fed. Cir. 2018); *see also Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1308 (Fed. Cir. 2011).  This means that the evidence cannot be "plainly disproportionate to

the scope of the claim." *Id.*; *see, e.g.*, *In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005) (affirming Board's finding that showing of unexpected results was not commensurate in scope with the claims where "the elemental composition of CMSX®-486 [the applicant's commercial embodiment relied on to show unexpected results] is at or near the midpoint of the claimed range"); *Peterson*, 315 F.3d at 1331 (affirming obviousness finding where patentee claimed an alloy with 1-3% rhenium, but presented unexpected results only for 2% rhenium, and evidence suggested that 3% rhenium possessed inferior properties); *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983) (concluding that unexpected results "limited to sodium only" were not commensurate in scope with claims to a catalyst having "an alkali metal"); *In re Greenfield*, 571 F.2d 1185, 1189 (C.C.P.A. 1978) (affirming obviousness finding for a genus containing "several hundred compounds" where unexpected results were proved for "only one" such compound).

158.    "[A] claimed amount [is] not critical where specification of patent disclosed that amounts . . . outside the claimed amount were also effective." *Tris Pharma, Inc. v. Actavis Labs. FL, Inc.*, 276 F. Supp. 3d 226, 254 (D. Del. 2017) (citing *Warner Chilcott*, 89 F. Supp. 3d at 655-56), *vacated on other grounds*, 755 F. App'x 983 (Fed. Cir. 2019); *see also, e.g., id.* ("The patents-in-suit make clear that 'the product is most stable at pH between 3.5

and 5.0. . . .   Thus, there is nothing critical about the narrower range of 4 to 4.5."); *Warner Chilcott*, 89 F. Supp. 3d at 655-56 ("Thus, the patents assert that the disclosed range of 75 mg to 250 mg EDTA will work effectively with risedronate sodium.  It does not indicate that any particular level of EDTA is critical for each type of bisphosphonate."), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016) ("Moreover, in view of the broad disclosures in the specification providing embodiments with varying amounts of EDTA, and nothing in the asserted claims teaching one of skill in the art that or how only the specific 100 mg amount produces pharmaceutically effective absorption, Warner Chilcott failed to show the criticality of the claimed amount.").

159.    Differences of a specific condition or parameter will generally not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such specified condition or parameter is critical.  "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation."  *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955) (claimed process which was performed at a temperature between 40°C and 80°C and an acid concentration between 25% and 70% was held to be *prima facie* obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid

concentration of 10%.); *In re Hoeschele*, 406 F.2d 1403, 1406 (C.C.P.A. 1969) (claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions).

160.   "A recognition in the prior art that a property is affected by the variable is sufficient to find the variable result-effective." *E.I. DuPont de Nemours*, 904 F.3d at 1006.   Merely optimizing a result-effective variable does not render a claimed invention non-obvious because "discovery of an optimum value of a result effective variable . . . is ordinarily within the skill of the art." *See id.*; *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012).

2.     *Teaching Away*

161.   "Although a reference that teaches away is a significant factor to be considered in determining unobviousness, the nature of the teaching is highly relevant, and must be weighed in substance." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).   "A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use." *Id.*; *see also Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1356 (Fed. Cir. 2012) (prior art did not teach

away when it merely characterized alleged inventive feature as being the "second best choice").

162.    A reference teaches away "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Gator Tail, LLC. v. Mud Buddy, LLC*, 618 F. App'x 992, 998-99 (Fed. Cir. 2015) (quoting *In re Gurley*, 27 F.3d at 553). Indeed, the ***only*** relevant inquiry is whether a person of ordinary skill would have considered the prior art to teach away; other reasons not to make the claimed invention (such as economic considerations) are irrelevant. *See In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983) ("That a given combination would not be made by businessmen for economic reasons does not mean that persons skilled in the art would not make the combination because of some technological incompatibility. Only the latter fact would be relevant.").

163.    There is no "teaching away" if the reference "merely expresses a general preference for an alternative invention but does not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (citation omitted).  Nor does silence or a lack of certainty imply teaching away. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 964 (Fed.

Cir. 2014) (addressing silence); *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 89 F. Supp. 3d 641, 667 n. 24 (D.N.J. 2015), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016) (addressing uncertainty).

164.    A reference does not teach away if it does not disclose the claimed invention. *See, e.g.*, *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013) ("Neither of these articles mentions 0.3% adapalene compositions, nor do they expressly teach away from the claimed invention. The district court inferred that these references taught away from a further tripling of the adapalene concentration. We cannot agree with this inference.").

165.    Similarly, "[a] teaching that a composition may be optimal or standard does not criticize, discredit, or otherwise discourage investigation into other compositions."  *Galderma*, 131 F.3d at 739; *see also SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1320 (Fed. Cir. 2015) ("'[M]ere disclosure of more than one alternative' does not amount to teaching away from one of the alternatives where the reference does not 'criticize, discredit, or otherwise discourage the solution claimed.'" (citation omitted)).

166.    Moreover, the mere existence of drawbacks does not render the claimed invention non-obvious; the benefits and drawbacks of the claimed invention must be weighed accordingly.  *See Hoffman-La Roche Inc. v.*

*Apotex Inc.*, 748 F.3d 1326, 1333 (Fed. Cir. 2014) ("A higher frequency of diarrhea does not necessarily teach away . . . modest gastrointestinal side effects must be weighed in light of the benefits of the drug."); *Galderma*, 737 F.3d at 738-39 ("These articles show increased side effects associated with 0.1% adapalene as compared to 0.03% adapalene, yet they failed to discourage even the use of 0.1% adapalene . . . . [N]or do these articles indicate in any way that the side effects would be serious enough to dissuade the development of a 0.3% adapalene product."); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine.").

167.    "Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue." *Idemitsu Kosan Co. v. SFC Co.*, 870 F.3d 1376, 1381 (Fed. Cir. 2017).

### E.    Written Description and Enablement

168.    Under 35 U.S.C. § 112(a), the specification of a patent

shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

In other words, this paragraph sets forth two distinct requirements:  (1) that the specification describe the invention in clear and concise terms (the written description requirement) and; (2) that the specification enables any person skilled in the art to practice the invention (the enablement requirement).  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (*en banc*) (setting forth the distinct requirements of § 112, first paragraph, which is substantially identical to AIA § 112(a)).

169.   While written description and enablement overlap in some regards, they are two distinct requirements.  As the Federal Circuit stated in *Ariad:*

> Perhaps there is little difference in some fields between describing an invention and enabling one to make and use it, but that is not always true of certain inventions, ***including chemical and chemical-like inventions***.   Thus, although written description and enablement often rise and fall together, requiring a written description of the invention plays a vital role in curtailing claims that do not require undue experimentation to make and use, and thus satisfy enablement, but that have not been invented, and thus cannot be described.

*Id.* at 1352 (emphasis added).

1.   *Written Description*

170.   "[A] patent can be held invalid for failure to meet the written description requirement, based solely on the language of the patent specification." *Univ. Of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927

(Fed. Cir. 2004) (citing *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002)).

171.   The written description requirement requires that the specification "'clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed.'  In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad, 5 Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (era banc) (citation omitted); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991) ("Although the applicant does not have to describe exactly the subject matter claimed, the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed." (internal quotation marks, brackets, and ellipses omitted)).

172.   The test for written description "requires an objective inquiry into the four comers of the specification from the perspective of a person of ordinary skill in the art.  Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351.  Each and every claim limitation must find support in the specification.  *See TurboCare*

*Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("The written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date.").

173.    Merely reciting the claim language in the specification is insufficient to show possession. *See Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968-69 (Fed. Cir. 2002) ("[T]he fact that [a claim] appears as an original claim or in the specification does not save it. A claim does not become more descriptive by its repetition . . . ."). The specification must describe the claim "as an integrated whole rather than as a collection of independent limitations." *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013); *accord, Purdue Pharma L.P. v. Recro Tech., LLC*, 694 F. App'x 794, 797-98 (Fed. Cir. 2017). In other words, where the specification "merely renders the invention obvious," the written description requirement is not satisfied. *Purdue Pharma*, 694 F. App'x at 796 (quoting *Ariad*, 598 F.3d at 1352); *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("One shows that one is 'in possession' of *the invention* by describing the invention, with all its claimed limitations, not that which makes it obvious." (emphasis in original)).

79

174.    Describing a single embodiment or species in the specification may be insufficient if it is at all unclear that possession of the one embodiment inherently indicates possession of the whole range or genus. *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) ("[A] patentee cannot always satisfy the requirements of section 112, in supporting expansive claim language, merely by clearly describing one embodiment of the thing claimed."); *see also LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 433 F.3d 1373, 1375 (Fed. Cir. 2006) ("But merely calling an embodiment 'preferred,' when there are no others, does not entitle one to claims broader than the disclosure.").

175.    Indeed, "[i]t is well settled that claims in an application which are broader than the applicant's disclosure are not allowable." *In re Sus*, 306 F.2d 494, 505 (C.C.P.A. 1962) (quoting *In re Moore*, 155 F.2d 379, 382 (C.C.P.A. 1946); *see also ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) ("ICU's asserted spikeless claims are broader than its asserted spike claims because they do not include a spike limitation; these spikeless claims thus refer to medical valves generically—covering those valves that operate with a spike and those that operate without a spike. But the specification describes only medical valves with spikes. . . . We reject ICU's contention that the figures and descriptions that include spikes

somehow demonstrate that the inventor possessed a medical valve that operated without a spike."); *In re Alonso*, 545 F.3d 1015, 1021 (Fed. Cir. 2008) (no written description where specification disclosed only a single embodiment, finding the single embodiment "cannot be said to be representative of a densely populated genus"); *Ariad*, 598 F.3d at 1353 (finding claims invalid for written description because they "cover[ed] any compound later actually invented and determined to fall within the claim's functional boundaries—leaving it to the pharmaceutical industry to complete an unfinished invention").

176. *Pernix Ireland Pain DAC v. Alvogen Malta Operations* is instructive. There, the claims at issue "read on all oral dosage units comprising extended-release hydrocodone in which hydrocodone is the only active ingredient," but the "specification disclose[d] only one formulation that was found to satisfy all the limitations of any of the claims, including the functional limitations." 323 F. Supp. 3d 566, 618-19 (D. Del. 2018) (Bryson, J.), *aff'd on other grounds*, 945 F.3d 1184 (Fed. Cir. 2019); *see id.* at 624 ("But all that evidence shows is that that the inventors had possession of a single species. It does not show that they had possession of the broad genus covered by the claims."). The court found that the specification, which disclosed "only a single embodiment within the broad scope of the claims,"

was insufficient to provide written description support because the result claimed by the patent method "depend[ed] entirely on whether the particular formulation function[ed] in the manner recited in the claims." *Id.* at 624-26. Indeed, the court found that because "testing results would be fundamental to determining which formulations would satisfy the asserted claims, . . . in the absence of such testing data, the inventors cannot be said to have possessed the full scope of the claimed invention." *Id.* at 628.

177. Finally, where a POSA would have to engage in an "iterative, trial-and-error process" to determine whether a given formulation worked for its intended purpose, the claims are invalid for lack of written description. *See, e.g.*, *MorphoSys AG v. Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 371 (D. Del. 2019); *see also Pernix*, 323 F. Supp. 3d at 628 ("All that the specification discloses is that one such formulation will work for that purpose. Whether any others will work, and which they are, would depend entirely on testing, and thus cannot be said to have been within the scope of what the patentees invented.").

2.   <em><u>Enablement</u></em>

178. By statute, a patent must "enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use" the claimed invention. 35 U.S.C. § 112(a). "To be enabling, the specification

of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (internal quotation marks omitted). "[A] patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012); *see also Par Pharma., Inc. v. TWi Pharm., Inc.*, 120 F. Supp. 3d 468, 475-79 (D. Md. 2015) (invalidating claims because they were broad enough to read on inoperative particle sizes), *aff'd without opinion*, 624 F. App'x 756 (Fed. Cir. 2015).

179.    It is well settled that the "full scope of the claimed invention must be enabled." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008); id. ("[a] patentee who chooses broad claim language must make sure the broad claims are fully enabled"); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379-80 (Fed. Cir. 2007) ("[I]n this case, the asserted claims read on, and the full scope of the claimed invention includes, an injector system with and without a pressure jacket. There must be 'reasonable enablement of the scope of the range' which, in this case, includes both injector systems with and without a pressure jacket. The specification's reference that teaches away from an injector system with a disposable syringe without a pressure jacket, .

. . supports the district court's conclusion that the specification fails to fulfill the enablement requirement of § 112"); *Pharm. Res., Inc. v. Roxane Labs., Inc.*, Civ. No. 03-3357(DRD), 2006 WL 3231427, at *13 (D.N.J. Nov. 8, 2006) ("The claims encompass every possible megestrol acetate flocculated suspension made with any surfactant and one or more of the listed wetting agents, with the exception of the combination that Atzinger recommended. Par's common specification fails to provide an enabling disclosure of similar scope."), *aff'd*, 253 F. App'x 26 (Fed. Cir. 2007).

180.   Claims are enabled when they may be practiced without undue experimentation. *ALZA*, 603 F.3d at 940. The factors to be considered in determining whether a disclosure would require undue experimentation include: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

181.   Breadth alone can be the basis for finding a lack of enablement. *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213-14 (Fed. Cir. 1991) (affirming district court's invalidation under Section 112 based on breadth

alone where Amgen claimed every possible analog of a gene containing about 4,000 nucleotides with details for preparing only a few EPO analog genes).

182.    "Undue experimentation is evaluated from the vantage point of those experienced in the field of the invention." *Impax Labs., Inc. v. Aventis Pharm. Inc.*, 496 F. Supp. 2d 428, 432 (D. Del. 2007), *aff'd*, 545 F.3d 1312 (Fed. Cir. 2008).    Some "experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *Wands*, 858 F.2d at 737.

183.    A patent with "a complete absence of data supporting the statements which set forth the desired results of the claimed invention" fails for lack of enablement. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1323-24 (Fed. Cir. 2005) (stating that patentee needed to provide experimental proof that the patented invention was operable); *Petito v. Puritan's Pride, Inc.*, 35 F. Supp. 3d 494, 504 (S.D.N.Y. 2014) (quoting *Rasmusson* and finding a patent not enabled because the claims were "not supported by any experimental results" and the specification failed to "describe[] test results or other substantiating evidence").

184.    In the absence of sufficient test results, the mere fact that an assertion of use may be tested or a method carried out by a POSA also is

insufficient.  For example, in *Rasmusson* the Federal Circuit rejected the assertion "that the specifications of the respective applications are enabling because a person of ordinary skill in the art could perform the steps of the disclosed method without the need for any experimentation."  *Rasmusson*, 413 F.3d at 1322; *see also Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1285 (Fed. Cir. 2007) (finding claims "including both mechanical and electronic side impact sensors" lacked enablement where there was "[disclosure of only mechanical side impact sensors"); *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1256 (Fed. Cir. 2004) ("Here, the scope of the claim includes not only murine but also chimeric antibodies. While Chiron's applications certainly enable murine antibodies, they do not enable chimeric antibodies."); *cf. Pharm. Res.*, 253 F. App'x at 31 (agreeing with district court that "numerous unsuccessful attempts by Par to practice subject matter within the scope of the claims" supported a determination of no enablement).

185.   Furthermore, "[e]nablement is determined as of the effective filing date of the patent's application."  *ALZA*, 603 F.3d at 940.  That is, "the enabling disclosure must appear in the specification at the time of filing."  *MagSil*, 687 F.3d at 1382.  A patentee cannot rely on post-filing experimental data to establish utility.  *In re '318 Patent Infringement Litig.*, 583 F.3d 1317,

1325 (Fed. Cir. 2009) (affirming district court finding that test results not available at the time of the patent application could not be used to establish enablement).

186.    A patent cannot be both non-obvious and enabled if the patentee relies on the prior art to establish enablement.  *See, e.g.*, *In re '318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 736 (D. Del. 2008) ("Put another way, since plaintiffs rely exclusively on the prior art to establish enablement, the court agrees with defendants that the '318 patent cannot both be non-obvious and enabled.").

## VI.    REMEDIES

### A.    Injunctive Relief

187.    Once the issue of infringement has been resolved, damages must be determined. Rarely are monetary damages awarded, as there is seldom a commercial ANDA product on the market. *See* 35 U.S.C. § 271(e)(4)(C).

188.    Instead, where a patentee proves infringement, "the court shall order the effective date of any approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed." 35 U.S.C. § 271(e)(4)(A).

189.    Furthermore, in some cases, injunctive relief "*may*" be warranted, 35 U.S.C. § 271(e)(4)(B) (emphasis added), but only if the

patentee meets the traditional standard for obtaining a permanent injunction. *See Bayer Pharma AG v. Watson Labs., Inc.*, C.A. No. 12-1726-LPS, 2016 WL 7468172, at *2 (D. Del. Dec. 28, 2016) ("In order to obtain a permanent injunction [against an ANDA product], a party with a valid and infringed patent must show that the following factors favor the requested relief: (i) the patent holder has suffered or will suffer irreparable injury or harm, (ii) legal remedies are inadequate to compensate that injury, (iii) balance of hardships, and (iv) the public interest." (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006))); *see also Alcon, Inc. v. Teva Pharm. USA, Inc.*, C.A. No. 06-234-SLR, 2010 WL 3081327, at *2 (D. Del. Aug. 5, 2010) (explaining that the prevailing patentee in ANDA case is not automatically entitled to a § 271 (e)(4)(B) injunction but, instead, must demonstrate that the four traditional factors weigh in its favor).

### B.    Costs and Fees

190.    Federal Rule of Civil Procedure 54 states "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1).  To that end, 28 U.S.C. § 1920 permits judges or clerks to tax as costs the following:

> (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in

this case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under [28 U.S.C. § 1923]; and (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under [28 U.S.C. § 1828].

*See also* D. Del. LR 54.1.

### C.   Attorneys' Fees

191.    In exceptional cases, a court may award reasonable attorneys' fees to the prevailing party. 35 U.S.C. § 285. The decision to award attorneys' fees is based on a two-step inquiry. *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994).

192.    First, the court must evaluate whether the case is exceptional. *Interspiro*, 18 F.3d at 933. A case is exceptional if it "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). This determination is a "case-by-case exercise" to be made based on "the totality of the circumstances." *Id.*

193.    Second, the court must determine whether an award of attorneys' fees to the prevailing party is warranted. *Interspiro*, 18 F.3d at 933.

194. The burden of proof rests with the prevailing party, but there is no particular standard of proof or evidentiary burden; "[s]ection 285 demands a simple discretionary inquiry." *Octane Fitness*, 572 U.S. at 557.

195. Prevailing on a claim of inequitable conduct often makes a case "exceptional," leading potentially to an award of attorneys' fees under 35 U.S.C. § 285. *Therasense Inc. v. Becton Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011); *see also, e.g., Regeneron Pharm., Inc. v. Merus N. V.*, No. 1:14-cv- 01650-KBF, slip op. at 31-35 (S.D.N.Y. Mar. 26, 2018) (D.I. No. 468).

196. Moreover, a finding of "exceptional case" is warranted where a patentee takes contradictory positions before the PTO during prosecution of the patent-at-issue, and then before the Court in litigation. *Route1 Inc. v. AirWatch LLC*, No. 17-CV-331 (KAJ), 2020 WL 1955436, at *2 (D. Del. Apr. 23, 2020); *see also, Cartner v. Alamo Group, Inc.*,  561 F. App'x 958, 965 (Fed. Cir. 2014) (finding the patentee's infringement allegations were frivolous where the accused product had the same feature that was present in prior art that the patentee distinguished during prosecution).

EXHIBIT 6

EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br><br>Defendants. | **C.A. No. 18-cv-2023-CJB (Consolidated)**<br><br>████████████ |

**<u>JOINT LIST OF EXHIBITS</u>**

Par–Amneal
Joint Trial Exhibit List

| JTX# | PTX # | DTX# | Date | Bates Begin | Bates End | Description | Depo. Exh No. | Confidentiality |
|------|-------|------|------|-------------|-----------|-------------|---------------|-----------------|
| JTX-0001 | PTX-0001 | | 2017-06-27 | PAR-VASO_0295299 | PAR-VASO_0295377 | Clean copy of United States Patent 9,687,526: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0002 | PTX-0002 | | 2017-08-29 | PAR-VASO_0295216 | PAR-VASO_0295298 | Clean copy of United States Patent 9,744,209: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0003 | PTX-0003 | | 2017-09-05 | PAR-VASO_0295378 | PAR-VASO_0295459 | Clean copy of United States Patent 9,750,785: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0004 | PTX-0004 | DTX-002 | 2017-06-27 | PAR-VASO_0000034 | PAR-VASO_0000113 | Certified copy of United States Patent 9,687,526: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0005 | PTX-0005 | DTX-003 | 2017-08-29 | PAR-VASO_0000114 | PAR-VASO_0000197 | Certified copy of United States Patent 9,744,209: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0006 | PTX-0006 | DTX-005 | 2017-09-05 | PAR-VASO_0000232 | PAR-VASO_0000314 | Certified copy of United States Patent 9,750,785: Vasopressin Formulations for Use in Treatment of Hypotension | | |
| JTX-0007 | PTX-0007 | DTX-008 | 2016-10-10 | PAR-VASO_0002629 | PAR-VASO_0005399 | Certified copy of File Wrapper for United States Patent 9,687,526 | | |
| JTX-0008 | PTX-0008 | DTX-009 | 2017-08-29 | PAR-VASO_0005400 | PAR-VASO_0006452 | Certified copy of File Wrapper for United States Patent 9,774,209 | | |
| JTX-0009 | PTX-0009 | DTX-011 | 2017-09-05 | PAR-VASO_0009319 | PAR-VASO_0010365 | Certified copy of File Wrapper for United States Patent 9,750,785 | | |
| JTX-0010 | PTX-0010 | DTX-015 | 2017-04-19 | PAR-VASO_0108290 | PAR-VASO_0108299 | Certified Assignment Reel/Frame 042097.0331 | | |
| JTX-0011 | PTX-0011 | DTX-014 | 2016-10-26 | PAR-VASO_0108300 | PAR-VASO_0108307 | Certified Assignment Reel/Frame 040491.0176 | | |
| JTX-0012 | PTX-0012 | DTX-019 | 2017-03-02 | PAR-VASO_0108308 | PAR-VASO_0108313 | Certified Assignment Reel/Frame 041442.0453 | | |
| JTX-0013 | PTX-0013 | DTX-017 | 2017-03-02 | PAR-VASO_0108321 | PAR-VASO_0108326 | Certified Assignment Reel/Frame 041442.0482 | | |
| JTX-0014 | PTX-0014 | DTX-016 | 2017-04-20 | PAR-VASO_0108333 | PAR-VASO_0108341 | Certified Assignment Reel/Frame 042293.0855 | | |
| JTX-0015 | PTX-0015 | DTX-021 | 2017-06-08 | PAR-VASO_0108342 | PAR-VASO_0108373 | Certified Assignment Reel/Frame 042743.0216 | | |

# EXHIBIT 7

EXHIBIT 7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>**v.**<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>███████████ |

## PLAINTIFFS' LIST OF EXHIBITS

Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively "Plaintiffs") reserve their right to incorporate by reference into their Trial Exhibit List any exhibit listed by Defendants on Defendants' Trial Exhibit List.  Plaintiffs reserve their right to amend, modify, or supplement their Trial Exhibit List throughout the balance of this case in response to case developments including but not limited to Defendants' Trial Exhibit List, Defendants' objections, and/or further streamlining of the case.   Plaintiffs also reserve the right to supplement or modify their Trial Exhibit List in response to rulings by the Court (including on any motions) or upon settlement of any party.

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|------------------------|------------|
| PTX-0001 | 2017-06-27 | PAR-VASO_0295299 | PAR-VASO_0295377 | Moved to JTX-0001 | | |
| PTX-0002 | 2017-08-29 | PAR-VASO_0295216 | PAR-VASO_0295298 | Moved to JTX-0002 | | |
| PTX-0003 | 2017-09-05 | PAR-VASO_0295378 | PAR-VASO_0295459 | Moved to JTX-0003 | | |
| PTX-0004 | 2017-06-27 | PAR-VASO_0000034 | PAR-VASO_0000113 | Moved to JTX-0004 | | |
| PTX-0005 | 2017-08-29 | PAR-VASO_0000114 | PAR-VASO_0000197 | Moved to JTX-0005 | | |
| PTX-0006 | 2017-09-05 | PAR-VASO_0000232 | PAR-VASO_0000314 | Moved to JTX-0006 | | |
| PTX-0007 | 2016-10-10 | PAR-VASO_0002629 | PAR-VASO_0005399 | Moved to JTX-0007 | | |
| PTX-0008 | 2017-08-29 | PAR-VASO_0005400 | PAR-VASO_0006452 | Moved to JTX-0008 | | |
| PTX-0009 | 2017-09-05 | PAR-VASO_0009319 | PAR-VASO_0010365 | Moved to JTX-0009 | | |
| PTX-0010 | 2017-04-19 | PAR-VASO_0108290 | PAR-VASO_0108299 | Moved to JTX-0010 | | |
| PTX-0011 | 2016-10-26 | PAR-VASO_0108300 | PAR-VASO_0108307 | Moved to JTX-0011 | | |
| PTX-0012 | 2017-03-02 | PAR-VASO_0108308 | PAR-VASO_0108313 | Moved to JTX-0012 | | |
| PTX-0013 | 2017-03-02 | PAR-VASO_0108321 | PAR-VASO_0108326 | Moved to JTX-0013 | | |
| PTX-0014 | 2017-04-20 | PAR-VASO_0108333 | PAR-VASO_0108341 | Moved to JTX-0014 | | |
| PTX-0015 | 2017-06-08 | PAR-VASO_0108342 | PAR-VASO_0108373 | Moved to JTX-0015 | | |
| PTX-0145 | 2012-09-25 | EAGLEVAS0014051 | EAGLEVAS0014364 | Biopharmaceutics Review NDA 204485 | | Dup, H ,R, F, 403, 1006, E |
| PTX-0146 | 2012-09-26 | EAGLEVAS0014051 | EAGLEVAS0014355 | Biopharmaceutics Review: Vasopressin Injection, USP | | Dup, H, R, F, 403, IN, 1006 |
| PTX-0147 | 2012-09-26 | EAGLEVAS0014351 | EAGLEVAS0014364 | Biopharmaceutics Review: Vasopressin Injection, USP | | Dup, H, R, F, 403, 1006 |
| PTX-0148 | 2012-09-26 | EAGLEVAS0014351 | EAGLEVAS0014364 | Vasopressin Injection Biopharmaceutics Review | | Dup, H, R, F, 403, 1006 |
| PTX-0153 | 2015-06-01 | EAGLEVAS0038897 | EAGLEVAS0038905 | Adamsons 1958 - The Stability of Natural and Synthetic Neurophysial Hormones in Vitro | | H, R, F, 403 |
| PTX-0232 | | EAGLEVAS0058064 | EAGLEVAS0058337 | Yoshioka, S. and Stella, V. Stability of Drugs and Dosage Forms. Kluwer Academic Publishers 2012 | | H, A, R, F, 403, 26 |
| PTX-0236 | 2015-05-20 | PAR-VASO_0000977 | PAR-VASO_00001013 | United States Patent and Trademark Filing Application | | Dup, E |
| PTX-0242 | 2014-06-03 | PAR-VASO_0014805 | PAR-VASO_0014809 | Letter - General Advice on Content of Labeling for Vasostrict | | H, A, R, F, 403 |
| PTX-0243 | 2012-09-25 | PAR-VASO_0015573 | PAR-VASO_0015586 | FDA NDA Approval Letter | | Dup, E |
| PTX-0244 | 2012-09-25 | PAR-VASO_0015573 | PAR-VASO_0015586 | Letter acknowledging receipt of amendments for Vasostrict | | Dup, E |
| PTX-0245 | 2017-06-05 | PAR-VASO_0024408 | PAR-VASO_0024421 | Tabulated Stability Data through 23 Month Interval | | H, A, R, 403, F |

EXHIBIT C

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|-----------------------|------------|
| PTX-0246 | 2009-03-16 | PAR-VASO_0025902 | PAR-VASO_0025949 | JHP Research Report 703-00159 Analytical Method Validation Report for the Determination of Vasopressin and Impurities in Pitressin Gradient HPLC | | H, A, R, 403, F |
| PTX-0247 | 2014-10-21 | PAR-VASO_0028307 | PAR-VASO_0028352 | Pharmaceutical Development Technical Report - Document Approval (FRD-14-001R) | | H, A, R, F, 403 |
| PTX-0248 | 2014-10-21 | PAR-VASO_0028307 | PAR-VASO_0028352 | Vasostrict (Vasopressin injection, USP) Justification of Time Out of Refrigeration | | H, A, R, F, 403 |
| PTX-0249 | 2014-08-26 | PAR-VASO_0029501 | PAR-VASO_0029502 | Chain email from P. Dardaine to M. Kenney re SA Rochester Slides 8/29/14 Updated needed (redacted) | | H, A, R, F, 403 |
| PTX-0250 | | PAR-VASO_0030050 | PAR-VASO_0030052 | 2014-05-28 Meeting Minutes | | H, A, R, F, 403 |
| PTX-0251 | 2015-10 | PAR-VASO_0030399 | PAR-VASO_0030458 | PAR Vasostrict, 20 Unites/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock # 2002501) Product Development Technical Report FRD-15-012 | | H, A, Dup, R, F, 403 |
| PTX-0252 | | PAR-VASO_0030563 | PAR-VASO_0030582 | Product Development Stability Summary, Room Temperature Evaluation for Vasostrict pH 3.8 Acetate Buffer, Single Dose (Stock # 2002501) | | H, A, R, F, 403 |
| PTX-0253 | 2016-02-17 | PAR-VASO_0030979 | PAR-VASO_00310015 | Vasostrict, 20 units per ml Product Development Technical Report | | H, A, Dup, R, F, 403 |
| PTX-0254 | 2013-05-09 | PAR-VASO_0031687 | PAR-VASO_0031708 | Product Development Procedure Validation Report | | H, A |
| PTX-0255 | 2017-06-05 | PAR-VASO_0042538 | PAR-VASO_0042551 | Vaso 1mL stk 2002501_23M data for OOR studies_07Jun17.pdf | | Dup, H, A, R, 403, F |
| PTX-0256 | 2016-09-07 | PAR-VASO_0046745 | | Vasostrict, 20 Units.ML Stability Request/Initiation | | H, A, R, 403, F |
| PTX-0258 | 2015-01-27 | PAR-VASO_0059897 | PAR-VASO_0059949 | Par R&D Lab Notebook of Vinayagam Kannan No. 44 Project Vasostrict | | H, R, 403 |
| PTX-0259 | 2014-06-01 | PAR-VASO_0059950 | PAR-VASO_0060041 | Par R&D Lab Notebook of Kenney No. 71 Project Pitressin Formulation | | H, Dup, R, 403 |
| PTX-0260 | | PAR-VASO_0059950 | PAR-VASO_0060041 | Par R&D Lab Notebook of Kenney No. 71 Project Pitressin Formulation | | H, Dup, R, 403 |
| PTX-0261 | | PAR-VASO_0060083 | PAR-VASO_0060106 | 3 month-Interim Stability Summary Vasostrict pH 3.8 Acetate Buffer, Multiple Dose (Stock # 2002525) | | H, A, DUP, R F, 403 |
| PTX-0262 | | PAR-VASO_0060127 | PAR-VASO_0060163 | Product Development Technical Report FRD-16-001 | | H, A, DUP, R, F, 403 |
| PTX-0263 | | PAR-VASO_0060713 | PAR-VASO_0060736 | 3 month-Interim Stability Summary Vasostrict pH 3.8 Acetate Buffer, Single Dose (Stock # 2002501) | | H, A, DUP, R, F, 403 |
| PTX-0264 | | PAR-VASO_0061004 | PAR-VASO_0061004 | Par Spreadsheet with Vasostrict Reformulation Information | | H, A, R, F, 403, E |
| PTX-0265 | | PAR-VASO_0061005 | PAR-VASO_0061005 | Par Spreadsheet with Sample name and conditions | | H, A, R, F, 403, E |
| PTX-0266 | 2015-10-16 | PAR-VASO_0062982 | PAR-VASO_0062994 | Tabulated Stability Data through 3 Month Interval | | H, A, DUP, R, F, 403 |
| PTX-0267 | 2016-02-05 | PAR-VASO_0066728 | PAR-VASO_0066823 | Vasostrict, 20 Units per 1ml Master Batch Record | | H, R, 403 |
| PTX-0268 | | PAR-VASO_0067647 | PAR-VASO_0067659 | Stability Results NDA 204485, Sequence # 0059, Supplement S-004 | | H, A, Dup, R, 403, F |
| PTX-0270 | | PAR-VASO_0072472 | PAR-VASO_0072502 | Pitressin 2.3.P Drug Product Stability | | H, E |
| PTX-0271 | 2012-06-27 | PAR-VASO_0073573 | PAR-VASO_0073583 | Product Development Report DEV-12-033R | | H, A, Dup, R, F, 403 |
| PTX-0272 | 2014-11-22 | PAR-VASO_0081195 | PAR-VASO_0081292 | Vasostrict, 20 Units per 1ml Master Batch Record | | H |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|------------------------|------------|
| PTX-0273 | | PAR-VASO_0082232 | PAR-VASO_0082234 | 3.2.P.1  Vasostrict Description and Composition | | H |
| PTX-0274 | 2012-04-16 | PAR-VASO_0088184 | PAR-VASO_0088212 | Product Development Technical Report  DEV-12-16 - Identification of Pitressin Impurities and Development of the AVP Impurity marker Solution D009-19 | | H, A, R, F, 403 |
| PTX-0275 | | PAR-VASO_0089744 | PAR-VASO_0089750 | Bi, Mingda., Effect of buffer pH, buffer concentration and skin with or without enzyme inhibitors on the stability of [Arg8]-vasopressin, International Journal of Pharmaceutics 197 (2000) 87-93 | | H, A, R, F, 403 |
| PTX-0276 | 2013-02-04 | PAR-VASO_0089785 | PAR-VASO_0089787 | Email from V. Kannan to T. Kovalcik re: Pitressin NDA optimized product study | | H, A, R, F, 403 |
| PTX-0277 | | PAR-VASO_0089788 | PAR-VASO_0089791 | Comparison of Vasopressin Formulations | | H, A, R, F, 403 |
| PTX-0278 | 2015-09-29 | PAR-VASO_0093612 | PAR-VASO_0093671 | Product Development Technical Report  FRD-15-012 Vasostrict, 20 Units/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock #2002501) | | H, A, Dup, R, F, 403 |
| PTX-0279 | 2015-09-29 | PAR-VASO_0093612 | PAR-VASO_0093671 | Product Development Technical Report  FRD-15-012 Vasostrict, 20 Units/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock #2002501) | | H, A, Dup, R, F, 403 |
| PTX-0280 | 2015-09-29 | PAR-VASO_0093612 | PAR-VASO_0093671 | Product Development Technical Report  FRD-15-012 Vasostrict, 20 Units/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock #2002501) | | H, A, Dup, R, F, 403 |
| PTX-0281 | | PAR-VASO_0096366 | PAR-VASO_0096447 | Master Batch Record 2002532 Rev R002 | | H, A, E, R, F, 403 |
| PTX-0282 | | PAR-VASO_0100092 | PAR-VASO_0100188 | Master Batch Record 2002501 Rev 9 | | H, A, R, F, 403, E |
| PTX-0283 | | PAR-VASO_0100393 | PAR-VASO_0100491 | Master Batch Record 2002525 Rev 7 | | H, A, R, F, 403 |
| PTX-0284 | 2016-03-28 | PAR-VASO_0101219 | PAR-VASO_0101320 | Master Batch Record 2002501, Revision 003 | | H, A, R, F, 403 |
| PTX-0285 | 2016-01-28 | PAR-VASO_0101219 | PAR-VASO_0101320 | Vasostrict, 20 units per 1 ML Master Batch Record | | H, A, R, F, 403 |
| PTX-0286 | 2014-10-09 | PAR-VASO_0111795 | PAR-VASO_0111795 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 10/10/14 | | H, A, R, F, 403 |
| PTX-0287 | | PAR-VASO_0111796 | PAR-VASO_0111829 | 2014-10-10 Project Management Slides | | H, A, R, F, 403 |
| PTX-0288 | 2014-08-14 | PAR-VASO_0112061 | PAR-VASO_0112061 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 8/15/14 | | H |
| PTX-0289 | | PAR-VASO_0112062 | PAR-VASO_0112112 | 2014-08-15 Project Management Slides | | H |
| PTX-0290 | 2014-07-17 | PAR-VASO_0113001 | PAR-VASO_0113001 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 7/18/14 | | H, A, R, F, 403 |
| PTX-0291 | | PAR-VASO_0113002 | PAR-VASO_0113037 | 2014-07-18 Project Management Slides | | H, A, R, F, 403 |
| PTX-0292 | 2014-12-04 | PAR-VASO_0113467 | PAR-VASO_0113467 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 12/5/14 | | H, A, R, F, 403 |
| PTX-0293 | | PAR-VASO_0113468 | PAR-VASO_0113500 | 2014-12-05 Project Management Slides | | H, A, R, F, 403 |
| PTX-0294 | 2011-09-19 | PAR-VASO_0120243 | PAR-VASO_0120263 | SV 4200 Pitressin (Synthetic) USP, 20 units per 1 Ml Master Batch Record | | H, Dup |
| PTX-0295 | 2011-09-19 | PAR-VASO_0120243 | PAR-VASO_0120363 | SV 4200 Pitressin USP Master Batch Record | | H, Dup |
| PTX-0296 | 2015-05-07 | PAR-VASO_0134068 | PAR-VASO_0134068 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 5/8/15 | | H, A, R, F, 403, E |
| PTX-0297 | | PAR-VASO_0134069 | PAR-VASO_0134103 | 2015-05-08 Project Management Slides | | H, A, R, F, 403 |
| PTX-0298 | 2014-11-06 | PAR-VASO_0135570 | PAR-VASO_0135570 | E-mail from P. Dardaine to S. Ahmed et al. re SA Rochester Slides - 11/7/14 | | H, A, R, F, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0299 | | PAR-VASO_0135571 | PAR-VASO_0135604 | 2014-11-07 Project Management Slides | | H, A, R, F, 403 |
| PTX-0300 | 2015-01-15 | PAR-VASO_0200879 | | Email from M. Kenney to S. Sanghvi re: Vasopressin Experimental Summary | | H |
| PTX-0301 | | PAR-VASO_0200880 | PAR-VASO_0200913 | Vasopressin Experimental Summary | | H, Dup |
| PTX-0302 | | PAR-VASO_0200880 | PAR-VASO_0200913 | Vasopressin Experimental Summary | | H, Dup |
| PTX-0305 | | PAR-VASO_0219794 | PAR-VASO_0219795 | Pitressin (Vasopressin Injection, USP Synthetic Warning Label | | H |
| PTX-0306 | | PAR-VASO_0226936 | PAR-VASO_0227034 | Spreadsheet | | H, A, R, F, 403, E |
| PTX-0307 | | PAR-VASO_0226936 | PAR-VASO_0227034 | Spreadsheet | | H, A, R, F, 403, E |
| PTX-0308 | | PAR-VASO_0230505 | PAR-VASO_0230536 | Table of Contents re: Stability | | H, A, R, F, 403, E |
| PTX-0309 | 2013-10-18 | PAR-VASO_0238720 | PAR-VASO_0238757 | Center for Drug Evaluation and Research, Chemistry Reviews | | H, A, R, F, 403, E |
| PTX-0310 | 2015-05-01 | PAR-VASO_0239795 | PAR-VASO_0239802 | USP Monograph 38, NF 33 | | H, A, R, F, 403, E |
| PTX-0311 | | PAR-VASO_0246222 | PAR-VASO_0246429 | Notebook No. 1281 | | H |
| PTX-0312 | | PAR-VASO_0246430 | PAR-VASO_0246652 | Notebook No. 1283 | | H |
| PTX-0313 | | PAR-VASO_0247613 | PAR-VASO_0247819 | Notebook No. 1277 | | H, A, R, F, 403 |
| PTX-0314 | | PAR-VASO_0248169 | PAR-VASO_0248172 | Vasostrict Chart | | H |
| PTX-0315 | | PAR-VASO_0248782 | PAR-VASO_0249000 | Notebook No. 1285 | | H, A, R, F, 403 |
| PTX-0316 | | PAR-VASO_0291641 | PAR-VASO_0291658 | FDA, Analytical Procedures and Methods Validations for Drugs and Biologics: Guidance for Industry,  Ctr. For Drug Evaluation and Research (July 2015) | | H, A, R, 403, F |
| PTX-0317 | | PAR-VASO_0291724 | PAR-VASO_0291760 | Guidance for Industry: Analytical Procedures and Methods Validation (Draft Guidance) August 2000 | | H, A, R, 403, F |
| PTX-0318 | | PAR-VASO_0291761 | PAR-VASO_0291775 | Pharmaceutical Stress Testing: Predicting Drug Degradation (S.W. Baertschi, ed.) (2005) | | H, A, R, 403, F |
| PTX-0319 | | PAR-VASO_0291790 | PAR-VASO_0291794 | Webpage with information about patent examiner Christina Bradley | | H, A, R, 403, F, E |
| PTX-0320 | | | | A. Joshi, E. Rus, L. Kirsch, The degradation pathways of glucagon in acidic solutions, International Journal of Pharmaceutics 203 (2000) | | H, A, R, 403, F, 26 |
| PTX-0322 | | | | CV of Lee E. Kirsch | | H, A, R, 403, F |
| PTX-0324 | | | | CV of Zlatan Coralic, PharmD, BCPS | | H, A, R, 403, F |
| PTX-0325 | 2019-03-22 | | | Declaration of Zlatan Coralic | | H |
| PTX-0326 | 2015-05-20 | | | Declaration Under 37 CFR 1.32 by Inventor Sunil Vandse | | Dup, H, I, E |
| PTX-0328 | 2015-05-20 | | | Declaration under 37 CFR by Inventor Sunil Vandse | | Dup, H, I, E |
| PTX-0329 | 2015-05-20 | | | Declaration under 37 CFR by Inventor Vinayagam Kannan | | Dup, H, I, E |
| PTX-0330 | 2015-05-20 | | | Declaration under 37 CFR by Inventor Vinayagam Kannan | | Dup, H, I, E |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0339 | | | | Ex. B. FDA Guidance for Industry, ANDA Submissions - Content and Format June 2019 | | H, A, R, F, 403, 26, DUP |
| PTX-0340 | | | | Ex. C. FDA Guidance for Industry, ANDA's: Stability Testing of Drug Substances and Products: Quesitons and Answers: (May 2014) | | H, A, R, F, 403, 26 |
| PTX-0347 | | | | H. Fresier and Q. Fernando, IONIC EQUILIBRIA IN ANALYTICAL CHEMISTRY, Wiley, New York (1963) | | H, A, R, F, 403, |
| PTX-0349 | | | | Holmes et al., Science Review: Vasopressin and the cardiovascular system part 2—clinical physiology, Critical Care 2004, 8:15-23 (June 26, 2003) | | H, A, R, F, 403, 26 |
| PTX-0350 | | | | Holmes, et al., Science Review: Vasopressin and the cardiovascular system part 1—receptor physiology, Critical Care, 2003, 7:427-34 (June 26, 2003) | | H, A, R, F, 403, 26 |
| PTX-0353 | 2019-05-03 | | | Joint Claim Construction Brief | | H, R, F, 403 |
| PTX-0355 | 2015-05-20 | | | Office Action Summary | | R, 403, E |
| PTX-0372 | 2015-08-14 | | | Response to Action: Peptide Congeners with Polymer Excipients | | Dup, E |
| PTX-0373 | 2015-11-24 | | | Response to Final Office Action and Request for Continued Examination re: Vasopressin Formulations for use in Treatment of Hypotension | | Dup, E |
| PTX-0374 | | | | Stratton, Lewis, Controlling Deamidation Rates in a Model Peptide: Effects of Temperature, Peptide Concentration, and Additives, Journal of Pharmaceutical Sciences Vol. 90, No. 12 (December 2001) 2141-2148 | | H, A, R, F, 403 |
| PTX-0375 | 2019-04-16 | | | Supplemental Declaration of Zlatan Coralic | | H, A, R, F, 403 |
| PTX-0376 | 2015-10-21 | | | United States Patent Application NO. 14717877 Office Action Summary | | Dup |
| PTX-0377 | 2015-05-20 | | | United States Patent Application NO. 14717877 Office Action Summary | | Dup |
| PTX-0378 | 2009-05-01 | EAGLEVAS0058037 | EAGLEVAS0058040 | USP 32 (2009) | | H, A, R, F, 403 |
| PTX-0379 | 2012-05-01 | | | USP 35 (2012) <791> | | H, A, R, F, 403 |
| PTX-0381 | | | | Wang, Wei, Instability, stabilization and formulation of liquid protein pharmaceuticals, International Journal of Pharmaceutics 185 (1999) 129-188 | | H, A, R, F, 403 |
| PTX-0382 | | | | Vasostrict Label | | H, A |
| PTX-0408 | 3/xx/1980 | AMPHPA0006054 | AMPHPA0006080 | Gordon L. Flynn, "Buffers - pH Control within Pharmceutical Systems," PDA J. Pharm. Sci. and Tech. 34 139-162 (1980) | | H, A, R, F, 403 |
| PTX-0409 | xx/xx/2013 | AMPHPA0006136 | AMPHPA0006184 | Pharmaceutical Formulation Development of Peptides and Proteins (2d ed.) (L. Hovgaard, S. Forkjaer, M. van de Weert eds. 2013) | | H, A, R, F, 403 |
| PTX-0410 | 2015-05-01 | AMPHPA0006744 | AMPHPA0006747 | USP Vasopressin Injection USP 38 | | H, A, R, F, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0411 | 2017-04-28 | PAR-VASO_0070200 | PAR-VASO_0070289 | Stability Data | | R, 403, 1006 |
| PTX-0412 | 2013-05-17 | PAR-VASO_0077369 | PAR-VASO_0077369 | JHP May 2013 Letter to FDA, Request for Reconsideration of Proprietary Name | | R, 403 |
| PTX-0413 | 2013-02-04 | PAR-VASO_0089792 | PAR-VASO_0089792 | Email from Kannan to Bergren re Pitressin Comparison | | H, A, R, F, 403 |
| PTX-0414 | 2013-02-04 | PAR-VASO_0089793 | PAR-VASO_0089796 | Comparison of Vasopressin Formulations | | H, A, R, F, 403 |
| PTX-0417 | xx/xx/1993 | PAR-VASO_0298219 | PAR-VASO_0298224 | Kirsch, L. E., Riggin, R., Gearhart, D., LeFeber, D., Lytle, D., "In-process Protein Degradation by Exposure to Trace Amounts of Sanitizing Agents," Journal of Parenteral Science and Technology, 47(4):155-160 (1993) | | H, A, R, F, 403 |
| PTX-0418 | | PAR-VASO_0298225 | PAR-VASO_0298228 | Kirsch, L. E., Notari, R., "Theoretical Basis for the Detection of General-Base Catalysis in the Presence of Predominating Hydroxide Catalysis," Journal of Pharmaceutical Sciences, 73(6):724-727 | | H, A, R, F, 403 |
| PTX-0419 | xx/xx/1995 | PAR-VASO_0298229 | PAR-VASO_0298302 | Joost J. M. Holthuis and Reinoud J. Driebergen, "Chromatographic Techniques for the Characterization of Proteins," in Physical Methods to Characterize Pharmaceutical Protein, eds. James N. Herron, Wim Jiskoot, Daan J.A. Crommelin, Plenum Press, New York, 1995 | | H, A, R, F, 403 |
| PTX-0420 | | PAR-VASO_0298412 | PAR-VASO_0298450 | Jens Brange and Lotte Langkjaer, "Insulin Structure and Stability," in Stability and Characterization of Protein and Peptide Drugs: Case Histories, eds. Y. John Wang and Rodney Pearlman, Plenum Press, New York, 19 | | H, A, R, F, 403 |
| PTX-0421 | | PAR-VASO_0298451 | PAR-VASO_0298599 | Nail, S. L., & Akers, M. J. (2002). Development and manufacture of protein pharmaceuticals. New York: Kluwer Academic/Plenum Publishers. | | H, A, R, F, 403 |
| PTX-0422 | | PAR-VASO_0298600 | PAR-VASO_0298725 | James E. De Muth, Basic Statistics and Pharmaceutical Statistical Application, 2nd, Chapman & Hall/CRC, Boca Raton, 2006 | | H, A, R, F, 403 |
| PTX-0423 | | PAR-VASO_0298726 | PAR-VASO_0298740 | C. Lawrence, A. Reilly, "Maximum Likelihood Estimation of Subsequence Conservation," J. Theor. Biol., 113 425-439 (1985) | | H, A, R, F, 403 |
| PTX-0467 | | | | Exhibit 1 - Guidance for Industry Q1E Evaluation of Stability Data June 2004 | | H, A, R, F, 403 |
| PTX-0468 | | | | Exhibit 2 - ICH Harmonised Tripartite Guideline Evaluation for Stability Data Q1E February 6 2003 | | H, A, R, F, 403 |
| PTX-0469 | 2016-03-18 | PAR-VASO_0014613 | PAR-VASO_0014618 | NDA 204485 Approval Letter | | H, R, 403 |
| PTX-0470 | | PAR-VASO_0298746 | PAR-VASO_0298750 | FDA Emergency Preparedness and Response: Expiration Dating Extension | | H, A, R, F, 403 |

EXHIBIT 5

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0600 | | AMVAS0000001 | AMVAS0009090 | Amneal's ANDA No. 212944 Sequences 1-9 | | H, R, F, 403 |
| | | AMVAS0018317 | AMVAS0018464 | | | |
| | | AMVAS0018618 | AMVAS0018619 | | | |
| | | AMVAS0018622 | | | | |
| | | AMVAS0018624 | AMVAS0018667 | | | |
| | | AMVAS0078354 | AMVAS0078383 | | | |
| | | AMVAS0120290 | AMVAS0120334 | | | |
| | | AMVAS0120386 | AMVAS0120486 | | | |
| | | AMVAS0120439 | AMVAS0120447 | | | |
| | | AMVAS0131379 | AMVAS0131646 | | | |
| PTX-0601 | | AMVAS0009091 | AMVAS0018316 | Amneal's ANDA No. 212945 Sequences 1-9 | | H, R, F, 403 |
| | | AMVAS0018465 | AMVAS0018617 | | | |
| | | AMVAS0018620 | AMVAS0018621 | | | |
| | | AMVAS0018623 | | | | |
| | | AMVAS0018668 | AMVAS0018714 | | | |
| | | AMVAS0078384 | AMVAS0078413 | | | |
| | | AMVAS0120335 | AMVAS0120385 | | | |
| | | AMVAS0120407 | AMVAS0120427 | | | |
| | | AMVAS0120448 | AMVAS0120456 | | | |
| | | AMVAS0133647 | AMVAS0133927 | | | |
| PTX-0602 | | AMVAS0018624 | AMVAS0018667 | Module 3.2.P.8.3 Stability Data | | Dup, R, 403 |
| PTX-0603 | 2020-07-14 | AMVAS0120290 | AMVAS0120334 | Module 3.2.P.8.3 Stability Data | | Dup, R, 403 |
| PTX-0604 | 2020-07-17 | AMVAS0120386 | AMVAS0120406 | Module 3.2.P.8.3 Stability Report for Additional Study | | Dup, R, 403 |
| PTX-0605 | 2019-12-16 | AMVAS0120439 | AMVAS0120447 | Amneal's ANDA No. 212944 Sequences 1-8-SDV ██████████ | | Dup, R, 403 |
| PTX-0606 | 2020-07-17 | AMVAS0120407 | AMVAS0120427 | Module 3.2.P.8.3 Stability Report for Additional Study | | Dup, R, 403 |
| PTX-0607 | | AMVAS0120448 | AMVAS0120456 | Amneal's ANDA No. 212945 Sequences 1-8 -MDV ██████████ | | Dup, R, 403 |
| PTX-0608 | 2018-12-11 | AMVAS0000001 | AMVAS0000002 | Module 1.12.11 ANDA Basis for Submission Statement | | Dup |
| PTX-0609 | 2018-12-11 | AMVAS0000003 | AMVAS0000006 | SDV Module 1.12.11 Basis for Submission | | R, 403 |
| PTX-0610 | 2018-12-25 | AMVAS0000010 | AMVAS0000033 | Module 1.12.15 Request for Waiver of In-VIVO BA/BE Studies | | R, 403 |
| PTX-0611 | 2018-12-21 | AMVAS0000296 | AMVAS0000456 | Module 2.3.P Drug Product | | R, 403, E |

EXHIBIT 26

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0612 | 2018-12-20 | AMVAS0001018 | AMVAS0001056 | Module 3.2.P.1 Description and Composition of the Drug Product | | R, 403 |
| PTX-0613 | 2018-12-19 | AMVAS0001254 | AMVAS0001384 | Module 3.2.P.2 Pharmaceutical Development | | R, 403, Dup |
| PTX-0614 | 2018-12-03 | AMVAS0002202 | AMVAS0002217 | Product Bubble Point Ratio Determination Test Report | | R, 403, E |
| PTX-0615 | 2018-12-03 | AMVAS0002218 | AMVAS0002237 | Filter Compatibility Test Protocol | | R, 403 |
| PTX-0616 | 2018-12-24 | AMVAS0001385 | AMVAS0001428 | Module 3.2.P.3.1 Manufacturer(s) | | R, 403 |
| PTX-0617 | 2018-12-05 | AMVAS0001429 | AMVAS0001432 | Module 3.2.P.3.2 Batch Formula | | R, 403 |
| PTX-0618 | 2018-12-06 | AMVAS0001443 | AMVAS0001496 | Module 3.2.P.3.3 Description of the Manufacturing Process and Process Controls | | R, 403 |
| PTX-0619 | 2018-12-03 | AMVAS0001497 | AMVAS0001511 | Module 3.2.P.3.3 Batch Manufacturing Record Comparison (Rationale) | | Dup, R, 403 |
| PTX-0620 | 2018-11-27 | AMVAS0001512 | AMVAS0001640 | Intended Batch Manufacturing Record | | Dup, R, 403 |
| PTX-0621 | 2018-05-30 | AMVAS0002086 | AMVAS0002092 | Exhibit Batch In-Process Certificates of Analysis | | R, 403 |
| PTX-0622 | 2019-09-16 | AMVAS0018333 | AMVAS0018338 | Module 3.2.P.3.4 In-Process Specifications / Laboratory Test Report Form | | R, 403 |
| PTX-0623 | 2018-11-20 | AMVAS0003963 | AMVAS0003974 | Module 3.2.P.5.2 Analytical Procedure for Assay of Vasopressin (In Unit) | | R, F, 403 |
| PTX-0624 | 2018-12-17 | AMVAS0003983 | AMVAS0003993 | Module 3.2.P.5.2 Analytical Procedure for General Methods | | R, F, 403 |
| PTX-0625 | 2018-11-28 | AMVAS0003994 | AMVAS0004083 | Module 3.2.P.5.2 Analytical Procedure for Related Compounds | | R, F, 403 |
| PTX-0626 | 2018-12-17 | AMVAS0004084 | AMVAS0004143 | Superiority/Equivalency Report of Analytical Procedure for Assay of Vasopressin | | R, 403 |
| PTX-0627 | 2018-12-15 | AMVAS0004144 | AMVAS0004156 | Module 3.2.P.5.2 Validation of Analytical Procedures and Sample Statement | | R, 403 |
| PTX-0628 | 2018-11-28 | AMVAS0004157 | AMVAS0004214 | Comparative Analytical Evaluation Study Report for Assay | | R, 403 |
| PTX-0629 | 2018-11-30 | AMVAS0004215 | AMVAS0004295 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Assay of Vasopressin (In Units) | | Dup, R, 403, 1006 |
| PTX-0630 | 2018-10-12 | AMVAS0004296 | AMVAS0004429 | Module 3.2.P.5.3 Validation Report of Revised Analytical Procedure for Assay of Vasopressin (In Units) | | Dup, R, 403, 1006 |
| PTX-0631 | | AMVAS0004505 | AMVAS0004577 | Comparative Analytical Evaluation Study Report for Related Compound | | R, 403, 1006 |
| PTX-0632 | 2018-12-10 | AMVAS0004578 | AMVAS0004859 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Related Compounds (By UPLC) | | R, 403, 1006 |
| PTX-0633 | 2018-10-10 | AMVAS0004860 | AMVAS0005117 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Related Compounds (By HPLC) | | R, 403, 1006 |
| PTX-0634 | 2018-12-17 | AMVAS0005136 | AMVAS0005186 | Certificates of Analysis for Batch ███████████████ | | R, 403 |
| PTX-0635 | 2018-12-18 | AMVAS0005187 | AMVAS0005195 | Module 3.2.P.5.5 Characterization of Impurities | | Dup, E, R, 403 |
| PTX-0636 | 2018-12-17 | AMVAS0005538 | AMVAS0005544 | Additional Study Protocol for Vasopressin Injection USP, 20 Units/mL | | R, 403 |
| PTX-0637 | 2018-12-17 | AMVAS0005552 | AMVAS0005560 | Stability Protocol | | Dup, R, 403 |
| PTX-0638 | 2018-12-14 | AMVAS0005561 | AMVAS0005562 | Module 3.2.P.8.1 Stability Summary and Conclusion | | R, 403 |
| PTX-0639 | 2018-12-13 | AMVAS0005570 | AMVAS0005577 | Module 3.2.P.8.2 Post-Approval Stability Commitment | | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0640 | 2018-12-24 | AMVAS0005631 | AMVAS0006252 | Module 3.2.P.8.3 Stability Data Overview | | Dup, R, 403 |
| PTX-0641 | 2018-11-23 | AMVAS0006272 | AMVAS0006288 | Module 3.2.R.1.P.1 Executed Batch Records with Reconciliation | | R, 403 |
| PTX-0642 | 2018-05-04 | AMVAS0006289 | AMVAS0006620 | Batch Manufacturing Record – ██████████ | | H, R, 403, Dup |
| PTX-0643 | 2018-05-10 | AMVAS0006621 | AMVAS0006943 | Batch Manufacturing Record – ██████████ | | H, R, 403, Dup |
| PTX-0644 | 2018-05-10 | AMVAS0006944 | AMVAS0007390 | Batch Manufacturing Record – ████████ 4 | | H, R, 403, Dup |
| PTX-0645 | | N/A | | Unused Number | | |
| PTX-0646 | | N/A | | Unused Number | | |
| PTX-0647 | | N/A | | Unused Number | | |
| PTX-0648 | 2018-12-25 | AMVAS0007625 | AMVAS0007665 | Module 3.2.S.3 Characterization | | R, 403 |
| PTX-0649 | | AMVAS0008966 | AMVAS0008969 | Final Carton or Container Labels | | R, F, 403 |
| PTX-0650 | | AMVAS0009026 | AMVAS0009026 | Final Carton or Container Labels | | R, F, 403, E |
| PTX-0651 | | AMVAS0009027 | AMVAS0009027 | Final Carton or Container Labels | | R, F, 403, E, Dup |
| PTX-0652 | 2019-03-01 | AMVAS0008970 | AMVAS0008971 | 1-14-2-3-final-package-insert-fpl | | R, 403, Dup |
| PTX-0653 | 2019-03-01 | AMVAS0008972 | AMVAS0008982 | 1-14-2-3-final-package-insert | | R, 403, E |
| PTX-0654 | 2019-09-18 | AMVAS0018339 | AMVAS0018353 | Module 3.2.P.5.1 Finished Product Specifications | | Dup, R, 403 |
| PTX-0655 | 2019-09-17 | AMVAS0018354 | AMVAS0018425 | Module 3.2.P.5.6 Justification of Specifications for Finished Product | | R, 403 |
| PTX-0656 | 2019-02-14 | AMVAS0025200 | AMVAS0025205 | Paragraph IV Acknowledgement-ANDA Receipt from FDA to Amneal | | R, 403 |
| PTX-0657 | 2018-12-11 | AMVAS0009091 | AMVAS0009092 | Module 1.12.11 ANDA Basis for Submission Statement | | R, 403 |
| PTX-0658 | 2018-12-11 | AMVAS0009093 | AMVAS0009096 | Module 1.12.12 Comparison Between Generic Drugs and RLD | | R, 403 |
| PTX-0659 | 2018-12-25 | AMVAS0009100 | AMVAS0009115 | Module 1.12.15 Request for Waiver of In-VIVO BA/BE Studies | | R, 403 |
| PTX-0660 | 2018-12-15 | AMVAS0009368 | AMVAS0009544 | Module 2.3.P Drug Product | | Dup, R, 403, E |
| PTX-0661 | 2018-12-20 | AMVAS0010136 | AMVAS0010166 | Module 3.2.P.1 Description and Composition of the Drug Product | | R, 403 |
| PTX-0662 | 2018-12-13 | AMVAS0010387 | AMVAS0010541 | Module 3.2.P.2 Pharmaceutical Development | | R, 403, Dup |
| PTX-0663 | | AMVAS0011412 | AMVAS0011425 | Product Bubble Point Ratio Determination Test Report | | R, 403, Dup |
| PTX-0664 | 2018-05-23 | AMVAS0011426 | AMVAS0011439 | Filter Compatibility Test Protocol | | R, 403 |
| PTX-0665 | 2018-12-24 | AMVAS0010561 | AMVAS0010607 | Module 3.2.P.3.1 Manufacturer(s) | | R, 403 |
| PTX-0666 | 2018-12-05 | AMVAS0010608 | AMVAS0010611 | Module 3.2.P.3.2 Batch Formula | | R, 403 |
| PTX-0667 | 2018-12-06 | AMVAS0010622 | AMVAS0010676 | Module 3.2.P.3.3 Description of the Manufacturing Process and Process Controls | | R, 403 |
| PTX-0668 | 2018-12-03 | AMVAS0010677 | AMVAS0010692 | Module 3.2.P.3.3 Batch Manufacturing Record Comparison (Rationale) | | R, 403 |
| PTX-0669 | 2018-11-23 | AMVAS0010693 | AMVAS0010826 | Intended Batch Manufacturing Record | | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|------------------------|------------|
| PTX-0670 | 2019-09-16 | AMVAS0018481 | AMVAS0018486 | Module 3.2.P.3.4 In-Process Specifications / Laboratory Test Report Form | | R, 403 |
| PTX-0671 | 2018-11-20 | AMVAS0013399 | AMVAS0013409 | Module 3.2.P.5.2 Analytical Procedure for Assay of Vasopressin (In Unit) | | R, F, 403 |
| PTX-0672 | 2018-12-17 | AMVAS0013428 | AMVAS0013441 | Module 3.2.P.5.2 Analytical Procedure for General Methods | | R, F, 403 |
| PTX-0673 | 2018-12-10 | AMVAS0013566 | AMVAS0013579 | Module 3.2.P.5.3 Validation of Analytical Procedures and Sample Statement | | R, 403 |
| PTX-0674 | 2018-11-28 | AMVAS0013580 | AMVAS0013638 | Comparative Analytical Evaluation Study Report for Assay | | R, 403 |
| PTX-0675 | 2018-12-15 | AMVAS0013639 | AMVAS0013724 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Assay of Vasopressin (In Units) | | R, 403 |
| PTX-0676 | 2018-12-15 | AMVAS0013725 | AMVAS0013787 | Module 3.2.P.5.3 Validation Report of Revised Analytical Procedure for Assay of Vasopressin (In Units) | | R, 403, E |
| PTX-0677 | 2018-12-05 | AMVAS0013913 | AMVAS0013985 | Comparative Analytical Evaluation Study Report for Related Compound | | R, 403 |
| PTX-0678 | 2018-12-08 | AMVAS0013986 | AMVAS0014266 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Related Compounds (By UPLC) | | R, 403 |
| PTX-0679 | 2018-12-17 | AMVAS0014267 | AMVAS0014551 | Module 3.2.P.5.3 Validation Report of Analytical Procedure for Related Compounds (By HPLC) | | R, 403 |
| PTX-0680 | 2018-12-17 | AMVAS0014570 | AMVAS0014638 | Certificates of Analysis for Batch Nos█████████████ | | R, 403 |
| PTX-0681 | 2018-12-11 | AMVAS0014639 | AMVAS0014647 | Module 3.2.P.5.5 Characterization of Impurities | | Dup, E, R, 403 |
| PTX-0682 | 2018-12-17 | AMVAS0014982 | AMVAS0014988 | Additional Study Protocol for Vasopressin Injection USP, 20 Units/mL | | R, 403 |
| PTX-0683 | 2018-12-17 | AMVAS0014996 | AMVAS0015004 | Stability Protocol | | Dup, R, 403 |
| PTX-0684 | 2018-12-14 | AMVAS0015005 | AMVAS0015006 | Module 3.2.P.8.1 Stability Summary and Conclusion | | R, 403 |
| PTX-0685 | 2018-12-12 | AMVAS0015014 | AMVAS0015021 | Module 3.2.P.8.2 Post-Approval Stability Commitment | | r, 403 |
| PTX-0686 | 2018-12-21 | AMVAS0015094 | AMVAS0015766 | Module 3.2.P.8.3 Stability Data Overview | | Dup, R, 403 |
| PTX-0687 | 2018-11-21 | AMVAS0015786 | AMVAS0015802 | Module 3.2.R.1.P.1 Executed Batch Records with Reconciliation | | R, 403 |
| PTX-0688 | | N/A | | Unused Number | | |
| PTX-0689 | | N/A | | Unused Number | | |
| PTX-0690 | | N/A | | Unused Number | | |
| PTX-0691 | 2018-05-18 | AMVAS0015803 | AMVAS0016088 | Batch Manufacturing Record –████ | | R, 403 |
| PTX-0692 | 2018-05-21 | AMVAS0016089 | AMVAS0016351 | Batch Manufacturing Record –████ | | R, 403 |
| PTX-0693 | 2018-05-24 | AMVAS0016352 | AMVAS0016626 | Batch Manufacturing Record –████ | | R, 403 |
| PTX-0694 | 2018-12-25 | AMVAS0016856 | AMVAS0016896 | Module 3.2.S.S.3 Characterization | | R, 403 |
| PTX-0695 | 2019-03-16 | AMVAS0018194 | AMVAS0018196 | Module 1.14.2.1 Final Carton or Container Labels | | Dup, R, 403 |
| PTX-0696 | 2019-03-01 | AMVAS0018253 | AMVAS0018253 | vasopressin-injection-usp-20-units-per-ml---10-ml-2 | | Dup, R, 403 |
| PTX-0697 | 2019-03-01 | AMVAS0018254 | AMVAS0018254 | vasopressin-injection-usp-20-units-per-ml---10-ml-3-(10mL Carton) | | Dup, R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0698 | 2019-03-01 | AMVAS0018197 | AMVAS0018198 | MDV Package Insert | | Dup, R, 403 |
| PTX-0699 | 2019-03-01 | AMVAS0018199 | AMVAS0018209 | 1-14-2-3-final-package-insert | | Dup, R, 403 |
| PTX-0700 | 2019-09-18 | AMVAS0018487 | AMVAS0018501 | Module 3.2.P.5.1 Finished Product Specifications | | Dup, R, 403 |
| PTX-0701 | 2019-09-17 | AMVAS0018502 | AMVAS0018575 | Module 3.2.P.5.6 Justification of Specifications for Finished Product | | R, 403 |
| PTX-0702 | | AMVAS0018668 | AMVAS0018714 | Module 3.2.P.8.3 Stability Data | | Dup, R, 403, E |
| PTX-0703 | | AMVAS0120335 | AMVAS0120385 | Module 3.2.P.8.3 Stability Data | | R, 403 |
| PTX-0704 | 2019-02-14 | AMVAS0024704 | AMVAS0024709 | February 14, 2019, Paragraph IV Acknowledgement-ANDA Receipt from FDA to Amneal | | R, 403 |
| PTX-0705 | 2017-06-01 | AMVAS0071848 | AMVAS0071908 | Laboratory Notebook, PD-LNB-155 | | H, R, 403 |
| PTX-0706 | 2018-06-14 | AMVAS0071786 | AMVAS0071847 | Laboratory Notebook, PD-LNB-176 | | H, R, 403 |
| PTX-0707 | 2019-12-09 | | | Amneals' Responses and Objections to Plaintiffs' RFPs (Nos. 1-40) | | R, 403 |
| PTX-0708 | 2019-12-09 | | | Amneals' Responses and Objections to Plantiffs' First Set of Rogs. (Amneal) | | R, 403 |
| PTX-0709 | 2020-03-02 | | | Amneals' First Supplemental Responses and Objections to Plantiffs' First Set of Rogs. (Nos. 1-2) | | R, 403 |
| PTX-0710 | 2020-08-03 | | | Amneals' Second Supplemental Responses and Objections to Plaintiffs' First Set of Rogs (Nos. 1, 2, &, 8) | | R, 403, E |
| PTX-0711 | 2020-07-02 | | | Amneal's Responses and Objections to Plaintiffs' Second Set of Interrogatories | | R, 403 |
| PTX-0712 | | AMVAS0051164 | AMVAS0051164 | Amneal Product Development Spreadsheet, Analytical Results Updated | | R, 403, Dup |
| PTX-0713 | | AMVAS0057512 | AMVAS0057512 | Amneal Product Development Spreadsheet, Analytical Results Updated | | R, 403, Dup |
| PTX-0714 | | PAR-VASO_0014782 | PAR-VASO_0014787 | March 2015 Vasostrict Label | | H, A, E |
| PTX-0715 | 2017-04-25 | PAR-VASO_0024462 | PAR-VASO_0024475 | Stability Tables, 2002501_21M data for OOR studies | | H, A, R, 403, F |
| PTX-0716 | 2014-10-21 | PAR-VASO_0028307 | PAR-VASO_0028352 | Pharmaceutical Development Technical Report, FRD-14-001R | | H, A, R, 403, F |
| PTX-0717 | 2018-05-03 | PAR-VASO_0051301 | PAR-VASO_0051369 | Vasostrict - Stability Data for Annual Report | | H, R, 403 |
| PTX-0718 | 2015-06-23 | PAR-VASO_0063116 | PAR-VASO_0063179 | Certificate of Analysis, rc3279-bulk.pdf | | H, R, 403 |
| PTX-0719 | 2015-07-13 | PAR-VASO_0063191 | PAR-VASO_0063238 | Certificate of Analysis, rc3279-fill-part-1.pdf | | H, R, 403 |
| PTX-0720 | 2015-06-03 | PAR-VASO_0063367 | PAR-VASO_0063432 | Request for Sample/Testing, rc3280-bulk.pdf | | H, R, 403 |
| PTX-0721 | Undated | PAR-VASO_0063444 | PAR-VASO_0063491 | Certificate of Analysis, rc3280-fill-part-1.pdf | | H, R, 403 |
| PTX-0722 | 2015-06-26 | PAR-VASO_0063600 | PAR-VASO_0063650 | Certificate of Analysis, rc3281-bulk-part-1.pdf | | H, R, 403 |
| PTX-0723 | Undated | PAR-VASO_0063706 | PAR-VASO_0063747 | Certificate of Analysis - Release Chemistry, rc3281-fill-part-1.pdf | | H, R, 403 |
| PTX-0724 | 2015-10-12 | PAR-VASO_0065457 | PAR-VASO_0065546 | Executed Master Batch Record, RC3300 | | H, A, R, 403, F |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|------------------------|------------|
| PTX-0725 | Undated | PAR-VASO_0065558 | PAR-VASO_0065636 | Executed Master Batch Record, rc3300-fill.pdf | | H, A, R, 403, F |
| PTX-0726 | 2015-10-21 | PAR-VASO_0065688 | PAR-VASO_0065760 | Executed Master Batch Record, rc3301-bulk.pdf | | H, A, R, 403, F |
| PTX-0727 | | PAR-VASO_0065772 | PAR-VASO_0065870 | Executed Master Batch Record, rc3301-fill.pdf | | H, A, R, 403, F |
| PTX-0728 | 2015-10-27 | PAR-VASO_0065929 | PAR-VASO_0066011 | Executed Master Batch Record, rc3302-bulk.pdf | | H, A, R, 403, F |
| PTX-0729 | Undated | PAR-VASO_0066023 | PAR-VASO_0066110 | Executed Master Batch Record, rc3302-fill.pdf | | H, A, R, 403, F |
| PTX-0730 | | PAR-VASO_0071912 | PAR-VASO_0071967 | Stability Data - Annual Stability Lots | | H, A, R, 403, F |
| PTX-0731 | 2019-02-07 | PAR-VASO_0083614 | PAR-VASO_0083646 | Stability Tables, Stock No. 2002501 | | H, R, 403 |
| PTX-0732 | 2015-03-17 | PAR-VASO_0096634 | PAR-VASO_0096687 | Certificate of Analysis, 788436F Bulk | | H, R, 403 |
| PTX-0733 | 2016-07-01 | PAR-VASO_0109117 | PAR-VASO_0109128 | License Agreement between Par Sterile Products and Endo Par Innovation Company, effective July 1, 2016 | | H, A, R, 403, F, Dup |
| PTX-0734 | 2016-07-01 | PAR-VASO_0109129 | PAR-VASO_0109144 | License Agreement between Par Sterile Products and Endo Par Innovation Company, effective July 1, 2016 | | H, A, R, 403, F, Dup |
| PTX-0735 | 2018-05-30 | PAR-VASO_0109145 | PAR-VASO_0109146 | Supplement to License Agreement dated July 1, 2016 between Par Sterile Products and Endo Par Innovation Company | | H, A, R, 403, F |
| PTX-0736 | 2012-06-27 | PAR-VASO_0138678 | PAR-VASO_0138688 | Product Development Report, Stability Comparison of Vasopressin, DEV-12-033R | | H, A, R, 403, F |
| PTX-0737 | | PAR-VASO_0292771 | PAR-VASO_0292982 | [Redacted] Kirsch Validity and Enforceability Expert Report.pdf | | H, A, R, 403, F |
| PTX-0738 | | PAR-VASO_0254549 | PAR-VASO_0254550 | December 2016 Vasostrict Label | | H, A |
| PTX-0739 | 2020-06-02 | N/A | | Pltfs. First Notice of Dep. Of Amneal Pharmaceuticals | Exhibit 1 Joshi Volume 1 | R, 403 |
| PTX-0740 | 2020-07-17 | N/A | | Email from J. Bennett t B. Goldberg re: Kenney Depositiion | Exhibit 2 Joshi Volume 1 | H, R, F, 403 |
| PTX-0741 | 2018-12-27 | AMVAS0000178 | AMVAS0000236 | December 27, 2018 ANDA # 212944 Sequence # 0001 Cover Letter | Exhibit 3 Joshi Volume 1 | R, 403 |
| PTX-0742 | 2018-12-27 | AMVAS0009258 | AMVAS0009309 | December 27, 2018 ANDA # 212945 Sequence # 0001 Cover Letter | Exhibit 4 Joshi Volume 1 | R, 403 |
| PTX-0743 | 2018-12-11 | AMVAS0000001 | AMVAS0000002 | SDV Module 1.12.11 ANDA Basis for Submission Statement, December 11, 2018 | Exhibit 5 Joshi Volume 1 | R, 403 |
| PTX-0744 | 2018-12-11 | AMVAS0009091 | AMVAS0009092 | MDV Module 1.12.11 ANDA Basis for Submission Statement, December 11, 2018 | Exhibit 6 Joshi Volume 1 | R, 403 |
| PTX-0745 | 2019-02-14 | AMVAS0024704 | AMVAS0024709 | MDV Vasopressin Injection, USP Paragraph and Acknowledgement and Receipt | Exhibit 7 Joshi Volume 1 | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0746 | 2018-12-27 | AMVAS0025200 | AMVAS0025205 | SDV Vasopressin Injection, USP Paragraph and Acknowledgement and Receipt | Exhibit 8 Joshi Volume 1 | R, 403 |
| PTX-0747 | 2018-12-11 | AMVAS0000003 | AMVAS0000006 | SDV Module 1.12.12 Comparison between Generic and RLD | Exhibit 9 Joshi Volume 1 | R, 403 |
| PTX-0748 | 2018-12-11 | AMVAS0009093 | AMVAS0009096 | MDV Module 1.12.12 Comparison between Generic and RLD | Exhibit 10 Joshi Volume 1 | R, 403 |
| PTX-0749 | 2018-12-25 | AMVAS0016856 | AMVAS0016896 | Module 3.2.S.3 Characterization | Exhibit 11  Joshi Volume 1 | R, 403 |
| PTX-0750 | 2018-12-13 | AMVA0010387 | AMVA0010541 | MDV Module 3.2.P.2 Pharmaceutical Development | Exhibit 12 Joshi Volume 1 | R, 403 |
| PTX-0751 | 2018-12-19 | AMVA0001254 | AMVA0001384 | SDV Module 3.2.P.2 Pharmaceutical Development | Exhibit 13 Joshi Volume 1 | R, 403 |
| PTX-0752 | | AMVAS0011412 | AMVAS0011425 | Product Bubble Point Ratio Determination Test Report Vasopressin Injection, USP | Exhibit 14 Joshi Volume 2 | R, 403 |
| PTX-0753 | 2019-05-07 | AMVAS0071786 | AMVAS0071847 | Laboratory Notebook, PD-LNB-176 | Exhibit 15 Joshi Volume 2 | H, R, 403 |
| PTX-0754 | 2018-12-06 | AMVAS0001443 | AMVAS0001496 | SDV Module 3.2.P.3.3 Description of Manufacuring Process and Controls | Exhibit 16 Joshi Volume 2 | R, 403 |
| PTX-0755 | 2018-12-06 | AMVAS0010622 | AMVAS0010676 | MDV Module 3.2.P.3.3 Description of Manufacuring Process and Controls | Exhibit 17 Joshi Volume 2 | R, 403 |
| PTX-0756 | 2018-12-20 | AMVAS0001018 | AMVAS0001056 | SDV Module 3.2.P.1 Description and Composition of Drug Product | Exhibit 18 Joshi Volume 2 | R, 403 |
| PTX-0757 | 2018-12-20 | AMVAS0010136 | AMVAS0010166 | MDV Module 3.2.P.1 Description and Composition of Drug Product | Exhibit 19 Joshi Volume 2 | R, 403 |
| PTX-0758 | 2019-09-16 | AMVAS0018333 | AMVAS0018338 | SDV Module 3.2.P.3.4 In-Process Specifications (Sept. 16, 2019) | Exhibit 20 Joshi Volume 2 | R, 403 |
| PTX-0759 | 2019-09-16 | AMVAS0018481 | AMVAS0018486 | MDV Module 3.2.P.3.4 In-Process Specifications (Sept. 16, 2019) | Exhibit 21 Joshi Volume 2 | R, 403 |
| PTX-0760 | 2019-09-17 | AMVAS0018339 | AMVAS0018353 | SDV Module 3.2.P.5.1 Finished Product Specifications (Sept. 16, 2019) | Exhibit 22 Joshi Volume 2 | R, 403 |
| PTX-0761 | 2019-09-16 | AMVAS0018487 | AMVAS0018501 | MDV Module 3.2.P.5.1 Finished Product Specifications (Sept. 16, 2019) | Exhibit 23 Joshi Volume 2 | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0762 | 2019-09-17 | AMVAS0018354 | AMVAS0018425 | SDV Module 3.2.P.5.6 Justification of Specification (Sept. 17, 2019) | Exhibit 24 Joshi Volume 2 | R, 403 |
| PTX-0763 | 2019-09-17 | AMVAS0018502 | AMVAS0018575 | MDV Module 3.2.P.5.6 Justification of Specification (Sept. 17, 2019) | Exhibit 25 Joshi Volume 2 | R, 403 |
| PTX-0764 | 2018-12-27 | AMVAS00120439 | AMVAS00120447 | ███████████████████████ | Exhibit 26 Joshi Volume 2 | R, 403 |
| PTX-0765 | 2018-12-27 | AMVAS00120448 | AMVAS00120456 | ███████████████████████ | Exhibit 27 Joshi Volume 2 | R, 403 |
| PTX-0766 | 2018-12-06 | AMVAS0001111 | AMVAS0001172 | Vasopressin Injection, USP Disolution Study Report | Exhibit 28 Joshi Volume 2 | R, 403 |
| PTX-0767 | 2020-07-23 | AMVAS0051164 | | Amneal Product Development Stability Excel Spreadsheet (AMVAS0051164) | Exhibit 29 Joshi Volume 2 | R, 403 |
| PTX-0768 | 2020-07-23 | AMVAS0057512 | | Amneal Product Development Stability Excel Spreadsheet (AMVAS0057512) | Exhibit 30 Joshi Volume 2 | R, 403 |
| PTX-0769 | 2018-12-21 | AMVAS0015061 | AMVAS0015093 | MDV Module 3.2.P.8.3 Stability Report for Accelerated and Long-Term Condition (Dec. 21, 2018) | Exhibit 31 Joshi Volume 2 | R, 403 |
| PTX-0770 | 2018-12-21 | AMVAS0005599 | AMVAS0005630 | SDV Module 3.2.P.8.3 Stability Report for Accelerated and Long-Term Condition (Dec. 21, 2018) | Exhibit 32 Joshi Volume 2 | R, 403 |
| PTX-0771 | 2020-07-14 | AMVAS0120290 | AMVAS0120334 | SDV Module 3.2.P.8.3 Stability Report for Accelerated and Long-Term Conditions Report (Jul. 14, 2020) | Exhibit 35 Joshi Volume 2 | R, 403 |
| PTX-0772 | 2020-07-15 | AMVAS0120335 | AMVAS0120385 | MDV Module 3.2.P.8.3 Stability Report for Accelerated and Long-Term Conditions Report (Jul. 15, 2020) | Exhibit 36 Joshi Volume 2 | R, 403 |
| PTX-0773 | 2020-07-17 | AMVAS0120386 | AMVAS0120406 | SDV Module 3.2.P.8.3 Stability Report for Additional Study (Jul. 17, 2020) | Exhibit 37 Joshi Volume 2 | R, 403 |
| PTX-0774 | 2020-07-17 | AMVAS0120407 | AMVAS0120427 | MDV Module 3.2.P.8.3 Stability Report for Additional Study (Jul. 17, 2020) | Exhibit 38 Joshi Volume 2 | R, 403 |
| PTX-0775 | Undated | AMVAS0008966 | AMVAS0008969 | 1-14-2-1-final-carton-container-labels | | R, 403 |
| PTX-0776 | 2019-09-18 | AMVAS0018322 | AMVAS0018327 | ███████████████████ | | R, 403 |
| PTX-0777 | 2019-09-18 | AMVAS0018470 | AMVAS0018475 | 1-2-cover-letter-esigned-seq-0006-20190918-████████████ | | R, 403 |
| PTX-0778 | 2020-09-11 | | | Expert Report of Zlatan Coralic, Pharm.D., BCPS Regarding Infringement | | H, A, R, F, 403 |
| PTX-0779 | | | | CV of Zlatan Coralic, PharmD, BCPS | | H, A, R, F, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0780 | | | | Materials Considered for Opening Expert Report of Coralic | | |
| PTX-0781 | | | | Infringement Claim Chart for U.S. Patent No. 9,744,209 - Amneal's SDV and MDV ANDA Products | | H, A, R, F, 403 |
| PTX-0782 | 2020-09-11 | | | Opening Expert Report of Lee E. Kirsch, Ph.D. Regarding Infringement of U.S. Patent Nos. 9,744,209 and 9,750,785 by Amneal | | H, A, R, F, 403 |
| PTX-0783 | | | | CV of Lee E. Kirsch | | H, A, R, 403, F |
| PTX-0784 | 2018-12-27 | AMVAS0000178 | AMVAS0000236 | December 27, 2018 ANDA # 212944 Sequence # 0001 Cover Letter | | R, 403 |
| PTX-0785 | 2018-12-06 | AMVAS0001111 | AMVAS0001172 | SDV Dilution Study Report | | R, 403 |
| PTX-0786 | 2018-12-22 | AMVAS0005599 | AMVAS0005630 | SDV Module 3.2.P.8.3 Stability Report for Accelerated and Long Term Conditions (Dec. 21, 2018) | | R, 403 |
| PTX-0787 | 3/xx/2019 | AMVAS0008983 | AMVAS0008991 | SDV Package Insert | | R, 403 |
| PTX-0788 | 2018-12-06 | AMVAS0010220 | AMVAS0010281 | MDV Dilution Study | | R, 403 |
| PTX-0789 | 2018-12-22 | AMVAS0015061 | AMVAS0015093 | MDV Module 3.2.P.8.3 Stability Report for Accelerated and Long Term Conditions (Dec. 21, 2018) | | R, 403 |
| PTX-0790 | 2019-03-12 | AMVAS0063812 | AMVAS0063824 | Laboratory Investigation Report, OOS No.: 00S/19/20 | | R, 403 |
| PTX-0791 | 2018-03-13 | AMVAS0120110 | AMVAS0120150 | OOS Initial Laboratory Assessment, OOS/19/019 | | R, 403 |
| PTX-0792 | 2020-07-14 | AMVAS0120151 | AMVAS0120194 | SDV Module 3.2.P.8.3 Stability Data for Accelerated and Long Term Conditions (Jul. 14, 2020) | | R, 403 |
| PTX-0793 | 2020-07-14 | AMVAS0120195 | AMVAS0120241 | MDV Module 3.2.P.8.3 Stability Data for Accelerated and Long Term Conditions (Jul. 14, 2020) | | H, A, R, F, 403, 26 |
| PTX-0794 | 2003-06-26 | | | Holmes, et al., Science Review: Vasopressin and the cardiovascular system part 1—receptor physiology, Critical Care, 2003, 7:427-34 (June 26, 2003) | | H, A, R, F, 403, 26 |
| PTX-0795 | 2003-06-26 | | | Holmes et al., Science Review: Vasopressin and the cardiovascular system part 2—clinical physiology, Critical Care 2004, 8:15-23 (June 26, 2003). | | H, A, R, F, 403, 26 |
| PTX-0796 | 7/xx/1959 | PAR-VASO_0298138 | PAR-VASO_0298143 | A. Damodaran Nair and John L. Lach, The Kinetics of Degradation of Chlorobutanol, Scientific Edition (July 1959) | | H, A, R, F, 403 |
| PTX-0797 | 2018-03-25 | PAR-VASO_0298176 | PAR-VASO_0298189 | Infringement Claim Chart for U.S. Patent No. 9,744,209 - Amneal's SDV and MDV ANDA Products | | H, A, R, F, 403 |
| PTX-0798 | xx/xx/1977 | PAR-VASO_0298194 | PAR-VASO_0298203 | Lyman Ott, An Introduction to Statistical Methods and Data Analysis; Duxbury Press, Belmont California, 1977 | | H, A, R, F, 403 |
| PTX-0799 | 6/xx/2019 | PAR-VASO_0297425 | PAR-VASO_0297462 | FDA Guidance for Industry, ANDA Submissions – Content and Format (June 2019) | | H, A, R, F, 403, DUP |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0800 | 2014-05-01 | PAR-VASO_0297541 | PAR-VASO_0297557 | FDA Guidance for Industry, ANDAs: Stability Testing of Drug Substances and Products: Questions and Answers (May 2014) | | H, A, R, F, 403 |
| PTX-0801 | xx/xx/1988 | PAR-VASO_0298165 | PAR-VASO_0298175 | Larry L. Havilcek and Ronald D. Crain, Statistics for the Physical Sciences (1988) | | H, A, R, F, 403 |
| PTX-0802 | 2020-09-08 | PAR-VASO_0298190 | PAR-VASO_0298193 | NORMDIST function, Microsoft Excel, https://support.microsoft.com/en-us/office/normdist-function-126db625-c53e-4591-9a22-c9ff422d6d58 | | I, A, F, H, R, 403 |
| PTX-0803 | 2020-09-10 | PAR-VASO_0298163 | PAR-VASO_0298164 | Overview of the Distribution Platform, JMP, https://www.jmp.com/support/help/en/15.1/index.shtml#page/jmp/overview-of-the-distribution-platform.shtml | | H, A, R, F, 403 |
| PTX-0804 | xx/xx/2005 | PAR-VASO_0298204 | PAR-VASO_0298218 | Stephen R. Schmidt and Robert G. Launsby, Understanding Industrial Designed Experiments (2005) | | H, A, R, F, 403 |
| PTX-0805 | 2020-10-31 | | | Expert Report of Lee E. Kirsch, Ph.D. Regarding Validity and Enforceability | | H, A, R, F, 403 |
| PTX-0806 | 2012-06-28 | PAR-VASO_0073360 | PAR-VASO_0073361 | Certificate of Analysis Lot 310574F | | H, R, 403 |
| PTX-0807 | 2012-06-28 | PAR-VASO_0073356 | PAR-VASO_0073357 | Certificate of Analysis, Lot 310571F | | H, R, 403 |
| PTX-0808 | 2012-06-28 | PAR-VASO_0073358 | PAR-VASO_0073359 | Certificate of Analysis, Lot 310573F | | H, R, 403 |
| PTX-0809 | xx/xx/2002 | AMPHPA0005986 | AMPHPA0005991 | Jadwiga Dudkiewicz-Wilczynska, et al., "Determination of the Content of Desmopressin in Pharmaceutical Preparations by HPLC and Validation of the Method," Acta Poloniac Pharmaceutica- Drug Research 59(3), 163-168 (2002) | | H, A, R, F, 403 |
| PTX-0810 | xx/xx/1969 | AMPHPA0006326 | AMPHPA0006356 | Alfred N. Martin, et al. (1969) Chapter 10 Buffers and Buffered Isotonic Systems, in Physical Pharmacy Second Edition Lea & Febiger Philadelphia | | H, A, R, F, 403 |
| PTX-0811 | 9/xx/2014 | AMPHPA0006829 | AMPHPA0006832 | September 2014 Vasostrict Label | | H, A |
| PTX-0812 | Undated | PAR-VASO_0073630 | PAR-VASO_0073677 | NDA 204485 3.2.P.8 Stability Summary | | H, A, R, F, 403 |
| PTX-0813 | 2013-03-08 | PAR-VASO_0078041 | PAR-VASO_0078161 | 2000179 Master Batch Record Rev. 025 | | H, A, R, F, 403 |
| PTX-0814 | 2012-11-05 | PAR-VASO_0238720 | PAR-VASO_0238757 | FDA Chemistry Review | | H, A, R, F, 403, E |
| PTX-0815 | 2012-11-08 | PAR-VASO_0240262 | PAR-VASO_0240575 | FDA Biopharmaceutics Review | | H, A, R, F, 403, E |
| PTX-0816 | Undated | VAS0000017 | VAS0000021 | Luitpold Pharmaceuticals Method Development Report for Vasopressin | | H, A, R, F, 403 |
| PTX-0817 | 4/xx/2014 | PAR-VASO-0004583 | PAR-VASO-0004593 | Vasostrict April 2014 Label (Excerpt from '526 Patent File History) | | H, A |
| PTX-0818 | 10/xx/2012 | PAR-VASO-0004293 | PAR-VASO-0004299 | Pitressin Label 2014 (Excerpt from '526 Patent File History) | | H, A |
| PTX-0819 | 2011-05-11 | PAR-VASO-0004300 | PAR-VASO-0004307 | American Regent Vasopressin Label (Excerpt from '526 Patent File History) | | H, A |
| PTX-0820 | 9/xx/2013 | PAR-VASO-0004308 | PAR-VASO-0004319 | Fresenius Vasopressin Label (Excerpt from '526 Patent File History) | | H, A |
| PTX-0821 | xx/xx/2000 | PAR-VASO-0004438 | PAR-VASO-0004444 | Mingda Bi, "Effect of buffer pH, buffer concentration and skin with or without enzyme inhibitors on the stability of [Arg-8]-vasopressin," International Journal of Pharmaceutics 197 (2000) 87-93 (Excerpt from '526 Patent File History) | | H, A, R, F, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|------------------------|------------|
| PTX-0822 | 2015-11-10 | PAR-VASO_0250581 | PAR-VASO_0250635 | Batch Record 310571F | | H, A, R, F, 403 |
| PTX-0823 | 2012-01-27 | PAR-VASO_0106685 | PAR-VASO_0106783 | Master Batch Record 2002132, Revision 001 | | H, A, R, F, 403 |
| PTX-0824 | 2012-01-27 | PAR-VASO_0249998 | PAR-VASO_0250053 | Master Batch Record 2002132, Revision 001 | | H, A, R, F, 403 |
| PTX-0825 | xx/xx/2000 | AMPHPA0005662 | AMPHPA0005668 | Mingda Bi, "Effect of buffer pH, buffer concentration and skin with or without enzyme inhibitors on the stability of [Arg-8]-vasopressin," International Journal of Pharmaceutics 197 (2000) 87-93 | | H, A, R, F, 403 |
| PTX-0826 | 2015-05-07 | PAR-VASO_0255042 | PAR-VASO_0255044 | May 2015 Supplement Approval Letter | | H, R, 403 |
| PTX-0827 | 1958-06-06 | AMPHPA0005427 | AMPHPA0005437 | Karlis Adamsons, "The Stability of Natural and Synthetic Neurohypophsical Hormones In Vitro," Endocrinology Volume 63 July-December 1958 | | H, A, R, F, 403 |
| PTX-0828 | 4/xx/2010 | PAR-VASO_0256577 | PAR-VASO_0256608 | Mark Cornell Manning, "Stability of Protein Pharmaceuticals: An Update," Pharmaceutical Research, 27:4 (April 2010) | | H, A, R, F, 403 |
| PTX-0829 | 12/xx/2001 | PAR-VASO_0291795 | PAR-VASO_0291802 | Lewis Stratton, "Controlling Deamidation Rates in a Model Peptide: Effects of Temperature, Peptide Concentration, and Additives," Journal of Pharmaceutical Sciences, 90(12) (December 2001) 2141-2148 | | H, A, R, F, 403 |
| PTX-0830 | 1999-01-21 | PAR-VASO_0291664 | PAR-VASO_0291723 | Wei Wang, "Instability, stabilization, and formulation of liquid protein pharmaceuticals," International Journal of Pharmaceutics 185 (1999) 129-188 | | H, A, R, F, 403 |
| PTX-0831 | | | | Unused Number | | |
| PTX-0832 | | PAR-VASO_0298401 | PAR-VASO_0298411 | A. Joshi, E. Rus, L. Kirsch, The degradation pathways of glucagon in acidic solutions, International Journal of Pharmaceutics 203 (2000) 115-125 | | H, A, R, 403, F, 26 |
| PTX-0833 | | PAR-VASO_0291659 | PAR-VASO_0291663 | USP 36 (2013) <659>, Packaging and Storage Requirements | | H, A, R, F, 403 |
| PTX-0834 | 2009-12-31 | PAR-VASO_0291776 | PAR-VASO_0291789 | Handbook of Stability Testing in Pharmaceutical Development: Regulations, Methodologies, and Best Practices (Kim Huynh-Ba, ed.) (2009) | | H, A, R, F, 403 |
| PTX-0835 | 2017-05-01 | PAR-VASO-0004876 | PAR-VASO-0004877 | Declaration of Vinayagam Kannan, dated May 1 2017 (Kannan IV) | | Dup, H, I, E |
| PTX-0836 | 2015-07-28 | PAR-VASO-0001936 | PAR-VASO-0001955 | Office Action Summary dated July 28, 2015 (Excerpt of '478 patent file history) | | R, 403 |
| PTX-0837 | 2015-10-21 | PAR-VASO-0008323 | PAR-VASO-0008335 | Office Action Summary dated Oct. 21, 2015  (Excerpt of '239 File History) | | R, 403 |
| PTX-0838 | 2015-11-24 | PAR-VASO-0008379 | PAR-VASO-0008387 | Response to Office Action dated Nov. 24, 2015 ('239 File History) | | R, 403 |
| PTX-0839 | 2016-01-11 | PAR-VASO-0008417 | PAR-VASO-0008429 | Office Action, Jan. 11, 2016 ('239 File History) | | R, 403 |
| PTX-0840 | 2017-05-22 | PAR-VASO_0008786 | PAR-VASO_0008798 | Response to Office Action, May 22, 2017 ('239 File History) | | R, 403 |
| PTX-0841 | 2015-06-08 | PAR-VASO-0000977 | PAR-VASO-0001001 | June 8, 2015 Office Action ('478 File History) | | R, 403 |
| PTX-0842 | 2016-01-22 | PAR-VASO-0002283 | PAR-VASO-0002293 | January 22, 2016 Response to Final Office Action and Request for Continued Examination ('478 File History) | | R, 403 |
| PTX-0843 | 2017-06-28 | PAR-VASO-0005809 | PAR-VASO-0005819 | June 28, 2017 Response to Non-Final Office Action ('209 File History) 209 patent | | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0844 | 2017-06-28 | PAR-VASO-0009715 | PAR-VASO-0009724 | June 28, 2017 Response to Non-Final Office Action ('785 File History) | | R, 403 |
| PTX-0845 | 2020-11-11 | | | Supplemental Expert Report of Lee E. Kirsch, Ph.D. Regarding Validity | | H, A, R, F, 403 |
| PTX-0846 | 2020-10-29 | AMVAS0131386 | AMVAS0131503 | ███████████████████████████████ | | R, 403 |
| PTX-0847 | 2020-10-29 | AMVAS0132645 | AMVAS0132665 | SDV 3.2.P.8.3 Stability Report for Additional Study | | Dup |
| PTX-0848 | 2020-10-29 | AMVAS0132666 | AMVAS0132710 | SDV 3.2.P.8.3 Stability Report for Accelerated and Long-Term Conditions | | Dup |
| PTX-0849 | 2020-10-29 | AMVAS0133654 | AMVAS0133779 | ███████████████████████████████ | | R, 403 |
| PTX-0850 | 2020-10-29 | AMVAS0134921 | AMVAS0134941 | MDV 3.2.P.8.3 Stability Report for Additional Study | | Dup |
| PTX-0851 | 2020-10-29 | AMVAS0134942 | AMVAS0134992 | MDV 3.2.P.8.3 Stability Report for Accelerated and Long-Term Conditions | | Dup |
| PTX-0852 | 3/xx/2016 | PAR-VASO_0014613 | PAR-VASO_0014618 | March 2016 Reformulated Vasostrict Label | | H, A |
| PTX-0853 | 2020-09-11 | | | Expert Report of Ronald Stellon Regarding Amneal's VasoPressin Injection USP ANDAS | | H, A, R, F, 403 |
| PTX-0854 | | | | CV of Ronald C. Stellon | | H, A, R, F, 403 |
| PTX-0855 | Undated | AMVAS0008959 | AMVAS0008965 | (SDV Module 1.14.1.2 Annotated Labeling) | | R, 403 |
| PTX-0856 | Undated | AMVAS0131511 | AMVAS0131514 | 1-14-2-1-final-carton-container-labels | | R, 403 |
| PTX-0857 | 2020-10-01 | AMVAS0131515 | AMVAS0131516 | SDV 1-14-2-3-final-package-insert-fpl | | Dup, R, 403 |
| PTX-0858 | 2020-10-19 | AMVAS0132302 | AMVAS0132634 | 32p33-scaled-up-mfg-record | | Dup, R, 403, E |
| PTX-0859 | 2020-10-07 | AMVAS0132433 | AMVAS0132439 | 32p34-in-process-specification | | Dup, R, 403, E |
| PTX-0860 | 2020-10-22 | AMVAS0132440 | AMVAS0132455 | 32p51-specification | | Dup, R, 403, E |
| PTX-0861 | 2020-10-24 | AMVAS0132632 | AMVAS0132634 | 32p81-stab-sum-n-conc | | Dup, R, 403, E |
| PTX-0862 | 2020-10-28 | AMVAS0132635 | AMVAS0132644 | 32p82-postapproval-stability | | Dup, R, 403, E |
| PTX-0863 | 2020-10-01 | AMVAS0133786 | AMVAS0131514 | 1-14-2-1-final-carton-container-labels | | R, 403, E |
| PTX-0864 | 2020-10-01 | AMVAS0133789 | AMVAS0133790 | MDV 1-14-2-3-final-package-insert-fpl | | Dup, R, 403, E |
| PTX-0865 | 2020-10-19 | AMVAS0134547 | AMVAS0134682 | 32p33-scale-up-mfg-record | | Dup, R, 403, E |
| PTX-0866 | 2020-10-07 | AMVAS0134683 | AMVAS0134688 | 32p34-in-process-specification | | Dup, R, 403, E |
| PTX-0867 | 2020-10-22 | AMVAS0134689 | AMVAS0134706 | 32p51-specification | | Dup, R, 403, E |
| PTX-0868 | 2019-06-13 | AMVAS0134898 | AMVAS0134907 | 32p81-stability-protocol | | R, 403, E |
| PTX-0869 | 2020-10-24 | AMVAS0134908 | AMVAS0134910 | 32p81-stab-sum-n-conc | | Dup, R, 403, E |
| PTX-0870 | 2020-10-28 | AMVAS0134911 | AMVAS0134920 | 32p82-postapproval-stability | | Dup, R, 403, E |
| PTX-0871 | 2020-09-10 | PAR-VASO_0297516 | PAR-VASO_0297516 | Amneal Recall | | H, A, R, F, 403 |
| PTX-0872 | 2020-09-10 | PAR-VASO_0297539 | PAR-VASO_0297540 | Amphastar recall 77988 | | H, A, R, F, 403 |
| PTX-0873 | 2017-12-15 | PAR-VASO_0297838 | PAR-VASO_0297845 | CDER Manual Dec 2017 | | H, A, R, F, 403 |
| PTX-0874 | 2019-08-13 | PAR-VASO_0297880 | PAR-VASO_0297925 | FDA Compliance 7346.832 | | H, A, R, F, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PTX-0875 | 2017-10-31 | PAR-VASO_0297698 | PAR-VASO_0297726 | FDA Compliance Program 7356.00 | | H, A, R, F, 403, E |
| PTX-0876 | Undated | PAR-VASO_0297729 | PAR-VASO_0297730 | FDA Fact Sheet | | H, A, R, F, 403 |
| PTX-0877 | 2018-07-01 | PAR-VASO_0297463 | PAR-VASO_0297475 | FDA FAR Submissions July 2018 | | H, A, R, F, 403 |
| PTX-0878 | 2019-06-01 | PAR-VASO_0297425 | PAR-VASO_0297462 | FDA Guidance ANDA Submissions June 2019 | | H, A, R, F, 403 |
| PTX-0879 | 2004-04-01 | PAR-VASO_0297476 | PAR-VASO_0297515 | FDA Guidance Changes to NDA_ANDA April 2004 | | H, A, R, F, 403 |
| PTX-0880 | 2000-12-01 | PAR-VASO_0297951 | PAR-VASO_0298004 | FDA Guidance ICH Q6A December 2000 | | H, A, R, F, 403 |
| PTX-0881 | 2009-11-01 | PAR-VASO_0297792 | PAR-VASO_0297820 | FDA Guidance ICH Q8(R2) Nov 2009 | | H, A, R, F, 403 |
| PTX-0882 | 2009-04-01 | PAR-VASO_0297770 | PAR-VASO_0297791 | FDA Guidance ICH Q10 April 2009 | | H, A, R, F, 403 |
| PTX-0883 | 2000-08-01 | PAR-VASO_0297846 | PAR-VASO_0297878 | FDA Guidance M4Q CTD Quality August 2001 | | H, A, R, F, 403 |
| PTX-0884 | 2006-10-01 | PAR-VASO_0297821 | PAR-VASO_0297837 | FDA Guidance OOS Test Results Oct 2006 | | H, A, R, F, 403 |
| PTX-0885 | 2011-01-01 | PAR-VASO_0297517 | PAR-VASO_0297538 | FDA Guidance Process Validation January 2011 | | H, A, R, F, 403 |
| PTX-0886 | 2020-03-01 | PAR-VASO_0298040 | PAR-VASO_0298056 | FDA Guidance Product Recalls March 2020 | | H, A, R, F, 403 |
| PTX-0887 | 2003-11-01 | PAR-VASO_0297926 | PAR-VASO_0297950 | FDA Guidance Q1A R2 November 2003 | | H, A, R, F, 403 |
| PTX-0888 | 2006-09-01 | PAR-VASO_0298057 | PAR-VASO_0298088 | FDA Guidance Quality Systems Sept 2006 | | H, A, R, F, 403 |
| PTX-0889 | 2013-06-01 | PAR-VASO_0297693 | PAR-VASO_0297697 | FDA Guidance Stability Testing June 2013 | | H, A, R, F, 403 |
| PTX-0890 | 2020-06-01 | PAR-VASO_0297558 | PAR-VASO_0297692 | FDA Reg Procedures Manual June 2020 | | H, A, R, F, 403 |
| PTX-0891 | 2020-09-10 | PAR-VASO_0297727 | PAR-VASO_0297728 | FDAs Role Drug Recalls | | H, A, R, F, 403 |
| PTX-0892 | 2013-05-21 | PAR-VASO_0297731 | PAR-VASO_0297731 | Fresenius Recall 118287 | | H, A, R, F, 403 |
| PTX-0893 | 1999-10-06 | PAR-VASO_0298005 | PAR-VASO_0298039 | ICH Q6A October 1999 | | R, 403 |
| PTX-0894 | 2015-05-01 | PAR-VASO_0298101 | PAR-VASO_0298108 | USP 38 Vasopressin USP | | H, A, R, F, 403 |
| PTX-0895 | Undated | PAR-VASO_0298089 | PAR-VASO_0298100 | USP-NF Notices and Requirements | | H, A, R, F, 403 |
| PTX-0896 | 2020-02-01 | PAR-VASO_0298109 | PAR-VASO_0298116 | Vasostrict Product Insert | | H, A, R, F, 403 |
| PTX-0897 | 2018-06-08 | AMVAS0011220 | AMVAS0011226 | Exhibit Batch In-Process Certificates of Analysis | | R, 403 |
| PTX-0898 | 2020-12-02 | | | Supplemental Opening Expert Report of Lee E. Kirsch, Ph.D. Regarding Infringement of U.S. Patent Nos. 9,744,209 and 9,750,785 By Amneal | | H, A, R, F, 403 |
| PTX-0899 | | | | Appendices 1-5 to Kirsch Supplemental Infringement Report | | H, A, R, F, 403 |
| PTX-0900 | | | | Unused Number | | |
| PTX-0901 | 2020-10-29 | AMVAS0131386 | AMVAS0131503 | Amneal ████████████████████████████████ | | R, 403 |
| PTX-0902 | 2020-10-29 | AMVAS0131515 | AMVAS0131516 | SDV Oct. 2020 Package Insert | | R, 403 |
| PTX-0903 | 2020-10-29 | AMVAS0132302 | AMVAS0132432 | SDV October 29, 2020 Intended Batch Manufacturing Record | | R, 403 |
| PTX-0904 | 2020-10-29 | AMVAS0132433 | AMVAS0132439 | SDV October 29, 2020 Module 3.2.P.3.4 In-Process Specification | | R, 403 |
| PTX-0905 | 2020-10-23 | AMVAS0132440 | AMVAS0132455 | SDV October 29, 2020 Module 3.2.P.5.1 Finished Product Specification | | R, 403 |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0906 | 2020-10-26 | AMVAS0132614 | AMVAS0132631 | SDV October 26, 2020 Module 3.2.P.5.6 Justification of Specifications | | R, 403 |
| PTX-0907 | 2020-10-24 | AMVAS0132632 | AMVAS0132634 | SDV October 24, 2020 Module 3.2.P.8.1 Stability Summary and Conclusions | | R, 403 |
| PTX-0908 | 2020-10-27 | AMVAS0132666 | AMVAS0132710 | SDV October 29, 2020 Module 3.2.P.8.3 Stability Report | | R, 403 |
| PTX-0909 | 2020-10-29 | AMVAS0133654 | AMVAS0133779 | Amneal ███████████████████████████████ | | R, 403 |
| PTX-0910 | 2020-10-29 | AMVAS0133789 | AMVAS0133790 | MDV Oct. 2020 Package Insert | | R, 403 |
| PTX-0911 | 2020-10-29 | AMVAS0134547 | AMVAS0134682 | MDV October 29, 2020 Intended Batch Manufacturing Record | | R, 403 |
| PTX-0912 | 2020-10-29 | AMVAS0134683 | AMVAS0134688 | MDV October 29, 2020 Module 3.2.P.3.4 In-Process Specification | | R, 403 |
| PTX-0913 | 2020-10-23 | AMVAS0134689 | AMVAS0134706 | MDV October 29, 2020 Module 3.2.P.5.1 Finished Product Specification | | R, 403 |
| PTX-0914 | 2020-10-26 | AMVAS0134872 | AMVAS0134890 | MDV October 26, 2020 Module 3.2.P.5.6 Justification of Specifications | | R, 403 |
| PTX-0915 | 2019-06-17 | AMVAS0134891 | AMVAS0134897 | MDV June 2019, Module 3.2.P.8.1 Additional Study Protocol | | R, 403 |
| PTX-0916 | 2020-10-24 | AMVAS0134908 | AMVAS0134910 | MDV October 24, 2020 Module 3.2.P.8.1 Stability Summary and Conclusions | | R, 403 |
| PTX-0917 | 2020-10-29 | AMVAS0134942 | AMVAS0134992 | MDV October 29, 2020 Module 3.2.P.8.3 Stability Report | | R, 403 |
| PTX-0918 | 2020-05-01 | AMVAS0135961 | AMVAS0135962 | Certificate of Analysis, AP-FB-20004 | | R, 403, Dup |
| PTX-0919 | 2020-05-01 | AMVAS0135963 | AMVAS0135964 | Certificate of Analysis, AP-FB-20005 | | R, 403, Dup |
| PTX-0920 | 2020-05-01 | AMVAS0135965 | AMVAS0135966 | Certificate of Analysis, AP-FB-20006 | | R, 403, Dup |
| PTX-0921 | 2020-05-01 | AMVAS0135967 | AMVAS0135968 | Certificate of Analysis, AP-FB-20007 | | R, 403, Dup |
| PTX-0922 | 2020-05-01 | AMVAS0135969 | AMVAS0135970 | Certificate of Analysis, AP-FB-20008 | | R, 403, Dup |
| PTX-0923 | 2020-05-01 | AMVAS0135971 | AMVAS0135972 | Certificate of Analysis, AP-FB-20009 | | R, 403, Dup |
| PTX-0924 | 2020-05-18 | AMVAS0135992 | AMVAS0136008 | Email from R. Soni to R. Prajapat re Vasopressin query response draft for Review | | R, 403 |
| PTX-0925 | xx/xx/2012 | PAR-VASO_0205249 | PAR-VASO_0205252 | United States Pharmaceopeia and National Formulary (USP 35-NF 30), United States Pharmacopeial Convention (2012). | | H, A, R, F, 403 |
| PTX-0926 | xx/xx/2006 | PAR-VASO_0298741 | PAR-VASO_0298745 | James E. De Muth, Basic Statistics and Pharmaceutical Statistical Applications (Chapman & Hall 2d. Ed. 2006) | | H, A, R, F, 403 |
| PTX-0927 | 2020-10-29 | AMVAS0133654 | AMVAS0133779 | Amneal ██████████████████████████ | Exhibit 1 Joshi Volume 3 | R, 403 |
| PTX-0928 | 2020-10-29 | AMVAS0131386 | AMVAS0131503 | Amneal ██████████████████████████ | Exhibit 2 Joshi Volume 3 | R, 403 |
| PTX-0929 | 2020-11-20 | | | Email from B. Goldberg to S. Zhu confirming deposition | Exhibit 3 Joshi Volume 3 | H, R, F, 403 |
| PTX-0930 | 2020-05-01 | AMVAS0135961 | AMVAS0135962 | AP-FB-20004 Certificate of Analysis | Exhibit 4 Joshi Volume 3 | R, 403, Dup |

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|------------|
| PTX-0931 | 2020-05-01 | AMVAS0135963 | AMVAS0135964 | AP-FB-20005 Certificate of Analysis | Exhibit 5 Joshi Volume 3 | R, 403, Dup |
| PTX-0932 | 2020-05-01 | AMVAS1035965 | AMVAS0135966 | AP-FB-20006 Certificate of Analysis | Exhibit 6 Joshi Volume 3 | R, 403, Dup |
| PTX-0933 | 2020-05-01 | AMVAS0135967 | AMVAS0135968 | AP-FB-20007 Certificate of Analysis | Exhibit 7 Joshi Volume 3 | R, 403, Dup |
| PTX-0934 | 2020-05-01 | AMVAS0135969 | AMVAS0135970 | AP-FB-20008 Certificate of Analysis | Exhibit 8 Joshi Volume 3 | R, 403, Dup |
| PTX-0935 | 2020-05-01 | AMVAS0135971 | AMVAS0135972 | AP-FB-20009 Certificate of Analysis | Exhibit 9 Joshi Volume 3 | R, 403, Dup |
| PTX-0936 | 2019-09-18 | AMVAS0018470 | AMVAS0018475 | ████████████████████ | Exhibit 10 Joshi Volume 3 | R, 403 |
| PTX-0937 | 2019-09-18 | AMVAS0018322 | AMVAS0018327 | ████████████████████ | Exhibit 11 Joshi Volume 3 | R, 403 |
| PTX-0938 | 2017-06-27 | PAR-VASO-0000034 | PAR-VASO-0000113 | United States Patent No. 9,687,526 | Exhibit 12 Joshi Volume 3 | Dup, 1 |
| PTX-0939 | 2012-11-05 | PAR-VASO_0238720 | PAR-VASO_0238757 | FDA Chemistry Review | Exhibit 13 Joshi Volume 3 | E |
| PTX-0940 | 2020-10-10 | AMVAS0134683 | AMVAS0134688 | MDV October 29, 2020 Module 3.2.P.3.4 In-Process Specification | Exhibit 14 Joshi Volume 3 | E, R, 403 |
| PTX-0941 | 2020-10-10 | AMVAS0132433 | AMVAS0132439 | SDV October 29, 2020 Module 3.2.P.3.4 In-Process Specification | Exhibit 15 Joshi Volume 3 | E, R, 403 |
| PTX-0942 | 2020-10-23 | AMVAS0134689 | AMVAS0134706 | MDV October 29, 2020 Module 3.2.P.5.1 Finished Product Specification | Exhibit 16 Joshi Volume 3 | E, R, 403 |
| PTX-0943 | 2020-10-23 | AMVAS0132440 | AMVAS0132455 | SDV October 29, 2020 Module 3.2.P.5.1 Finished Product Specification | Exhibit 17 Joshi Volume 3 | E, R, 403 |
| PTX-0944 | 2020-05-18 | AMVAS0135992 | AMVAS0136008 | Email from R. Soni to R. Prajapat re Vasopressin query response draft for Review | Exhibit 18 Joshi Volume 3 | R, 403 |
| PTX-0945 | 2020-10-27 | AMVAS0132666 | AMVAS0132710 | SDV October 29, 2020 Module 3.2.P.8.3 Stability Report | Exhibit 19 Joshi Volume 3 | E, R, 403 |
| PTX-0946 | 2020-10-29 | AMVAS0134942 | AMVAS0134992 | MDV October 29, 2020 Module 3.2.P.8.3 Stability Report | Exhibit 20 Joshi Volume 3 | E, R, 403 |

EXHIBIT C
Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|-------|------|-------------|-----------|-------------|----------------------|-----------|
| PTX-0947 | 2020-10-29 | AMVAS0133789 | AMVAS0133790 | MDV Oct. 2020 Final Package Insert | Exhibit 21 Joshi Volume 3 | Dup, E |
| PTX-0948 | 2020-10-29 | AMVAS0131515 | AMVAS0131516 | SDV Oct. 2020 Final Package Insert | Exhibit 22 Joshi Volume 3 | Dup, E |
| PTX-0949 | 2015-08-14 | PAR-VASO_0007062 | PAR-VASO_0007073 | Response to Office Action Regarding Application No. 14/7171,877 | | R, 403 |
| PTX-0950 | 2014-11-18 | PAR-VASO_0065296 | PAR-VASO_0065341 | Certificate of Analysis, Historical Batches | | H, R, 403 |
| PTX-0951 | 2013-05-09 | PAR-VASO_0019181 | PAR-VASO_0019202 | Product Development Procedure Validation Report, DEV-13-033R | Exhibit 23 to Kenney 2020 Dep. | R, 403, 1006 |
| PTX-0952 | | | | Kirsch Rebuttal Expert Report Corrected Paragraph 303 Table | | H, A, R, F, 403, 26 |
| PTX-0953 | | | | Kirsch Supplemental Infringement Report Corrected Appendix 3 | | H, A, R, F, 403, 26 |
| PTX-0954 | 2016-07-21 | PAR-VASO_0090019 | PAR-VASO_0090019 | Email from M. Kenney to V. Kannan re vasostrict 12 mo analysis | | H, A, R, F, 403, 26 |
| PTX-0955 | | AMVAS0131528 | AMVAS0131549 | SDV 1.14.3.1 Annotated Comparison with Amneal Previous Label | | R, 403 |
| PTX-0956 | | AMVAS0133802 | AMVAS0133822 | MDV 1.14.3.1 Annotated Comparison with Amneal Previous Label | | R, 403 |
| PTX-0957 | 2021-04-15 | AMVAS0136323 | AMVAS0136330 | ANDA 212944 ██████████████ | | R, 403 |
| PTX-0958 | 2021-04-15 | AMVAS0136331 | AMVAS0136338 | ANDA 212945 ████████ | | R, 403 |
| PTX-0959 | 2021-05-17 | | | Second Supplemental Expert Report of Lee E. Kirsch, Ph.D. Regarding Validity | | H, A, R, F, 403, 26 |
| PTX-0960 | 2020-11-11 | | | Supplemental Expert Report of Ronald Stellon Regarding Amneal's Proposed Vasopressin Injection Products | | H, A, R, F, 403, 26 |
| PTX-1320 | | | | Mean Difference of pH 3.7, 3.8 and 3.9 Compared to pH Range 2.5-4.5 | | H, A, R, F, 403, 26, DEM, IC |
| PTX-1323 | 2014-08-01 | PAR-VASO_0298805 | PAR-VASO_0298843 | FDA Guidance for Industry, Immunogenicity Assessment for Therapeutic Protein Products | | H, A, R, F, 403, 26 |
| PTX-1324 | | PAR-VASO_0083909 | PAR-VASO_0083922 | Vasostrict Vasopressin Injection, USP, Tabulated Stability Data through 24-Month Interval Stock No. 2002525 | | H, A, R, F, 403, 26 |
| PTX-1436 | | AMPHPA0006362 | AMPHPA0006559 | Steven L. Nail and Michael J. Akers, Development and Manufacture of Protein Pharmaceuticals (2002) New York: Kluwer Academic/Plenum Publishers | | H, A, R, F, 403, 26 |
| | | | | | | |
| **PPX-001** | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| **PPX-002** | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| **PPX-003** | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| **PPX-004** | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| **PPX-005** | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |

Exhibit 7

Plaintiffs Second Amended Exhibit List

| PTX # | Date | Bates Begin | Bates End | Description | Amneal Depo. Exh. No. | Objections |
|---|---|---|---|---|---|---|
| PPX-006 | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| PPX-007 | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| PPX-008 | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |
| PPX-009 | | | | **Placeholders for Plaintiffs' Physical Exhibits** | | |

| Amneal's Objection Code | |
|---|---|
| CODE | OBJECTION |
| A | Fed. R. Evid. 901 - Requires proof of authenticity as a condition precedent to its admissibility |
| DEM | Demonstrative Only |
| DUP | Duplication of Another Exhibit |
| E | Mischaracterization in Description |
| F | Fed. R. Evid. 602 - No Foundation |
| H | Fed. R. Evid. 801 & 802 - Hearsay |
| I | Illegible (partly or wholly) |
| IC | Improper compilation |
| IN | Fed. R. Evid. 106 - Incomplete |
| NT | No Certified Translation |
| R | Fed. R. Evid. 402 - Not Relevant |
| RD | Redaction Required |
| 26 | Fed. R. Civ. P. 26 - Not timely disclosed |
| 403 | Fed. R. Evid. 403 - Any relevance substantially outweighed by confusion, prejudice or waster of time |
| 1006 | Fed. R. Evid. 1006 - Voluminous document requires summary |

# EXHIBIT 8

EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC, <br><br> Plaintiffs, <br> v. <br><br> AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al. <br><br> Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)** <br><br> ███████████████ |

## <u>DEFENDANTS' EXHIBIT LIST</u>

Defendant Amneal reserves its right to incorporate by reference into its

Exhibit List any exhibit listed by Plaintiffs Par Pharmaceutical, Inc., Par Sterile

Products, LLC, and Endo  Par Innovation Company, LLC (collectively

"Plaintiffs") on Plaintiffs' Exhibit List.  Amneal reserves its right to amend,

modify, or supplement its Exhibit List throughout the balance of this case in

response to case developments including but not limited to Plaintiffs' Exhibit List,

Plaintiffs' objections, and/or further streamlining of the case.  Amneal also

reserves the right to supplement or modify its Exhibit List in response to rulings by

the Court (including on any motions) or upon settlement of any party.  Amneal also

reserves its right to add demonstratives to its Exhibit List. Amneal agrees to

EXHIBIT 8

exchange demonstratives with Plaintiffs in accordance with the procedures agreed

upon by the parties in the Joint Pretrial Order.

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC., et al. v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| | DTX-010 | 8/29/2017 | File History of U.S. Patent No. 9,744,239 to Kenney et al. (Application No. 14/717,877) | PAR-VASO-0006453-9318 | | 401, 402, 403, L* |
| | DTX-012 | 4/10/2018 | File History of U.S. Patent No. 9,937,223 to Kenney et al. (Application No. 15/606,442) | PAR-VASO-0010366-205 | | 401, 402, 403, L* |
| | DTX-026 | | JHP Pharmaceuticals NDA Module: 2.3.P Drug Production - Pitressin® (NDA No. 204485) | PAR-VASO_0072472-502 | | L* |
| 4 | DTX-1000 | 1999 | Argenziano et al., "Arginine Vasopressin in the Management of Vasodilatory Hypotension After Cardiac Transplantation," J. Heart & Lung Transplant. 18(8):814–17 (1999) | AMPHPA0005482-487 | | 801, 802 |
| 6 | DTX-1001 | 2011 | Avanti et al., "A New Strategy to Stabilize Oxytocin in Aqueous Solutions: I. The Effects of Divalent Metal Ions and Citrate Buffer," AAPS J. 13(2):284-290 (2011) | AMPHPA0005488-494 | | 401, 402, 403, 801, 802 |
| 9 | DTX-1002 | 2000 | Bi & Singh, "Effect of buffer pH, buffer concentration and skin with or without enzyme inhibitors on the stability of [Arg8]-vasopressin," Int I J. Pharmaceut. 197 87-93 (2000) | AMPHPA0005662-668 | | |
| 12 | DTX-1003 | 1972 | Brunfeldt et al., "Acetylation an artefact in solid phase peptide synthesis. A mass spectrometrical investigation," FEBS Lett. 25(1):184-188 (1972) | AMPHPA0005671-675 | | 401, 402, 403, 801, 802 |
| 13 | DTX-1004 | 3/1/2011 | Centers for Disease Control and Prevention, Frequently Asked Questions (FAQs) Regarding Safe Practices for Medical Injections (March 1, 2011), https://www.cdc.gov/injectionsafety/PD F/FAQs-Safe-Practices-for-Medical- Injections.pdf | AMPHPA0005979-985 | | 401, 402, 403, 801, 802 |
| 14 | DTX-1005 | 8/14/2015 | Declaration 37 CFR § 1.132 of Inventor Sunil Vandse, filed Aug. 14, 2015 in support of U.S. Patent Appl. No. 14/717,882 | AMPHPA0006766-773 | | 401, 402, 403 |
| 15 | DTX-1006 | 8/14/2015 | Declaration 37 CFR § 1.132 of Inventor Sunil Vandse, filed Aug. 14, 2015 in support of U.S. Patent Appl. No. 14/717,877 | AMPHPA0006774-828 | | 401, 402, 403 |
| 17 | DTX-1007 | 2002 | DEVELOPMENT AND MANUFACTURE OF PROTEIN PHARMACEUTICALS (Steven L. Nail & Michael J. Akers, eds., 2002) | AMPHPA0006362-559 | | |
| 20 | DTX-1008 | 2001 | Dünser et al., "The Effects of Vasopressin on Systemic Hemodynamics in Catecholamine- Resistant Septic and Postcardiotomy Shock: A Retrospective Analysis," Anaesth. Analg. 93:7-13 (2001) | AMPHPA0005992-998 | | 801, 802 |
| 22 | DTX-1009 | 6/1/2008 | FDA Guidance for Industry: Q3A Impurities in New Drug Substances (June 2008) | AMPHPA0006019-035 | | 801, 802 |
| 23 | DTX-1010 | 7/1/2008 | FDA Guidance for Industry: Q3B(R2) Impurities in New Drug Products (July 2006) | AMPHPA0006036-053 | | 801, 802 |
| 24 | DTX-1011 | 5/1/2015 | FDA Information on Vasostrict® Storage (May 2015) | AMPHPA0006011 | | 801, 802 |
| 25 | DTX-1012 | 1980 | Flynn, G.L., "Buffers – pH control within pharmaceutical systems," PDA J. Pharmaceut. Sci and Technol., 34: 139-62 (1980) | AMPHPA0006054-080 | | |
| 26 | DTX-1013 | 1961 | G. Mattock, "pH Measurement and Titration," The MacMillan Co., New York (1961) | AMPHPA0006835-855 | | 801, 802 |
| 30 | DTX-1014 | 1966 | Hedge et al., "Site of Action of Vasopressin in Causing Corticotropin Release," Endocrinology, 79(2):328-40 (1966) | AMPHPA0006123-135 | | 801, 802 |
| 33 | DTX-1015 | 2010 | Kumar & Sreeramulu, "Stability indicating RP-HPLC method for simultaneous determination of Terlipressin in pure and pharmaceutical formulation," J. Chem. Pharm. Res. 2(3):424-32 (2010) | AMPHPA0006269-277 | | 401, 402, 403, 801, 802 |
| 36 | DTX-1016 | | Lithuanian Patent No. 4487 (Certified English Translation) | AMPHPA0006289-300 | | 401, 402, 403, 801, 802, 901, 902 |
| 37 | DTX-1017 | 2005 | Luckner et al., "Arginine vasopressin in 316 patients with advance vasodilatory shock," Crit. Care. Med. 33(11):2659-66 (2005) | AMPHPA0006301-308 | | 801, 802 |
| 38 | DTX-1018 | 2007 | Luckner et al., "Comparison of two dose regimens of arginine vasopressin in advanced vasodilatory shock," Crit. Care Med. 35:2280 (2007) | AMPHPA0006309-314 | | 801, 802 |
| 41 | DTX-1019 | 2003 | Buck, "Low-dose Vasopressin Infusions for Vasodilatory Shock," Pediatric Pharmacother. 9(9):1-4 (2003) | AMPHPA0005676-679 | | 801, 802 |
| 42 | DTX-1020 | 1969 | Martin et al., "Ch. 10:  Buffers and Buffered Isotonic Systems," in PHYSICAL PHARMACY, Henry Kimpton Publishers, London (1969) | AMPHPA0006326-356 | | |
| 43 | DTX-1021 | 2011 | McEvoy et al., "AHFS Drug Information 2011," Am. Soc. Health- Sys. Pharmacists, Inc. | PAR-VASO_0104670-672 | | 801, 802 |
| 44 | DTX-1022 | 2013 | Mettler Toledo, "pH Theory Guide: A Guide to pH Measurement Practice and Applications" (2013) | AMPHPA0006856-957 | | 801, 802 |
| 47 | DTX-1023 | 3/15/2013 | NDA 204485 Review, Office of New Drug Quality Assessment (E. Chickhale), Biopharmaceutics Review (dated Mar. 15, 2013), https://www.accessdata.fda.gov/drugsatf da_docs/nda/2014/204485Orig1s000ClnIPharmR.pdf | AMPHPA0006005-6010 | | |
| 48 | DTX-1024 | 3/15/2013 | NDA 204485 Review, Office of New Drug Quality Assessment (E. Chickhale), Clinical Pharmacology Review (dated Mar. 15, 2013), https://www.accessdata.fda.gov/drugsatf da_docs/nda/2014/204485Orig1s000ClnIPharmR.pdf | PAR-VASO_0240262-575 | | |
| 49 | DTX-1025 | 5/23/2013 | NDA 204485 Review, Pediatric and Maternal Health Staff (C. Ceresa), Labeling Revisions – Pregnancy, Nursing Mothers (dated May 23, 2013), https://www.accessdata.fda.gov/drugsatf da_docs/nda/2014/204485Orig1s0000th erR.pdf | AMPHPA0006012-018 | | 801, 802 |
| 55 | DTX-1026 | | Par Sterile Products – About Vasostrict, http://www.parsterileproducts.com/prod ucts/products/vasostrict/about- vasostrict.php (last accessed Oct. 22, 2019) | AMPHPA0005424-426 | | |
| 57 | DTX-1027 | 2000 | Peptide and Protein Drug Analysis (Ronald E. Reid, ed., 2000) | AMPHPA0006584-621 | | 801, 802 |
| 58 | DTX-1028 | 2013 | PHARMACEUTICAL FORMULATION DEVELOPMENT OF PEPTIDES AND PROTEINS (Lars Hovgaard et al., eds., 2013) | AMPHPA0006136-184 | | |
| 61 | DTX-1029 | 2000 | REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY (20th ed., 2000) | AMPHPA0006622-627 | | 801, 802 |
| 63 | DTX-1030 | 2011 | Russell et al., "Bench-to-bedside review: Vasopressin in the management of septic shock," Critical Care 15:226 (2011) | AMPHPA0006657-675 | | 801, 802 |
| 67 | DTX-1031 | 2008 | Supplementary Appendix to Russell 2008, https://www.nejm.org/doi/suppl/10.1056/NEJMoa067313/suppl_file/nejm_russel l_877sa1.pdf | AMPHPA0006628-645 | | 801, 802 |
| 68 | DTX-1032 | 2013 | Swain et al., "Stabilization and Delivery Approaches for Protein and Peptide Pharmaceuticals: An Extensive Review of Patents," Recent Patents on Biotech 7(1):1-18 (2013) | AMPHPA0006676-694 | | 801, 802 |
| 71 | DTX-1033 | 1988 | U.S. Patent No. 4,760,052 (1988) | AMPHPA0005680-692 | | 401, 402, 403, 801, 802 |
| 72 | DTX-1034 | 1975 | U.S. Patent No. 3,929,758 (1975) | AMPHPA0006185-202 | | 401, 402, 403, 801, 802 |
| 73 | DTX-1035 | 1996 | U.S. Patent No. 5,482,931 (1996) | AMPHPA0006106-112 | | 801, 802 |
| 74 | DTX-1036 | 11/1/2014 | USP General Chapter 1079 (Good Storage and Distribution Practices for Drug Products), USP 38-NF 33, Vol. 1, published Nov. 1, 2014 | AMPHPA0006732-743 | | 801, 802 |
| 75 | DTX-1037 | 11/1/2014 | USP General Chapter 621 (Chromatography), USP 38-NF 33, Vol. 1, published Nov. 1, 2014 | AMPHPA0006709-721 | | 801, 802 |
| 76 | DTX-1038 | 11/1/2014 | USP General Chapter 659 (Packaging & Storage Requirements), USP 38-NF 33, Vol. 1, published Nov. 1, 2014 | AMPHPA0006722-731 | | 801, 802 |
| 77 | DTX-1039 | 11/1/2014 | USP Vasopressin Injection Monograph, USP 38-NF 33, Vol. 3, published Nov. 1, 2014 | AMPHPA0006744-747 | | 801, 802 |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC., et al. v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 78 | DTX-1040 | 2011 | Van Dorpe et al., "Purity Profiling of Peptide Drugs," J. Bioanal. Biomed. S6(003):1-18 (2011) | AMPHPA0006748-765 | | 801, 802 |
| 79 | DTX-1041 | 11/1/2011 | Vasopressin Injection, USP Package Insert, American Regent, Inc. (Nov. 2011) | AMPHPA0006315-316 | | 801, 802 |
| 80 | DTX-1042 | 4/1/2014 | Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc. (dated April 2014), https://www.accessdata.fda.gov/drugsatf da_docs/label/2014/204485Orig1s000lb l.pdf (see PAR-VASO_0103506) | PAR-VASO_0254534-542 | | |
| 82 | DTX-1043 | 3/1/2015 | Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc. (dated March 2015) (see PAR-VASO_0103553) | PAR-VASO_0014782-787 | | |
| 83 | DTX-1044 | 5/1/2014 | Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc. (dated May 2014), https://www.accessdata.fda.gov/drugsatf da_docs/label/2014/204485Orig1s001lb l.pdf (see PAR-VASO_0254543) | AMPHPA0006829-832 | | |
| 84 | DTX-1045 | 11/1/2015 | Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc. (dated Nov. 2015), https://www.accessdata.fda.gov/drugsatf da_docs/label/2016/204485s003lbl.pdf (see PAR-VASO_0014613) | AMPHPA0006958-959 | | |
| 85 | DTX-1046 | 1963 | W. Cash & B. Smith, "Synthesis and Biological Properties of 1-Acetyl-8-lysine-vasopressin," J. Biol. Chem. 238(3) 994-97 (1963) | AMPHPA0005915-919 | | 401, 402, 403, 801, 802 |
| 87 | DTX-1047 | 9/11/2014 | Webinar Transcript, The Joint Commission, The Misuse of Vials, A Follow-Up to the Sentinel Event Alert (Sept. 11, 2014), https://www.jointcommission.org/assets/1/6/Transcript_Vials_Webinar_9_11_14.pdf | AMPHPA0006245-268 | | 401, 402, 403, 801, 802 |
| 90 | DTX-1048 | 2009 | WO 2009/020934 | AMPHPA0005920-978 | | 801, 802 |
| 91 | DTX-1049 | 2010 | WO 2010/030180 A2 | AMPHPA0005438-476 | | 801, 802 |
| 93 | DTX-1050 | 1/21/2020 | Par Responses to Consolidated First Set of Interrogatories (1-10) | | | 401, 402, 403, 801, 802, AA, Legal |
| 94 | DTX-1051 | 6/12/2020 | Par Responses to Amphastar First Interrogatories | | | 401, 402, 403, 801, 802, AA, Legal |
| 95 | DTX-1052 | 6/12/2020 | Par Supplemental Responses to Consolidated Interrogatory No 1 | | | 401, 402, 403, 801, 802, AA, Legal |
| 96 | DTX-1053 | 7/13/2020 | Par Responses to 2nd Set of Joint Interrogatories (Nos. 11-18) | | | 401, 402, 403, 801, 802, AA, Legal |
| 97 | DTX-1054 | 7/13/2020 | Par Responses to 1st Set of Joint Request for Admissions  (Nos. 1-169) | | | 401, 402, 403, 801, 802, AA, Legal |
| 98 | DTX-1055 | 7/15/2020 | Par Supplemental Responses to Consolidated Interrogatory No 7 | | | 401, 402, 403, 801, 802, AA, Legal |
| 99 | DTX-1056 | 10/29/2019 | Par to Amneal - Par Infringement Contentions | | | 401, 402, 403, 801, 802, AA, Legal |
| 100 | DTX-1057 | 1/14/2020 | Par to Amneal - Amended Infringement Contentions | | | 401, 402, 403, 801, 802, AA, Legal |
| 101 | DTX-1058 | 7/21/2020 | Par to Amneal - Final Infringement Contentions | | | 401, 402, 403, 801, 802, AA, Legal |
| 102 | DTX-1059 | 8/14/2020 | Par Supplemental Response to Amphastar Interrogatory 7 | | | 401, 402, 403, 801, 802, AA, Legal |
| 103 | DTX-1060 | 8/14/2020 | Par Supplemental Responses to Consolidated Interrogatories Nos 14, 17, 18 | | | 401, 402, 403, 801, 802, AA, Legal |
| 104 | DTX-1061 | 8/4/2020 | Par Supplemental Responses to Joint Interrogatories No 2 and 6 and Second Supplemental Response to Joint Interrogatory 7 | | | 401, 402, 403, 801, 802, AA, Legal |
| 105 | DTX-1062 | | Comparison of Vasopressin Formulations | PAR-VASO_0089820-21 | Kannan Ex. 1 | |
| 106 | DTX-1063 | | Comparison of Vasopressin Formulations | PAR-VASO_0089793-96 | Kannan Ex. 2 | |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC. & ENDO PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 107 | DTX-1064 | 5/22/2014 | Email from Vinayagam Kannan to Matthew Kenny re Few Papers attaching Krishnamurthy, R., The stability Factor - Inportance in Formulation Development.pdf; Bi, M., Effect of butter pH, buffer concentration and skin with or without enzyme inhibitors on the stability of [Arg8]-vasopressin.pdf; Heller, H., The effect of Hydrogen-ion concentration on the stability of the antidiuretic and vasopressor activities of posterior potuitary extracts.pdf | PAR-VASO_0030299-300 | Kannan Ex. 3 | 401, 402, 403, 801, 802 |
| 108 | DTX-1065 | 5/27/2014 | Email from Vinayagam Kannan to Matthew Kenny re Few Papers | PAR-VASO_0030298 | Kannan Ex. 4 | 401, 402, 403, 801, 802 |
| 109 | DTX-1066 | 6/9/2014 | Email from Vinayagam Kannan to Matthew Kenny re Emailing: Avanti, C. Innovative strategies for stabilization of therapeutic peptides in aqueous solutions_D6-202.pdf attaching Avanti, C. Innovative strategies for stabilization of therapeutic peptides in aqueous solutions_D6-202.pdf | PAR-VASO_0029815-16 | Kannan Ex. 5 | 401, 402, 403, 801, 802 |
| 110 | DTX-1067 | 10/21/2014 | Pharmaceutical Development Technical Report Vasostrict FRD-14-001R | PAR-VASO_0029307-52 | Kannan Ex. 6 | |
| 111 | DTX-1068 | 1/15/2015 | Email from Matthew Kenney to Suketu Sanghvi et al. re vasopressin attaching Vasopressin Experimental Summary.pptx | PAR-VASO_0200879 | Kannan Ex. 7 | 401, 402, 403, 801, 802 |
| 112 | DTX-1069 | | Vasopressin Experimental Summary | PAR-VASO_0200880-913 | Kannan Ex. 8 | 401, 402, 403, 801, 802 |
| 113 | DTX-1070 | 5/26/2015 | Email from Vinayagam Kannan to Suketu Sanghvi re Vasostrict Stability Protocol for Additional Studies, attaching Vasostrict 2002501 protocol proposal for special studies_20May2015_2.docx; 2002501_New Vasostrict (VK) | PAR-VASO_0038936-37 | Kannan Ex. 9 | 401, 402, 403, 801, 802 |
| 114 | DTX-1071 | | Additional Stability Protocols to Support Development Work of Vasostrict (Vasopressin Injection, USP) 20 units per ml, 1 ml (Stock #2002501) | PAR-VASO_0038938-41 | Kannan Ex. 10 | |
| 115 | DTX-1072 | | Par Product Specification-Shelf Life | PAR-VASO_0038943-52 | Kannan Ex. 11 | 401, 402, 403 |
| 116 | DTX-1073 | 5/22/2019 | Declaration Under 37 C.F.R. Section 1.132 by Vinayagam Kannan | PAR-VASO_0008804-24 | Kannan Ex. 12 | 401, 402, 403 |
| 117 | DTX-1074 | 3/31/2016 | Declaration Under 37 C.F.R. Section 1.132 by Vinayagam Kannan | PAR-VASO_0002580-90 | Kannan Ex. 13 | 401, 402, 403 |
| 118 | DTX-1075 | 11/24/2015 | Declaration Under 37 C.F.R. Section 1.130(a) by Inventor Vinayagam Kannan | PAR-VASO_0008388-90 | Kannan Ex. 14 | 401, 402, 403 |
| 119 | DTX-1076 | 5/1/2017 | Declaration Under 37 C.F.R. Section 1.132 by Vinayagam Kannan | PAR-VASO_0004876-77 | Kannan Ex. 15 | 401, 402, 403 |
| 120 | DTX-1077 | 1/22/2015 | Email from Vinayagam Kannan to Matthew Kenny re RE: RT Stability for Vasostrict | PAR-VASO_0028483-87 | Kannan Ex. 17 | 401, 402, 403, 801, 802 |
| 121 | DTX-1078 | 4/11/2017 | Email from Vinayagam Kannan to Somnath Sharma et al. re Vasopression methods for Acrecor, attaching 20170324101843173.pdf; CofAs.pdf; DEV-12-016.pdf | PAR-VASO_0088157-59 | Kannan Ex. 18 | 401, 402, 403, 801, 802 |
| 122 | DTX-1079 | 8/20/2013 | Laboratory Notebook No. 00040 | PAR-VASO_0108261-81 | Kannan Ex. 19 | |
| 123 | DTX-1080 | 1/27/2015 | Laboratory Notebook No. 00044 | PAR-VASO_0059897-949 | Kannan Ex. 20 | |
| 124 | DTX-1081 | 8/29/2016 | Laboratory Notebook No. RB-198 | PAR-VASO_0237891-932 | Kannan Ex. 21 | 401, 402, 403 |
| 125 | DTX-1082 | 5/22/2014 | Email from Vinayagam Kannan to Jennifer Weingarten re Re-formulation - Vasostrict | PAR-VASO_0089763-65 | Kannan Ex. 22 | 401, 402, 403, 801, 802 |
| 126 | DTX-1083 | 1/22/2016 | Declaration Under 37 C.F.R. Section 1.132 by Inventor Sunil Vandse | PAR-VASO_0002304-17 | Kannan Ex. 23 | 401, 402, 403 |
| 127 | DTX-1084 | 3/22/2016 | Email from Vinayagam Kannan to Matthew Kenney re 4 week data, attaching Vasopression pH 2.5-4.5.jrp; Vasopression rate assay -25C.png; Vasopression rate assay -40C.png; Vasopression rate RS -25C.png; Vasopression rate RS -40C.png; pH 2.5-3.5 study 4 weeks 3.xlsx | PAR-VASO_0034737 | Kannan Ex. 24 | 401, 402, 403, 801, 802 |
| 128 | DTX-1085 | | Coding Text | PAR-VASO_0034738-45 | Kannan Ex. 25 | 401, 402, 403, 1003, ID |
| 129 | DTX-1086 | | Rate of Change in Assay (%LC/week) vs. Target pH | PAR-VASO_0034746 | Kannan Ex. 26 | 401, 402, 403 |
| 130 | DTX-1087 | | Rate of Change in Assay (%LC/week) vs. Target pH | PAR-VASO_0034747 | Kannan Ex. 27 | 401, 402, 403 |
| 131 | DTX-1088 | | Rate of Change in impurities (%LC/week) vs. Target pH | PAR-VASO_0034748 | Kannan Ex. 28 | 401, 402, 403 |
| 132 | DTX-1089 | | Rate of Change in impurities (%LC/week) vs. Target pH | PAR-VASO_0034749 | Kannan Ex. 29 | 401, 402, 403 |
| 133 | DTX-1090 | | pH 2.5-3.5 study 4 weeks 3 | PAR-VASO_0034750 | Kannan Ex. 30 | 401, 402, 403 |
| 134 | DTX-1091 | 10/2/2015 | Product Development Technical Report Vasostrict FRD-15-012 | PAR-VASO_0093612-71 | Kannan Ex. 31 | DUP-DTX-1115, 1162, 1311 |
| 135 | DTX-1092 | 2/3/2015 | Laboratory Notebook No. 1281 | PAR-VASO_0246222-429 | Kannan Ex. 32 | |
| 136 | DTX-1093 | 5/23/2014 | Email from Jennifer Weingarten to Michelle Rennwald re Vasostrict stability, attaching DEV13-019_PitressinRegStaility Update.pdf; DEV12-031_PiressinRegStability.pdf; PitressinRegStabilityTables_1311.docx | PAR-VASO_0294256-395 | Kannan Ex. 33 | 401, 402, 403, 801, 802 |
| 137 | DTX-1094 | 6/2/2020 | Plaintiff's First Notice of Deposition of Amneal Pharmaceuticals | | Joshi 1 & 2 Ex. 1 | 401, 402, 403, 801, 802, AA, Legal |
| 138 | DTX-1095 | 7/17/2020 | Email from J. Bennett to B. Goldberg etc. re Kenney Deposition | | Joshi 1 & 2 Ex. 2 | 401, 402, 403, 801, 802, AA, Legal |
| 139 | DTX-1096 | 12/27/2018 | Letter from Amneal Pharmaceuticals to FDA re vasopression Injection USP, 20 Units/mL (1mL) Pre-Assigned Application #212944: Sequence # 0001 | AMVAS0000178-236 | Joshi 1 & 2 Ex. 3 | 801, 802 |
| 140 | DTX-1097 | | 1.12.11 ANDA Basis for Submission Statement | AMVAS0000001-02 | Joshi 1 & 2 Ex. 5 | 801, 802 |
| 141 | DTX-1098 | 12/11/2018 | 1.12.11 ANDA Basis for Submission Statement | AMVAS0009091-92 | Joshi 1 & 2 Ex. 6 | 801, 802 |
| 142 | DTX-1099 | 2/14/2019 | ANDA 212945 FDA Paragraph IV | AMVAS0024704-709 | Joshi 1 & 2 Ex. 7 | 401, 402, 801, 802 |
| 143 | DTX-1100 | 2/14/2019 | ANDA 212944 FDA Paragraph IV | AMVAS0025200-205 | Joshi 1 & 2 Ex. 8 | 401, 402, 801, 802 |
| 144 | DTX-1101 | 12/11/2018 | 1.12.12 Comparison Betweeen generic drug and RLD | AMVAS0000003-06 | Joshi 1 & 2 Ex. 9 | 801, 802 |
| 145 | DTX-1102 | 12/11/2018 | 1.12.12 Comparison Betweeen generic drug and RLD | AMVAS0009093-96 | Joshi 1 & 2 Ex. 10 | 801, 802 |
| 146 | DTX-1103 | 12/25/2018 | 3.2.S.3 Characterization | AMVAS0016856-896 | Joshi 1 & 2 Ex. 11 | 801, 802 |
| 147 | DTX-1104 | 12/13/2018 | 3.2.P.2 Pharmaceutical Development | AMVAS0010387-541 | Joshi 1 & 2 Ex. 12 | 801, 802 |
| 148 | DTX-1105 | 12/20/2018 | 3.2.P.1 Description and Composition of Drug Product | AMVAS0010136-166 | Joshi 1 & 2 Ex. 14 | 801, 802 |
| 149 | DTX-1106 | 9/17/2019 | 3.2 P.5.6 Justification of Specification | AMVAS0018354-425 | Joshi 1 & 2 Ex. 24 | 801, 802 |
| 150 | DTX-1107 | 12/5/2018 | Comparitive Analytical Evaluation Study Report | AMVAS0004505-577 | Joshi 1 & 2 Ex. 33 | 401, 402, 403, 801, 802 |
| 151 | DTX-1108 | 12/5/2018 | Comparitive Analytical Evaluation Study Report | AMVAS0013913-985 | Joshi 1 & 2 Ex. 34 | 401, 402, 403, 801, 802 |
| 152 | DTX-1109 | | JHP Pharmaceuticals Laboratory Notebook 00071 | PAR-VASO_0059950-041 | Kenney Ex. 5 | |
| 153 | DTX-1110 | 11/2/2015 | Email from Matthew Kenney to Sunil Vandse and Vinayagam Kannan re vasopressin attaching Vasopressin Experimental Summary.pptx | PAR-VASO_0192147-181 | Kenney Ex. 6 | 401, 402, 403, 801, 802 |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC., ET AL. v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 154 | DTX-1111 | 10/8/2014 | Email from Matthew Kenney to Polly-Ann Dardaine re SA Rochester Slides 10/10/14 Update needed by Tuesday 10/07/14 COB | PAR-VASO_0044251 | Kenney Ex. 7 | 401, 402, 403, 801, 802 |
| 155 | DTX-1112 | 4/15/2015 | Email from Matthew Kenney to Sunil Vandse et al re Vasopressin 2 month analysis, attaching 2 month Data.xlsx | PAR-VASO_0033111-129 | Kenney Ex. 8 | DUP-DTX-1295 |
| 156 | DTX-1113 | 5/12/2015 | Email from Matthew Kenney to Suketu Sanghvi et al. re 3 month vaso data | PAR-VASO_0037748-770 | Kenney Ex. 9 | 401, 402, 403, 801, 802 |
| 157 | DTX-1114 | 5/13/2015 | Email from Matthew Kenney to Suketu Sanghvi and Sunil Vandse re vaso pH grahps | PAR-VASO_0032828-832 | Kenney Ex. 10 | 401, 402, 403, 801, 802 |
| 158 | DTX-1115 | 10/2/2015 | Product Development Technical Report Vasostrict FRD-15-012 | PAR-VASO_0093612-71 | Kenney Ex. 11 | DUP-DTX-1091,1162, 1311 |
| 159 | DTX-1116 | 9/16/2015 | Email from Luis Carbini to Matthew Kenney et al, re Vasopressin assay range limits for new process | PAR-VASO_0025901-949 | Kenney Ex. 12 | 401, 402, 403, 801, 802 |
| 160 | DTX-1117 | 3/8/2012 | Email from Kim High to Matthew Kenney FW 20545-Pitressin Gradient Assay and Impurities, attaching 20545-Pitressin Gradient Assay and Impurities.doc | PAR-VASO_0022246-257 | Kenney Ex. 13 | 401, 402, 403, 801, 802 |
| 161 | DTX-1118 | 2/15/2011 | Letter from Rick Whitfield to Stuart Hinchen re January, 2011 - Quality Operations Monthly Report | PAR-VASO_0022760-774 | Kenney Ex. 14 | 401, 402, 403, 801, 802 |
| 162 | DTX-1119 | | References of lots sold, and Lot | PAR-VASO_0297181 | Kenney Ex. 15 | 401, 402, 403 |
| 163 | DTX-1120 | 5/26/2009 | Letter from Doriano Battisti to Pitressin Team re Analytical Progress: Pitressin Biweekly Meeting | PAR-VASO_0108640-651 | Kenney Ex. 16 | DUP-DTX-1316 |
| 164 | DTX-1121 | | Stability analysis on Pitressin | PAR-VASO_0108703-710 | Kenney Ex. 17 | DUP-DTX-1317 |
| 165 | DTX-1122 | | Asignment and Assumption of Contract | PAR-VASO_0219783-789 | Kenney Ex. 18 | 106, 401, 402, 403, 801, 802, 1002 Legal, ID |
| 166 | DTX-1123 | 9/28/2005 | Letter from Luis Carbini to D. Battisti, J. Gantenbein and B. Boesch re Development of a Vasopressin (Pitressin®) Stability-Indicating HPLC Assay and Identification of Degradation Products Present at 1 % wt/wt and Above | PAR-VASO_0109021-028 | Kenney Ex. 19 | 401, 402, 403, 801, 802 |
| 167 | DTX-1124 | 3/24/2010 | Determination of Vasopressin and Impurities in Pitressin by Gradient HPLC | PAR-VASO_0231222-230 | Kenney Ex. 20 | |
| 168 | DTX-1125 | 2/8/2012 | Determination of Vasopressin and Impurities in Pitressin by Gradient HPLC | PAR-VASO_0073929-940 | Kenney Ex. 21 | |
| 169 | DTX-1126 | 4/11/2011 | Letter from Doriano Battisti to Gerald Vasquez (Regulatory Affairs) re Summary of Vasopressin activities | PAR-VASO_0090540-556 | Kenney Ex. 22 | 401, 402, 403, 801, 802 |
| 170 | DTX-1127 | 5/9/2013 | Supplemental Analytical Validation for Test Procedure 20545 "Determination of Vasopressin and Impurities in Pitressin by Gradient HPLC" | PAR-VASO_0019181-202 | Kenney Ex. 23 | |
| 171 | DTX-1128 | 3/4/2014 | Supplemental Analytical Validation for Determination of Dimer-A VP in Pitressin using minor modification to Test Procedure 20545 | PAR-VASO_0062261-295 | Kenney Ex. 24 | |
| 172 | DTX-1129 | 11/20/2013 | Email from Mike Bergren to Kathy Taylor etc re Pitressin QS volume concerns and USP vasopressin standard | PAR-VASO_0089174-176 | Kenney Ex. 25 | 401, 402, 403, 801, 802 |
| 173 | DTX-1130 | | Problems with the Assay for Vasopressin USP and Related Concerns with USP Vasopressin Reference Standard | PAR-VASO_0089177-202 | Kenney Ex. 26 | 401, 402, 403, 801, 802 |
| 174 | DTX-1131 | | JHP development projects March 2013 | PAR-VASO_0224269-289 | Kenney Ex. 27 | 401, 402, 403, 801, 802 |
| 175 | DTX-1132 | 7/23/2015 | Email from Matthew Kenney to Karen Flanagan et al re Vasostrict 10ml inventory (as of 7/21/15) | PAR-VASO_0032619-622 | Kenney Ex. 28 | 401, 402, 403, 801, 802 |
| 176 | DTX-1133 | 2/12/2020 | Plaintiff's Objections and Responses to Defendants Notice of Deposition Pursuant to Rule 30(b)(6) | | Sanghvi Ex. 34 | 401, 402, 403, 801, 802, AA, Legal |
| 177 | DTX-1134 | 3/9/2020 | Plaintiffs' Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC's First Supplemental Responses and Objections to Defendant Sando Inc.'s Interrogatory Numbers 1, 2 and 6, and Second Supplemental Response to Interrogatory Number 4 | | Sanghvi Ex. 35 | 401, 402, 403, 801, 802, AA, Legal |
| 178 | DTX-1135 | 1/21/2015 | Email from Suketu Sanghvi to Jason Crist re Vasostrict room temperature stability | PAR-VASO_0038272-273 | Sanghvi Ex. 36 | 401, 402, 403, 801, 802 |
| 179 | DTX-1136 | 10/31/2016 | Email from Suketu Sanghvi to Brandon Rockwell re Vaso LCM Brief Update - Arecor | PAR-VASO_0192953-954 | Sanghvi Ex. 37 | 401, 402, 403, 801, 802 |
| 180 | DTX-1137 | 8/15/2018 | Arecor Vasopressin Reformulation Update PowerPoint | PAR-VASO_0236197-210 | Sanghvi Ex. 38 | 401, 402, 403, 801, 802 |
| 181 | DTX-1138 | | Declaration Under 37 CFR 1.132 by Inventor Sunil Vandse | PAR-VASO_000704-7128 | Sanghvi Ex. 39 | 401, 402, 403 |
| 182 | DTX-1139 | | United States Patent No. 9,375,478 | PAR-VASO_0067410-441 | Sanghvi Ex. 40 | |
| 183 | DTX-1140 | | Vasopressin Label | PAR-VASO_0008349-356 | Sanghvi Ex. 41 | |
| 184 | DTX-1141 | | Pitressin Label | PAR-VASO_0219794-795 | Sanghvi Ex. 42 | |
| 185 | DTX-1142 | | Vasostrict Label | PAR-VASO_0053330-31 | Sanghvi Ex. 43 | |
| 186 | DTX-1143 | 5/9/2013 | Supplemental Analytical Validation for Test Procedure 20545 "Determination of Vasopressin and Impurities in Pitressin by Gradient HPLC" | PAR-VASO_0031687-708 | Sanghvi Ex. 44 | |
| 187 | DTX-1144 | | Research Reort Regarding HPLC for determination of impurities in vasopressin | PAR-VASO_0025902-949 | Sanghvi Ex. 45 | |
| 188 | DTX-1145 | | United States Patent No. 9,750,785 | PAR-VASO_0070981-062 | Sanghvi Ex. 46 | |
| 189 | DTX-1146 | 7/3/2014 | Email from Terrance Coughlin to Suketu Sanghvi et al FW Vasostrict | PAR-VASO_0138674-689 | Sanghvi Ex. 47 | 401, 402, 403, 801, 802 |
| 190 | DTX-1147 | 3/9/2015 | Email from Sunil Vandse to Suketu Sanghvi FW 6 month vaso time out of refigeration results | PAR-VASO_0038961-972 | Sanghvi Ex. 48 | 401, 402, 403, 801, 802 |
| 191 | DTX-1148 | 6/16/2015 | Email from Terrance Coughlin to Joseph Barbarite FW Vasopressin Reference Standard | PAR-VASO_0037812-815 | Sanghvi Ex. 49 | 401, 402, 403, 801, 802 |
| 192 | DTX-1149 | | Stability Report | PAR-VASO_0058576-649 | Sanghvi Ex. 50 | |
| 193 | DTX-1150 | 7/11/2014 | Email from David Jones to Suketu Sanghvi re proposal | PAR-VASO_0037670-673 | Sanghvi Ex. 51 | 401, 402, 403, 801, 802 |
| 194 | DTX-1151 | 1/11/2013 | Report on the results of a stability study Pitressin use and dilution with saline | PAR-VASO_0028643-647 | Sanghvi Ex. 52 | 401, 402, 403 |
| 195 | DTX-1152 | 9/24/2014 | Email from Matthew Kenney to Suketu Sanghvi re Vasopressin 1 month at RT | PAR-VASO_0039428 | Vandse Ex. 2 | 401, 402, 403, 801, 802 |
| 196 | DTX-1153 | 2/27/2013 | Pitressin Registration Stability Studies: 9 Month Update | PAR-VASO_0039429-488 | Vandse Ex. 3 | |
| 197 | DTX-1154 | | SV 4200 Pitressin (Synthetic) USP, 20 Units/1 ML | PAR-VASO_0039489-490 | Vandse Ex. 4 | 401, 402, 403, 801, 802 |
| 198 | DTX-1155 | 5/13/2015 | Email from Terrance Coughlin to Paul Campanelli et al re vasostrict new formulation for GMP stability | PAR-VASO_0192029-030 | Vandse Ex. 5 | 401, 402, 403, 801, 802 |
| 199 | DTX-1156 | 5/7/2015 | Email from Vinayagam Kannan to Suketu Sanghvi re Vasopressin Tox Data from NDA | PAR-VASO_0027455 | Vandse Ex. 6 | 401, 402, 403, 801, 802 |
| 200 | DTX-1157 | 6/29/2012 | A 28-Day Repeated Dose Intravaneous Toxicity Study in Sprague-Dawley Rats Given Arginin Vasopressin Alone and in Combination with Arginin Vasipressin Impurities Final Report | PAR-VASO_0027456-776 | Vandse Ex. 7 | 801, 802 |
| 201 | DTX-1158 | 5/28/2012 | Maximum Tolerated Dose and Dose-Range Finding Study for Arginin Vasopressin and its Degregadtion Products in Sprague-Dawley Rats | PAR-VASO_0027777-967 | Vandse Ex. 8 | 801, 802 |
| 202 | DTX-1159 | 6/9/2015 | Email from Sunil Vandse to Suketu Sanghvi FW 6 month vaso time out of refigeration results | PAR-VASO_0038961-968 | Vandse Ex. 9 | 401, 402, 403, 801, 802 |
| 203 | DTX-1160 | 8/14/2015 | Response to Office Action with Attachments | | Vandse Ex. 10 | ID |
| 204 | DTX-1161 | 5/2/2017 | Response to Non-Final Office Action with attachments | | Vandse Ex. 11 | ID |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC. & ENDO PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 205 | DTX-1162 | | Vasostrict, 20 Units/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock # 2002501) Product Development Technical Report | PAR-VASO_0093612-671 | Vandse Ex. 12 | DUP-DTX-1091, 1115, 1311 |
| 206 | DTX-1163 | | Vasostrict, 20 Units/mL, pH 3.8 Acetate Buffer, Single Dose (Preservative Free) (Stock # 2002501) Product Development Technical Report | PAR-VASO_0060127-163 | Vandse Ex. 13 | |
| 207 | DTX-1164 | | Vasostrict Label | PAR-VASO_0064215-216 | Vandse Ex. 14 | |
| 208 | DTX-1165 | | Highlights of Prescribing Information for Vasostrict | | Vandse Ex. 15 | 401, 402, 403 |
| 209 | DTX-1166 | 11/20/2020 | Email from Shaobo Zhu to B. Goldberg etc. re Par v. Amneal - Major Amendments to Amneal ANDA | | Joshi 3 Ex. 3 | 401, 402, 403, 801, 802, AA, Legal |
| 210 | DTX-1167 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 mL, Batch | AMVAS0135961-62 | Joshi 3 Ex. 4 | 401, 402, 403, 801, 802 |
| 211 | DTX-1168 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 Ml, Batch | AMVAS0135963-64 | Joshi 3 Ex. 5 | 401, 402, 403, 801, 802 |
| 212 | DTX-1169 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 Ml, Batch | AMVAS0135965-66 | Joshi 3 Ex. 6 | 401, 402, 403, 801, 802 |
| 213 | DTX-1170 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 Ml, Batch | AMVAS0135967-68 | Joshi 3 Ex. 7 | 401, 402, 403, 801, 802 |
| 214 | DTX-1171 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 Ml, Batch | AMVAS0135969-70 | Joshi 3 Ex. 8 | 401, 402, 403, 801, 802 |
| 215 | DTX-1172 | 4/16/2020 | Certificate of Analysis re Vasopressin Injection USP, 20 Units/mL, 10 Ml, Batch | AMVAS0135970-71 | Joshi 3 Ex. 9 | 401, 402, 403, 801, 802 |
| 216 | DTX-1173 | 5/22/2018 | United States Patent No. 9,687,526 | PAR-VASO-0000034-113 | Joshi 3 Ex. 12 | |
| 217 | DTX-1174 | | Center for Drug Evaluation and Research, Application No. 2044850rig1s00 Chemistry Review | PAR-VASO_0238720-757 | Joshi 3 Ex. 13 | |
| 218 | DTX-1175 | 5/18/2020 | Email from Rapil Soni to Ramesh Prajapat re Vasopressin query response draft for review | AMVAS0135992-008 | Joshi 3 Ex. 18 | 801, 802 |
| 219 | DTX-1176 | | Lithuania Patent No. 4487 | AMPHPA0006278-88 | | 401, 402, 403, 801, 802, 901, 902 |
| 220 | DTX-1177 | 12/21/2018 | Vasopressin Injection USP, 20 Units/mL (1mL) 2.3 Quality (CMC) Overall Summary | AMVAS0000296-456 | | 801, 802 |
| 221 | DTX-1178 | 12/20/2018 | Vasopressin Injection USP, 20 Units/mL (1mL) 3.2.P.1 Description of Composition of Drug Product | AMVAS0001018-056 | Joshi 1 & 2 Ex. 18 | 801, 802 |
| 222 | DTX-1179 | | Vasopressin Injection USP, 20 Units/mL (1 mL) Dilution Study Report | AMVAS0001111-172 | Joshi 1 & 2 Ex. 28 | 801, 802 |
| 223 | DTX-1180 | 12/19/2019 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2.P.2 Pharmaceutical Development | AMVAS0001254-384 | Joshi 1 & 2 Ex. 13 | 801, 802 |
| 224 | DTX-1181 | 12/24/2018 | 3.2.P.3.1. Manufacturer(s) for Vasopressin | AMVAS0001385-428 | | 801, 802 |
| 225 | DTX-1182 | 12/6/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2.P.3.3 Description of Manufacturing Process and Process Controls | AMVAS0001443-496 | Joshi 1 & 2 Ex. 16 | 401, 402, 801, 802 |
| 226 | DTX-1183 | | In-Process Certificate of Analysis for Vasopressin Injection USP, 20 Units/mL (1 mL) | AMVAS0002086-092 | | |
| 227 | DTX-1184 | | Amneal's Certificate of Analysis (Batch # | AMVAS0005136-186 | | ID |
| 228 | DTX-1185 | 12/18/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2. P.5.5 Characterization of Impurities | AMVAS0005187 | | 401, 402, 403, 801, 802 |
| 229 | DTX-1186 | | Schott Fiolax Technical Data | AMVAS0005526 | | 401, 402, 403, 801, 802 |
| 230 | DTX-1187 | | Table of Contents | AMVAS0005531-32 | | 401, 402, 403, 801, 802 |
| 231 | DTX-1188 | 12/15/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) Additional Study Protocol | AMVAS0005538-544 | | 801, 802 |
| 232 | DTX-1189 | 12/15/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) Stability Protocol | AMVAS0005552-560 | | 801, 802 |
| 233 | DTX-1190 | 12/14/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2.P.8.1 Stability Summary and Conclusions | AMVAS0005561-62 | | 801, 802 |
| 234 | DTX-1191 | 12/18/2018 | 3.2.P.8.2 Post-Approval Stability Commitment | AMVAS0005570-577 | | 801, 802 |
| 235 | DTX-1192 | | MDV Module 3.2.P.8.3 | AMVAS0005599-630 | Joshi 1 & 2 Ex. 32 | 801, 802 |
| 236 | DTX-1193 | 12/24/2018 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2.P.8.3 Stability Data | AMVAS0005631-652 | | 801, 802 |
| 237 | DTX-1194 | | Vasopressin Injection USP, 20 Units/mL (1 mL) Batch Manufacturing Record | AMVAS0006289-620 | | 801, 802 |
| 238 | DTX-1195 | | Vasopressin Injection USP, 20 Units/mL (1 mL) Batch Manufacturing Record | AMVAS0006621-943 | | 801, 802 |
| 239 | DTX-1196 | | Vasopressin Injection USP, 20 Units/mL (1 mL) Batch Manufacturing Record | AMVAS0006944-390 | | 801, 802 |
| 240 | DTX-1197 | 03/2019 | Vasopressin Injection, USP Label | AMVAS0008970-71 | | 801, 802 |
| 241 | DTX-1198 | 12/27/2018 | Letter from C. Edwards to FDA re Original ANDA Vasopressin Injection USP, 20 Units/mL (10 mL) | AMVAS0009258-309 | Joshi 1 & 2 Ex. 4 | 801, 802 |
| 242 | DTX-1199 | 12/15/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 2.3 Quality (CMC) Overall Summary | AMVAS0009368-544 | | 801, 802 |
| 243 | DTX-1200 | 12/6/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) Dilution Study Report | AMVAS0010220-281 | | 801, 802 |
| 244 | DTX-1201 | 12/13/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2.P.2 Pharmaceutical Development | AMVAS0010387-541 | | 801, 802 |
| 245 | DTX-1202 | 12/24/2018 | 3.2.P.3.1. Manufacturer(s) for Vasopressin | AMVAS0010561-607 | | 801, 802 |
| 246 | DTX-1203 | 12/6/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2.P.3.3 Description of Manufacturing Process and Process Controls | AMVAS0010622-676 | Joshi 1 & 2 Ex. 17 | 401, 402, 801, 802 |
| 247 | DTX-1204 | 5/22/2018 | In-process Certificate of Analysis for Vasopressin Injection, USP, 20 Units/ML (10mL) | AMVAS0011220-226 | | |
| 248 | DTX-1205 | 5/10/2018 | Product Buble Point Ration Determination Test Report | AMVAS0011412-425 | Joshi 1 & 2 Ex. 14 | 801, 802, ID |
| 249 | DTX-1206 | 12/11/2018 | Amneal's Certificate of Analysis (Batch #1 ) | AMVAS0014570-638 | | ID |
| 250 | DTX-1207 | 12/11/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2. P.5.5. Characterization of Impurities | AMVAS0014639-647 | | 801, 802 |
| 251 | DTX-1208 | | Schott Fiolax Technical Data | AMVAS0014972 | | 401, 402, 403, 801, 802 |
| 252 | DTX-1209 | | Table of Contents | AMVAS0014975-81 | | 801, 802 |
| 253 | DTX-1210 | 12/15/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) Additional Study Protocol | AMVAS0014982-988 | | 801, 802 |
| 254 | DTX-1211 | 12/15/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) Additional Study Protocol | AMVAS0014996-004 | | 801, 802 |
| 255 | DTX-1212 | 12/14/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2.P.8.1 Stability Summary and Conclusions | AMVAS0015005-06 | | 801, 802 |
| 256 | DTX-1213 | 12/18/2018 | 3.2.P.8.2 Post-Approval Stability Commitment | AMVAS0015014-021 | | 801, 802 |
| 257 | DTX-1214 | | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2.P.8.3 Stability Data for Accelerated and Long term Conditions | AMVAS0015061-093 | Joshi 1 & 2 Ex. 31 | 801, 802 |
| 258 | DTX-1215 | 12/21/2018 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2.P.8.3 Stability Data | AMVAS0015094-766 | | 801, 802 |
| 259 | DTX-1216 | | Vasopressin Injection USP, 20 Units/mL (10 mL) Batch Manufacturing Record | AMVAS0015803-088 | | 801, 802 |
| 260 | DTX-1217 | | Vasopressin Injection USP, 20 Units/mL (10 mL) Batch Manufacturing Record | AMVAS0016089-351 | | 801, 802 |
| 261 | DTX-1218 | | Vasopressin Injection USP, 20 Units/mL (10 mL) Batch Manufacturing Record | AMVAS0016352-626 | | 801, 802 |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC., v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 262 | DTX-1219 | 3/2019 | Vasopressin Injection, USP Label | AMVAS0018197-98 | | 801, 802 |
| 263 | DTX-1220 | 12/18/2019 | Letter from C. Edwards to FDA re ANDA#212944 (Sequence # 0006) | AMVAS0018322-27 | Joshi 3 Ex. 11 | 801, 802 |
| 264 | DTX-1221 | 9/16/2019 | 3.2.P.3.4 In-Process Specifications/Laboratory Test Report Form Document | AMVAS0018333-38 | Joshi 1 & 2 Ex. 20 | 401, 402, 801, 802 |
| 265 | DTX-1222 | 9/16/2019 | 3.2.P.5.1 Finished Product Specifications/Laboratory Test Report Approval Page for Vasopressin Injection USP 20 Units/mL, 1 mL | AMVAS0018339-353 | Joshi 1 & 2 Ex. 22 | 801, 802 |
| 266 | DTX-1223 | 9/17/2019 | Vasopressin Injection USP, 20 Units/mL (1 mL) 3.2. P.5.6 Justification of Specification | AMVAS0018354-425 | | 801, 802 |
| 267 | DTX-1224 | 9/18/2019 | Letter from C. Edwards to FDA re Original ANDA #212945 (Sequence # 0006) | AMVAS0018470-475 | Joshi 3 Ex. 10 | 401, 402, 403, 801, 802 |
| 268 | DTX-1225 | 9/16/2019 | 3.2.P.3.4 In-Process Specifications/Laboratory Test Report Form Document | AMVAS0018481-86 | Joshi 1 & 2 Ex. 21 | 401, 402, 801, 802 |
| 269 | DTX-1226 | 9/16/2019 | 3.2.P.5.1 Finished Product Specifications/Laboratory Test Report Approval Page for Vasopressin Injection USP 20 Units/mL, 1 mL | AMVAS0018487-501 | Joshi 1 & 2 Ex. 23 | 801, 802 |
| 270 | DTX-1227 | 9/17/2019 | Vasopressin Injection USP, 20 Units/mL (10 mL) 3.2 P.5.6 Justification of Specification | AMVAS0018502-575 | Joshi 1 & 2 Ex. 25 | 801, 802 |
| 271 | DTX-1228 | 9/29/2019 | Letter from Scott Janiczak to Amneal Pharmaceuticals of New York, LLC re Vasopressin Injection USP, 20 Units/mL Single-Dose Vials amendment | AMVAS0018618-19 | | 401, 402, 403, 801, 802 |
| 272 | DTX-1229 | 9/29/2019 | Letter from Scott Janiczak to Amneal Pharmaceuticals of New York, LLC re Vasopressin Injection USP, 20 Units/mL Multiple-Dose Vials amendment | AMVAS0018620-21 | | 401, 402, 403, 801, 802 |
| 273 | DTX-1230 | 6/13/2017 | Results_Vasopressin - Not Considered Spreadsheet | AMVAS0049657 | | 401, 402, 403, 801, 802, 901, 902 |
| 274 | DTX-1231 | 9/1/2017 | Vasopressin Injection USP, 20 Units/mL Certificate of Analysis | AMVAS0050779-80 | | 401, 402, 403, 801, 802, 901, 902 |
| 275 | DTX-1232 | 9/1/2017 | Vasopressin Injection USP, 20 Units/mL, 1 mL  Certificate of Analysis | AMVAS0050781-82 | | 401, 402, 403, 801, 802, 901, 902 |
| 276 | DTX-1233 | | Analytical Results Spreadsheet | AMVAS0051164 | Joshi 1 & 2 Ex. 29 | |
| 277 | DTX-1234 | | Analytical Results Updated Spreadsheet | AMVAS0057512 | Joshi 1 & 2 Ex. 30 | |
| 278 | DTX-1235 | 5/1/2019 | Amneal Laboratory Notebook No. PD-LNB-176 | AMVAS0017786-847 | Joshi 1 & 2 Ex. 15 | 801, 802 |
| 279 | DTX-1236 | | Amneal Laboratory Notebook No. PD-LNB-155 | AMVAS0071848-908 | | 401, 402, 403, 801, 802 |
| 280 | DTX-1237 | 7/14/2020 | 3.2.P.8.3 Stability Report For Accelerated and Long Term Conditions Document Approval Page | AMVAS0120290-334 | Joshi 1 & 2 Ex. 35 | 801, 802 |
| 281 | DTX-1238 | 7/15/2020 | 3.2P.8.3 Stability Report For Accelerated and Long Term Conditions Document | AMVAS0120335-385 | Joshi 1 & 2 Ex. 36 | 801, 802 |
| 282 | DTX-1239 | 7/14/2020 | 3.2.P.8.3 Stability Report For Additional Study Document Approval Page | AMVAS0120386-406 | Joshi 1 & 2 Ex. 37 | 801, 802 |
| 283 | DTX-1240 | 7/15/2020 | 3.2P.8.3 Stability Report For Additional Study Document | AMVAS0120407-427 | Joshi 1 & 2 Ex. 38 | 801, 802 |
| 284 | DTX-1241 | 12/16/2019 | FDA letter re ANDA for Vasopressin Injection USP, 20 Units/mL Single-Dose Vials | AMVAS0120439-447 | Joshi 1 & 2 Ex. 26 | |
| 285 | DTX-1242 | 12/16/2019 | FDA letter re ANDA for Vasopressin Injection USP, 20 Units/mL Multiple-Dose Vials | AMVAS0120448-456 | Joshi 1 & 2 Ex. 27 | |
| 286 | DTX-1243 | | Batch Manufacturing Records for Batch No. | AMVAS0127998-131 | | 401, 402, 403, 801, 802 |
| 287 | DTX-1244 | | Batch Manufacturing Records for Batch No. | AMVAS0128622-752 | | 401, 402, 403, 801, 802 |
| 288 | DTX-1245 | | Batch Manufacturing Records for Batch No. | AMVAS0128944-075 | | 401, 402, 403, 801, 802 |
| 289 | DTX-1246 | 2004 | Beale et al., "Vasopressor and inotropic support in septic shock: an evidence-based review," Critical care medicine 32 S455-65 (2004) | AMVAS0129256-266 | | 801, 802 |
| 290 | DTX-1247 | 2004 | Hall et al., "Fixed-dose vasopressin compared with titrated dopamine and norepinephrine as initial vasopressor therapy for septic shock," Pharmacotherapy 24:1002-12 (2004) | AMVAS0129844-854 | | 801, 802 |
| 291 | DTX-1248 | 1994 | Hwang et al., "Changes of alpha 1-adrenergic receptors in human liver during intraabdominal sepsis. Hepatology (Baltimore, Md) 20:638-42 (1994) | AMVAS0129855-859 | | 401, 402, 403, 801, 802 |
| 292 | DTX-1249 | 1991 | Kaufmann et al., "Plasma endothelin during upright tilt: relevance for orthostatic hypotension?" The Lancet 338:1542-5 (1991) | AMVAS0129860-863 | | 801, 802 |
| 293 | DTX-1250 | 2004 | Mullner et al., "Vasopressors for shock," The Cochrane database of systematic reviews Cd003709 (2004) | AMVAS0129864-887 | | 801, 802 |
| 294 | DTX-1251 | 2001 | Pertsemlidis & Fondon, "Having a BLAST with bioinformatics (and avoiding BLASTphemy), Genome Biology (2001) | AMVAS0129888-897 | | 801, 802 |
| 295 | DTX-1252 | 1983 | RL Z et al., Vasopressin response to orthostatic hypotension," Am. J Medicine 74:A64 (1983) | AMVAS0129898-898 | | 801, 802 |
| 296 | DTX-1253 | 1987 | Roth et al., "Altered hepatic vasopressin and alpha 1-adrenergic receptors after chronic endotoxin infusion," Am. J Physiology 252:E699-702 (1987) | AMVAS0129899-902 | | 801, 802 |
| 297 | DTX-1254 | 2009 | Sawa et al., "The long-term survival rate of catecholamine-resistant septic shock in Japanese patients who received vasopressin therapy," Clinical Nephrology 72:129-36 (2009) | AMVAS0129903-910 | | 801, 802 |
| 298 | DTX-1255 | 1993 | Zeitlhofer et al., "Central nervous system function after cardiopulmonary bypass," Eur Heart J 14 885-90 (1993) | AMVAS0129911-916 | | 401, 402, 403, 801, 802 |
| 299 | DTX-1256 | | Batch Manufacturing Records for Batch No. | AMVAS0129917-045 | | 401, 402, 403, 801, 802 |
| 300 | DTX-1257 | | Batch Manufacturing Records for Batch No. | AMVAS0130248-376 | | 401, 402, 403, 801, 802 |
| 301 | DTX-1258 | | Batch Manufacturing Records for Batch No. | AMVAS0130562-690 | | 401, 402, 403, 801, 802 |
| 302 | DTX-1259 | | Study Report on Aggregation Study of Vasopressin Injection USP 20 Units/ML by SEC-UV | AMVAS0131341-378 | | 401, 402, 403, 801, 802 |
| 303 | DTX-1260 | | Seq. 0009 of ANDAs 212944 and 212945 | AMVAS0131379-5927 | | 401, 402, 403, 801, 802, 1003 |
| 304 | DTX-1261 | 10/29/2020 | Letter from Denise Toyer to Office of Generic Drugs re Vasopressin Injection USP, 20 Units/mL 1 mL Complete Response Amendment | AMVAS0131386-503 | Joshi 3 Ex. 2 | 801, 802 |
| 305 | DTX-1262 | 10/7/2020 | 3.2.P.3.4 In-Process Specifications/Laboratory Test Report Document Approval Page for Vasopressin Injection USP 20 Units/mL, 1 mL | AMVAS0132433-39 | Joshi 3 Ex. 15 | 401, 402, 801, 802 |
| 306 | DTX-1263 | 10/22/2020 | 3.2.P.5.1 Finished Product Specifications/Laboratory Test Report Approval Page for Vasopressin Injection USP 20 Units/mL, 1 mL | AMVAS0132440-55 | Joshi 3 Ex. 17 | 801, 802 |
| 307 | DTX-1264 | 10/24/2020 | 3.2.P.8.1 Stability Summary and Conclusions | AMVAS0132632-34 | | 801, 802 |
| 308 | DTX-1265 | 10/28/2020 | 3.2.P.8.2 Post-Approval Stability Commitment | AMVAS0132635-44 | | 801, 802 |
| 309 | DTX-1266 | 10/29/2020 | 3.2.P.8.3 Stability Report for Additional Study Document Approval Page | AMVAS0132645-65 | | 801, 802 |
| 310 | DTX-1267 | 10/29/2020 | 3.2.P.8.3 Stability Report for Accelerated and Long Term Conditions Document Approval Page | AMVAS0132666-710 | Joshi 3 Ex. 19 | 801, 802 |
| 311 | DTX-1268 | 10/29/2020 | Letter from Denise Toyer to Office of Generic Drugs re Vasopressin Injection USP, 20 Units/mL 10 mL Complete Response Amendment | AMVAS0133654-779 | Joshi 3 Ex. 1 | 801, 802 |
| 312 | DTX-1269 | 10/7/2020 | 3.2.P.3.4 In-Process Specifications/Laboratory Test Report Document Approval Page for Vasopressin Injection USP 20 Units/mL, 10 mL | AMVAS0134683-88 | Joshi 3 Ex. 14 | 401, 402, 801, 802 |

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 314 | DTX-1270 | 10/22/2020 | 3.2.P.5.1 Finished Product Specifications/Laboratory Test Report Approval Page for Vasopressin Injection USP 20 Units/mL, 10 mL | AMVAS0134689-706 | Joshi 3 Ex. 16 | 801, 802 |
| 315 | DTX-1271 | 10/24/2020 | 3.2.P.8.1 Stability Summary and Conclusions | AMVAS0134908-910 | | 801, 802 |
| 316 | DTX-1272 | 10/28/2020 | 3.2.P.8.2 Post-Approval Stability Commitment | AMVAS0134911-20 | | 801, 802 |
| 317 | DTX-1273 | | Xiong, ESSENTIAL BIOINFORMATICS 34, 2006 | AMVAS0135928-954 | | 401, 402, 403, 801, 802, 1003 |
| 318 | DTX-1274 | 12/21/2018 | 3.2 P.8.3 Stability Data | AMVAS0015094-776 | | 801, 802 |
| 319 | DTX-1275 | 4/18/2014 | Fresenius Kabi, New Product Announcement - Novaplus | FKSS0000094 | | 401, 402, 403, 801, 802 |
| 320 | DTX-1276 | September 2013 | Vasopressin Injection Product Label (Novaplus 2013) | FKSS0000353-56 | | 401, 402, 403, 801, 802 |
| 322 | DTX-1277 | 2004 | Noah E. Robinson, Arthur B. Robinson, Molecular Clocks: Deamidation of Asparaginyl and Glutaminyl Residues in Peptides and Proteins (2004) | | | 801, 802 |
| 323 | DTX-1278 | 3/12/2015 | Par Pharmaceutical Holdings, Inc., General Form for Registration of Securities Under the Securities Act of 1933 (Form S-1) F-21 (March 12, 2015) | | | 401, 402, 403, 801, 802 |
| 324 | DTX-1279 | 1993 | Garrard et al., "Spectral analysis of heart rate variability in the sepsis syndrome," Clinical autonomic research : official journal of the Clinical Autonomic Research Society 3 5-13 (1993) | | | 401, 402, 403, 801, 802 |
| 325 | DTX-1280 | 1986 | McMillan et al., "Hepatic alpha 1- adrenergic receptor alteration in a rat model of chronic sepsis," Circulatory Shock 19:185-93 (1986) | | | 401, 402, 403, 801, 802 |
| 326 | DTX-1281 | 2010 | Gujarati, Damodar N., and Dawn C. Porter, Essentials of Econometrics, 4th Ed., 2010, Chapters 2, 3, 6 | | | 401, 402, 403, 801, 802 |
| 327 | DTX-1282 | 1999 | Mingda Bi, Jagdish Singh, "HPLC Method for Quantification of Arginine Containing Vasopressin," J. Liq. Chrom. & Rel. Technol., 22(4), 551–560 (1999) | Par-Vaso_0238426-37 | | 801, 802 |
| 328 | DTX-1283 | 2000 | Mingda Bi, Jagdish Singh, "Effect of buffer pH, buffer concentration and skin with or without enzyme inhibitors on stability of [Arg8]-vasopressin," International Journal of Pharmaceutics, 197, 87-93 (2000) | PAR-VASO_0030301-07 | | |
| 329 | DTX-1284 | | www.britannica.com/science/pH | | | 401, 402, 403, 801, 802, 901, 902 |
| 330 | DTX-1285 | | mathworld.wolfram.com/Significance.html | | | 401, 402, 403, 801, 802, 901, 902 |
| 331 | DTX-1286 | | mathworld.wolfram.com/P-Value.html | | | 401, 402, 403, 801, 802, 901, 902 |
| 332 | DTX-1287 | | mathworld.wolfram.com/BonferroniCorrection.html | | | 401, 402, 403, 801, 802, 901, 902 |
| 333 | DTX-1288 | | www.parsterileproducts.com/products/products/vasostrict/ | | | 401, 402, 403 |
| 334 | DTX-1289 | | Recall of Metformin Hydrochloride Extended-Release Tables, https://www.accessdata.fda.gov/scripts/ires/?Product=182106 | | | 401, 402, 403, 801, 802, 901, 902 |
| 335 | DTX-1290 | | Recall of Nizatidine Oral Solution, https://www.accessdata.fda.gov/scripts/ires/?Product=180726 | | | 401, 402, 403, 801, 802, 901, 902 |
| 336 | DTX-1291 | | Recall of Ranitidine Tablets, USP 150 mg, https://www.accessdata.fda.gov/scripts/ires/?Product=178116 | | | 401, 402, 403, 801, 802, 901, 902 |
| 337 | DTX-1292 | 3/31/2016 | Declaration of Inventor Vinayagam Kannan, March 31, 2016 | PAR-VASO-0004878-88 | | 401, 402, 403 |
| 338 | DTX-1293 | | FRD-14-001R Document Approval | PAR-VASO_0028307 | | missing end bates |
| 339 | DTX-1294 | | DEV-12-031, Three Month Iterim Analysis of Registration Stability Studies for Pitressin | PAR-VASO_0030161 | | |
| 340 | DTX-1295 | 4/15/2015 | Email from Matthew Kenney to Sunil Vandse etc. re vasopressin 2 mo analysis | PAR-VASO_0033111-128 | | DUP-DTX-1112 |
| 341 | DTX-1296 | | 2 Month Data Spreadsheet | PAR-VASO_0033129 | | 401, 402, 403, 801, 802 |
| 342 | DTX-1297 | 10/17/2011 | FDA Version of Pre-NDA Meeting Minutes for Pitressin (vasopressin) Injection, USP | PAR-VASO_0037497-515 | | 401, 402, 403, 801, 802 |
| 343 | DTX-1298 | 9/16/2011 | Letter from JHP Pharmaceuticals to FDA re Pre NDA Meeting Package Pitressin, Synthetic Pre-IND 112,944 and 112,945 | PAR-VASO_0058258 | | 401, 402, 403, 801, 802 |
| 344 | DTX-1299 | 10/24/2011 | Pitressin Meeting Minutes | PAR-VASO_0058393-399 | | 401, 402, 403, 801, 802 |
| 345 | DTX-1300 | 9/25/2012 | Letter from Gerald Vasquez to Norman Stockbridge re Original New Drug Application in eCTD format | PAR-VASO_0058427-433 | | 401, 402, 403, 801, 802 |
| 346 | DTX-1301 | 9/25/2012 | FDA Application to Market a New Drug for Vasopressin Injection, USP | PAR-VASO_0072406-410 | | |
| 347 | DTX-1302 | | 2.5 Pitressin Clinical Overview | PAR-VASO_0072526-689 | | 801, 802 |
| 348 | DTX-1303 | | 3.2.P.2 Pharmaceutical Development of Pitressin | PAR-VASO_0072798-803 | | |
| 349 | DTX-1304 | 11/29/2012 | 3.2.P.8 Stability Data | PAR-VASO_0073585-629 | | |
| 350 | DTX-1305 | 5/3/2013 | Letter from Gerald Vasquez to Norman Stockbridge re Pitressin, Synthetic NDA #204485 | PAR-VASO_0077264-267 | | 401, 402, 403, 801, 802 |
| 351 | DTX-1306 | 5/3/2013 | 3.2.P.2 Pharmaceutical Development of Pitressin | PAR-VASO_0077270 | | |
| 352 | DTX-1307 | 5/17/2013 | Letter from Gerald Vasquez to FDA re Request for Reconsideration of Propietary Name NDA 204485 | PAR-VASO_0077369 | | |
| 353 | DTX-1308 | 6/24/2013 | Letter from Gerald Vasquez to FDA re Request for Withdrawal of Propietary Name NDA 204485 | PAR-VASO_0077570 | | |
| 354 | DTX-1309 | 10/17/2013 | Pitressin NDA #204485 Complete Response to Information Request | PAR-VASO_0078267-272 | | 401, 402, 403, 801, 802 |
| 355 | DTX-1310 | 8/19/2014 | Letter from Andrea Gloster to Julianna Zebelian re 2014 APR Stability Information for Pitressin | PAR-VASO_0088553-596 | | |
| 356 | DTX-1311 | 11/19/2015 | Vasostrict, 20 Units/mL, single Dose Product Development Technical Report | PAR-VASO_0093612-671 | | DUP-DTX-1091, 1115, 1162 |
| 357 | DTX-1312 | 1/18/2005 | Letter from Kristy Jones to Pitressin File re pH Matrix for SV 4200 Pitressin (Synthetic) USP, 20 Units per 1 mL | PAR-VASO_0095005 | | 401, 402, 403, 801, 802 |
| 358 | DTX-1313 | 4/28/2003 | Excel spreadsheet of validation data | PAR-VASO_0095102 | | 401, 402, 403 |
| 359 | DTX-1314 | 7/22/2015 | Certificate of Analysis for Vasostrict, 20 units per 1 mL | PAR-VASO_0096688-698 | | |
| 360 | DTX-1315 | 3/4/2008 | Letter from Karen Mondejar to B. Boesch re Regression Analysis of Pitressin Synthetic, 20 units per 1 mL with Teflon Stoppers | PAR-VASO_0108554-570 | | 401, 402, 403 |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC. v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 361 | DTX-1316 | 5/26/2009 | Letter from Doriano Battisti to Pitressin Team re Analytical Progress: Pitressin Biweekly Meeting | PAR-VASO_0108640-651 | | DUP-DTX-1120 |
| 362 | DTX-1317 | | Stability analysis on Pitressin | PAR-VASO_0108703-710 | | DUP-DTX-1121 |
| 363 | DTX-1318 | | Stability analysis on Pitressin | PAR-VASO_0108711-722 | | 401, 402, 403 |
| 364 | DTX-1319 | | Stability analysis on Pitressin | PAR-VASO_0108983-985 | | 401, 402, 403 |
| 365 | DTX-1320 | | Stability analysis on Pitressin | PAR-VASO_0108986-988 | | 401, 402, 403 |
| 366 | DTX-1321 | | SV 4200 Pitressin (Synthetic) USP, 20 Units per 1 mL Master Batch Record | PAR-VASO_0120243-363 | | |
| 367 | DTX-1322 | 1997 | Landry, et al., "Vasopressin Deficiency Contributes to the Vasodilation of Septic Shock," Circulation 95:1122-5 (1997) | PAR-VASO_0123317-329 | | 801, 802 |
| 368 | DTX-1323 | 11/12/2010 | Letter from Steve Richardson to Dorothy Stanback re Entry No. 435-1024270-4 and 435-1024392-6 | PAR-VASO_0241702-796 | | 401, 402, 403, 801, 802 |
| 369 | DTX-1324 | 2013 | Daley et al., "A Comparison of Initial Monotherapy with Norepinephrine Versus Vasopressin for Resuscitation in Septic Shock," The Annals of Pharmacotherapy 47:301-10 (2013) | PAR-VASO_0251276-285 | | 801, 802 |
| 370 | DTX-1325 | 2008 | Dellinger et al., "Surviving Sepsis Campaign: International Guidelines for Management of Sepsis and Septic Shock: 2008," Intensive Care Med 34:17–60 (2008) | PAR-VASO_0252730-745 | | 801, 802 |
| 371 | DTX-1326 | 2008 | Sharma et al., "Effects of Low Dose Vasopressin in Catecholamine Resistant Septic Shock," Med. J Armed Forces India 64:304-7 (2008) | PAR-VASO_0253183-86 | | 801, 802 |
| 372 | DTX-1327 | 2001 | Tsuneyoshi et al., "Hemodynamic and Metabolic Effects of Low-Dose Vasopressin Infusions in Vasodilatory Septic Shock," Critical Care Medicine 29:487-93 (2001) | PAR-VASO_0253452-458 | | 801, 802 |
| 373 | DTX-1328 | May 2014 | Vasostrict Prescribing Label | PAR-VASO_0254543-46 | | |
| 374 | DTX-1329 | November 2015 | Vasostrict Prescribing Label | PAR-VASO_0254547-48 | | |
| 375 | DTX-1330 | 2017 | Rhodes et al., "Surviving Sepsis Campaign: International Guidelines for Management of Sepsis and Septic Shock: 2016," Critical Care Medicine 45:3:486-552 (2017) | PAR-VASO_0256720-793 | | 801, 802, 901, 902 |
| 376 | DTX-1331 | 2004 | Dellinger, "Surviving Sepsis Campaign: International Guidelines for Management of Sepsis and Septic Shock," Critical Care Medicine 32;3:858-873 (2004) | PAR-VASO_0256794-837 | | 801, 802 |
| 377 | DTX-1332 | 2012 | Serpa et al., "Vasopressin and Terlipressin in Adult Vasodilatory Shock: A Systematic Review and Meta-Analysis of Nine Randomized Controlled Trials," Critical Care (London, England) 16 R154 (2012) | PAR-VASO_0257451-460 | | 801, 802 |
| 378 | DTX-1333 | 1997 | Landry et al., "Vasopressin Pressor Hypersensitivity in Vasodilatory Septic Shock," Critical Care Medicine 25:1279-82 (1997) | PAR-VASO_0257747-757 | | 801, 802, 901, 902 |
| 379 | DTX-1334 | | Utility Patent Application Transmittal | PAR-VASO_0259393-004 | | 401, 402, 403, ID |
| 380 | DTX-1335 | | JHP Pharmaceuticals Laboratory Notebook No. D00071 | PAR-VASO_0270713-804 | | |
| 381 | DTX-1336 | | Item Number Spreadsheet | PAR-VASO_0271773-860 | | 401, 402, 403, 801, 802, ID |
| 382 | DTX-1337 | | USP General Notices and Requirement | PAR-VASO_0298089-100 | | |
| 383 | DTX-1338 | 2/6/2003 | International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (the "ICH"), Harmonised Tripartite Guideline, Evaluation for Stability Data Q1E (February 6, 2003) | PAR-VASO_0298144-62 | | 401, 402, 801, 802 |
| 384 | DTX-1339 | 8/14/2015 | Declaration of Inventor Sunil Vandse, August 14, 2015 | PAR-VASO-0001039-46 | | 401, 402, 403 |
| 385 | DTX-1340 | 1/22/2016 | Declaration of Inventor Sunil Vandse, January 22, 2016 | PAR-VASO-0002304-17 | | 401, 402, 403 |
| 386 | DTX-1341 | 10/22/2011 | Dorpe et al., Purity Profiling of Peptide Drugs, Journal of Bioanalysis & Biomedicine (2011) | PAR-VASO_0232952-69 | | 401, 402, 403, 801, 802, 901, 902 |
| 387 | DTX-1342 | | Biology Notes for IGCSE, No. 71 Arteries, veins and capillaries - structure and functions (2014), https://biology-igcse.weebly.com/arteries-veins-and-capillaries---structure-and-functions.html | | | 401, 402, 403, 801, 802, 901, 902 |
| 388 | DTX-1343 | | CV of Aaron Waxman | | | |
| 389 | DTX-1344 | | CV of Gerhard Winter | | | |
| 390 | DTX-1345 | | CV of Patricia Gupta | | | |
| 391 | DTX-1346 | | CV of Laurentius Marais | | | |
| 392 | DTX-1347 | | Marais Attachment B: Kirsch Model I (Linear Time Dependence) | | | 701, 702, 801, 802 |
| 393 | DTX-1348 | | Marais Attachment C: Kirsch Model I (Linear Time Dependence), Initial pH | | | 701, 702, 801, 802 |
| 394 | DTX-1349 | | Marais Attachment D: Kirsch Model II (No Time Dependence) | | | 701, 702, 801, 802 |
| 395 | DTX-1350 | | Marais Attachment E: Kirsch Model II (No Time Dependence), Initial pH | | | 701, 702, 801, 802 |
| 396 | DTX-1351 | | Marais Attachment F: Dr. Kirsch's Time-Dependent Model I Corrections and Sensitivity Analysis | | | 401, 402, 403, 701, 702, 801, 802 |
| 397 | DTX-1352 | | Marais Attachment G: Dr. Kirsch's Time-Dependent Model II Corrections and Sensitivity Analysis | | | 401, 402, 403, 701, 702, 801, 802 |
| 398 | DTX-1353 | 9/8/2020 | Exhibit B to Coralic Expert Report - Materials Considered | | Coralic Ex. 3 | |
| 399 | DTX-1354 | 9/8/2020 | Exhibit C to Coralic Expert Report - Table of Contents | | Coralic Ex. 4 | |
| 400 | DTX-1355 | 9/8/2020 | Exhibit D to Coralic Expert Report - Table of Contents | | Coralic Ex. 5 | |
| 401 | DTX-1356 | 9/8/2020 | Exhibit E to Coralic Expert Report - Infringement Claim Chart for US Patent No. 9,744,209 | | Coralic Ex. 6 | |
| 402 | DTX-1357 | 10/29/2020 | Letter to FDA re ANDA # 212944 (Sequence # 0009) Vasopressin Injection USP, 20 Units/mL (1 mL) | | Stellon Ex. 3 | 801, 802 |
| 403 | DTX-1358 | 5/16/2014 | Letter from FDA to Par Sterile Products, LLC re NDA 204485 | PAR-VASO_0037819-821 | | 401, 402, 403, 801, 802, L* |
| 404 | DTX-1359 | 12/9/2016 | Drug Product Specification - Vasostrict 10 mL | PAR-VASO_0068002-016 | | 401, 402, 403, L* |
| 405 | DTX-1360 | 6/14/2012 | Supporting Stability Studies for Pitressin Injection | PAR-VASO_0105305-401 | | 801, 802, L* |
| 406 | DTX-1361 | 8/19/2014 | Letter from Andrea Gloster to Julianna Zebelian re 2014 APR Stability Information for Pitressin | PAR-VASO_0272691-734 | | 401, 402, 403, L* |
| 407 | DTX-1362 | | Vasostrict 20 Units PER Spreadsheet | PAR-VASO_0297182-219 | | 401, 402, 403, 801, 802, L* |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC. et al v. EAGLE PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 408 | DTX-1363 | 5/22/2018 | '239 Patent File History | PAR-VASO-0000198-231 | | 401, 402, 403, ID, L* |
| 409 | DTX-1364 | 5/23/2018 | 478 Patent File History | PAR-VASO-0000422-2628 | | 401, 402, 403, L* |
| 410 | DTX-1365 | 5/9/2019 | Vasopressin Injection USP, 20 units/mL Sample Age | VAS0000009-10 | | 801, 802, 901, 902, ID, L* |
| 411 | DTX-1366 | 1/15/1996 | Vasopressin Injections, USP 200 Liters Master Formula | VAS0000011-16 | | 801, 802, 901, 902, ID, L* |
| 412 | DTX-1367 | | Vasopressin Shipment Spreadsheet | VAS0000022 | | 801, 802, 901, 902, ID, L* |
| 413 | DTX-1368 | 9/3/2020 | 3.2.P.5.3 Validation Report of Analytical Procedure for Related Compounds | AMVAS0134728-862 | | 401, 402, 403, 801, 802, L* |
| 414 | DTX-1369 | 6/14/2019 | Vasopressin Injection USP, 20 Units/mL (10 mL) Stability Protocol | AMVAS0134898-907 | | 801, 802, L* |
| 415 | DTX-1370 | 10/20/2020 | 3.2.P.8.3 Stability Report for Additional Study Document Approval Page | AMVAS0134921-941 | | 401, 402, 801, 802, L* |
| 416 | DTX-1371 | 7/16/2014 | Letter from to FDA re Vasostrict, Synthetic 1 mL vial (20 pressor units) NDA #204485 Request for Expedited Review of Supplement 001 | PAR-VASO_0080154 | | 401, 402, 403, L* |
| 417 | DTX-1372 | 12/1/2014 | Letter from FDA to Par Sterile Products re NDA 204485 /S-001 | PAR-VASO_0014805-809 | | 401, 402, 403, 801, 802, L* |
| 418 | DTX-1373 | | SV 4200 Pitressin (Synthetic) USP, 20 Units per 1 mL Master Batch Record | PAR-VASO_0078041-161 | | L* |
| 419 | DTX-1374 | 12/21/2018 | Letter from FDA to Kurt Karst re Docket No. FDA-2017-P-1096 | PAR-VASO_0266141 | | 401, 402, 403, 801, 802, L* |
| 420 | DTX-1375 | | Reproduction and Extension of Dr. Kirsch's Estimates of Numbers and Vials Expected to Reach pH 3.65 | | | 401, 402, 701, 702, 801, 802, L* |
| 421 | DTX-1376 | | Vasopressin Stability Tables | PAR-VASO_0014742-752 | | 106, 401, 402, 403, 801, 802, L* |
| 422 | DTX-1377 | 8/19/2014 | Letter from Andrea Gloster to Julianna Zebelian re 2014 APR Stability Information for Pitressin | PAR-VASO_0028263-306 | | 401, 402, 403, L* |
| 423 | DTX-1378 | 2014 | Certificate of Analysis - Historical Batches | PAR-VASO_0065296-341 | | 401, 402, 403, L* |
| 424 | DTX-1379 | 4/4/2007 | Certificate of Analysis SV 4200 Pitressin (Synthetic) USP, 20 Units per 1 mL | PAR-VASO_0250103-111 | | 401, 402, 403, 801, 802, L* |
| 425 | DTX-1380 | | 3.2.P.8.1.5.3 Vasopressin Gradient Assay | PAR-VASO_0028052-055 | | 106, 401, 402, 403, L* |
| 426 | DTX-1381 | 12/10/2015 | Office Action Summary dated Oct. 21, 2015  (Excerpt of '239 File History) | PAR-VASO-0008323-335 | | 401, 402, 403, 801, 802, L* |
| 427 | DTX-1382 | 1/11/2016 | Office Action, Jan. 11, 2016 ('239 File History) | PAR-VASO-0008417-429 | | 401, 402, 403, 801, 802, L* |
| 428 | DTX-1383 | 10/29/2020 | SDV October 29, 2020 Intended Batch Manufacturing Record | AMVAS0132302-432 | | 801, 802, L* |
| 429 | DTX-1384 | 10/26/2020 | SDV October 26, 2020 Module 3.2.P.5.6 Justification of Specifications | AMVAS0132614-631 | | 801, 802, L* |
| 430 | DTX-1385 | 10/29/2020 | MDV October 29, 2020 Intended Batch Manufacturing Record | AMVAS0134547-682 | | 801, 802, L* |
| 431 | DTX-1386 | 10/26/2020 | MDV October 26, 2020 Module 3.2.P.5.6 Justification of Specifications | AMVAS0134872-890 | | 801, 802, L* |
| 432 | DTX-1387 | 6/17/2019 | MDV June 2019, Module 3.2.P.8.1 Additional Study Protocol | AMVAS0134891-897 | | 401, 402, 801, 802, L* |
| 433 | DTX-1388 | 10/29/2020 | MDV October 29, 2020 Module 3.2.P.8.3 Stability Report | AMVAS0134942-992 | | 801, 802, L* |
| 434 | DTX-1389 | 8/14/2015 | Response to Office Action Regarding Application No. 14/7171,877 | PAR-VASO_0007062-073 | | 401, 402, 403, L* |
| 29 | DTX-175 | 2009 | Hawe et al., "Towards Heat-stable Oxytocin Formulations: Analysis of Degradation Kinetics and Identification of Degradation Products," Pharma Res. 26(7):1679-86 (2009) | AMPHPA0006113-122 | | 401, 402, 403, 801, 802 |
| 59 | DTX-178 | Oct-12 | Pitressin® (Vasopressin Injection, USP) Package Insert, JHP Pharmaceuticals, LLC (Oct. 2012) | AMPHPA0006579-583 | | 801, 802, 901, 902 |
| 88 | DTX-201 | 4/1/2013 | WHO International Standard, Arginine Vasopressin (AVP), Instructions for Use (Version 6.0, dated April 4, 2013) | AMPHPA0006833-834 | | 801, 802 |
| 1 | DTX-206 | 2013 | 2013 INTRAVENOUS MEDICATIONS (B. Gahart & A. Nazareno, eds., 29th ed. 2013) | AMPHPA0006081-100 | | 801, 802 |
| 3 | DTX-210 | 1997 | Argenziano et al., "A Prospective Randomized Trial of Arginine Vasopressin in the Treatment of Vasodilatory Shock After Left Ventricular Assist Device Placement," Circulation 96(95) II-286-II-290 (1997) | AMPHPA0005477-481 | | 801, 802 |
| 5 | DTX-211 | 1998 | Argenziano et al., "Management of Vasodilatory Shock After Cardiac Surgery: Identification of Predisposing Factors and Use of a Novel Pressor Agent," J. Thoraic & Cardiovascular Surgery 116:973-80 (1998) | PAR-VASO_0254855-862 | | 801, 802 |
| 11 | DTX-212 | 2013 | Birmingham Children s Hospital Injectable Medicine Guide: VASOPRESSIN 10 units in 5ml IV INFUSION for vasopressor effect (dated February 2013), http://kids.bch.nhs.uk/wp- content/uploads/2015/08/Vasopressin- 10-units-in-50ml-V1.0.0.pdf | AMPHPA0005669-670 | | 801, 802 |
| 19 | DTX-214 | 2002 | Dünser et al., "Cardiac performance during vasopressin infusion in postcardiotomy shock," Intensive Care Med. 28:746-751 (2002) | AMPHPA0005999-6004 | | 801, 802 |
| 18 | DTX-215 | 2003 | Dünser et al, "Arginine Vasopressin in Advanced Vasodilatory Shock: A Prospective, Randomized Controlled Study," Circulation 107:2313-19 (2003) | PAR-VASO_0251748-754 | | 801, 802 |
| 28 | DTX-216 | 2010 | Hasija et al., "Prophylactic Vasopressin in Patients Receiving the Angiotensin-Converting Enzyme Inhibitor Ramipril Undergoing Coronary Artery Bypass Graft Surgery," J. Cardiothoracic & Vascular Anesthesia 24:230-238 (2010) | PAR-VASO_0256108-116 | | 801, 802 |
| 31 | DTX-217 | 2001 | Holmes et al., "The effects of vasopressin on hemodynamics and renal function in severe septic shock: a case series," Intensive Care Med. 27:1416-21 (2001) | PAR-VASO_0256979-984 | | 801, 802 |
| 34 | DTX-218 | 2006 | Lauzier et al., "Vasopressin or norepinephrine in early hyperdynamic septic shock: a randomized clinical trial," Intensive Care Med. 32:1782-89 (2006) | PAR-VASO_0257727-734 | | 801, 802 |
| 35 | DTX-219 | 2007 | Lechner et al., "Arginine-Vasopressin in Neonates with Vasodilatory Shock After Cardiopulmonary Bypass," Eur. J. Pediatr. 166:1221-27 (2007) | PAR-VASO_0075756-762 | | 801, 802 |
| 50 | DTX-220 | 2014 | Nekic and Shanker, "Vasopressin," Liverpool Hospital (2014) ("Liverpool Hospital") | PAR-VASO_0253990-993 | | 801, 802 |
| 39 | DTX-221 | 1999 | Malay et al., "Low-Dose Vasopressin in the Treatment of Vasodilatory Septic Shock," J. Trauma 47(4):699-705 (1999) | AMPHPA0006317-325 | | 801, 802 |
| 46 | DTX-222 | 2000 | Morales et al., "Arginine Vasopressin in the Treatment of 50 Patients with Postcardiotomy Vasodilatory Shock," Ann. Thorac. Surg. 69:102-106 (2000) | AMPHPA0006357-361 | | 801, 802 |

U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
PAR PHARMACEUTICAL, INC. & ENDO PAR INNOVATION COMPANY, LLC V. AMNEAL PHARMACEUTICALS INC.
C.A. No. 18-cv-2032-CFC
DEFENDANT AMNEAL PHARMACEUTICALS OF NEW YORK, LLC's TRIAL EXHIBIT LIST

| No. | EXHIBIT NO. | DATE | DESCRIPTION | BATES RANGE | DEPO. EXH. NO | Objections |
|---|---|---|---|---|---|---|
| 45 | DTX-223 | 2003 | Morales et al., "A Double-Blind Randomized Trial: Pr+A74ophylactic Vasopressin Reduces Hypotension After Cardiopulmonary Bypass," Ann. Thorac. Surg. 75:926-30 (2003) | PAR-VASO_0251314-318 | | 801, 802 |
| 53 | DTX-225 | 2004 | Obritsch et al., "Effects of Continuous Vasopressin Infusion in Patients with Septic Shock," Ann. Pharmacother. 38:1117-22 (2004) | AMPHPA0006566-571 | | 801, 802 |
| 54 | DTX-226 | 2010 | Papadopoulos et al., "Perioperative Infusion of low-dose of vasopressin for prevention and management of vasodilatory vasoplegic syndrome in patients undergoing coronary artery bypass grafting -- A double-blind randomized study," J. Cardiothoracic Surgery 5:17 (2010) | PAR-VASO_0255561-572 | | 801, 802 |
| 56 | DTX-230 | 2002 | Patel et al., "Beneficial Effects of Short- term Vasopressin Infusion during Severe Septic Shock," Anesthesiology 96 576-82 (2002) | AMPHPA0006572-578 | | 801, 802 |
| 62 | DTX-231 | 1999 | Rosenzweig et al., "Intravenous Arginine-Vasopressin in Children with Vasodilatory Shock After Cardiac Surgery," Circulation 100 (19 Suppl) II-182-II-186 (1999) | PAR-VASO_0254491-496 | | 801, 802 |
| 64 | DTX-232 | 2008 | Russell et al., "Vasopressin Versus Norepinephrine Infusion in Patients with Septic Shock," New Eng. J. Med. 358:877-87 (2008) | AMPHPA0006646-656 | | 801, 802 |
| 66 | DTX-235 | 2003 | Sun et al., "Low-Dose Vasopressin in the Treatment of Septic Shock in Sheep," Am. J. Respir. Crit. Care Med. 168:481-85 (2003) | PAR-VASO_0240819-824 | | 801, 802 |
| 69 | DTX-237 | 2010 | Torgersen et al., "Comparing two different arginine vasopressin dosages in advanced vasodilatory shock: a randomized controlled, open-label trial," Intensive Care Med. 36:57-65 (2010) | PAR-VASO_0252594-602 | | 801, 802 |
| 70 | DTX-238 | 2006 | Treschan & Jürgen, "The Vasopressin System: Physiology and Clinical Strategies," Anesthesiology 105 599-612 (2006) | AMPHPA0006695-708 | | 801, 802 |
| 89 | DTX-240 | 1/22/2009 | WO 2009/009907, Use of Vasopressin- Receptor Antagonists for the Treatment of Septic Shock | PAR-VASO_0261376-433 | | 801, 802 |
| 60 | DTX-247 | 2002 | RATIONAL DESIGN OF STABLE PROTEIN FORMULATIONS (J. F. Carpenter & M. C. Manning, eds., 2002) | AMPHPA0005693-914 | | 801, 802 |
| 10 | DTX-248 | 1999 | Bi et al., "HPLC Method for Quantification of Arginine Containing Vasopressin," J. Liq. Chrom. & Rel. Technol. 22(4) 551-60 (1999) | AMPHPA0005652-661 | | 801, 802 |
| 86 | DTX-250 | 9/11/2014 | Webinar Slides, The Joint Commission, The Misuse of Vials, A Follow-Up to the Sentinel Event Alert (Sept. 11, 2014), https://www.jointcommission.org/assets/1/6/Webinar_on_misuse_of_vials.pdf | AMPHPA0006209-244 | | 401, 402, 403, 801, 802 |
| 32 | DTX-251 | 2002 | J. Dudkiewicz-Wilczynska et al., "Determination of the Content of Desmopressin in Pharmaceutical Preparations by HPLC and Validation of the Method," Acta Poloniac Pharmaceutica -- Drug Research, 59(3):163-68 (2002) | AMPHPA0005986-991 | | 801, 802 |
| 92 | DTX-252 | 1998 | Yanagisawa et al., "A Novel Potent Vasoconstrictor Peptide Produced by Vascular Endothelial Cells," Nature 332:411-14 (1998) | PAR-VASO_0251334-338 | | 401, 402, 403, 801, 802 |
| 40 | DTX-254 | 2010 | Manning et al., "Stability of Protein Pharmaceuticals: An Update," Pharm. Research 27:544-75 (2010) | PAR-VASO_0256577-608 | | |
| 65 | DTX-256 | 6/16/2014 | Sentinel Event Alert, The Joint Commission, Preventing infection from the misuse of vials, 52:1-6 (June 16, 2014), https://www.jointcommission.org/assets/1/6/SEA_52.pdf | AMPHPA0006203-208 | | 401, 402, 403, 801, 802 |
| 7 | DTX-263 | 2012 | Avanti et al., "Innovative Strategies for Stabilization of Therapeutic Peptides in Aqueous Formulations," University of Groningen (2012) | AMPHPA0005495-651 | | 801, 802 |
| 2 | DTX-361 | 1958 | Adamsons et al., "The Stability of Natural and Synthetic Neurohypophysial Hormones in Vitro," Endocrinology 63(5) 679-87 (1958) | AMPHPA0005427-437 | | |
| 51 | DTX-368 | Oct-13 | Novaplus® (Vasopressin Injection, USP) Package Insert, Fresenius Kabi USA, LLC (Oct. 2013) | AMPHPA0006560-565 | | 801, 802 |
| 27 | DTX-369 | 1991 | Grzonka et al., "In Vitro Degradation of Some Arginine-Vasopressin Analogs by Homogenates of Rat Kidney, Liver and Serum" Peptide Research, 4(5):270-274 (1991) | AMPHPA0006101-105 | | 801, 802 |
| 8 | DTX-370 | 1986 | Aylward et al., "Effects of vasopressin on the circulation and its baroreflux control in healthy men," Circulation 73(6):1145-54 (1986) | PAR-VASO_0238408-418 | | 801, 802 |
| 52 | DTX-371 | 2009 | Nunez et al., "Terlipressin Continuous Infusion: Please Mind the Solvent!," Current Drug Targets 10(6):577 (2009) | PAR-VASO_0239223 | | 401, 402, 403, 801, 802 |
| 21 | DTX-372 | Oct-15 | FDA Draft Guidance, "Selection of the Appropriate Package Type Terms and Recommendations for Labeling Injectable Medical Products Packaged in Multiple-Dose, Single- Dose, and Single-Patient-Use Containers for Human Use" | PAR-VASO_0238773-783 | | 801, 802 |
| 81 | DTX-375 | 12/1/2016 | Vasostrict® (Vasopressin Injection, USP) Package Insert, Par Pharmaceutical Companies, Inc. (dated Dec. 2016), https://www.accessdata.fda.gov/drugsatf da_docs/label/2016/204485s004lbl.pdf (see PAR-VASO_0067947) | PAR-VASO_0254549-550 | | |
| 16 | DTX-376 | 2013 | Dellinger et al., "Surviving Sepsis Campaign: International Guidelines for Management of Severe Sepsis and Septic Shock," Intensive Care Med. 39:165-228 (2013) | PAR-VASO_0256662-719 | | 801, 802 |

* DTX-010, DTX-012, DTX-026, and DTX-1358-1389 were designated on 12/29/20, the date the pretrial order was filed. Par's objections are based on a preliminary review of the documents. As such, Par reserves the right to lodge additional objections as necessary and appropriate at trial.

| **Objection Key** | |
|---|---|
| Code | Objection |
| 106 | partial document/lacks context (FRE 106) |
| 401/402 | lacks relevance (FRE 401/402) |
| 403 | unduly prejudicial/confusing/waste of time (FRE 403) |
| 501/502 | Privilege/Work Product (FRE 501/502) |
| 602/LOF | lacks foundation/speculative (FRE 602) |
| 701/702 | improper opinion (FRE 701/702) |
| 801-802 | hearsay (FRE 802) |
| 901/902 | lacks authenticity (FRE 901/902) |
| 1002 | original document required (FRE 1002) |
| 1003 | incomplete/illegible (FRE 1003) |
| 1006 | improper summary (FRE 1006) |
| ID | insufficient/incorrect description |
| L | late/not produced |
| AA | attorney argument improperly offered as evidence; contains counsel colloquy or objections |
| C | compound |
| Legal | calls for a legal conclusion |
| Leading | leading question of a non-hostile witness |
| MC | Mischaracterizes/misstates witness's testimony |
| NR | nonresponsive |
| PMIL | Subject of pending motion in limine |
| P | privilege |
| OS | beyond the scope |
| V | Vague and/or ambiguous |

# EXHIBIT 9

EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>███████████████ |

### PLAINTIFFS' WITNESS LIST

Pursuant to Local Rule 16.3(c), Plaintiffs expect to call the following witnesses to testify live or by deposition at trial.  Plaintiffs reserve the right to revise or supplement this list consistent with the Pretrial Order or as otherwise permitted by the Court.  If any witness Plaintiffs intend to call to testify live is unavailable, Plaintiffs reserve the right to offer deposition testimony from such witness.  Plaintiffs also reserve the right to call live or by deposition anyone appearing on Defendants' witness list.  Plaintiffs further reserve the right to call live or by deposition any witness to provide foundational testimony should any party contest the authenticity or admissibility of any material proffered at trial.  Plaintiffs reserve the right to call any witness for impeachment purposes.  Finally, Plaintiffs reserve the right to call live or by deposition any fact witness designated by Defendants in their List of Witnesses that Defendants

EXHIBIT 9

elect not to call at trial.  Plaintiffs are not required to present testimony from any witness on its

list of witnesses.

## WILL CALL LIST

| EXPERT WITNESS | LIVE OR BY DEPOSITION |
|---|---|
| Lee Kirsch (CV included as Attachment A hereto) | Live |
| Zlatan Coralic (CV included as Attachment B hereto) | Live |

## MAY CALL LIST

| WITNESS | LIVE OR BY DEPOSITION |
|---|---|
| Carla English | Live |
| Vinay Kannan | Live or by deposition |
| Suketu Sanghvi | Live or by deposition |
| Matthew Kenney | Live or by deposition |
| Hardik Joshi | Live or by deposition |

# ATTACHMENT A

**Lee E. Kirsch**

Professor Emeritus

Department of Pharmaceutical Science Experimental Therapeutics

The University of Iowa

S221 PHAR

Iowa City, Iowa 52242-112



Email: lee-kirsch@uiowa.edu

## EDUCATION AND PROFESSIONAL HISTORY

### Education

Ph D, Pharmaceutics, 1982
The Ohio State University

BS, Pharmacy, 1975
Purdue University

### Professional and Academic Positions

Professor Emeritus, The University Iowa, January 2019 – present, Division of Pharmaceutics and Translational Therapeutics

Professor, The University of Iowa, August 2010 – December 2018, Division of Pharmaceutics (Primary Appointment), Department of Chemical and Biochemical Engineering (Secondary Appointment)

Visiting Professor, Mahidol Univesity, Faculty of Pharmacy, Thailand (January, 2014 – April, 2014)

Professor, Virginia Commonwealth University, Department of Pharmaceutics (Affiliate Appointment). (May 2005 - December 2018).

Adjunct Professor, Pharmaceutical Technology, Faculty of Pharmaceutical Sciences, Chulalongkorn University, Thailand (2003 – 2018)

Associate Professor, The University of Iowa, College of Pharmacy. (November 1994 - July 2010).

Associate Professor, The University of Iowa, Department of Chemical and Biochemical Engineering (Secondary Appointment). (May 2006 - July 2010).

Senior Research Scientist/group leader, Lilly Research Laboratories. (January 1992 - November 1994).

Research Scientist/group leader, Lilly Research Laboratories. (January 1987 - January 1992).

Senior Pharmaceutical Chemist, Lilly Research Laboratories. (November 1982 - January 1987).

Research Associate, The Ohio State University. (June 1979 - November 1982).

Teaching Assistant, The Ohio State University. (August 1978 - June 1979).

Community Pharmacist, Family Pharmacy North Bloomington, Indiana. (July 1975 - August 1978).

**Honors and Recognition**

Editor-in-chief, AAPS PharmSciTech Journal. (July 2008 – December, 2014).
Fellow of the American Association of Pharmaceutical Scientists (June 2013)
Distinguished Service Award, Parenteral Drug Association. (February 2011).
Editor, PDA Journal of Pharmaceutical Science and Technology. (July 2000 - June 2008).
Fred Simon Award for best paper, PDA Journal of Pharmaceutical Science and Technology. (October 1997).
Jack L. Beal Postbaccalaureate Award, The Ohio State University College of Pharmacy. (May 1997).


**TEACHING AT THE UNIVERSITY OF IOWA AND EXTERNAL TEACHING: INTERNATIONAL AND US**

Professional PharmD Courses
Macromolecular Drug Substance, PHAR 8136, 2015-2017
Solution Drug Products, PHAR 8137, 2015
Regulatory and Quality Systems, PHAR 8137, 2015
Pharmacokinetics, PHAR 8112, 2015
Pharmacokinetics and Biopharmaceutics, Pharmacy 46:138, 2002-2009
Pharmaceutical Proteins unit in Pharmacy 46:123, 2002-2013
Advanced Compounding, Pharmacy 46:120, 2004-2005
Drug Stability in Pharmacy 46:123 and 46:124, 2005-2013, 1995-2000
                              PHAR 8136, 2016-2017
Fundamentals of Kinetics in Pharmacy 46:123, 46:050, 2005-2013
Fundamentals of Pharmacokinetics in Pharmacy 46:124, 2010-2013
Solids processing, Packaging, Capsules, Lyophilized Powders units in Pharmacy 46:124, 1995-2000

Graduate Courses in Pharmaceutics
Pharmacy Research, Pharmacy 46:233, 1995-2017
Pharmaceutical Product Development, Pharmacy 46: 225, 1999 and 2006
Drug Degradation Kinetics and Mechanisms (Drug Stability) 46:206, 1995, 1997, 1999, 2001, 2003, 2007, 2009, 2011, 2013, 2015, 2017
Stability of Pharmaceuticals, PHAR 6701, 2015

External Teaching: International and US
Pharmaceutical Technology, Federal University of Rio Grande do Norte, Natal, Brazil, 2015
International Pharmaceutical Technology, University of the Philippines (Manila), 2015
Pharmaceutical Package Integrity, PDA Research and Training Center, 1998
Drug Degradation Kinetics Short Course, Chulalongkorn University, International Pharmaceutical Technology Graduate Program, 2002, 2003, 2005, 2008-2016
      Bangkok, Thailand
Drug Degradation Kinetics Short Course, Virginia Commonwealth University, Pharmaceutical Sciences Graduate Program, 2005
Drug Degradation Kinetics Short Course, Mahidol University, Bangkok, Pharmaceutical Sciences Graduate Program, 2014

M.S. Students Directed
Craig Moeckly (Non-thesis) degree conferred 1997
Walaisiri Muangsiri (Thesis) degree conferred July, 2000
Simei Li (Non-thesis) degree conferred December, 2000
Bhanu Kalvakota (Non-thesis) degree conferred December, 2002
Pipat Sittisak (Thesis) with W. Muangsiri, Chulalongkorn University, degree conferred 2010

Ph.D. Students Directed
Young-Sihn Sihn, degree conferred June 1997
Lida Nguyen, degree conferred December, 2001
Xiaoguang Zhang, degree conferred December, 2001
Anjali Joshi, degree conferred December, 2001
Walasiri Muangsiri, degree conferred December, 2003
Madhushree Gokhale, degree conferred May, 2006
Himanshu Naik (with L. Fleckenstein), degree conferred December, 2007
Boontarika Chanvorachote (with W. Muangsiri), degree conferred June, 2009 (Chulalongkorn Univeristy)
Salil Desai degree conferred December, 2009
Zhixin Zong degree conferred May, 2012
Jiang Qui, degree conferred May, 2013
Hong Guann Lee (with D. Flanagan), degree conferred May, 2015
Nguyen Quynh Hoa, degree conferred December, 2014
Radaduen Tinmanee, thesis defended May, 2015, anticipated graduation December, 2015
Mo'tasem Mohamed Alsmadi (with L. Fleckenstein), degree conferred December, 2014
Phawanan Sawangchan, degree conferred December, 2017
Pratak Ngeacharernkul degree conferred December, 2017
Éverton do Nascimento Alencar, visiting Ph.D. scholar from Federal University of Rio Grande do Norte, Natal, Brazil, 2014-2015, degree conferred December, 2017
Francisco Alexandrino Junior, visiting Ph.D. scholar from Federal University of Rio Grande do Norte, Natal, Brazil, 2016-2018
Silvana Cartaxo Da Costa Urtiga, visiting Ph.D. scholar from Federal University of Rio Grande do Norte, Natal, Brazil, 2017-2018

Post-doctoral Scholars
Gisela N. Piccirilli, Ph.D., 2011
Stephen Stamatis, Ph.D., 2011-2013
Eiji Ueyama, Ph.D., 2013-2014

## SCHOLARSHIP/RESEARCH/PROFESSIONAL PRODUCTIVITY

### Publications

1. Pratak Ngeacharernkul, Stephen D. Stamatis, Lee E. Kirsch (2018), Particle size distribution equivalency as novel predictors for bioequivalence, *AAPS PharmSciTech*, 19(7):2787-2800.

2. Stephen D. Stamatis, Lee E. Kirsch (2018), Using Manufacturing Design Space Concepts for Stability Risk Assessment—Gabapentin NIPTE/FDA Case Study, *AAPS PharmSciTech*,

19(7):2801-2807.

3.  Stephen D. Stamatis, Linas Mockus, Lee E. Kirsch, Gintaras V. Reklaitis (2018) Chapter 5-Bayesian hierarchical modeling of gabapentin absorption and disposition with application to dosing regimen assessment, *Computer Aided Chemical Engineering*, **42**: 111-137.

4.  Radaduen Tinmanee, Stephen D. Stamatis, Eji Ueyama, Kenneth R. Morris, Lee E. Kirsch (2018) Polymorphic and Covalent Transformations of Gabapentin in Binary Excipient Mixtures after Milling-Induced Stress, *Pharmaceutical Research*, **35**:39

5.  Radaduen Tinmanee, Sarah C. Larsen, Kenneth R. Morris, Lee E. Kirsch (2017) Quantification of gabapentin polymorphs in gabapentin/excipient mixtures using solid state 13C NMR spectroscopy and X-ray powder diffraction, *Journal of Pharmaceutical and Biomedical Analysis*, **146**: 29-36.

6.  Salil Dileep Desai and Lee E. Kirsch The Ortho Effect on the Acidic and Alkaline Hydrolysis of Substituted Formanilides, (2015) *International Journal of Chemical Kinetics*, **47**(8), 471-488.

7.  Hoa Q. Nguyen, Stephen D. Stamatis, Lee E. Kirsch, (2015) A novel method for assessing drug degradation product safety using physiologically-based pharmacokinetic models and stochastic risk assessment, *Journal of Pharmaceutical Science*, **104**(9), 3101-3199.

8.  Boontarika Chanvorachote, Jiang Qiu, Walaisiri Muangsiri, Ubonthip Nimmannit, and Lee E. Kirsch (2015) The interaction mechanism between lipopeptide (daptomycin) and polyamidoamine (PAMAM) dendrimers, *Journal of Peptide Science*, **21**: 312-319, 2015.

9.  Qiu, J. and Kirsch, Lee E. (2014) Evaluation of Lipopeptide (Daptomycin) Aggregation Using Fluorescence, Light Scattering, and Nuclear Magnetic Resonance Spectroscopy, *Journal of Pharmaceutical Sciences,* **103**(3), 853–861.

5.   Dempah KE, Barich DH, Kaushal AM, Zong Z, Desai SD, Suryanaranyanan R.; Kirsch L, Munson EJ; (2013) Investigation Gabapentin Polymorphism Using Solid-State NMR Spectrocsopy; *AAPS PharmSciTech*, **14**(1), 19-28.

6.  Zong, Z., Qiu, J., Tinamnee, R., Kirsch, L. E. (2012). Kinetic model for solid-state degradation of gabapentin. *Journal of Pharmaceutical Science,* **101**(6), 2123-2133.

7.  Zong, Z., Kirsch, L. E. (2012). Studies on the Instability of Chlorhexidine, Part 1. *Journal of Pharmaceutical Science,* **101**(7), 2417-2427.

8.  Mockus, L., Lainez, J., Reklaitis, G., Kirsch, L. E. (2011). A Bayesian Approach to Pharmaceutical Product Quality Risk Quantification. *Informatica, **22***(4), 537-558.

9.  Qiu, J., Yu, L., Kirsch, L. E. (2011). Estimated pKa values for specific amino acid residues in daptomycin. *Journal of Pharmaceutical Science, **100***(10), 4225-4233.

10.  Ratcliff, J. L., Kirsch, L. E., Dykstra, J. W., Cooley, W. E. (2011). Fluoride and chlorine dioxide-containing compositions and method for reducing demineralization of teeth. *PCT Int. Appl*, WO 2010075419 A1 20100701.

11.  Zong, Z., Desai, S., Barich, A., Huang, H.-S., Munson, E., Suryanarayanan, R., Kirsch, L. E. (2011). The Stabilizing Effect of Moisture on the Solid-State Degradation of Gabapentin. *AAPS PharmSciTech, **12***(3), 924-931.

12.  Chanvorachote, B., Nimmannit, U., Muangsiri, W., Kirsch, L. E. (2009). An Evaluation of a Fluorometric Method for Determining Binding Parameters of Drug–Carrier Complexes Using Mathematical Models Based on Total Drug Concentration. *Journal of Fluorescence, **19***(4), 747-753.

13.  Gokhale, M., Kearney, W., Kirsch, L. E. (2009). Glycosylation of Aromatic Amines I: Characterization of the Reaction Products of Kynurenine and Glucose in Aqueous Solutions. *AAPS PharmSciTech, **10***(2), 317-328.

14.  Tan, B., Naik, H., Jang, I.-J., Yu, K.-S., Kirsch, L. E., Shin, C.-S., Fleckenstein, L. (2009).

Population Pharmacokinetics of Artesunate and Dihydroartemisinin Following Single- and Multiple-Dosing of Oral Artesunate in Healthy Subjects. *Malaria Journal, 8*(1), 304.

15. Gokhale, M., Kirsch, L. E. (2009). Glycosylation of aromatic amines II: Kinetics and mechanisms of the hydrolytic reaction between kynurenine and glucose. *Journal of Pharmaceutical Science*, DOI 10.1002/jps.21754.

16. Gokhale, M., Kirsch, L. E. (2009). Glycosylation of aromatic amines III: Mechanistic implications of the pH-dependent glycosylation of various aromatic amines (kynurenine, 2'-aminoacetophenone, daptomycin, and sulfamethoxzaole). *Journal of Pharmaceutical Science*, DOI 10.1002/jps.21765.

17. Kirsch, L. E. (2008). On Transforming Pharmaceutical Technology Education. http://www.pharmamanufacturing.com/articles/2008/113.html

18. Hoppe, C. C., Nguyen, L. T., Kirsch, L. E., Wiencek, J. M. (2008). Characterization of seed nuclei in glucagon aggregation using light scattering methods and field-flow fractionation. *Journal of Biological Engineering, 2*(10).

19. Kirsch, L. E. (2007). Package Integrity Testing. *CRC Press*.

20. Muangsiri, W., Kirsch, L. E. (2006). The Protein-binding and Drug Release Properties of Macromolecular Conjugates containing Daptomycin and Dextran. *International Journal of Pharmaceutics, 315*, 30-43.

21. Naik, H., Murry, D. J., Kirsch, L. E., Fleckenstein, L. (2005). Development and validation of a high-performance liquid chromatography-mass spectroscopy assay for determination of artesunate and its metabolite dihydroartemisinin in human plasma. *Journal of Chromatography B, 816*(1-2), 233-242.

22. Kirsch, L. E. (2005). Extemporaneous Quality. *PDA Journal of Pharmaceutical Science and Technology, 59*(1 & 3).

23. Joshi, A., Kearney, W., Sawai, M., Kirsch, L. E. (2005). Studies on the Mechanism of Aspartic Acid Cleavage and Deamidation in the Acidic Degradation of Glucagon. *Journal of Pharmaceutical Sciences, 94*(9), 1912-1927.

24. Muangsiri, W., Kearney, W. R., Teesch, L. M., Kirsch, L. E. (2005). Studies on the Reactions between Daptomycin and Glyceraldehyde. *International Journal of Pharmaceutics, 289*(1-2), 133-150.

25. Zhang, X., Kirsch, L. E. (2004). Correlation of the Thermal Stability of Phospholipid-based Emulsions and Microviscosity Measurements as Determined by Fluorescence Polarization. *Pharmaceutical Development and Technology, 9*(2), 219-227.

26. Kirsch, L. E. (2004). Lessons unlearned. *PDA Journal of Pharmaceutical Science and Technology, 58*(3), 119-120.

27. Kirsch, L. E. (2004). PDA Students. *PDA Journal of Pharmaceutical Science and Technology, 58*(5), 241-242.

28. Joshi, A., Kirsch, L. E. (2004). The estimation of glutaminyl deamidation and aspartyl cleavage rates in glucagon. *International Journal of Pharmaceutics, 273*(1-2), 213-219.

29. Zhang, X., Kirsch, L. E. (2003). An Assessment of Techniques for Evaluating the Physical Stability of Parenteral Emulsions. *PDA Journal of Pharmaceutical Science and Technology, 57*(4), 300-315.

30. Nguyen, L., Wiencek, J., Kirsch, L. E. (2003). Characterization Methods for the Physical Stability of Biopharmaceuticals. *PDA Journal of Pharmaceutical Science and Technology, 57*(6), 429-445.

31. Zhang, X., Kirsch, L. E. (2003). The Physical Stability of Thermally-stressed Phospholipid-based Emulsions Containing Methyl, Propyl and Heptyl Parabens as Model Drugs. *International Journal of Pharmaceutics, 265*(1-2), 133-140.

32. Kirsch, L. E. (2002). Beyond bioterrorism. *PDA Journal of Pharmaceutical Science and Technology, 56*(3), 113-114.

33. Joshi, A., Kirsch, L. E. (2002). The Relative Rates of Asparaginyl and Glutaminyl in Glucagon Fragment 22-29 under Acidic Conditions. *Journal of Pharmaceutical Science, 91*(11), 2332-2342.

34. Kirsch, L. E., Zhang, X., Muangsiri, W., Redmon, M., Luner, P., Tartrate, D. (2001). Development of a Lyophilized Formulation for (R,R)-Formoterol (L)-Tartrate. *Drug Development and Industrial Pharmacy, 27*(1), 89-96.

35. Kirsch, L. E. (2001). Power to the People. *PDA Journal of Pharmaceutical Science and Technology, 55*(5), 261-262.

36. Luner, P., Kirsch, L. E., Majuru, S., Oh, E., Joshi, A., Wurster, D., Redmon, M. (2001). Preformulation Studies on the S-isomer of Oxybutynin Hydrochloride, an Improved Chemical Entity (ICE). *Drug Development and Industrial Pharmacy, 27*(4), 321-329.

37. Kirsch, L. E. (2001). Research Misconduct. *PDA Journal of Pharmaceutical Science and Technology, 55*(4), 205-206.

38. Muangsiri, W., Kirsch, L. E. (2001). The Kinetics of Daptomycin Degradation in Alkaline Solutions. *Journal of Pharmaceutical Science, 90*(8), 1066-1075.

39. Kirsch, L. E. (2000). Peer Review Fallibility. *PDA Journal of Pharmaceutical Science and Technology, 54*(4), 279.

40. Kirsch, L. E. (2000). Pharmaceutical Container/Closure Integrity VI: Correlations Between Liquid Tracer Methods and Microbial Ingress. *PDA Journal of Pharmaceutical Science and Technology, 54*(4), 305.

41. Joshi, A., Kirsch, L. E. (2000). The Acidic Degradation Pathways of Glucagon. *International Journal of Pharmaceutics, 203*(1-2), 115.

42. Kirsch, L. E. (2000). The Ivied Halls of Industry. *PDA Journal of Pharmaceutical Science and Technology, 54*(6), 433-434.

43. Kirsch, L. E. (2000). The PDA Journal and the Validation of Science. *PDA Journal of Pharmaceutical Science and Technology, 54*(3), 171.

44. Kirsch, L. E. (2000). The Rule of Three. *PDA Journal of Pharmaceutical Science and Technology, 54*(5), 365.

45. Nguyen, L., Muangsiri, W., Kirsch, L. E., Schiere, R., Morton Guazzo, D. (1999). Pharmaceutical Container/Closure Integrity IV: Development of an Indirect Correlation Between Microbial Ingress and Vacuum Decay Leakage Detection. *PDA Journal of Pharmaceutical Science and Technology, 54*(4), 211.

46. Kirsch, L. E., Nguyen, L., Kirsch, A. M., Schmitt, G., Koch, M., Wertli, T., Lehmann, M., Schramm, G. (1999). Pharmaceutical Container/Closure Integrity V: Comparison of Helium Leak Rate and LFC Methods. *PDA Journal of Pharmaceutical Science and Technology, 53*(5), 235.

47. Carroll, M. C., Denny, V. F., Guazzo, D. M., Kaiser, M. W., Kirsch, L. E., Ludwig, J. D., Masover, G. K., May, J. L., Moldenhauer, J. E., Olsen, J. I., Polson, T. M., Wright, G. E. (1998). Technical Report No. 27: Pharmaceutical Package Integrity. *PDA Journal of Pharmaceutical Science and Technology, 52*(S2).

48. Kirsch, L. E., Nguyen, L., Moeckly, C. S. (1997). Pharmaceutical Container/Closure Integrity I: Mass Spectrometry-based Helium Leak Rate Detection for Rubber-stoppered Glass Vials. *PDA Journal of Pharmaceutical Science and Technology, 51*(5), 187.

49. Kirsch, L. E., Nguyen, L., Gerth, R. (1997). Pharmaceutical Container/Closure Integrity II: The Relationship Between Microbial Ingress and Helium Leak Rates in Rubber-stoppered

Glass Vials. *PDA Journal of Pharmaceutical Science and Technology, 51*(5), 203.

50. Kirsch, L. E., Nguyen, L., Moeckly, C. S., Gerth, R. (1997). Pharmaceutical Container/Closure Integrity III:    The Relationship Between Microbial Ingress and Helium Leak Rates in Rubber-stoppered Glass Vials. *PDA Journal of Pharmaceutical Science and Technology, 51*(5), 195.

51. Sihn, Y.-S., Guillory, J., Kirsch, L. E. (1997). Quantitation of Taurolidine Decomposition in Polymer Solutions by Chromotropic Acid Formaldehyde Assay Method. *Journal of Pharmaceutical and Biomedical Analysis, 16*(4), 643.

52. Kirsch, L. E., Sihn, Y.-S. (1997). The Effect of Polyvinylpyrrolidine on the Stability of Taurolidine. *Pharmaceutical Development and Technology, 2*(4), 345.

53. Kirsch, L. E., Nguyen, L., Moeckly, C. S., Gerth, R. (1996). The Application of Mass Spectrometry Leak Testing to Pharmaceutical Container/Closure Integrity. *Proceedings of the PDA International Congress*.

54. Kirsch, L. E., Riggin, R., Gearhart, D., LeFeber, D., Lytle, D. (1993). In-process Protein Degradation by Exposure to Trace Amounts of Sanitizing Agents. *Journal of Parenteral Science and Technology, 47*, 155.

55. Kirsch, L. E., Redmon, M. P. (1993). Quality Tools for Pharmaceutical Product Development. *Proceedings of the Biopharmaceutical Section of the American Statistical Association*.

56. Inman, E. L., Kirsch, L. E. (1990). Stabilized parenteral formulation of daptomycin. *Eur. Pat.*.

57. Kirsch, L. E., Molloy, R., DeBono, M., Baker, P., Farid, K. (1989). Kinetics of the Aspartyl Transpeptidation of Daptomycin, a Novel Lipopeptide Antibiotic. *Pharmaceutical Research, 6*, 387.

58. Kirsch, L. E., Notari, R. (1984). Aqueous Conversion Kinetics and Mechanisms of Ancitabine, Prodrug of the Antileukemic Agent Cytarabine. *Journal of Pharmaceutical Sciences, 73*, 897.

59. Kirsch, L. E., Notari, E. (1984). Pharmacokinetic Prodrug Modeling:    In Vitro and In Vivo Kinetics and Mechanisms of Ancitabine Bioconversion to Cytarabine. *Journal of Pharmaceutical Sciences, 73*, 728.

60. Kirsch, L. E., Notari, R. (1984). Theoretical Basis for the Detection of General-Base Catalysis in the Presence of Predominating Hydroxide Catalysis. *Journal of Pharmaceutical Sciences, 73*, 724.

61. Larson, R., Kirsch, L. E., Shaw, S., Christian, J., Born, G. (1972). Excretion and Tissue Distribution of Uniformly Labeled 14C-Pentachlorophenol in Rats. *Journal of Pharmaceutical Sciences, 61*, 2004.

**Presentations**

1. Lee E. Kirsch, "Particle Size Distribution Overlap Metrics for the Evaluation of Disperse System Drug Product Equivalency", April 30, 2015, NIPTE/FDA Research Conference: Pharmaceutical Critical Path Manufacturing-2015, Rockville, MD

2. Lee Kirsch, Pharmaceutical Technology Lecture Series I at United Laboratories, Manila, Philippines, October 1, 2015    "Quality-by-Design", "Quality Risk Management", "Manufacturing Biopharmaceuticals"

3. Lee Kirsch, Pharmaceutical Technology Lecture Series II at United Laboratories, Manila, Philippines, October 9, 2015    "Pharmaceutical Packaging and Package Integrity", "Stability of Pharmaceuticals and Drug Degradation Kinetics Overview"

4. Lee Kirsch, "Physiologically-based Pharmacokinetic Models and Tools for Drug Development and Therapeutics", February 21, 2014, Universiti Kebangsaa Malaysia, Kuala Lumpur, Malaysia.

5. Lee Kirsch, "Linking Stability to Manufacturing in the Quality-By-Design Pharmaceutical Development Paradigm", February 20, 2014, The University of Nottingham-Malaysia, Malaysia.

6. Lee E. Kirsch, "Trends in Pharmaceutical Sciences: Education and Research", February 28, 2014, University of Philippines-Manila, Philippines.

7. Lee E. Kirsch, "Drug Degradant Risk Assessment using PBPK Modeling", March 4, 2014, Mahidol University, Thailand.

8. Lee E. Kirsch, "Get Ready➔Get Set➔Publish: the why, what and how of science writing", March 11, 2014, Mahidol University, Thailand.

9. Lee E. Kirsch, "Modernized Pharmaceutical Stability Evaluation and Packaging Science". March 26, 2014, University of Surabaya, Indonesia.

10. Lee E. Kirsch, "On the Role of Physical Stability in the Chemical Instability of Pharmaceuticals". March 28, 2014, Institut Teknologi Bangdung, Indonesia.

11. Lee E. Kirsch, "Kinetics and Mechanisms of Gabapentin Instability", March 29, 2014, Universitas Gadjah Mada, Yogyakarta, Indonesia.

12. Lee E. Kirsch, "Trends in Pharmaceutical Technology Education", April 8, 2014, University of Health Sciences, Vientiane, Lao PDR.

13. Lee E. Kirsch, "Trends in Pharmaceutical Sciences, Manufacturing and Regulatory", Hanoi University of Pharmacy, April 5, 2014, Vietnam.

14. Lee E. Kirsch, "Physiologically-based Pharmacokinetic Models and Tools for Drug Development and Therapeutics Applications". SINATER 2013, Federal University of Pernambuco, Recife, Brazil, 2013.

15. Mo'tasem M. Alsmadi, Stephen D. Stamatis, Lawrence Fleckenstein, and Lee E. Kirsch, "Whole Body Physiologically Based Pharmacokinetic (WBPBPK) Model of Ivermectin (IVM)" 2013, *AAPS Annual Meeting and Exposition*. San Antonio, TX.

16. Nguyen HQ, Stamatis SD, Kirsch LE., "Risk assessment of drug degradants using a physiologically-based pharmacokinetic model approach". 2013, *AAPS Annual Meeting and Exposition*. San Antonio, TX.

17. Radaduen Tinmanee, Stephen D. Stamatis, Lee E. Kirsch, "Modeling Chemical and Physical Instability Pathways of Gabapentin/Excipient Mixtures", 2013, *AAPS Annual Meeting and Exposition*. San Antonio, TX.

18. Nguyen HQ, Stamatis SD, Kirsch LE "Physiologically based risk assessment for drug product degradants with a case study for aniline in rat".. 2012. *Health Sciences Research Week*. University of Iowa. Carver College of Medicine.

19. Radaduen Tinmanee, Stephen D. Stamatis, Lee E. Kirsch, Sarah C. Larsen, Kenneth R. Morris. "The Effect of Excipients on API Stability: Covalent and Polymorphic Transitions." Poster session presented at: 2012 AAPS Annual Meeting and Exposition; 2012 October 14-18; Chicago, IL.

20. Stamatis SD, McLennan MJ, and Kirsch LE, "Architecture of pHUBpk: A portal to active learning environments for understanding rational linkages between drug and patient characteristics and pharmacokinetics", AAPS, Chicago IL, 2012

21. Stamatis SD, McLennan MJ, and Kirsch LE, "Active learning environments for understanding drug distribution, elimination and bioequivalence in pHUBpk on the pharmaHUB", AAPS, Chicago IL, 2012

22. Nguyen H, Stamatis SD, and Kirsch LE, "Risk Assessment of drug degradants using a

physiologically-based Pharmacokinetic Model Approach", AAPS Chicago IL, 2012

23.   Stamatis SD, McLennan MJ, and Kirsch LE, "Kpred and Vdss: Free Tools on the PharmaHUB for Exploring Drug Tissue Partitioning and Distribution", Podium presentation, AIChE National Meeting, Pittsburgh, PA, 2012

24.   Tinmanee, R., Stamatis, S., Huang, H., Ngeacharernkul, P., Kirsch, L. E., AAPS Annual Meeting, "Development of a shelf life prediction model using Bayesian parameter estimation for kinetics of solid state gabapentin degradation", Washington DC, USA, Contributed. (2011).

25.   Tinmanee, R., Stamatis, S., Dempah, E., Munson, E., Kirsch, L. E., AAPS Annual Meeting, "Modeling polymorphic transformations of gabapentin and assessing the effect of excipients using PXRD and ssNMR", Washington DC, USA, Contributed. (2011).

26.   Chanvorachote, B., Qiu, J., Muangsiri, W., Nimmannit, U., Kirsch, L. E., AAPS Annual Meeting and Exposition, "The mechanism between PAMAM dendrimers and lipopeptide (daptomycin)", Washington DC, Contributed. (October 2011).

27.   Tinmanee, R., Stamatis, S., Nguyen, Q., Zong, Z., Kirsch, L. E., NIPTE/FDA Research Symposium, "Formulation of a gabapentin drug degradation model that combines manufacturing and storage stress variables", Rockville, USA, Contributed. (June 2011).

28.   Tinmanee, R., Zong, Z., Kirsch, L. E., NIPTE/FDA Research Symposium, "Role of excipients in the solid state lactamization of gabapentin", Rockville, USA, Contributed. (June 2011).

29.   Qiu, J., Kirsch, L. E., AAPS National Biotechnology Conference, "The effects of aggregation and conformation on the ionization of lipopeptide (Daptomycin)", San Francisco, CA, Contributed. (May 2011).

30.   Buckner, I., Dalal, N., Tinmanee, R., Zong, Z., Huang, H., Qiu, J., Kirsch, L. E., AAPS, "Excipient effects on the solid-state stability of gabapentin", New Orleans, Lousiana, USA, Contributed. (November 2010).

31.   Qiu, J., Yu, L., Kirsch, L. E., AAPS Annual Meeting and Exposition, "Determination of the complex ionization behaviour of daptomycin", New Orleans, Louisiana, Contributed. (November 2010).

32.   Zong, Z., Kirsch, L. E., Kaushal, A., Suryanarayanan, R., Dempah, E., Munson, E., FIP Pharmaceutical Sciences World Congress in Association with the AAPS Annual Meeting and Exposition, "A Kinetic Model for the Solid State Degradation of Gabapentin", New Orleans, Louisiana, Contributed. (November 2010).

33.   Kaushal, A., Dempah, E., Huang, H. G., Qiu, J., Munson, E., Kirsch, L. E., Suryanarayanan, R., FIP Pharmaceutical Sciences World Congress in Association with the AAPS Annual Meeting and Exposition, "Phase transformations in gabapentin during wet granulation and drying", New Orleans, Louisiana, Contributed. (November 2010).

34.   Dempah, K., Kaushal, A., Huang, H. G., Suryanarayanan, R., Kirsch, L. E., Munson, E., FIP Pharmaceutical Sciences World Congress in Association with the AAPS Annual Meeting and Exposition, "Predicting Gabapentin Stability upon Processing using SSNMR", New Orleans, Louisiana, Contributed. (November 2010).

35.   Kirsch, L. E., Department of Chemical and Biological Engineering, Illinois Institute of Technology, "On the Role of Physical Stability on the Chemical Instability of Pharmaceuticals", Chicago, IL, Invited. (October 21, 2010).

36.   Kirsch, L. E., Primera Reunion Internacional De Ciencias Farmaceuticas (RICiFa 2010), "A Case Study on Linking Solid-state Stability to Manufacturing Design in the FDA's Quality-by-Design Pharmaceutical Development Paradigm", Cordoba, Argentina, Invited. (June 25, 2010).

37.   Kaushal, A., Suryanarayanan, R., Zong, Z., Desai, S., Huang, H.-S., Khan, M., Kirsch, L. E.,

Barich, D. H., Munson, E. J., AAPS Annual Meeting, "Anhydrous and monohydrate gabapentin inter-conversion: Potential implications during solid dosage form manufacture", Los Angeles, Contributed. (2009).

38. Barich, D. H., Munson, E. J., Kaushal, A., Suryanarayanan, R., Zong, Z., Desai, S., Huang, H.-S., Khan, M., Kirsch, L. E., AAPS Annual Meeting, "Characterization of Gabapentin Forms and Stability using Solid-State NMR Spectroscopy", Los Angeles, Contributed. (2009).

39. Zong, Z., Desai, S., Kaushal, A., Barich, D., Huang, H., Munson, E., Suryanarayanan, R., Khan, M., Kirsch, L. E., AAPS Annual Meeting, "The Stabilizing Effect of Moisture on the Solid-State Degradation of Gabapentin", Los Angeles, Contributed. (2009).

40. Zong, Z., Desai, S., Huang, H.-S., Kirsch, L. E., Kaushal, A., Suryanarayanan, R., Barich, D. H., Munson, E. J., Wildfong, P., Buckner, I., Drennen, J., Pingali, K. C., Muzzio, F. J., Kayrak-Talay, D., Litster, J. D., Reklaitis, G., Bogner, R., Khan, M., AIChE Annual Meeting, "The Development of Methods to Link Design Space Models to Product Stability", Nashville, Contributed. (2009).

41. Kirsch, L. E., Symposium presentation at the University of Wisconsin, "Pharmaceutical Chemistry of a Lipopeptide Antibiotic (Daptomycin)", Invited. (March 27, 2009).

42. Qiu, J., Kirsch, L. E., AAPS Annual meeting, "The effects of aggregation on the pharmaceutical chemistry of daptomycin", Atlanta, Contributed. (November 2008).

43. Kirsch, L. E., NIPTE Stakeholders Meeting, "An Introduction to the NIPTE Curriculum", Chicago, Contributed. (April 2008).

44. Kirsch, L. E., Annual AAPS meeting, "Transforming Pharmaceutical Technology Education", San Diego, Invited. (2007).

45. Qiu, J., Kirsch, L. E., AAPS Annual Meeting, "Evaluation of Lipopeptide Aggregation Using Light Scattering, Fluorescence and NMR Spectroscopy", San Diego, Contributed. (November 2007).

46. Desai, S., Kirsch, L. E., AAPS Annual Meeting, "Ortho Substitution Effects in the Hydrolysis of Formanilides", San Diego, Contributed. (November 2007).

47. Naik, H., Kirsch, L. E., Fleckenstein, L., AAPS Annual Meeting, "Population pharmacokinetics of artesunate and its metabolite, dihydroartemisinin", San Diego, Contributed. (November 2007).

48. Chanvorachote, B., Kirsch, L. E., AAPS Annual Meeting, "Studies on the Binding between Daptomycin and PAMAM Dendrimers", San Diego, Contributed. (November 2007).

49. Zong, Z., Kirsch, L. E., AAPS Annual Meeting, "Studies on the Instability of Chlorhexidine", San Diego, Contributed. (November 2007).

50. Kirsch, L. E., AAPS Annual Meeting, "Transforming Pharmaceutical Technology Education: A NIPTE Proposal", Contributed. (November 2007).

51. Kirsch, L. E., Annual PDA Meeting, "NIPTE Roadmap", Las Vegas. (March 2007).

52. Kirsch, L. E., Science and Education Advisory Committee meeting, "NIPTE Roadmap", Chicago, Contributed. (March 2007).

53. Kirsch, L. E., Chemical and Biochemical Engineering Symposium Series, "Physical and Pharmaceutical Chemistry of Daptomycin", The University of Iowa, Invited. (February 15, 2007).

54. Zong, Z., Kirsch, L. E., AAPS meeting, "Kinetic Studies of the Formation of p-Chloroaniline from the Degradation of Chlorhexidine", Nashville, Contributed. (November 2005).

55. Gokhale, M., Kirsch, L. E., AAPS meeting, "Kinetics and Mechanisms of the Glycosylation of Weakly Basic Aromatic Amines and Monosaccharides", Nashville, Contributed. (November 2005).

56. Desai, S., Kirsch, L. E., AAPS meeting, "Preliminary Studies of Ortho Substitution Effects on Amide Hydrolysis using Formanilides as Model Compounds", Nashville, Contributed. (November 2005).

57. Kirsch, L. E., Pharmaceutical Forum, "Depot Injection Systems: Current Uses and Issues", London, England, Invited. (November 2005).

58. Kirsch, L. E., North Carolina Discussion Group, Research Triangle Part, "Adventures in Peptide Degradation Kinetics", Durham, NC, Invited. (June 6, 2005).

59. Gokhale, M., Kirsch, L. E., AAPS Annual Meeting, "The Effects of pH and Buffers on the Kinetics of Kynurenine Glycosylation", Baltimore, MD, Contributed. (November 2004).

60. Kirsch, L. E., Pharmaceutical Microbiology Forum, "Package Integrity Quality Assurance", Fairport, NY, Invited. (October 2004).

61. Gokhale, M., Kirsch, L. E., AAPS Annual Meeting, "Preliminary Kinetic Studies on the Reaction of Kynurenine with D-glucose", Stalt Lake City, Contributed. (October 2003).

62. Kirsch, L. E., University of North Carolina, College of Pharmacy, "Chemical Degradation of Pharmaceutical Peptide", Invited. (April 15, 2003).

63. Kirsch, L. E., Genentech, "The Science Behind Pharmaceutical Packaging Quality Assurance", South San Francisco, CA, Invited. (February 2003).

64. Muangsiri, W., Kirsch, L. E., Annual Meeting of the American Association of Pharmaceutical Scientists, "In Vitro Characterization of Macromolecular Antibiotic Prodrugs", Toronto, Canada, Contributed. (November 2002).

65. Muangsiri, W., Kirsch, L. E., Annual Meeting of the American Association of Pharmaceutical Scientists, "Preparation of Macromolecular Antibiotic Prodrugs", Toronto, Canada, Contributed. (November 2002).

66. Kirsch, L. E., Annual Meeting of the American Association of Pharmaceutical Scientists, "Techniques for Establishing Critical Leakage Specifications", Toronto, Canada, Contributed. (November 13, 2002).

67. Kalvakota, B., Kirsch, L. E., Redmon, M., Thakur, A., Annual Meeting of the American Association of Pharmaceutical Scientists, "The Degradation of (R,R)-formoterol-L-tartrate in Aqueous Solutions", Denver, Colorado, Contributed. (October 2001).

68. Joshi, A., Kirsch, L. E., Annual Meeting of the American Association of Pharmaceutical Scientists, "The Relative Rates of Asparaginyl and Glutaminyl Deamidation in Glucagon Fragment 22-29 under Acidic Conditions", Denver, Colorado, Contributed. (October 2001).

69. Kirsch, L. E., Pulmonary Delivery and Disposition of Inhaled Aerosols Workshop, Controlled Release Society 28th International Symposium, "Protein and Peptide Stability in the Liquid and Solid States", San Diego, California, Contributed. (June 24, 2001).

70. Joshi, A., Kirsch, L. E., Annual Meeting of the Pharmaceutical Congress of the Americas, "Determination of Relative Cleavage and Deamidation Rates in Acidic Glucagon Solutions to Evaluate Sequence Effects", Orlando, Florida, Contributed. (March 2001).

71. Kirsch, L. E., Pharmacia, "Package Integrity Testing for Sterility Assurance", Portage, MI, Invited. (October 2000).

72. Kirsch, L. E., Cubist Pharmaceutical, "The Role of Aggregation in the Kinetics of Daptomycin Degradation", Cambridge, MA, Invited. (August 2000).

73. Joshi, A. B., Kirsch, L. E., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "Acidic Degradation Pathways of Glucagon", New Orleans, Contributed. (November 1999).

74. Muangsiri, W., Kirsch, L. E., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "Aqueous Degradation of Daptomycin in Alkaline Solutions", New

Orleans, Contributed. (November 1999).

75. Nguyen, L., Kirsch, L. E., Wiencek, J., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "Effects of Shear Stress on the Structural and Mechanical Characteristics of Glucagon Gel Systems", New Orleans, Contributed. (November 1999).

76. Zhang, X., Kirsch, L. E., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "Microviscosity of the Emulsion Determined by Fluorescence Polarization", New Orleans, Contributed. (November 1999).

77. Kirsch, L. E., Zhang, Z., Muangsiri, W., Luner, P., Wurster, D., Redmon, M., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "RR-Formterol (L) Tartrate Development", New Orleans, Contributed. (November 1999).

78. Kirsch, L. E., Majuru, S., Oh, E., Joshi, A., Luner, P., Wurster, D., Redmon, M., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "S-Oxybutynin Preformulation Studies", New Orleans, Contributed. (November 1999).

79. Zhang, X., Kirsch, L. E., 1999 Annual American Association of Pharmaceutical Scientists Meeting, "Study of the Mechanism of Thermally-stressed Parenteral Fat Emulsion", New Orleans, Contributed. (November 1999).

80. Kirsch, L. E., PDA and American Association of Pharmaceutical Scientists Chicagoland discussion groups, "Debunking Pharmaceutical Package Integrity Testing", Chicago, Invited. (September 1999).

81. Zhang, X., Kirsch, L. E., 1997 Annual American Association of Pharmaceutical Scientists Meeting, "Drug Effects on the Coalescence Rate of Thermally-stressed Emulsions", San Francisco, Contributed. (November 1998).

82. Nguyen, L. T., Kirsch, L. E., 1998 Annual American Association of Pharmaceutical Scientists Meeting, "Establishing the Microbial Barrier Properties of Pharmaceutical Packaging by Physical Leak Rate Measurements", San Francisco, Contributed. (November 1998).

83. Kirsch, L. E., Israel Chapter of the PDA, "Pharmaceutical Package Integrity", Herzelia, Israel, Invited. (October 28, 1998).

84. Kirsch, L. E., Medical College of Virginia, "Pharmaceutical Instability of Peptides", Invited. (September 1998).

85. Kirsch, L. E., Morton Guazzo, D., PDA Training and Research Center, "Leakage and Parenteral Packaging Seal Integrity", Baltimore, MD, Invited. (July 1998).

86. Kirsch, L. E., the International Blow-Fill-Seal Operators Meeting, "Current and Future State of Pharmaceutical Package Integrity", Cambridge, MA, Invited. (April 30, 1998).

87. Kirsch, L. E., Nguyen, L. T., Morton Guazzo, D., Scheire, R., Muangsiri, W., Western PDA meeting, "Methods for the Development of Indirect Correlations between Physical Leak Rate Methods and Microbial Ingress into Parenteral Packaging", San Francisco, Contributed. (March 1998).

88. Kirsch, L. E., ESI-Lederle, "Current Issues in Pharmaceutical Container/Closure Integrity Technologies", Invited. (February 2, 1998).

89. Nguyen, L. T., Gerth, R., Kirsch, L. E., 1997 Annual American Association of Pharmaceutical Scientists Meeting, "A Model for Predicting Helium Leak Rates of Defective Sealed Vials and Its Application in the Validation of Helium Leak Rate Method for Pharmaceutical Container/Closure Systems", Boston, Contributed. (November 1997).

90. Zhang, X., Kirsch, L. E., 1997 Annual American Association of Pharmaceutical Scientists Meeting, "An Assessment of Techniques for Evaluating the Physical Stability of Parenteral Microemulsions", Boston, Contributed. (November 1997).

91. Nguyen, L. T., Gerth, R., Moeckly, C. S., Kirsch, L. E., 1997 Annual American Association of Pharmaceutical Scientists Meeting, "Correlation of Mass Spectrometry-based Helium Leak Measurements to Microbial Ingress for Pharmaceutical Container/Closure Integrity Testing", Boston, Contributed. (November 1997).

92. Kirsch, L. E., Executive MBA program offered by the College of Business Administration at The University of Iowa, "A Technologist's View of the Pharmaceutical Industry", Invited. (August 1997).

93. Kirsch, L. E., Glaxo Welcome, "Pharmaceutical Container/Closure Integrity Technologies", Invited. (April 14, 1997).

94. Kirsch, L. E., PDA International Congress, "PDA Container/Closure Study", Osaka, Japan, Invited. (February 18, 1997).

95. Nguyen, L., Moeckly, C., Kirsch, L. E., 1996 Annual American Association of Pharmaceutical Scientists Meeting, "Pharmaceutical Container Closure Integrity by Mass Spectrometry-based Leak Detection", Seattle, Contributed. (1996).

96. Kirsch, L. E., 50th Annual PDA meeting, "Application of Mass Spectrometry Leak Testing to Pharmaceutical Package Integrity Quality Assurance", Philadelphia, Invited. (November 20, 1996).

97. Kirsch, L. E., Seminar at Fujisawa USA, "Pharmaceutical Container/Closure Integrity Technologies", Chicago, Invited. (April 19, 1996).

98. Sihn, Y., Guillory, K., Kirsch, L. E., 1995 Annual American Association of Pharmaceutical Scientists meeting, "Degradation Kinetics and Interaction Studies of Taurolidine Equilibrium Products with PVP in Aqueous Media", Contributed. (1995).

99. Kirsch, L. E., 1995 Annual American Association of Pharmaceutical Scientists Meeting, "Challenges in the Sterilization of Injectable Disperse Systems", Miami, Invited. (November 1995).

100. Kirsch, L. E., Genetics Institute, "Re-engineering Pharmaceutical Product Development", Andover, Invited. (December 1994).

101. Kirsch, L. E., Redmon, M. P., 16th Annual Midwest Biopharmaceutical Statistics Workshop, "Quality Tools Applied to Pharmaceutical Product Development: Quality Function Deployment, Business Function Deployment, and Failure Modes and Effects Analysis", Invited. (May 1993).

102. Kirsch, L. E., Redmon, M. P., Arden House Conference, "Biopharmaceutical Product Development", Invited. (February 1993).

103. Kirsch, L. E., Annual American Association of Pharmaceutical Scientists Meeting, "New Method for Predicting Arrhenius Behavior in Accelerated Drug Degradation Studies", Washington DC, Contributed. (October 1991).

104. Kirsch, L. E., Virginia Commonwealth University, School of Pharmacy faculty and graduate students, "Degradation Kinetics Short Course and Simulation Laboratory", Invited. (April 1991).

105. Stout, P., Khoury, N., Mauger, J., Kirsch, L. E., Annual American Association of Pharmaceutical Scientists Meeting, "Human Zinc Insulin Suspension Release Kinetics", Las Vegas, Nevada, Contributed. (November 1990).

106. Kirsch, L. E., Land O Lakes meeting, "Protein Reactivity", Invited. (June 1990).

107. Kirsch, L. E., Lefeber, D., Riggin, R., Gearhart, D., Clone to Clinic Biotechnology Meeting, "The Susceptibility of Human Growth Hormone to In-process Degradation", Amsterdam, the Netherlands, Contributed. (March 1990).

108. Kirsch, L. E., University of Nebraska, College of Pharmacy, Pharmaceutical Sciences Research Retreat, "Strategies for Research Collaboration with Industrial Sites",

Boystown, Nebraska, Invited. (November 1989).

109. Mauger, K., Shaeiwitz, J., Mauger, J., Kirsch, L. E., Annual American Association of Pharmaceutical Scientists meeting, "Mechanism of Crystalline Zinc Insulin Dissolution", Atlanta, Georgia, Contributed. (October 1989).

110. Kirsch, L. E., Annual American Association of Pharmaceutical Scientists meeting, "Protein Degradation Pathways in Parenteral Dosage Forms", Atlanta, Georgia, Invited. (October 1989).

111. Gearhart, D., Lefeber, D., Riggin, R., Kirsch, L. E., Annual American Association of Pharmaceutical Scientists meeting, "The Effects of Parenteral Sterilants on the Generation of Protein Degradation Products During Pharmaceutical Processing", Atlanta, Georgia, Contributed. (October 1989).

112. Khoury, N., Stout, P., Mauger, J., Shaeiwitz, J., Kirsch, L. E., ACS Colloid and Surface Science Symposium, "Dissolution of Recombinant Human Insulin Crystal", Seattle, Washington, Contributed. (June 1989).

113. Kirsch, L. E., Rho Chi lecturer, "Biotechnic Drug Development", Duquesne University, Invited. (December 1988).

114. Stout, P., Mauger, J., Koury, N., Kirsch, L. E., American Association of Pharmaceutical Scientists meeting, "Dissolution Characteristics of Changing Mixtures of Amorphous: Crystalline Humulin Zinc Insulin", Orlando, Florida, Contributed. (November 1988).

115. Gearhart, D., Kirsch, L. E., Annual American Association of Pharmaceutical Scientists meeting, "Dry-state Deamidation of Glucagon", Orlando, Florida, Contributed. (November 1988).

116. Kirsch, L. E., Short course presented to the West Virginia University, School of Pharmacy graduate students, "Degradation Kinetics Short Course and Simulation Laboratory", Invited. (May 1988).

117. Kirsch, L. E., West Virginia University, University of Kentucky, Duquesne University, Medical College of Virginia, Biochemical Development Seminar Series, "The Role of Transpeptidation and Deamidation in the Pharmaceutical Instability of Proteins and Peptides", Invited. (1987).

118. Kirsch, L. E., Biotechnology symposium at the American Association of Pharmaceutical Scientists meeting, "The Role of Transpeptidation and Deamidation in the Pharmaceutical Instability of Proteins and Peptides", Boston, Invited. (June 1987).

119. Kirsch, L. E., Short Course presented to the West Virginia University, School of Pharmacy graduate students, "Degradation Kinetics Short Course and Simulation Laboratory", Invited. (May 1987).

120. Kirsch, L. E., Bucko, J., Smith, W., Akers, M., Hargrove, W., 1986 American Association of Pharmaceutical Scientists meeting, "Development of a Quantitative Model for the In Vitro and In Vivo Delivery Kinetics of CRIS, a Novel Intravenous System", Washington DC, Contributed. (November 1986).

121. Stout, P., Mauger, J., Kirsch, L. E., Khoury, N., Sheliga, T., Annual American Association of Pharmaceutical Scientists, "Dissolution of Lente Insulins", Washington DC, Contributed. (November 1986).

122. Kirsch, L. E., Humana Corporate Center, "IVAC CRIS System Performance", Louisville, Kentucky, Invited. (May 1986).

123. Kirsch, L. E., Delaware Valley Society of Hospital Pharmacists, "Drug Delivery with the IVAC CRIS System", Philadelphia, Pennsylvania, Invited. (April 1986).

124. Kirsch, L. E., Graduate Faculty Seminar, "Kinetics and Pharmacokinetics of Intravenous Drug Delivery", School of Pharmacy West Virginia, Invited. (January 1986).

125. Kirsch, L. E., American Society of Hospital Pharmacists 20th Midyear Clinical Meeting, "Drug Delivery with the IVAC CRIS System", New Orleans, Louisiana, Contributed. (December 1985).

126. Kirsch, L. E., Smith, W., Massey, E., Bechtel, L., Davies, D., Thirty-seventh National Meeting of the Academy of Pharmaceutical Sciences, "The Evaluation of Human Insulin Formulations by Kinetic Analysis of Time-Action Profiles in Rabbits", Philadelphia, Pennsylvania, Contributed. (October 1984).

127. Kirsch, L. E., Notari, R., 130th American Pharmaceutical Association Annual Meeting, "Kinetics and Mechanism of In Vitro Prodrug Conversion to Cytarabine (ARA-C)", New Orleans, Louisiana, Contributed. (April 1983).

128. Kirsch, L. E., Notari, R., 130th American Pharmaceutical Association Annual Meeting, "Pharmacokinetics of Prodrug Bioconversion to Cytarabine (ARC-C)", New Orleans, Louisiana, Contributed. (April 1983).

**Grantsmanship**

**Over 55 research grants and contracts**

**PROFESSIONAL, GOVERNMENTAL, UNIVERSITY AND OTHER SERVICE**

**Professional/Clinical Services and Committees**

**Internal Committee**

University of Iowa STEM Advisory Council. (2011 - 2013).
College of Pharmacy Curriculum Re-engineering Task Force, "Transformers". (2009 - 2014).
Faculty Senate. (2008 - 2011).
College of Pharmacy IT Committee Chairman. (2008 - 2009).
Graduate College Council. (2006 - 2009).
College of Pharmacy Admissions Committee. (2007 - 2008).
College of Pharmacy Curriculum Committee. (2006 - 2007).
College of Pharmacy Continuing Education Oversight Committee. (2003 - 2006).
College of Pharmacy Industrial Consortium. (2003 - 2006).
College of Pharmacy Admissions Committee Chairman. (2001 - 2003).
College of Pharmacy Research Equipment Committee. (1999 - 2003).
Pharmaceutics Search Committee Chairman. (2001 - 2002).
Ad Hoc Planning Committee for the 1999 Collegiate Research Retreat. (1999).
Advisory Committee to the Vice President for Research for Medical and Biological Sciences. (1998 - 1999).

**General**

Member of the American Association of Pharmaceutical Scientists (1993 – present)
Member of USP <1207> Expert Panel. (January 2011 - 2013).
Editor-in-chief, AAPS Pharmaceutical Science and Technology Journal. (July 2008 – December, 2014).
Faculty Committee Leadership in the National Institute for Pharmaceutical Technology and Education, Faculty Committee, Chairman and Leadership Team (2009-2011): Education

Roadmap, Co Chairman: Pharmaceutical Material Section of Technology Roadmap. (2005 - 2008). Chaired the education committee for NIPTE working on the design of a national curriculum in pharmaceutical technology. (2005 – 2008)

Editorial Advisory Board, Drug Development and Industrial Pharmacy. (June 2000 - 2009).

Member of the Parenteral Drug Association Executive Committee. (2000 - 2002).

Member of USP <1059> Advisory Committee of Excipient Quality. (January 2009 - January 2011).

PQRI Working Group Member, Aseptic Processing. (2003 - 2008).

Regulatory Affairs Advisory Board for the Parenteral Drug Association. (2003 - 2008).

Scientific Advisory Board for the Parenteral Drug Association. (2003 - 2008).

Strategic Planning Committee for the Parenteral Drug Association. (2003 - 2008).

Editorial Advisory Board, Pharmaceutical Development and Technology. (1995 - 2008).

Editor, The PDA Journal of Pharmaceutical Science and Technology. (February 2000 - June 2008).

Reviewer for United Arab Emirate University Research Fund. (2004).

The University of Iowa Research Review Committee in the Biological Sciences. (2003 - 2004).

Reviewer for State of Indiana 21st Century Fund proposals. (2003).

Member of the Ad Hoc National Institutes of Health SBIR and STTR Study Section for Drug Development and Delivery. (2000).

Reviewer for the National Science Foundation Directorate for Engineering. (2000).

Member of the Pharmaceutical Sciences Alliance Council, Aseptic Processing Advisory Panel, PDA-TRI Container/Closure Applied Research Task Force, and Faculty member for the Parenteral Drug Association Research and Training Center. (1998 - 1999).

Chairman of the American Association of Pharmaceutical Scientists Sterile Products Focus Group. (1997).

AAPS Pharmaceutical Technology Section Leadership Team. (1995 - 1997).

Conference co-chairman (with Dr. John Clements of the Royal Pharmaceutical Society of Great Britain) for the 1996 Arden House Conferences. (1996).

# ATTACHMENT B

# Zlatan Coralic, PharmD, BCPS



Zlatan.Coralic@ucsf.edu

## EDUCATION

| | |
|---|---|
| Jul 2008 - Jul 2009 | **Pharmacy Practice Residency, PGY-1** |
| | ASHP Accredited |
| | University of California, San Francisco (UCSF) |
| | Residency Director: Cathi Dennehy, PharmD |
| | San Francisco, California |
| | |
| Aug 2005 - Jun 2008 | **Doctor of Pharmacy** |
| | University of Southern Nevada (USN) |
| | College of Pharmacy |
| | Henderson, Nevada |
| | |
| Sep 2000 - Jun 2005 | **B.S. in Biology** (Cell and Molecular concentration) |
| | Minor in Chemistry |
| | University of Nevada, Las Vegas (UNLV) |
| | Las Vegas, Nevada |

## LICENSES / CERTIFICATIONS

| | |
|---|---|
| Nov 2012 | **Board Certified Pharmacotherapy Specialist** |
| | Board of Pharmacy Specialties |
| | |
| Oct 2009 | **Pediatric Advanced Life Support (PALS)** |
| | |
| Jul 2009 | **Advanced Teaching Certificate** |
| | UCSF School of Pharmacy |
| | |
| Jul 2008 - present | **Registered Pharmacist #17361** |
| | Nevada State Board of Pharmacy |
| | |
| Jul 2008 - present | **Registered Pharmacist #61422** |
| | California State Board of Pharmacy |
| | |
| Jun 2009 | **Certified Clinical Preceptor** |
| | |
| Jul 2006 - Feb 2019 | **Advanced Cardiac Life Support (ACLS)** |
| | |
| Sep 2005- present | **Basic Life Support (BLS)** |

# PROFESSIONAL EXPERIENCE

Oct 2013 – present **Assistant Clinical Professor of Emergency Medicine (WOS)**
UCSF School of Medicine (Department of Emergency Medicine)
Director: Peter Sokolove, MD

Jul 2009 – Nov 2016 **Health Sciences Assistant Clinical Professor (Pharmacy/WOS)**
Nov 2016 – present **Promotion: Health Sciences Associate Clinical Professor (Pharmacy/WOS)**
UCSF School of Pharmacy
Director: B. Joseph Guglielmo, PharmD

Jul 2009 – present **Emergency Medicine Clinical Pharmacist**
UCSF Medical Center
Director: Desi Kotis, PharmD

Jul 2010 – present **Clinical Preceptor – Emergency Medicine**
Pharmacy (PGY 1-2) and Medical (PGY 3-4) Residents

Oct 2006 - Jul 2008 **Pharmacist Intern**
University Medical Center, Southern Nevada (UMCSN)
Director of Pharmaceutical Services: Diana Bond, RPh

May 2005 - Jul 2008 **Pharmacist Technician / Intern**
Walgreens #3873
Las Vegas, Nevada
Pharmacy Supervisor: Matt Forster, PharmD

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 558 of 820 PageID #: 19619

# PEER-REVIEWED PUBLICATIONS

Murphy CE, Wang RC, **Coralic Z**, Lai AR, Raven M. Association between Methamphetamine Use and Psychiatric Hospitalization, Chemical Restraint, and Emergency Department Length of Stay. Acad Emerg Med 2020; July 26; e-pub ahead of print.

Brown C, Noble J, **Coralic Z**. Brief Summary of Potential SARS-CoV-2 Prophylactic and Treatment Drugs in the Emergency Department. West J Emerg Med. 2020;21(3):510-513.

Montoy JCC, **Coralic Z**, Herring AA, Clattenburg EJ, Raven MC. Association of Default Electronic Medical Record Settings With Health Care Professional Patterns of Opioid Prescribing in Emergency Departments: A Randomized Quality Improvement Study. JAMA Intern Med. 2020 Jan 21;180(4):487-93.

Chamberlain JM, Kapur J, (UCSF Trial Principal Investigator **Coralic, Z.**), et al. Efficacy of levetiracetam, fosphenytoin, and valproate for established status epilepticus by age group (ESETT): a double-blind, responsive-adaptive, randomised controlled trial. Lancet. 2020;395(10231):1217-1224.

Kapur J, Elm J, (UCSF Trial Principal Investigator **Coralic, Z.**), et al. Randomized Trial of Three Anticonvulsant Medications for Status Epilepticus. N Engl J Med 2019;381:2103-13.

**Coralic Z**. Medication reconciliation studies: High quantity, low quality. Am J Health Syst Pharm 2019;76:1996-7.

Avdagic K, Geier M, **Coralic Z**, Finley P. Evaluation of the Impact of a Multimodel Intervention on Prescribing Patterns of Sedative-Hypnotics in a Behavioral Health System. Prim Care Companion CNS Disord 2018;20.

Morgan SR, Acquisto NM, **Coralic Z**, et al. Clinical pharmacy services in the emergency department. Am J Emerg Med. Am J Emerg Med. 2018 Oct;36(10):1727-1732.

**Coralic Z,** et al. Ketamine Procedural Sedation in the Emergency Department of an Urban Tertiary Hospital in Dar es Salaam, Tanzania. Emerg Med J. 2018 Apr;35(4):214-219.

Li, K., Vo, K., Addo N., Lee, B., **Coralic, Z**. Effect of a single dose of i.v. ondansetron on QTc interval in emergency department patients. Am J Health Syst Pharm. 2018 Mar 1;75(5):276-282.

**Coralic Z,** Hayes BD. Emergency Medicine Pharmacists on an International Scale. Emerg Med J. Emerg Med J. 2017 Aug; 34(8): 492-493.

**Coralic Z**, Kim SA, Vinson DR. Prochlorperazine-Induced Hemidystonia Mimicking Acute Stroke. Western Journal of Emergency Medicine. 2015;16(4):1-3.

Burnett MM, Zimmermann L, **Coralic Z**, et al. A simple text-messaging intervention is associated with improved door-to-needle times for acute ischemic stroke. Stroke. 2014 Dec;45(12):3714-6.

**Coralic Z**, Kanzaria HK, Bero L, Stein J. Staff perceptions of an on-site clinical pharmacist program in an academic emergency department after one year. West J Emerg Med. 2014 Mar;15(2):205-10.

Gertler SA, **Coralic Z**, et al. Root cause analysis of ambulatory adverse drug events that present to the emergency department. J Patient Saf. 2014 Feb 27.

James KT, Detz A, **Coralic Z**, Kanzaria H. Levamisole contaminated cocaine induced cutaneous vasculitis syndrome. West J Emerg Med. 2013 Sep;14(5):448-9.

**Coralic Z,** Lenhoff T, Kanzaria HK, Gerona R. A 120-hour case of priapism from an over-the-counter herbal supplement. Ann Pharmacother. 2013 Feb;47(2):289-90.

Case 1:18-cv-02023-CRC-CJB    Document 302    Filed 08/30/21    Page 559 of 820 PageID #: 080701

Kanzaria HK, Farzan N, **Coralic Z.** Adie's tonic pupil. West J Emerg Med. 2012 Dec;13(6):543.

Chung-Esaki H, Knight R, Noble J, Wang R, **Coralic Z.** Detection of Acute Pulmonary Embolism by Bedside Ultrasound in a Patient Presenting in PEA Arrest: A Case Report**.** *Case Reports in Emergency Medicine*, vol. 2012, Article ID 794019, 5 pages, 2012.

Frymoyer A, Hersh AL, **Coralic Z**, Benet LZ, Joseph Guglielmo B. Prediction of vancomycin pharmacodynamics in children with invasive methicillin-resistant staphylococcus aureus infections: A monte carlo simulation. Clin Ther. 2010 Mar;32(3):534-42.

Avdagic Z, Purisevic E, Omanovic S, **Coralic Z**. Artificial intelligence in prediction of secondary protein structure using CB513 database. Summit on Translat Bioinforma. 2009 Mar 1; 2009:1-5.

# BOOK AUTHORSHIPS AND CHAPTERS

**Coralic, Z.** Magnesium Sulfate. In: Poisoning & Drug Overdose, 8th Edition. Olson K, Anderson I, Benowitz N, (eds). The McGraw-Hill Companies. (Publishing TBD 2021).

**Coralic, Z.** Operational Delay in Starting an Epinephrine Drip. In: Tricks of the Trade in Emergency Medicine.  Lin M, Haas MRC, Hayes BD, Joshi N (eds). Redwood City, CA: ALiEM Publishing, 2020; pp 24-25.  ISBN 978-0-9992825-5-7

**Coralic, Z** (Associate Editor), Farzee B, Chin R. Emergency Management of Infectious Diseases, 2nd edition. [Textbook]. Cambridge University Press. Publication date: September 8, 2018. ISBN 978-1107153158

Koehl J, DeWitt K, Procopio G, **Coralic Z**. In: ALiEMU Capsules Module 11: Acute Agitation. Hays B (ed). Web. 16 Nov 2018.  https://www.aliem.com/aliemu-capsules-module-11-acute-agitation/

**Coralic Z**. Anaphylaxis and Angioedema. Pulmonary and Emergency Medicine:  Pharmacotherapy Self Assessment Program (PSAP), Book 2. American College of Clinical Pharmacy. Jun 2017.

**Coralic Z**, Awad N. ALiEMU Capsules Module 5: Procedural Sedation and Analgesia in the ED. Hays B (ed). Web.10 Feb 2016. https://www.aliem.com/aliemu-capsules-procedural-sedation-analgesia-ed/

**Coralic, Z**. Anticoagulation. In: AFEM Handbook of Acute and Emergency Care. Wallis, L & Reynolds, T (eds). Cape Town: Oxford University Press Southern Africa. 2013;  pp. 959-965. ISBN 978-0190722821

**Coralic Z**, Nemer JA.  Acute Pain Management. In: GEMSoft [electronic media]. Lin M, Chin R (eds). GEMSoft (General Emergency Medicine Software). Queensland, Australia: Pemsoft Pty Ltd. In press, 2012.

**Coralic Z**, Duong D.  Acute Agitation Management. In: GEMSoft [electronic media]. Lin M, Chin R (eds). GEMSoft (General Emergency Medicine Software). Queensland, Australia: Pemsoft Pty Ltd. In press, 2012

**Coralic Z**, Mongelluzzo J.  Procedural Sedation. In: GEMSoft [electronic media]. Lin M, Chin R (eds). GEMSoft (General Emergency Medicine Software). Queensland, Australia: Pemsoft Pty Ltd. In press, 2012

# OTHER SCIENTIFIC CONTRIBUTIONS

Coralic, Z. *ALiEM*. "Trick of the Trade: Mix Ceftriaxone IM with Lidocaine for Less Pain." Web. 6 Nov. 2014. http://bit.ly/1CpVbWi

Coralic, Z. *ALiEM*. "I am giving prochlorperazine. Should I give diphenhydramine too?" Web. 3 Sep. 2014. http://bit.ly/12d7KUg

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02023-CRC-GLS   Document 302   Filed 08/30/21   Page 560 of 820 PageID #: 189101

Coralic, Z. *ALiEM*. "My EpiPen expired! Can I still use it?" Web. 19 May 2014. http://bit.ly/1tyZtk3

Coralic, Z. *ALiEM*. "New Antibiotic Dalbavancin: Should we use this in the ED?" Web. 12 May 2014. http://bit.ly/1z2tUUf

Coralic, Z. *ALiEM*. "The Ultimate Consult Service: Emergency Pharmacists." Web. 3 Oct 2013. http://bit.ly/1y8fftu

Coralic, Z. *ALiEM*. "The Dirty Epi Drip: IV Epinephrine When You Need It." Web. 27 Jun 2013. http://bit.ly/1tyZxjw

Coralic, Z. *ALiEM*. "On the Horizon: Propofol for Migraines." Web. 25 May 2013. http://bit.ly/15Io7dK

Coralic, Z. *ALiEM*. "One-dose vancomycin for SSTIs: Just don't do it." 23 Jan 2013. Web. http://bit.ly/124pYbs

Coralic, Z. *ALiEM*. "Trick of the Trade: Converting % to mg/mL." 17 Jun 2012. Web. http://bit.ly/1vWKffU

Podcasts

Herbert, M. (Producer), Lin, M., Poree, L., Coralic, Z. (Contributors). 2015 Nov 1. "Lin Sessions – Intrathecal Pumps in Emergency Medicine" Available through subscription http://www.emrap.org/ **[Audio Podcast].**

Herbert, M. (Producer), Lin, M., and Coralic, Z. (Contributors). 2014 Jan 1. "Lin Sessions - PO vs IV Clindamycin - Dirty Epi Drip - Propofol for Migraines." Available through subscription http://www.emrap.org/ **[Audio Podcast].**

Herbert, M.,(Producer), Lin, M., and Coralic, Z. (Contributors). 2015 Jan 1. tPA in Pregnancy? Available through subscription http://www.emrap.org/ **[Audio Podcast].**

# PRESENTATIONS

| | |
|---|---|
| Jan 2020 | **Acute Management of Shortness of Breath in ED**<br>UCSF Department of Emergency Medicine Nursing Education Series, San Francisco, CA: *Lecture* |
| Apr 2019 | **Drug Shortages: Woes and Opportunities**<br>Vituity Spring Symposium, San Diego, CA: *Lecture* |
| Oct 2018 | **Updates in Reversal of Anticoagulation**<br>Advanced Critical Care & Emergency Nursing, Las Vegas, NV: *Lecture* |
| Oct 2018 | **A Discussion about the Opioid Epidemic**<br>Advanced Critical Care & Emergency Nursing, Las Vegas, NV: *Lecture* |
| Oct 2018 | **Drug Shortages: Woes and Opportunities**<br>Advanced Critical Care & Emergency Nursing, Las Vegas, NV: *Lecture* |
| Apr 2018 | **Hyponatremic Emergencies in the ED**<br>High Risk Emergency Medicine, Maui, Hawaii: *Lecture* |
| Dec 2017 | **Opioids for Pain: Drug Seeking Behavior, Acute Pain Management, and Drug Monitoring Databases**<br>ASHP 2017 Mid-Year Meeting, Orlando, FL: *Lecture* |
| Nov 2017 | **EM Meds: Pearls and Pitfalls**<br>Advanced Critical Care & Emergency Nursing, Las Vegas, NV: *Lecture* |

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02023-CRC-CJB   Document 305   Filed 08/30/21   Page 561 of 820 PageID #: 28510

| Dec 2016 | **Stop the Bloodshed: What Every Pharmacists Needs to Know About Anticoagulation Reversal** |
| | ASHP 2016 Mid-Year Meeting, Las Vegas, NV: *Lecture* |

| May 2016 | **Medication Price Gouging in Emergency Medicine** |
| | Essentials of Emergency Medicine, Las Vegas, NV: *Lecture* |

| May 2016 | **Dangerous Drug Interactions in Emergency Medicine** |
| | Essentials of Emergency Medicine, Las Vegas, NV: *Lecture* |

| May 2016 | **Careful with Some of These in the Resus Room** |
| | Essentials of Emergency Medicine, Las Vegas, NV: *Lecture* |

| April 2016 | **Emergent Anticoagulation Reversal** |
| | CEP America continuing education (Long Beach, CA; Chicago, IL; San Francisco, CA): *Lecture* |

| Mar 2016 | **NOACS in the ED** |
| | Kaiser South San Francisco CE: *Lecture* |

| Dec 2015 | **ASHP Clinical Pearls Session** |
| | ASHP 2014 Mid-Year Meeting, New Orleans, LA: *Lecture* |

| Dec 2015 | **The Use of Ketamine in a Low Resource Hospital: Dar es Salaam, Tanzania** |
| | ASHP 2014 Mid-Year Meeting, New Orleans, LA: *Poster presentation* |

| Nov 2015 | **A Drug Study Sponsored by Industry…What Does That Mean?** |
| | Essentials of Emergency Medicine - Los Angeles, CA: *Lecture/Livestream* |

| Nov 2015 | **Novel Antibiotics: Should We Use These in the ED**? |
| | Essentials of Emergency Medicine - Los Angeles, CA: *Lecture/Livestream* |

| Nov 2015 | **What Happens In July…Stays in July!** |
| | Essentials of Emergency Medicine - Los Angeles, CA: *Lecture/Livestream* |

| Nov 2015 | **Common Medication Errors in the ED** |
| | Essentials of Emergency Medicine - Los Angeles, CA: *Lecture/Livestream* |

| Oct 2015 | **Paralyzed and Awake: Lessons from ED Intubation Research** |
| | UCSF Clinical Pharmacy Research Seminar Series: *Lecture* |

| Aug 2015 | **Treatment of Skin and Soft Tissue Infections in the ED** |
| | UCSF Emergency Medicine Conference: *Lecture* |

| Aug 2015 | **Common Pitfalls with Antibiotics** |
| | UCSF Emergency Medicine Conference: *Lecture* |

| Jun 2015 | **Blood Thinners – Pearls and Pitfalls** |
| | High Risk Emergency Medicine San Francisco Conference: *Lecture* |

| Jun 2015 | **Medication Errors - Pearls and Pitfalls** |
| | High Risk Emergency Medicine San Francisco Conference: *Lecture* |

| May 2015 | **Opioids in the ED** |
| | UCSF School of Medicine Emergency Medicine Elective: *Lecture* |

| April 2015 | **Drugs in Pregnancy in Emergency Medicine** |

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 562 of 820 PageID #:

UCSF Emergency Medicine Conference: *Lecture*

| | |
|---|---|
| Dec 2014 | **Perceived Value of Resource-Specific Treatment Protocols in Dar es Salaam, Tanzania**<br>ASHP 2014 Mid-Year Meeting, Aneheim, CA: *Poster Presentation* |
| Dec 2014 | **Demystifying Acute Management of Atrial Fibrillation**<br>ASHP 2014 Mid-Year Meeting, Aneheim, CA: *Lecture* |
| Dec 2014 | **The Errors We Make…**<br>ASHP 2014 Mid-Year Meeting, Aneheim, CA: *Lecture* |
| Oct 2014 | **Adverse Drug Events in the Community**<br>Continuous Pharmacy Education; Alameda Highland Hospital: *Lecture* |
| Oct 2014 | **Fun with Drugs in the ED**<br>UCSF Emergency Medicine Conference: *Lecture* |
| Jun 2014 | **Your Medications: Making Sense of Treatments, Benefits, and Risks**<br>UCSF Osher Mini Medical School for the Public: *Lecture / YouTube Series* |
| May 2014 | **Emerging in the ED: Primer for Starting in the Emergency Department**<br>ASHP: *Webinar* (460 attendees) |
| Apr 2014 | **Toxicology Review**<br>UCSF Emergency Department; Department of Nursing: *Lecture* |
| Apr 2014 | **A Qualitative Study Evaluating the Current Landscape of Healthcare Social Media and Podcasts**<br>UCSF Spring Research Seminar: *Poster Presentation* |
| Dec 2013 | **Post Rapid-Sequence-Intubation Analgesia and Sedation Practices**<br>ASHP 2013 Mid-Year Meeting/Society for Academic Emergency Medicine: *Poster Presentation* |
| Dec 2013 | **Root-Cause Analysis of Adverse Drug Events Leading to an Emergency Department Visit**<br>ASHP 2013 Mid-Year Meeting/Society for Academic Emergency Medicine: *Poster Presentation* |
| Dec 2013 | **Cannabinoid Induced Hyperemesis Syndrome & Treatment**<br>ASHP 2013 Mid-Year Meeting: Hot Topics in Emergency Medicine: *Lecture* |
| Nov 2013 | **Controversies in Migraine Management / Fun with Drugs in the ED**<br>UCSF's Continuing Medical Education Series: Topics in Emergency Medicine: *Lecture* |
| Oct 2013 | **Emergency Department Clinical Pharmacists: Pros and Cons**<br>CSHP 2013 Annual Meeting: *Lecture* |
| Dec 2012 | **Give Me Fat, or Give Me Death! The Use of Fat Emulsion Therapy for Calcium Channel Blockers and Other Toxicities**<br>ASHP 2012 Mid-Year Meeting: Hot Topics in Emergency Medicine: *Lecture* |
| Dec 2012 | **Impact of ED Pharmacists in Improving Door-to-tPA Administration Times in Ischemic Stroke**<br>ASHP 2012 Mid-Year Meeting: *Poster Presentation* |
| Dec 2012 | **Prospective Observational Study of Adverse Drug Events Leading to an Emergency Department Visit Identified by a Clinical Pharmacist**<br>ASHP 2012 Mid-Year Meeting: *Poster Presentation* |

Zlatan Coralic, PharmD
September 2020

7

Case 1:18-cv-02023-CFC-CJB   Document 305   Filed 08/30/21   Page 563 of 820 PageID #: 168701

| Dec 2012 | **Prothrombin Complex Concentrates INR Dose Response Analysis in Patients with Intracranial Hemorrhage: PIDRA-ICH Study**<br>ASHP 2012 Mid-Year Meeting: *Poster Presentation* |
|---|---|
| Nov 2012 | **Simulation Training in Emergency Medicine**<br>Association of American Medical Colleges (AAMC) national conference in San Francisco: *Simulation* |
| Apr 2012 | **Emergency Department Override Medication List**<br>Pharmacy and Therapeutics Committee at UCSF: *Policy Approval* |
| Apr 2012 | **UCSF Nursing Grand Rounds: Code Stroke**<br>UCSF Department of Nursing: *Lecture* |
| Jan 2012 | **Emergency Medicine Pharmacotherapy – Global Initiative**<br>Emergency Medicine Conference; Dar es Salaam, Tanzania: *Lecture* |
| Jan 2012 | **Medication Use in Pregnancy – Global Initiative**<br>Emergency Medicine Conference; Dar es Salaam, Tanzania: *Lecture* |
| Dec 2011 | **Emergency Medicine Clinical Pearls - tPA and ED Pharmacists**<br>ASHP 2011 Mid-Year Meeting: *Lecture* |
| Oct 2011 | **California Poison Control Center Rounds – GHB Ingestion**<br>California Poison Control Center San Francisco Division: *Lecture* |
| Jun 2011 | **California Poison Control Center Rounds – Amphetamines from India**<br>California Poison Control Center San Francisco Division: *Lecture* |
| May 2011 | **Successful Implementation of Emergency Department Clinical Pharmacists at UCSF**<br>UCSF Spring Research Seminar: *Poster Presentation* |
| Aug 2010 - present | **ED Nursing Annual In-service: Meds in the Code Room**<br>UCSF Medical Center Emergency Department: *Lecture* |
| May 2009 | **Current Recommended Dosing for Vancomycin in Children is Inadequate – a Montecarlo Simulation**<br>UCSF Spring Research Seminar *Poster Presentation*, Western States Conference, and UCSF Pharmacy and Therapeutics Committee |
| Nov 2008 | **Proposal for Addition to UCSF's Formulary: Regadenoson**<br>UCSF Pharmacy and Therapeutics Committee: *Policy Approval* |
| Dec 2007 | **Treatment of Cysticercosis**<br>UMCSN: *Student Lecture* |
| Nov 2007 | **Diabetic Medications**<br>UMCSN – Family Resource Center Services: *Community Outreach Lecture* |
| Oct 2007 | **Detecting EPS in Patients on Metoclopramide**<br>UMCSN: *Student Lecture* |
| Jun 2007 | **Maraviroc in Antiretroviral Experienced HIV Patients**<br>UMCSN: *Student Lecture* |

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02032-CFC-CJB    Document 302    Filed 08/30/21    Page 564 of 820 PageID #: 10882

| | | | Dec 2006 | **Etiology and Treatment of Pulmonary Fibrosis** |
|---|---|---|---|---|

Dec 2006 | **Etiology and Treatment of Pulmonary Fibrosis**
USN College of Pharmacy: *Student Lecture*

Apr 2006 | **OTC Supplements: Garlic**
USN College of Pharmacy: *Student Lecture*

# TEACHING EXPERIENCE

| Year(s) | Quarter | Course Number and Title | Nature of Contribution | Hours | Student# |
|---|---|---|---|---|---|
| 2019 - present | All | EM Pharmacology | Longitudinal Section Leader | 1-2/mo | 60 |
| 2019 - present | Fall | Therapeutics: Stroke | Lecturer | 2 | 120 |
| 2016 - present | Spring | EM Boot Camp: Pain Management | Lecturer | 1 | 30 |
| 2015 - 2017 | Winter | CP 111: Critical Thinking | Lecturer | 1 | 120 |
| 2015 | Spring | PC/PCOL: CNS Drugs | Lecturer | 2 | 120 |
| 2012 - present | Spring | Therapeutics: ACS | Lecturer | 2 | 120 |
| 2010 - 2015 | Spring | ICU Elective: Toxicology | Lecturer | 1 | 30 |
| 2009 | Spring | Pediatric Elective Juvenile Idiopathic Arthritis | Lecturer | 1 | 50 |
| 2008 - present | Spring | CP 120: Acid – Base | Lecturer | 2 | 120 |
| 2009 | Spring | Physical Assessment Seminar: Blood Pressure Measurement | Instructor | 1 | 45 |
| 2009 | Spring | Biochemistry 112: Hepatic Encephalopathy | Mock Patient Role | 1 | 120 |
| 2009 | Winter/Spring | Ambulatory Care | Preceptor | 480 | 8 |
| 2008 - 2018 | Fall | CP 111: Diarrhea, Gas, and Hemorrhoids OTC | Lecturer | 2 | 120 |
| 2008 | Fall | CP 130: Headaches | Lecturer | 2 | 120 |
| 2008 | Fall | CP 130: Student Conference | Conference Leader | 48 | 30 |

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02025-CRC-GLS   Document 302   Filed 08/30/21   Page 565 of 820   PageID #: 089101

# PROFESSIONAL ORGANIZATIONS / AFFILIATIONS / LEADERSHIP

| | |
|---|---|
| June 2020 - ongoing | **Pharmacy Representative: Door-to-Needle Code Stroke Taskforce** |
| Mar 2020 - ongoing | **Lead Clinical Pharmacist: Emergency Department COVID19 Response Team** |
| Mar 2020 – ongoing | **Co-PI: Novel treatment for alcohol dependent frequent users of the emergency department (ED): ED-initiated extended release naltrexone, tele-addiction services, and case management.**<br>ClinicalTrials.gov: NCT04094584 |
| Feb 2020 – ongoing | **Lead Clinical Pharmacist: TIMELESS Multicenter Randomized Trial**<br>ClinicalTrials.gov: NCT03785678 |
| Feb 2020 – ongoing | **Lead Clinical Pharmacist: MOST Multicenter Randomized Trial**<br>ClinicalTrials.gov: NCT03735979 |
| Oct 2019 | **UCSF Medical Center Guideline for the Management of Suspected Skin and Soft Tissue Infections in Adults**<br>Collaborating author |
| Sep 2019 - ongoing | **Pharmacy Representative: ED Unit Based Leadership Team (UBLT)** |
| Sep 2019 - ongoing | **Lead Clinical Pharmacist: Geriatric Emergency Department Certification** |
| Aug 2017 | **Emergency Medicine Pharmacy Role Delineation Task Force Member**<br>Board of Pharmacy Specialties |
| Jul 2016 – Jul 2018 | **Vice Chair / Chair / Past Chair: ASHP Science Advisory Group on Emergency Care** |
| Jan 2016 – Jul 2017 | **Lead Institution Clinical Pharmacist: ESETT Multicenter Randomized Trial**<br>ClinicalTrials.gov: NCT01960075 |
| Oct 2015 - present | **Reviewer: Annals of Emergency Medicine** |
| Oct 2014 | **Lead Author: Proposition 44 (national). American College of Emergency Physician Policy Statement: Support for Clinical Pharmacists as Part of the Emergency Medicine Team** |
| Oct 2014 – present | **Reviewer: Emergency Medicine Journal (British Medical Journals)** |
| Aug 2013 – Jul 2018 | **ASHP's Science Advisory Group on Emergency Care Member** |
| Dec 2012- present | **Reviewer: American Journal of Health-System Pharmacy** |
| Jun 2011- present | **Contributor: Academic Life in Emergency Medicine Blog** |
| Feb 2010 – present | **Founding Member: California Emergency Medicine Pharmacy Network** |
| Sep 2008 | **UCSF Pharmacy Residency Chief Resident** |
| Oct 2008 – Oct 2009 | **California Society of Health Systems Pharmacists (CSHP)** |
| Oct 2007- Jul 2018 | **American Society of Health Systems Pharmacists (ASHP)** |
| Sep 2005- Jun 2006 | **USN College of Pharmacy Class President** |

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 566 of 820 PageID #: 18970

# SPECIALIZED TRAINING / OTHER EXPERIENCE

July 2020      **Philips Patient Monitor Training**
UCSF Department of Emergency Medicine

Feb 2018      **Hospital Emergency Response Team (HERT) Training**
FEMA's Center for Disaster Preparedness, Anniston, AL

Jul-Sep 2017      **STATA Statistical Analysis Course (BIOSTAT 212)**
UCSF Department of Epidemiology and Biostatistics

Feb 2015      **First Responder for Implantable Drug Infusion Systems**
Training in interrogation and emergent management of common intrathecal pump malfunctions
UCSF Department of Anesthesia and Neuromodulation

Oct 2014      **Emergency Department Violence Training: Code 100.**
Training in approach, restraint, and treatment of agitated patients in the Emergency Department
UCSF Department of Emergency Medicine

Jan-Apr 2014      **Scientific Writing Course**
UCSF Department of Surgery

Jul-Sep 2011      **Training in Clinical Research (EPI 202)**
UCSF Department of Epidemiology and Biostatistics

# HONORS AND AWARDS

Aug 2020      **Excellence in Interprofessional Teaching Award**
The UCSF Program for Interprofessional Practice and Education
Haile T. Debas Academy of Medical Educators

Jan 2018      **Top 50 Peer-Reviewer**
& Jan 2019      Annals of Emergency Medicine

Dec 2015      **Employee of the Year**
UCSF Department of Emergency Medicine

Aug 2015      **Excellence in Teaching Award**
UCSF Academy of Medical Educators

Jun 2012 & 2014      **Clinical Preceptor of the Year**
Department of Clinical Pharmacy

Aug 2012      **ASHP New Investigator Award**
Research: Prospective Observational Study of Adverse Drug Events Leading to an Emergency
Department Visit Identified by a Clinical Pharmacist

Jan 2010      **Employee of the Month**
UCSF Medical Center Department of Emergency Medicine

May 2009      **Gary Rifkind Award - Best Research**
UCSF's Spring Research Seminar

Nov 2007      **ASHP Clinical Skills Competition**

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02032-CRC-CJ1 Document 302 Filed 08/30/21 Page 567 of 820 PageID #: 188701

Local Competition Finalist

Aug 2007 **USN Annual Scholarship**

Sep 2000 **Millennium Scholarship of Nevada**

# EXPERT WITNESS WORK

| Year | Lawyer/Firm | Case | Consulted by | Type of Work |
|------|-------------|------|--------------|--------------|
| 2020 | Floyd, Pflueger & Ames | Brown v. Providence | Defendant | Review |
| 2020 | La Follette, Johnson, DeHaas, Fesler & Ames | Cisneros v. Santa Rosa Memorial Hospital | Defendant | Review |
| 2020 | FAVROS Law | Johnson v. Harrison | Defendant | Review |
| 2020 | Floyd, Pflueger & Ringer | Harned v. Swedish | Defendant | Review |
| 2020 | Salvi, Sschostok & Pritchard P.C. | Thompson v. OSF Healthcare | Plaintiff | Review |
| 2020 | Dechert LLP | Par v. Amneal | Plaintiff | Review, opinion |
| 2019 | Dechert LLP | Par v. Eagle | Plaintiff | Review, opinion, deposition |
| 2019 | Dechert LLP | Par v. Sandoz | Plaintiff | Review, opinion |
| 2019 | Floyd, Pflueger & Ringer | Coache v. MultiCare | Defendant | Review |
| 2018 | La Follette, Johnson, DeHaas, Fesler & Ames | Gutierrez v. Santa Rosa Memorial Hospital | Defendant | Review, opinion, deposition |
| 2018 | David L. Hunter | N/A | Plaintiff | Review |
| 2013 | Virginia C. Nelson | Mau v. Rady Children's Hospital | Plaintiff | Review |

Zlatan Coralic, PharmD
September 2020

Case 1:18-cv-02032-CFC-CJB   Document 302   Filed 08/30/21   Page 568 of 820 PageID #: 16889

# EXHIBIT 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | C.A. No. 18-cv-2032-CFC-CJB (Consolidated)<br><br>██████████████ |

## DEFENDANTS' WITNESS LIST

Pursuant to Local Rule 16.3(c), Amneal identifies the following witnesses whom Amneal intends to or may call live or by deposition at trial. This list is not a commitment that Amneal will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial. By identifying these witnesses, Amneal is not required to call any listed witness at trial, nor is Amneal limited in the manner in which such testimony is presented at trial. With respect to Plaintiffs' witnesses, Amneal reserves the right to introduce testimony through deposition or live examination, as appropriate or by agreement. Amneal also reserves the right to call any witnesses called by Plaintiffs or anyone currently or formerly employed by or for Plaintiffs appearing on Plaintiffs' witness list, and to revise this list in light of further rulings by the Court or any other changed

circumstances.   Amneal further reserves the right to call one or more additional witnesses to provide foundational testimony to establish the authenticity or admissibility of any material proffered at trial if the admissibility or authenticity is challenged by Plaintiffs.   Amneal also reserves the right to call any witness for impeachment purposes.   Amneal reserves the right to further modify, supplement, and/or amend the Final Pretrial Order and attachments in light of issues that remain open and until entry of the Final Pretrial Order.

## I.   Expert Witnesses

Below are the expert witnesses Amneal intends to call live at trial. The curriculum vitae for each expert is also attached herein.

1. Patricia A. Gupta (CV included as Attachment A hereto)

2. M. Laurentius Marais, Ph.D. (CV included as Attachment B hereto)

3. Aaron B. Waxman, M.D., Ph.D. (CV included as Attachment C hereto)

4. Gerhard Winter, Ph.D. (CV included as Attachment D hereto)

## II.   Fact Witnesses

Below are the fact witnesses that Amneal may call at trial live or by deposition (as indicated).

1. Brian Boesch (by deposition)

2. Michelle Bonomi-Huvala (by deposition)

3. Carla English (by deposition)

4. Hardik Joshi (live or by deposition)

5. Vinayagam Kannan (by deposition)

6. Craig Kenesky (by deposition)

7.  Matthew Kenney (by deposition)

8.  Michelle Rennwald (by deposition)

9.  Suketu Sanghvi (by deposition)

10. Sunil Vandse (by deposition)

# Attachment A

Complete *Curriculum Vitae* for

**PATRICIA A. GUPTA**
Henderson, NV USA

███████████

Email: guptapat@hotmail.com

**EXPERIENCE**

More than 13 years experience as a GMP Compliance Consultant to the pharmaceutical / biotech industries; eleven years experience with corporate Quality Assurance/Compliance departments within Merck & Co., Genentech Inc.and Janssen Supply Group (Johnson & Johnson); eleven years experience in the U.S. Food and Drug Administration with eight years as an investigator and three years as a supervisory investigator.  In addition, eight years of clinical microbiology experience; two years of research experience in interferon production and tissue culture techniques.

**9/07 – 9/10    GMP Consultant and President**, Patti Gupta & Associates LLC, Henderson, NV
**10/11 – Present**

Provide GMP compliance consulting services to the biotech and pharmaceutical industries.  Able to perform  pre-approval, due diligence, routine or for-cause GMP audits/assessments in manufacturing and/or quality departments of pharmaceutical manufacturers (small molecule, biotech, biologic, active pharmaceutical ingredient (API), solid dosage forms, aseptic/sterile drugs, liquid oral, etc.). Audit findings are based on knowledge and experience with U.S. FDA regulations (21 CFR Part 11, 210 and 211) as well as regulations from foreign countries, including European Union (Vol. 4 Eudralex and all annexes), Japan and Brazil. Assist companies in performing system assessments to identify and prioritize compliance/quality deviations and issues.  Provide advice and solutions in making corrective actions.  Extensive experience in assisting companies in responding to regulatory agency inspection reports (e.g. FDA 483's, EMEA inspectional reports, etc.) to avoid regulatory actions, including Warning Letters. Assist companies in meeting Warning Letter or other regulatory commitments. Provide GMP training and updates on current FDA regulations.  Able to perform benchmarking on significant issues compared with other pharmaceutical companies. Also served as an Expert Witness for pharmaceutical company in lengthy lawsuit regarding product quality and recall.  Suit resulted in settlement in January 2020 after 9 years of litigation, in large part due to extensive knowledge and experience in the pharmaceutical industry, particularly demonstrated in testimony during the deposition process. Past pharmaceutical company clients have included: Abbott, Hospira, Pfizer, Wyeth, Amgen, Genentech, GE Healthcare, Enzon, Diosynth, Reckitt Benckiser, Pfizer, Becton Dickinson, BMS, Astra Zeneca plus numerous companies outside of the U.S.

**9/10 – 10/11  Vice President Compliance, Pharmaceutical Sector,** Janssen Supply Group (Johnson & Johnson), Horsham, PA

Served as Vice President of Compliance for the pharmaceutical sector of J&J, which encompasses 30 Janssen Pharmaceutical/Centocor and R&D manufacturing sites and 70 global marketing companies.  Provided guidance and developed strategy on GMP compliance issues for group of 21 auditors and compliance professionals.  Created and implemented escalation process for notification and decision making in recalls or other significant quality issues used by all sites worldwide.  Responsible for executing and reporting on all U.S. pharmaceutical product recalls.  Responsible for establishing compliance and inspection readiness plan for all Janssen manufacturing sites.  Interacted with FDA / CDER personnel on key compliance issues.

**2/07 – 8/07  Senior Director GMP Compliance,** Genentech, Inc., South San Francisco, CA

Responsible for managing GMP audit program of internal sites and external contract manufacturers, laboratories, distribution centers and clinical depots. Managed a department that included 25 personnel who performed approximately 180 Drug/Device/Computer System GMP audits/year.  Have high degree of expertise in addressing compliance questions and GMP issues involving bulk biotech manufacturing, aseptic filling, small molecule API's, tablets, laboratories, computer systems and warehouse/distribution centers. Responsible for maintaining and communicating surveillance information on changing FDA expectations, guidelines, Warning Letters, etc. as well as seeking out and sharing benchmarking information with other pharma companies. Completed reorganization of department and simplification or re-design of TrackWise audit database and reports.  Provided compliance metrics (compliance status) to senior management for all internal and external sites on a quarterly basis, as well as kept management abreast of critical audit findings and other compliance concerns.  Developed and delivered compliance updates and GMP training to company's senior management 2-5 times/year.

**1/06 – 2/07  Director, GCP/GLP Corporate Compliance,** Genentech, Inc., South San Francisco, CA

Served as Acting Director over GCP/GLP Compliance auditing group which consisted of 10 auditors and 2 managers.  Responsible for interacting with operational and GCP/GLP QA groups in identifying, scheduling and performing GCP or GLP audits and reporting audit findings.  Largely responsible for stabilizing the audit group and enhancing communications with key customers (GCP/GLP QA, Clinical Operations, Development Sciences, Medical Safety, etc.). Hired 3 new auditors and created permanently staffed GLP Quality Assurance Unit (QAU).  Continued to assist GMP Compliance group, as needed.

**12/01 – 1/06**   <u>**Director, GMP Corporate Compliance**</u>, Genentech Inc., South San Francisco, CA

Responsible for managing the corporate internal and external audit program for Genentech, Inc.  Managed group of 10 auditors and two Associate Director who performed approximately 120 "system" audits of various operations and departments as well as external contractors, collaborators and partners. Provided awareness and input to Genentech senior management on significant compliance issues based on risk management.  Participated in development of Quality Manual by writing or providing comments on draft Quality Policies. Performed benchmarking activities by interacting with Compliance/QA representatives from many large US pharmaceutical and biotech manufacturers to assess Genentech practices vs. other companies in all manufacturing and QA areas.  Identified and assessed new risks from benchmarking activities and communicated risks and recommendations to Genentech senior management.

**5/01 – 12/01**   <u>**Director, Quality Assurance Worldwide Auditing,**</u> Merck & Company, Inc., Whitehouse Station, NJ

Responsible for managing corporate Quality audit program for 32 Merck sites worldwide.  Responsibilities include supervising and training 9 auditors to perform FDA/EMEA type of GMP audits at Merck manufacturing sites, licensees, contractors and suppliers (API's, excipients, raw materials and packaging/labeling components).   Scheduled, planned and reviewed all audit reports (approx. 200/yr.) and participated in most complex or high priority audits.  Served in FDA consulting role and as liaison in communications with Agency, performing FDA preparatory audits of Merck sites and worked with core group of individuals in responding to all 483.  Assisted in divisional quality policy development and GMP guidelines for Merck sites worldwide.

**11/99 – 5/01**   <u>**Manager, North American Compliance**</u>, Merck & Company, Inc., Whitehouse Station, NJ

Managed corporate audit program overseeing 6 North American sites (finished pharmaceutical and API) located in US and Canada.  Supervised and managed 4 auditors; reviewed and approved audit reports of Merck sites, suppliers and contractors; worked with Procurement in identifying, correcting or replacing non-compliant suppliers.  Responsible for identifying and scheduling all pre-approval audits (PAI) at Merck sites worldwide.  Served as Lead Auditor in numerous GMP and PAI audits; acted as in-house GMP consultant in preparing domestic and foreign API and finished dosage form sites for FDA inspections. Assisted Merck Senior Management in developing corporate Quality Policy and other, divisional quality policies and guidelines.  Worked with sites and other

senior managers in communicating with FDA regarding inspections.  Kept abreast of FDA changes and initiatives; developed QSIT audit program at Merck nine months before FDA QSIT announcement.  Worked with GMP Training Coordinator in identifying training needs and developing auditor training modules.

**2/99 – 11/99**   **Senior QA Project Analyst**, Merck & Company, Inc., Whitehouse Station, NJ.

Served as senior project analyst for corporate Quality Assurance department. Assisted in evaluating Merck manufacturing sites for compliance with FDA requirements and made appropriate recommendations for corrective action. Also, provided training on FDA inspections and expectations to various departments and sites.  Assisted in writing and developing divisional policies regarding quality issues.

**10/88 – 1/99**   **Consumer Safety Officer (Investigator),** United States Food and Drug Administration, Chicago, IL; Minneapolis, MN; Philadelphia, PA; Phoenix, AZ.

Performed inspections of pharmaceutical (sterile, solid dosage form and API bulk) and biological/biotechnology drug manufacturers. Inspected large sterile and non-sterile drug manufacturers, both domestic and international including Merck, Abbott, Searle, Smith Kline Beecham, Ciba-Geigy (Novartis), Bayer, Baxter, Rhone-Poulenc, Steris, etc., which resulted in product recalls, Warning Letters or other significant regulatory actions.  Lead Investigator and Compliance Officer for FDA's largest drug seizure and subsequent consent decree. Performed domestic and international NDA/ANDA pre-approval inspections, some of which resulted in recommendation for non-approval.  Also inspected vaccine manufacturers, bioequivalency test facilities, contract research organizations (CRO's), non-clinical laboratories, clinical investigators and institutional review boards.  Knowledgeable in food and drug related regulations and served as Drug Team Compliance Officer, writing Warning Letters and recommendations for Seizure, Injunction, and AIP actions.  Made presentations and conducted training workshops at local and national industry meetings including annual conventions of ASM and AAPS.  Received numerous awards, national recognition, and Commissioner's Commendations for excellence in inspectional and compliance achievements.  Testified in front of U.S. Congressional Sub-Committee on inspections of two generic companies as part of the Generic Drug Scandal in 1989 and 1990.

**Supervisory Investigator** - Served as supervisor of eight inspectors and three investigators in the Chicago district office, seven investigators and two inspectors in Minneapolis.  Endorsed and recommended legal actions on GMP and NDA/ANDA pre-approval inspections performed by investigators, including

Seizure and Warning Letter recommendations for drug, device, and food manufacturers. Was responsible for import operations at district offices, O'Hare Airport resident post, and more than 50 border ports on Canadian border. Worked closely with other Federal agencies including U.S. Customs, F.B.I., Offices of U.S. Attorney, and U.S.D.A. Additionally, responsible for Consumer Complaint investigations and product recalls. Also performed international inspections of pharmaceutical manufacturers of bulk (API), sterile, and solid dosage forms.

11/78 - 10/88  Clinical and Supervisory Microbiologist in 4 research/clinical hospital settings.

**EDUCATION**

1973 - 1975  University of Wisconsin - LaCrosse
Major:  Biology

1976 - 1977  University of Wisconsin - Madison
Degree:                   Bachelor of Arts
Major:  Medical Microbiology

**PROFESSIONAL ASSOCIATIONS AND CERTIFICATION**

Member of:  American Society for Microbiology (ASM) - 1983
American Society of Medical Technology (ASMT) - 1984
American Society of Clinical Pathologists (ASCP)
Specialty in Microbiology Certification  (SM)ASCP #1611, (M)ASCP #1623
Parenteral Drug Association (PDA) – 2001-2015

# Attachment B

July 2020

# M. LAURENTIUS MARAIS

**332 South Michigan Avenue**
**Chicago, IL 60604**

**tel** ▮▮▮▮▮▮▮▮

**www.compasslexecon.com**

## EDUCATION:

| | |
|---|---|
| Ph.D. | Stanford University (Business Administration, Mathematics), 1985 |
| M.S. | Stanford University (Statistics), 1983 |
| M.S. | Stanford University (Mathematics), 1976 |
| B.Sc. | Stellenbosch University (Mathematics, Applied Mathematics, Computer Science), 1973 |

## EMPLOYMENT:

| | |
|---|---|
| 2019 to date | Compass Lexecon, Executive Vice President |
| 1993–2019 | William E. Wecker Associates, Vice President and Principal Consultant |
| 1994–1998 | Stanford University School of Law, Consulting Professor |
| 1992–1993 | William E. Wecker Associates, Senior Consultant |
| 1982–1991 | University of Chicago Graduate School of Business, Instructor, later Assistant and Associate Professor |

## ACTIVITIES:

Editorial Board, Journal of Accounting Research, 1987-1992

Refereed for:  The Accounting Review
Contemporary Accounting Research
Journal of Accounting and Economics
Journal of Accounting Research
Journal of Business and Economic Statistics
Journal of Financial Research
Journal of Money, Credit and Banking

Member of:  American Accounting Association
American Economic Association
American Statistical Association
Royal Statistical Society
Mathematical Association of America
Society for Industrial and Applied Mathematics

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

<u>PUBLICATIONS and WORKING PAPERS:</u>

"The experimental design of classification models: an application of recursive partitioning and bootstrapping to commercial bank loan classifications," (with James M. Patell and Mark A. Wolfson), <u>Journal of Accounting Research</u>, 1984.

"An application of the bootstrap method to the distribution of squared, standardized market model prediction errors," <u>Journal of Accounting Research</u>, 1984.

"An analysis of a multivariate regression model in the context of a regulatory event study by computer intensive resampling," Working Paper, Institute of Professional Accounting, University of Chicago, July 1986.

"A note on the algebraic and statistical properties of the multivariate market model," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On drawing inferences about market reactions to the regulation of accounting for oil and gas exploration: An application of computer intensive resampling methods," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On detecting abnormal returns to a portfolio of nonsynchronously traded securities," Working Paper, Institute of Professional Accounting, University of Chicago, October 1986.

"Reduced demands on recovery room resources with Diprivan compared to thiopental-isoflurane," (with Michael W. Maher et al.), <u>Anesthesiology Review</u>, January/February 1989.

"Wealth effects of going private for senior securities," (with Katherine Schipper and Abbie J. Smith), <u>Journal of Financial Economics</u>, 1989.

"Consequences of going-private buyouts for public debt and preferred stock: 1974 to 1985," (with Katherine Schipper and Abbie J. Smith), in <u>Proceedings of the 25th Annual Conference on Bank Structure and Competition: Banking System Risk - Charting a New Course</u>, Federal Reserve Bank of Chicago, 1989.

"Discussion of 'Post-earnings-announcement drift: Delayed price response or risk premium?'," <u>Journal of Accounting Research</u>, 1989.

"Using relative productivity assessments for allocating housestaff to departments," (with Michael W. Maher, Michael F. Roizen, et al.), <u>Medical Care</u>, 1990.

"An adaptable computer model of the economic effects of alternative anesthetic regimens in outpatient surgery," (abstract; with Michael W. Maher et al.), <u>Anesthesiology (Supplement)</u>, September 1990.

"On the finite sample performance of estimated generalized least squares in seemingly unrelated regressions: nonnormal disturbances and alternative standard error estimators," Working Paper, Institute of Professional Accounting, University of Chicago, January 1991.

2

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

"Exploiting tax attributes of spinoffs to structure takeovers and takeover-related defenses," (with Katherine Schipper), Working Paper, Institute of Professional Accounting, University of Chicago, August 1991.

"Technological innovation and firm decision-making: accounting, finance and strategy," (with Paul J. H. Schoemaker), Working Paper, Institute of Professional Accounting, University of Chicago, September 1991.

"Process-oriented activity-based costing," (with Michael W. Maher), Working Paper, Institute of Professional Accounting, University of Chicago, June 1992.

"A field study on the limitations of activity-based costing when resources are provided on a joint and indivisible basis" (with Michael W. Maher), Journal of Accounting Research, 1998.

"Correcting for omitted-variables and measurement-error bias in regression with an application to the effect of lead on IQ" (with William E. Wecker), Journal of the American Statistical Association, June 1998.

"Event study methods: detecting and measuring the security price effects of disclosures and interventions" (with Katherine Schipper), in Litigation Services Handbook: The Role of the Financial Expert, 2005 Cumulative Supplement, 3rd Ed., John Wiley & Sons.

"Estimating Cost Behavior" (with Michael W. Maher), in Handbook of Cost Management, 2005, 2nd Ed., John Wiley & Sons.

"Audit Committee Financial Literacy: A Work in Progress" (with Douglas J. Coates and Roman L. Weil), Journal of Accounting Auditing and Finance, March 2007.

"Statistical Estimation of Incremental Cost from Accounting Data" (with William E. Wecker and Roman L. Weil), in Litigation Services Handbook: The Role of the Financial Expert, 2017, 6th Ed., John Wiley & Sons.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

# Attachment C

## Harvard Medical School Curriculum Vitae

**Date Prepared:**   October 25, 2020

**Name:**   Aaron B. Waxman, M.D., Ph.D.

**Office Address:**   Pulmonary and Critical Care Medicine, Brigham and Women's Hospital, Boston, MA

**Home Address:**   673 Centre Street, Newton, MA 02458

**Work Phone:**   ███████

**Work Email:**   abwaxman@bwh.harvard.edu

**Work FAX:**   ███████

**Place of Birth:**   London, Ontario, Canada

### Education

| | | | |
|---|---|---|---|
| 1978 | BS | Zoology | The George Washington University, Washington, DC |
| 1987 | Ph.D. | Anatomy and Neuroscience | Albany Medical College, Albany, NY |
| 1992 | M.D. | Medicine | Yale University School of Medicine, New Haven, CT |

### Postdoctoral Training

| | | | |
|---|---|---|---|
| 1/92 – 9/92 | Intern | Internal Medicine | Yale New Haven Hospital |
| 9/92 – 6/94 | Resident | Internal Medicine | Yale New Haven Hospital |
| 7/94 – 6/97 | Fellow | Pulmonary and Critical Care Medicine | Yale University School of Medicine |
| 7/87 – 6/88 | Postdoctoral Associate | Neuroanatomy | Yale University School of Medicine |
| 6/88 – 12/90 | Postdoctoral Associate | Molecular Neurobiology | Howard Hughes Medical Institute and Yale University School of Medicine |

### Faculty Academic Appointments

| | | | |
|---|---|---|---|
| 1997 – 1998 | Instructor | Medicine | Yale University School of Medicine |
| 1998 – 2000 | Assistant Professor | Medicine | Yale University School of Medicine |
| 2000 – 2001 | Assistant Professor | Medicine | Tufts University School of Medicine |
| 2001 – 2011 | Assistant Professor | Medicine | Harvard Medical School, Boston, MA |
| 2011 - | Associate Professor | Medicine | Harvard Medical School, Boston, MA |

### Appointments at Hospitals/Affiliated Institutions

| | | | |
|---|---|---|---|
| 1993-1994 | Attending Physician | Emergency Room | West Haven VA Hospital |
| 1994-1995 | Attending Physician | Emergency Medicine | Bristol Hospital, Bristol CT |
| 1995-1997 | Attending Physician | Emergency Medicine | Yale New Haven Hospital |
| 1995-1999 | Attending Physician | Emergency Medicine | Hospital of Saint Raphael |
| 7/96-12/99 | Attending Physician | Pulmonary Critical Care | West Haven VA Hospital |
| 7/97-12/99 | Attending Physician | Pulmonary Critical Care | Yale New Haven Hospital |

| 1/00-12/01 | Attending Physician | Pulmonary Critical Care | Winchester Hospital |
| 1/00-12/01 | Attending Physician | Pulmonary Critical Care | New England Medical Center, Boston |
| 1/00-12/09 | Attending Physician | Emergency Medicine | Faulkner Hospital, Boston, MA |
| 1/02 – 11/09 | Attending Physician | Pulmonary Critical Care | Massachusetts General Hospital |
| 08/13– 07/16 | Attending Physician | Cardiology | Boston Children's Hospital |
| 11/09 - | Consulting Staff | Medical Oncology | Dana-Farber Cancer Institute |
| 11/09 - | Associate Physician | Pulmonary Critical Care | Brigham and Women's Hospital |
| 05/19 - | Attending Physician | Pulmonary Critical Care | Newton Wellesley Hospital |

**Major Administrative Leadership Positions**

**Local**

| 1998-1999 | Associate Medical Director, Medical Intensive Care Unit | Yale New Haven Hospital |
| 1999-2001 | Director of Bronchoscopy Services | Yale New Haven Hospital |
| 2001 | Medical Director of Respiratory Therapy | New England Medical Center |
| 2005-2009 | Director, Pulmonary Vascular Disease Program | Massachusetts General Hospital |
| 2009 - | Director, Pulmonary Vascular Disease Program | Brigham and Women's Hospital |
| 2011- | Director, Dyspnea and Performance Evaluation Center | Brigham and Women's Hospital |
| 2012-2015 | Associate Program Director, PCCM fellowship training program | Brigham and Women's Hospital and Harvard Medical School |
| 2013- | Executive Director, Center for Pulmonary Heart Diseases | Brigham and Women's Hospital Heart and Vascular Center |

**Committee Service**

**Local**

| 1983-1984 | Curriculum Committee | Albany Medical College. |
| | 1983-1984 | Member, Graduate Studies Program |
| 1993-1994 | Education Committee | Yale University School of Medicine, Department of Medicine |
| | 1993-1994 | Member |
| 1996-1999 | Fellowship Curriculum Committee | Yale University School of Medicine, Section of Pulmonary and Critical Care |
| | 1996-1999 | Chairperson |
| 1996-1999 | Fellowship Admissions Committee | Yale University School of Medicine, Section of Pulmonary and Critical Care |
| | 1996-1999 | Member |
| 1996-1999 | Bronchoscopy Quality Assurance Committee | Yale New Haven Hospital |
| | 1996-1999 | Chairperson |
| 2002-2003 | Fellowship Admissions Committee | Yale University School of Medicine |
| | | Member |
| 2004 | Task Force on Sepsis Management and Early Goal Directed Therapy, Critical Care Committee | Massachusetts General Hospital |
| | 2004 | Chairperson |

2

| 2004 | Task Force on the Use of Albumin in Resuscitation in Shock, Critical Care Committee | Massachusetts General Hospital |
| | 2004 | Chairperson |
| 2004-2009 | Optimum Care Committee | Massachusetts General Hospital |
| | 2004-2009 | Member |
| 2007-2009 | Clinical Research Council, | Massachusetts General Hospital |
| | 2007-2009 | Member |
| 2014 | Acute Pulmonary Embolism Program | Director of Steering Committee, Brigham and Women's Hospital |

**National and International**

| 2003-2011 | Partnership for Excellence in Critical Care | One of the founding members with a leadership role in a number of quality improvement initiatives |
| 2008-2010 | Biomarkers in Pulmonary Vascular Disease | Chair of Planning Committee for International Meeting |
| 2012, 2013, 2014 | International Right Heart Failure Summit Annual Meeting | Co-Chair of organizational committee developing an international expert forum focused on pathophysiologic and clinical issues focused on right heart failure from multiple pathways. |
| 2013-2016 | International Right Heart Failure Foundation | Founding member and Chair of the Scientific Steering Committee |
| 2013 | Pulmonary Vascular Research Institute - joint Symposium of the Excellence Cluster Cardiopulmonary System (ECCPS) and Pulmonary Vascular Research Institute (PVRI) in Bad Nauheim, Germany | Member of the scientific committee responsible for meeting organization and content. |
| 2014 | Pulmonary Vascular Research Institute – 8th World Congress | Director of Scientific Affairs and head of committee responsible for meeting organization and content. |
| 2017 | Pulmonary Vascular Research Institute – Grants Advisory Committee | Formulation, administration, review, and distribution of research funds as part of the PVRI and Dinosaur Trust, UK |
| 2018 | Pulmonary Hypertension Association | Pulmonary Hypertension Care Centers (PHCC) Review Committee |
| 2020 | Pulmonary Vascular Research Institute | Global Health Working Group |

**Professional Societies**

| | | |
|---|---|---|
| 1983-1992 | American Association of Anatomists | |
| 1996- | Society for Critical Care Medicine | |
| 1996- | American College of Physicians | |
| 2013 | | Fellow |
| 1996- | American College of Chest Physicians | |
| 1998- | | Fellow |
| 2006-2007 | | Member, Chest Journal CME Task Force |
| 1996- | American Thoracic Society | |
| | ATS Pulmonary Circulation Assembly Program Committee for 2012. | Program committee to plan the Pulmonary Circulation Assembly's sessions for the 2013 International Conference, May 17-24 in Philadelphia, PA.  Review abstracts submitted to the Assembly and help program acceptable abstracts into the appropriate format |
| 2004- | Pulmonary Hypertension Association | |
| 2004- | | Member, Clinicians and Researchers |
| 2008-2010 | | Scientific Leadership Council, Scientific Sessions Committee. Committee responsible for planning structure and content of sessions at 2010 PHA International Conference |
| | 2011-2012 | Scientific Leadership Council, Scientific Sessions Committee. Committee responsible for planning structure and content of sessions at 2012 PHA International Conference |
| 2006-2008 | Pulmonary Arterial Hypertension Education Initiative | |
| | 2006-2008 | Member, Educational Council |
| 2008 | European Respiratory Society | Member |
| 2008-2014 | Wilderness Medical Society | Member |
| 2009 | Pulmonary Vascular Research Institute | Fellow |
| 2013 | Pulmonary Vascular Research Institute | Chair, Right Heart Failure Task Force |
| 2013 | Pulmonary Vascular Research Institute | Chair, Exercise Task Force |
| 2014-2015 | Pulmonary Vascular Research Institute | Director, Scientific Affairs – Organize the annual international meeting, oversee all educational activities of the institute |
| 2017 | Pulmonary Vascular Research Institute | Organized the first PVRI Symposium on PAH for the Cuban Society of Cardiology and the Hospital Hermanos Ameijeiras |

**Editorial Activities**

**Ad Hoc Reviewer**

New England Journal of Medicine, Brain, Pediatric Research, Journal of Intensive Care Medicine, American Journal of Medicine, American Journal of Physiology: Lung Cellular and Molecular Physiology, Chest, American Journal of Respiratory Cell and Molecular Biology, Cytokine, Journal of Experimental Medicine, Respiratory Medicine, American Heart Journal, Circulation, Thrombosis and Hemostasis, Circulation Heart Failure, Circulation: Imaging, Journal of Heart and Lung Transplantation, Circulation Research, Pulmonary Circulation, American Journal of Respiratory and Critical Care Medicine, Journal of the American College of Cardiology, European Respiratory Journal, Journal of the American Medical Association, Annals of Internal Medicine

**Other Editorial Roles**

| 2010 | Editorial Board | Pulmonary Circulation |
| 2012 | Editorial Board | The Journal of Heart and Lung Transplantation |

**Honors and Prizes**

| 1982-1987 | Trustee Scholarship | Albany Medical College | Academic |
| 1985, 1986 | Dean's Award and Prize for Leadership | Albany Medical College | Leadership |
| 1985, 1986 | Dean's Award and Prize for Excellence in Teaching | Albany Medical College | Teaching |
| 1987 | Alumni Association Medal and Prize | Albany Medical College | Research and Teaching |
| 1987 | Sigma Xi | Sigma Xi Research Society | Excellence in scientific investigation |
| 1997 | Young Investigator's Awards | American College of Chest Physicians | Excellence in scientific investigation |
| 1999 | Merck Respiratory Young Investigator | Merck and Company, Inc | Excellence in scientific investigation |
| 1999 | Fellowship Teaching Award, Pulmonary Critical Care Fellowship | Yale University School of Medicine | Excellence in Teaching and Mentorship |
| 2001 | Oliver Smith Award | Tufts Medical Center | Recognition for outstanding patient care |
| 2002 | Pulmonary Critical Care Fellows Award for Teaching and Mentorship | Tufts Medical Center | Excellence in Teaching and Mentorship |
| 2011 | Susan & Katherine McArthur-Radovsky Award | Brigham and Women's Hospital | Research and Clinical |
| 2014 | Partners in Excellence Award | Brigham and Women's Hospital | Development of Right Heart Failure Team |
| 2014 | Excellence in Mentoring Award | Harvard Medical School | Nominee |

**Report of Funded and Unfunded Projects**

**Funding Information**

5

**Past**

| | |
|---|---|
| 1997-1999 | IL-11 protection from hyperoxic lung injury |
| | Parker B. Francis Fellowship Award |
| | Role: Principle Investigator |
| | Goals: Characterize the protective effects of IL-11 pretreatment in the setting of hyperoxic injury. Characterize the mechanism(s) of IL-11-induced protection in the setting of hyperoxic injury. |
| 1998-2004 | Mechanisms of IL-11 protection from hyperoxic lung injury |
| | Mentored Clinical Scientist Research Award (KO8 HL03888-01) |
| | Role: Principle Investigator |
| | Goals: Compare the expression of apoptosis regulators in IL-11 transgene (+) and littermate control mice before and after exposure to 100% oxygen.  Establish an *in vitro* system that can be used to define the mechanism of hyperoxia- (oxidant) induced apoptosis and the protective effects of IL-11. |
| 1999-2001 | Mechanisms of IL-11 protection from hyperoxic lung injury |
| | American Lung Association Research Grant |
| | Role: Principle Investigator |
| | Goals: Define the kinetics and the specific cell populations that undergo apoptosis in hyperoxic lung injury.  Define the alterations in apoptosis regulatory processes and, characterize the alterations in regulators of apoptosis induced by IL-11 and determine their role in mediating IL-11-induced protection in lung injury. |
| 2004-2009 | Interleukin-11 and Interleukin-6 protection from oxidant mediated lung injury |
| | NIH RO1 Research Grant RO1 HL074859 |
| | Role: Principle Investigator |
| | Goals: Characterize the signal transduction pathways that mediate IL-11 and IL-6 induced protection from oxidant stress *in vitro* and examine the relationship to upregulation of mediators of cell death. Evaluate the contribution(s) of Bcl 2 family proteins to protection of pulmonary epithelial and microvascular endothelial cells in vitro. Evaluate the contribution(s) of Bcl 2 family proteins to protection in vivo. |
| 2006-2009 | MGH Pulmonary Vascular Development Fund |
| | Internal award for research on pathogenesis of pulmonary hypertension |
| | Role: Principle Investigator |
| | Evaluation of the role of inflammatory mediators in pulmonary vascular remodeling in a mouse model of pulmonary hypertension |
| 2007-2009 | A study to quantify the number of circulating endothelial cells in patients with severe sepsis. |
| | Sponsor: Eli Lilly and Company - Investigator Initiated Grant |
| | Role: Principle Investigator |
| | Goals: Quantify and characterize abnormal circulating populations of endothelial cells in patients with severe sepsis and septic shock as a mechanism for multi organ failure syndrome |
| 2007-2011 | Open-label Study to Evaluate the Safety and Efficacy of PRX-08066 in Patients with Pulmonary Hypertension and Chronic Obstructive Pulmonary Disease. |
| | Sponsor: EPIX Pharmaceuticals - Investigator Initiated Study |
| | Role: Principle Investigator |
| 2007-2011 | A randomized, double blind, placebo-controlled study of oral UT-15C SR in Subjects with Pulmonary Arterial Hypertension |
| | Sponsor: United Therapeutics, Protocol No. TDE-PH-201 |

6

Role: Principle Investigator

2008-2012   A Phase 2, Randomized, Double-blind, Placebo-controlled, Multicenter, Dose-ranging study of Cicletanine in Subjects with Pulmonary Arterial Hypertension
Sponsor Gilead Sciences  (Chair of Steering Committee)
Role: Principle Investigator and Steering Committee Chairman
Goals: Assess the efficacy and safety of a novel eNOS coupler, Cicletanine, in patients with pulmonary arterial hypertension.

2011-2013   Brigham and Women's Hospital Clinical Innovations Grant, Development of a Multidisciplinary Dyspnea/Exercise Intolerance Center
Role: Principle Investigator and Director
Goals: Establish of a comprehensive center to evaluate patients with resting or exertional dyspnea, bringing together a core group of clinical experts to collaboratively develop a streamlined efficient and effective approach to assessing and treating the patient with dyspnea.

2005-2012   REVEAL Registry
Sponsor: Actelion, Protocol No. RIV PH-408
Role: Site Principle Investigator
Goals: Development of a 5000 patient database of patients with PAH in order to better define the natural history of the disease.

2013-2016   Study to assess the fate, safety, and efficacy of allogeneic mesenchymal stromal cells in a large animal model of precapillary pulmonary hypertension and right ventricular dysfunction
United Therapeutics, Investigator Initiated Grant
Role: Principle Investigator
Goals: preclinical and clinical study to assess the safety and efficacy of allogeneic mesenchymal stromal cells infused into the right coronary artery in a large animal model of pulmonary hypertension and in patients with PAH and right ventricular dysfunction.

2012-2016   Heme Oxygenase – 1/Carbon Monoxide in Lung Vascular Injury
Role: Site Principle Investigator
NHLBI: R01HL06023412A1
Goals: My role is specific to Aim 3 and includes an assessment of the efficacy of carbon monoxide in ameliorating pulmonary vascular remodeling via inhibition of inflammasome

2014-2016   PCORI Clinical Data Research Network (CDRN) - Scalable Collaborative Infrastructure for Learning Healthcare System, PCORNet Rare Diseases Task Force, Harvard University Representative
Goals: 29 clinical research data networks that together will form an ambitious new resource known as PCORnet, the National Patient-Centered Clinical Research Network. PCORnet served as a large, highly representative, national network for conducting clinical outcomes research.

2008-2016   An open label uncontrolled study of the safety and efficacy of ambrisentan in patients with exercise induced pulmonary arterial hypertension.
Gilead Science, Investigator Initiated Grant
Role: Principle Investigator
Goals: 6-month study to evaluate the effects of Ambrisentan (selective ETRA) administered orally on exercise capacity utilizing invasive cardiopulmonary exercise testing in patients with either exercise induced pulmonary arterial hypertension or diastolic dysfunction.

2013-2016   Targeting metabolism to reverse RV dysfunction in PAH

The Cardiovascular Medical Research and Education Fund
Role: Co-Principle Investigator (Co-Principle Investigator with Dr. Yuchi Han at University of Pennsylvania)
Goals: Multicenter study with colleagues at the University of Pennsylvania and the University of Maryland. This proposal will identify: (A) Key molecular and metabolic regulatory pathways that may be targeted for recovery of RV function in patients with PAH; and (B) Specific imaging, plasma, and metabolic markers to better guide prognosis and therapy of the RV dysfunction in PAH.

2016-2019   Molecular imaging of angiogenic activity in pulmonary arterial hypertension
1R01HL131910-01 (Yu)
Role: Consultant
Goals: Molecular imaging of angiogenic activity in pulmonary arterial hypertension

**Current**

2014-2020   United Therapeutics- Investigator Initiated Grant
A double-blinded, placebo-controlled, crossover study to assess efficacy of oral treprostinil titrated to highest tolerable dose in 20 patients with symptomatic primary or secondary Raynaud's phenomenon resistant to vasodilatory therapy
Role: PI

2014-2019   Integrated Endothelial Phenotyping to Redefine Pulmonary Hypertension.
NHLBI U01 HL125215-01
Role: Co-Principle Investigator (with Dr. Jane Leopold)
Goals: performing patient phenotyping, which will lead to novel sub classifications of patients with pulmonary vascular-right ventricular disease, based on molecular and radiographic as well as clinical characteristics, which can be associated with specific molecular mechanisms of pathogenesis.

2019-2020   Biomarkers of for early diagnosis of PAH
Actelion and Janssen Research & Development-Investigator Initiated Grant
Role: Principle Investigator
Goals: Micro-RNA Diagnostic Biomarker Profiling Study Using Banked Clinical Samples
This microRNA (miRNA) biomarker profiling study will apply a proprietary qPCR-based miRNA assay technology developed by MiRXES to assay a total of 600 miRNA biomarkers using banked clinical samples in patients with PAH in the hopes of a diagnostic biomarker.

2019-2020   Gossamer Biopharm – Investigator Initiated Grant
Role: Principle Investigator
Assessment of Inspiratory Flow Rate and Pattern in Patients with Pulmonary Arterial Hypertension
Goals: Generate data from patients with pulmonary arterial hypertension (PAH) in order to model dry powder inhalation and distribution into the airways to aid in selecting the appropriate flow resistance of the DPI for patients with pulmonary hypertension

| | | |
|---|---|---|
| 2017-2021 | United Therapeutics Corp – INCREASE Clinical Trial<br>Role: Principle Investigator<br>A Multicenter, Randomized, Double-Blinded, Placebo Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease | |
| 2017-2021 | United Therapeutics Corp – PERFECT Clinical Trial<br>Role: Principle Investigator<br>A Phase 3, Randomized, Placebo-controlled, Double-blind, Adaptive Study to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Patients with Pulmonary Hypertension due to Chronic Obstructive Pulmonary Disease (PH-COPD) | |
| 2020-2022 | Aria CV – ASPIRE PH Clinical Trial Protocol: ASPIREPH202001<br>Role: Principle Investigator<br>An Early Feasibility Study Assessing Treatment of Pulmonary Arterial Hypertension Using the Aria CV Pulmonary Hypertension System (ASPIRE PH) | |

**Current Unfunded Projects**

| | | |
|---|---|---|
| 2007- | Principle Investigator<br>Patient registry and biological database<br>Ongoing collection of patient samples obtained during right heart catheterization and invasive CPET from the pulmonary artery and radial artery at rest, peak exercise, and one-hour post exercise | |

**Report of Local Teaching and Training**

**Teaching of Students in Courses**

*Yale University School of Medicine*

| | | |
|---|---|---|
| 1995-1997 | Yale Physician Associate Program, Introduction to Clinical Medicine for Pulmonary Section<br>1st year students. | Lecturer, Course Coordinator<br><br>6 hours |
| 1996-1999 | Introduction to Clinical medicine for Pulmonary Medicine Section<br>2nd year medical students | Lecturer<br><br>4 1-hour lectures over a 2 mos period |
| 1997-1999 | Introduction to Clinical Medicine Course<br>2nd year medical students | Preclinical Tutor<br>4-hrs/wk for 16-wks |
| 1998-1999 | Introduction to Clinical Medicine Course, Cellular and Molecular Basis of Acute Lung Injury<br>2nd year medical students | Lecturer<br><br>1-hour lecture |

*Harvard Medical School*

| | | |
|---|---|---|
| 2003-2012 | Introduction to Clinical Medicine Course, Human Systems, Respiratory/Cardiovascular Sections<br>2nd year medical students | Preclinical Tutor<br><br>2-hrs/day 3-days/wk for 8 wks |
| 2004-2008 | Respiratory Infections, Human Systems, Respiratory/Cardiovascular Sections<br>2nd year medical students | Lecturer<br><br>1-hr per year |

**Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs)**

| | | |
|---|---|---|
| 1997-1999 | Acute Care Lecture Series, | Lecturer - Yale New Haven Hospital |
| | Internal Medicine Residency Program, Critical Care Summer Lecture Series | 2 1-hour lectures |
| 2000-2008 | Critical Care Lecture Series | Lecturer – MGH |
| | Internal Medicine Residency Program | 2 hours per month |
| 2003-2008 | Airway Workshop, airway management course; Pulmonary Critical Care Training Program | Course Director and Lecturer - HMS |
| | Presented annually to incoming first year fellows in the Harvard Combined Program | 1-full day |
| 2003-2008 | Introduction to Bronchoscopy Course, Indication, Contraindication and Consent | Lecturer - HMS |
| | Presented annually to incoming first year fellows throughout New England | 1-full day |
| 2004-2009 | Pulmonary Vascular Physiology Clinical Training Includes training and supervision of fellows | Preceptor - HMS 3-hours every week |
| 2005-2009 | Cardiopulmonary Physiology Lecture Series | Lecturer and Organizer – HMS training program |
| | Pulmonary Critical Care fellowship trainees | 1-hour every week |

**Clinical Supervisory and Training Responsibilities**

*Yale University School of Medicine*

| | | |
|---|---|---|
| 1996-1997 | Service Attending in the Medical Intensive Care Unit and Pulmonary Consultation Service, West Haven Veterans Hospital, Yale University Internal Medicine Training Program (1 Fellow, 1 Resident, 1 Student) | One month |
| 1996-1997 | Service Attending in the Medical Intensive Care Unit and Pulmonary Consultation Service, West Haven Veterans Hospital, Yale University Internal Medicine Training Program (1 Fellow, 1 Resident, 1 Student) | One month |
| 1996-1999 | Attending Physician, Pulmonary Consultation Service, West Haven Veterans' Administration Hospital | One month |
| 1996-1999 | Service Attending in the Medical Intensive Care Unit, Yale New Haven Hospital, Yale University Internal Medicine Training Program (1 Fellow, 3 Residents, 3 Interns, 2 Students) | Three months each year |
| 1997-1999 | Pulmonary Consultations Service Attending, Yale New Haven Hospital, Yale University Pulmonary Fellowship Training Program (1-2 Fellows, 1-2 Residents, 1-2 Students) | 2 weeks each year |
| 1997-1999 | Attending Physician, Medical Intensive Care Unit, YNHH | 3 months each year |

10

| 1997-1999 | Attending Physician, Pulmonary Consultation Service, YNHH | 2 months each year |

### New England Medical Center

| 2000 – 2001 | Pulmonary Service Attending, Tufts University Internal Medicine Training Program (1 Fellow, 1 Resident, 2 Interns, and 1-2 Students) | Four weeks each year for 2 years |
| 2000-2001 | Service Attending in the Medical Intensive Care Unit, New England Medical Center, Tufts University Internal Medicine Training Program (1 Fellow, 5 Residents, 3 interns, and 1-2 Students) | Three months each year for two years |
| 2000-2001 | Attending Physician, Medical Intensive Care Unit, NEMC | 2 months |

### Winchester Hospital

| 2000-2001 | Attending Physician Medical Intensive Care Unit, Winchester Hospital | 2 months per year |

### Harvard Medical School

| 2002-2009 | Pulmonary Consult Attending, Massachusetts General Hospital, Harvard Medical School Pulmonary Critical Care Training Program (2 Fellows, 1-2 Residents, and 1-2 Students) | Two weeks each year |
| 2002-2009 | Critical Care Attending, Medical Intensive Care Unit, Massachusetts General Hospital, Harvard Medical School Internal Medicine and Pulmonary Critical Care Training Program (1 Fellow, 3 Residents, 3 interns, and 1-2 Students) | Three months each year |
| 2003-2009 | Pulmonary Clinic, Clinical Preceptor, Internal Medicine Residency Program (1st, 2nd and 3rd year medical residents) | 2 and a half days per week |
| 2009- | Pulmonary Vascular Disease and Critical Care Attending, Brigham and Women's Hospital, Harvard Medical School Anesthesiology, Ob-Gyn, Surgery, Internal Medicine, and Pulmonary Critical Care Training Programs (1 Fellow, 4 Residents, 1 interns) | Two months each year |

## Laboratory and Other Research Supervisory and Training Responsibilities

### Massachusetts General Hospital

| 2001- 2010 | Principle Investigator Pulmonary Research Laboratory | 15% effort |

## Formally Supervised Trainees

| 1997-1998 | Jonathan Corne, MBBS, Yale School of Medicine. Current position: Senior Consultant, Queens University Medical Center Nottingham, England, Funded by the Medical |

Research Council of the United Kingdom, Research Advisor, 2 years. *IL-13 stimulates vascular endothelial cell growth factor and protects against hyperoxic lung injury.*

1996-1999    Nicholas Ward, M.D., Yale School of Medicine. Current position: Associate Professor, Brown University School of Medicine. Research Advisor, 2 years. *Evaluation of IL-6 induced protection in hyperoxic acute lung injury using an overexpression transgenic model*

2001-2002    Hubert Chen, M.D.,MPH,. Research Advisor, 1 year. *Potential Cost-Effectiveness of Epoprostenol as First-line Therapy for Pulmonary Arterial Hypertension.* Current position: Medical Director at Genentech

2003-2005    Po-Shun Lee, M.D., Current position in industry. Research Advisor, 2 years, *Plasma Gelsolin is a Critical Pro-Survival Factor in Sepsis; Evaluation of the role of cytoskeletal components and cellular debris in the initiation of the systemic inflammatory response.* Second Prize 2005 New England Respiratory Research Competition Award, Research Advisor, Current position Translational Medicine Expert at Novartis Institutes for BioMedical Research

2003-2007    George Barker, M.D., Ph.D. Current position, Clinical faculty Harvard Medical School, Mount Auburn Hospital, Primary Mentor, Research Advisor, 3 years. *DNA Damage in Hyperoxic Lung Injury.* Recipient of the GSK Mentored Pulmonary Research Fellowship 2004-2005, First Prize 2005 New England Respiratory Research Competition Award.

2005-2008    James Tolle, M.D., Current position, Assistant Professor, Vanderbilt University School of Medicine, Research Advisor, 3- years. *Abnormal Systemic Oxygen Extraction in Pulmonary Hypertension During Incremental Exercise.*

2006-2008    M. Kathryn E. Steiner, M.D., Current position, Staff Pulmonologist, New England Baptist Hospital, Primary Mentor, Research Advisor, 2-years. *Role of IL-6 in the Pathogenesis of Pulmonary Hypertension.*

2005- 2010    Narasiah Kolliputi, Ph.D., Current position, Associate Professor, University of South Florida, Primary Mentor, 5-years. *Role of IL-6 in protection from cell death.* Recipient of an AHA research award in lung injury, FASEB Young Investigator Award, and successfully RO1 funded

2013    Bart Boerrigter, M.D., Ph.D., Current Position, Clinical fellowship in pulmonary medicine, VU University Medical Center, Amsterdam. Research mentor as part of pre-doctoral research, *Pulmonary hemodynamics and exercise in chronic obstructive pulmonary disease.*

2012-2014    Mario Santos, M.D., Ph.D., Current position, Department of Physiology and Cardiothoracic Surgery, Cardiovascular R&D Unit, Faculty of Medicine, University of Porto, Portugal, Research mentor, Study of the physiologic limits to aerobic capacity in heart failure with preserved ejection fraction, and pulmonary hypertension.

2014-2015    Manyoo Agarwal, MBBS, Research Fellowship in pulmonary vascular disease and exercise physiology. Research Mentor as part of postdoctoral research fellowship, *Treatment of Group-3 PH with pulmonary vasodilator therapy.* Current position, Fellow in Cardiology, Department of Internal Medicine, University of California, Los Angeles

12

2014-2015     Rudolph Oliveira, M.D., Research Fellowship in pulmonary vascular disease and exercise physiology. Research Mentor as part of postdoctoral research fellowship, *Hemodynamic and physiologic characteristics of patients with connective tissue disease related lung disease.,* Current position – Associate Professor, Department of Respiratory Medicine, Federal University of São Paulo

2014-2015     Wei Huang, M.D., Ph.D, Research Fellowship and Clinical Observership funded by the State Hospital In Chongqing China. Research and Clinical mentor, *Outcomes of patients with EPAH and HFpEF.* Current position – Cardiology Faculty at Chongqing Medical University in Chongqing China

2014-2016     Roza Badreslam, M.D., Erin-Schrodinger-Fellowship, Austrian Science Fund. Research Mentor, post-doctoral research fellowship, *Right ventricular remodeling and mitochondrial function.* Current position – Cardiology Faculty Medical University of Vienna, Vienna Austria

2014-2017     Tamara Roldan Sevilla, Pre-Doctoral Student, Universidad Autónoma De Madrid Facultad De Medicina, Departamento De Medicina, Doctoral Thesis: *Safety Evaluation of Oral Anticoagulation in Pulmonary Arterial Hypertension: Observational Study of Patients Followed in Two Pulmonary Hypertension Referral Centers in Spain and United States.*

2016-2018     Inderjit Singh, M.D., Pulmonary Vascular Disease Fellowship, 2 years, Primary Mentor, *Evaluation of RV-PA coupling during exercise in patients with pulmonary hypertension.* Current position – Assistant Professor, Internal Medicine, Pulmonary Critical Care Medicine, Yale University School of Medicine

2017- 2018    Andrew Schissler, M.D., Primary Mentor, Research Mentor, 2 years, *Evaluation of outcomes in patients with submassive pulmonary embolism.* Current Position – Staff Pulmonary Critical Care, Suburban Hospital, Bethesda, MD

2015-2020     Farbod N Rahaghi M.D., Ph.D., Research Mentor, *Computed Tomographic Insights into Pulmonary Hypertension.,* Funded by NIH NHLBI K23 HL136905, Instructor in Medicine, Pulmonary Critical Care Medicine, Brigham and Women's Hospital, Boston, MA

2015-2020     Marianna Faria Urbina, M.D., Research Fellowship in pulmonary vascular disease and exercise physiology. Primary Research Mentor, *Physiologic assessment of precapillary pulmonary hypertension in the setting of hypoxic lung disease.* Current position - Research Staff, Vertex Pharmaceuticals

2018-2020     Jason Sanders, M.D., Ph.D, Research Mentor, *Metabolomic signatures of precapillary pulmonary hypertension*

2018-2020     Nicole Ruopp, M.D., Primary Mentor, Primary Research Mentor, *Assessment of pulmonary vasoreactivity.* Current position - Instructor in Medicine, Tufts Medical Center

2019-present  Eileen Harder, M.D., Primary Mentor, Primary Research Mentor, *Assessment of pulmonary vasoreactivity*

## Formal Teaching of Peers (e.g., CME and other continuing education courses)

No presentations below were sponsored by outside entities

| 2002 | Bioterrorism Preparedness and Response | Single presentation |
| | Harvard Medical School, Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2002 | Bioterrorism Preparedness and Response. Harvard University Wide Health Policy Program Core Seminar Series, Public Health Section, Kennedy School of Government, Harvard University | Cambridge MA |
| 2002 | 73-year-old woman with Pneumonia and Respiratory Failure. Clinical Pathologic Conference of the Massachusetts General Hospital and Harvard Medical School | Boston, MA |
| 2003 | Severe Sepsis and Septic Shock: New Options for Treatment. Anesthesia Critical Care Grand Rounds, Beth Israel Deaconess Medical Center and Harvard Medical School | Boston, MA |
| 2003 | Pulmonary Arterial Hypertension, Evaluation and Management. Medical Grand Rounds, Massachusetts General Hospital | Boston, MA |
| 2003, 2004 | Fluid Resuscitation in Septic Shock | Single presentation |
| | Harvard Medical School, Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2003, 2004 | Severe Sepsis: New Options in the Treatment of Sepsis | Single presentation |
| | Harvard Medical School, Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2003, 2004 | Pulmonary Arterial Hypertension | Single presentation |
| | Harvard Medical School, Continuing Medical Education, Internal Medicine Postgraduate Review Course, MGH | Cambridge, MA |
| 2004 | Acute Respiratory Distress Syndrome | Single presentation |
| | Harvard Medical School Continuing Medical Education, Intensive Review of Internal Medicine, Postgraduate Review Course, Brigham and Women's Hospital | Boston, MA |
| 2004, 2006, 2007, | Fluid Resuscitation in Vasodilatory Shock; Crystalloids versus Colloids | |
| | Harvard Medical School Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2005, 2006, 2007, 2008 | Pulmonary Arterial Hypertension: Evaluation and Management | |
| | Harvard Medical School Continuing Medical Education: <br> • Internal Medicine Postgraduate Review Course (2005) <br> • Pulmonary Critical Care Postgraduate Course (2008), MGH | Cambridge, MA |
| 2006 | Update on Therapy in Pulmonary Arterial Hypertension | Single presentation |
| | Harvard Medical School Continuing Medical Education, Advanced Heart and Lung Disease, MGH | Cambridge, MA |
| 2007 | Inflammation and Pulmonary Vascular Remodeling. Harvard Medical School Combined Pulmonary Critical Care Grand Rounds | Boston MA |

| 2007 | Evaluation and Management of Pulmonary Arterial Hypertension for the General Internist | Single presentation |
| | Harvard Medical School Continuing Medical Education, Internal Medicine Postgraduate Review Course, MGH | Cambridge, MA |
| 2007 | Simply Speaking - Post Conference Update: American Thoracic Society | |
| | Pulmonary Arterial Hypertension Educator's CME Lecture Series (Unrestricted Industry Grants) | Boston, MA |
| 2007 | Evolving Management of ARDS; Less is Definitely Better. Pediatric Pulmonary Conference, Massachusetts General Hospital | Boston, MA |
| 2008, 2009 | Fluid Resuscitation in Shock; Crystalloids and Colloids, is there any difference? | Single presentation |
| | Harvard Medical School Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2009 | Pulmonary Arterial Hypertension: Chronic and Acute and Management | Single presentation |
| | Harvard Medical School Continuing Medical Education, Pulmonary Critical Care Postgraduate Course, MGH | Cambridge, MA |
| 2009 | Pulmonary Arterial Hypertension; A Systemic Disease. Rheumatology Grand Rounds, Massachusetts General Hospital | Boston, MA |
| 2009 | Systemic Issues in PHT: The View from the Rest of the Body. Congenital Heart Disease-Associated Pulmonary Hypertension: A Two Day "Master Class", Children's Hospital | Boston, MA |
| 2010 | Pulmonary Arterial Hypertension – Management in the Acute Setting. Anesthesia Critical Care Grand Rounds, Brigham and Women's Hospital | Boston, MA |
| 2010 | Pulmonary Arterial Hypertension – A Systemic Inflammatory Disease. Cardiovascular Medicine Grand Rounds, Brigham and Women's Hospital | Boston, MA |
| 2010 | Making the Diagnosis of Pulmonary Arterial Hypertension, It Still Takes too Long, Brigham and Women's Hospital | Boston, MA |
| 2011 | New Therapies: Targeting The Right Ventricle in PAH. Pulmonary Grand Rounds, Brigham and Women's Hospital, Boston, MA | |
| 2012 | Pulmonary Hypertension; Controversy in Diagnosis and management. Medical Grand Rounds, Faulkner Hospital, Boston, MA | |
| 2013 | CTEPH – Diagnostic Approaches and Therapeutic Options. Combined Cardiac Surgery and Thoracic Surgery Clinical Conference, Brigham and Women's Hospital | |
| 2013 | Idiopathic Pulmonary Arterial Hypertension; Clinical Presentation, Diagnosis, Therapy, and Prognosis. Harvard Medical School Continuing Medical Education, Biannual Cardiovascular Medicine Review Course | |
| 2015 | Chronic Thromboembolic Pulmonary Hypertension, Biannual Thrombosis and Thromboembolism Course, Harvard Medical School Continuing Medical Education Brigham and Women's Hospital, Boston, MA | |

| 2016 | Clinical Case of the Month; 61 year old woman with dyspnea on exertion., Medical Grand Rounds, Brigham and Women's Hospital, Boston, MA |
| 2016 | Recent advances in Pulmonary Arterial Hypertension; Translating preclinical studies into clinical practice., Medical Grand Rounds, Brigham and Women's Hospital, Boston, MA |
| 2016 | Novel Therapeutic Approaches to the Treatment of Pulmonary Hypertension., Advances in the Practice of Pulmonary and Critical Care Medicine, Harvard Medical School and the Brigham and Women's Hospital, Boston MA |
| 2016 | Updates in Pathophysiology, Genetics, and Medical Management of Idiopathic Pulmonary Hypertension, Brigham and Women's Hospital / Mayo Clinic course: Cardiovascular Medicine Updates 2016: Updates for Practitioners, Harvard Medical School, Boston MA |
| 2017 | Pulmonary Arterial Hypertension; Clinical Presentation, Diagnosis, and Emerging Therapies., Harvard Medical School Continuing Medical Education, Biannual Cardiovascular Medicine Review Course, Boston, MA |
| 2017 | Novel Therapeutic Approaches to the Treatment of  Pulmonary Hypertension., Second Annual Advances in the Practice of Pulmonary and Critical Care Medicine, Harvard Medical School and the Brigham and Women's Hospital, Boston MA |
| 2018 | What is new in Pulmonary Arterial Hypertension., Innovations and New Practices in Internal Medicine 2018, Harvard Medical School and the Brigham and Women's Hospital, Boston MA |
| 2019 | Pulmonary Arterial Hypertension: Combination Pharmacological Therapy—Rationale and Results., Harvard Medical School Continuing Medical Education, Biannual Cardiovascular Medicine Review Course, Boston, MA |
| 2019 | Novel Therapeutic Approaches to the Treatment of Pulmonary Hypertension., Innovations and New Practices in Internal Medicine 2019, Harvard Medical School and the Brigham and Women's Hospital, Boston MA |

## Local Invited Presentations

No presentations below were sponsored by outside entities

| 1997 | The Pulmonary Artery Catheter; A Technology Assessment. Yale University School of Medicine, Connecticut State Chest Conference, New Haven, CT |
| 1997 | The Pulmonary Artery Catheter Under Fire; Do The Data Support It's Continued Use In The ICU Medical Grand Rounds, Greenwich Hospital, Greenwich, CT |
| 1997 | Critical Care Update on Mechanical Ventilation. Yale University School of Medicine, Connecticut State Chest Conference, New Haven, CT |
| 1999 | Protection from oxidant induced lung injury: Modulation of cell death pathways The John B. Pierce Laboratory, Center for Research in Health and the Environment and Yale University School of Medicine, New Haven, CT |
| 1999 | Patient with acute onset of dyspnea. Medical Grand Rounds, Yale New Haven Hospital and Yale School of Medicine, New Haven, CT |

1999     Management of Shock with an emphasis on septic shock.  Yale University School of Medicine, Connecticut State Chest Conference, New Haven, CT

2001     A patient with rapidly progressive dyspnea and hemodynamic collapse –Medical Grand Rounds, New England Medical Center, Boston, MA

2001     27-Week Pregnant Patient with Massive Pulmonary Embolism – Critical Care Management. Yale University School of Medicine, Pulmonary Critical Care Fellowship Clinical Conference, New Haven, CT

2004     Chronic Obstructive Pulmonary Disease, Update on Evaluation and Management
Harvard Vanguard Medical Associates, Continuing Medical Education Series, Boston, MA

2004     Pulmonary Arterial Hypertension, Evaluation and Management in the 21st Century. Massachusetts Society for Respiratory Care (MSRC) Twenty-Seventh Annual Meeting, Springfield, MA

2004     Diagnosis and Management of Pulmonary Arterial Hypertension: ACCP Evidence-Based Clinical Practice Guidelines. What are they? Should we use them? 2nd Annual Update in Pulmonary Hypertension, Boston, MA

2007     Inflammatory Mediators and the Pathogenesis of Pulmonary Arterial Hypertension, a New Paradigm. 5th Annual Update in Pulmonary Hypertension, Boston, MA

2008     Pulmonary Arterial Hypertension. Massachusetts General Hospital, The Norman Knight Nursing Center for Clinical and Professional Development, Pulmonary Hypertension Education Day, Boston, MA

2008     Pathway Directed Therapy, A Look Towards The Future – 6th Annual Update in Pulmonary Hypertension, Boston MA

2009     Pulmonary Arterial Hypertension, A Systemic – Inflammatory Disease. The Warren Alpert Medical School of Brown University, Division of Pulmonary, Sleep and Critical Care Medicine, Rhode Island Hospital, Providence, RI

2010     Cancer Chemotherapies: Role in PAH? 7th Annual Update in Pulmonary Hypertension Boston, MA

2011     Non-Group-1 Pulmonary Hypertension, Evaluation and Management. Combined Pulmonary and Cardiology Conference, Mount Auburn Hospital, Cambridge, MA

2011     Unexplained shortness of breath; A systematic approach to evaluation in women vs. men. Women's Health CME Course, Brigham and Women's / Massachusetts General Hospital and Harvard Medical School, Foxborough, MA

2011     PAH, Clinical Presentation, Diagnosis, and Therapy. Combined Cardiology and Pulmonary Grand Rounds, South Shore Hospital, Weymouth MA

2011     Pulmonary Hypertension, Definition, Presentation, Diagnosis, and Therapy. Combined Cardiology and Pulmonary Grand Rounds, Leonard Morse – Metro West Medical Center, Natick MA

2012     Cellular Respiration: Advances in Therapeutic Targeting in PH. Pulmonary Research Seminar, Tufts University School of Medicine, Tufts Medical Center, Pulmonary Critical Care Division, Boston, MA

2013     Unexplained Dyspnea; A Systematic Approach to Evaluation. Medical Grand Rounds, Melrose Wakefield Hospital, Melrose, MA

2014    Pulmonary Arterial Hypertension: Diagnostic Approach and Treatment. Spaulding Rehabilitation Hospital, Cambridge MA

2014    Improving Outcomes in Pulmonary Heart Disease: Diagnostic Approach and Treatment. Medical Grand Rounds, Beth Israel Deaconess Medical Center - Needham, Needham, MA

2014    Practical Management of PAH: A Case-Based Approach. Prima Care Medical, Pulmonary Medicine, Fall River, MA

2014    Improving Outcomes in Pulmonary Heart Disease; Diagnostic Approach and Treatment. Medical Grand Rounds, Good Samaritan Hospital, Brockton, MA

2014    Non-Group-1 Pulmonary Hypertension, Ignored but not Forgotten. Medical Grand Rounds, Saint Elizabeth's Medical Center, Boston, MA

2014    Improving Outcomes in Pulmonary Vascular Disease; Sometimes it is a Zebra. Medical Grand Rounds, Lowell General Hospital, Lowell, MA

2014    Prostaglandin Pathway – New Drugs and Approaches. 12th Annual Update in Pulmonary Hypertension, Boston, MA

2016    Unexplained Dyspnea; Diagnosis based on physiology., Harvard University Health Services, Grand Rounds, Cambridge, MA

2017    Explaining unexplained exertional dyspnea., Medical Grand Rounds, Metrowest Medical Center, Natick, MA

2019    Explaining Unexplained Dyspnea: Dynamic assessment of cardiopulmonary and metabolic function during invasive exercise testing., Medical Grand Rounds, Newton Wellesley Hospital, Newton MA

## **Report of Regional, National and International Invited Teaching and Presentations**

### **Invited Presentations and Courses**

#### **Regional**

No presentations below were sponsored by outside entities

1997    Interleukin-11 Protection from Hyperoxic Lung Injury - Connecticut Thoracic Society, 1997 Connecticut Lung Research Conference, Meriden, CT

2001    Update on Therapy for Pulmonary Hypertension - Yale University School of Medicine, Connecticut State Chest Conference, New Haven, CT

2002    Therapy for Pulmonary Artery Hypertension in the 21st Century –Medical Grand Rounds The North Shore Medical Center, Salem Hospital, Salem, MA

2002    National Asthma Education and Prevention Program, Update on Asthma Therapy – Medical Grand Rounds, Caritas Norwood Hospital, Norwood, MA

2003    Spirometry and Asthma – Lung Update Series, American Lung Association of Greater Norfolk County Norwood, MA

2003    Community Acquired Pneumonia: Epidemiology, Diagnosis, and Management – Medical Grand Rounds, Caritas Saint Anne's Hospital, Fall River, MA

2003    Community Acquired Pneumonia: Diagnosis and Management – Medical Grand Rounds New England Sinai Hospital and Rehabilitation Center, Stoughton, MA

| 2004 | Chronic Obstructive Pulmonary Disease, Evaluation, Management, and Treatment – Medical Grand Rounds, Veterans Administration Hospital, Togus, ME |
|---|---|
| 2006 | Management of ARDS: Less May Be Better – Medical Grand Rounds, Newton-Wellesley Hospital, Newton, MA |
| 2008 | Pulmonary Hypertension, Controversies in Management – Medical Grand Rounds, Newton-Wellesley Hospital, Newton, MA |
| 2008 | Treatment of Pulmonary Hypertension: Approach to the Patient Who Worsens on Therapy – 3rd Annual Update on Pulmonary Hypertension, Brown University School of Medicine, Rhode Island Hospital, Providence, RI |
| 2009 | Pulmonary Arterial Hypertension; A Systemic Disease – 12th Annual Yale Pulmonary Critical Care Alumni Lecture, New Haven CT |
| 2009 | Pulmonary Arterial Hypertension, Update on Evaluation and Management – Medical Grand Rounds, Hospital of Saint Raphael's, Yale School of Medicine, New Haven, CT |
| 2010 | Pulmonary Arterial Hypertension: Management Of PAH In The Acute Setting – What Do You Do When The Patient Is Decompensating – Pulmonary Critical Care Fellows Conference, Division of Pulmonary Critical Care Medicine, Yale University School of Medicine |
| 2010 | Pulmonary Arterial Hypertension, A Systemic - Inflammatory Disease – Connecticut State Chest Conference Yale University School of Medicine |
| 2012 | Improving Outcomes in Pulmonary Hypertension; Diagnostic Approaches and Therapeutic Options. Medical Grand Rounds, Memorial Hospital, Pawtucket, RI |
| 2013 | Innovation in Targeting Pulmonary Heart Disease. Connecticut State Chest Conference, Yale University School of Medicine, New Haven, CT – Visiting Professor Spring 2013 |
| 2013 | Inflammation – Playing a Central Role in Pulmonary Heart Disease. Pulmonary Critical Care Research Conference, Yale University School of Medicine, New Haven, CT – Visiting Professor Spring 2013 |
| 2013 | Improving Outcomes in Pulmonary Hypertension; Diagnosis and Treatment. Medical Grand Rounds, Berkshire Medical Center, Pittsfield, MA |
| 2014 | Improving Outcomes in Pulmonary Heart Disease: Diagnostic Approach and Treatment. St. Vincent's Hospital, Worcester, MA |
| 2014 | Making Therapy Decisions in Individual PAH Patients: Balancing Efficacy, Safety and Tolerability. Cardiology Seminar, Hartford Cardiology Associates, New Haven, CT |
| 2014 | Improving Outcomes in Pulmonary Heart Disease: A Pathophysiologic Approach. Medical Grand Rounds, University of Massachusetts, Worcester, MA |
| 2014 | Long-term Management of Patients with PAH. Adult Medicine Noon Conference, Community Health Services, Hartford, CT |
| 2016 | Exercise Induced Pulmonary Hypertension; Is it a real disease? Cardiology Grand Rounds, Yale University School of Medicine, New Haven, CT |
| 2016 | Chronic Thromboembolic Disease and Chronic Thromboembolic Pulmonary Hypertension., Medical Grand Rounds, Department of Internal Medicine, Hartford Hospital, Hartford CT |
| 2016 | Chronic Thromboembolic Pulmonary Hypertension – Evaluation and Management., Heart and Vascular Center Grand Rounds, Dartmouth Medical Center, Hitchcock NH |

2017    Pulmonary Arterial Hypertension; Clinical Presentation, Diagnosis, and Emerging Therapies., Medical Grand Rounds, Gaylord Hospital, Wallingford CT

2018    Explaining unexplained exertional dyspnea: Application of the full Fick Principle., 29th Annual Samuel Frumkin Lecture, Medical Grand Rounds, Norwalk Hospital, Norwalk CT

2018    In the age of combination therapy: How do we know we are headed in the right direction? 12th Annual Yale Pulmonary Hypertension Symposium, Yale University School of Medicine, New Haven, CT

2019    Treprostinil Administered Using a Fully Implantable Programmable Intravascular Delivery System, 13th Annual Yale Pulmonary Hypertension Symposium, Yale University School of Medicine, New Haven, CT

2019    Exercise Pulmonary Hypertension., 13th Annual Yale Pulmonary Hypertension Symposium, Yale University School of Medicine, New Haven, CT

**National**

No presentations below were sponsored by outside entities

1998    Modulation of acute lung injury in transgenic mice.

New York Academy of Sciences and The Inflammation Research Association, Joint Meeting on Cytokines and Chemokines in Pulmonary Disease, New York, NY

1998    Targeted lung expression of interleukin-11 enhances murine tolerance of 100% oxygen and diminishes hyperoxia-induced DNA fragmentation.

Thomas L. Petty Aspen Lung Conference, 41st Annual Meeting, Aspen CO

2001    IL-6 type cytokines protect from hyperoxic acute lung injury.

University of Rochester School of Medicine Lung Biology Research Program, Rochester, NY

2001    Workup and Management of Pulmonary Hypertension – City Wide Pulmonary Grand Rounds, University of Rochester School of Medicine, Rochester, NY - City Wide Pulmonary Grand Rounds

2005    Cytokines and Organ Injury; Rethinking Old Concepts – Pulmonary Critical Care Training Program, Critical Care Grand Rounds, Denver Health Medical Center, University of Colorado, Denver, CO

2006    Assessing the Evidence: Clinical Applications of Therapeutic Interventions in the Treatment of PAH - American College of Chest Physicians, Chest 2006, October 23, 2006 Satellite Symposium on Pulmonary Arterial Hypertension in 2006: Treating to Goal

2007    Pulmonary Arterial Hypertension: Current Controversies in Management – Combined Pulmonary, Cardiology, and Rheumatology Grand Rounds, Dekalb Hospital, Atlanta GA

2007    Pulmonary Arterial Hypertension: Current Controversies in Management – Medical Grand Rounds, Northside Hospital, Atlanta GA

2007    Inflammation and Pulmonary Vascular Remodeling - Cleveland Clinic Pulmonary Hypertension Summit 2007, Translating Discoveries into Patient Care, Cleveland, OH

2008    Treatment Decisions in the Complex Patient with PAH – Cardiology Grand Rounds, Carolinas Medical Center, Carolinas Heart Institute, Charlotte, NC

2008    Pulmonary Arterial Hypertension: Management in the Acute Setting – Critical Care Medicine for the Hospitalist, Society of Hospital Medicine One Day University Baltimore, MD

2010    Diagnosis to Treatment: Facing the Challenges of Pulmonary Arterial Hypertension. Clinical Case Challenge. http://cmecorner.articulate-online.com/p/6103578089/DocumentViewRouter.ashx?Cust=61035&DocumentID=8f33d44d-07d5-4e9b-ae3c-6d53133c9688&Popped=True&InitialPage=quiz.html

2011    PAH: Clinical Presentation, Evaluation, and Treatment, an Update for 2011. Internal Medicine Grand Rounds, Northside Hospital, Atlanta GA

2011    Exercise Induced Pulmonary Arterial Hypertension; Does it exist and what does it mean? Baltimore Right Heart Failure Summit, University of Maryland School of Medicine, Baltimore, MD

2011    The Right Ventricle as Victim of Heart Failure Preserved Ejection Fraction. Heart Failure Society of America, Boston, MA

2012    Cellular Respiration: Targeting Metabolism in PH. Pulmonary Critical Care Grand Rounds, University of Pittsburgh Medical Center, Pittsburgh PA.

2013    Pulmonary Hypertension; Diagnosis and Treatment. Combined Pulmonary and Cardiology Rounds. Northside Hospital Pulmonary Hypertension Conference, Atlanta GA

2013    Improving Outcomes in Pulmonary Hypertension; Diagnostic Approach's & Treatment. Medical Grand Rounds, Lankenau Medical Center, Jefferson Medical College, Philadelphia PA

2013    Form Follows Function: Understanding the Structural Basis on Pulmonary Arterial Hypertension. Heart Failure Society of America Annual Meeting, Orlando FL

2013    Regenerative Medicine: Are Opportunities Growing? Pulmonary Hypertension Association Pulmonary Hypertension Professional Network Symposium, Arlington VA

2014    Unexplained shortness of breath; A systematic approach to evaluation, Pulmonary Grand Rounds, Stanford University School of Medicine, Palo Alto, CA

2015    Explaining unexplained dyspnea. Pulmonary Critical Care Grand Rounds, Division of Pulmonary Critical Care Medicine, University of North Carolina School of Medicine, Chapel Hill, NC

2015    Exercise Induced Pulmonary arterial hypertension; What is it? And what do we do about it? 7th North Carolina Research Triangle Pulmonary Hypertension Symposium, Joint Symposium sponsored by Duke University and University of North Carolina Schools of Medicine, Durham, NC

2016    Exercise in the Diagnosis of Patients without/maybe with/with Pulmonary Hypertension. The Alfred P. Fishman Symposium: Exercise in the Diagnosis, Assessment and Treatment of Pulmonary Hypertension. University of Pennsylvania School of Medicine, Philadelphia PA.

2016    How should we standardize proteomic approach for phenotyping? Proteomic & Genomic Deep Phenotyping in Pulmonary Arterial Hypertension, Stanford University, Palo Alto, CA

| | |
|---|---|
| 2016 | Invasive-CPET: Dynamic Assessment of Cardiovascular, Respiratory, and Metabolic Function During Exercise, Cardiopulmonary Exercise Testing Course September 2016, American College of Chest Physicians Global Headquarters, Glenview, IL |
| 2016 | CTEPH: predicting who is at risk and how to follow patients after a PE., Venous Thromboembolism Symposium, The Difficult Questions Re-Visited 2016 A Global Perspective., Lankenau Medical Center, Philadelphia PA |
| 2017 | Invasive Exercise Testing; The full Fick equation., Cardiopulmonary Exercise Testing Course September 2017, American College of Chest Physicians Global Headquarters, Glenview, IL |
| 2018 | Invasive cardiopulmonary exercise testing to predict outcomes in heart failure preserved ejection fraction. University of Utah Cardiac Recovery Symposium, University of Utah School of Medicine, Salt Lake City, UT |
| 2018 | Treprostinil Administered Using a Fully Implantable Programmable Intravascular Delivery System. Intermountain Medical Center, Murray UT |
| 2018 | Unexplained exertional intolerance: Dynamic assessment of cardiopulmonary and metabolic function during invasive exercise testing., Lung Force Expo, Loma Linda University School of Medicine, and The American Lung Association, Loma Linda, CA |
| 2018 | Totally Implantable Subcutaneous Devices for Continuous Prostanoid Delivery., University of California, San Francisco's 11th International Conference, Neonatal & Childhood Pulmonary Vascular Disease, San Francisco, CA |
| 2018 | Invasive Cardiopulmonary Exercise Testing; The full Fick equation., Cardiopulmonary Exercise Testing Course September 2018, American College of Chest Physicians Global Headquarters, Glenview, IL |
| 2019 | Exercise Pulmonary Hypertension; An entity worthy of treatment., University of Arizona College of Medicine and Banner Health Care, Visiting Professor, Medical Grand Rounds. Phoenix, AZ |
| 2019 | Explaining unexplained exertional intolerance; Application of the full Fick Principle., University of Arizona College of Medicine and Banner Health Care, Visiting Professor, Combined Pulmonary Critical Care and Cardiovascular Medicine Conference, Phoenix, AZ |
| 2019 | The role of exercise hemodynamics in the diagnosis and treatment of pulmonary hypertension. Advances In Pulmonary Hypertension 2019, Bluhm Cardiovascular Institute, Northwestern University Feinberg School of Medicine, Chicago, IL |
| 2019 | Using Cardiopulmonary Exercise Testing in PH Evaluation and Management, Pulmonary Hypertension Professional Network Annual Symposium, Washington, DC |

**International**

Those presentations below sponsored by outside entities are so noted and the sponsor is identified.

| | |
|---|---|
| 1998 | Etiology and Treatment of Acute Lung Injury: From Bench to Bedside – IL-6 type cytokine protection from lung injury. NATO Advanced Study Institute, Corfu, Greece |
| 1999 | IL-6 type cytokine protection in hyperoxic lung injury – Symposium on Basic and Clinical Aspects of Apoptosis in the Lung, American Thoracic Society, International Conference, San Diego, CA |

2000    Current Management of Pulmonary Hypertension American Thoracic Society, International Conference, Toronto, Ont

2003    Transgenic Investigations of Apoptosis in Acute Lung Injury – Symposium on Mechanisms of Apoptosis During Acute Lung Injury, American Thoracic Society, International Conference, Seattle, WA

2008    Diagnosis and Evaluation of Pulmonary Arterial Hypertension: What Do We Really Need to Know? – Chairperson and Organizer, American Thoracic Society Toronto, Ontario Evening Postgraduate Seminar. Seminar focuses on diagnostic tools used to evaluate pulmonary arterial hypertension (PAH) in clinical practice and in clinical trials.

2009    Inflammation in Pulmonary Hypertension and Pulmonary Vascular Remodeling – Session Chair, American Thoracic Society International Conference, San Diego, California

2009    Practical Solutions to Modern Clinical Dilemmas: PAH Case Studies. The Case of a Patient With Poor Functional Class and Prognosis. Symposium on Prostacyclins in Treatment of PAH. European Respiratory Society, International Conference, Vienna Austria (United Therapeutics)

2010    Inflammation And Bone Marrow Derived Cells In Pulmonary Arterial Hypertension Session Chair, American Thoracic Society International Conference, New Orleans, LA

2010    IL-6 and Pulmonary Arterial Hypertension.  The 11th International Workshop on Scleroderma Research, Boston, Massachusetts

2011    IL-6 in PAH; Downstream targets for therapy. Pulmonary Vascular Research Institute Workshop and Debates, Panama City, Panama

2011    New Therapies: Advances in Targeting, The Right Ventricle as a Therapeutic Target in PAH. Symposium on Pulmonary Hypertension: new targets, new goals, and new therapies. European Respiratory Society, International Conference, Amsterdam, Netherlands (Bayer Healthcare)

2012    Survival data and results of most relevant clinical trials. Teach in Seminar: Basics of Pulmonary Hypertension: Classification, Definitions, and Management, Pulmonary Vascular Research Institute International Conference, Cape Town South Africa

2012    Be it resolved. The most important target of therapy in advanced WHO category 1 Pulmonary Hypertension is the right ventricle. Right ventricular pathobiology in pulmonary vascular disease. Pulmonary Vascular Research Institute International Conference, Cape Town South Africa

2012    Targeting Mitochondria and Metabolism in Pulmonary Hypertension and Right Heart Failure. Chinese Heart Congress 2012, Beijing, China

2012    Any news from the right ventricle? Innovative therapy for the RV. 5th Annual Central European Pulmonary Hypertension Conference, Salzburg, Austria

2013    The Role of Inflammation in PAH – Possible Inflammatory Pathways Causing PAH. Pulmonary Vascular Research Institute International Conference, Istanbul, Turkey

2013    Exercise training and rehabilitation in patients with PH, safe and effective. Pulmonary Vascular Research Institute International Conference, Istanbul, Turkey

2013    Inflammation – Playing a Central Role In Pulmonary Arterial Hypertension. Invited speaker for the Annual Meeting of the International Society of Heart Lung Transplantation, Montreal Quebec, Canada

2013    The Roll of Inflammation in Pulmonary Arterial Hypertension. Pulmonary Hypertension from Bench to Bedside, Post Graduate Course, American Thoracic Society International Conference, Philadelphia, PA

23

2013    Right Ventricular Metabolic Shift And Ischemia In Pulmonary Arterial Hypertension. Session Chair, American Thoracic Society International Conference, Philadelphia, PA

2013    Initiating the right prostanoid, in the right patient at the right time. Symposium on Changing the parenteral paradigm – Keeping prostanoids front and centre in PAH management thinking. European Respiratory Society, International Conference, Barcelona, Spain (United Therapeutics)

2014    Chronic Altitude Sickness. Pulmonary Vascular Research Institute International Conference, Bad Nauheim, Germany

2014    Prostacyclin Therapy for PAH; Choosing the right prostanoid at the right time in the right person. Chinese Medical Doctors Association, Cardiovascular Section, Guangzhou, China (Lee's Pharmaceuticals)

2014    Prostacyclin Therapy for PAH; Choosing the right prostanoid at the right time in the right person. Chinese Medical Doctors Association and the Fuwai Cardiovascular Hospital, Beijing, China (Lee's Pharmaceuticals)

2014    Combination Treatment for PAH: What is the evidence telling us so far? Right Heart Failure Summit and American Heart Association joint meeting, Chicago IL

2016    Assessing heart function in patients with early to advanced pulmonary vascular disease. PH Global Science Forum 2016, Berlin Germany (Bayer Pharmaceutical)

2016    Abnormal Transpulmonary Metabolite Flux In Exercise Induced Pulmonary Arterial Vasculopathy., American Thoracic Society International Conference, San Francisco, CA

2016    Pulmonary Arterial Hypertension; Clinical Presentation, Diagnosis, and Approach to Therapy., Department of Cardiology, Chongqing Medical University, Chongqing China

2016    Recent advances in Pulmonary Arterial Hypertension; Translating preclinical studies into clinical practice., Long March Cardiovascular Conference, Fuwai Hospital, Beijing China

2016    Clinical Trials for Exercise Pulmonary Hypertension Are Warranted, 3rd International Drug Discovery & Development Symposium, PVRI/FDA/NIH Bethesda MD

2016    Unexplained Exertional Intolerance; A systematic approach to diagnosis., Respiratory Medicine Conference, The Royal Brompton Hospital, London England

2017    Twenty Years of Therapy for PAH; Where are we now, and where are we headed., PAH Symposium La Sociedad Cubana De Cardiologia and Hospital Hermanos Ameijeiras, Havana Cuba

2017    Imaging the Right Ventricle During Exercise, Pulmonary Vascular Research Institute International Conference, Miami FL

2017    Is there a therapeutic opportunity for prostacyclins in patients with PH secondary to primary pulmonary disease? 12th John Vane Memorial Symposium on Prostacyclin Science and Pulmonary Vascular Disease, 17th and 18th March 2017 at the Royal Society London, United Kingdom

2017    Practical use of different methods of exercise testing in PH, including 6-minute walk test, cardiopulmonary exercise test, and treadmill exercise., Berlin Pulmonary Hypertension Symposium, Berlin Germany (Bayer and Merck Sharp and Dohme)

2018    Exercise Pulmonary Arterial Hypertension: To treat or not to treat., Chongqing Medical University Department of Cardiology, Pulmonary Hypertension Symposium, Chongqing China

24

2019   Pulmonary Hypertension – An Overview and Update., Visiting Professorship, Chongqing Medical University Grand Rounds, Chongqing China

2019   World Symposium on Pulmonary Hypertension 2019 - One step forward, one step back., 2019 Visiting Professor International Grand Rounds, FuWai Hospital & Key Laboratory of Pulmonary Vascular Medicine, Peking Union Medical College and Chinese Academy of Medical Sciences, Beijing China

2020   Optimized risk assessment, non - invasive imaging and CPET will substitute right heart catherization in PH, Pulmonary Vascular Research Institute, 14th World Congress, Lima Peru

2020   How to assess exercise hemodynamics in a patient with unexplained dyspnea., European Society of Cardiology, ESC Congress 2020, Amsterdam NL

2020   SPECTRA and Beyond: Signs of Disease Modification?, American Heart Association, Virtual Sessions

## Report of Clinical Activities and Innovations

### Current Licensure and Certification

| 1993 | Massachusetts State License (77804) |
| 1993 | National Board of Examiners, Diplomat |
| 1994 | Connecticut state License (inactive as of 2/2002) |
| 1995 | American Board of Internal Medicine, Diplomat (Recertified 2015) |
| 1997 | American Board of Internal Medicine, Diplomat in Pulmonary Disease (Recertified 2017) |
| 1998 | American Board of Internal Medicine, Diplomat in Critical Care (Recertified 2018) |
| 2009 | Utah State License (7318309-1205) |

### Practice Activities

| 2009 - | Ambulatory Care | Watkins Clinic, Brigham and Women's Hospital | 2 sessions/week |
| 2009 - 2016 | Ambulatory Care | Center for Chest Diseases, Brigham and Women's Hospital | ½ session/week |

### Clinical Innovations

1. **Bronchoscopy Credentialing Guidelines for YNHH (1998)**– developed clinical guidelines for credentialing for the practice of Bronchoscopy at Yale New Haven Hospital. Prior to this there were no prepared standards for the hospital. As part of this guideline I instituted maintenance of privileges standards and a record keeping system.
2. **Community Acquired Pneumonia Clinical Practice Guideline, YNHH (1999)** – As part of a hospital-working group, I helped develop guidelines for Yale New Haven Hospital for diagnosis and treatment of community acquired pneumonia.
3. **Pulmonary Vasodilator Clinical Practice Guideline YNHH (1999)** – Developed clinical practice guideline for acute pulmonary vasodilator testing. This was first developed at Yale New Haven Hospital. This was revised and implemented at MGH (2001) and continued now at the BWH (2010).
4. **Ventilator Weaning Protocol, T-NEMC (2001) –** Developed guidelines and instituted a protocol based approach to liberating patients from mechanical ventilation at Tufts-New England Medical Center MICU.
5. **Right heart catheterization and invasive cardiopulmonary exercise testing Clinical Practice Guideline, MGH (2004)** – Developed procedure guideline for all aspects of right heart

25

catheterization and acute pulmonary vasodilator testing. Also developed guidelines regarding placement of right heart catheters and radial arterial lines for invasive cardiopulmonary exercise testing. These guidelines have formed the basis for a new clinical exercise-testing program at the BWH (2010).

6. **Intravenous Prostacyclin Clinical Practice Guideline, MGH (2006)** – Developed clinical protocol for continuous delivery of intravenous prostacyclins for patients with pulmonary hypertension. This was initially developed for patients at the MGH. In November 2011 this was updated for use at the BWH and for new pump technologies.

7. **Exercise Training Clinical Practice Guideline, MGH (2006)** – Developed a guideline for starting exercise rehabilitation programs in patients with PAH. This was initially designed for our clinical practice. Through involvement in national committee's on practice guidelines for patients with PAH, we have contributed components of this guideline to the formulation of a national guideline. These guidelines have been updated recently based on data that we have generated in our exercise laboratory.

8. **Cicletanine for treatment of PAH (2006)** - Evaluated the use of a novel eNOS coupler for treatment of PAH as part of a compassionate use program. Compound was acquired by Gilead Sciences and has now entered Phase II clinical trial. Steering Cmt. Chairman, Study Sponsor: Gilead Sciences. The initial work on this project has been published, see research publication #20.

9. **Sepsis Management Clinical Practice Guideline, MGH (2007)** – Led a working group that developed practice guideline for management of severe sepsis and septic shock in the ICU at MGH. As part of this program I oversaw the development of a computer ordering admission template for template for patients admitted to the ICU with severe sepsis and septic shock.

10. **Mechanical Ventilation Clinical Practice Guideline (2008)** – Developed a best practice approach to liberating patients from mechanical ventilation. This was presented to a national working group and portions of our guidelines were adapted into a national multicenter guideline for determining readiness for liberation from mechanical ventilation. Work related to this effort was published, see research publication #19.

11. **Implantable Drug Delivery System of Treprostinil in PAH** (2009) - Proposed use of Medtronic Synchromed pump as part of a fully implantable IV drug delivery system. Steering committee member designing device trial supported by Medtronic's and United Therapeutics, see research publication #s 53, 60, and 82

12. **CTEPH Clinical Program, BWH (2011)**– Developing a systematic approach to the patient with chronic thromboembolic pulmonary hypertension in consideration for surgical or medical therapy. This program was developed as a multispecialty approach to the evaluation and treatment of patient with both surgical and medical thromboembolic disease.

13. **Dyspnea and Performance Evaluation Center (2011)** - successful clinical innovation grant to develop a clinical program for the efficient evaluation and diagnosis of patients with unexplained dyspnea. This was a collaborative program with participants from Pulmonary and Cardiovascular Medicine, Radiology, and Neurology. This included the establishment of a structured multilevel cardiopulmonary exercise evaluation program. Work related to this effort was published, see research publication #s 38, 43, 46, 48, 49, 52, 56, 57, 59, 61, 64, 68, 70, 73

14. **First in human percutaneous Potts Shunt as salvage therapy for PAH and right heart failure (2013)** – Working as a member of the RV Salvage group, a collaborative team of physicians from the Brigham and Women's Hospital and Boston Children's Hospital developed a percutaneous descending aorta-left main pulmonary artery conduit to unload the failing right ventricle. Work related to this effort has been published, see research publication #34

15. **Acute Pulmonary Embolism Program at BWH (2014)**. Program designed to improve triage and optimize timely management of patients presenting to the ED with Acute Pulmonary Embolism.

26

This is a multidisciplinary program and members of the Cardiovascular Division (Vascular Medicine, CCU, Interventional Cardiology), Pulmonary Vascular Medicine, Cardiac Surgery, and Cardiovascular Imaging are also involved.

16. **Center for Pulmonary Heart Disease (2014).** Executive Director and organizer of the first center of its kind in the country, the Center brings together BWH experts in both lung and cardiac disease to tackle pulmonary heart diseases from all possible angles. The center's clinical programs are closely tied to its translational research platform, bringing findings made in the laboratory to the clinic, and then back to the laboratory for further improvement.

17. **Advanced Fellowship in Pulmonary Heart Disease (2014)**. The program focuses on the evaluation and management of patients with diseases of the right heart system including pulmonary vascular disease, congenital heart disease, and end stage lung disease. The program provides trainees with several unique clinical opportunities that are not available in most centers across the country and provide more in depth and focused training than what is provided in general Pulmonary and Critical Care Medicine and Cardiovascular training programs.

18. **PHA-Accredited Pulmonary Hypertension Care Center (2015)**. BWH pulmonary vascular disease program, under my direction, was formally accredited by the Pulmonary Hypertension Association after undergoing a thorough evaluation based on quality and depth of resources available for the expert care of patients with pulmonary vascular disease.

19. **Yale New Haven-Brigham and Women's Joint Symposium on Pulmonary Heart Disease (2019).** First joint symposium held covering advanced topics in pulmonary hypertension, and right heart failure.

## Report of Education of Patients and Service to the Community

### Activities

| | |
|---|---|
| 2006 | Pulmonary Hypertension Association 6th International Conference |
| | Chaired patient education forum on prostacyclin's - Prostacyclin treatment options |
| 2006 | Developed educational pamphlet for patients who are undergoing right heart catheterization at the MGH. This is being adapted now for distribution at the BWH |
| 2008 | Pulmonary Hypertension Association 7th International Conference |
| | Discussant - Patient education forum on clinical lab testing as part of the care of patients with PAH - The ABC's of BNP (and Other PH Test Results) |
| 2009 | PHA 30-City Tour Medical Education Program |
| | Information on PAH diagnosis and management to physicians and other health professionals located in areas without nationally recognized PAH centers |
| 2009 | Pulmonary Hypertension Patient PHorum |
| | Patient education forums held around the United States and sponsored by the Pulmonary Hypertension Association |
| 2009 - | Volunteer Physician for Snowbird Ski Patrol / Wasatch Mountain Rescue |
| | Physician first responder on Ski patrol and backcountry rescue for Snowbird Utah and Wasatch Mountain Rescue – 10 shifts per season |
| 2009 - | Continuing education lecturer, Snowbird Ski Patrol and Wasatch Mountain Rescue |
| | Physician speaker for continuing education program, 4 lectures per year |
| 2010 | Pulmonary Hypertension Association 8th International Conference |
| | Discussant – Managing emergency situations for care givers and patients with PAH |
| 2012 | Pulmonary Hypertension Patient Support Group – Taking control of your pulmonary hypertension treatment – A question and answer session for patients and caregivers. Seabrook NH |

| | | | |
|---|---|---|---|
| 2015 | Established and organized a community outreach program for the Roxbury Tenants of Harvard Community with focus on improving health in heart and lung disease, and diabetes. This is an ongoing program that includes health screening and education. | | |
| 2016 | Pulmonary Hypertension Association 10th International Conference Panel Discussant – Living with a chronic disease | | |
| 2017 | Appointed to the Governors Pulmonary Hypertension Task Force, Massachusetts General Laws Chapter 6A, Section 16Z | | |
| 2017-2019 | Exercise and exercise testing. Teen Talent ID Camp, USA Cycling's National Development Program, Gill MA | | |

## **Educational Material for Patients and the Lay Community**
**Books, monographs, articles and presentations in other media**

| | | | |
|---|---|---|---|
| 2005 | Patient Care Manual | Massachusetts General Hospital | Patient care manual detailing guidelines on initiating treatment, side effect management, Hickman catheter care, and management of line infections |
| 2008 | Pulmonary Arterial Hypertension, Diagnostic Challenges and Selecting Optimal Therapy | MedScape CME | http://cme.medscape.com/viewprogram/17133 |
| 2012 | Shortness of breath, lung disease and pulmonary hypertension | Massachusetts Senior Action Council | Invited by the MSAC to present to the council and provide a question and answer period for members because of high prevalence of lung and vascular disease among seniors |
| 2016 | Chapter 7-More on PH Drugs | Patients Survival Guide – 5th Edition | Book developed for patients and care givers by the Pulmonary Hypertension Association, covers all aspects of living with the disease |

## **Recognition**

| | | |
|---|---|---|
| 2005-2020 | Best Doctors in America | Castle Connelly Medical, Ltd. |
| 2007-2009 | Best Doctors in Boston | Boston Magazine |
| 2016-2020 | Best Doctors in Boston | Boston Magazine |

## **Report of Scholarship**

## **Peer reviewed publications in print or other media**
**Research Investigations:**

1. Klemm WR, Sherry CJ, Sis RF, Schake LM and **Waxman AB**. (1984) Evidence of a role for the vomeronasal organ in social hierarchy in feedlot cattle. Applied Animal Behavior Science 1980; 12:53-62

2. Higgins D, **Waxman AB,** and Banker GA. The distribution of microtubule-associated protein 2 changes when dendritic growth is induced in rat sympathetic neurons in vitro. Neuroscience 1988; 241:583-92 PMID: 3362354

3. **Waxman AB,** Goldie SJ, Brett-Smith H, Matthay RA. Cytomegalovirus as a Primary Pulmonary Pathogen in AIDS. Chest 1997; 111:128-34 PMID: 8996006

4. **Waxman AB**, White K, Trawick DR. Electromechanical dissociation following verapamil and propranolol ingestion: a physiologic profile. Cardiology 1997; 8:478-82 PMID: 9286512

5. Goldie SJ, **Waxman AB**. Cytomegalovirus as a Pulmonary Pathogen. Chest 1997; 112:1151

6. **Waxman AB**, Einarsson O, Seres T, Knickelbein RG, Homer R, Warshaw JB, Johnston R, Elias, JA. Targeted lung expression of interleukin-11 enhances murine tolerance of 100% oxygen and diminishes hyperoxia-induced DNA fragmentation.  Journal of Clinical Investigation 1998; 101:1970-82 PMID: 9576762

7. **Waxman AB\***, Ward N\*, Homer R, Du Y, Mantel L, Elias JA. IL-6 induced protection in hyperoxic acute lung injury, American Journal of Respiratory Cell and Molecular Biology 2000; 22:535-542 PMID: 10783124 *Co-First authorship

8. Corne, J, Chupp G, Lee GG, Homer RJ, Zhu Z, Chen Q, Ma B, Du Y, McArdle J, **Waxman AB**, Elias JA. IL-13 stimulates vascular endothelial cell growth factor and protects against hyperoxic acute lung injury. Journal of Clinical Investigation 2000; 106:783-91 PMID: 10995789

9. **Waxman AB**, Zhu Z, Lee CG, Elias JA. Transgenic Modeling of Mechanisms of Protection in Acute Lung Injury, Matalon S, Sznajder JI, editors. NATO ASI Series, Etiology and Treatment of Acute Lung Injury: From Bench to Bedside. BV Amsterdam, Netherlands: IOS Press, NATO Science Series, Series 1 January 2000; 336:140-51

10. **Waxman AB**, Mahboubi K, Knickelbein RG, Mantel L, Manzo ND, Pober JS, Elias JA, Interleukin-11 and interleukin-6 protect cultured human endothelial cells from H2O2-induced cell death. American Journal of Respiratory Cell and Molecular Biology 2003; 29:5513-522 PMID: 12730073

11. He CH, **Waxman AB**, Lee CG, Link H, Rabach ME, Ma B, Chen Q, Zhu Z, Homer R, and Elias JA. Bcl-2-related protein A1 is an endogenous and cytokine-stimulated mediator of cytoprotection in hyperoxic acute lung injury. Journal of Clinical Investigation 2005; 115:1039-48 PMID: 15841185

12. Chetty A, Manzo N, **Waxman AB**, Nielsen HC. Modulation of IGF-binding protein-2 and -3 in hyperoxic injury in developing rat lung. Pediatric Research, 2005; 58(2): 222-28 PMID: 16055936

13. Lee PS, **Waxman AB**. The importance of differentiating gelsolin isoforms. American Journal of Respiratory and Critical Care Medicine 2006; 173:685-86 PMID: 16522767

14. Barker GF, Manzo JG, Cotich K, Shone RK, **Waxman AB**. DNA damage induced by hyperoxia: quantitation and correlation with lung injury, American Journal of Respiratory Cell and Molecular Biology 2006; 35(3): 277-89 PMID: 16574945

15. Steiner MK, Preston IR, **Waxman AB**, Klinger JR, Criner GJ, Hill NS. Conversion to bosentan from prostacyclin infusion therapy in pulmonary arterial hypertension: a pilot study. Chest 2006; 130:1471-80 PMID: 17099026

16. Lee PS, **Waxman AB**, Cotich KL, Chung SW, Perrella MA, Stossel TP. Plasma Gelsolin is a Marker and Therapeutic Agent in Animal Sepsis. Critical Care Medicine 2007; 35(3): 849-55.

17. Tolle JJ, **Waxman AB**, Systrom DS. Impaired systemic oxygen extraction at maximum exercise in pulmonary hypertension. Medicine & Science in Sports and Exercise 2008; 40(1): 3-8 PMID: 18091026.

18. Chetty A, Cao GJ, Manzo N, Nielsen HC, **Waxman AB**. The role of IL-6 and IL-11 in hyperoxic injury in developing lung. Pediatric Pulmonology 2008; 43(3): 297-304PMID: 18214944

19. Robertson T, Mann H, Hyzy R, Rogers A, **Waxman AB**, Weinert C, Douglas I, Alapat P, Guntupalli K, Buchman T. Multicenter implementation of a consensus-developed, evidence-based, spontaneous breathing trial protocol. Critical Care Medicine 2008; 36(10): 2753-62, PMID: 18828193

20. **Waxman AB**, Lawler L, Cornett G. Cicletanine for the treatment of pulmonary arterial hypertension, Archives of Internal Medicine 2008; 168(19): 2164-66 PMID: 18955648

21. Tolle JJ, **Waxman AB**, Pappagianopoulos PP, Systrom DM. Exercise-induced pulmonary arterial hypertension. Circulation 2008; 118(21): 2183 – 89 PMID: 18981305

22. Lee PS, Patel S, Christiani DC, Bajwa E, Stossel TP, **Waxman AB**. Plasma gelsolin depletion and circulating actin in sepsis – A pilot study. PLoS One. 2008; 3(11): e3712. PMID: 19002257

23. Kolliputi N, **Waxman AB**. IL-6 cytoprotection in hyperoxic acute lung injury occurs via suppressor of cytokine signaling-1-induced apoptosis signal-regulating kinase-1 degradation. Am. J. Respir. Cell Mol. Biol 2009; 40:314-24 PMID: 18776134

24. Steiner MK, Syrkina OL, Kolliputi N, Mark EJ, Hales CA, **Waxman AB**. Lung-specific IL-6 overexpression in mice induces pulmonary hypertension. Circulation Research 2009; 104:236-44 PMID: 19074475

25. **Waxman AB**, Kolliputi N. IL-6 protects against hyperoxia induced mitochondrial damage via BCL-2 induced BAK interactions with mitofusions, Am. J. Respir. Cell Mol. Biol 2009; 41: 385-396 PMID: 19168699

26. Kolliputi N, **Waxman AB**. IL-6 cytoprotection in hyperoxic lung injury occurs via PI3K/AKT-mediated Bax phosphorylation., American Journal of Physiology, Lung Cellular and Molecular Physiology. 2009; 297: L6 - L16 PMID: 19376889

27. Thibault, H., Kurtz, B., Raher, M.J., Rahamthulla, S., **Waxman, A.B.**, Halpern, E.F., Bloch, K., Scherrer-Crosbie, M., Noninvasive assessment of murine pulmonary arterial pressure: validation and application to models of pulmonary hypertension. Circulation Cardiovasc Imaging, 2010; 3: 157–163 PMID: 20044514

28. Kolliputi, N., Shaik, R., S., and **Waxman, A.B**. The Inflammasome Mediates Hyperoxia-Induced Alveolar Cell Permeability.  The Journal of Immunology, 2010, 184: 5819 -5826 PMID: 20375306

29. Schlichting, D.E., **Waxman, A.B.***, O'Brien, L.A., Wang, T., Naum, C.C., Rubiez, G.J., Um, S.L., Williams, M., Yan, S.B., Circulating Endothelial and Endothelial Progenitor Cells in Patients with Severe Sepsis. Microvascular Research 2011; 81:216-211 *corresponding author PMID: 21130783

30. Malhotra, R, Hess, D, Lewis, GD, Bloch,KD, **Waxman, AB**, and Marc J. Semigran, Vasoreactivity to inhaled nitric oxide and oxygen predicts long term survival in pulmonary arterial hypertension., Pulmonary Circulation 2011; 1(2):250-258, PMID: 22020367

31. Parikh, V.N., Jin, R.C., Rabello, S., Gulbahce, N., White, K., Hale, A., Shaik, R.S., **Waxman, A.B.**, Zhang, Y., Maron, B.A., Hartner, J.C., Fujiwara, Y., Orkin, S.H., Haley, K.J., Barabasi, A., Loscalzo, J., Chan, S.Y., A Network Biology Approach Reveals that MicroRNA-21 Integrates

Pathogenic Signaling to Control Pulmonary Hypertension. Circulation 2012; 125:1520-1532, PMID: 22371328

32. Maron, B.A., Opotowsky, A.R., Landzberg, M.J., Loscalzo, J., **Waxman, A.B.**, Leopold, J.A., Plasma aldosterone levels are elevated in patients with pulmonary arterial hypertension in the absence of left ventricular heart failure: a pilot study. Eur J Heart 2013 Mar;15(3):277-83, PMID: 23111998

33. **Waxman A**, Chen SY, Boulanger L, Watson JA, Golden G., Factors associated with adherence to phosphodiesterase type 5 inhibitors for the treatment of pulmonary arterial hypertension. J Med Econ. 2013;16(2):298-306, PMID: 23216015

34. Jesse Esch, J., Shah, P.B., Cockrill, B.A., Farber, H.W., Landzberg, M.J., Mehra, M.R., Mullen, M.P., Opotowsky, A.R., **Waxman, A.B.**, Lock, J.E., Marshall, A.C., Transcatheter Potts Shunt Creation in Patients with Severe Pulmonary Arterial Hypertension: Initial Clinical Experience. Journal of Heart Lung Transplantation 2013 April; 32(4):381-7, PMID: 23415728

35. Opotowsky, A.R., Clair, M., Afilalo, J., Landzberg, M.J., **Waxman, A.B.**, Moko, L., Maron, B.A., Vaidya, A., Forfia, P.R.. A simple echocardiographic method to estimate pulmonary vascular resistance. Am J Cardiol. 2013;112(6):873-882 PMID: 23735649

36. Maron, B.A., **Waxman, A.B.**, Opotowsky, A.R., Gillies, H., Blair, C., Aghamohammadzadeh, R., Loscalzo, J., Leopold, J.A., Effectiveness of Spironolactone Plus Ambrisentan for Treatment of Pulmonary Arterial Hypertension (from the [ARIES] Study 1 and 2 Trials). Am J Cardiol. 2013;112(5):720-725 PMID: 23751938

37. Nakahira, K., Kyung, S.Y., Rogers, A.J., Gazourian, L., Youn, S., Massaro, A.F., Quintana, C., Osorio, J.C., Wang, Z., Zhao, Y., Lawler, L.A., Christie, J.D., Meyer, N.J., Causland, F.R., Waikar, S.S., **Waxman, A.B.**, Chung, R.T., Bueno, R., Rosas, I.O., Fredenburgh, L.E., Baron, R.M., Christiani, D.C., Hunninghake, G.M., Choi, A.M., Circulating mitochondrial DNA in patients in the ICU as a marker of mortality: derivation and validation. PLoS Med. 2013 Dec; 10(12):e1001577. PMID: 24391478

38. Boerrigter, B.G., **Waxman, A.B.**, Westerhof, N., Vonk-Noordegraaf, A., Systrom, D.S. Measuring central pulmonary pressures during exercise in COPD: How to cope with respiratory effects. European Respiratory Journal, May 1, 2014 vol. 43 no. 5 1316-1325 PMID: 24177003

39. Bertero T, Lu Y, Annis S, Hale A, Bhat B, Saggar R, Saggar R, Wallace WD, Ross DJ, Vargas SO, Graham BB, Kumar R, Black SM, Fratz S, Fineman JR, West JD, Haley KJ, **Waxman AB**, Chau BN, Cottrill KA, Chan SY. Systems-level regulation of microRNA networks by miR-130/301 promotes pulmonary hypertension. J Clin Invest. 2014 Aug 1;124(8):3514-28. PMID: 24960162

40. Frantz RP, Durst L, Burger CD, Oudiz RJ, Bourge RC, Franco V, **Waxman AB**, McDevitt S, Walker S., Conversion From Sildenafil to Tadalafil: Results From the Sildenafil to Tadalafil in Pulmonary Arterial Hypertension (SITAR) Study. J Cardiovasc Pharmacol Ther. 2014 Nov;19(6):550-7. PMID: 24742768

41. Preston, I.R., J. Feldman, J. White, V. Franco, D. Ishizawar, C. Burger, **A. B. Waxman**, N. S. Hill, Safety and efficacy of transition from inhaled to parenteral treprostinil in selected patients with pulmonary arterial hypertension. Pulmonary Circulation 2014; 4(3) 456-461 PMID: 25621159

42. Bertero T, Cottrill K, Krauszman A, Lu Y, Annis S, Hale A, Bhat B, **Waxman AB**, Chau BN, Kuebler WM, Chan SY,  The microRNA-130/001 family controls vasoconstriction in pulmonary hypertension. J Biol Chem. 2015 Jan 23; 290(4):2069-85 PMID: 25505270

43. Santos, M., Opotowsky, A.R., Shah, A.M., Tracy, J., **Waxman, A.B.**, Systrom, D.M., Central cardiac limit to aerobic capacity in patients with exertional pulmonary venous hypertension: Implications for heart failure with preserved ejection fraction. Circ Heart Fail. 2015;8: 278-285 PMID: 25550438

44. Riviello E.D., Letchford S., Cook E.F., **Waxman A.B**., Gaziano T., Improving decision making for massive transfusions in a resource poor setting: a preliminary study in Kenya. PLoS One. 2015 May 28;10(5):e0127987. doi: 10.1371/journal.pone.0127987. eCollection 2015. PMID: 26020935

45. White, K., Lu, Y., Annis, S., Hale, A.E., Chau, B.N., Dahlman, J.E., Hemann, C., Opotowsky, A.R., Vargas, S.O., Rosas, I., Perrella, M.A., Osorio, J.C., Haley, K.J., Graham, B.B., Kumar, R., Saggar, R., Saggar, R., Wallace, W.D., Ross, D.J., Khan, O.F., Bader, A., Gochuico, B.R., Matar, M., Polach, K., Johannessen, N.M., Prosser, H.M., Anderson, D.G., Langer, R., Zweier, J.L., Bindoff, L.A., Systrom, D.M., **Waxman, A.B.,** Jin, R.C., Chan, S.Y., Genetic and hypoxic alterations of the microRNA-210-ISCU1/2 axis promote iron–sulfur deficiency and pulmonary hypertension. EMBO Mol Med. 2015 June; 7(6): 695–713. PMID: 25825391

46. Santos M., Rivero J., McCullough S.D., West E., Opotowsky A.R., **Waxman A,B**., Systrom D.M., Shah AM. E/e' Ratio in Patients with Unexplained Dyspnea: Lack of Accuracy in Estimating Left Ventricular Filling Pressure. Circ Heart Fail. 2015 Jul;8(4):749-56. PMID: 26067855

47. Bertero T., Cottrill K.A., Lu Y., Haeger C.M., Dieffenbach P., Annis S., Hale A., Bhat B., Kaimal V., Zhang Y.Y., Graham B.B., Kumar R., Saggar R., Saggar R., Wallace W.D., Ross D.J., Black S.M., Fratz S., Fineman J.R., Vargas S.O., Haley K.J., **Waxman A.B.**, Chau B.N., Fredenburgh L.E., Chan S.Y., Matrix Remodeling Promotes Pulmonary Hypertension through Feedback Mechanoactivation of the YAP/TAZ-miR-130/301 Circuit. Cell Rep. 2015 Nov 3; 13(5): 1016-32 PMID: 26565914

48. Oliveira, R.K. Agarwal, M., Tracy, J.A., Karin, A.L., Opotowsky, A.R., **Waxman, A.B.**, Systrom, D.M., Age-related upper limits of normal for maximum upright exercise pulmonary haemodynamics. Eur Respir J. 2016 47:1179-1188 PMID: 26677941

49. Oldham, W.M., Lewis, G.D., Opotowsky, A.R., **Waxman, A.B.**, Systrom, D.M., Unexplained exertional dyspnea caused by low ventricular filling pressures: results from clinical invasive cardiopulmonary exercise testing. Pulmonary Circulation, 2016; 6(1):55-62 PMID: 27162614

50. Rahaghi, F.N., Ross, J.C., Agarwal, M., Gonzalez, G., Come, C.E., Diaz, A., Sanchez-Ferrero, G.V., Andetta, H., Jose Estapar, R.S., **Waxman, A.B.**, Washko, G.R., Pulmonary vascular morphology as an imaging biomarker in chronic thromboembolic pulmonary hypertension. Pulmonary Circulation, 2016 6(1): 70-81

51. Aghamohammadzadeh R, Zhang YY, Stephens TE, Arons E, Zaman P, Polach KJ, Matar M, Yung LM, Yu PB, Bowman FP, Opotowsky AR, **Waxman AB**, Loscalzo J, Leopold JA, Maron BA., Up-regulation of the mammalian target of rapamycin complex 1 subunit Raptor by aldosterone induces abnormal pulmonary artery smooth muscle cell survival patterns to promote pulmonary arterial hypertension. FASEB J. 2016 Jul;30(7):2511-27 PMID: 27006450

52. Oliveira RK, **Waxman AB**, Agarwal M, Badr Eslam R, Systrom DM. Pulmonary hemodynamics during recovery from maximum incremental cycling exercise. Eur Respir J. 2016 Jul;48(1):158-67 PMID: 27126692

53. Bourge, R.C., **Waxman, A.B.**, Gomberg-Maitland, M.D., Shapiro, S.M., Tarver, J.H., Zwicke, D.L., Feldman, J.P., Chakinala, M.M., Frantz, R.P., Torres, F., Cerkvenik, J., Morris, M., Thalin, M., Peterson, L., Rubin, L.J., Treprostinil Administered to Treat Pulmonary Artery Hypertension

32

Using a Fully Implantable Programmable Intravascular Delivery System: Results of the DelIVery for PAH Trial. Chest 2016 150(1):27-34  PMID: 27396777

54. Bertero T., Oldham W.M., Cottrill K.A., Pisano S., Vanderpool R.R., Yu Q., Zhao J., Tai Y., Tang Y., Zhang Y.Y., Rehman S., Sugahara M., Qi Z., Gorcsan J., Vargas S.O., Saggar R., Saggar R., Wallace W.D., Ross D.J., Haley K.J., **Waxman A.B.**, Parikh V.N., De Marco T., Hsue P.Y., Morris A., Simon M.A., Norris K.A., Gaggioli C., Loscalzo J., Fessel J., Chan S.Y., Vascular stiffness mechanoactivates YAP/TAZ-dependent glutaminolysis to drive pulmonary hypertension. J Clin Invest. 2016 Sep 1;126(9):3313-35  PMID: 27548520

55. Biering-Sørensen T, Santos M, Rivero J, McCullough SD, West E, Opotowsky AR, **Waxman AB**, Systrom DM, Shah AM. Left ventricular deformation at rest predicts exercise-induced elevation in pulmonary artery wedge pressure in patients with unexplained dyspnea. Eur J Heart Fail. 2017 Jan;19(1):101-110. PMID:27878925

56. van Riel AC, Systrom DM, Oliveira RK, Landzberg MJ, Mulder BJ, Bouma BJ, Maron BA, Shah AM, **Waxman AB**, Opotowsky AR., Development of a Right Ventricular Outflow Tract Gradient During Upright Exercise: A Hemodynamic Observation., J Am Coll Cardiol. 2017 Feb 7;69(5):595-597  PMID: 28153114

57. van Riel AC, Opotowsky AR, Santos M, Rivero JM, Dhimitri A, Mulder BJ, Bouma BJ, Landzberg MJ, **Waxman AB**, Systrom DM, Shah AM. Accuracy of Echocardiography to Estimate Pulmonary Artery Pressures with Exercise: A Simultaneous Invasive-Noninvasive Comparison. Circ Cardiovasc Imaging. 2017 Apr;10(4). pii: e005711. doi: 10.1161/CIRCIMAGING.116.005711. PMID: 28360262

58. Badr Eslam, R., Croce, K., Mangione, F.M., Musmann, R., Leopold, J.A., Mitchell, R.N., **Waxman, A.B.**, Persistence and proliferation of human mesenchymal stromal cells in the right ventricular myocardium following intracoronary injection in a large animal model of pulmonary hypertension., Cytotherapy. 2017 May 9, 19: 668-679. DOI: 10.1016/j.jcyt.2017.03.002 PMID: 28392314

59. W. Huang, Resch, S., Oliveira, R.K.F., Cockrill, B.A., Systrom, D.M., **Waxman, A.B.**, Invasive Cardiopulmonary Exercise Testing in the Evaluation of Unexplained Dyspnea: insights from a Multidisciplinary Dyspnea Center., Eur J Prev Cardiol. 2017 Jul;24(11):1190-1199. doi: 10.1177/2047487317709605 PMID: 28506086

60. **A.B. Waxman**, McElderry, H.T., Gomberg-Maitland, M. Burke, M.C., Ross, E.L., Bersohn, M.M., Pangarkar, S.S., Tarver, J.H., Zwicke, D.L., Feldman, J.P., Chakinala, M.M., Frantz, R.P., Thompson, G.B., Torres, F., Rauck, R.L., Clagg, K., Durst, L., Li, P., Morris, M., Southall, K.L., Peterson, L., Bourge, R.C., Totally Implantable Intravenous Treprostinil Therapy in Pulmonary Hypertension: Assessment of the Implantation Procedure., Chest. December 2017 Vol. 152(6) Pages 1128-1134. PMID:28583617

61. Segrera, S.A., Lawler, L. Opotowsky, A.O., Systrom, D.M., **Waxman, A.B.**, Open label study of ambrisentan in patients with exercise pulmonary hypertension., Pulm Circ. 2017 Apr-Jun;7(2):531-538. PMID: 28597763

62. A.C.M.J. van Riel, Systrom, D.M., Oliveira, R.K.F., Landzberg, M.J., Mulder, B.J.M., Bouma, B.J., Maron, B.A., Shah, A.M., **Waxman, A.B.,** Opotowsky, A.R., Hemodynamic and metabolic characteristics associated with development of a right ventricular outflow tract pressure gradient during upright exercise., PLoS One. 2017 Jun 21;12(6):e0179053. doi: 10.1371/journal.pone.0179053. eCollection 2017. PMID: 28636647

33

63. T. Roldan, Rios, J.J., Villamañan, E., **Waxman, A.B.** Complications associated with the use of oral anticoagulation in patients with pulmonary arterial hypertension from two referral centers., Pulmonary Circulation Article first published online: 2017 Jul-Sep;7(3):692-701 PMID: 28677986

64. R.K. F. Oliveira, Faria-Urbina, M., Maron, B.A., Santos, M **Waxman, A.B**, Systrom, D.M., Functional impact of exercise pulmonary hypertension in patients with borderline resting pulmonary arterial pressure. Pulmonary Circulation, 2017; 7(3) 654–665 PMID:28895507

65. Hemnes A.R., Beck G.J., Newman J.H., Abidov A., Aldred M.A., Barnard J., Berman-Rosenzweig E., Borlaug B.A., Chung W.K., Comhair S.A.A., Erzurum S.C., Frantz R.P., Gray M.P., Grunig G., Hassoun P.M., Hill N.S., Horn E.M., Hu B., Lempel J.K., Maron B.A., Mathai S.C., Olman M.A., Rischard F.P., Systrom D.M., Tang W.H.W., **Waxman A.B.**, Xiao L., Yuan J.X-J and Leopold J.A. PVDOMICS. *A Multi-Center Study to Improve Understanding of Pulmonary Vascular Disease Through Phenomics*. Circulation Research 2017;121:1136-1139 PMID:29074534

66. Faria-Urbina, M., Oliveira, R.K.F., Agarwal, M., **Waxman, A.B.**, Inhaled Treprostinil in Pulmonary Hypertension Associated with Lung Disease. Lung, 2018, April 196(2), 139-146 PMID: 29275453

67. Roldan, T., E. Villamáñan, J. J. Rios, **Waxman, A. B**., Assessment of the Quality of Anticoagulation Management in Patients with Pulmonary Arterial Hypertension. Thrombosis Research 2017 Nov 2;160:83-90. doi: 10.1016/j.thromres.2017.10.024. [Epub ahead of print] PMID: 29127864

68. W. Huang, Oliveira, R.K.F., Lei, H., Systrom, D.M., **Waxman, A.B.**, Pulmonary Vascular Resistance during Exercise Predicts Long-Term Outcomes in Heart Failure with Preserved Ejection Fraction., Journal of Cardiac Failure (2017) 2018 Mar;24(3):169-176 PMID: 29180305

69. Truong, Q.A., Bhatia, H.S., Szymonifka, J., Zhou, Q., Lavender, Z., **Waxman, A.B.**, Semigran, M.J., Malhotra, R.J., A four-tier classification system of pulmonary artery metrics on computed tomography for the diagnosis and prognosis of pulmonary hypertension. Cardiovasc Comput Tomogr. 2017 Dec 6. pii: S1934-5925(17)30259-9. doi: 10.1016/j.jcct.2017.12.001. [Epub ahead of print] PMID: 29254655

70. Faria Urbina, M., Oliveira, R., Segrera, S.A., Lawler, L., **Waxman, A.B.**, Systrom, D. Impaired systemic oxygen extraction in treated exercise pulmonary hypertension: a new engine in an old car? Pulm Circ. 2018 Jan 1:2045893218755325. doi: 10.1177/2045893218755325. [Epub ahead of print] PMID:29309261

71. Oldham, W.M., Oliveira, R.K., Wang, R.S., Opotowsky, A.R., Rubins, D.M., Hainer, J., Wertheim, B.M., Alba, G.A., Choudhary, G., Tornyos, A., MacRae, C.A., Loscalzo, J., Leopold, J.A., **Waxman, A.B**., Olschewski, H., Kovacs, G., Systrom, D.M., Maron, B.A., Network analysis to risk stratify patient with exercise intolerance., Circ Res. 2018 Mar 16;122(6):864-876 PMID: 29437835

72. Han Y, Forfia PR, Vaidya A, Mazurek JA, Park MH, Ramani G, Chan SY, **Waxman AB.**, Rationale and design of the ranolazine PH-RV study: a multicentred randomised and placebo-controlled study of ranolazine to improve RV function in patients with non-group 2 pulmonary hypertension. Open Heart. 2018 Feb 23;5(1):e000736. doi: 10.1136/openhrt-2017-000736. eCollection 2018. PMID: 29531764

73. Samokhin, A.O., Stephens, T., Wertheim, B.M., Wang, R.S., Vargas, S.O., Yung, L.M., Cao, M.,

Brown, M., Arons, E., Dieffenbach, P.B., Fewell, J.G., Matar, M., Bowman, F.P., Haley, K.J., Alba, G.A., Marino, S.M., Kumar, R., Rosas, I.O., **Waxman, A.B.**, Oldham, W.M., Khanna, D., Graham, B.B., Seo, S., Gladyshev, V.N., Yu, P.B., Fredenburgh, L.E., Loscalzo, J., Leopold, J.A., Maron, B.A., NEDD9 targets *COL3A1* to promote endothelial fibrosis and pulmonary arterial hypertension. Sci Transl Med. 2018 Jun 13;10(445). pii: eaap7294. doi: 10.1126/scitranslmed.aap7294. PMID: 29899023

74.  McCabe, C., Oliveira, R.K.F., Rahaghi, F., Faria-Urbina, M., Howard, L., Axell, R.G., Priest, A.N., **Waxman, A.B.**, Systrom, D.M., Right ventriculo-arterial uncoupling and impaired contractile reserve in obese patients with unexplained exercise intolerance. Eur J Appl Physiol. 2018 Jul;118(7):1415-1426. PMID: 29713818

75.  Schissler, A.J., Glynn, R.J., Sobieszczyk, P.S., **Waxman, A.B.**, 2018. EXPRESS: Ultrasound-assisted catheter-directed thrombolysis compared with anticoagulation alone for treatment of intermediate-risk pulmonary embolism. Pulmonary Circulation 204589401880026. doi:10.1177/2045894018800265 PMID: 30142025

76.  Platz E, Merz A, Silverman M, Lewis E, Groarke JD, **Waxman A**, Systrom D. Association between lung ultrasound findings and invasive exercise haemodynamics in patients with undifferentiated dyspnoea. First published: 26 November 2018, ESC Heart Failure, 2019 Feb;6(1):202-207. doi: 10.1002/ehf2.12381. https://doi.org/10.1002/ehf2.12381. PMID: 30474936

77.  Yu Q, Tai YY, Tang Y, Zhao J, Negi V, Culley MK, Pilli J, Sun W, Brugger K, Mayr J, Saggar R, Saggar R, Wallace WD, Ross DJ, **Waxman AB**, Wendell SG, Mullett SJ, Sembrat J, Rojas M, Khan OF, Dahlman JE, Sugahara M, Kagiyama N, Satoh T, Zhang M, Feng N, Gorcsan Iii J, Vargas SO, Haley KJ, Kumar R, Graham BB, Langer R, Anderson DG, Wang B, Shiva S, Bertero T, Chan SY., BOLA3 Deficiency Controls Endothelial Metabolism and Glycine Homeostasis in Pulmonary Hypertension. Circulation. 2019 May 7;139(19):2238-2255. doi: 10.1161/CIRCULATIONAHA.118.035889. PMID: 30759996

78.  Kohli, P., Kelly, V.J., Kehl,E.G., Rodriguez-Lopez, J., Hibbert, K.A., Kone, M., Systrom, D.M., **Waxman, A.B.,** Venegas, J.G., Channick, R., Winkler, T., Harris, R.S., Perfusion Imaging Distinguishes Exercise Pulmonary Arterial Hypertension at Rest. Am J Respir Crit Care Med. 2019 Jun 1;199(11):1438-1441 PMID: 30811948

79.  Singh, I., Oliveira, R., Naeije, R., Rahaghi, F.N., Oldham, W., Systrom, D.M., **Waxman, A.B**., Pulmonary Vascular Distensibility and Early Pulmonary Vascular Remodeling in Pulmonary Hypertension., Chest. 2019 Oct. 156(4):724-732. PMID:31121149

80.  Singh, I., Rahaghi, F.N., Naeije, R., Oliveira, R., Systrom, D.M., **Waxman, A.B**., Right Ventricular-Arterial Uncoupling During Exercise in Heart Failure with Preserved Ejection Fraction - Role of Pulmonary Vascular Dysfunction. Chest. 2019 May 16. pii: S0012-3692(19)31057-8. doi: 10.1016/j.chest.2019.04.109. PMID: 31103695

81.  Singh I, Rahaghi F.N, Naeije R., Oliveira R., Vanderpool R.R., **Waxman A. B.**, Systrom D., Dynamic Right Ventricular - Pulmonary Arterial Uncoupling During Maximum Incremental Exercise in Exercise Pulmonary Hypertension and Pulmonary Arterial Hypertension. Pulm Circ. 2019; 9(3):1-10 doi: 10.1177/2045894019862435 PMID: 31218910

82.  Gomberg-Maitland, M., Bourge, R. C., Shapiro, S. M., Tarver III, J., Zwicke, D. L., Feldman, J., Chakinala, Murali M., Frantz, R., Torres, F., Bag, R., Lautenbach, A., Morris, M., Murphy, J. A., Peterson, L. **Waxman, A.** (2019). EXPRESS: Long-Term Results of the DelIVery for Pulmonary Arterial Hypertension Trial. Pulmonary Circulation 2019; 9(4) 1-9,

https://doi.org/10.1177/2045894019878615.  PMID: 31723407

83. Melamed, K.H., Santos, M., Oliveira, R.K.F., Urbina, M.F., Felsenstein, D., Opotowsky, A.R., **Waxman, A.B.**, Systrom D.M., Unexplained exertional intolerance associated with impaired systemic oxygen extraction. Eur J Appl Physiol. 2019 Oct;119(10):2375-2389. doi: 10.1007/s00421-019-04222-6. Epub 2019 Sep 6. PMID: 31493035

84. Sanders, J., Han, Y., Faria Urbina, M., Systrom, D., **Waxman, A.B.,** Metabolomics of exercise pulmonary hypertension are intermediate between controls and patients with pulmonary arterial hypertension. Pulm Circ. 2019 Oct 30;9(4):2045894019882623. doi: 10.1177/2045894019882623. eCollection 2019 Oct-Dec. PMID: 31695905

85. Samokhin, A.O., Hsu, S., Yu, P.B., **Waxman, A.B.**, Alba, G.A., Wertheim, B.M., Hopkins, C.D., Bowman, F., Channick, R.N., Nikolic, I., Faria-Urbina, M., Hassoun, P.M., Leopold, J.A., Tedford, R.J., Ventetuolo, C.E., Leary, P.J., Maron, B.A., Circulating NEDD9 is increased in pulmonary arterial hypertension: A multicenter, retrospective analysis., J Heart Lung Transplant. 2020 Apr;39(4):289-299. doi: 10.1016/j.healun.2019.12.002. PMID: 31952977

86. Oliveira, R.K.F., **Waxman, A.B.**, Hoover, P.J., Dellaripa, P.F., Systrom, D.M.. Pulmonary vascular and right ventricular burden during exercise in interstitial lung disease. Chest. 2020 Jul;158(1):350-358. doi: 10.1016/j.chest.2020.02.043. PMID: 32173491

87. Joseph P, Oliveira RKF, Eslam RB, Agarwal M, **Waxman DM**, Systrom DM. Fick principle and exercise pulmonary hemodynamic determinants of the six-minute walk distance in pulmonary hypertension. Pulm Circ. 2020 Sep 11;10(3):2045894020957576. doi: 10.1177/2045894020957576. PMID: 32994925; PMCID: PMC7502687.

88. Singh I, Oliveira RKF, Naeije R, Oldham WM, Faria-Urbina M, **Waxman AB**, Systrom DM. Systemic vascular distensibility relates to exercise capacity in connective tissue disease. Rheumatology (Oxford). 2020 Oct 1:keaa510. doi:

89. Singh I, Oliveira RKF, Heerdt P, Brown MB, Faria-Urbina M, **Waxman, AB**, Systrom DM. Dynamic right ventricular function response to incremental exercise in pulmonary hypertension. Pulmonary Circulation. July 2020. doi:10.1177/2045894020950187

90. Han, Y., Forfia, P., Vaidya, A., Mazurek, J.A., Park, M.H., Ramani, G., Chan, S.Y., **Waxman, A.B.**, Ranolazine improves right ventricular function in patients with precapillary pulmonary hypertension: results from a double blinded randomized placebo-controlled trial., Journal of Cardiac Failure, 2020, ISSN 1071-9164, https://doi.org/10.1016/j.cardfail.2020.10.006.

**Reviews, Chapters, Monographs and Editorials**

1. Banker GA and **Waxman AB**. Hippocampal neurons generate natural shapes in cell culture. In: Lasek R, Black MB, editors. Intrinsic Determinants of Neuronal Form. New York: Alan R. Liss; 1988.  p. 128-140

2. Smith SJ, Cooper MW, **Waxman AB**.  Laser Microscopy of Subcellular Structure in Living Neocortex: Can One See Dendritic Spines Twitch? In: Squire L, Lindenlaub E, editors, Proceedings of 23rd Symposium Medicum Hoechst on "The Biology of Memory". 1989, p. 237-56

3. **Waxman AB**, Matthay RA. A 51-year-old woman with a bone marrow transplant and rapidly progressive dyspnea. In: Sahn SA, Heffner JE, editors. Critical Care Pearls. Second Edition. Philadelphia: Hanley & Belfus, Inc.; 1997 p. 254-56

4.  Siegel M, **Waxman AB**. Acute Respiratory Distress Syndrome, In: Franco K, Putnam JB, editors. Advanced Therapy in Thoracic Surgery. Hamilton, Ont: B.C. Decker Inc.; 1998 p. 1-13

5.  **Waxman AB**, Matthay M. Critical Review of Pulmonary Artery Catheter Use in the ICU. Pulmonary and Critical Care Update, 1998; 12(21) www.chestnet.org/accp/pccu

6.  **Waxman AB**, Sasidhar M. Practical Use of the Pulmonary Artery Catheter in the ICU, The Journal of Respiratory Diseases, 1999; 20:106-18

7.  **Waxman AB**. Invited commentary on Prospective randomized trial comparing pressure-controlled ventilation and volume-controlled ventilation in ARDS. Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, July 2000

8.  **Waxman AB**. Invited commentary on the comfort of breathing: A study with volunteers assessing the influence of various modes of assisted ventilation. Journal Club of the Assembly on Critical Care of American Thoracic Society Respiratory Failure and Mechanical Ventilation, http://www.thoracic.org/assemblies/cc/ccjcframe.html, January 2001

9.  Sethi J, **Waxman AB**. Cellular and Molecular Mechanisms of Lung Injury and Repair. Clinical Pulmonary Medicine, 2001; 8(4):214-25

10. **Waxman AB**. Invited commentary on Prevention of Ventilator-associated Pneumonia by Oral Decontamination. A Prospective, Randomized, Double blind, Placebo-controlled Study. Journal Club of the Assembly on Critical Care of American Thoracic Society Respiratory Failure and Mechanical Ventilation, http://www.thoracic.org/assemblies/cc/ccjcframe.html, September 2001

11. **Waxman AB**. Pulmonary function test abnormalities in pulmonary vascular disease and chronic heart failure, In: Geoffrey Chupp, editor. Clinics in Chest Medicine, Pulmonary Function Testing, Philadelphia: W.B. Saunders Company; 2001; 22(4): 751-58 PMID: 11787662

12. **Waxman AB**. Invited commentary on Oscillations and Noise, Inherent Instability of Pressure Support Ventilation? Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, February 2002

13. Budhiraja R, **Waxman AB**. Pulmonary Hypertension: Diagnosis and Management. Resident and Staff Physician: 2002; 48(9):12-20

14. **Waxman AB**. Invited commentary on Tidal Volume Increases Do Not Affect Alveolar Mechanics in Normal Lung But Cause Alveolar Overdistension And Exacerbate Alveolar Instability after Surfactant Deactivation. Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, February 2003

15. Papa J, Sasidhar M, **Waxman AB**. Hemodynamic Impact of Mechanical Ventilation in ARDS. Clinical Pulmonary Medicine, 2003; 10(3):154-61

16. Manzo ND, **Waxman AB**. Pathogenesis of Acute Lung Injury: Experimental Studies, In: Matthay M editor. Acute Respiratory Distress Syndrome. New York: Markel Dekker 2003 Vol 179: Chapter 6:115-46

17. Boyce P, **Waxman AB**. Pulmonary hypertension: work in progress, Journal of Nuclear Cardiology, 2003; 10(4):413-23 PMID: 12900746

18. **Waxman AB**. Invited commentary on Noninvasive Ventilation during Persistent Weaning Failure; A Randomized Controlled Trial. Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, September 2003

19. **Waxman AB**. Invited commentary on Effect of Hemofiltration on Hemodynamics, Lung Inflammation and Pulmonary Edema in a Canine Model of Acute Lung Injury." Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, June 2004

20. **Waxman AB**. Invited commentary on Differential effects of sustained inflation recruitment maneuvers on alveolar epithelial and lung endothelial injury. Respiratory Failure and Mechanical Ventilation, Journal Club of the Assembly on Critical Care of the American Thoracic Society. http://www.thoracic.org/assemblies/cc/ccjcframe.html, February 2005

21. **Waxman AB**, Ward N, Thompson T, Lilly CM, Lisbon A, Hill N, Nasraway SA, Heard S, Corwin H, Levy M. Roundtable debate: Controversies in the management of the septic patient--desperately seeking consensus Journal of Critical Care. 2005; 9:E1 PMID: 15693960

22. Schmidt S, **Waxman AB**. Preoperative Intravenous Epoprostenol Prior to Surgical Repair of a Ventricular Septal Defect in an Adult With Eisenmenger's Syndrome. Chest, 2006; 130(4): 304-05

23. Mojica JE, **Waxman AB**. Pulmonary Vascular Physiology. In: Fein A, Kamholz AS, Ost D, editors. Respiratory Emergencies. London: Edward Arnold Publishers, Ltd., 2006 p. 31-41

24. **Waxman AB**. A review of sitaxsentan sodium in patients with pulmonary arterial hypertension. Vascular Health and Risk Management, 2007:3(1) 151-57 PMID: 17583185

25. Laraia A, **Waxman AB**. Pulmonary arterial hypertension: evaluation and management. Southern Medical Journal, 2007; 100(4): 393-99 PMID: 17458400

26. **Waxman AB**. Flexible Bronchoscopy: Indications, Contraindications, and Consent. In: Armin Ernst A, editor. Introduction to Bronchoscopy, New York, NY: Cambridge University Press, 2008 p. 75-85

27. Troy P, **Waxman AB**. Portopulmonary Hypertension, Challenges in Diagnosis and Management, Therapeutic Advances in Gastroenterology, 2009; 2: 281-286

28. **Waxman, Aaron B**., Pulmonary Hypertension in Heart Failure with Preserved Ejection Fraction: A Target for Therapy? Circulation 2011, 124:133-135, PMID: 21747065

29. **Waxman, AB**, Chakinala, MM, Frantz, RP. Advanced Prostanoid Therapy in PAH: The Time to Be Proactive Is Now! http://www.medscape.org/viewarticle/755179, December 22, 2011

30. Smith, K.A., **Waxman, A.B**., Pulmonary Hypertension in Older Patients. In M. Pisani, editor, Aging and Lung Disease: A Clinical Guide, Respiratory Medicine, DOI 10.1007/978-1-60761-727-3_6, © Springer Science Business Media, LLC ISBN 978-1-60761-726-6 2012

31. Maron, B.A. Bhatt, D.L., Nykiel, M., Kinlay, S., **Waxman, A.B.,** Protocol for Vasoreactivity Testing With Epoprostenol in Pulmonary Hypertension. Critical Pathways in Cardiology: A Journal of Evidence-Based Medicine. 11(1):40-42, March 2012. PMID:22337220

32. **Waxman, A.B**., Exercise Physiology and Pulmonary Arterial Hypertension. Progress in Cardiovascular Diseases - September 2012 Vol. 55, Issue 2, Pages 172-179, PMID: 23009913

33. **Waxman, A.B.**, Oral Prostacyclin Therapy for Pulmonary Arterial Hypertension: Another Step Forward. Circulation. 2013; 127:563-565. PMID: 23307828

34. **Waxman, A.B**. and R.T. Zamanian, Pulmonary Arterial Hypertension: New Insights into the Optimal Role of Current and Emerging Prostacyclin Therapies. American Journal of Cardiology. 2013; 111[suppl]:1A-16A PMID: 23414683

35. Mehra, M. R., M.H.Park, M.J. Landzberg, A. Lala, **Waxman A.B.**, Right Heart Failure: Towards a Common Language. Pulm Circ. 2013 Dec;3(4):963-7 PMID: 25006413

36. Maron, B.A., B.A. Cockrill, **A.B. Waxman**, D.M. Systrom, Clinician Update; The Invasive Cardiopulmonary Exercise Test. Circulation 2013; 127: 1157-1164 PMID: 23479667

37. Cockrill BA, **Waxman AB.** Phosphodiesterase-5 Inhibitors**.** In M. Humbert, O.V. Evgenov, and J-P Stasch,  editors, Handbook of Experimental Pharmacology. Pharmacotherapy of Pulmonary Hypertension. 2013;218:229-255. PMID: 24092343

38. Mehra, M. R., M.H.Park, M.J. Landzberg, A. Lala, **Waxman A.B.**, Right Heart Failure: Towards a Common Language. Journal of Heart Lung Transplantation. 2014 Feb;33(2):123-6. PMID: 24268184

39. Opotowsky, A.R., M. Santos, B. A. Maron, J. Afilalo, **A. B. Waxman**, M. J. Landzberg, P.R. Forfia, Towards widespread noninvasive assessment of pulmonary vascular resistance in clinical practice. Journal of the American Society of Echocardiography. 2014, January; 27(1):108-109 PMID: 24280251

40. **Waxman, A.B.**, and K.A. Smith, Pulmonary Hypertension – Coexisting and Differential Diagnosis. In R.F. Lockey and D.K. Ledford, editors, Asthma; Comorbidities, Coexisting Conditions, & Differential Diagnosis. Oxford University Press, New York, NYISBN 978-0-19-991806-5 2014 pages 215-231

41. Mehra, M. R., M.H.Park, M.J. Landzberg, **Waxman A.B.**, The normal and abnormal right heart: Introduction to a clinical classification. In S.P. Gaine, R. Naejie, and A.J. Peacock editors, The Right Heart, Springer-Verlag London 2014 pages 1-5 DOI: 10.1007/978-1-4471-2398-9_1

42. **Waxman, A.B**., J. Loscalzo, Pulmonary Hypertension, In D.L. Kasper, A.S. Fauci et al. Harrison's Principles of Internal Medicine, 19th Edition, 2015 McGraw Hill Education, New York, pages 1655-1661 ISBN 0071802150 / 9780071802154

43. Systrom, D.M., **A.B. Waxman**, Cardiopulmonary exercise testing in pulmonary hypertension. In J.R. Klinger and R.P. Frantz, The Diagnosis and Management of Pulmonary Hypertension. 2015 Springer-Verlag, New York, pages 265-301 PMID: 26697168

44. Berry, N.C., M. Agarwal, W.M. Oldham, T.E. Stephens, R.H. Goldstein, **A.B. Waxman**, J.A. Tracy, P.J. Leary, J.A. Leopold, S. Kinlay, A.R. Opotowsky, D.M. Systrom, B.A. Maron, Protocol for Exercise Hemodynamic Assessment: Performing the Invasive Cardiopulmonary Exercise Test in Clinical Practice., Pulmonary Circulation, Vol. 5, No. 4 (December 2015), pp. 610-618 DOI: 10.1086/683815 PMID: 26697168

45. Agarwal, M., **A.B. Waxman**, Assessing Disease State in the Pulmonary Vasculature in Clinical Practice and Research. In Pulmonary Hypertension; Basic Science to Clinical Medicine. Editors: Maron, Bradley A., Zamanian, Roham T., **Waxman, Aaron B.** (Eds.) Springer New York, NY 2016, pages 291-229 ISBN 978-3-319-23594-3

46. **Waxman, A.B**., H.W. Farber, Recent Advances In Pulmonary Hypertension; Using Clinical Trial End Points to Risk Stratify Patients With Pulmonary Arterial Hypertension. Circulation 2015; 132: 2152-2161 PMID: 26621638

47. Roldan, T., M.J. Landzberg, D.J. Deicicchi, J.K. Atay, **A.B. Waxman**, Anticoagulation in patients with pulmonary arterial hypertension: An update on current knowledge. The Journal of Heart and Lung Transplantation, 2016 35(2): 151-164 PMID: 26527532

48. Babu AS, Arena R, Myers J, Padmakumar R, Maiya AG, Cahalin LP, **Waxman A**, Lavie CJ., Exercise intolerance in pulmonary hypertension: Mechanism, evaluation and clinical implications. Expert Rev Respir Med. 2016 Sep;10(9):979-90. PMID: 27192047

49. Agarwal M, **Waxman AB**., Physiological Techniques and Pulmonary Hypertension- Left Heart Disease. Prog Cardiovasc Dis. 2016 Jul-Aug;59(1):30-41. PMID: 27211586

50. Badr Eslam, R., **Waxman, A.B**. Approach to the patient with Dyspnea., Scientific American Medicine, Pulmonary Medicine, https://www.deckerip.com/decker/scientific-american-medicine/chapter/115/ Decker, December 8, 2016

51. **Waxman, A.** (2017). Flexible Bronchoscopy: Indications, Contraindications, and Consent. In A. Ernst & F. Herth (Eds.), *Introduction to Bronchoscopy* (pp. 95-101). Cambridge: Cambridge University Press. doi:10.1017/9781316084182.008

52. Schissler, A.J., **Waxman, A.B**. Medical Management of Pulmonary Embolism. In: Stone, PH, Lewis, EF, editors.  Scientific American Medicine. Hamilton (ON): Decker Intellectual Properties; May 2018. DOI: 10.2310/7900.1638. Available at: http://www.deckerip.com.

53. Ryan, J.J., **Waxman, A.B**., The Dyspnea Clinic., Circulation. May 2018;137:1994-1996; PMID: 29735586

54. **Waxman, A.B**., J. Loscalzo, Pulmonary Hypertension, In J.L.Jameson, A.S. Fauci et al. Harrison's Principles of Internal Medicine, 20th Edition, 2018 McGraw Hill Education, New York, pages 1935-1941 ISBN 978-1-259-64403-0

55. Singh, I., **Waxman, A.B.** Medical Management of Pulmonary Arterial Hypertension. In: Stone, PH, Lewis, EF, editors.  Scientific American Medicine. Hamilton (ON): Decker Intellectual Properties; October 2018. DOI: 10.2310/7900.1638. Available **at: http://www.deckerip.com**

56. Aday, A. W., **Waxman, A.B.** Risk Factors and Epidemiology of Pulmonary Embolism. In: Stone, PH, Lewis, EF, editors.  Scientific American Medicine. Hamilton (ON): Decker Intellectual Properties; November 2018. DOI: 10.2310/7900.1638. Available **at: http://www.deckerip.com**

57. Hahn, R.T., Delhaas, T., Denti, P., **Waxman, A.B.**., The Tricuspid Valve Relationship with the Right Ventricle and Pulmonary Vasculature., JACC Cardiovasc Imaging. 2019 Mar;12(3):564-565 PMID:30660539

58. Hahn RT, **Waxman AB**, Denti P, Delhaas T. Anatomic Relationship of the Complex Tricuspid Valve, Right Ventricle, and Pulmonary Vasculature: A Review. JAMA Cardiol. 2019 May 1;4(5):478-487. doi: 10.1001/jamacardio.2019.0535. PMID:30994879

59. Oudiz, R.J., **Waxman, A.B**., Naeije, R., Pulmonary Hypertension Roundtable: The Role of Exercise in Clinical Practice and Clinical Trials., Advances in Pulmonary Hypertension (2019) 18(2) 63-67 DOI:10.21693/1933-088X-18.2.63

60. Tang, W.H.W., Wilcox, J.D., Jacob, M.S., Rosenzweig, E.B., Borlaug, B.A., Frantz, R.P., Hassoun, P.M., Hemnes, A.R., Hill, N.S., Horn, E.M., Singh, H.S., Systrom, D.M., Tedford, R.J.,

Vanderpool, R.R., **Waxman, A.B.**, Xiao, L., Leopold, J.A., Rischard, F.P., Comprehensive Diagnostic Evaluation of Cardiovascular Physiology in Patients With Pulmonary Vascular Disease: Insights From the PVDOMICS Program. Circ Heart Fail. 2020 Mar;13(3):e006363. doi: 10.1161/CIRCHEARTFAILURE.119.006363. Epub 2020 Feb 24. PMID: 32088984

61. Shioleno, A., **Waxman, A.B.**, The Failing Right Heart from Pulmonary Hypertension., In: Tsao, Lana, Afari, Maxwell (Eds.) Clinical Cases in Right Heart Failure., 2020 Springer Nature, Switzerland, pages 147-169 ISBN 978-3-030-38662-7

62. N.F. Ruopp, and **Waxman**, A.B., Group 1 Clinical Features and Treatment., In: Encyclopedia of Respiratory Medicine, 2nd Edition Medicine, edited by Geoffrey Laurent, Oliver Eickelberg, Marc Humbert, Elsevier Reference Collection in Biomedical Sciences, Elsevier B.V. 2020 https://doi.org/10.1016/B978-0-12-801238-3.11504-1

63. E. Harder, and **Waxman, A.B.**, Clinical Trials in Group 3 Pulmonary Hypertension., Current Opinion in Pulmonary Medicine: September 2020 - Volume 26 - Issue 5 - p 391-396 PMID: 32657833

**Books/Textbooks for the Medical or Scientific Community**

1. Pulmonary Hypertension; Basic Science to Clinical Medicine. Editors: Maron, Bradley A., Zamanian, Roham T., **Waxman, Aaron B.** (Eds.) Springer New York, NY 2016 ISBN 978-3-319-23594-3

**Case Reports**

1. **Waxman AB**, Shepard J-AO, Mark EJ. Case records of the Massachusetts General Hospital. Weekly clinicopathological exercises. Case 14-2003. A 73-year-old woman with pneumonia and progressive respiratory failure. New England Journal of Medicine 2003; 348:1902-12 PMID: 12736284

**Thesis**

1. **Waxman, AB**. The Role of Cell Interactions in the Development of Dendritic Arbors of Hippocampal Neurons in Culture [doctoral thesis] Albany (NY), Albany Medical College, 1988

**Abstracts, Poster Presentations and Exhibits Presented at Professional Meetings**

1. R. Oudiz, C. Meyer, M. Chin, J. Feldman, A. Goldsberry, J. McConnell, P.A. McCullough, M. O'Grady, V. Tapson, F. Torres, A.B. Waxman, R.J. White, Results of Interim Analysis of the Efficacy and Safety of Bardoxolone Methyl in Patients with Pulmonary Arterial Hypertension Associated with Connective Tissue Disease (CTD) (The LARIAT Study)., American Thoracic Society, Washington D.C. 2017 American Journal of Respiratory and Critical Care Medicine 2017;195:A6896

2. D.M. Systrom, R.K.F. Oliveira, M.U. Faria, A.B. Waxman, A.L. Oaklander, Exercise limit in small fiber axonopathy: an invasive cardiopulmonary exercise test study., American Thoracic Society, Washington D.C. 2017

3. D.M. Systrom, R.K.F. Oliveira, M.U. Faria, A.B. Waxman, A.L. Oaklander, Exercise limit in small fiber axonopathy: an invasive cardiopulmonary exercise test study., American Thoracic Society, Washington D.C. 2017

4. F.N. Rahaghi, R Radhakrishnan, J Minhas, E Ayala, J Ross, R San Jose Estepar, AB Waxman, G.R Washko, CT Measures of Arterial and Venous Geometry in Pre- and Post capillary Pulmonary Hypertension., American Thoracic Society, Washington D.C. 2017

5. I. Singh, E. Gay, A.B. Waxman, A Sweet Remedy for Severe Pulmonary Arterial Hypertension., American Thoracic Society, Washington D.C. 2017

6. W.M. Oldham, R.K.F. Oliveira, R. Wang, A.R. Opotowsky, B.M. Wertheim, G.A. Alba, C. MacRae, D.M. Rubins, J. Loscalzo, J.A. Leopold, A.B. Waxman, D.M. Systrom, B.A. Maron, Network Analysis for Diagnosis and Risk Stratification of Cardiopulmonary Patients with Exercise Dysfunction., American Heart Association, Scientific Sessions Anaheim, CA 2017

7. L.M. Yung, I. Nikolic, M. Park, M.F. Kijewski, S. Wang, T. Dinter, G. Bocobo, J. Paolino, A.P. Belanger, S. Dubey, M. Southwood, N. Morrell, B.A. Maron, A.B. Waxman, M. DiCarli, P.B. Yu, [89]Zr-Bevacizumab PET Detects Arteriolar Remodeling In Experimental Pulmonary Hypertension., American Heart Association, Scientific Sessions Anaheim, CA 2017

8. A.B. Waxman, V.F. Tapson, P.M. Smith, C.Q. Deng, S.D. Nathan, A Multicenter, Randomized, Double-Blinded, Placebo-Controlled Trial to Evaluate the Safety and Efficacy of Inhaled Treprostinil in Subjects with Pulmonary Hypertension due to Parenchymal Lung Disease (Study RIN-PH-201)., A5688 American Thoracic Society, San Diego, CA 2018

9. A.J. Schissler, R.J. Glynn, P.S. Sobieszczyk, A.B. Waxman, Ultrasound-assisted catheter-directed thrombolysis (UACDT) compared with anticoagulation alone for treatment of acute submassive pulmonary embolism., A3786 American Thoracic Society, San Diego, CA 2018

10. S. Segrera, P. Joseph, J. Tracy, A. B. Waxman, D. M. Systrom, Submaximum exercise testing to evaluate outcomes in pulmonary vasodilator therapy in PAH., A2149 American Thoracic Society, San Diego, CA 2018

11. P. Joseph, J. Tracy , H. Mallidi , A. B. Waxman , D. M. Systrom, - Submaximum Exercise Testing to Evaluate Outcomes After Pulmonary Thromboendarterectomy., A3788 American Thoracic Society, San Diego, CA 2018

12. I. Singh, F. N. Rahaghi, M. Faria Urbina, R. K. Oliveira, T. Bachman, A. B. Waxman, D. M. Systrom, Right Ventricular-Pulmonary Arterial Uncoupling During Exercise in Pulmonary Hypertension., A4372 American Thoracic Society, San Diego, CA 2018

13. M. Faria Urbina, R. Oliveira, S. Segrera, L. Lawler, A. B. Waxman, D. M. Systrom, Impaired Systemic Oxygen Extraction in Treated Exercise Pulmonary Hypertension: A New Engine in an Old Car? A6144 American Thoracic Society, San Diego, CA 2018

14. M. Faria Urbina, R. Oliveira, A. Oaklander, A. B. Waxman, D. M. Systrom, Exercise Intolerance in Preload Failure Treated with Pyridostigmine., A6146 - American Thoracic Society, San Diego, CA 2018

15. Y. Han, P. R. Forfia, A. Vaidya, J. A. Mazurek, M. H. Park, G. Ramani, A. B. Waxman, Ranolazine and Right Ventricular Function in Patients with Pulmonary Hypertension., A7583 American Thoracic Society, San Diego, CA 2018

16. R. White, C. Meyer, M. Chin, J. P. Feldman, A. Goldsberry, J. W. McConnell, P. A. McCullough, M. O'Grady, V. F. Tapson, F. Torres, A. B. Waxman, R. J. Oudiz; Bardoxolone Methyl Increased

eGFR in Patients with Pulmonary Arterial Hypertension Associated with Connective Tissue Disease (The LARIAT Study)., A7584 American Thoracic Society, San Diego, CA 2018

17. M. Agarwal, M. Shah, B. Patel, V.J. Nolan, S. Agrawal, L. Garg, V. Anand, G.L. Reed, A.B. Waxman, R.J. Oudiz, G. Choudhary, B.A. Maron, Association Between Pulmonary Hypertension and 30-day Hospital Readmission for Congestive Heart Failure. American Heart Association Scientific Sessions, Chicago, IL 2018

18. R. Oliveira, M. Faria Urbina, A. B. Waxman, D. M. Systrom, Prognostic Impact of Exercise Pulmonary Hypertension in Patients with Unexplained Dyspnea., American Thoracic Society, Dallas TX, 2019

19. M. Faria Urbina, R. Oliveira, A. B. Waxman, D. M. Systrom, Mechanisms of Hyperventilation in Heart Failure with Preserved Ejection Fraction., American Thoracic Society, Dallas, TX 2019

20. S. Ansari, I. de La Bruere, I. Singh, C. E. Come, M. Faria Urbina, J. Leopold, A. Hunsaker, R. San Jose Estepar, G. R. Washko, D. M. Systrom, A. B. Waxman, F. N. Rahaghi, Right and Left Pulmonary Artery Dilation in Pulmonary Hypertension., American Thoracic Society, Dallas, TX 2019

21. N. Ruopp, I. De La Bruere, I. Singh, C. E. Come, M. Faria Urbina, J. Leopold, G. R. Washko, R. San Jose Estepar, D. M. Systrom, A. B. Waxman, F. N. Rahaghi, Main Pulmonary Artery Dilation in Early/Exercise Pulmonary Hypertension., American Thoracic Society, Dallas TX, 2019

22. I. Singh, R. Oliveira, R. Naeije, F. N. Rahaghi, W. M. Oldham, D. M. Systrom, A. B. Waxman, Pulmonary Vascular Distensibility and Early Pulmonary Vascular Remodeling in Pulmonary Hypertension., American Thoracic Society, Dallas, TX 2019

23. J. Sanders, Y. Han, D. M. Systrom, A. B. Waxman, Metabolomic Signatures of Exercise-Induced Pulmonary Hypertension Suggest It Physiologically Precedes Overt Pulmonary Hypertension., American Thoracic Society, Dallas, TX 2019

24. L. Yung, P. Yang, T. Dinter, G. Bocobo, Z. Augur, A. B. Waxman, D. Man, P. B. Yu, Cyclic Car Peptide Targets Pulmonary Vascular Endothelium and Enhances the Efficacy of Prostacyclin in Experimental Pulmonary Hypertension., American Thoracic Society, Dallas, TX 2019

25. F. N. Rahaghi, I. de La Bruere, I. Singh, P. Nardelli, C. E. Come, M. Faria Urbina, J. Leopold, A. Hunsaker, R. San José Estépar, D. M. Systrom, A. B. Waxman, G. R. Washko, Decrease in Intraparenchymal Small Vessel Fraction in Exercise Pulmonary Arterial Hypertension., American Thoracic Society, Dallas, TX 2019

26. P. Joseph, J. Sanders, A. Oaklander, T. C. A. Arevalo Rodriguez, R. Oliveira, M. Faria Urbina, A. B. Waxman, D. M. Systrom, The Pathophysiology of Chronic Fatigue Syndrome: Results from an Invasive Cardiopulmonary Exercise Laboratory., American Thoracic Society, Dallas, TX 2019

27. P. Hota, F.N. Rahaghi, R. San Jose Estepar, A.B. Waxman, A.R. Hunsaker, Dual Energy Derived Pulmonary Blood Volume Histogram Parameters as Biomarkers of Pulmonary Dysfunction in Acute and Chronic Pulmonary Thromboembolic Disease., Radiological Society of North America, Chicago, IL 2019

28. E. Harder, P.V. Hota, P. Nardelli, G.V. Sánchez-Ferrero, A. R. Hunsaker, A. B. Waxman, .G.R. Washko, R. San José Estépar, F. N. Rahaghi, Relationship Between Pulmonary Vascular Pruning

and Perfusion Defects in Thromboembolic Lung Disease., American Thoracic Society, Philadelphia, PA, May 2020

29. E.M. Harder, P. Nardelli, J. K. Minhas, A.B. Waxman, R. San José Estépar, G. Washko, F. N. Rahaghi, Distal Pulmonary Vascular Pruning in Acute Pulmonary Embolism and Chronic Thromboembolic Pulmonary Hypertension: A Comparison., American Thoracic Society, Philadelphia, PA, May 2020

30. T. Winkler, P. Kohli, V. J. Kelly, E. Gladysheva, M. Kone, K. Hibbert, J. M. Rodriguez-Lopez, D. M. Systrom, A. B. Waxman, J. G. Venegas, R. N. Channick, R. S. Harris, Regional Pulmonary Vascular Resistance in Pulmonary Arterial Hypertension., American Thoracic Society, Philadelphia, PA, May 2020

31. D. Badesch, S. Gibbs, M. Gomberg-Maitland, M. Humbert, V. Mclaughlin, I. Preston, R. Souza, A.B. Waxman, M. Mutyaba, S. Manimaran, J. Barnes, J. de Oliveira Pena, The PULSAR Study: An Ongoing Phase 2, Double-Blind, Placebo-Controlled, Randomized Study to Compare the Efficacy and Safety of Sotatercept (ACE-011) Versus Placebo When Added to Standard of Care for the Treatment of Pulmonary Arterial Hypertension., American Thoracic Society, Philadelphia, PA, May 2020

32. R. Pari, K. LeWine, A.B. Waxman, D.M. Systrom, Follow-up of Treated Pulmonary Arterial Hypertension Using A Submaximum Cardiopulmonary Exercise Test., American Thoracic Society, Philadelphia, PA, May 2020

33. Singh I, Oliveira R, Brown M, Faria Urbina M, Waxman A and Systrom D. Right Ventricular-Pulmonary Vascular Uncoupling Threshold During Incremental Exercise *A55 EXERCISE RELATED STUDIES AND CLINICAL STUDIES IN PULMONARY VASCULAR DISEASES*: American Thoracic Society; 2020: A2069-A2069.

34. Singh I, Oliveira R, Naeije R, Faria Urbina M, Waxman A and Systrom D. Systemic Vascular Distensibility Predicts Exercise Capacity in Connective Tissue Disease *B39 DYSPNEA, NEUROMUSCULAR DISEASE, MECHANICS, AND IMAGING*: American Thoracic Society; 2020: A3240-A3240.

35. Yu P, Yang P, Yung L-M, Augur Z, Kim S, Dinter T, Bocobo G, Waxman A and Mann D. Cyclic CAR Peptide Modulates the Effects of Treprostinil and Macitentan in Experimental Pulmonary Hypertension *D108 WHAT IS HOT, WHAT IS NEW? EMERGING MOLECULAR TARGETS IN PULMONARY HYPERTENSION AND ACUTE LUNG INJURY*: American Thoracic Society; 2020: A7856-A7856

36. A.Waxman, Fong YL, Jatkoe T, Cheng H, Zhou L, Bridges C., Feasibility of microRNA signatures for detection early stage pulmonary hypertension., European Respiratory Society, Vienna Austria, September 2020

37. M.F. Urbina, K. Ung, L.S. Zisman, A.B. Waxman, Inspiratory Flow Patterns with Dry Powder Inhalers (DPIs) of Low and Medium Resistance in Subjects with Pulmonary Arterial Hypertension., European Respiratory Society, Vienna Austria, September 2020

38. A.B. Waxman, R. Restrepo-Jaramillo, T. Thenappan, A. Ravichandran, P. Smith, E. Borg, L. Edwards, V. Tapson, S.D. Nathan, Impact of Inhaled Treprostinil on Patient Lung Function – Results from the INCREASE Study., American College of Chest Physicians Annual Meeting, Montreal Que, October 2020

44

# Attachment D

**Curricium Vitae – Prof. Dr. Gerhard Winter**

**Academic Qualifications:** PhD in Pharmacy, University of Heidelberg, 1987; Professor for Pharm. Technology and Biopharmaceutics, LMU München, 1999

**Research and Professional Experience:**

- 1999- ongoing, Professor for Pharmaceutical Technology and Biopharmaceutics, Ludwig-Maximilians-University Munich, Germany
- 1988-1999 Different Positions in Pharmaceutical R&D at Boehringer Mannheim, later Roche GmbH, Mannheim, Germany ( Drug delivery, Technology Assessement, External cooperations, Formulations research, GMP Manufacturing, Stability studies, Upscaling, Production transfer, CMC Dossier writing etc. )
- 1987-1988  Laboratory Head, Solid dosage Form Development, E. Merck, Darmstadt, Germany
- 1983-1987 Ph.D. Student in the area of transdermal delivery, University of Heidelberg, Germany
- 1977-1982 Pharmacy student, University of  Heidelberg, Germany

**Present research/professional specialty:** Protein formulation and analytics, immunogenicity of protein aggregates, vaccine delivery, Colloidal drug carriers, biomaterials, Drying technologies, Parenteral depot systems.

**Number of Refereed Journal Articles: > 100**

**Patents: > 45**

**Other publications: > 150 posters**
**Oral presentations : > 50**
**Editorial board : EJPB, J Pharm. Sci;**
**Symposium Organizer : Freeze drying conferences Garmisch and Breckenridge ( 4x), Protein Production meetings at Schaffhausen and ULM ( 4x), AF4 meeting Munich, CRS German Chapter Meeting**

# Schriftenverzeichnis

(Stand 31/12/2012)

## Prof. Dr. Gerhard Winter

| | |
|---|---|
| Patente | 35 |
| Publications | 94 |
| Book review | 3 |
| Abstracts | 150 |
| Ph.Ds. | 33 |
| Diplomarbeit | 1 |
| Oral presentations | 118 |

# **Patents**

1.
EP 0528313
H. Woog, W. Gruber, H.J. Markl, G. Winter, F. Demmer
„Verfahren zur Herstellung von humanproteinhaltigen, konservierten Arzneimitteln für Infusions- oder Injektionszwecke"

2.
EP 0528314
H. Woog, F. Demmer, G. Winter, H.J., Markl, W. Gruber
„Verfahren zur Herstellung von Humanprotein-enthaltenden, gut verträglichen Arzneimitteln für Infusions- und Injektionszwecke"

3.
EP 0607156 – US 5503827
H. Woog, W Gruber, H.J. Markl, G. Winter, F. Demmer
„Pharmaceutical preparations containing human protein for infusion or injection purpose"
(EPO-Injektionslösung, schmerzfrei II)

4.
US 5919757
G. Winter, U. Michaelis, Woog H, Rudolph R.
„Lagerstabile wässrige pharmazeutische Zubereitungen von G-CSF"
(Galenik-CSF I)

5.
EP 0656780 – US 5662918
G. Winter, B. Pichler, H. Woog, W. Heller
„Diphosphonsäuren und deren Salze enthaltende Arzneimittel"
„Pharmaceutical agents containing diphosphonic acids and salts thereof"
(Diphosphonhaltige Injektionslösungen)

EP 0674524 – US 5919443
U. Michaelis, R. Rudolph, G. Winter, H. Woog
„Stabile lyophilisierte pharmazeutische Zubereitungen von G-CSF"
(Galenik G-CSF II)

6.
WO 9628143
G. Winter, H. Koll, T. Kissel, M. Morlock
„Polypeptid-enthaltende pharmazeutische Darreichungsformen in Form von Mikropartikeln und Verfahren zu deren Herstellung"
(EPO/DDS-I)

PCT WO 97/15288
M. Mattern, G. Winter
„Zubereitungen und Verfahren zur Stabilisierung biologischer Materialien mittels Trocknungsverfahren ohne Einfrieren"

8.
PCT WO98/22136
G. Kallmeyer, G. Winter, Ch. Klessen, H. Woog
"Stabile lyophilisierte pharmazeutische Zubereitungen von mono oder polyklonalen Antikörpern"
„Stable lyophilized pharmaceutical substances from monoclonal or polyclonal antibodies"
(MAK- und HBV-Formulierungen)

9.
DE 19716154 A1
Rödel W., Mattern M., Winter G.
„Stabile pharmazeutische Darreichungsform für Peptide, Protein und Nukleinsäuren"
(Storage-stable lyophilized formulation of proteins)

10.
DE 100 21 917.9 – WO 01/85217
G. Winter, Göpferich A., Bastian P., Bader R. und Rödel W.
„Gelartige, pharmazeutische Zubereitung zur subkutanen Applikation enthaltend als Wirkstoff Bisphosphonsäuren oder deren physiologisch unbedenkliche Salze"

11.
EP 913177
M. Mattern, A. Wirl, R.D. Gabel, G. Winter, H. Woog
"Verfahren zur Herstellung trockener, amorpher Produkte enthaltend biologisch aktive Materialien mittels Konvektionstrocknung, insbesondere Sprühtrocknung
„Stabilisierung biologischer Materialien in sprühgetrockneten/sprühgranulierten Zubereitungen"
(Convection drying of human protein)

12.
WO 99/04838
Haar HP., Mecham GBK.
„Slingshot Technik"
(Electromagnetic transdermal injection device and methods RE)

13.
US 6238664-EP971879
Hellerbrand K., Winter G., Papadimitriou A.
„Verbessertes Verfahren zur Stabilisierung von Proteinen"

14.
BM 4526
Haar HP., Beuttenmueller, Mattern M., Mecham GBK.

EP 03004744
F. Gruber, G. Winter et al.
Method of producing a cationic liposomal preparation comprising a lipophilic compound

16.
EP 03029798
S. Waibler, G. Winter et al.
Method for producing colloidal nanoparticles

17.
EP 04005008
A. Stabenau, R. Schmidt, G. Winter et al.
Pharmaceutical composition for topical use in form of xerogels of films with controlled application of active ingredient microdroplets and a method for its production.

18.
EP 04023609
R. Schmidt, U. Gosslar, G. Winter
Wound dressing compositions, especially for delivery of protease inhibitors.

19.
Th. Willi, G. Winter
„Zweikammer-Injektionssystem"

20.
WO 2005/063377   PCT/ EP 2004/014684
H. Haas, G. Winter, S. Waibler
Method for producing colloidal nanoparticles with a compounder

21.
EP05026983.6
M. Wiggenhorn, H. C. Pellikaan, G. Winter
Preparation of Powders containing Colloidal Particles

22.
eingereicht
S. Mohl, G. Winter
Sustained protein drug delivery systems with precipitation and stabilising agents

23.
EP 06113895.4
R.Lang, G. Winter, Fa. Cytos
Nicotine-Carrier Vaccine Formulation

24.
U.S. 2007/0148196
H. Haas, G. Winter, S. Waibler
Method for producing colloidal nanoparticles with a compounder

25.

4

eingereicht
F. Siepmann, S. Herrmann, G. Winter, J. Siepmann
"A novel comprehensive mathematical model quantifying drug release from lipid implants"


26.
PCT , WO 2008-EP5766, 20080715
S. Hepbildikler, W. Kuhne, E. Rosenberg, G. Winter
„ Variable tangential flow filtration for concentrating an lg solution"


27.
PCT, WO 2008121301, 20081009
D. Borhani, W. Fraunhofer, H-J. Krause, A. Königsdorfer, G. Winter, S. Gottschalk
„Crystalline anti-human interleukin-12 antibodies"


28.
PCT, WO 2008055628, 20080515
M. Wiggenhorn, G. Winter, H. Haas, K. Drexler
„Lipid liposome preperation by single-pass process"


29.
PCT, WHO 2008-US9549, 20080808
W. Fraunhofer, D. Borhani, G. Winter, S. Gottschalk
„Compositions and methods for crystallizing therapeutic antibodies that satisfy stability and safety requirements, as well as patient compliance"


30.
PCT, WO 2008049633, 20080502
M. Wiggenhorn, G. Winter, H. Haas, K. Drexler
„Percolative drying fort he prepartion of particles"


31.
EP 1 915 987 A1
M. Wiggenhorn, G. Winter, H. Haas, K. Drexler
„Spray-freeze-drying process for the preparation of pellets comprising percolation drying"


32.
US provisional application, serial number 61/265,344
M. Schwab, A. Lammel, G. Winter, Th. Scheibel
„Spider silk particles for controlled and substained delivery of compounds"


33.
A. Lammel, T. Scheibel, M. Schwab, G. Winter, M. Hofer, J. Myschik
Silk particles for controlled and sustained delivery of compounds
PCT/EP2010/007266; WO/2011/063990.


34.
A. Besheer, M. Noga, G. Winter
METHOD FOR THE CONTROLLED INTRACELLULAR DELIVERY OF NUCLEIC ACIDS
1. Anmeldung:  EP 11 177 175.4
2. Anmeldung:  EP 11 195 030.9

35.
S. Fuchs, C. Coester, H. Gehlen, J. Klier, G. Winter
Immunomodulating nanoparticulate composition for use in inhalation therapy
28.12.2011, EP2399608A1

# Publications

1.
**H. Stricker, G. Winter, A. Leber**
Galenische Faktoren der kutanen Wirkstoffpenetration in vivo
Acta Pharm. Technol. **33 (2)** (1987), 80-87

2.
**G. Winter, G. Lee, H. Stricker**
Dermal drug absorption and its in vitro simulation
Acta Pharm. Technol. **33** (1987), 233-234

3.
**Ch. Gido, P. Langguth, J. Kreuter, G. Winter, H. Woog, E. Mutschler**
Conventional versus novel conditions for the in vitro dissolution testing of parenteral slow release formulations: Application to doxepin parenteral dosage forms.
Pharmazie **48 (10)** (1993), 764-769  PMID:  8265710

4.
**M. Morlock, H. Koll, G. Winter, T. Kissel**
Microencapsulation of rh-erythropoietin, using biodegradable poly(D,L-lactide-co-glycolide): protein stability and the effects of stabilizing excipients
Eur. J. Pharm. Biopharm. **43 (1)** (1997) 29-36

5.
**M. Mattern, G. Winter, R. Rudolph, G. Lee**
Formulation of proteins in vacuum-dried glasses. I. Improved vacuum-drying of sugars using crystallising amino acids
Eur. J. Pharm. Biopharm. **44 (2)** (1997), 177-185

6.
**B. Bittner, M. Morlock, H. Koll, G. Winter, T. Kissel**
Recombinant human erythropoietin (rhEPO) loaded poly(lactide-co-glycolide) micropheres: influence of the encapsulation technique and polymer purity on microsphere characteristics
Eur. J. Pharm. Biopharm. **45** (1998), 295-305

7.
**M. Morlock, T. Kissel, Y. Li, H. Koll, G. Winter**
Erythropoietin loaded microspheres prepared from biodegradable LPLG-PEO-LPLG triblock copolymers: Protein stabilization and in-vitro release properties
J. Control. Release **56** (1998), 105-115

8.
**M. Mattern, G. Winter, U. Kohnert, G. Lee**
Formulation of proteins in vacuum-dried glasses. II. Process and storage stability in sugar-free amino acid systems
Pharm. Develop. Technol. **4 (2)** (1999), 199-208

9.

**K.F. Pistel, B. Bittner, H. Koll, G. Winter, T. Kissel**
Biodegradable recombinant human erythropoietin loaded microspheres prepared from linear and star-branched block copolymers: Influence of encapsulation technique and polymer composition on particle characteristics
J. Control. Release **59** (1999), 309-325

10.

**L.S. Jones, T.W. Randolph, U. Kohnert, A. Papadimitriou, G. Winter, M.-L. Hagmann, M.C. Manning, J.F. Carpenter**
The effects of Tween 20 and sucrose on the stability of anti-L-selectin during lyophilization and reconstitution
J. Pharm. Sci. **90 (10)** (2001), 1466-1477  PMID: 11745706

11.

**C. Roth, G. Winter, G. Lee**
Continuous measurement of drying rate of crystalline and amorphous systems during freeze-drying using an in situ microbalance technique
J. Pharm. Sci. **90 (9)** (2001), 1345-1355  PMID: 11745787

12.

**K. Schumacher, G. Winter, H.-C. Mahler**
Instabilitäten von Proteinarzneimitteln
PZ Prisma **10 (1)** (2003), 15-18

13.

**W. Fraunhofer, G. Winter, J. Zillies, C. Coester**
Asymmetrical flow field-flow fractionation as new analytical tool in pharmaceutical biotechnology
New Drugs **2 March** (2003), 16-19

14.

**W. Fraunhofer, G. Winter, C. Coester**
Asymmetrical flow field-flow fractionation and multiangle light scattering for analysis of gelatin nanoparticle drug carrier systems
Anal Chem **76 (7)** (2004), 1909-1920  PMID: 15053651

15.

**S. Mohl, G. Winter**
Continuous release of rh-interferon α-2a from triglyceride matrices
J. Control Release **97** (2004), 67-78  PMID: 15147805

16..

**W.Fraunhofer, G. Winter**
The use of asymmetrical flow field-flow fractionation in pharmaceutics and biopharmaceutics
Eur J Pharm Biopharm **58 (2)** (2004), 369-383  PMID: 15296962

17.
**M. Wiggenhorn, I. Presser, G. Winter**
The current state of PAT in freeze-drying
American Pharmaceutical Review, January/February 2005, Volume 8 (1), 38–44
European Pharmaceutical Review **10 (4)** (2005) 87-92

18.
**S. Mohl, G. Winter**
Continuous release of rh-interferon α-2a from triglyceride implants: storage stability of the dosage forms
Pharmaceutical Development and Technology**, 11 (1)** 2006, 103-110

19.
**T. Schönbrodt, S. Mohl, G. Winter, G. Reich**
NIR spectroscopy – a non-destructive analytical tool for protein quantification within lipid implants
Journal Control Release, **114** (2006), 261-267

20.
**G. Winter**
Steriltechnik in der Herstellung pharmazeutischer Produkte
Chemie Ingenieur Technik **78 (11)** (2006), 1690-1696

21.
**S. Hermann, G. Winter, S. Mohl, F. Siepmann, J. Siepmann**
Mechanisms controlling protein release from lipidic implants: effects of PEG addition
J Control Release **118** (2007), 161-168  PMID: 17275943

22.
**S. Herrmann, S. Mohl, F. Siepmann, J. Siepmann, G. Winter**
New insight into the role of polyethylene glycol acting as protein release modifier in lipidic implants
Pharm. Res. **24 (8)** (2007), 1527-1537  PMID: 17380261

23.
**A. Stabenau, G. Winter**
Application and drying of protein drug microdroplets on solid surfaces
Pharm Dev Technol **12 (1)** (2007), 61-70  PMID: 17484145

24.
**J. P. Gabrielson JP, M. L. Brader, A. H. Pekar, K. B.Mathis, G. Winter G, J. F. Carpenter, T. W.  Randolph TW.**
Quantitation of aggregate levels in a recombinant humanized monoclonal antibody formulation by size-exclusion chromatography, asymmetrical flow field flow fractionation, and sedimentation velocity.
J Pharm. Sci.  **96 (2)** (2007), 268-279.  PMID:  17080424

25.

**J.C. Zillies, K. Zwiorek, G. Winter, C. Coester**
Method for quantifying the PEGylation of gelatin nanoparticle drug carrier systems using asymmetrical flow field-flow fractionation and refractive index detection
Anal. Chem. **79 (12)** (2007), 4574-4580.  PMID: 17506521

26.

**R. Bekeredjian, R. Kroll, E.Fein, S. Tinkov, C. Coester, G. Winter, H.A. Katus, H.Kulaksiz**
Ultrasound targeted microbubble destruction increases capillary permeability in hepatomas
Ultrasound Med. Biol. **33 (10)** (2007), 1592-1598.   PMID: 17618040

27.

**M. Hossann, M.Wiggenhorn, A.Schwerdt, K. Wachholz, N. Teichert, H. Eibl, R. D. Issels, L. H. Lindner**
In vitro stability and content release properties of phosphatidylglyceroglycerol containing thermosensitve liposomes
Biochimica et Biophysica Acta (BBA) - Biomembranes,  **1768 (10)** (2007), 2491-2499

28.

**K. Zwiorek, C. Bourquin, J. Battiany, G. Winter, S. Endres, G. Hartmann, C.Coester'**
Delivery by cationic gelatin nanoparticles strongly increases the immunostimulatory effects of CpG oligonucleotides
Pharm Res **25 (3)** (2008), 551-562.  PMID: 17912489

29.

**F. Siepmann, S. Herrmann, G. Winter, J. Siepmann**
A novel mathematical model quantifying drug release from lipid implants
J Control Release **128 (3)** (2008), 233-240.  PMID: 18442866

30.

**J. Zillies, K. Zwiorek, F. Hoffmann, A. Vollmar, T. Anchordoquy, G. Winter, C. Coester**
Formulation development of freeze-dried oligonucleotide-loaded gelatin nanoparticles
Eur J of Pharm Biopharm **70 (2)** (2008), 514-521.  PMID: 18582569

31.

**M. Schwab, B. Kessler, E. Wolf, G. Jordan, S. Mohl, G. Winter**
Correlation of in vivo and in vitro release data for rh-INFalpha lipid implants
Eur J Pharm Biopharm **70 (2)** (2008), 690-694.  PMID:  18582576

32.

**A. Lammel, M. Schwab, Ute Slotta, G. Winter, Th. Scheibel**
Processing conditions for the formation  of spider silk microspheres
ChemSusChem, **1 (5)** (2008), 413-416.  PMID: 18702135

33.

**J. F. Carpenter, Th. W. Randolph, W. Jiskoot, D. J. Crommelin, C. Middaugh, G. Winter, Y. Fan, S. Kirshner, D. Verthelyi, St. Kozlowski, K. Clouse, P. Swann, A. Rosenberg, B. Cherney**
Overlooking subvisible particles in therapeutic protein products: gaps that may compromise product quality
J Pharm Sci **98 (4)** (2009), 1201-1205.  PMID:  18704929

34.

**C. Bourquin, D. Anz, K. Zwiorek, A-L. Lanz, S. Fuchs, S. Weigel, C. Wurzenberger, P. von der Borch, M. Golic, S. Moder, G. Winter, C. Coester, S. Endres**
Targeting CpG oligonucleotides to the lymph node by nanoparticles elicits efficient antitumoral immunity
J Immunol **181 (5)** (2008), 2990-2998.  PMID: 18713969

35.

**St. Tinkov, R. Bekeredijan, G. Winter, C. Coester**
Microbubbles as ultrasound triggered drug carriers
J Pharm Sci **98 (6)** (2009), 1935-1961.  PMID:  18979536

36.

**R. Lang, G. Winter, L.Vogt, A. Zürcher, B. Dorigo, B. Schimmele**
Rational design of a stable, freeze-dried virus-like particle-based vaccine formulation
Drug Dev Ind Pharm **35 (1)** (2009), 83-97.  PMID: 19016059

37.

**S. Schulze, G. Winter**
Lipid extrudates as novel sustained release systems for pharmaceutical proteins
J Control Release **134 (3)** (2009), 177-185.  PMID: 19121347

38.

**F. Hoffmann, G. Sass, J. Zillies, St. Zahler, G. Tiegs, A. Hartkorn, J. Wagner, G. Winter, C. Coester, A.L. Gerbes, A. Vollmar**
A novel technique for selective NF-kappaB inhibition in Kupffer cells shows contrary effects in fulminant hepatitis and ischemia-reperfusion"
Gut  **58 (12)** (2009), 1670-1678.  PMID: 19470497

39.

**St. Tinkov, R. Bekeredjian, G. Winter, C. Coester**
Characterization of ultrasound-mediated destruction of drug-loaded microbubbles using an improved in vitro model
Applied Acoustics **70 (10)**  (2009) 1323–1329

40.

**S. Fuchs, R. Parlitz, D. Gau, G., C. Coester**
Ultrasonic resonator technology - A tool to fill a gap in analytics of nanoparticulate oligonucleotide drug delivery systems
J Microencaps **27 (3)** (2010), 242-252

41.

**S. Schultes, K. Mathis, J. Zillies, K. Zwiorek, C. Coester, G. Winter**
Analysis of prototype polymers and protein nanoparticles with asymmetrical flow field-flow fractionation
LC-GC Europe **22 (8)** (2009)

42.

**E. Rosenberg, S. Hepbildikler, W. Kuhne, G.Winter**
Ultrafiltration Concentration of Monoclonal Antibody Intermediate Solutions: Development of an Optimized Method minimizing Aggregation
Journal of Membrane Science **342** (2009) 50–59, JMS-08967R1

43.

**M. Schwab, G. Sax, S. Schulze, G. Winter**
Studies on the lipase induced degradation of lipid based drug delivery systems
J Control Release. **140 (1)** (2009), 27-33   PMID: 19619592

44.

**T. De Beer, M. Wiggenhorn, R. Veillon, C. Debacq, Y. Mayeresse, B. Moreau, A. Burggraeve, W. Friess, G. Winter, C. Vervaet, J. P. Remon, W. Baeyens**
The importance of using complementary process analyzers for the process monitoring, analysis and understanding of freeze drying
Anal Chem **81 (18)** (2009), 7639-7649.  PMID:  19681620

45.

**R. Lang, L. Vogt, A. Zürcher, G. Winter**
Asymmetrical Flow FFF as an Analytical Tool for the Investigation of the Physical Stability of Virus-Like Particles
LCGC North America 2009 Sept 1

46.

**R. Lang, L. Vogt, A. Zürcher, G. Winter**
Virus-Like Particle Characterization Using New AF4 Channel Technology
American Laboratory 2010 April 02

47.

**T. Serno, J.F. Carpenter, Th. W. Randolph, G. Winter**
Inhibition of agitation-induced aggregation of an IgG-antibody by hydroxypropyl-β-cyclodextrin
J Pharm Sci. **99 (3)** (2010), 1193-1206.  PMID:  19774651

48.

**J. F. Carpenter, T. W. Randolph, W. Jiskoot, D. J. Crommelin, C. R. Middaugh, G. Winter**
Potential inaccurate quantitation and sizing of protein aggregates by size exclusion chromatography: Essential need to use orthogonal methods to assure the quality of therapeutic protein products
J Pharm Sci **99 (5)** (2010), 2200-2208.  PMID: 19918982

49.

**W. Tian, S. Schulze, M. Brandl, G. Winter**
Vesicular phospholipid gel-based depot formulations for pharmaceutical proteins: development and in vitro evaluation
J Control Release **142 (3)** (2010), 319-325.  PMID:  19925833

50.

**K. Schersch, O. Betz, P. Garidel, S. Muehlau, S. Bassarab, G. Winter**
Systematic investigation of the effect of lyophilizate collapse on pharmaceutically relevant proteins I: Stability after freeze drying
J Pharm Sci **99 (5)** (2010), 2256-2278.  PMID: 20039389

51.

**S. Tinkov, G. Winter, C. Coester, R. Bekeredjian**
New doxorubicin-loaded phospholipid microbubbles for targeted tumor therapy : Part I - Formulation development and in-vitro characterization
J Control Release **143 (1)** (2010), 143-150.  PMID: 20060861

52.

**C. Bourquin, C. Wurzenberger, S. Heidegger, S. Fuchs, D. Anz, S. Weigel, N. Sandholzer, G.Winter, C.Coester, S. Endres**
Delivery of immunostimulatory RNA oligonucleotides by gelatin nanoparticles triggers an efficient antitumoral response"
Journal of Immunotherapy **33 (9)** (2010), 935-44

53.

**M. Hossann, T. Wang, M. Wiggenhorn, R. Schmidt, A.Zengerle, G.Winter, H. Eibl, M. Peller, M. Reiser, R. D. Issels, L. H. Lindner**
Size of thermosensitive liposomes influences content release
J Control Release **147** (2010), 436–443

54.

**S. Fuchs, G. Winter and C. Coester**
Ultrasonic resonator technology as a new quality control method evaluating gelatin nanoparticles
J Microencapsul **27 (3)** (2010), 242-252.  PMID: 20406094

55.

**K. Ofokansi, G. Winter, G. Fricker, C. Coester**
Matrix-loaded biodegradable gelatin nanoparticles as new approach to improve drug loading and delivery
Eur J  Pharm Biopharm **76 (1)** (2010), 1–9  PMID: 20420904

56.

**S. Tinkov, C. Coester, S. Serba, N. A. Geis, H. A. Katus, G. Winter, R. Bekeredjian**
New doxorubicin-loaded phospholipid microbubbles for targeted tumor therapy:
Part II — In-vivo characterization
Journal of Controlled Release **148** (2010), 368–372

57.

**S. Fuchs, M. Kutscher, T. Hertel, G. Winter, M. Pietzsch and C. Coester**
Transglutaminase: new insights into gelatin nanoparticle cross-linking
J Microencapsul, **27 (8)** (2010), 747–754.  PMID: 21034367

58.

**A. Lammel, M. Schwab,  M. Hofer, G. Winter, T. Scheibel**
Recombinant spider silk particles as drug delivery vehicles
Biomaterials **32 (8)** (2011), 2233-2240.  PMID: 21186052

59.

**A. J. Freitag, K. Wittmann, G. Winter, J. Myschik**
The preparative use of flow field-flow fractionation (AF4)
LC GC Europe **24 (3)** (2011), 134 – 140

60.

**T.R.M. De Beer, M. Wiggenhorn, A. Hawe, J.C. Kasper, A. Almeida,T. Quinten, W. Friess , G. Winter, C. Vervaet, J.P. Remon**
Optimization of a pharmaceutical freeze-dried product and its process using an experimental design approach and innovative process analyzers"
Talanta **83 (5)** (2011), 1623–1633.  PMID: 21238761

61.

**S. P. Hertel, W. Friess, G. Winter**
Comparison of aerosol collection methods for liquid protein formulations
RDD Europe **2** (2011), 345-350

62.

**A. J. Freitag, K. Wittmann, I. Immohr, G. Winter, J. Myschik**
Asymmetrical flow field-flow fractionation – a preparative tool to obtain endotoxin-free protein species
G.I.T. Laboratory Journal Europe **15** (2011), 11-12

63.

**T. Serno, R. Geidobler, G. Winter**
Protein stabilisation by cyclodextrins in the liquid and dried state
Adv Drug Deliv Rev **63 (13)** (2011), 1086-1106  PMID: 21907254

64.

**J. Klier, S. Fuchs, A. May, U. Schillinger, C. Plank, G. Winter, C. Coester, H. Gehlena**
Immunostimulation of bronchoalveolar lavage cells from recurrent airway obstruction-affected horses by different CpG-classes bound to gelatin nanoparticles
Veterinary Immunology and Immunopathology **144** (2011), 79–87

65.

**S. Bauersachs, S.E. Ulbrich, H.D. Reichenbach, M. Reichenbach, M. Büttner, H.H. Meyer, T.E. Spencer, M. Minten, G. Sax, G. Winter, E. Wolf.**
Comparison of the effects of early pregnancy with human Interferon, Alpha 2 (IFNA2), on gene expression in bovine endometrium
Biol Reprod  **86 (2)** (2012), 1–15. doi: 10.1095/biolreprod.111.094771. Epub 2011 Oct 27
PMID: 22034527

66.

**E. E. Kis, G. Winter, J. Myschik**
Devices for intradermal vaccination
Vaccine **30 (3)** (2011), 523-538. doi: 10.1016/j.vaccine.2011.11.020. Epub 2011 Nov 18
PMID: 22100637

67.

**M. Hofer, G. Winter, J. Myschik**
Recombinant spider silk particles for controlled delivery of protein drugs
Biomaterials. **33 (5)** (2012), 1554-62. Epub 2011 Nov 9

68.

**S. Zölls, R.Tantipolphan, M. Wiggenhorn, G. Winter, W. Jiskoot, W. Friess, A. Hawe**
Particles in Therapeutic Protein Formulations, Part 1: Overview of Analytical Methods
J Pharm Sci. **101 (3)** (2012)**,** 914-35   PMID: 22161573

69.

**W. Jiskoot, T. W. Randolph, D. B. Volkin, C. R. Middaugh, C. Schöneich, G. Winter, W. Friess W, D. J. Crommelin, J. F. Carpenter**
Protein instability and immunogenicity: Roadblocks to clinical application of injectable protein delivery systems for sustained release
J Pharm Sci. **101 (3)** (2012), 946-54. doi: 10.1002/jps.23018. Epub 2011 Dec 14.
PMID: 22170395

70.

**M. Noga, D. Edinger, W. Rödl, E. Wagner, G. Winter, A. Besheer**
Controlled shielding and deshielding of gene delivery polyplexes using hydroxyethyl starch (HES) and alpha-amylase
J Control Release **159 (1)** (2012), 92-103.  Epub  2012 Jan 16.  PMID: 22269664

71.

**J. Klier , S. Fuchs , A. May, U.  Schillinger, C. Plank, G. Winter, H. Gehlen, C. Coester**
A nebulized gelatin nanoparticle-based CpG formulation is effective in immunotherapy of allergic horses
Pharm Res. **29 (6)** (2012), 1650-1657. doi: 10.1007/s11095-012-0686-8.
Erratum in Pharm Res  **29 (7)** (2012), 2030.  PMID: 22302522

72.

**S. Fuchs, J. Klier , A. May, G. Winter, C. Coester C, H. Gehlen**
Towards an inhalative in vivo application of immunomodulating gelatin nanoparticles in horse-related preformulation studies
J Microencapsul. **29 (7)** (2012), 615-625. doi: 10.3109/02652048.2012.668962. Epub 2012 Mar 20.  PMID: 22432849

73.

**Y. Deng, G. Winter, J. Myschik**
Preparation and validation of a skin model for the evaluation of intradermal powder injection devices
Eur J Pharm Biopharm **81(2)** (2012), 360-368. doi: 10.1016/j.ejpb.2012.03.008. Epub 2012 Mar 30  PMID: 22484250

74.

**K. Schersch, O. Betz, P. Garidel, S. Muehlau, S. Bassarab, G. Winter**
Systematic investigation of the effect of lyophilizate collapse on pharmaceutically relevant proteins, Part 2: stability during storage at elevated temperatures"
J Pharm Sci. **101 (7)** (2012), 2288-2306. doi: 10.1002/jps.23121. Epub 2012 Apr 19. PMID: 22517663

75.

**G. Sax, F. Feil, S. Schulze, Ch. Jung, Ch. Bräuchle, G. Winter**
Release pathways of interferon α2a molecules from lipid twin screw extrudates  revealed by single molecule fluorescence microscopy
J Control Release **162 (2)** (2012), 295-302. doi:10.1016/j.jconrel.2012.07.014. Epub 2012 Jul 20   PMID: 22820452

76.

**T. Serno, E. Härtl, A. Besheer, R. Miller, G. Winter**
The role of polysorbate 80 and HP β CD at the air-water interface of IgG solutions
Pharm Res. **30 (1)** (2013), 117-130. doi: 1007/s11095-012-0854-x. Epub 2012 Aug 22. PMID: 22910890

77.

**S. Buchmann, G.H. Sandmann, L. Walz, H. Hoppe, K. Beitzel, G. Wexel, W. Tian, G. Winter, A.B.  Imhoff**
Refixation of the supraspinatus tendon in a rat model - influence of continuous growth factor application on tendon structure
J Orthop Res. **31 (2)** (2013), 300-305.  doi: 10.1002/jor.22211. Epub 2012 Aug 21 PMID: 22912341

78.

**G. Sax, G. Winter**
Mechanistic studies on the release of lysozyme from twin-screw extruded lipid implants
J Control Release **163 (2)** (2012), 187-194. doi: 10.1016/j.jconrel.2012.08.025. [Epub  2012 Sep 1. PMID: 22964391

79.

**G. Sax, B. Kessler, E. Wolf, G. Winter**
In-vivo biodegradation of extruded lipid implants in rabbits
J Control Release **163 (2)** (2012), 195-202. doi:10.1016/j.jconrel.2012.08.026. Epub 2012 Sep 1  PMID: 22964393


80.

**R. Geidobler, S. Mannschedel, G. Winter**
A new approach to achieve controlled ice nucleation of supercooled solutions during the freezing step in freeze-drying
J  Pharm. Sci. **101 (12)** (2012), 4409-4413. doi: 10.1002/jps.23308. Epub 2012 Sep 10. PMID: 22965644


81.

**V. Iyer, N. Maddux,  L. Hu, W. Cheng, A. K. Youssef, G. Winter, S. B. Joshi, D. B. Volkin, C. R. Middaugh**
Comparative signature diagrams to evaluate biophysical data for differences in protein structure across various formulations
J Pharm Sci  **102 (1)**  (2013),43-51. doi: 10.1002/jps.23367. Epub 2012 Nov 15. PMID: 23160989


82.

**M. Noga, D. Edinger,  R. Kläger, S. V. Wegner, J. P. Spatz, E. Wagner, G. Winter, A. Besheer**
The effect of molar mass and degree of hydroxyethylation on the controlled shielding and deshielding of hydroxyethyl starch-coated polyplexes
Biomaterials **34 (10)** (2013), 2530-2538.  doi: 10.1016/j.biomaterials.2012.12.025.  Epub 2013 Jan 11.  PMID: 23312901


83.

**A. M. Youssef, G. Winter**
A critical evaluation of microcalorimetry as a predictive tool for long term stability of liquid protein formulations: Granulocyte Colony Stimulating Factor  (GCSF)
Eur J Pharm Biopharm **84 (1)** (2013), 145-155. doi: 10.1016/j.ejpb.2012.12.017. Epub 2013 Jan 18  PMID: 23333898


84.

**M. Schwab, C. M. McGoverin, K. C. Gordon, G. Winter, T. Rades, J. Myschik, C. J. Strachan**
Studies on the lipase-induced degradation of lipid-based drug delivery systems. Part II – Investigations on the mechanisms leading to collapse of the lipid structure
Eur J Pharm Biopharm 2013 Feb 4. doi: pii: S0939-6411(13)00031-3. 10.1016/j.ejpb.2012.12.023.  PMID: 23385286


85.

**E. E. Etzl, G. Winter, J. Engert**
Toward intradermal vaccination: preparation of powder formulations by collapse freeze-drying
Pharm Dev Technol 2013 Feb 25.  PMID:  23432539

86.

**A. Hawe, F. Schaubhut, R. Geidobler, M. Wiggenhorn, W. Friess, M. Rast, C. de Muynck, G. Winter**
Pharmaceutical feasibility of sub-visible particle analysis in parenterals with reduced volume light obscuration methods
Eur J Pharm Biopharm 2013 Feb 27. doi: pii: S0939-6411(13)00058-1.
10.1016/j.ejpb.2013.02.004. PMID: 23454051

87.

**S. Zölls, M. Gregoritza, R. Tantipolphan, M. Wiggenhorn, G. Winter, W. Friess, A. Hawe**
How subvisible particles become invisible-relevance of the refractive index for protein particle analysis
J Pharm Sci 102 (5) (2013), 1434-1446. doi: 10.1002/jps.23479. Epub 2013 Mar 5.
PMID: 23463514

88.

**D. Weinbuch, S. Zölls, M. Wiggenhorn, W. Friess, G. Winter, W. Jiskoot, A. Hawe**
Micro-flow imaging and resonant mass measurement (Archimedes) – complementary methods to quantitatively differentiate protein particles and silicone oil droplets
J Pharm Sci 102 (7) (2013), 2152-2165. doi: 10.1002/jps.23552. Epub 2013 Apr 26.
PMID: 2362585

89.

**R. Geidobler, G. Winter**
Controlled ice nucleation in the field of freeze-drying: Fundamentals and technology review
Eur J Pharm Biopharm 2013 May 2. doi:pii: S0939-6411(13)00160-4.
10.1016/j.ejpb.2013.04.014.  PMID: 23643793

90.

**E. Härtl, N. Dixit, A. Besheer, D. Kalonia, G. Winter**
Weak antibody-cyclodextrin interactions determined by quartz crystal microbalance and dynamic/static light scattering
Eur J Pharm Biopharm 2013 May 17. doi:pii: S0939-6411(13)00167-7.
10.1016/j.ejpb.2013.04.021.  PMID: 23685354

91.

**R. Mathaes, G. Winter, J. Engert, A. Besheer**
Application of different analytical methods for the characterization of non-spherical micro- and nanoparticles
Int J Pharm 2013 May 29. doi:pii: S0378-5173(13)00463-8.
10.1016/j.ijpharm.2013.05.046.  PMID:23727141

92.

**K. Schersch, O. Betz, P. Garidel, S. Muehlau, S. Bassarab, G. Winter**
Systematic investigation of the effect of lyophilizate collapse on pharmaceutically relevant proteins III: Collapse during storage at elevated temperatures
Eur J Pharm Biopharm 2013 May 31. doi:pii: S0939-6411(13)00195-1.
10.1016/j.ejpb.2013.05.009.  PMID: 23727369

93.

**J. C. Kasper, G. Winter, W. Friess**
Recent advances and further challenges in lyophilization
Eur J Pharm Biopharm 2013 Jun 7. doi:pii: S0939-6411(13)00218-X.
10.1016/j.ejpb.2013.05.019.  PMID: 2375160

94.

**W. Friess, G. Winter**
Meeting the challenges in freeze-drying of pharmaceuticals and biological
Eur J Pharm Biopharm 2013 Jun 29. doi:pii: S0939-6411(13)00244-
0.10.1016/j.ejpb.2013.06.025  PMID: 23820293

95.

**A. R. Prélaud, S. Fuchs, K. Weber, G. Winter, C. Coester, R. S. Müller**
In vitro effects of CpG oligodeoxynucleotides delivered by gelatin nanoparticles on canine
peripheral blood mononuclear cells of atopic and healthy dogs – a pilot study
Vet Dermatol  2013 Jul 5. doi:10.1111/vde.12056  PMID: 23826658

# Reviews

**G. Winter**
Pharmaceutical Product Properties
in: Handbook of Pharmaceutical Drying Technology, Marcel Dekker Verlag

am 09.06.1999 eingereicht

**G. Winter**
Book review:
Excipient Toxicity and Safety
08.05.2000

**G. Winter**
Book review:
Biopharmaceutical processs validation
01.08.2000

# Abstracts

1.
**J. Möckel, G. Kallmeyer, E. Münch, T. Vocke, G. Winter, F. Woltmann**
Application of isolator technology to produce small scale clinical samples for gene therapy
2nd World Meeting on Pharmaceutics, Paris 1998

2.
**Jones, Randolph, Kohnert, Papadimitriou, Winter, Hagman, Carpenter**
The roles of tween 20 and sucrose in stabilizing anti 1-selectin in lyophilized formulations
2. Breckenridge-Meeting on Stabilization of biological drugs, Breckenridge 1998

3.
**C. Schroer, G. Kallmeyer, R. Schubert, G. Winter, F. Woltmann**
Influences on the in vitro transfection efficiency of DOTAP-Plasmid complexes
Doktoranden Tagung der DPhG, Freiburg 1999

4.
**W. Fraunhofer, H.-J. Krause, H. Schuch, G. Winter**
"Asymmetrical flow field-flow fractionation: A new approach to analysis of high-molecular weight protein aggregates?"
CRS-Congress, San Diego 2001

5.
**H. Reithmeier, G. Winter**
„Accelerated isothermal and non-istothermal stability studies of aqueous protein formulations"
CRS-Congress, San Diego 2001

6.
**R. Zippelius, G. Winter**
„New Methods in large-scale Cryopreservation of pharmaceutical protein solutions"
4th Centr. Europ. Symp. on Pharm. Technol., Wien 23. – 25.09.2001

7.
**S. Waibler, C. Welz, C. Mundus, U. Michaelis, G. Winter**
„Easy preparation of cationic liposomes accomplished by extrusion and sterile filtration avoiding the film-method"
4th Centr. Europ. Symp. on Pharm. Technol., Wien 23. – 25.09.2001

8.
**I. Presser, N. Denkinger, H. Hörmann, G. Winter**
„New Methods in the monitoring of freeze drying proceses: Validation of the microbalance"
4th Centr. Europ. Symp. on Pharm. Technol., Wien 23. – 25.09.2001

9.
**C. Welz, M. Schmitt-Sody, S. Krasnici, G. Winter, B. Sauer, M. Teifel, U. Michaelis, M. Dellian**
„Vascular tumor targeting with pegylated cationic liposomes"
AAPS Annual Meeting and Exposition, Denver, 21. – 25.10.2001
AAPS Pharm. Sci [SM] Volume 3, Number 3 (Supplement)

10.
**S. Mohl, H. Reithmeier, G. Winter**
„Towards Controlled Protein Release From Lipid Implants, Protein Stability Assessment During Manufacture And Incuabtion"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

11.
**S. Waibler, C. Welz, C. Mundus, U. Michaelis, G. Winter**
„Conformation And Homogeneity Of Cationic Liposomal Membranes Investigated By Fluorescence Resonance Energy Transfer"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

12.
**S. Effer, B. Obermayer, B. Ladstetter, G. Winter**
„Toxicity And Permeability Screening Of Microemulsions Using Caco-2 Cells And Class II Drugs"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

13.
**A. Stabenau, G. Winter**
„Hot-air-drying: a novel drying method for concentrated protein drug solutions"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

14.
**W. Fraunhofer, H.-J. Krause, G. Winter**
"Identification Of Particulate Matter In Siliconized Disposable Syringes With Asymmetrical Flow Field-Flow-Fractionation"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

15.
**M. Willmann, G. Winter**
„Vacuum drying of pharmaceutical protein solutions – Evaluation of laboratory vacuum concentration equipment"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

16.
**I. Presser, N. Denkinger, H. Hörmann, G. Winter**
„New Methods In Monitoring Of Freeze-Drying: The Use Of Mass Spectrometer Gas Analysis to Develop Freeze-Drying Processes"
4th World Meeting on Pharmaceutics, Biopharmaceutics, Pharmaceutical Technology, Florenz 08.-11.04.2002

**S. Mohl, H. Reithmeier, G. Winter**
„Sustained release of BSA from implant systems by using physiological lipids"
2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

18.
**W. Fraunhofer, H.-J. Krause, G. Winter**
„Towards overall quantification of protein instability outcome: fragments, aggregates, precipitates"
2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

19.
**R. Zippelius, W. Kuhne, J. Burg, J. Wahl, G. Winter**
„Methods for the stabilization of a monoclonal antibody in solution against freeze-induced aggregation"
2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

20.
**A. Stabenau, G. Winter**
„Effect of the sugar matrix composition on the stabilization of proteins during evaporative drying with heated nitrogen"
2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

21.
**I. Presser, N. Denkinger, H. Hörmann, G. Winter**
„New methods in monitoring of freeze-drying: Near-infrared spectroscopy determination of residual moisture during freeze-drying processes"2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

22.
**M. Willmann, W. Fraunhofer, G. Winter**
„Reversible aggregation of G-CSF during vacuum drying from aqueous solutions"
2002 Colorado Protein Stability Conference, Breckenridge, 17.-20.07.2002

23.
**S. Mohl, H. Reithmeier, G. Winter**
„Lipid implant as a promising alternative to polymeric drug delivery systems for the controlled release of pharmaceutical proteins"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

24.
**W. Fraunhofer, H.-J. Krause, G. Winter**
„Latest developments in asymmetrical flow field-flow fractionation: a separation method with wide applicability in pharmaceutics"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

25.
**M. Willmann, W. Fraunhofer, G. Winter**
„Vacuum drying of protein solutions – New results in evaluation of vacuum concentration processes"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

**I. Presser, N. Deckinger, H. Hörmann, G. Winter**
"Monitoring and adjusting the residual moisture level during the freeze-drying process using Near-infrared and Mass Spectrometry"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

27.
**R. Zippelius, K. Reichert, J. Burg, J. Wahl, G. Winter**
„Critical Parameters in Large Scale Freeze-Thawing of Pharmaceutical Proteins"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

28.
**W. Fraunhofer, H.-J. Krause, G. Winter**
„Separation of Particulate Matter in Siliconized Syringes: Detached Silicone Oil and/or denatured Protein?"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

29.
**T. Schönbrodt, G. Reich, S. Mohl, G. Winter**
„Nondestructive quantification of lyophilized protein drugs"
AAPS Annual Meeting and Exposition, Toronto, 10. – 14.11.2002

30.
**J. Zillies, C. Coester**
"Capillary Hydrodynamic Fractionation (CHDF) and Other Semi-Chromatographic Methodes as New Analytical Tools for the Separation and Analysis of Protein Based Nanoparticles Aside Low Molecular Weight Proteins and Oligonucleotides"
German Chapter Annual Meeting of the Controlled Release Society, München, 04.04.2003

31.
**R. Schmidt, U. Gosslar, G. Winter**
„Xerogels – a topical protein delivery system for moist wound healing"
30th Annual Meeting & Exposition of the Controlled Release Society, Glasgow, 19-23.07.2003

32.
**F. Gruber, H. Haas, G. Winter**
„A Thorough Investigation of the Thermal Behaviour of Lipid Bilayers in the Presence of Lipophilic Drugs"
30th Annual Meeting & Exposition of the Controlled Release Society, Glasgow, 19-23.07.2003

33.
**J. Zillies, G. Winter, C. Coester**
"New Methods for the Characterization of Different Gelatin Based Nanoparticulate Drug Carrier Systems"
AAPS Annual Meeting and Exposition, Salt Lake City, 26. – 30.10.2003

**K. Zwiorek, C. Coester**
"Evaluation of Surface-Modified Gelatin Nanoparticles as Delivery System for Oligonucleotides and Plasmids"
AAPS Annual Meeting and Exposition, Salt Lake City, 26. – 30.10.2003

35.
**M. Willmann, G. Winter**
„Evaluation of different excipients on the stabilization of G-CSF formulations"
Proc. International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
Nürnberg 15. - 18.03.2004

36.
**A. Stabenau, G. Winter**
„Application and drying of protein drug microdroplets on solid surfaces: Effect of the surface on the product quality"
Proc. International Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
Nürnberg 15. - 18.03.2004

37.
**Poster zur Ersten Netzwerk-Veranstaltung mit allen Forschungseinrichtungen am Campus Großhadern-Martinsried**
Wirtschaft, Technologietransfer und Vermarktung"
BioTech Campus Großhadern Martinsried
02. März 2005

38.
**S. Herrmann, S. Mohl, G. Winter**
„Influence of the lipid modification on the release behaviour of  a cytokine from lipid implants"
Controlled Release Society German Chapter Annual Meeting
Marburg, 14. März 2005

39.
**Ch. Welz, F. Gruber, G. Winter, K. Drexler, H. Haas**
„Endo TAG-1
a Pharmaceutical Preparation for Tumor Therapy with a Novel Mode of Action"
Konferenz BioProcess, Formulation and Drug Development
Berlin, 12. u. 13. April 2005

40.
**S. Hermann, S. Mohl, G. Winter**
Enhanced stability of Interferon α-2a in non aqueous solutions by using highly hydrophobic solvents
BioPerspectives 2005, Congress
Wiesbaden, 10. – 12. Mai 2005

41.

**K. Zwiorek, P. Elamanchili, J. Samuel, C. Coester**
"In vitro evaluation of various biodegradable colloidal carriers for dendritic cell targeting"
CRS Annual Meeting
Miami, 18. – 22. Juni 2005

42.

**M. Wiggenhorn, G. Winter, H. Haas**
„Application of DSC in the development of parenteral formulations of Paclitaxel-derivatives for targeted delivery"
32nd Annual Meeting & Exposition of the Controlled Release Society
Miami Beach, Florida, 18. – 22. Juni 2005

43.

**H. Haas, Klaus Drexler, Christian Welz, Friedrich Gruber, Gerhard Winter**
Industrial Manufacturing of Endo TAG® - 1, a Novel Liposomal Product for Tumor Therapy
32nd Annual Meeting & Exposition of the Controlled Release Society
Miami Beach, Florida, 18. – 22. Juni 2005

44.

**J. Zillies, T. M. Göppert, R. H. Müller, F. Hoffmann, A. Vollmar, G. Winter, C. Coester**
„Correlation of Plasma Protein Adsorption Patterns and Biodistribution Data of Different Gelatin Nanoparticle Formulations"
Abstract
AAPS Annual Meeting
Nashville, November 2005

45.

**S. Herrmann, S. Mohl, G. Winter**
"Strategies to Circumvent Polymorphism in sustained Release Systems based on Lipids"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

46.

**M. Wiggenhorn, H. Haas, G. Winter**
"Spray-Freeze-Drying of Cationic Liposomal Formulations"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

47.

**M. Wiggenhorn, H.C. Pellikaan, G. Winter**
"Application of Near- and Supercritical Fluids to Dry Aqueous Liposomal Formulations"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

48.

**K. Schersch, O. Betz, P. Garidel, S. Mühlau, S. Bassarab, G. Winter**
"Investigations on the effect of collapse on pharmaceutical protein lyophilizates"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

49.

**Schimanski, K. , Zobel, H.-P. , Winter, G.**
"Preformulation studies with antibody-cytokine fusion Proteins:
Part 1 – freeze/ thaw and shaking stress stability"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

50.
**Schimanski, K. , Zobel, H.-P. , Winter, G.**
"Preformulation studies with antibody-cytokine fusion Proteins:
Part 2 – thermal and short term storage stability"
5th World Meeting on Pharmaceutics Biopharmaceutics and Pharmaceutical Technology
Genf, 27. – 30. März 2006

51.
**Raffi Bekeredjian, Richard Kroll, Helmut Kücherer, Stelijan Tinkov, Conrad Coester, Gerhard Winter**
„Organspezifischer Transport von Pharmaka und gentherapeutischen Vektoren durch Ultraschall gesteuerte Zerstörung von Mirosphären"
5. Präsentation des BMBF-Wettbewerbs BioFuture
Berlin

52.
**K. Mathis, G. Winter**
Field-Flow Fractionation fort he characterization of monoclonal antibodies
ISPPP 2006, Innsbruck

53.
**K. Schersch, O. Betz, P. Garidel, S. Mühlau, S. Bassarab, G. Winter**
„Effect of collapse during-lyophilization and during storage at elevated temperatures on the stability of pharmaceutical protein lyophilizates"
Spray Drying Kongreß Garmisch Okt. 2006

54.
**M. Wiggenhorn, K. Drexler, H. Haas, G. Winter**
"Spray-Freeze-Drying of a Cationic Liposomal Paclitaxel Formulation (EndoTAGTM-1)"
Garmisch Okt. 2006

55.
**K. Schersch, O. Betz, P. Garidel, S. Mühlau, S. Bassarab, G. Winter**
„Effect of Collapse on Protein-Lyophilizates Using L-Lactic Dehydrogenase as Sensitive Model Protein
AAPS-Kongreß San Antonio, USA, Nov. 2006

56.
**M. Wiggenhorn, H.C. Pellikaan, K. Drexler, H. Haas, G. Winter**
"Supercritical fluid drying of aqueous cationic liposomal formulations"
AAPS-Kongreß San Antonio, USA, Nov. 2006

57.

**K. Mathis, Friedrich Gruber, G. Winter**
„Use of alternative analytical methods to detect small amounts of protein aggregates"
AAPS-Kongreß San Antonio, USA, Nov. 2006

58.
**Stefan Gottschalk, Rainer Lang, Gerhard Winter**
"Quantification of insolubler monoclonal antibody aggregates via the steric hyperlayer mode"

59.
**Rainer Lang, Gerhard Winter**
"Characterization of Virus Like Particles by Asymmetrical Flow Field Flow Fractionation in comparison to Dynamic Light Scattering"

60.
**W. Fraunhofer, H. Liu, I. Correia, S. Gottschalk, G. Winter, D.Borhani, J. Neily, A. Koenigsdorfer, H.-J. Krause**
„Approaching New Protein Formulations: Crystalline Monoclonal Antibodies"
**<u>NUR INTERN VERWENDEN!</u>**

61.
**S. Fuchs, R. Parlitz, D. Gau, G. Winter, C. Coester**
"Determination of Low to High Gelatin Nanoparticle Concentrations and Oligonucleotide Loading by Ultrasonic Resonator Technology"
Pharmaceutical Sciences World Congress 2007
Amsterdam 22.04.-25.04.2007

62.
**K. Schersch, K. Mathis, G. Winter**
"ULTRASONIC RESONATOR TECHNOLOGY AS A NEW SENSITIVE ANALYTICAL TOOL IN THE INVESTIGATION OF COLLAPSED AND NOT COLLAPSED PROTEIN LYOPHILIZATES"
Pharmaceutical Sciences World Congress 2007
Amsterdam 22.04.-25.04.2007

63.
**K. Schersch, O. Betz, P. Garidel, S. Mühlau, S. Bassarab, G. Winter**
"STABILITY OF COLLAPSED AND NOT COLLAPSED PROTEIN LYOPHILIZATES DURING STORAGE AT ELEVATED TEMPERATURES"
Pharmaceutical Sciences World Congress 2007
Amsterdam 22.04.-25.04.2007

64.
**M. Wiggenhorn, H. Haas, K. Drexler, G. Winter**
„Impact of the Filling Volume on the Lyophilization of the Liposomal EndoTAG$^{TM}$-1 Paclitaxel Formulation"
Pharmaceutical Sciences World Congress 2007
Amsterdam 22.04.-25.04.2007

65.

**M. Wiggenhorn, H. Haas, K. Drexler, G. Winter**
„Enhancing the Lyophilization Efficiency of a Liposomal Paclitaxel Formulation (EndoTAG$^{TM}$-1)"
Pharmaceutical Sciences World Congress 2007
Amsterdam 22.04.-25.04.2007

66.
**M. Wiggenhorn, H. Haas, K. Drexler, G. Winter**
„Application of Inert-Spray-Drying fort he Formation and Stabilization of Liposomes
AFSIA
Biaritz, May 2007

67.
**R. Lang ; G. Winter**
„Improvement of Virus-Like Particle characterization using new AF4 channel technology"
Wyatt's Application Note Contest, Eclipse FFF Meeting, 21 June 07

68.
**T. Serno, R. Lang, S. Gottschalk and G. Winter**
"Convenient separation of rh-GCSF using a new small channel for Asymmetrical Flow Field-Flow Fractionation"
Wyatt's Application Note Contest, Eclipse FFF Meeting, 21 June 07

69.
**E. Rosenberg, K. Heinrich, S. Hepbildikler, W. Kuhne, J. Burg, G. Winter**
Optimization of TFF in DSP for highly concentrated MAB Intermediate Solutions with respect to Aggregation
Colorado Protein Stability Conference, Breckenridge, 18.-21.07.2007,

70.
**T. Serno, J. F. Carpenter, E. Pittenauer, G. Allmaier, G. Winter**
Interaction of various cyclodextrin - derivatives with rh –GCSF
Colorado Protein Stability Conference, Breckenridge, 18.-21.07.2007,

71.
**W. Hild, R. Lang, G. Winter, A. Goepferich**
"Towards the characterization of quantum dots by asymmetrical flow field flow fraction"
DPhG Tagung 2007; Erlangen

72.
**R. Lang, S. Gottschalk, G. Winter**
„Comparison of Asymmetrical Flow Field-Flow Fractionation to various commonly used analytical tools for biopharmaceuticals
2007 AAPS Annual Meeting and Expositon
San Diego, 11. – 14. Nov. 2007,

73.

**R. Lang, L. Vogt, A. Züricher, G. Winter**
Stabilization of a virus-like particle based vaccine by freeze-drying
2007 AAPS Annual Meeting and Expositon
San Diego, 11. – 14. Nov. 2007,

74.
**A. Youssef, F. Gruber, G. Winter**
Systemic Correlation of Microcalorimetry Data with Conventional Stability Study Results for
Protein Drug Formulations: Liquid GCSF formulations
2007 AAPS Annual Meeting and Expositon
San Diego, 11. – 14. Nov. 2007,

75.
**M. Schwab, B. Kessler, E. Wolf, G. Jordan , S. Mohl , G Winter**
Correlation of in vivo and in vitro release data for rh-INFα lipid implants
2007 AAPS Annual Meeting and Expositon
San Diego, 11. – 14. Nov. 2007,

76.
**S. Schultes, G. Winter, C. Coester**
Automatic microviscosimetry as a toll for fast biopolymer analysis compared to AF4 interact
PhD Symposium München, Dez. 2007

77.
**K. Freitag, J. Gradl, M. Neu, H.J. Krause, W. Peukert, G. Winter**
"Investigations on particle formation and particle growth for establishinga mathematical
model for Precipitation Processes"
APV-Meeting, Barcelona 07.-10.04.2008

78.
**Michael Wiggenhorn, Heinrich Haas, Klaus Drexler, Bas Vermeulen, Gerhard Winter**
"Comparison of Freeze-drying, Spray-freeze-drying, (Inert)-spray-drying, Supercritical- and
Subcritial-fluid-drying for the stabilization of liposomal formulations"
APV-Meeting, Barcelona 07.-10.04.2008

79.
**W. Tian, S. Herrman, M. Brandl, G. Winter**
Texture analysis as an analytical tool for the characterization of
 FITC-Dextran loaded vesicular phospholipids gels"
APV-Meeting, Barcelona 07.-10.04.2008

80.
**Sandra Herrmann, Florence Siepmann, Juergen Siepmann, Gerhard Winter**
"Protein release from PEG-containing lipid implants: Importance of drug solubility"
APV-Meeting, Barcelona 07.-10.04.2008

81.

**Sandra Herrmann, Ahmed Youssef, Tim Serno, Gerhard Winter**
"Increased thermal stability of IFN-alpha by HP-β-CD was detected
by FTIR but not by microcalorimetry"
APV-Meeting, Barcelona 07.-10.04.2008

82.
**E. Rosenberg, K. Heinrich, S. Hepbildikler, W. Kuhne, G. Winter**
"The influence of shear stress and preformed soluble aggregates in TFF on the protein
aggregation in concentrated MAb intermediate solutions in DSP"
APV-Meeting, Barcelona 07.-10.04.2008

83.
**A. Youssef, F. Gruber, G. Winter**
"Systematic correlation study of thermodynamic parameters determined by μDSC for
liquid GCSF formulations with conventional isothermal stability study"
APV-Meeting, Barcelona 07.-10.04.2008

84.
**Tim Serno, John F. Carpenter, Gerhard Winter**
"Cyclodextrins inhibit surface – induced aggregation of a monoclonal antibody"
APV-Meeting, Barcelona 07.-10.04.2008

85.
**S. Schultes, G. Winter, C. Coester**
"Simulated in-vivo endothelial cell adhesion of cationic polysaccharide-gelatine
nanoparticles"
APV-Meeting, Barcelona 07.-10.04.2008

86.
**S. Schultes, G. Winter, C. Coester**
"Novel hydrophobic prototype gelatins for nanoparticles preparation analyse by asymmetrical
flow field-flow fraction and multi-angle light scattering"
APV-Meeting, Barcelona 07.-10.04.2008

87.
**S. Fuchs, R. Parlitz, D. Gau, G. Winter, C. Coester**
"Towards better auality control of Nanoparticulate DNA Delivery Preparations by Ultrasonic
resonator technology"
APV-Meeting, Barcelona 07.-10.04.2008

88.
**W. Tian, S. Herrmann, M. Brandl , G. Winter**
"Macromolecular Drug Loaded Vesicular Phospholipid Gels: Preparation and
Characterization"
2nd Midnight Sun Meeting on Drug Transport and Delivery, University of Tromsö,
Norwegen, 25.-27.Juni 2008

89.

**S. Herrmann, A. Youssef, T. Serno, G. Winter**
"Thermal Stability of Proteins in the Presence of Hydroxypropyl-ß-Cyclodestrin: Discrepancies between Fourier Transform Infrared Spectroscopy and Microcalorimetry"
AAPS National Biotechnology Conference 2008, Toronto, 22-25.06.2008

90.
**T. Serno, John F. Carpenter , G. Winter**
"Cyclodextrins as stabilizing excipients for Monoclonal Antibody formulations: evaluation of effects and mechanisms and comparison to other excipients"
AAPS National Biotech Conference , Toronto, Ontario, Canada, June 22-25, 2008

91.
**A. Youssef, G. Winter.**
"The use of Microcalorimetry for prediction of the physical stability of a Monoclonal antibody"
Application of Bio-calorimetry (abc6), 7th-10th July 2008, Heidelberg, Germany

92.
**A. Youssef, K. Reiche, G. Winter**
"The effect of aggregates present in protein formulations on microcalorimetry parameters"
Application of Bio-calorimetry (abc6), 7th-10th July 2008, Heidelberg, Germany

93.
**K. Freitag, J. Gradl, M. Neu, H. J. Krause, W. Peukert, G. Winter**
"Modeling of Precipitation Conditions for Poorly Soluble Drugs"
2008 AAPS Annual Meeting and Exposition, 16th to 20th November 2008, Atlanta, GA

94.
**S. Fuchs, J. Auernheimer, K. Zwiorek, H.-J. Wester, G. Winter, C. Coester**
"In Vivo Tracking of 68Ga Labeled Gelatin Nanoparticles
by Positron Emission Tomography"
AAPS Annual Meeting and Exposition , Atlanta, GA, November 16 – 20, 2008

95.
**S. Tinkov, M. Mayer, L.Almendinger, M. Ogris, E. Wagner, R. Bekeredjian, G. Winter, C. Coester**
"Secondary carrier-associated microbubbles for enhanced ultrasound targeted gene therapy"
AAPS Annual Meeting and Exposition , Atlanta, GA, November 16 – 20, 2008

96.
**Long Xu, Manfred Ogris, Gerhard Winter, Ernst Wagner, Thomas Anchordoquy**
"In vivo study of Cationic Lipid/DNA Complexes with high cholesterol content"
AAPS Seattle, June 2009

97.
**Veronika Spalthoff, Gerhard Winter**
"Micro-Flow Imaging and low threshold particle counting
- Is a new pharmacopoeial method necessary? –"
Science to Market Conference, Hannover, 6.-7.10.2009

98.

**Hofer M, Lammel A, Schwab M, Myschik J, Scheibel T, Winter G**
"Spider Silk Proteins – A New Biopolymer for Drug Delivery Applications"
Science to Market Conference, Hannover, 6.-7.10.2009


99.
**Freitag A, Myschik J, Schulze S, Winter G**
"Immunogenicity of Protein Aggregates"
Science to Market Conference, Hannover, 6.-7.10.2009


100.
**W. Tian, S. Schulze, M. Brandl, G. Winter**
"Sustained release formulation of pharmaceutical proteins based on vesicular phospholipid gels:  development and in vitro evaluation"
Science to Market Conference, Hannover, 6.-7.10.2009


101.
**Tim Serno, John F. Carpenter, Theodore W. Randolph, Gerhard Winter**
"Cyclodextrins as alternative to non-ionic surfactants in monoclonal antibody formulation"
Science to Market Conference, Hannover, 6.-7.10.2009


102.
**V.Spalthoff, G. Winter**
"Is submicron particle counting relevant for the development and quality assurance of protein pharmaceuticals?"
10.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology


103.
**W. Tian, S. Schulze, M. Brandl , G. Winter , J. Myschik**
"Vesicular phospholipid gel-based depot formulations for pharmaceutical proteins: development and in vitro evaluation"
10.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology


104.
**Kis EE, Lell P, Winter G, Myschik J**
"Evaluation of a surrogate apparatus for epidermal ballistic powder injection."
11.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology


105.
**Hofer M, Lammel A, Schwab M, Myschik J, Scheibel T, Winter G**
"Preparation of spider silk particles and their evaluation as a new particulate drug delivery system."

09.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

106.

**Freitag AJ, Myschik J, Schulze S, Winter G**
"Preparative methods to reproducibly generate aggregates of monoclonal antibodies."
10.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

107.

**Straller G., Serno T., Winter G., Lee G.**
„Spray-Freeze-Drying of Carbonic Anhydrase with online Light Scattering, Assymetric Flow Field Flow Fractionation vs. SEC"
09.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

108.

**M. Sprengholz, H. Spilgies, G. Winter**
"How *in vitro* drug release from biodegradable subcutaneaous implants can be switched from real-time to short-term"
10.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

109.

**S. Fuchs, M. Kutscher, T. Hertel, G. Winter, M. Pietzsch, C. Coester**
„Transglutaminase, a new approach in gelatin nanoparticle cross-linking"
09.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

110.

**S. Fuchs, J. Klier, A. May, G. Winter, H. Gehlen, C. Coester**
„Towards an inhalative in vivo application of immunomodulating gelatin nanoparticles in cob horses – related preformulation studies"
09.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

111.

**E. E. Kis, P. Lell, G. Winter, J. Myschik**
"Can collapse freeze-drying provide high density protein sugar particles
for ballistic powder injection?"
16. – 18.09.2010 8th Central European Symposium on Pharmaceutical Technology, Graz

112.

**V. Spalthoff, G. Winter**
Prediction of particle formation after stir stress of IgG1
DPHG Conference 2010, 4th to 7th October 2010, Braunschweig, Germany

113.

**Thomas Bosch, Nico Erlewein, Gerhard Winter**
Influence of formulation composition on physical characteristics of collapse-dried lyophilizates
Freeze-Drying of Pharmaceuticals and Biologicals,
28th of September to 1st of October 2010, Garmisch-Partenkirchen, Germany

114.

**Bosch T, Schersch KB, Winter G**
Effect of process parameters on collapse-drying performance
7th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology, 8th to 11th March 2010, Valletta, Malta

115.

**Gerhard Sax, Sandra Schulze, Gerhard Winter**
Sustained release of a monoclonal antibody from lipid twin-screw extrudates
37th Annual Meeting and Exposition of the Controlled Release Society, Portland, Oregon, USA, July 10-14, 2010

116.

**Thomas Bosch, Kathrin Schersch, Gerhard Winter**
"Aggressive collapse-drying as a faster alternative to conventional freeze-drying of Biologics"
Forum Life Sciences Munich, 23.03.2011 - 24.03.2011

117.

**Raimund Geidobler, Elisabeth Härtl, Ahmed Besheer, Gerhard Winter**
„Cyclodextrins as stabilizing excipients in protein formulation"
Forum Life Sciences Munich, 23.03.2011 - 24.03.2011

118.

**Elsa E. Kis, Yibin Deng, Peter Lell, Gerhard Winter, Julia Myschik**
"Novel intradermal vaccination devices using ballistic delivery of powder particles"
Forum Life Sciences Munich, 23.03.2011 - 24.03.2011

119.

**Gerhard Sax, Christian Hildebrandt, Wei Wei Tian, Sandra Schulze, Gerhard Winter**
"Delivery of drug proteins from lipid based implants"
Forum Life Sciences Munich, 23.03.2011 - 24.03.2011

120.

**Hofer M, Agostini E, Winter G, Myschik J**
"Recombinant spider silk proteins as new biomaterial for innovative drug delivery system (DDS)"
*Forum Life Sciences Munich, 23.03.2011 - 24.03.2011*

121.
**Sebastian P. Hertel, Wolfgang Frieß, Gerhard Winter**
 "Comparison of Aerosol Collection Methods for Liquid Protein Formulations"
Respiratory Drug Delivery Europe 2011, Berlin 03.05.2011 – 06.05.2011

122.
**Sarah Zölls, Ruederporn Tantipolphan, Michael Wiggenhorn, Wolfgang Frieß, Gerhard Winter, Andrea Hawe**
"Comparative analysis of subvisible particles induced by freeze-thawing, stirring and heating of an IgG antibody"
National Biotechnology Conference, San Francisco, May 16th – May 18th 2011

123.
**Elisabeth Härtl, Ahmed Besheer, Gerhard Winter**
„Influence of HPβCD on stability of highly concentrated antibody formulations during stirring"
Bio Production Forum, Ulm, 08.06. – 10.06.2011

124.
**V. Spalthoff, G. Winter**
"Dilution of stressed IgG1-solution into serum: Effects on particulate matter"
Colorado Protein Stability Conference, Breckenridge, July 19th – July 21st, 2011

125.
**V. Spalthoff, G. Winter**
"Prediction of particle formation after stir stress of IgG1"
Colorado Protein Stability Conference, Breckenridge, July 19th – July 21st, 2011

126.
**V. Spalthoff, G. Winter**
"Relevance of submicron particle counting"
Colorado Protein Stability Conference, Breckenridge, July 19th – July 21st, 2011

127.
**M. Hofer, G. Winter, J. Myschik**
"Protein loading of recombinant spider silk particles"
2011 AAPS ANNUAL MEETING AND EXPOSITION, OCTOBER 23-27, WASHINGTON D.C., USA

128.
**E. E. Kis, Y. Deng, P. Lell, G. Winter, J. Myschik**
"Intradermal ballistic delivery - New approaches to deliver powdered particles using a surrogate accelerator"
2011 AAPS ANNUAL MEETING AND EXPOSITION, OCTOBER 23-27, WASHINGTON D.C., USA

129.
**E. E. Kis, J. Pott, G. Winter, J. Myschik**
"Evaluation of a cryo-mill for the production of particles for intradermal ballistic delivery"
2011 AAPS ANNUAL MEETING AND EXPOSITION, OCTOBER 23-27, WASHINGTON D.C., USA

130.

**Freitag AJ, Immohr LI, Winter G, Myschik J**

The Endotoxin-free Separation of Protein Species via Asymmetrical Flow Field-Flow Fractionation (AF4)

22nd Annual International Light Scattering Colloquium - October 31st – November 1st 2011, Santa Barbara, California, USA

131.

**Elisa Agostini, Gerhard Winter, Julia Myschik**

Preparation and Investigation of Water-based Spider Silk Films

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

132.

**Cihad Anamur, Andreas Schmitt, Gerhard Winter, Julia Myschik**

Mechanical properties of alginate gels for a stem cell matrix system

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

133.

**Thomas Bosch, Manuel Gregoritza, Gerhard Winter**

Stabilization of protein pharmaceuticals by aggressive freeze-drying

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

134.

**Elisabeth Härtl, Ahmed Besheer, Reinhard Miller, Gerhard Winter**

Comparing the behavior of Hydroxypropyl-β-cyclodextrin and polysorbate 80 at the air water interface of an IgG solution

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

135.

**Elisabeth Härtl, Ahmed Besheer, Gerhard Winter**

Influence of Hydroxypropyl-beta-cyclodextrin on the Stability of Highly Concentrated IgG Formulations

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

136.

**Hildebrandt C, Saedler R, Tschöpe M, Weber C, Winter G**

Bulk drying of protein (lysozyme) crystals with inert drying gas

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

137.

**Hildebrandt C, Saedler R, Tschöpe M, Weber C, Winter G**

Lysozyme crystals of various morphology show different mechanical stability and solubility in organic solvents.

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

19th to 22th of March 2012, Istanbul

138.
**Joos L, Saedler R, Tschöpe M, Weber C, Winter G**
Reduction of peroxide and formaldehyde content in polyethylene glycol (PEG) 4000 solutions by drying
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

139.
**Joos L, Saedler R, Tschöpe M, Weber C, Winter G**
Stability of PEG 4000 solutions during temperature and light stress
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

140.
**R. Liebner, G. Winter, A. Besheer**
Synthesis and physicochemical characterization of PEGylated Anakinra
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

141.
**R. Mathäs, G. Winter, J. Myschik, A. Besheer**
Application of different analytical methods for the characterisation of non-spherical micro- and nanoparticulate standards
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

142.
**Christian Neuhofer, Ahmed Besheer, Carsten Olbrich, Gerhard Winter**
Development of lipid based depot formulations for protein delivery
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

143.
**Matthäus Noga, Daniel Edinger, Ernst Wagner, Gerhard Winter, Ahmed Besheer**
Can nano-dandelions overcome the "PEG dilemma" in gene delivery? -
Designing HES-decorated core-shell polyplexes with controlled shielding and deshielding
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

144.
**Matthäus Noga, Gerhard Winter, Ahmed Besheer**
HES-PEI COPOLYMERS FOR GENE DELIVERY: SYNTHESIS, CHARACTERIZATION AND
GENERATION OF HES-DECORATED POLYPLEXES
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

38

145.

**Martina Sprengholz, Sabine Hauck, Gerhard Winter**

INTERACTION OF OXYBUTYNIN HYDROCHLORIDE AND POLY(LACTIC-CO-GLYCOLIC ACID) IN DEGRADING IMPLANTS

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

146.

**S. P. Hertel, W. Friess, G. Winter**

ENABLING NEBULIZATION OF THERMO LABILE PROTEINS WITH VIBRATING MESH NEBULIZERS

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

147.

**S. P. Hertel, F. Wurst, M. Patzak, W. Friess, G. Winter**

HIGH-THROUGHPUT STABILITY SCREENING METHOD FOR VIBRATING-MESH NEBULIZATION OF PROTEIN FORMULATIONS

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology
19th to 22th of March 2012, Istanbul

148.

**Sarah Zölls, Ruedeeporn Tantipolphan, Michael Wiggenhorn, Gerhard Winter, Wolfgang Frieß, Andrea Hawe**

Evaluation of Archimedes and Coulter counter for the analysis of (protein) particles
National Biotech Conference (NBC) San Diego, Workshop on Protein Aggregation and Immunogenicity Breckenridge

149.

**Sarah Zölls, Manueal Gregoritza, Ruedeeporn Tantipolphan, Michael Wiggenhorn, Gerhard Winter, Wolfgang Frieß, Andrea Hawe**

How subvisible particles get invisible - Relevance of refractive index for protein particle analysis
National Biotech Conference (NBC) San Diego, Protein Engineering Summit (PEGS) Boston, Workshop on Protein Aggregation and Immunogenicity Breckenridge

150.

**M. Noga, D. Edinger, E. Wagner, G. Winter, and A. Besheer**

Controlled shielding & deshielding of HES-decorated polyplexes using alpha amylase
The 39th Annual Meeting & Exposition of the Controlled Release Society
15-18 July 2012, Quebec

## PhDs.

1.
**Michael Morlock**
Erythropoietin-Mikropartikel – Eine Untersuchung zur Mikroverkapselung von Proteinen mit Hilfe bioabbaubarer Polyester
Marburg, 1995  (Prof- Kissel)

2.
**Markus Mattern**
Stabilisierung von therapeutischen Proteinen mittels Gefrier- und Vakuumtrocknung
Erlangen, 1997 ( Prof. Lee)

3.
**Claudia Roth**
Moderne Steuerungsverfahren für die Gefriertrocknung – Wägesystem
Erlangen, 2000 ( Prof. Lee)

4.
**Ralf Zippelius**
Untersuchungen zum Einfrieren- und Auftauverhalten pharmazeutischer Humanproteinlösungen im Großmaßstab
München, 2002

5.
**Dirk Haefner**
Untersuchungen zu Wechselwirkungen zwischen flexiblen kationischen Lipidvesikeln und DNS sowie in vitro und in vivo Eigenschaften der daraus hergestellten Komplexe
München, 2002 (mit Prof. Cevz)

6.
**Ingo Presser**
Innovative Online Messverfahren zur Optimierung von Gefriertrocknungsprozessen
München, 2003

7.
**Anke Stabenau**
Trocknung und Stabilisierung von Proteinen mittels Warmlufttrocknung und Applikation von Mikrotropfen
München, 2003

8.
**Sabine Effer**
Optimierung der pharmakokinetischen Eigenschaften von schwerlöslichen Substanzen mit Hilfe von Mikroemulsionen
München, 2003

40

9.

**Wolfgang Fraunhofer**
Asymmetrical Flow Field-Flow-Fractionation in Pharmaceutical Analytics
Investigations in Aggregation Tendencies of Pharmaceutical Antibodies
München, 2003

10.

**Saskia Waibler**
Comparative studies on manufacturing methods for cationic liposomes
München, 2003

11.

**Matthias Willmann**
Stabilisierung von pharmazeutischen Proteinlösungen durch Vakuumtrocknung
Verfahrenstechnische Optimierung verschiedener Vakuumtrocknungsverfahren, Untersuchung von
Aggregations-Phänomenen und Evaluierung von Hilfsstoffen
München, 2003

12.

**Fritz Gruber**
Untersuchungen zur Enkapsulierung von Paclitaxel in kationischen Liposomen
München, 2004

13.

**Silke Mohl**
The Development of a Sustained and Controlled Release Device for Pharmaceutical
Proteins based on Lipid Implants
München, 2004

14.

**Roland Schmidt**
Topical Delivery of $\alpha_1$-Antichymotrypsin for wound healing
München, 2005

15.

**Kathrin Schimanski**
Untersuchungen zum Stabilitätsverhalten der therapeutischen Antikörper-Zytokin-Konstrukte
huKS-IL 2 und hu.14.18-IL2
München, 2006

16.

**Klaus Zwiorek**
Gelatin Nanoparticles as Delivery System for Nucleotide-Based Drugs
München, 2006

17.

**Jan Zillies**
Gelatin Nanoparticles for Targeted Oligonucleotide Delivery to Kupffer Cells – Analytics,
Formulation Development, Practical Application
München, 2007

41

18.

**Sandra Herrmann**
Lipidic Implants for Pharmaceutical Proteins: Mechanisms of Release and Development of Extruded Devices
München, 2007

19.

**Michael Wiggenhorn**
Scale-Up of Liposome Manufacturing: Combining High Pressure Liposome Extrusion with Drying Technologies
München, 2007

20.

**Rainer Lang**
Virus-Like Particle Based Vaccines: Stabilization by Freeze-Drying and Development of Sustained-Release Devices
München, 2008

21.

**Stefan Gottschalk**
Crystalline Monoclonal Antibodies: Process Development for Large Scale Production, Stability and Pharmaceutical Applications
München, 2008

22.

**Steliyan Tinkov**
Development of Ultrasound Contrast Agents for Targeted Drug Delivery
München, 2009

23.

**Martin Schwab**
Degradation of Lipid Based Drug Delivery Systems and Characterization of Semi-Synthetic Silk Proteins for the Application in Pharmaceutical Technology
München, 2009

24.

**Kathrin Schersch**
Effect of Collapse on Pharmaceutical Protein Lyophilizates
München 2009

25.

**Stephan Schultes**
Nanoparticles for RNA Interference – Novel Preclinical Formulations for Sirna Mediated Gene Therapie
München, 2009

26.

**Weiwei Tian**
The Development of Sustained Release Formulation for Pharmaceutical Proteins based on Vesicular Phospholipid Gels
München, 2009

42

27.

**Eva Rosenberg**

Aggregation of Therapeutic Antibodies in the Course of Downstream Processing
München, 2009

28.

**Ahmed Youssef**

Systematic Studies to Correlate Microcalorimetry with Stability Studies on Liquid
Formulations of Various Protein Drugs
München, 2010

29.

**Kathrin Mathis**

Characterisation of Protein Formulations and Non-Viral Gene Vectors by Asymmetrical Flow
Field-Flow Fractionation and Ultrasonic Resonance Technology
München, 2010

30.

**Sebastian Fuchs**

Gelatin Nanoparticles as a Modern Platform for Drug Delivery - Formulation Development
and Immunotherapeutic Strategies
München, 2010

31.

**Klaus Freitag**

Preparation of Nanodispersions by Antisolvent Precipitation – a New Formulation Approach
München, 2010

32.

**Tim Serno**

Inhibition of Therapeutic Protein Aggregation by Cyclodextrins
München, 2012

33.

**Gerhard Sax**

Twin-screw Extruded Lipid Implants for Controlled Protein Drug Delivery
München, 2012

34.

**Angelika Freitag**

The Immunogenicity of Protein Aggregates: Studies on a Murine Monoclonal Antibody in
Wild-Type Mice
München, 2012

35.

**Veronika Spalthoff**

New Analytical Methods for the Assessment of the Physical Stability of Therapeutical
Proteins
München 2012

43

36.

**Yibin Deng**
Investigations on the Administration of Dry Vaccines for Epidermal Powder Injection

37.

**Matthäus Noga**
Bioresponsive HES-PEI Conjugates for Controlled Shielding and Deshielding of pDNA Polyplexes
München, 2013

# Diplomarbeit

**Christoph Mück**
Analytik von Proteinaggregation mittels Coulter-Prinzip: Vergleich mit der Lichtblockade-Messung
März 2002

# Oral presentations

1.

**G. Winter**

„Berufsbild des Apothekers und seine Aufgaben in den verschiedenen Tätigkeitsbereichen"
Arbeitsamt, Heidelberg 1985

2.

**G. Winter, A. Leber, H. Stricker**

"Drug uptake studies on human skin in vivo"
FIP Congress of Pharm. Sciences, Montreal 09.1985

3.

**G. Winter, A. Leber, H. Stricker**

"Die Kinetik der kutanen Arzneistoffaufnahme in vivo (Mensch)"
Annual Meeting APV, Leiden 1986

4.

**G. Winter**

"Simulation der kutanen Arzneistoff-Aufnahme mit nachgewiesener In-Vivo-/In-Vitro-Korrelation"
34th Annual Congress APV, Hamburg 10.03.1988

5.

**G. Winter**

"Drug Delivers Systeme"
Brainstorming Targeting/Gentherapie Boehringer-Mannheim, Penzberg 09.12.1993

6.

**G. Winter**

"Flüssige und feste Proteinformulierungen für die parenterale Applikation"
APV Symposium, Mainz 06.03.1996

7.

**M. Mattern, U. Kohnert, G. Winter, G. Lee**

„Physico-Chemical Characterization of amorphous masses produced by vacuum-drying and stabilization of proteins therein"
APV Symposium, Mainz 06.03.1996

8.

**G. Winter**

„Rationale Entwicklung von Proteinlyophilisaten auf der Basis amorpher Hilfsstoffgerüste"
1. Symposium Erfahrungsaustausch Gefriertrocknung Boehringer, Mannheim 12.11.1996

9.

**G. Winter**

"Galenic Formulation of Protein Drugs"
4th Interlaken Conference, CH-Interlaken 14.03.1997

**10.**
**G. Winter**
"Galenische Entwicklung von therapeutischen Proteinen"
Festkolloquium Prof. Stricker, Heidelberg 06.06.1997

**11.**
**G. Winter**
"Moderne Trocknungsverfahren zur Stabilisierung biotechnologischer Arzneimittel"
Berufung, München 27.04.1998

**12.**
**P. Bastian, A. Weingart, W. Roedel, G. Winter, A. Göpferich**
„A rotating two channel model for determination of the diffusion coefficient"
$2^{th}$ World Meeting on Pharmaceutics, APV Paris 26. – 27.05.1998

**13.**
**C. Roth, G. Winter, G. Lee**
„Advanced process monitoring for freeze-drying of amorphous sugar Matrices"
Doktoranden Tagung der DPhG, Freiburg 13.03.1999

**14.**
**G. Winter**
„Development of Needle Free Injectors"
APV-Seminar No. 397, Nürnberg 5./6.10.1999

**15.**
**G. Winter**
„Trocknungsverfahren für pharmazeutische Proteinformulierungen"
Fa. Knoll, Ludwigshafen 25.10.1999

**16.**
**C. Roth, G. Winter, G. Lee**
"Novel Micro-Balance technique for measuring drying-rate during freeze-drying"
3rd World Meeting on Pharmaceutics Biopharmaceutics Pharmaceutical Technol., Berlin 04.04.2000

**17.**
**G. Winter**
"Nadellose Glasspritzen"
Symposium "Pharmazie und Glas 2000", Bayreuth, 18.05.2000

**18.**
**G. Winter**
„Peptidarzneistoffe und ihre Formulierungen"
DPhG Landesgruppe Schleswig-Holstein, Kiel, 06.06.2000

**19.**
**G. Winter**
„Forschungsvorhaben der Pharmazeutichen Technologie und Biopharmazie"
„Nadellose Injektionssysteme"
Wien, 10.11.2000

20.
**G. Winter**
„Scale Up am Beispiel einer sterilen Darreichungsform"
Fa. Concept, Heidelberg, 16.11.2000

21.
**G. Winter**
„Nadellose Injektionssysteme"
DPhG, Braunschweig, 23.11.2000

22.
**G. Winter**
„Nadellose Injektionssysteme"
DPhG, München, 06.12.2000

23.
**G. Winte**r
"Neue Formulierungen für Protein-Arzneistoffe"
Pharm. Kolloquium, DPhG, Freiburg, 31.01.2001

24.
**G. Winter**
"Arzneimittelstabilität-Regulatorische Anforderungen ICH/CPMP/WHO"
Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 22.03.2001

25.
**G. Winter**
"Instabilität und Stabilisierung von Peptiden"
Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 22.03.2001

26.
**G. Winter**
„Pharmazeutische Gefriertrocknung: Vom Hustentee zur Gentherapie"
Seniorenstudium München, 14.05.2001

27.
**G. Winter**
„Performation and Stabilization of human protein drugs"
Fa. Hexal, Holzkirchen, 20.09.2001

28.
**H. Reithmeier, G. Winter**
"Nonisothermal stability assessment: an efficient tool for the development of stable aqueous protein pharmaceuticals"
4th Centr. on Pharm. Technol., Europ. Symp. ", 24.09.2001, Wien

29.
**G. Winter**
"Protein Galenics: From research to industrial development"
3. Scientific rate, Switch Biotec, 04./05.10.01, Oberambach

47

30.

**G. Winter**

„Sprühtrocknung von Pharmapeptiden – Eine Alternative zur Gefriertrocknung?"
Pharm. Anwendung d. Gefriertrocknung, CONCEPT Heidelberg, 08.11.2001, Heidelberg

31.

**G. Winter**

"Neue Herstell- und Analysenmethoden für Proteinarzneimittel"
Pharm. Kolloquium, DPhG, Heidelberg, 05.02.2002

**32.**

**G. Winter**

"Arzneimittelstabilität-Regulatorische Anforderungen ICH/CPMP/WHO"
Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 18.03.2002

33.

**G. Winter**

"Instabilität und Stabilisierung von Peptiden"
Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 18.03.2002

34.

**G. Winter**

"Arzneimittelstabilität-Regulatorische Anforderungen ICH/CPMP/WHO"
Weiterbildungssem. Pharm. Technol., Bayer. LAK, München, 22.03.2002

35.

**G. Winter**

" Stabilisierung von pharmazeutischen Proteinen"
Weiterbildungssem. Pharm. Technol., Bayer. LAK, München, 22.03.2002

36.

**H. Reithmeier, M. Dickes, G. Winter**

"Development of an automated device for accelerated preformulation studies of liquid protein dosage forms"
4th World Meeting on Pharm., Biopharm.and Pharm. Technol., Florenz, 10.04.2002

37.

**A. Stabenau, G. Winter**

"Micro drops: a novel application and drying method for concentrated protein drug solutions"
4th World Meeting on Pharm., Biopharm.and Pharm. Technol., Florenz, 10.04.2002

38.

**W. Fraunhofer, G. Winter**

"Asymmetrical Flow Field-Flow-Fractionation in Combination With Multi-Angel Laser Light Scattering: New Applications Of An Upcoming Analytical Method"
4th World Meeting on Pharm., Biopharm.and Pharm. Technol., Florenz, 10.04.2002

39.

**S. Waibler, G. Winter**

"Large-scale production of cationic liposomes – an uphill fight ?"
Colloquium des Physik. Instituts (Prof. Rädler), München, 30.07.2002

48

40.

**G. Winter**

„Future Challenges in Drug Delivery in the New  Millenium"

Pharm Seminar, Fa. Abbott, North Chicago, 15.08.2002

41.

**G. Winter, W. Friess**

"Spray Drying of Peptide and Protein Drugs"

Pharm. Applications of SPRAY DRYING, Basel, 21.11.2002

42.

**G. Winter**

"Arzneimittelstabilität-Regulatorische Anforderungen ICH/CPMP/WHO"

Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 24.03.2003

43.

**G. Winter**

"Instabilität und Stabilisierung von Peptiden"

Weiterbildungssem. Pharm. Technol. Bayer. LAK, München, 24.03.2003

44.

**K. Zwiorek, N. Stock, C. Coester, G. Winter**

"A New Method for Characterization and Analysis of Nanocolloid Drug-Delivery-Systems Based on Biological Polymers"

German Chapter Annual Meeting of the Controlled Release Society, München, 04.04.2003

45.

**G. Winter**

„New Liposomen and SLN for topical applications"

Symposium on Topical Formulation for Psoriasis Treatment, Neuried, 16.09.2003

46.

**G. Winter**

"Formulation of Proteins and Peptides – Highlights from 4 new research projects"

2. Meeting on new technologies, Roche AG, Feldafing, 08.10.2003

47.

**G. Winter**

"Protein stabilisation by traditional and novel drying methods"

AAPS, Salt Lake City, 29.10.2003

48.

**G. Winter**

"Application of Field Flow Fractionation in Pharmaceutical Development of Protein Drug Products"

Seminar bei Sveron AG, Rom, 21.11.2003

49.

**G. Winter**

„Sterile process technologies and device manufacturing"

49

Forschungsaufenthalt University of Colorado Health, Sciences Center, Center for Pharm. Biotechnology Denver, 03.03.2004

**50.**
**G.Winter**
„Sterilisation methods and clean room technology"
Forschungsaufenthalt University of Colorado Health, Sciences Center, Center for Pharm. Biotechnology Denver, 10.03.2004

**51.**
**G. Winter**
„Lipid based parenteral depots for biotechnology drugs"
Forschungsaufenthalt University of Colorado Health, Sciences Center, Center for Pharm. Biotechnology Denver, 17.03.2004

52.
**G. Winter**
"Advanced Methods in Drying of Protein Formulation"
Forschungsaufenthalt University of Colorado Health, Sciences Center, Center for Pharm. Biotechnology Denver, 24.03.2004

53.
**G. Winter**
"Applications of AF4 in Protein Characterization"
Forschungsaufenthalt University of Colorado Health, Sciences Center, Center for Pharm. Biotechnology Denver, 31.03.2004

54.
**G. Winter**
"Proteinformulierungen"
Fa. Vetter, Ravensburg, 26.04.2004

55.
**G. Winter**
"Application of Field Flow Fractionation in Pharmaceutical Development of Protein Drug Products"
Fa. Vetter, Ravensburg, 26.04.2004

56.
**Vortrag zur TechnoPharm 2004**
„Kompetenz in Proteinformulierung und Sterilherstellung"
TechnoPharm, Nürnberg, April 2004

57.
**G. Winter**
"Stabilisation of protein drugs in solution"
Produktseminar Aventis Biotechnologie, Frankfurt, 06.05.04

58.
**R. Schmidt, U. Goßlar, G. Winter**
"Polymer films – a topical protein delivery system for moist wound healing"

Europ. Conf. on Drug Delivery and Pharm. Technology, Sevilla, 10.-12.05.04

59.
**G. Winter**
"Effective Delivery of Biopharmaceuticals – Formulation of Proteins"
R. P. Scherer Workshop, Gravenbruch, 15.06.04

60.
**G. Winter**
„Neue Herstellungs- und Analysenmethoden für Proteinarzneimittel"
Antrittsvorlesung LMU, München, 08.07.04

61.
**R. Schmidt, U. Gosslar, G. Winter**
"Xerogels and polymer films – topical protein delivery systems for wound healing"
2nd World Meeting of Wound Healing Societ., Paris, 9.-15.07.04

62.
**G. Winter**
"The Current State of PAT in Freeze Drying"
Symposium „Lyophilisation" Breckenridge, 29.07.04

63.
**K. Zwiorek, C. Coester, E. Wagner, G. Winter**
"In Vitro Gene Transfection with Surface-Modified Gelatine Nanoparticles"
The 2004 International Conference on Mems, Nano, and Smart Systems
Banff, Alberta-Canada, 25.-27.08.04

64.
**J. Zillies, C. Coester, G. Winter**
"A New Delivery System for Double Stranded siRNA Oligonucleotides Based on Gelatin Nanoparticles"
The 2004 International Conference on Mems, Nano, and Smart Systems
Banff, Alberta-Canada, 25.-27.08.04

65.
**G. Winter**
"Application of Field Flow Fractionation as a promising analytical tool for parenteral solutions of biotechnology drugs"
Seminar Fa. Centocor/Cilag, Schaffhausen, 08.09.04

66.
**G. Winter**
"Formulation of proteins Galenical and analytical aspects"
Seminar Fa. Novartis, Basel, 09.09.04

67.
**G. Winter**
"Relevance of Drying Technologies fort he Quality of Biopharmaceuticals"
APV Seminar, Ulm/Biberach, 22.-23.09.04

68.
**G. Winter**
"Trends in der Proteingalenik"
Seminar Fa. Hexal, Holzkirchen, 29.09.04


69.
**G. Winter**
"Application of Flow Field Flow Fractionation Analytics for Characterisation of Pharmaceutical Protein Formulations."
Symposium, DphG, Regensburg, 06.-07-10.04


70.
**K. Mathis, W. Fraunhofer, G. Winter**
"Application of Flow Field-Flow Fractionation for the Evaluation of Protein Drug Stability in Pharmaceutical Formulations"
Vortrag Aachen, 20.10.04


71.
**G. Winter**
„Neue Herstell- und Analysemethoden für Protein-Arzneimittel"
Vortrag Pharm. Kolloquium Martin-Luther-Universität Halle, 25.10.04


72.
**G. Winter**
„Aktuelle Herausforderungen an die moderne Galenik"
Vortrags-Seminar anlässlich der „Volwiler-Donation", Fa. Abbott Ludwigshafen, 21.01.05


73.
**J. Zillies**
„Gelatin characterization via AF4/MALS"
Vortrag für "postnova analytics"


74.
**G. Winter**
"Actual Methods in Protein Formulation Development"
Vortrag Cytos AG, Zürich, 17.02.2005


75.
**G. Winter**
"Arzneimittelstabilität – Regulatorische Anforderungen"
LAK Seminar „Stabilität", LMU Großhadern, 02.03.2005


76.
**G. Winter**
"Specific analytical techniques for complex pharmaceutical Protein formulations"
Protein Meeting, Universität Halle, 05.03.2005


77.
**G. Winter**

„Application of asymmetrical flow field flow fractionation in the analysis of complex protein formulations"
PharmSciFair, Pharmaceutical Sciences Fair & Exhibition, Nizza, 12. – 17.06.2005

78.
**J. Zillies, G. Winter, C. Coester**
„Application of asymmetrical flow field-flow fractionation in the analysis of colloidal drug carrier systems"
PharmSciFair, Pharmaceutical Sciences Fair & Exhibition, Nizza, 12. – 17.06.2005

79.
**K. Zwiorek, P. Elamanchili, J. Samuel,  C. Coester**
"Enhanced immuno stimulation of dendritic cells by cationized gelatine nanoparticles loaded with CpG oliognucleotides"
Vortrag CRS Annual Meeting, Miami, 18. – 22.06.2005

80.
**J. Zillies, P. Nayyar, J. Samuel, C. Coester**
"Intracellular distribution and trafficking of fluorescent dye loaded gelatine nanoparticles"
Vortrag CRS Annual Meeting, Miami, 18. – 22.06.2005

**81.**
**G. Winter**
"Application of Specific Analytical Methods for Development of Complex Protein Formulations"
Protein Stability Conference, Breckenridge, 15.07.2005

**82.**
**G. Winter**
„Aktuelle Herausforderungen an die moderne Galenik"
Retreat Chiemsee, 20.07.2005

83.
First Munich Conference on Field Flow Fractionation in Pharmaceutical Biotechnology
Presented by: Ludwig-Maximilians-University Munich Pharmaceutical Technology and
 Wyatt Technology Europe GmbH, Munich, 6. – 7. Oktober 2005

84.
PowerPoint-Präsentation zur TechnoPharm 2005
"Kompetenz in Proteinformulierung und Sterilherstellung"
TechnoPharm, Nürnberg, 11. – 13. Oktober 2005

85.
**G. Winter**
"Stability issues for protein bulks and dosage forms
Processes and analytical"
Abbott Bioresearch Center, Worcester, 11.11.2005

**86.**
**G. Winter**
"Formulation of Lyophilized Proteins"

Graduate Course on Analytics of Biotch Drugs, Universität Kopenhagen, 14.11.2005

**87.**
**S. Herrmann, G. Winter**
"Improved IFN α-2a delivery systems based on lipids"
Abbott Laboratories, Ludwigshafen, 27.01.2006

88.
**S. Mohl, G. Winter**
"Controlled protein release from lipid implants"
Abbott Laboratoies, Ludwigshafen, 27.01.2006

**89.**
**G. Winter, G. Simon**
"Arzneimittelstabilität   Regulatorische Anforderungen"
LAK Seminar "Stabilität", München, 20.03.2006

**90.**
**K. Zwiorek, C. Bourquin, S. Endres, C. Coester**
"CpG oligonucleotide-loaded gelatin nanoparticles as an effective biodegradable vaccine adjuvant"
5th Word Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology, Genf, 27. – 30. März 2006

91.
**Gerhard Winter**
Wie "verpackt" man neue biologische Arzneistoffe?
LAK Baden-Württemberg, St. Blasien, 02.04.2006

92.
**Gerhard Winter**
Application of Spray Drying Technologies fort he Stabilization of Liposomes
Spray Drying Conference, Lissabon 07.-09.11.2006

93.
**Gerhard Winter**
Formulation Research and Process Development
Cooperation areas for Industry and University?
Aseptic Processing for Biopharmaceuticals, Schaffhausen 07.-08.12.2006

94.
**Gerhard Winter**
Size-concentration and loading determination of Gelatine Nanoparticles
Denver/USA, 01.03.07

95.
**Gerhard Winter, K. Mathis**
Ultrasonic Resonator Technology in Protein Stability
Denver/USA, 01.03.07

96.
**Prof. G. Winter, M. Wiggenhorn, H. Haas, K. Drexler**
Application of Spray Drying Technologies fort theStabilization of Liposomes,
Copenhagen, Okt. 2007

97.
**Prof. G. Winter, Dr. W. Fraunhofer, K. Mathis, R. Lang,Dr. J. Zillies, S. Gottschalk,**
**Dr. K. Zwiorek, Dr. C. CoesterK. Schersch, T. Serno, S. Schultes**
AF4 as a tool fort he characterisation of protein, biopolymersand nanoparticles Workshop on
Flow Field Flow Fractionation in Biotechnology,
St. Barbara/USA 17. 10.07

98.
**Prof. G. Winter**
Current Process Development Approaches for Biopharmaceuticals,
Schaffhausen, CH ECA BioPharma Conference 28.11.07

99.
**Prof. G. Winter, K. Schersch**
"Quo vadis Lyophilisation?"
Concept Heidelberg, Schaffhausen 20.-22.01.2008

100.
**Prof. G. Winter**
"Improved output and quality at the interface of DSP and final formulation"
Recovery of Biological Products XIII, Quebec City, 26.6.08

101.
**Ahmed Youssef, Gerhard Winter**
"Is Tm a Good marker for predicting biopharmaceutical formulation stability?"
July 8th, 2008, Heidelberg

101.

**Prof. G. Winter**
"The use of asymmetrical flow field flow fractionation
for the analysis of pharmaceutically relevant macromolecular systems"
29.01.09 in Amsterdam, 4. SCM meeting

102.

**S. Fuchs**
"Gelatin nanoparticles are suitable carriers for immunostimulatory RNA oligonucleotides to trigger efficient antitumoral immune responses"
11.06.2009 Nice France, 2nd PharmSciFair

103.

**Prof. G. Winter**
"Proteingalenik – Aktuelle Probleme und Beispiele aus eigenen Arbeiten "
Laupheim, 01.07.2009, Rentschler

104.
**E. Rosenberg, Prof. G. Winter**
"Progress at the interface from protein downstreaming to final formulation"
BioProduktionForum, Schaffhausen, 29. 09. 2009

105.
**Freitag AJ, Myschik J, Schulze S, Winter G**
"Immunogenicity of Protein Aggregates – A proposal"
Science to Market Conference, EAPB, October 6th-7th 2009, Hannover, Germany

106.
**Veronika Spalthoff, Gerhard Winter**
"Micro-Flow Imaging and low threshold particle counting - Is a new pharmacopoeial method necessary? "
Science to Market Conference, EAPB, October 6th-7th 2009, Hannover, Germany

107.
**Hofer M, Lammel A, Schwab M, Myschik J, Scheibel T, Winter G**
"Spider Silk Proteins – a new biopolymer for drug delivery applications"
Science to Market Conference, EAPB, October 6th-7th 2009, Hannover, Germany

108.

**Tim Serno, John F. Carpenter, Theodore W. Randolph, Gerhard Winter**
"Cyclodextrins as alternative to non-ionic surfactants in monoclonal antibody formulation"
Science to Market Conference, Hannover, 6.-7.10.2009

109.
**Dr. J. Myschik**
"Lysozyme release from lipid twin-screw extrudates:
Influence of the composition of the triglyceride matrix"
11.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

110.
**Ahmed Youssef**
"Prediction of real time stability of GCSF liquid formulations: Comparison of microcalorimety (Tm) vs. Accelerated stability studies"
11.03.2010 in Valletta/Malta, 7th World meeting on Pharmaceutics, Biopharmaceutics and Pharmaceutical Technology

111.
**Ahmed Youssef**
"Prediction of real time stability of GCSF liquid formulations: Comparison of microcalorimety (Tm) vs. Accelerated stability studies"
02.11.2010 in Hamburg, 1. Hamburger MicroCal Anwendertag

112.
**Kathrin Schersch**
"New insights into freeze-drying with collapse"
Freeze-Drying of Pharmacuticals and Biologicals, Sept 28th – October 1st 2010, Garmisch-Partenkirchen, Germany

113.
**Dr. J. Myschik**
"Spider silk – a new biomaterial for pharmaceutical applications"
16.02.2011 in Dunedin/New Zealand,
Conference on Formulation and Delivery of Bioactives 2011

114.
**Prof. Dr. G. Winter**
"Novel concepts for protein depots and low aggregate formulations"
25.02.2011 in Halle / Saale
4th Halle conference on recombinant protein production, 24.-26.02.2011

115.
**Prof. Dr. G. Winter**
"Recent progress in formulation development for biologics"
08.06. – 10.06.2011 in Ulm
Concept Bio Production Forum, 08.–10.06.2011

116.
**Prof. Dr. G. Winter**
"Formulation of protein pharmaceuticals - Trends, truths and surprises"
29.09. – 01.10.2011 in Bled, Slowenien
4th BBBB – Bled International Conference on Pharmaceutical Sciences

117.
**Markus Hofer**
„Investigation of spider silk particles as a potential drug carrier for biotec drugs"
8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceut- ical Technology
19th to 20nd March 2012, Istanbul

118.

**Thomas Bosch**

„Bulk freeze-drying of sensitive pharmaceuticals by stirred freeze-drying"

8th World Meeting on Pharmaceutics, Biopharmaceutics and Pharmaceut- ical Technology

19th to 20nd March 2012, Istanbul

# EXHIBIT 11

EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>    **v.**<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>██████████████ |

## PLAINTIFFS' DEPOSITION DESIGNATIONS

Pursuant to Local Rule 16.3(c)(7), Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively "Plaintiffs") submit herein their list of deposition designations, Defendants' objections to Plaintiffs' designations, Defendants' counter-designations, and Plaintiffs' objections to such counter-designations. Plaintiffs reserve the right to counter-designate testimony in response to Defendants' designations.

Exhibit 11

| Joshi, Hardik July 23, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 6:6 | 6:20 | | | | |
| 6:24 | 7:8 | | | | |
| 17:1 | 17:7 | | | | |
| 17:9 | 17:10 | | | | |
| 17:23 | 18:11 | | | | |
| 18:23 | 19:6 | | | | |
| 19:16 | 19:24 | | | | |
| 20:3 | 20:23 | | | | |
| 21:3 | 21:6 | | | | |
| 36:22 | 36:25 | | | | |
| 37:3 | 37:4 | | | | |
| 37:9 | 37:14 | | | | |
| 37:19 | 37:23 | | | | |
| 43:19 | 43:21 | | | | |
| 44:1 | 44:9 | | | | |
| 46:14 | 46:16 | R, Form, OS | 44:20 | 45:1 | |
| | | | 45:5 | 45:13 | |
| | | | 45:21 | 46:12 | |
| 46:19 | 46:21 | R, Form, OS | 44:20 | 45:1 | |
| | | | 45:5 | 45:13 | |
| | | | 45:21 | 46:12 | |
| 46:23 | 46:23 | R, Form, OS | 44:20 | 45:1 | |
| | | | 45:5 | 45:13 | |
| | | | 45:21 | 46:12 | |
| 48:23 | 49:11 | | | | |
| 49:23 | 50:11 | | | | |
| 50:15 | 51:14 | | | | |

| Joshi, Hardik<br>July 23, 2020 | | | | | |
|---|---|---|---|---|---|
| Par's Initial Designations | | Amneal's Objections | Amneal's Counter Designations | | Par's Objections |
| From | To | | From | To | |
| 51:16 | 52:6 | | | | |
| 54:17 | 54:20 | | | | |
| 55:9 | 55:11 | OS | 61:19 | 61:20 | |
| | | | 61:22 | 61:23 | |
| 55:14 | 55:14 | | | | |
| 55:16 | 55:18 | | | | |
| 57:18 | 57:21 | | | | |
| 60:10 | 60:25 | | | | |
| 61:8 | 61:11 | | 61:19 | 61:20 | |
| | | | 61:22 | 61:23 | |
| 63:22 | 63:24 | | | | |
| 64:20 | 65:8 | | | | |
| 65:10 | 65:12 | | | | |
| 67:6 | 67:16 | | 68:25 | 69:3 | 401, 402, 602/LOF, 801, 802 |
| 71:22 | 71:25 | | | | |
| 73:11 | 73:16 | | | | |
| 74:5 | 74:5 | | | | |
| 74:7 | 74:15 | NA | 74:16 | 74:16 | |
| 74:17 | 75:2 | | | | |
| 76:21 | 78:6 | | | | |
| 78:12 | 79:4 | | | | |
| 79:6 | 79:14 | | | | |
| 79:17 | 79:19 | | | | |
| 80:10 | 80:25 | Includes objections at 80:13-15, 80:21-22 | | | |
| 80:10 | 80:12 | | | | |
| 80:16 | 80:20 | | | | |

| Joshi, Hardik July 23, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 81:5 | 81:11 | | | | |
| 81:14 | 81:15 | Includes objections at 81:18-21 | | | |
| 81:18 | 81:23 | Includes objections at 81:25-82:1 | | | |
| 81:25 | 82:1 | | | | |
| 82:4 | 84:12 | | | | |
| 84:20 | 86:9 | | | | |
| 86:16 | 88:12 | | | | |
| 92:12 | 93:13 | | | | |
| 94:11 | 96:16 | F | | | |
| 96:19 | 96:24 | | | | |
| 97:10 | 97:17 | | | | |
| 98:1 | 99:11 | F | | | |
| 101:15 | 101:23 | | | | |
| 102:7 | 103:8 | | 103:9 | 104:1 | 401, 402, 403, 801, 802 |
| 104:2 | 104:7 | | 103:9 | 104:1 | 401, 402, 403, 801, 802 |
| | | | | | |
| | | Need to account for errata | | | |

Exhibit 11

| Joshi, Hardik July 24, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 6:19 | 7:10 | | | | |
| 8:13 | 8:17 | | | | |
| 8:23 | 10:23 | | | | |
| 11:3 | 11:14 | | | | |
| 11:20 | 11:23 | | | | |
| 12:1 | 12:5 | | | | |
| 12:7 | 18:10 | F | 18:17 | 18:21 | 401, 402, 403, 602/LOF, 801, 802 |
| 18:22 | 19:2 | | 19:6 | 19:10 | 401, 402, 403, 602/LOF, 801, 802 |
| 20:17 | 22:25 | | | | |
| 23:5 | 23:8 | | | | |
| 24:4 | 25:25 | | | | |
| 26:4 | 26:8 | | | | |
| 27:12 | 27:18 | | 27:19 | 27:22 | |
| 29:6 | 30:25 | F | | | |
| 31:3 | 31:20 | | | | |
| 31:24 | 32:1 | | | | |
| 32:6 | 32:9 | | | | |
| 33:16 | 34:12 | | 33:2 | 33:11 | 801, 802 |
| 35:1 | 36:25 | | | | |
| 37:12 | 39:3 | | | | |
| 39:5 | 40:8 | | | | |
| 41:2 | 43:8 | | | | |
| 43:17 | 43:25 | | | | |
| 44:4 | 44:7 | | | | |
| 44:21 | 45:1 | Includes objection at 44:24 | | | |

Exhibit 11

| Joshi, Hardik July 24, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 44:21 | 44:23 | | | | |
| 44:25 | 45:1 | | | | |
| 45:4 | 45:11 | F | | | |
| 45:13 | 45:15 | | | | |
| 47:10 | 47:18 | | | | |
| 48:3 | 49:13 | | | | |
| 59:8 | 61:3 | | | | |
| 62:23 | 63:10 | | | | |
| 63:20 | 63:23 | | | | |
| 64:5 | 64:17 | R, OS | | | |
| 66:12 | 66:21 | R, OS | | | |
| 66:24 | 67:4 | R, OS | | | |
| 67:7 | 67:10 | R, OS | | | |
| 67:14 | 67:18 | R | | | |
| 71:9 | 72:6 | | | | |
| 74:3 | 75:5 | | 75:12 | 75:21 | 401, 402, 403, 602/LOF, 801, 802 |
| 84:10 | 86:18 | R | | | |
| 87:12 | 87:16 | | | | |
| 87:20 | 87:25 | | | | |
| 88:10 | 88:19 | | | | |
| 88:21 | 89:4 | | | | |
| 89:22 | 91:19 | R, F | | | |
| 92:1 | 92:4 | NA, NQP | | | |
| 100:16 | 100:21 | | | | |
| 100:23 | 100:24 | | | | |

Exhibit 11

| Joshi, Hardik July 24, 2020 | | | | | | |
|---|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** | |
| **From** | **To** | | **From** | **To** | | |
| 101:25 | 102:23 | F | 128:24 | 129:6 | 401, 402, 403, 602/LOF, 801, 802 | |
| 103:16 | 105:6 | F | 128:24 | 129:6 | 401, 402, 403, 602/LOF, 801, 802 | |
| 105:11 | 105:19 | | | | | |
| 121:9 | 121:12 | | | | | |
| 121:14 | 122:25 | | 129:7 | 129:9 | 401, 402, 403, 602/LOF, 801, 802 | |
| | | | 129:15 | 129:18 | 401, 402, 403, 602/LOF, 801, 802 | |
| | | | 131:15 | 131:18 | 401, 402, 403, 602/LOF, 801, 802 | |
| | | | 131:20 | 132:1 | 401, 402, 403, 602/LOF, 701, 702, 801, 802 | |
| | | | 132:3 | 132:3 | 401, 402, 403, 602/LOF, 701, 702, 801, 802 | |
| 124:22 | 124:25 | | | | | |
| | | | | | | |
| | | Need to account for errata | | | | |

| Joshi, Hardik | | | | | | |
| November 25, 2020 | | | | | | |

| Par's Initial Designations | | Amneal's Objections | Amneal's Counter Designations | | Par's Objections |
|---|---|---|---|---|---|
| From | To | | From | To | |
| 7:7 | 7:24 | | | | |
| 9:9 | 9:11 | | | | |
| 9:19 | 9:23 | | | | |
| 12:16 | 13:8 | | | | |
| 13:10 | 13:20 | | | | |
| 14:13 | 15:11 | | 169:13 | 169:19 | |
| 20:21 | 21:12 | | 16:2 | 17:7 | |
| 21:16 | 22:2 | | | | |
| 22:7 | 22:21 | | | | |
| 23:2 | 23:5 | | | | |
| 23:12 | 23:17 | | | | |
| 24:4 | 24:8 | | 169:13 | 169:19 | |
| 26:1 | 26:8 | | | | |
| 28:13 | 28:17 | | 169:13 | 169:19 | |
| 30:3 | 30:8 | | 169:13 | 169:19 | |
| 33:11 | 34:16 | | | | |
| 34:19 | 35:20 | | | | |
| 35:24 | 38:2 | | 38:3 | 38:11 | |
| | | | 70:16 | 70:18 | 401, 402, 403, 602/LOF, 801, 802 |
| | | | 70:22 | 70:23 | 401, 402, 403, 602/LOF, 801, 802 |
| 40:18 | 44:14 | | | | |
| 44:18 | 44:19 | Form, OS | | | |
| 44:21 | 44:24 | OS | | | |
| 45:2 | 45:4 | OS | | | |
| 45:8 | 46:3 | OS | | | |

Exhibit 11

| Joshi, Hardik | | | | | |
| November 25, 2020 | | | | | |
| Par's Initial Designations | | Amneal's Objections | Amneal's Counter Designations | | Par's Objections |
| From | To | | From | To | |
| 46:5 | 46:10 | OS | | | |
| 46:17 | 46:24 | OS | | | |
| 47:2 | 47:18 | OS | | | |
| 47:24 | 48:21 | OS | | | |
| 48:23 | 49:17 | OS | | | |
| 49:19 | 49:20 | OS | | | |
| 51:8 | 51:14 | | | | |
| 51:20 | 52:2 | | | | |
| 52:5 | 55:8 | | | | |
| 55:13 | 57:17 | OS | | | |
| 58:9 | 58:19 | OS | | | |
| 59:11 | 59:24 | OS | | | |
| 60:8 | 60:10 | OS | | | |
| 60:12 | 60:17 | OS | | | |
| 60:19 | 60:21 | OS | | | |
| 60:23 | 61:2 | OS | | | |
| 61:4 | 61:5 | OS | | | |
| 61:7 | 61:9 | OS | | | |
| 61:11 | 61:14 | OS | | | |
| 61:16 | 61:23 | | | | |
| 62:5 | 63:3 | | 63:7 | 63:9 | |
| | | | 168:6 | 168:9 | 401, 402, 403, 602/LOF, 801, 802, leading |
| | | | 168:11 | 168:11 | 401, 402, 403, 602/LOF, 801, 802, leading |
| | | | 169:3 | 169:5 | 401, 402, 403, 602/LOF, 801, 802, leading |

| Joshi, Hardik November 25, 2020 | | | | | | |
|---|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** | |
| **From** | **To** | | **From** | **To** | | |
| | | | 169:7 | 169:7 | 401, 402, 403, 602/LOF, 801, 802, leading | |
| 63:7 | 63:13 | F | | | | |
| 63:16 | 63:18 | | | | | |
| 63:21 | 63:22 | | | | | |
| 65:2 | 66:13 | | | | | |
| 66:21 | 66:22 | | | | | |
| 66:24 | 67:4 | | | | | |
| 67:9 | 67:11 | | | | | |
| 67:13 | 67:14 | | | | | |
| 67:16 | 68:20 | | | | | |
| 69:1 | 69:10 | F | | | | |
| 70:16 | 70:18 | Form, OS | | | | |
| 70:22 | 70:23 | OS | | | | |
| 71:2 | 71:4 | OS | 168:6 | 168:9 | 401, 402, 403, 602/LOF, 801, 802, leading | |
| | | | 168:11 | 168:11 | 401, 402, 403, 602/LOF, 801, 802, leading | |
| | | | 169:3 | 169:5 | 401, 402, 403, 602/LOF, 801, 802, leading | |
| | | | 169:7 | 169:7 | 401, 402, 403, 602/LOF, 801, 802, leading | |
| 71:12 | 73:6 | | | | | |
| 73:14 | 73:16 | OS | | | | |
| 73:18 | 73:20 | OS | | | | |
| 73:22 | 74:1 | | | | | |
| 74:7 | 74:23 | | | | | |

| Joshi, Hardik<br>November 25, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 75:2 | 75:14 | | | | |
| 75:16 | 77:11 | | | | |
| 77:16 | 78:3 | | 168:6 | 168:9 | 401, 402, 403, 602/LOF, 801, 802, leading |
| | | | 168:11 | 168:11 | 401, 402, 403, 602/LOF, 801, 802, leading |
| | | | 169:3 | 169:5 | 401, 402, 403, 602/LOF, 801, 802, leading |
| | | | 169:7 | 169:7 | 401, 402, 403, 602/LOF, 801, 802, leading |
| 78:16 | 78:23 | | | | |
| 79:2 | 79:6 | OS | | | |
| 79:21 | 80:24 | OS | | | |
| 81:2 | 81:20 | OS | | | |
| 81:24 | 83:1 | OS | | | |
| 84:4 | 84:8 | Form, OS | | | |
| 84:10 | 84:15 | OS | | | |
| 84:17 | 84:20 | Form, OS | | | |
| 84:22 | 85:13 | OS | | | |
| 86:12 | 87:13 | Form, OS | 95:13 | 95:16 | 401, 402, 602/LOF, 801, 802 |
| | | | 95:19 | 95:23 | 401, 402, 602/LOF, 801, 802 |
| 87:15 | 87:17 | OS | | | |
| 88:1 | 88:5 | Missing part of question | | | |
| 89:12 | 89:14 | Form, OS | 95:13 | 95:16 | 401, 402, 602/LOF, 801, 802 |
| | | | 95:19 | 95:23 | 401, 402, 602/LOF, 801, 802 |
| 89:17 | 89:20 | OS | | | |
| 90:22 | 90:23 | | | | |

| Joshi, Hardik November 25, 2020 | | | | | |
|---|---|---|---|---|---|
| Par's Initial Designations | | Amneal's Objections | Amneal's Counter Designations | | Par's Objections |
| From | To | | From | To | |
| 91:2 | 91:2 | | | | |
| 91:4 | 91:8 | | | | |
| 91:17 | 92:9 | | | | |
| 92:19 | 93:8 | Form | | | |
| 93:10 | 93:23 | Form, OS | 95:13 | 95:16 | 401, 402, 602/LOF, 801, 802 |
| | | | 95:19 | 95:23 | 401, 402, 602/LOF, 801, 802 |
| 94:2 | 94:11 | | | | |
| 94:13 | 94:13 | | | | |
| 94:15 | 94:18 | | | | |
| 96:9 | 97:4 | F, OS | | | |
| 97:6 | 97:9 | F, OS | | | |
| 97:11 | 97:11 | F, OS | | | |
| 98:6 | 98:18 | | | | |
| 99:4 | 99:14 | | | | |
| 99:23 | 100:5 | | | | |
| 100:20 | 101:5 | | | | |
| 102:13 | 104:19 | | | | |
| 104:21 | 104:23 | | | | |
| 105:2 | 105:4 | | | | |
| 105:6 | 105:10 | | | | |
| 105:12 | 105:13 | | | | |
| 109:6 | 110:3 | | | | |
| 110:6 | 110:24 | Form, OS | | | |
| 111:3 | 111:10 | Form, OS | | | |
| 111:12 | 111:20 | | | | |
| 111:22 | 111:24 | | | | |
| 112:2 | 112:22 | | | | |

| Joshi, Hardik November 25, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 113:2 | 114:3 | | | | |
| 114:7 | 115:15 | | | | |
| 115:17 | 115:20 | | | | |
| 115:22 | 115:23 | Form, F | | | |
| 116:1 | 116:6 | | | | |
| 116:13 | 116:17 | F | | | |
| 116:24 | 116:24 | Form, OS | | | |
| 117:2 | 117:4 | | | | |
| 117:6 | 117:8 | | | | |
| 117:10 | 117:10 | | | | |
| 117:18 | 118:1 | | | | |
| 118:3 | 118:3 | | | | |
| 118:5 | 118:5 | | | | |
| 118:7 | 118:14 | | | | |
| 118:16 | 118:20 | | | | |
| 119:15 | 120:12 | Includes objection at 120:7 | | | |
| 119:15 | 120:6 | | | | |
| 120:8 | 120:12 | | | | |
| 121:3 | 121:11 | | | | |
| 123:5 | 123:10 | | | | |
| 123:14 | 123:19 | | | | |
| 123:23 | 125:24 | | | | |
| 126:8 | 127:5 | | | | |
| 127:7 | 127:8 | | | | |
| 127:10 | 127:17 | | | | |
| 127:19 | 127:22 | | | | |
| 127:24 | 128:18 | | 129:3 | 129:6 | NR, 401, 402, 403, 801, 802 |

| colspan Joshi, Hardik November 25, 2020 |||||||
|---|

| Par's Initial Designations | | Amneal's Objections | Amneal's Counter Designations | | Par's Objections |
|---|---|---|---|---|---|
| From | To | | From | To | |
| | | | 129:8 | 129:22 | NR, 401, 402, 403, 801, 802 |
| 130:7 | 131:15 | | | | |
| 131:18 | 132:12 | | 133:17 | 133:24 | 401, 402, 403, 602/LOF, 801, 802 |
| 134:23 | 135:3 | | | | |
| 135:22 | 136:6 | | | | |
| 136:12 | 136:23 | | | | |
| 137:1 | 138:4 | | | | |
| 138:10 | 138:14 | | | | |
| 139:9 | 139:14 | OS | | | |
| 139:16 | 139:17 | | | | |
| 140:2 | 140:14 | F | | | |
| 140:16 | 140:19 | F | | | |
| 140:21 | 142:5 | F, S (through 141:21) | | | |
| 142:7 | 142:8 | | | | |
| 142:10 | 143:5 | | | | |
| 143:7 | 143:11 | | | | |
| 143:13 | 143:15 | | | | |
| 143:17 | 143:23 | | | | |
| 144:6 | 144:23 | | | | |
| 145:2 | 145:9 | | | | |
| 145:13 | 145:15 | | | | |
| 145:18 | 146:7 | | | | |
| 146:12 | 146:20 | | 175:5 | 175:16 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading, designation starts with an answer |

| Joshi, Hardik<br>November 25, 2020 | | | | |
|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| 146:24 | 147:2 | Includes objection at 147:2 | | | |
| 147:6 | 147:7 | | | | |
| 147:9 | 147:15 | | | | |
| 147:17 | 147:22 | Includes objection at 147:17 | | | |
| 147:24 | 148:3 | | | | |
| 148:7 | 148:12 | | | | |
| 148:22 | 148:24 | | | | |
| 149:2 | 149:5 | | | | |
| 150:4 | 150:15 | | | | |
| 150:17 | 150:17 | | | | |
| 150:19 | 151:16 | | | | |
| 151:21 | 152:22 | | | | |
| 153:5 | 153:7 | | | | |
| 153:9 | 153:13 | | | | |
| 153:20 | 154:13 | | | | |
| 155:11 | 156:11 | | | | |
| 157:20 | 159:10 | | | | |
| 159:13 | 160:7 | | | | |
| 160:9 | 160:11 | | | | |
| 160:13 | 160:18 | F, S | | | |
| 160:20 | 160:21 | F, S | | | |
| 161:7 | 161:21 | | | | |
| 162:4 | 162:22 | | 175:4 | 175:16 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading, designation cuts off question |
| | | | 175:23 | 176:1 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading |

| Joshi, Hardik November 25, 2020 | | | | | |
|---|---|---|---|---|---|
| **Par's Initial Designations** | | **Amneal's Objections** | **Amneal's Counter Designations** | | **Par's Objections** |
| **From** | **To** | | **From** | **To** | |
| | | | 176:3 | 176:3 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading |
| 163:2 | 163:19 | | | | |
| 163:21 | 165:21 | | 175:4 | 175:16 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading, designation cuts off question |
| | | | 175:23 | 176:1 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading |
| | | | 176:3 | 176:3 | 401, 402, 403, 602/LOF, 701, 702, 801, 802, leading |
| 165:24 | 166:18 | | | | |
| 176:15 | 176:22 | | | | |
| 177:8 | 177:19 | | | | |
| 177:21 | 178:8 | | | | |
| 178:23 | 179:12 | | | | |

| Amneal's Objection Code | |
|---|---|
| **CODE** | **OBJECTION** |
| A | Fed. R. Evid. 901 - Requires proof of authenticity as a condition precedent to its admissibility |
| DEM | Demonstrative Only |
| DUP | Duplication of Another Exhibit |
| E | Mischaracterization in Description |
| F | Fed. R. Evid. 602 - No Foundation |
| H | Fed. R. Evid. 801 & 802 - Hearsay |
| I | Illegible (partly or wholly) |
| IC | Improper compilation |
| IN | Fed. R. Evid. 106 - Incomplete |
| NT | No Certified Translation |
| R | Fed. R. Evid. 402 - Not Relevant |
| RD | Redaction Required |
| 26 | Fed. R. Civ. P. 26 - Not timely disclosed |
| 403 | Fed. R. Evid. 403 - Any relevance substantially outweighed by confusion, prejudice or waster of time |
| 1006 | Fed. R. Evid. 1006 - Voluminous document requires summary |

| Par's Objection Key | |
|---|---|
| Code | Objection |
| 106 | partial document/lacks context (FRE 106) |
| 401/402 | lacks relevance (FRE 401/402) |
| 403 | unduly prejudicial/confusing/waste of time (FRE 403) |
| 501/502 | Privilege/Work Product (FRE 501/502) |
| 602/LOF | lacks foundation/speculative (FRE 602) |
| 701/702 | improper opinion (FRE 701/702) |
| 801-802 | hearsay (FRE 802) |
| 901/902 | lacks authenticity (FRE 901/902) |
| 1002 | original document required (FRE 1002) |
| 1003 | incomplete/illegible (FRE 1003) |
| 1006 | improper summary (FRE 1006) |
| ID | insufficient/incorrect description |
| L | late/not produced |
| AA | attorney argument improperly offered as evidence; contains counsel colloquy or objections |
| C | compound |
| Legal | calls for a legal conclusion |
| Leading | leading question of a non-hostile witness |
| MC | Mischaracterizes/misstates witness's testimony |
| NR | nonresponsive |
| PMIL | Subject of pending motion in limine |
| P | privilege |
| OS | beyond the scope |
| V | Vague and/or ambiguous |

# EXHIBIT 12

EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al. <br><br> Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)** <br><br> █████████████ |

## <u>DEFENDANTS' DEPOSITION DESIGNATIONS</u>

Pursuant to Local Rule 16.3(c)(7) and the Court's Scheduling Order (D.I. 20, 148), Defendant Amneal respectfully submits herein its list of deposition designations, Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC's (collectively "Plaintiffs") objections to Amneal's designations, Plaintiffs' counter-designations, and Amneal's objections to such counter-designations. Amneal reserves the right to counter designate testimony in response to Plaintiffs' designations.

| Boesch, Brian September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 12 | 20 | 12 | 23 | | 46 | 7 | 47 | 7 | R, 403, 32 |
| 37 | 11 | 37 | 16 | 602, LOF | 52 | 13 | 52 | 18 | R, 403, 32 |
| 37 | 19 | 37 | 23 | | 53 | 4 | 53 | 18 | R, 403, 32 |
| 37 | 25 | 37 | 25 | | 56 | 4 | 56 | 11 | R, 403, 32 |
| 38 | 3 | 38 | 7 | | 56 | 13 | 56 | 15 | R, 403, 32 |
| 38 | 9 | 38 | 11 | 602, LOF, 701, 702 | 59 | 3 | 59 | 10 | R, 403, 32 |
| 38 | 14 | 38 | 18 | 602, LOF, 701, 702 | 59 | 13 | 59 | 24 | R, 403, 32 |
| 38 | 20 | 38 | 21 | 401, 402, 403, 602, LOF | 63 | 24 | 64 | 3 | R, 403, 32 |
| 38 | 24 | 38 | 25 | 401, 402, 403, 602, LOF | 77 | 21 | 77 | 25 | R, 403, 32 |
| 39 | 2 | 39 | 2 | 401, 402, 403, 602, LOF | 80 | 23 | 81 | 9 | R, 403, 32 |
| 126 | 22 | 126 | 25 | No testimony designated | 90 | 20 | 91 | 16 | R, 403, 32, F, S |
| 127 | 13 | 127 | 22 | 801, 802 | 91 | 19 | 91 | 19 | R, 403, 32, F, S |
| 128 | 2 | 128 | 3 | 801, 802 | 107 | 22 | 108 | 25 | R, 403, 32 |
| 128 | 5 | 128 | 23 | 602, LOF, 801, 802 | 111 | 4 | 111 | 16 | R, 403, 32 |
| 129 | 2 | 129 | 10 | 602, LOF, 801, 802 | 115 | 19 | 115 | 23 | R, 403, 32 |
| 129 | 12 | 129 | 14 | 602, LOF, 801, 802 | 116 | 3 | 116 | 15 | R, 403, 32 |
| 130 | 16 | 130 | 18 | No testimony designated | 117 | 5 | 117 | 23 | R, 403, 32 |
| 130 | 20 | 130 | 25 | | 125 | 18 | 125 | 21 | R, 403, 32 |
| 138 | 20 | 138 | 23 | | 127 | 3 | 127 | 8 | F, S, 32 |
| 139 | 24 | 139 | 25 | 602, LOF | 146 | 3 | 146 | 5 | R, 403, 32, F, S |
| 140 | 2 | 140 | 2 | 602, LOF | 146 | 8 | 146 | 10 | R, 403, 32, F, S |
| 140 | 5 | 140 | 5 | 602, LOF | 146 | 12 | 146 | 17 | R, 403, 32, F, S |
| 141 | 23 | 141 | 25 | 401, 402, 403, 602, LOF, 801, 802, V | 146 | 24 | 146 | 25 | R, 403, F, S, 32 |
| 142 | 2 | 142 | 5 | 401, 402, 403, 602, LOF, 801, 802, V | 147 | 4 | 147 | 13 | R, 403, F, S, 32 |
| 142 | 8 | 142 | 10 | 401, 402, 403, 602, LOF, 801, 802, V | 150 | 15 | 150 | 16 | R, 403, 32 |
| 142 | 12 | 142 | 15 | 401, 402, 403, 801, 802 | 150 | 19 | 150 | 23 | R, 403, 32 |
| 142 | 19 | 142 | 22 | 602, LOF | 151 | 20 | 151 | 21 | R, 403, 32 |

| Boesch, Brian September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 142 | 24 | 142 | 25 | 602, LOF | 151 | 24 | 152 | 5 | R, 403, 32 |
| 143 | 2 | 143 | 4 | 602, LOF | 153 | 4 | 153 | 11 | R, 403, 32, F, S |
| 143 | 10 | 143 | 15 | | 169 | 18 | 169 | 19 | R, 403, F, S, LAY, 32 |
| 144 | 7 | 144 | 8 | 401, 402, 403, 602, LOF | 169 | 22 | 169 | 23 | R, 403, F, S, LAY, 32 |
| 144 | 11 | 144 | 13 | 401, 402, 403, 602, LOF | 169 | 25 | 170 | 2 | R, 403, F, S, LAY, 32 |
| 144 | 15 | 144 | 18 | 401, 402, 403, 602, LOF | 170 | 5 | 170 | 5 | R, 403, F, S, LAY, 32 |
| 145 | 16 | 145 | 18 | 401, 402, 403, 602, LOF | 170 | 7 | 170 | 7 | R, 403, F, S, LAY, 32 |
| 145 | 21 | 145 | 24 | 401, 402, 403, 602, LOF | 170 | 10 | 170 | 20 | R, 403, F, S, LAY, 32 |
| 146 | 18 | 146 | 23 | | 180 | 13 | 180 | 22 | R, 403, 32, F, S |
| 148 | 7 | 148 | 8 | 401, 402, 403, 602, LOF | 180 | 25 | 181 | 4 | R, 403, 32, F, S |
| 148 | 11 | 148 | 15 | 401, 402, 403, 602, LOF, 801, 802 | 181 | 9 | 181 | 10 | R, 403, 32, F, S |
| 148 | 18 | 148 | 18 | 401, 402, 403, 602, LOF, 801, 802 | 181 | 12 | 181 | 17 | R, 403, 32, F, S |
| 150 | 5 | 150 | 8 | 401, 402, 403, 602, LOF | 185 | 23 | 185 | 24 | NQP, NA, 32 |
| 150 | 12 | 150 | 14 | | 186 | 16 | 186 | 20 | F, S, 32 |
| 150 | 25 | 150 | 25 | 401, 402, 403, 602, LOF | 210 | 3 | 210 | 7 | R, 403, F, S, LAY, 32 |
| 151 | 2 | 151 | 2 | 401, 402, 403, 602, LOF | 210 | 10 | 210 | 15 | R, 403, F, S, LAY, 32 |
| 151 | 5 | 151 | 7 | 401, 402, 403, 602, LOF | 216 | 18 | 216 | 19 | R, 403, 32, F, S |
| 151 | 17 | 151 | 19 | | 216 | 22 | 216 | 22 | R, 403, 32, F, S |
| 152 | 14 | 152 | 16 | 401, 402, 403, 602, LOF | 250 | 18 | 250 | 23 | R, 403, 32 |
| 152 | 19 | 152 | 22 | 401, 402, 403, 602, LOF | 253 | 19 | 254 | 3 | R, 403, 32 |
| 162 | 16 | 162 | 18 | 401, 402, 403, 602, LOF, 701, 702 | 256 | 24 | 257 | 5 | R, 403, 32 |
| 162 | 21 | 162 | 25 | 401, 402, 403, 602, LOF, 701, 702 | 257 | 7 | 257 | 13 | R, 403, 32 |
| 163 | 2 | 163 | 3 | 401, 402, 403, 602, LOF, 701, 702 | 257 | 15 | 257 | 17 | R, 403, 32 |
| 170 | 22 | 170 | 25 | 602, LOF | | | | | |
| 171 | 4 | 171 | 4 | 602, LOF | | | | | |
| 186 | 25 | 186 | 25 | 602, LOF | | | | | |
| 187 | 2 | 187 | 3 | 602, LOF | | | | | |

| Boesch, Brian September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 187 | 6 | 187 | 17 | 602, LOF | | | | | |
| 187 | 19 | 187 | 22 | 602, LOF | | | | | |
| 187 | 25 | 187 | 25 | 602, LOF | | | | | |
| 188 | 2 | 188 | 3 | 602, LOF | | | | | |
| 196 | 13 | 196 | 16 | V | | | | | |
| 204 | 21 | 204 | 25 | | | | | | |
| 205 | 2 | 205 | 5 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 205 | 8 | 205 | 14 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 205 | 16 | 205 | 16 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 205 | 19 | 205 | 20 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 205 | 22 | 205 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 206 | 4 | 206 | 6 | 401, 402, 403, 602, LOF | | | | | |
| 206 | 8 | 206 | 9 | 401, 402, 403, 602, LOF | | | | | |
| 206 | 12 | 206 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 207 | 3 | 207 | 5 | 401, 402, 403, 602, LOF, 701, 702, V | | | | | |
| 207 | 8 | 207 | 16 | 401, 402, 403, 602, LOF, 701, 702, V | | | | | |
| 207 | 22 | 207 | 25 | 401, 402, 403 | | | | | |
| 208 | 2 | 208 | 12 | 401, 402, 403 | | | | | |
| 209 | 3 | 209 | 7 | 401, 402, 403, 602, LOF V | | | | | |
| 209 | 11 | 209 | 17 | 401, 402, 403, 602, LOF V | | | | | |
| 210 | 17 | 210 | 23 | 401, 402, 403, 602, LOF, C, V | | | | | |
| 211 | 2 | 211 | 2 | 401, 402, 403, 602, LOF, C, V | | | | | |
| 211 | 6 | 211 | 16 | 401, 402, 403, V | | | | | |
| 221 | 22 | 221 | 23 | 401, 402, 403, 602, LOF | | | | | |
| 222 | 2 | 222 | 5 | 401, 402, 403, 602, LOF | | | | | |
| 222 | 7 | 222 | 9 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 222 | 13 | 222 | 15 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |

| Boesch, Brian September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 250 | 24 | 250 | 25 | 401, 402, 403, 602, LOF, V, C | | | | | |
| 251 | 2 | 251 | 12 | 401, 402, 403, 602, LOF, V, C | | | | | |
| 251 | 15 | 251 | 17 | 401, 402, 403, 602, LOF, V, C | | | | | |
| 251 | 19 | 251 | 23 | 401, 402, 403, 602, LOF, V, C | | | | | |

| | | | | Bonomi-Huvala, Michelle | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | October 29, 2019 | | | | | |
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 10 | 3 | 10 | 11 | | 9 | 21 | 10 | 2 | |
| 11 | 2 | 11 | 9 | | 12 | 12 | 13 | 3 | |
| 11 | 19 | 11 | 24 | | 13 | 19 | 14 | 3 | |
| 12 | 2 | 12 | 5 | | 14 | 8 | 14 | 16 | S, F, 32 |
| 12 | 7 | 12 | 10 | | 15 | 18 | 16 | 6 | F, R, 32 |
| 13 | 5 | 13 | 18 | | 24 | 14 | 24 | 24 | 32 |
| 14 | 4 | 14 | 7 | | 26 | 13 | 27 | 15 | R, 403, 32 |
| 14 | 17 | 14 | 21 | | 28 | 4 | 28 | 22 | R, 403, 32 |
| 15 | 13 | 15 | 17 | | 29 | 14 | 30 | 2 | F, S, 32 |
| 16 | 9 | 16 | 14 | | 30 | 9 | 30 | 17 | 32 |
| 19 | 17 | 19 | 23 | | 31 | 7 | 31 | 19 | F, S, 32 |
| 19 | 25 | 19 | 25 | | 32 | 6 | 32 | 23 | F, S, 32 |
| 20 | 2 | 20 | 13 | | 33 | 14 | 33 | 17 | F, S, 32 |
| 20 | 18 | 20 | 20 | | 34 | 11 | 34 | 21 | NQP, F |
| 20 | 24 | 20 | 25 | | 35 | 9 | 36 | 5 | F, S, R, 403, 32 |
| 21 | 3 | 21 | 13 | | 38 | 5 | 38 | 15 | F, S, 32 |
| 21 | 15 | 21 | 20 | | 39 | 23 | 40 | 20 | F, S, 32 |
| 21 | 24 | 21 | 25 | | 42 | 24 | 43 | 11 | NR, 32 |
| 22 | 2 | 22 | 5 | | 43 | 14 | 43 | 17 | NR, F, 32 |
| 22 | 7 | 22 | 18 | | 44 | 12 | 44 | 14 | 32 |
| 22 | 22 | 22 | 25 | | 44 | 17 | 45 | 14 | NR, F, S, 32 |
| 23 | 2 | 23 | 6 | | 45 | 19 | 45 | 22 | 32 |
| 23 | 8 | 23 | 10 | | 45 | 24 | 45 | 24 | F, S, 32 |
| 24 | 2 | 24 | 10 | | 46 | 4 | 46 | 22 | F, S, 32 |
| 24 | 12 | 24 | 13 | | 47 | 7 | 47 | 11 | F, S, 32 |
| 24 | 25 | 24 | 25 | | 48 | 15 | 49 | 2 | F, S, 32 |
| 25 | 2 | 25 | 8 | | 50 | 23 | 51 | 8 | 32 |
| 25 | 10 | 25 | 20 | | 51 | 13 | 51 | 20 | 32 |

| Bonomi-Huvala, Michelle | | | | | | | | | |
| October 29, 2019 | | | | | | | | | |
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 26 | 8 | 26 | 10 | | 55 | 18 | 56 | 17 | F, S, 32 |
| 26 | 12 | 26 | 12 | | 62 | 20 | 63 | 9 | F, S, 32 |
| 28 | 23 | 28 | 25 | | 63 | 20 | 63 | 23 | 32 |
| 29 | 2 | 29 | 12 | | 63 | 25 | 64 | 19 | NR, F, S, 32 |
| 30 | 20 | 30 | 22 | | 66 | 20 | 67 | 2 | F, S, R, 403, 32, AF |
| 30 | 24 | 30 | 25 | | 67 | 20 | 67 | 24 | NR, F, S, R, 403, 32, AF |
| 31 | 2 | 31 | 6 | | 92 | 13 | 92 | 18 | 32, R |
| 31 | 20 | 31 | 24 | | 92 | 20 | 92 | 25 | F, S, 32 |
| 32 | 3 | 32 | 4 | | 93 | 17 | 93 | 21 | F, S, 32 |
| 33 | 2 | 33 | 13 | | 94 | 19 | 95 | 7 | FORM, R, 403, 32 |
| 33 | 19 | 33 | 25 | | 95 | 9 | 96 | 20 | FORM, R, 403, 32, F, S |
| 34 | 2 | 34 | 10 | | 96 | 23 | 97 | 6 | F, S, R, 403, 32 |
| 34 | 22 | 34 | 25 | | 97 | 8 | 97 | 10 | NQP, NA, R, 403, F, S, 32 |
| 35 | 2 | 35 | 8 | 602/LOF | 97 | 24 | 98 | 3 | FORM, R, 403, 32, F, S |
| 36 | 6 | 36 | 22 | | 98 | 6 | 98 | 13 | FORM, R, 403, 32, F, S |
| 36 | 25 | 36 | 25 | | 98 | 17 | 99 | 11 | FORM, R, 403, 32, F, S |
| 37 | 13 | 37 | 23 | | 99 | 15 | 99 | 18 | FORM, R, 403, 32, F, S |
| 37 | 25 | 37 | 25 | | 99 | 21 | 100 | 9 | FORM, R, 403, 32, F, S |
| 38 | 2 | 38 | 4 | | 100 | 11 | 100 | 11 | FORM, R, 403, 32, F, S |
| 38 | 18 | 38 | 25 | | 100 | 16 | 101 | 2 | FORM, R, 403, 32, F, S |
| 39 | 2 | 39 | 10 | | 101 | 5 | 101 | 5 | FORM, R, 403, 32, F, S |
| 44 | 7 | 44 | 11 | | 101 | 7 | 101 | 18 | FORM, R, 403, 32, F, S |
| 45 | 15 | 45 | 18 | | 101 | 21 | 102 | 2 | FORM, R, 403, 32, F, S |
| 45 | 25 | 45 | 25 | | 102 | 7 | 102 | 8 | FORM, R, 403, 32, F, S |
| 46 | 2 | 46 | 3 | | 102 | 10 | 102 | 21 | FORM, R, 403, 32, F, S |
| 46 | 24 | 46 | 25 | | 102 | 24 | 102 | 24 | FORM, R, 403, 32, F, S |
| 47 | 2 | 47 | 6 | | 103 | 3 | 103 | 5 | F, S, 32, R, 403 |
| 48 | 6 | 48 | 14 | | 103 | 7 | 103 | 13 | FORM, R, 403, 32, F, S |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| colspan="10" | **Bonomi-Huvala, Michelle**<br>**October 29, 2019** |
| colspan="4" | **Amneal's Initial Designations** | | colspan="4" | **Par's Counter Designations** | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 49 | 3 | 49 | 10 | | 103 | 16 | 103 | 25 | FORM, R, 403, 32, F, S |
| 49 | 13 | 49 | 19 | | 104 | 4 | 104 | 15 | FORM, R, 403, 32, F, S |
| 49 | 21 | 49 | 21 | | 104 | 18 | 104 | 19 | FORM, R, 403, 32, F, S |
| 49 | 24 | 49 | 25 | | 105 | 7 | 105 | 20 | F, S, 32, R, 403 |
| 50 | 2 | 50 | 6 | 602/LOF, AA, MC | 106 | 2 | 106 | 7 | F, S, 32, R, 403 |
| 50 | 9 | 50 | 20 | | 109 | 6 | 109 | 18 | F, S, 32, R, 403 |
| 51 | 9 | 51 | 12 | | 110 | 2 | 110 | 14 | F, S, 32, R, 403 |
| 54 | 5 | 54 | 19 | | 110 | 16 | 111 | 8 | F, S, 32, R, 403 |
| 56 | 18 | 56 | 25 | | 111 | 22 | 112 | 13 | F, S, 32, R, 403 |
| 57 | 2 | 57 | 13 | | 112 | 17 | 112 | 21 | FORM, R, 403, 32, F, S |
| 58 | 2 | 58 | 5 | | 112 | 24 | 112 | 24 | FORM, R, 403, 32, F, S |
| 58 | 7 | 58 | 13 | | | | | | |
| 59 | 3 | 59 | 5 | | | | | | |
| 59 | 8 | 59 | 11 | | | | | | |
| 60 | 7 | 60 | 10 | | | | | | |
| 60 | 25 | 60 | 25 | | | | | | |
| 61 | 2 | 61 | 6 | | | | | | |
| 61 | 8 | 61 | 14 | | | | | | |
| 61 | 16 | 61 | 22 | | | | | | |
| 61 | 24 | 61 | 25 | | | | | | |
| 62 | 3 | 62 | 3 | | | | | | |
| 62 | 9 | 62 | 12 | | | | | | |
| 62 | 14 | 62 | 18 | | | | | | |
| 65 | 7 | 65 | 10 | | | | | | |
| 65 | 12 | 65 | 12 | | | | | | |
| 68 | 17 | 68 | 20 | 602/LOF, AA, MC | | | | | |
| 68 | 24 | 68 | 24 | | | | | | |
| 73 | 13 | 73 | 17 | | | | | | |

| Bonomi-Huvala, Michelle October 29, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 73 | 20 | 73 | 24 | | | | | | |
| 74 | 15 | 74 | 18 | | | | | | |
| 74 | 20 | 74 | 24 | | | | | | |
| 75 | 3 | 75 | 15 | | | | | | |
| 75 | 17 | 75 | 24 | | | | | | |
| 76 | 2 | 76 | 2 | | | | | | |
| 81 | 5 | 81 | 10 | 602/LOF, AA, MC, V/incomplete | | | | | |
| 91 | 13 | 91 | 17 | | | | | | |
| 91 | 25 | 91 | 25 | | | | | | |
| 92 | 2 | 92 | 2 | | | | | | |
| 92 | 4 | 92 | 9 | | | | | | |
| 92 | 11 | 92 | 11 | | | | | | |
| 93 | 4 | 93 | 16 | | | | | | |
| 93 | 24 | 93 | 25 | | | | | | |
| 94 | 2 | 94 | 5 | | | | | | |
| 106 | 11 | 106 | 25 | | | | | | |
| 107 | 2 | 107 | 19 | | | | | | |
| 107 | 21 | 107 | 25 | | | | | | |
| 108 | 2 | 108 | 3 | | | | | | |
| 108 | 5 | 108 | 25 | AA, MC | | | | | |
| 109 | 2 | 109 | 2 | | | | | | |
| 109 | 19 | 109 | 23 | | | | | | |
| 111 | 10 | 111 | 16 | | | | | | |

| English, Carla | | | | | | | | | |
| September 18, 2019 | | | | | | | | | |
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 9 | 17 | 9 | 19 | | 9 | 20 | 9 | 21 | R, 403, 32 |
| 10 | 17 | 10 | 22 | | 18 | 12 | 18 | 16 | R, 403, 32 |
| 42 | 25 | 43 | 6 | | 18 | 22 | 19 | 2 | R, 403, 32 |
| 46 | 23 | 47 | 14 | | 23 | 9 | 23 | 12 | R, 403, 32 |
| 47 | 23 | 48 | 7 | 801-802, 602/LOF | 23 | 17 | 23 | 20 | R, 403, 32, F, S |
| 63 | 3 | 63 | 23 | | 24 | 24 | 25 | 3 | R, 403, 32, F, S |
| 64 | 11 | 64 | 13 | | 63 | 24 | 64 | 7 | NA, C, INC, R, 403 |
| 64 | 15 | 64 | 15 | | 64 | 17 | 64 | 19 | R, 403, 32 |
| 70 | 22 | 70 | 25 | | 71 | 2 | 71 | 6 | NQP, NA, C, 32, R, 403 |
| 71 | 15 | 71 | 15 | | 82 | 25 | 83 | 3 | NQP, NA, C, 32, R, 403 |
| 75 | 9 | 75 | 15 | | 83 | 9 | 84 | 14 | F, S, 32, R, 403 |
| 75 | 24 | 75 | 25 | | 158 | 2 | 158 | 4 | F, S, 32, R, 403 |
| 76 | 2 | 76 | 2 | | 158 | 6 | 158 | 8 | F, S, 32, R, 403 |
| 79 | 19 | 79 | 25 | | 159 | 24 | 160 | 3 | F, S, 32, R, 403 |
| 80 | 2 | 80 | 4 | | 160 | 5 | 160 | 7 | F, S, 32, R, 403 |
| 80 | 23 | 80 | 25 | | 161 | 25 | 162 | 4 | F, S, 32, R, 403 |
| 81 | 5 | 81 | 5 | | 162 | 6 | 162 | 9 | F, S, 32, R, 403 |
| 82 | 21 | 82 | 24 | | 163 | 10 | 163 | 13 | F, S, 32, R, 403 |
| 85 | 18 | 85 | 25 | | 163 | 15 | 163 | 17 | F, S, 32, R, 403 |
| 86 | 2 | 86 | 2 | | 168 | 2 | 168 | 4 | F, S, 32, R, 403 |
| 129 | 8 | 129 | 15 | 602/LOF | 168 | 6 | 168 | 11 | F, S, 32, R, 403 |
| 129 | 18 | 129 | 23 | | 172 | 18 | 172 | 19 | F, S, 32, R, 403 |
| 140 | 13 | 140 | 23 | | 172 | 22 | 172 | 25 | F, S, 32, R, 403 |
| 140 | 24 | 140 | 25 | | 199 | 3 | 199 | 20 | F, S, LAY, R, 403, 32 |
| 141 | 2 | 141 | 2 | | 201 | 3 | 201 | 5 | F, S, LAY, R, 403, 32 |
| 141 | 11 | 141 | 23 | | 202 | 18 | 202 | 22 | F, S, LAY, R, 403, 32 |
| 155 | 12 | 155 | 25 | | 202 | 25 | 203 | 6 | F, S, LAY, R, 403, 32 |
| 156 | 2 | 156 | 2 | | 219 | 4 | 219 | 10 | F, S, R, 403, 32 |
| 156 | 4 | 156 | 8 | | 219 | 13 | 219 | 24 | F, S, R, 403, 32 |
| 156 | 14 | 156 | 25 | | 220 | 19 | 220 | 21 | NQP, NA, C, 32, R, 403 |

| English, Carla September 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 157 | 3 | 157 | 8 | | 282 | 20 | 283 | 20 | F, S, R, 403, 32 |
| 157 | 10 | 157 | 13 | | 283 | 23 | 284 | 3 | F, S, R, 403, 32 |
| 158 | 10 | 158 | 25 | OS, 801-802, 602/LOF | 284 | 11 | 284 | 15 | F, S, R, 403, 32 |
| 159 | 1 | 159 | 7 | OS, 801-802, 602/LOF | 284 | 18 | 285 | 5 | F, S, R, 403, 32 |
| 160 | 19 | 160 | 25 | | 285 | 7 | 285 | 11 | F, S, R, 403, 32 |
| 161 | 2 | 161 | 4 | | 290 | 5 | 290 | 8 | F, S, R, 403, 32 |
| 162 | 24 | 162 | 25 | | 290 | 11 | 290 | 25 | F, S, R, 403, 32 |
| 163 | 2 | 163 | 9 | | 318 | 24 | 319 | 11 | F, S, R, 403, 32 |
| 165 | 23 | 165 | 25 | | 320 | 12 | 320 | 24 | F, S, R, 403, 32 |
| 166 | 2 | 166 | 15 | | | | | | |
| 166 | 24 | 166 | 25 | | | | | | |
| 167 | 2 | 167 | 10 | | | | | | |
| 167 | 19 | 167 | 25 | | | | | | |
| 169 | 19 | 169 | 25 | | | | | | |
| 170 | 2 | 170 | 7 | | | | | | |
| 170 | 18 | 170 | 25 | | | | | | |
| 171 | 2 | 171 | 21 | | | | | | |
| 173 | 22 | 173 | 25 | | | | | | |
| 174 | 2 | 174 | 2 | | | | | | |
| 177 | 17 | 177 | 25 | | | | | | |
| 178 | 2 | 178 | 10 | | | | | | |
| 178 | 25 | 178 | 25 | OS, 801-802, 602/LOF | | | | | |
| 179 | 2 | 179 | 2 | OS, 801-802, 602/LOF | | | | | |
| 179 | 5 | 179 | 7 | | | | | | |
| 200 | 9 | 200 | 25 | | | | | | |
| 201 | 2 | 201 | 2 | | | | | | |
| 217 | 21 | 217 | 25 | | | | | | |
| 218 | 2 | 218 | 25 | | | | | | |
| 219 | 2 | 219 | 3 | | | | | | |
| 219 | 25 | 219 | 25 | | | | | | |

| English, Carla September 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 220 | 2 | 220 | 18 | | | | | | |
| 220 | 23 | 220 | 25 | | | | | | |
| 221 | 2 | 221 | 5 | | | | | | |
| 221 | 8 | 221 | 20 | | | | | | |
| 221 | 22 | 221 | 24 | | | | | | |
| 222 | 2 | 222 | 8 | 602/LOF | | | | | |
| 222 | 11 | 222 | 14 | | | | | | |
| 222 | 17 | 222 | 19 | 602/LOF | | | | | |
| 222 | 21 | 222 | 22 | | | | | | |
| 223 | 10 | 223 | 13 | | | | | | |
| 223 | 16 | 223 | 20 | | | | | | |
| 223 | 22 | 223 | 25 | OS, 801-802 | | | | | |
| 224 | 2 | 224 | 2 | OS, 801-802 | | | | | |
| 224 | 4 | 224 | 5 | | | | | | |
| 282 | 9 | 282 | 19 | | | | | | |
| 286 | 7 | 286 | 14 | | | | | | |
| 287 | 5 | 287 | 23 | | | | | | |
| 291 | 22 | 291 | 25 | | | | | | |
| 292 | 2 | 292 | 4 | | | | | | |
| 319 | 12 | 319 | 25 | OS, 801-802, 602/LOF | | | | | |
| 320 | 2 | 320 | 2 | OS, 801-802, 602/LOF | | | | | |
| 320 | 7 | 320 | 7 | | | | | | |
| 320 | 9 | 320 | 11 | | | | | | |
| | | | | | | | | | |

*Par objects to all designated testimony for this witness pursuant to Fed. R. Evid. 801, 802, and 804, and Fed. R. Civ. P. 45 as the witness is within the subpoena power of the District of Delaware and Amneal has not demonstrated the witness is unavailable.

| Joshi, Hardik July 22, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 13 | 10 | 13 | 19 | | | | | | |
| 13 | 24 | 14 | 6 | 401/402, 801/802 | | | | | |
| | | | | | 19 | 16 | 19 | 16 | 32, R |
| | | | | | 19 | 21 | 20 | 23 | 32, R |
| | | | | | 21 | 3 | 21 | 6 | 32, R |
| | | | | | 21 | 13 | 21 | 16 | 32, R |
| | | | | | 22 | 10 | 22 | 16 | 32, R |
| | | | | | 23 | 2 | 23 | 16 | 32, R |
| | | | | | 24 | 3 | 24 | 19 | 32, R |
| | | | | | 25 | 2 | 25 | 14 | 32, R |
| | | | | | 25 | 23 | 26 | 15 | 32, R |
| | | | | | 27 | 9 | 27 | 17 | |
| | | | | | 28 | 12 | 29 | 1 | |
| | | | | | 29 | 7 | 29 | 20 | |
| | | | | | 29 | 23 | 29 | 25 | |
| | | | | | 30 | 25 | 31 | 3 | |
| | | | | | 31 | 8 | 31 | 13 | |
| | | | | | 32 | 3 | 32 | 8 | |
| | | | | | 32 | 12 | 32 | 17 | |
| | | | | | 34 | 20 | 34 | 22 | |
| | | | | | 35 | 1 | 35 | 2 | |
| | | | | | 35 | 12 | 35 | 17 | |
| 17 | 1 | 17 | 3 | 401/402, 801/802 | 35 | 24 | 36 | 2 | |
| 36 | 22 | 37 | 4 | 401/402, 801-802 | | | | | |
| | | | | | 46 | 13 | 46 | 16 | 32, R, OS, 403, Form |
| | | | | | 46 | 19 | 46 | 21 | 32, R, OS, 403, Form |
| 37 | 9 | 37 | 14 | 401/402, 801-802 | 46 | 23 | 46 | 23 | 32, R, OS, 403, Form |

| Joshi, Hardik July 22, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 48 | 23 | 49 | 1 | 401/402, 801-802 | | | | | |
| 50 | 23 | 51 | 4 | 401/402, 801-802 | | | | | |
| 51 | 8 | 52 | 6 | 401/402, 801-802 | | | | | |
| 52 | 10 | 52 | 12 | 401/402, 801-802 | | | | | |
| 52 | 17 | 53 | 12 | 401/402, 801-802 | | | | | |
| | | | | | 83 | 22 | 83 | 24 | |
| 84 | 9 | 84 | 12 | 401/402, 602/LOF, 801-802 | 84 | 16 | 84 | 17 | |
| 84 | 20 | 85 | 5 | 401/402, 801-802 | | | | | |
| 85 | 10 | 85 | 13 | 401/402, 801-802 | | | | | |
| 85 | 18 | 85 | 21 | | | | | | |
| 86 | 3 | 86 | 9 | 1003, 401/402, 602/LOF, 801-802 | 85 | 22 | 86 | 2 | |
| | | | | | | | | | |
| Par incorporates by reference its initial designations from the 7/22/2020 deposition of Hardik Joshi.  In addition to the objections to Amneal's designations listed above, Par objects to Amneal's designations of its own 30(b)(6) designee as impermissible under Fed. R. Civ. P. 32 and Fed. R. Evid. 601-602, 801-804. | | | | | | | | | |
| | | | | | | | | | |
| Amneal incorporates by reference its objections to Par's initial designations from the 7/22/2020 deposition of Hardik Joshi. | | | | | | | | | |

| Joshi, Hardik July 23, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| | | | | | 9 | 4 | 10 | 20 | |
| | | | | | 11 | 2 | 11 | 7 | |
| | | | | | 13 | 5 | 13 | 21 | |
| | | | | | 14 | 25 | 16 | 5 | 32 |
| | | | | | 16 | 17 | 16 | 20 | 32 |
| | | | | | 27 | 12 | 27 | 22 | |
| 11 | 9 | 13 | 4 | 401/402, 602/LOF, 801-802 | 29 | 22 | 30 | 12 | |
| 17 | 23 | 18 | 21 | 401/402, 602/LOF, 801-802 | 18 | 22 | 19 | 2 | 32, 403, FORM |
| 24 | 7 | 25 | 5 | 401/402, 602/LOF, 801-802 | 25 | 6 | 25 | 10 | |
| 33 | 2 | 33 | 11 | 401/402, 602/LOF, 801-802 | | | | | |
| 33 | 16 | 35 | 7 | 401/402, 602/LOF, 801-802 | | | | | |
| 121 | 9 | 122 | 14 | 401/402, 602/LOF, 801-802 | | | | | |
| 124 | 1 | 124 | 12 | 401/402, 602/LOF, 801-802 | | | | | |
| 125 | 23 | 126 | 2 | 401/402, 602/LOF, 801-802 | | | | | |
| 128 | 6 | 129 | 9 | 401/402, 602/LOF, 801-802 | | | | | |
| 129 | 15 | 129 | 18 | 401/402, 602/LOF, 801-802 | 129 | 19 | 129 | 24 | |
| 131 | 15 | 132 | 3 | 401/402, 602/LOF, 701/702, 801-802 | 129 | 19 | 129 | 24 | |
| | | | | | | | | | |

Par incorporates by reference its initial designations from the 7/23/2020 deposition of Hardik Joshi.  In addition to the objections to Amneal's designations listed above, Par objects to Amneal's designations of its own 30(b)(6) designee as impermissible under Fed. R. Civ. P. 32 and Fed. R. Evid. 601-602, 801-804.

Amneal incorporates by reference its objections to Par's initial designations from the 7/23/2020 deposition of Hardik Joshi.

| | | | Joshi, Hardik | | | | | | |
| | | | November 25, 2020 | | | | | | |
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 16 | 21 | 17 | 11 | 32, F |
| | | | | | 17 | 15 | 17 | 17 | 32, F |
| | | | | | 17 | 21 | 18 | 6 | 32, F |
| | | | | | 18 | 10 | 19 | 2 | 32, F |
| | | | | | 20 | 21 | 21 | 1 | 32, F |
| | | | | | 21 | 4 | 21 | 12 | 32, F |
| | | | | | 21 | 16 | 22 | 2 | 32, F |
| 14 | 19 | 15 | 11 | 401/402, 801-802 | 22 | 7 | 22 | 21 | |
| 23 | 2 | 23 | 5 | 401/402, 801-802 | | | | | |
| 23 | 12 | 23 | 17 | 401/402, 801-802 | | | | | |
| | | | | | 66 | 11 | 66 | 12 | |
| | | | | | 66 | 21 | 67 | 4 | |
| | | | | | 141 | 22 | 142 | 5 | |
| | | | | | 142 | 7 | 142 | 8 | |
| 24 | 4 | 24 | 8 | 401/402, 801-802 | 142 | 10 | 142 | 13 | |
| | | | | | 28 | 18 | 28 | 24 | |
| 28 | 13 | 28 | 17 | 401/402, 801-802 | 29 | 21 | 30 | 2 | |
| | | | | | 30 | 9 | 30 | 22 | |
| | | | | | 31 | 5 | 31 | 9 | |
| 30 | 3 | 30 | 8 | 401/402, 801-802 | 32 | 2 | 32 | 19 | 32, F |
| 37 | 3 | 37 | 18 | 401/402, 801-802 | 37 | 23 | 38 | 11 | 32, 403, FORM |
| 40 | 18 | 41 | 12 | | | | | | |
| 42 | 1 | 42 | 4 | | 42 | 24 | 43 | 7 | |

| | Joshi, Hardik | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | November 25, 2020 | | | | | | | | |
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| | | | | | 43 | 24 | 44 | 14 | |
| | | | | | 45 | 2 | 45 | 4 | 32 |
| | | | | | 46 | 17 | 46 | 24 | 32 |
| | | | | | 47 | 2 | 47 | 18 | 32 |
| | | | | | 47 | 24 | 48 | 21 | 32 |
| | | | | | 48 | 23 | 49 | 17 | 32 |
| | | | | | 49 | 19 | 49 | 20 | 32 |
| 42 | 8 | 42 | 23 | 401/402, 602/LOF, 801-802 | 76 | 21 | 78 | 3 | 32 |
| | | | | | 52 | 23 | 53 | 20 | 32 |
| 52 | 5 | 52 | 22 | 401/402, 602/LOF, 801-802 | 76 | 21 | 78 | 3 | 32 |
| 130 | 7 | 130 | 13 | | | | | | |
| 132 | 1 | 132 | 12 | 401/402, 602/LOF, 801-802 | 134 | 23 | 135 | 3 | |
| 135 | 22 | 136 | 21 | 401/402, 602/LOF, 801-802 | | | | | |
| 137 | 6 | 138 | 4 | 401/402, 602/LOF, 801-802 | | | | | |
| 138 | 10 | 138 | 14 | 401/402, 602/LOF, 801-802 | 139 | 9 | 139 | 14 | OS |
| | | | | | 139 | 16 | 139 | 17 | |
| | | | | | 141 | 22 | 142 | 5 | |
| | | | | | 142 | 7 | 142 | 8 | |
| | | | | | 142 | 10 | 142 | 13 | |
| | | | | | 142 | 21 | 143 | 5 | |
| 140 | 2 | 140 | 5 | 401/402, 602/LOF, 801-802 | 143 | 7 | 143 | 11 | |
| 144 | 6 | 144 | 8 | | 144 | 9 | 144 | 12 | 32 |
| 162 | 4 | 162 | 16 | 401/402, 602/LOF, 801-802 | 163 | 17 | 163 | 19 | |
| 163 | 2 | 163 | 16 | | 163 | 21 | 164 | 21 | |
| | | | | | 165 | 10 | 165 | 14 | |
| 164 | 22 | 165 | 9 | | | | | | |

| Joshi, Hardik November 25, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 169 | 13 | 170 | 18 | 401/402, 403, 602/LOF, 801-802 | 37 | 23 | 38 | 11 | 32, 403, FORM |
| 171 | 4 | 171 | 18 | 401/402, 602/LOF, 801-802 | 176 | 15 | 176 | 22 | |
| | | | | | 177 | 8 | 177 | 17 | |
| | | | | | 178 | 23 | 179 | 12 | |
| 172 | 4 | 172 | 19 | 401/402, 602/LOF, 801-802 | | | | | |
| 173 | 2 | 173 | 17 | 401/402, 403, 602/LOF, 801-802 | | | | | |
| 174 | 12 | 176 | 3 | 401/402, 403, 602/LOF, 701-702, 801-802 | 42 | 24 | 43 | 7 | |
| | | | | | 43 | 24 | 44 | 14 | |
| | | | | | 45 | 2 | 45 | 4 | |
| | | | | | 46 | 17 | 46 | 24 | |
| | | | | | 47 | 2 | 47 | 18 | |
| | | | | | 47 | 24 | 48 | 21 | |
| | | | | | 48 | 23 | 49 | 17 | |
| | | | | | 49 | 19 | 49 | 20 | |
| | | | | | 52 | 23 | 53 | 20 | |
| | | | | | 76 | 21 | 78 | 3 | 32 |
| | | | | | 163 | 17 | 163 | 19 | 32 |
| | | | | | 163 | 21 | 164 | 21 | |
| | | | | | 165 | 10 | 165 | 14 | |

| Joshi, Hardik | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| November 25, 2020 | | | | | | | | | |
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| Par incorporates by reference its initial designations from the 11/25/2020 deposition of Hardik Joshi. In addition to the objections to Amneal's designations listed above, Par objects to Amneal's designations of its own 30(b)(6) designee as impermissible under Fed. R. Civ. P. 32 and Fed. R. Evid. 601-602, 801-804. | | | | | | | | | |
| | | | | | | | | | |
| Amneal incorporates by reference its objections to Par's initial designations from the 11/25/2020 deposition of Hardik Joshi. | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Kannan, Vinayagam**<br>**September 10, 2019** | | | | | | | | | | |
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | Transcript | |
| 14 | 8 | 14 | 11 | | 48 | 25 | 48 | 25 | Kannan 2019 Tr. | R, 32, 403, Inc, NA |
| 29 | 24 | 29 | 25 | | 49 | 2 | 49 | 7 | Kannan 2019 Tr. | R, 32, 403, Inc |
| 30 | 2 | 30 | 3 | | 73 | 15 | 73 | 22 | Kannan 2019 Tr. | 32 |
| 35 | 15 | 35 | 24 | 602/LOF | 74 | 10 | 74 | 25 | Kannan 2019 Tr. | R, 403, 32 |
| 36 | 4 | 36 | 25 | | 75 | 2 | 75 | 25 | Kannan 2019 Tr. | R, 403, 32 |
| 37 | 2 | 37 | 8 | 602/LOF | 76 | 2 | 76 | 2 | Kannan 2019 Tr. | R, 403, 32 NQP, Inc |
| 38 | 11 | 38 | 24 | | 89 | 14 | 89 | 17 | Kannan 2019 Tr. | 32 |
| 39 | 10 | 39 | 13 | | 89 | 23 | 89 | 25 | Kannan 2019 Tr. | 32 |
| 46 | 4 | 46 | 11 | 401/402, 602/LOF, 801-802 | 118 | 16 | 118 | 21 | Kannan 2019 Tr. | C, NQP, NA, INC |
| 46 | 14 | 46 | 25 | 401/402, 602/LOF, 801-802 | 152 | 19 | 152 | 25 | Kannan 2019 Tr. | H, 32, R, 403 |
| 47 | 2 | 47 | 7 | 401/402, 602/LOF | 153 | 2 | 153 | 25 | Kannan 2019 Tr. | H, 32, R, 403 |
| 47 | 9 | 47 | 10 | 401/402, 602/LOF | 154 | 23 | 154 | 25 | Kannan 2019 Tr. | H, 32, R, 403, F, S |
| 47 | 12 | 47 | 23 | 401/402, 602/LOF | 155 | 2 | 155 | 25 | Kannan 2019 Tr. | H, 32, R, 403, F, S |
| 47 | 24 | 48 | 5 | 401/402, 602/LOF | 156 | 2 | 156 | 25 | Kannan 2019 Tr. | H, 32, R, 403, F, S |
| 49 | 19 | 49 | 22 | 602/LOF | 157 | 2 | 157 | 22 | Kannan 2019 Tr. | H, 32, R, 403, F, S |
| 50 | 8 | 50 | 11 | 602/LOF | 172 | 9 | 174 | 2 | Kannan 2019 Tr. | 32, H, F, R |
| 50 | 13 | 50 | 15 | 602/LOF | 174 | 5 | 175 | 21 | Kannan 2019 Tr. | 32, H, F, R |
| 51 | 14 | 51 | 20 | | 197 | 17 | 197 | 18 | Kannan 2019 Tr. | 32, NA, NQP |
| 52 | 3 | 52 | 7 | 602/LOF | 217 | 16 | 217 | 20 | Kannan 2019 Tr. | H, R, F, 403, S |
| 52 | 13 | 52 | 19 | 602/LOF | 217 | 22 | 217 | 25 | Kannan 2019 Tr. | H, R, F, 403, S |
| 53 | 8 | 53 | 14 | 401/402, 602/LOF | 218 | 2 | 218 | 3 | Kannan 2019 Tr. | H, R, F, 403, S |
| 54 | 8 | 54 | 20 | 401/402, 602/LOF | 226 | 2 | 226 | 12 | Kannan 2019 Tr. | INC, R, F, 403, S, LAY |
| 56 | 4 | 56 | 7 | 401/402, 602/LOF | 226 | 20 | 226 | 25 | Kannan 2019 Tr. | R, F, 403, S |
| 56 | 9 | 56 | 10 | 401/402, 602/LOF | 227 | 2 | 227 | 21 | Kannan 2019 Tr. | R, F, 403, S |
| 57 | 13 | 57 | 17 | 401/402, 602/LOF | 235 | 4 | 235 | 25 | Kannan 2019 Tr. | H, C, F, R, 32, 403, LAY |
| 57 | 20 | 57 | 21 | 401/402, 602/LOF | 236 | 2 | 236 | 5 | Kannan 2019 Tr. | H, C, F, R, 32, 403, LAY |
| 70 | 6 | 70 | 25 | 602/LOF | 250 | 5 | 250 | 12 | Kannan 2019 Tr. | R, 403, 32 |
| 71 | 2 | 71 | 2 | | 255 | 2 | 255 | 4 | Kannan 2019 Tr. | R, 403, 32 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| colspan="11" | **Kannan, Vinayagam**<br>**September 10, 2019** |
| colspan="4" | **Amneal's Initial Designations** | | colspan="6" | **Par's Counter Designations** | |
| **Start Page** | **Start Line** | **End Page** | **End Line** | **Par's Objections** | **Start Page** | **Start Line** | **End Page** | **End Line** | **Transcript** | **Amneal's Objections** |
| 71 | 6 | 71 | 16 | | 255 | 7 | 255 | 8 | Kannan 2019 Tr. | R, 403, 32 |
| 71 | 19 | 71 | 25 | | 255 | 10 | 255 | 12 | Kannan 2019 Tr. | R, 403, 32 |
| 72 | 2 | 72 | 20 | | 255 | 15 | 255 | 18 | Kannan 2019 Tr. | R, 403, 32 |
| 73 | 4 | 73 | 14 | | 255 | 20 | 255 | 25 | Kannan 2019 Tr. | R, 403, 32 |
| 76 | 3 | 76 | 13 | 401/402, 403 | 256 | 2 | 256 | 25 | Kannan 2019 Tr. | R, 403, 32, F, S |
| 81 | 2 | 81 | 3 | No testimony | 257 | 2 | 257 | 7 | Kannan 2019 Tr. | R, 403, 32 |
| 83 | 12 | 83 | 18 | 801-802 | 271 | 24 | 271 | 25 | Kannan 2019 Tr. | 32 |
| 84 | 2 | 84 | 11 | 401/402, 403 | 272 | 2 | 272 | 23 | Kannan 2019 Tr. | 32, F |
| 84 | 13 | 84 | 15 | 401/402, 403 | 272 | 25 | 272 | 25 | Kannan 2019 Tr. | 32 |
| 84 | 17 | 85 | 7 | 401/402, 403, 602/LOF | 273 | 2 | 273 | 8 | Kannan 2019 Tr. | 32 |
| 85 | 17 | 85 | 25 | 401/402, 403, 602/LOF, 801-802 | 274 | 2 | 274 | 11 | Kannan 2019 Tr. | 32 |
| 86 | 2 | 86 | 7 | 401/402, 403, 602/LOF, 801-802 | 274 | 13 | 274 | 21 | Kannan 2019 Tr. | 32, F |
| 86 | 12 | 86 | 20 | 401/402, 403, 602/LOF, 801-802 | 274 | 24 | 274 | 25 | Kannan 2019 Tr. | 32 |
| 89 | 4 | 89 | 9 | 401/402, 403, 602/LOF, 801-802, ID | 275 | 2 | 275 | 14 | Kannan 2019 Tr. | 32, F |
| 91 | 23 | 92 | 8 | | 275 | 16 | 275 | 25 | Kannan 2019 Tr. | 32 |
| 99 | 12 | 99 | 24 | 401/402, 403, 602/LOF, 801-802 | 276 | 2 | 276 | 13 | Kannan 2019 Tr. | 32 |
| 101 | 10 | 101 | 25 | 401/402, 403, 602/LOF, 801-802 | 284 | 3 | 284 | 11 | Kannan 2019 Tr. | C, 32, R, 403 |
| 102 | 2 | 102 | 2 | 401/402, 403, 602/LOF, 801-802 | 287 | 2 | 287 | 8 | Kannan 2019 Tr. | F, S, 32, R, 403, LAY |
| 105 | 21 | 105 | 23 | 401/402, 403, 602/LOF, 801-802 | 287 | 10 | 287 | 14 | Kannan 2019 Tr. | F, S, 32, R, 403, LAY |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Transcript | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | | |
| 106 | 3 | 106 | 9 | 401/402, 403, 602/LOF, 801-802 | 287 | 16 | 287 | 25 | Kannan 2019 Tr. | LAY, R, 403,32 |
| 107 | 7 | 107 | 10 | 401/402, 403, 602/LOF, 801-802 | 288 | 2 | 288 | 7 | Kannan 2019 Tr. | LAY, R, 403,32 |
| 107 | 14 | 107 | 15 | 401/402, 403, 602/LOF, 801-802 | 293 | 7 | 293 | 24 | Kannan 2019 Tr. | NQP, INC, F, S, R, 403,32 |
| 107 | 17 | 107 | 24 | 401/402, 403, 602/LOF, 801-802 | 297 | 4 | 297 | 25 | Kannan 2019 Tr. | FORM, 32, F, S, R, 403 |
| 108 | 3 | 108 | 3 | 401/402, 403, 602/LOF, 801-802 | 298 | 2 | 298 | 5 | Kannan 2019 Tr. | FORM, 32, F, S, R, 403 |
| 108 | 16 | 108 | 24 | 401/402, 403, 602/LOF, 801-802 | 298 | 8 | 298 | 13 | Kannan 2019 Tr. | FORM, 32, F, S, R, 403, LAY |
| 109 | 3 | 109 | 4 | 401/402, 403, 602/LOF, 801-802 | 298 | 15 | 298 | 25 | Kannan 2019 Tr. | H, FORM, 32, F, S, R, 403 |
| 116 | 9 | 116 | 14 | 401/402, 403, 602/LOF | 299 | 2 | 299 | 16 | Kannan 2019 Tr. | H, FORM, 32, F, S, R, 403 |
| 116 | 19 | 116 | 25 | 401/402, 403, 602/LOF | 299 | 19 | 299 | 21 | Kannan 2019 Tr. | H, 32, F, S, R, 403 |
| 117 | 5 | 117 | 10 | | 299 | 23 | 299 | 25 | Kannan 2019 Tr. | H, 32, F, S, R, 403 |
| 118 | 12 | 118 | 15 | 401/402, 403, 602/LOF | 300 | 3 | 300 | 11 | Kannan 2019 Tr. | H, 32, FORM, F, S, R, 403 |
| 118 | 22 | 118 | 24 | 401/402, 403, 602/LOF | 300 | 14 | 300 | 17 | Kannan 2019 Tr. | H, 32, FORM, F, S, R, 403 |
| 123 | 16 | 123 | 25 | 401/402, 403, 602/LOF, 801-802, AA | 300 | 19 | 300 | 24 | Kannan 2019 Tr. | H, 32, FORM, F, S, R, 403 |
| 124 | 23 | 125 | 2 | 401/402, 403, 602/LOF, 801-802 | 301 | 3 | 301 | 6 | Kannan 2019 Tr. | H, 32, FORM, F, S, R, 403 |
| 125 | 5 | 125 | 8 | 401/402, 403, 602/LOF, 801-802 | 301 | 8 | 301 | 18 | Kannan 2019 Tr. | H, 32, F, S, R, 403 |
| 125 | 15 | 125 | 25 | 401/402, 403, 602/LOF | 7 | 21 | 7 | 23 | Kannan 2020 Tr. | 32 |
| 126 | 2 | 126 | 6 | 401/402, 403, 602/LOF | 8 | 1 | 8 | 4 | Kannan 2020 Tr. | 32 |
| 127 | 16 | 127 | 25 | 401/402, 403, 602/LOF | 9 | 20 | 10 | 6 | Kannan 2020 Tr. | 32 |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 128 | 2 | 128 | 5 | 401/402, 403, 602/LOF | 11 | 4 | 11 | 11 | Kannan 2020 Tr. | 32, H, F |
| 128 | 8 | 128 | 9 | 401/402, 403, 602/LOF | 11 | 19 | 13 | 11 | Kannan 2020 Tr. | 32, H, F |
| 128 | 11 | 128 | 14 | 401/402, 403, 602/LOF | 13 | 24 | 14 | 5 | Kannan 2020 Tr. | 32, H, F |
| 128 | 17 | 128 | 18 | 401/402, 403, 602/LOF | 14 | 25 | 15 | 13 | Kannan 2020 Tr. | 32 |
| 128 | 20 | 128 | 25 | 401/402, 403, 602/LOF | 16 | 25 | 17 | 21 | Kannan 2020 Tr. | 32, H, F |
| 129 | 2 | 129 | 4 | 401/402, 403, 602/LOF | 26 | 22 | 27 | 19 | Kannan 2020 Tr. | 32, H, F |
| 129 | 23 | 129 | 25 | 401/402, 403, 602/LOF, 1006, AA | 37 | 22 | 38 | 4 | Kannan 2020 Tr. | 32,R |
| 130 | 2 | 130 | 2 | 401/402, 403, 602/LOF, 1006, AA | 38 | 11 | 38 | 15 | Kannan 2020 Tr. | 32,R, F |
| 130 | 5 | 130 | 7 | 401/402, 403, 602/LOF, 1006, AA | 38 | 17 | 39 | 3 | Kannan 2020 Tr. | 32,R |
| 130 | 9 | 130 | 21 | 401/402, 403, 602/LOF | 40 | 9 | 40 | 18 | Kannan 2020 Tr. | 32 |
| 131 | 2 | 131 | 14 | 401/402, 403, 602/LOF, 701/702 | 40 | 24 | 41 | 5 | Kannan 2020 Tr. | 32 |
| 131 | 17 | 131 | 22 | 401/402, 403, 602/LOF, 701/702 | 44 | 3 | 45 | 17 | Kannan 2020 Tr. | 32, R, F |
| 132 | 7 | 132 | 25 | 401/402, 403, 602/LOF | 45 | 21 | 46 | 9 | Kannan 2020 Tr. | 32, R, F |
| 133 | 2 | 133 | 9 | 401/402, 403, 602/LOF | 46 | 15 | 48 | 1 | Kannan 2020 Tr. | 32, R, F, Lay |
| 133 | 12 | 133 | 13 | 401/402, 403, 602/LOF | 51 | 15 | 52 | 11 | Kannan 2020 Tr. | 32, Lay, F |
| 133 | 15 | 133 | 22 | 401/402, 403, 602/LOF | 55 | 15 | 55 | 21 | Kannan 2020 Tr. | 32, F |
| 134 | 23 | 134 | 25 | | 62 | 15 | 63 | 4 | Kannan 2020 Tr. | 32, H |
| 135 | 2 | 135 | 9 | 401/402, 403, 602/LOF | 107 | 5 | 107 | 11 | Kannan 2020 Tr. | 32, Lay |
| 136 | 11 | 136 | 13 | 401/402, 403, 602/LOF | 107 | 16 | 108 | 1 | Kannan 2020 Tr. | 32 |
| 136 | 15 | 136 | 15 | 401/402, 403, 602/LOF | 108 | 7 | 108 | 8 | Kannan 2020 Tr. | 32 |
| 137 | 11 | 137 | 17 | | 108 | 10 | 110 | 6 | Kannan 2020 Tr. | 32, Lay |
| 138 | 11 | 138 | 16 | 401/402, 403, 602/LOF | 110 | 8 | 110 | 13 | Kannan 2020 Tr. | 32, Lay |
| 139 | 10 | 139 | 14 | 401/402, 403, 602/LOF | 110 | 15 | 111 | 7 | Kannan 2020 Tr. | 32, Lay |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| colspan=11 | **Kannan, Vinayagam**<br>**September 10, 2019** |
| colspan=4 | **Amneal's Initial Designations** | | colspan=6 | **Par's Counter Designations** | |
| **Start Page** | **Start Line** | **End Page** | **End Line** | **Par's Objections** | **Start Page** | **Start Line** | **End Page** | **End Line** | **Transcript** | **Amneal's Objections** |
| 139 | 18 | 139 | 25 | 401/402, 403, 602/LOF | 111 | 10 | 111 | 16 | Kannan 2020 Tr. | 32, Lay |
| 140 | 2 | 140 | 25 | 401/402, 403, 602/LOF | 111 | 18 | 112 | 4 | Kannan 2020 Tr. | 32, Lay |
| 141 | 2 | 141 | 4 | 401/402, 403, 602/LOF | 122 | 16 | 123 | 12 | Kannan 2020 Tr. | 32, R |
| 141 | 24 | 141 | 25 | 401/402, 403, 602/LOF | 176 | 13 | 176 | 25 | Kannan 2020 Tr. | 32 |
| 142 | 2 | 142 | 4 | 401/402, 403, 602/LOF | 177 | 18 | 177 | 21 | Kannan 2020 Tr. | 32 |
| 142 | 8 | 142 | 24 | 602/LOF, 801-802 | 177 | 24 | 178 | 11 | Kannan 2020 Tr. | 32 |
| 143 | 8 | 143 | 12 | 602/LOF, 801-802 | 184 | 6 | 186 | 12 | Kannan 2020 Tr. | 32 |
| 144 | 18 | 144 | 22 | 401/402, 403, 602/LOF, 801-802 | 186 | 21 | 186 | 24 | Kannan 2020 Tr. | 32, Lay, H, Form |
| 145 | 6 | 145 | 10 | 602/LOF, 801-802 | 187 | 1 | 187 | 25 | Kannan 2020 Tr. | 32, Lay, H, Form |
| 145 | 13 | 145 | 15 | 602/LOF, 801-802 | 190 | 8 | 191 | 11 | Kannan 2020 Tr. | 32, R |
| 145 | 17 | 145 | 24 | 602/LOF, 801-802 | 191 | 13 | 193 | 8 | Kannan 2020 Tr. | 32, R, Form |
| 146 | 3 | 146 | 3 | 602/LOF, 801-802 | 194 | 2 | 194 | 4 | Kannan 2020 Tr. | 32 |
| 146 | 14 | 146 | 19 | 602/LOF, 801-802 | 194 | 6 | 194 | 7 | Kannan 2020 Tr. | 32 |
| 147 | 10 | 147 | 25 | 401/402, 403, 602/LOF, 801-802 | 194 | 9 | 194 | 14 | Kannan 2020 Tr. | 32 |
| 148 | 2 | 148 | 25 | 401/402, 403, 602/LOF, 801-802 | 195 | 5 | 196 | 3 | Kannan 2020 Tr. | 32, Lay, H |
| 149 | 2 | 149 | 18 | 401/402, 403, 602/LOF, 801-802 | 196 | 5 | 196 | 8 | Kannan 2020 Tr. | 32, Lay, H |
| 149 | 20 | 149 | 20 | 401/402, 403, 602/LOF, 801-802 | 196 | 11 | 196 | 15 | Kannan 2020 Tr. | 32, Lay, H |
| 152 | 3 | 152 | 15 | 401/402, 403, 602/LOF, 801-802 | 196 | 23 | 198 | 1 | Kannan 2020 Tr. | 32, Lay, H |
| 158 | 17 | 158 | 20 | 401/402, 403, 701-702, 801-802 | 198 | 9 | 199 | 8 | Kannan 2020 Tr. | 32, F, Lay |
| 158 | 23 | 158 | 23 | 401/402, 403, 701-702, 801-802 | 199 | 10 | 200 | 22 | Kannan 2020 Tr. | 32, F, Lay |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | Transcript | |
| 159 | 5 | 159 | 18 | | 201 | 16 | 204 | 17 | Kannan 2020 Tr. | 32, H, Lay, F |
| 159 | 21 | 159 | 25 | 401/402, 403, 602/LOF | 204 | 19 | 204 | 24 | Kannan 2020 Tr. | 32, H, Lay, F |
| 160 | 2 | 160 | 18 | 401/402, 403, 602/LOF | 205 | 1 | 205 | 5 | Kannan 2020 Tr. | 32, H, Lay, F |
| 161 | 15 | 161 | 21 | 401/402, 403, 602/LOF, 801-802 | 205 | 7 | 205 | 23 | Kannan 2020 Tr. | 32, H, Lay, F |
| 162 | 2 | 162 | 7 | 401/402, 403, 602/LOF | 205 | 25 | 208 | 3 | Kannan 2020 Tr. | 32, H, Lay, F |
| 162 | 14 | 162 | 25 | 401/402, 403, 602/LOF | 208 | 6 | 208 | 12 | Kannan 2020 Tr. | 32, H, Lay, F |
| 163 | 2 | 163 | 10 | 401/402, 403, 602/LOF | 208 | 14 | 208 | 15 | Kannan 2020 Tr. | 32, H, Lay, F |
| 163 | 16 | 163 | 25 | 401/402, 403, 602/LOF | 210 | 9 | 210 | 17 | Kannan 2020 Tr. | 32, Lay |
| 164 | 2 | 164 | 17 | 401/402, 403, 602/LOF | 210 | 19 | 210 | 20 | Kannan 2020 Tr. | 32, Lay |
| 164 | 20 | 164 | 22 | 401/402, 403, 602/LOF | 214 | 8 | 214 | 12 | Kannan 2020 Tr. | 32 |
| 164 | 24 | 164 | 25 | 401/402, 403, 602/LOF | 217 | 9 | 217 | 19 | Kannan 2020 Tr. | 32, 403 |
| 165 | 2 | 165 | 7 | 401/402, 403, 602/LOF | | | | | | |
| 177 | 14 | 177 | 20 | 401/402, 403, 602/LOF | | | | | | |
| 179 | 13 | 179 | 19 | | | | | | | |
| 180 | 12 | 181 | 6 | 401/402, 403, 602/LOF, 801-802 | | | | | | |
| 186 | 15 | 186 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 187 | 6 | 187 | 11 | 401/402, 403, 602/LOF | | | | | | |
| 187 | 22 | 187 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 188 | 3 | 188 | 4 | 401/402, 403, 602/LOF | | | | | | |
| 188 | 6 | 188 | 9 | 401/402, 403, 602/LOF | | | | | | |
| 188 | 11 | 188 | 12 | 401/402, 403, 602/LOF | | | | | | |
| 188 | 14 | 188 | 22 | 401/402, 403, 602/LOF | | | | | | |
| 189 | 10 | 189 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | | |
| 190 | 2 | 190 | 4 | 401/402, 403, 602/LOF, 701/702 | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 190 | 7 | 190 | 15 | 401/402, 403, 602/LOF, 701/702 | | | | | | |
| 191 | 17 | 191 | 21 | 401/402, 403, 602/LOF | | | | | | |
| 191 | 23 | 191 | 23 | 401/402, 403, 602/LOF | | | | | | |
| 191 | 25 | 191 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 192 | 2 | 192 | 12 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 192 | 16 | 192 | 16 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 192 | 18 | 192 | 23 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 192 | 25 | 192 | 25 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 193 | 2 | 193 | 7 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 193 | 11 | 193 | 11 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 193 | 13 | 193 | 14 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 193 | 21 | 193 | 25 | 401/402, 403, 602/LOF, 801-802 | | | | | | |
| 194 | 2 | 194 | 13 | 401/402, 403, 602/LOF, 801-802, AA, P | | | | | | |
| 194 | 16 | 194 | 24 | 401/402, 403, AA, P | | | | | | |
| 195 | 3 | 195 | 8 | 401/402, 403, AA, P | | | | | | |
| 195 | 13 | 195 | 15 | 401/402, 403, P | | | | | | |
| 196 | 10 | 196 | 15 | 401/402, 403, AA, P | | | | | | |
| 196 | 16 | 196 | 18 | 401/402, 403, AA, P | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | | Amneal's Objections |
| 196 | 20 | 196 | 25 | 401/402, 403, AA, P | | | | | | | |
| 197 | 2 | 197 | 7 | 401/402, 403, AA, P | | | | | | | |
| 197 | 8 | 197 | 10 | 401/402, 403, AA, P | | | | | | | |
| 197 | 12 | 197 | 16 | 401/402, 403, AA, P | | | | | | | |
| 198 | 5 | 198 | 9 | 401/402, 403, AA, P | | | | | | | |
| 198 | 13 | 198 | 16 | 401/402, 403, P | | | | | | | |
| 199 | 3 | 199 | 5 | 401/402, 403, AA, P | | | | | | | |
| 199 | 6 | 199 | 7 | 401/402, 403, AA, P | | | | | | | |
| 199 | 25 | 199 | 25 | 401/402, 403 | | | | | | | |
| 200 | 2 | 200 | 6 | 401/402, 403 | | | | | | | |
| 208 | 17 | 208 | 23 | 401/402, 403, AA, P | | | | | | | |
| 208 | 24 | 208 | 25 | 401/402, 403, AA, P | | | | | | | |
| 209 | 2 | 209 | 2 | 401/402, 403, AA, P | | | | | | | |
| 209 | 4 | 209 | 9 | 401/402, 403, AA, P | | | | | | | |
| 209 | 10 | 209 | 11 | 401/402, 403, AA, P | | | | | | | |
| 210 | 8 | 210 | 10 | 401/402, 403, AA, P | | | | | | | |
| 210 | 11 | 210 | 15 | 401/402, 403, AA, P | | | | | | | |
| 210 | 18 | 210 | 20 | 401/402, 403, AA, P | | | | | | | |
| 210 | 24 | 210 | 25 | | | | | | | | |
| 211 | 2 | 211 | 25 | 602/LOF | | | | | | | |
| 212 | 2 | 212 | 12 | 602/LOF | | | | | | | |
| 212 | 24 | 212 | 25 | 401/402, 403 | | | | | | | |
| 213 | 2 | 213 | 12 | 401/402, 403, 602/LOF, 701/702 | | | | | | | |
| 213 | 17 | 213 | 25 | 602/LOF | | | | | | | |
| 214 | 2 | 214 | 3 | 602/LOF | | | | | | | |
| 214 | 14 | 214 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 215 | 2 | 215 | 8 | 602/LOF | | | | | | |
| 215 | 10 | 215 | 13 | 602/LOF | | | | | | |
| 215 | 15 | 215 | 25 | 602/LOF | | | | | | |
| 216 | 2 | 216 | 3 | 602/LOF | | | | | | |
| 218 | 9 | 218 | 21 | 602/LOF | | | | | | |
| 221 | 13 | 221 | 24 | 401/402, 403, 602/LOF, 701/702, AA, P | | | | | | |
| 221 | 25 | 221 | 25 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 222 | 2 | 222 | 3 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 222 | 2 | 222 | 3 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 222 | 5 | 222 | 10 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 222 | 11 | 222 | 12 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 222 | 15 | 222 | 19 | 401/402, 403, 602/LOF | | | | | | |
| 224 | 3 | 224 | 25 | 602/LOF, 701/702 | | | | | | |
| 225 | 2 | 225 | 3 | 602/LOF, 701/702 | | | | | | |
| 225 | 6 | 225 | 8 | 602/LOF, 701/702 | | | | | | |
| 225 | 14 | 225 | 21 | 602/LOF | | | | | | |
| 227 | 22 | 227 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | | |
| 228 | 2 | 228 | 25 | 401/402, 403, 602/LOF, 701/702, AA | | | | | | |
| 231 | 21 | 231 | 25 | 602/LOF, 701/702 | | | | | | |
| 232 | 2 | 232 | 2 | 602/LOF, 701/702 | | | | | | |
| 232 | 5 | 232 | 10 | 602/LOF, 701/702 | | | | | | |
| 232 | 12 | 232 | 25 | | | | | | | |
| 233 | 2 | 233 | 7 | | | | | | | |
| 234 | 15 | 234 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | | Amneal's Objections |
| 235 | 2 | 235 | 4 | 401/402, 403 | | | | | | | |
| 235 | 4 | 235 | 4 | 401/402, 403 | | | | | | | |
| 236 | 19 | 236 | 25 | 401/402, 403 | | | | | | | |
| 237 | 2 | 237 | 25 | 401/402, 403 | | | | | | | |
| 238 | 2 | 238 | 6 | 401/402, 403, 801/802 | | | | | | | |
| 238 | 10 | 238 | 25 | 401/402, 403, 801/802 | | | | | | | |
| 239 | 2 | 239 | 25 | 401/402, 403, 801/802 | | | | | | | |
| 240 | 2 | 240 | 4 | 401/402, 403, 801/802 | | | | | | | |
| 240 | 13 | 240 | 16 | 401/402, 403, 602/LOF | | | | | | | |
| 240 | 18 | 240 | 18 | 401/402, 403, 602/LOF | | | | | | | |
| 240 | 22 | 240 | 25 | | | | | | | | |
| 241 | 2 | 241 | 9 | 602/LOF | | | | | | | |
| 241 | 16 | 241 | 22 | 401/402, 403 | | | | | | | |
| 242 | 15 | 242 | 22 | 401/402, 403, 602/LOF | | | | | | | |
| 242 | 25 | 242 | 25 | 401/402, 403, 602/LOF | | | | | | | |
| 243 | 3 | 243 | 13 | 401/402, 403, 602/LOF | | | | | | | |
| 243 | 16 | 243 | 25 | 401/402, 403, 602/LOF | | | | | | | |
| 244 | 2 | 244 | 4 | 401/402, 403, 602/LOF | | | | | | | |
| 244 | 16 | 244 | 18 | 401/402, 403, 602/LOF | | | | | | | |
| 244 | 20 | 244 | 21 | 401/402, 403, 602/LOF | | | | | | | |
| 244 | 23 | 244 | 25 | 401/402, 403, 602/LOF | | | | | | | |
| 245 | 2 | 245 | 21 | 401/402, 403, 602/LOF | | | | | | | |
| 246 | 3 | 246 | 25 | 401/402, 403 | | | | | | | |
| 247 | 2 | 247 | 25 | 401/402, 403 | | | | | | | |
| 248 | 2 | 248 | 10 | 401/402, 403 | | | | | | | |
| 248 | 13 | 248 | 15 | 401/402, 403 | | | | | | | |
| 248 | 17 | 248 | 19 | 401/402, 403, 602/LOF | | | | | | | |
| 248 | 22 | 248 | 23 | 401/402, 403, 602/LOF | | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | Transcript | |
| 249 | 20 | 249 | 25 | 106, 401/402, 403, 602/LOF, AA, NR, V | | | | | | |
| 252 | 3 | 252 | 19 | 401/402, 403, 602/LOF, Legal | | | | | | |
| 252 | 22 | 252 | 22 | 401/402, 403, 602/LOF, Legal | | | | | | |
| 252 | 24 | 252 | 25 | | | | | | | |
| 253 | 2 | 253 | 5 | | | | | | | |
| 253 | 12 | 253 | 25 | 401/402, 403, 602/LOF, Legal | | | | | | |
| 254 | 2 | 254 | 25 | 401/402, 403, 602/LOF, Legal | | | | | | |
| 257 | 8 | 257 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 258 | 2 | 258 | 4 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 258 | 10 | 258 | 13 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 258 | 16 | 258 | 18 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 258 | 20 | 258 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 259 | 2 | 259 | 2 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 259 | 5 | 259 | 13 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 259 | 15 | 259 | 22 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 259 | 25 | 259 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 260 | 2 | 260 | 6 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 260 | 8 | 260 | 11 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 260 | 13 | 260 | 16 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 260 | 18 | 260 | 19 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 260 | 22 | 260 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 261 | 2 | 261 | 2 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 261 | 4 | 261 | 7 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 261 | 9 | 261 | 11 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 261 | 13 | 261 | 17 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 261 | 20 | 261 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 262 | 6 | 262 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 263 | 4 | 263 | 5 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 263 | 7 | 263 | 10 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 263 | 13 | 263 | 17 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 263 | 21 | 263 | 25 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |

| | | | | Kannan, Vinayagam September 10, 2019 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 264 | 11 | 264 | 13 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 264 | 16 | 264 | 16 | 401/402, 403, 602/LOF, AA, MC, Legal | | | | | | |
| 264 | 20 | 264 | 25 | 602/LOF, 801/802 | | | | | | |
| 265 | 2 | 265 | 9 | 602/LOF, 801/802 | | | | | | |
| 265 | 20 | 265 | 25 | 602/LOF, 801/802 | | | | | | |
| 266 | 2 | 266 | 24 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 267 | 3 | 267 | 4 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 267 | 14 | 267 | 19 | | | | | | | |
| 267 | 21 | 267 | 24 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 268 | 3 | 268 | 3 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 268 | 5 | 268 | 13 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 268 | 16 | 268 | 17 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 268 | 19 | 268 | 23 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 269 | 2 | 269 | 3 | 401/402, 403, 602/LOF, 801/802, AA, MC, Legal | | | | | | |
| 269 | 5 | 269 | 16 | 401/402, 403, 602/LOF, AA, MC, P | | | | | | |
| 269 | 18 | 269 | 22 | 401/402, 403, 602/LOF, AA, MC, P | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| colspan="11" | **Kannan, Vinayagam**<br>**September 10, 2019** |
| colspan="5" | **Amneal's Initial Designations** | colspan="5" | **Par's Counter Designations** | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Transcript** | **Amneal's Objections** |
| 269 | 23 | 269 | 25 | 401/402, 403, 602/LOF, AA, MC, P | | | | | | |
| 270 | 2 | 270 | 2 | 401/402, 403, 602/LOF, AA, MC, P | | | | | | |
| 270 | 4 | 270 | 9 | 401/402, 403, 602/LOF, AA, Legal | | | | | | |
| 270 | 12 | 270 | 15 | 401/402, 403, 602/LOF, AA, Legal | | | | | | |
| 270 | 17 | 270 | 20 | 401/402, 403, 602/LOF, AA, Legal | | | | | | |
| 270 | 24 | 270 | 25 | 401/402, 403 | | | | | | |
| 271 | 2 | 271 | 23 | 401/402, 403 | | | | | | |
| 273 | 14 | 273 | 25 | 401/402, 403 | | | | | | |
| 276 | 15 | 276 | 22 | 401/402, 403, 602/LOF | | | | | | |
| 282 | 6 | 282 | 11 | 401/402, 403, 602/LOF | | | | | | |
| 282 | 17 | 282 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 283 | 2 | 283 | 8 | 401/402, 403, 602/LOF | | | | | | |
| 283 | 21 | 283 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 284 | 2 | 284 | 2 | 401/402, 403, 602/LOF | | | | | | |
| 288 | 8 | 288 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 289 | 2 | 289 | 14 | 401/402, 403, 602/LOF, 701/702 | | | | | | |
| 289 | 16 | 289 | 18 | 401/402, 403, 602/LOF, 701/702 | | | | | | |
| 289 | 24 | 289 | 25 | | | | | | | |
| 290 | 2 | 290 | 17 | 602/LOF | | | | | | |
| 291 | 9 | 291 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 292 | 2 | 292 | 25 | 401/402, 403, 602/LOF | | | | | | |

| Kannan, Vinayagam September 10, 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Transcript | Amneal's Objections |
| 293 | 2 | 293 | 7 | 401/402, 403, 602/LOF | | | | | | |
| 293 | 25 | 293 | 25 | 401/402, 403, 602/LOF | | | | | | |
| 294 | 2 | 294 | 25 | 401/402, 403, 602/LOF, 701/702, C | | | | | | |
| 295 | 2 | 295 | 22 | 401/402, 403, 602/LOF, 701/702, AA, P | | | | | | |
| 295 | 23 | 295 | 25 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 296 | 3 | 296 | 7 | 401/402, 403, 602/LOF, AA, P | | | | | | |
| 296 | 8 | 296 | 10 | 401/402, 403, 602/LOF, AA, P | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 11 | 24 | 11 | 25 | | 10 | 18 | 11 | 11 | C, R, 403, NQP, NA , 32 |
| 12 | 2 | 12 | 4 | | 12 | 5 | 12 | 10 | R, 403, 32 |
| 16 | 3 | 16 | 12 | | 77 | 4 | 77 | 19 | F, S, R, 403, 32 |
| 16 | 17 | 16 | 20 | | 108 | 19 | 108 | 25 | F, S, R, 403, 32 |
| 17 | 3 | 17 | 9 | | 109 | 7 | 109 | 13 | F, S, R, 403, 32 |
| 23 | 25 | 23 | 25 | | 109 | 19 | 109 | 22 | F, S, R, 403, 32 |
| 24 | 2 | 24 | 3 | | | | | | |
| 24 | 6 | 24 | 6 | | | | | | |
| 24 | 8 | 24 | 13 | P, AA, 401, 403 | | | | | |
| 24 | 14 | 24 | 14 | P, AA, 401, 403 | | | | | |
| 24 | 15 | 24 | 19 | P, AA, 401, 403 | | | | | |
| 26 | 22 | 26 | 25 | P, AA, 401, 403 | | | | | |
| 27 | 2 | 27 | 2 | P, AA, 401, 403 | | | | | |
| 27 | 3 | 27 | 6 | P, AA, 401, 403 | | | | | |
| 27 | 8 | 27 | 14 | P, AA, 401, 403 | | | | | |
| 32 | 24 | 32 | 25 | | | | | | |
| 33 | 2 | 33 | 3 | | | | | | |
| 33 | 22 | 33 | 25 | | | | | | |
| 34 | 2 | 34 | 10 | | | | | | |
| 34 | 17 | 34 | 25 | | | | | | |
| 35 | 2 | 35 | 14 | | | | | | |
| 37 | 6 | 37 | 15 | | | | | | |
| 43 | 14 | 43 | 22 | P, AA, 401-403 | | | | | |
| 43 | 24 | 43 | 25 | P, AA, 401-403 | | | | | |
| 44 | 2 | 44 | 7 | P, AA, 401-403 | | | | | |
| 51 | 22 | 51 | 25 | | | | | | |
| 52 | 2 | 52 | 25 | | | | | | |
| 53 | 2 | 53 | 25 | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 54 | 2 | 54 | 3 | | | | | | |
| 54 | 13 | 54 | 25 | | | | | | |
| 55 | 2 | 55 | 11 | | | | | | |
| 56 | 9 | 56 | 18 | | | | | | |
| 57 | 9 | 57 | 25 | | | | | | |
| 58 | 2 | 58 | 5 | | | | | | |
| 58 | 15 | 58 | 25 | | | | | | |
| 59 | 2 | 59 | 24 | | | | | | |
| 60 | 23 | 60 | 25 | | | | | | |
| 61 | 2 | 61 | 25 | | | | | | |
| 62 | 2 | 62 | 3 | | | | | | |
| 62 | 23 | 62 | 25 | | | | | | |
| 63 | 2 | 63 | 20 | | | | | | |
| 64 | 14 | 64 | 25 | | | | | | |
| 65 | 2 | 65 | 18 | | | | | | |
| 65 | 20 | 65 | 20 | | | | | | |
| 65 | 22 | 65 | 25 | | | | | | |
| 66 | 2 | 66 | 25 | | | | | | |
| 67 | 2 | 67 | 7 | | | | | | |
| 68 | 17 | 68 | 25 | | | | | | |
| 69 | 2 | 69 | 2 | | | | | | |
| 69 | 25 | 69 | 25 | P, AA, 401-403 | | | | | |
| 70 | 2 | 70 | 8 | P, AA, 401-403 | | | | | |
| 70 | 9 | 70 | 9 | P, AA, 401-403 | | | | | |
| 70 | 11 | 70 | 17 | P, AA, 401-403 | | | | | |
| 70 | 18 | 70 | 18 | P, AA, 401-403 | | | | | |
| 70 | 20 | 70 | 25 | P, AA, 401-403 | | | | | |
| 71 | 2 | 71 | 2 | P, AA, 401-403 | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 72 | 3 | 72 | 21 | | | | | | |
| 75 | 17 | 75 | 25 | | | | | | |
| 76 | 2 | 76 | 6 | | | | | | |
| 77 | 20 | 77 | 25 | 602/LOF, 701/702 | | | | | |
| 78 | 4 | 78 | 6 | 602/LOF, 701/702 | | | | | |
| 78 | 7 | 78 | 7 | 602/LOF, 701/702 | | | | | |
| 79 | 6 | 79 | 9 | 602/LOF, 401-403, 701/702 | | | | | |
| 79 | 13 | 79 | 16 | 602/LOF, 401-403, 701/702 | | | | | |
| 80 | 10 | 80 | 16 | | | | | | |
| 80 | 20 | 80 | 21 | | | | | | |
| 82 | 17 | 82 | 22 | 602/LOF, 401-403, 701/702 | | | | | |
| 82 | 24 | 82 | 25 | 602/LOF, 401-403, 701/702 | | | | | |
| 83 | 2 | 83 | 11 | 602/LOF, 401-403, 701/702 | | | | | |
| 83 | 13 | 83 | 15 | | | | | | |
| 83 | 18 | 83 | 18 | | | | | | |
| 83 | 20 | 83 | 24 | P, AA, 401-403 | | | | | |
| 84 | 3 | 84 | 10 | P, AA, 401-403 | | | | | |
| 84 | 12 | 84 | 18 | P, AA, 401-403 | | | | | |
| 84 | 19 | 84 | 20 | P, AA, 401-403 | | | | | |
| 84 | 22 | 84 | 25 | P, AA, 401-403 | | | | | |
| 85 | 2 | 85 | 6 | P, AA, 401-403 | | | | | |
| 85 | 19 | 85 | 25 | | | | | | |
| 86 | 2 | 86 | 8 | | | | | | |
| 86 | 20 | 86 | 25 | | | | | | |
| 87 | 2 | 87 | 14 | | | | | | |
| 87 | 21 | 87 | 25 | | | | | | |
| 88 | 2 | 88 | 6 | | | | | | |
| 88 | 15 | 88 | 17 | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 88 | 20 | 88 | 20 | | | | | | |
| 88 | 22 | 88 | 25 | | | | | | |
| 89 | 20 | 89 | 25 | | | | | | |
| 90 | 2 | 90 | 24 | | | | | | |
| 91 | 10 | 91 | 17 | | | | | | |
| 91 | 19 | 91 | 20 | | | | | | |
| 93 | 9 | 93 | 21 | | | | | | |
| 94 | 5 | 94 | 7 | | | | | | |
| 94 | 9 | 94 | 16 | | | | | | |
| 95 | 7 | 95 | 11 | | | | | | |
| 95 | 13 | 95 | 14 | | | | | | |
| 97 | 11 | 97 | 22 | | | | | | |
| 98 | 14 | 98 | 21 | | | | | | |
| 99 | 3 | 99 | 5 | | | | | | |
| 99 | 19 | 99 | 23 | | | | | | |
| 100 | 2 | 100 | 4 | | | | | | |
| 100 | 9 | 100 | 13 | | | | | | |
| 101 | 25 | 101 | 25 | | | | | | |
| 102 | 2 | 102 | 9 | | | | | | |
| 102 | 12 | 102 | 13 | | | | | | |
| 102 | 15 | 102 | 18 | | | | | | |
| 102 | 21 | 102 | 23 | | | | | | |
| 102 | 25 | 102 | 25 | | | | | | |
| 103 | 2 | 103 | 25 | | | | | | |
| 104 | 2 | 104 | 8 | | | | | | |
| 104 | 21 | 104 | 25 | | | | | | |
| 106 | 13 | 106 | 20 | | | | | | |
| 106 | 23 | 106 | 24 | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 107 | 3 | 107 | 13 | P, AA, 401-403 107:10-13 | | | | | |
| 107 | 14 | 107 | 14 | P, AA, 401-403 | | | | | |
| 107 | 16 | 107 | 20 | P, AA, 401-403 | | | | | |
| 107 | 22 | 107 | 25 | P, AA, 401-403 107:22-24 | | | | | |
| 108 | 2 | 108 | 7 | P, 602/LOF, AA, 401-403 107:25-108:7 | | | | | |
| 108 | 10 | 108 | 14 | P, 602/LOF, AA, 401-403 | | | | | |
| 110 | 13 | 110 | 20 | AA, Misstates the law | | | | | |
| 111 | 3 | 111 | 4 | AA, Misstates the law | | | | | |
| 111 | 6 | 111 | 14 | AA, Misstates the law | | | | | |
| 111 | 20 | 111 | 21 | AA, Misstates the law | | | | | |
| 111 | 23 | 111 | 25 | | | | | | |
| 112 | 2 | 112 | 5 | | | | | | |
| 112 | 11 | 112 | 12 | | | | | | |
| 113 | 6 | 113 | 15 | AA, Misstates the law | | | | | |
| 113 | 19 | 113 | 20 | AA, Misstates the law | | | | | |
| 115 | 21 | 115 | 25 | AA, Misstates the law, 401-403, 701/702 | | | | | |
| 116 | 2 | 116 | 5 | AA, Misstates the law, 401-403 | | | | | |
| 116 | 11 | 116 | 14 | AA, Misstates the law, 401-403 | | | | | |
| 117 | 3 | 117 | 19 | AA, Misstates the law, 601/LOF, 701/702 | | | | | |
| 117 | 22 | 117 | 25 | AA, Misstates the law, 601/LOF, 701/702 | | | | | |
| 119 | 19 | 119 | 25 | | | | | | |
| 120 | 7 | 120 | 7 | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 120 | 9 | 120 | 16 | P, 401-403, AA | | | | | |
| 120 | 18 | 120 | 24 | P, 401-403, AA | | | | | |
| 121 | 3 | 121 | 25 | AA, P, 401-403 121:3-16 | | | | | |
| 122 | 2 | 122 | 13 | | | | | | |
| 122 | 15 | 122 | 17 | 401-403, AA, P | | | | | |
| 122 | 20 | 122 | 25 | 401-403, AA, P | | | | | |
| 123 | 2 | 123 | 9 | 401-403, AA, P | | | | | |
| 123 | 13 | 123 | 21 | 401-403, AA, P | | | | | |
| 123 | 23 | 123 | 25 | 401-403, AA, P | | | | | |
| 124 | 2 | 124 | 17 | 401-403, AA, P | | | | | |
| 125 | 18 | 125 | 25 | | | | | | |
| 126 | 6 | 126 | 6 | | | | | | |
| 126 | 8 | 126 | 25 | 401-403, AA, P | | | | | |
| 127 | 2 | 127 | 3 | 401-403, AA, P | | | | | |
| 127 | 5 | 127 | 15 | 401-403, AA, P | | | | | |
| 127 | 17 | 127 | 25 | | | | | | |
| 128 | 2 | 128 | 9 | | | | | | |
| 128 | 17 | 128 | 17 | | | | | | |
| 128 | 19 | 128 | 25 | 401-403, AA, P | | | | | |
| 129 | 2 | 129 | 3 | 401-403, AA, P | | | | | |
| 129 | 5 | 129 | 11 | 401-403, AA, P | | | | | |
| 129 | 13 | 129 | 22 | 401-403, AA, P | | | | | |
| 129 | 24 | 129 | 25 | | | | | | |
| 130 | 2 | 130 | 12 | | | | | | |
| 130 | 20 | 130 | 20 | | | | | | |
| 130 | 22 | 130 | 25 | 401-403, AA, P | | | | | |
| 131 | 2 | 131 | 6 | 401-403, AA, P | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 131 | 8 | 131 | 17 | 401-403, AA, P | | | | | |
| 131 | 19 | 131 | 25 | 401-403, AA, P | | | | | |
| 132 | 2 | 132 | 6 | 401-403, AA, P | | | | | |
| 132 | 8 | 132 | 20 | | | | | | |
| 133 | 3 | 133 | 8 | 401-403, AA, P | | | | | |
| 133 | 11 | 133 | 12 | 401-403, AA, P | | | | | |
| 133 | 14 | 133 | 18 | 401-403, AA, P | | | | | |
| 133 | 20 | 133 | 23 | 401-403, AA, P | | | | | |
| 133 | 25 | 133 | 25 | 401-403, AA, P | | | | | |
| 134 | 2 | 134 | 9 | 401-403, AA, P | | | | | |
| 135 | 19 | 135 | 23 | | | | | | |
| 136 | 3 | 136 | 4 | | | | | | |
| 136 | 6 | 136 | 18 | 401-403, AA, P | | | | | |
| 136 | 20 | 136 | 25 | 401-403, AA, P | | | | | |
| 137 | 2 | 137 | 4 | 401-403, AA, P | | | | | |
| 137 | 6 | 137 | 16 | 401-403, AA, P | | | | | |
| 137 | 18 | 137 | 20 | 401-403, AA, P | | | | | |
| 137 | 24 | 137 | 25 | 401-403, AA, P | | | | | |
| 138 | 2 | 138 | 9 | 401-403, AA, P | | | | | |
| 139 | 12 | 139 | 25 | | | | | | |
| 140 | 4 | 140 | 4 | | | | | | |
| 140 | 13 | 140 | 25 | | | | | | |
| 141 | 2 | 141 | 3 | | | | | | |
| 141 | 15 | 141 | 25 | | | | | | |
| 142 | 2 | 142 | 18 | | | | | | |
| 142 | 20 | 142 | 21 | | | | | | |
| 142 | 23 | 142 | 25 | | | | | | |
| 143 | 2 | 143 | 25 | | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 144 | 2 | 144 | 7 | 401-403, AA, P 144:4-25 | | | | | |
| 144 | 11 | 144 | 15 | 401-403, AA, P 144:4-25 | | | | | |
| 144 | 17 | 144 | 25 | 401-403, AA, P 144:4-25 | | | | | |
| 145 | 2 | 145 | 3 | 401-403, AA, P | | | | | |
| 145 | 4 | 145 | 5 | 401-403, AA, P | | | | | |
| 146 | 4 | 146 | 11 | | | | | | |
| 146 | 16 | 146 | 17 | | | | | | |
| 146 | 21 | 146 | 25 | | | | | | |
| 147 | 2 | 147 | 13 | | | | | | |
| 147 | 15 | 147 | 15 | | | | | | |
| 147 | 24 | 147 | 25 | 401-403, AA, P | | | | | |
| 148 | 2 | 148 | 3 | 401-403, AA, P | | | | | |
| 148 | 6 | 148 | 17 | 401-403, AA, P | | | | | |
| 149 | 15 | 149 | 19 | | | | | | |
| 149 | 21 | 149 | 21 | | | | | | |
| 149 | 23 | 149 | 25 | | | | | | |
| 150 | 2 | 150 | 4 | | | | | | |
| 150 | 7 | 150 | 8 | | | | | | |
| 150 | 10 | 150 | 18 | 401-403, AA, P | | | | | |
| 150 | 20 | 150 | 25 | | | | | | |
| 151 | 2 | 151 | 8 | | | | | | |
| 151 | 10 | 151 | 10 | | | | | | |
| 151 | 12 | 151 | 20 | 401-403, AA, P | | | | | |
| 151 | 22 | 151 | 25 | 401-403, AA, P | | | | | |
| 152 | 2 | 152 | 15 | 401-403, AA, P | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 152 | 17 | 152 | 24 | 401-403, AA, P | | | | | |
| 153 | 3 | 153 | 11 | 401-403, AA, P | | | | | |
| 154 | 18 | 154 | 25 | | | | | | |
| 155 | 2 | 155 | 14 | | | | | | |
| 156 | 4 | 156 | 25 | | | | | | |
| 157 | 2 | 157 | 2 | | | | | | |
| 157 | 5 | 157 | 10 | | | | | | |
| 158 | 22 | 158 | 25 | | | | | | |
| 159 | 2 | 159 | 5 | | | | | | |
| 159 | 9 | 159 | 12 | | | | | | |
| 159 | 20 | 159 | 25 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 160 | 6 | 160 | 8 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 161 | 8 | 161 | 14 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 161 | 19 | 161 | 23 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 161 | 25 | 161 | 25 | AA, 602/LOF, 701/702 | | | | | |
| 162 | 2 | 162 | 17 | AA, 602/LOF, 701/702 | | | | | |
| 164 | 3 | 164 | 9 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 164 | 12 | 164 | 16 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 165 | 23 | 165 | 25 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 166 | 2 | 166 | 6 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 166 | 10 | 166 | 14 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 166 | 16 | 166 | 22 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 167 | 2 | 167 | 6 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 167 | 8 | 167 | 13 | | | | | | |
| 167 | 20 | 167 | 20 | | | | | | |
| 168 | 18 | 168 | 23 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 169 | 4 | 169 | 8 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 169 | 10 | 169 | 12 | AA, 401-403, 602/LOF, 701/702 | | | | | |

| Kenesky, Craig October 3, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 169 | 17 | 169 | 18 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 171 | 5 | 171 | 12 | | | | | | |
| 171 | 15 | 171 | 18 | | | | | | |
| 171 | 23 | 171 | 25 | | | | | | |
| 172 | 2 | 172 | 5 | | | | | | |
| 172 | 7 | 172 | 9 | | | | | | |
| 173 | 12 | 173 | 16 | | | | | | |
| 173 | 19 | 173 | 20 | | | | | | |
| 174 | 17 | 174 | 23 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 175 | 3 | 175 | 5 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 175 | 7 | 175 | 11 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 175 | 15 | 175 | 16 | AA, 401-403, 602/LOF, 701/702 | | | | | |
| 197 | 9 | 197 | 13 | | | | | | |
| 201 | 10 | 201 | 24 | | | | | | |
| 202 | 4 | 202 | 6 | | | | | | |
| 204 | 23 | 204 | 25 | | | | | | |
| 205 | 2 | 205 | 4 | | | | | | |
| 205 | 9 | 205 | 25 | | | | | | |
| 206 | 2 | 206 | 2 | | | | | | |
| 206 | 21 | 206 | 25 | | | | | | |
| 207 | 2 | 207 | 2 | | | | | | |
| 207 | 9 | 207 | 17 | | | | | | |
| 208 | 8 | 208 | 11 | | | | | | |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 7 | 25 | 7 | 25 | | 8 | 4 | 8 | 5 | R, 403, 32 |
| 8 | 2 | 8 | 3 | | 11 | 18 | 11 | 25 | F, S, R, 403, 32 |
| 9 | 4 | 9 | 25 | | 12 | 2 | 12 | 5 | F, S, R, 403, 32 |
| 10 | 2 | 10 | 4 | | 18 | 14 | 18 | 25 | R, NQP, 403, 32 |
| 12 | 14 | 15 | 23 | 401, 402, 403, LOF, C | 19 | 2 | 19 | 9 | R, 403, 32 |
| 17 | 14 | 17 | 23 | 401, 402, 403, V | 20 | 24 | 20 | 25 | F, S, R, 403, 32 |
| 17 | 25 | 17 | 25 | 401, 402, 403, V | 23 | 13 | 23 | 20 | 32 |
| 18 | 2 | 18 | 2 | 401, 402, 403, V | 23 | 21 | 23 | 24 | F, S, R, 403, 32 |
| 18 | 4 | 18 | 7 | 401, 402, 403, V | 24 | 11 | 24 | 13 | F, S, R, 403, 32 |
| 18 | 9 | 18 | 10 | 401, 402, 403, V | 27 | 10 | 27 | 14 | F, S, R, 403, 32 |
| 19 | 22 | 19 | 25 | | 28 | 20 | 28 | 22 | F, S, R, 403, 32 |
| 20 | 2 | 20 | 5 | | 29 | 15 | 29 | 18 | F, S, R, 403, 32 |
| 20 | 16 | 20 | 22 | 401, 402, 403, 602, LOF, 801, 802, 901 | 30 | 5 | 30 | 7 | R, 403, 32 |
| 21 | 6 | 21 | 12 | 401, 402, 403, 801, 802 | 30 | 9 | 30 | 11 | R, 403, 32 |
| 23 | 25 | 23 | 25 | 401, 402, 403, 602, LOF, 901 | 33 | 18 | 34 | 19 | 32 |
| 24 | 2 | 24 | 4 | 401, 402, 403, 602, LOF, 901 | 35 | 5 | 35 | 8 | R, 403, 32 |
| 24 | 6 | 24 | 10 | 401, 402, 403, 602, LOF, 901 | 35 | 10 | 35 | 11 | R, 403, 32 |
| 28 | 6 | 28 | 10 | 401, 402, 403, 602, LOF, 901 | 35 | 16 | 35 | 25 | R, 403, 32 |
| 28 | 14 | 28 | 18 | 602, LOF, 801, 802, V | 36 | 3 | 36 | 4 | NR, F, R, 403, 32 |
| 29 | 7 | 29 | 9 | 602, LOF, 801, 802, V | 36 | 6 | 36 | 13 | F, R, 403, 32 |
| 29 | 11 | 29 | 13 | 602, LOF, 801, 802, V | 36 | 15 | 36 | 17 | NR, F, R, 403, 32 |
| 30 | 21 | 30 | 25 | 401, 402, 403, 602, LOF, V | 42 | 15 | 42 | 24 | F, S, R, 403, 32 |
| 31 | 2 | 31 | 2 | 401, 402, 403, 602, LOF, V | 43 | 3 | 43 | 4 | F, S, R, 403, 32 |
| 31 | 12 | 31 | 25 | 401, 402, 403, 602, LOF, 901 | 43 | 14 | 43 | 18 | F, S, R, 403, 32 |
| 32 | 2 | 32 | 23 | 401, 402, 403, 602, LOF | 45 | 6 | 45 | 24 | LAY, F, R, 403, S, 32 |
| 33 | 11 | 33 | 17 | 401, 402, 403 | 46 | 15 | 46 | 21 | LAY, F, R, 403, S, 32 |
| 34 | 20 | 34 | 23 | 401, 402, 403, 602, LOF | 47 | 16 | 47 | 24 | H, NR, F, S, 403, 32 |
| 34 | 25 | 34 | 25 | 401, 402, 403, 602, LOF | 48 | 2 | 48 | 4 | H, NR, F, S, 403, 32 |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 35 | 2 | 35 | 3 | 401, 402, 403, 602, LOF | 56 | 22 | 56 | 25 | 32, F, S, R, 403 |
| 36 | 20 | 36 | 24 | 401, 402, 403 | 58 | 20 | 58 | 24 | F, S, R, 403, 32 |
| 38 | 16 | 38 | 25 | 401, 402, 403 | 70 | 18 | 70 | 25 | LAY, F, R, 403, S, 32 |
| 39 | 2 | 39 | 4 | 401, 402, 403 | 71 | 2 | 71 | 5 | LAY, F, R, 403, S, 32 |
| 39 | 14 | 39 | 17 | 401, 402, 403, V | 77 | 4 | 77 | 18 | LAY, F, S, R, 403, 32 |
| 39 | 19 | 39 | 20 | 401, 402, 403, V | 78 | 6 | 78 | 9 | LAY, F, S, R, 403, 32 |
| 39 | 22 | 39 | 25 | 401, 402, 403 | 78 | 12 | 78 | 13 | LAY, F, S, R, 403, 32 |
| 40 | 2 | 40 | 25 | 401, 402, 403 | 78 | 15 | 78 | 17 | LAY, F, S, R, 403, 32 |
| 41 | 2 | 41 | 25 | 401, 402, 403 | 80 | 5 | 80 | 10 | F, S, R, 403, 32 |
| 42 | 2 | 42 | 14 | 401, 402, 403 | 80 | 23 | 80 | 25 | F, S, R, 403, 32 |
| 43 | 6 | 43 | 9 | 401, 402, 403, 602, LOF | 81 | 2 | 81 | 4 | F, S, R, 403, 32 |
| 43 | 11 | 43 | 12 | 401, 402, 403, 602, LOF | 81 | 12 | 81 | 18 | F, S, R, 403, 32 |
| 44 | 5 | 44 | 25 | 401, 402, 403, 602, LOF | 81 | 25 | 81 | 25 | F, S, R, 403, 32 |
| 45 | 2 | 45 | 2 | | 82 | 2 | 82 | 15 | F, S, R, 403, 32 |
| 46 | 22 | 46 | 24 | 106, 602, LOF | 82 | 18 | 82 | 19 | F, S, R, 403, 32 |
| 46 | 25 | 46 | 25 | 106, 602, LOF | 86 | 5 | 86 | 13 | LAY, F, S, R, 403, 32 |
| 47 | 2 | 47 | 3 | 106, 602, LOF | 86 | 16 | 86 | 20 | LAY, F, S, R, 403, 32 |
| 47 | 11 | 47 | 14 | 106, 602, LOF | 86 | 22 | 86 | 25 | LAY, F, S, R, 403, 32 |
| 48 | 6 | 48 | 14 | 106, 602, LOF | 87 | 2 | 87 | 3 | LAY, F, S, R, 403, 32 |
| 48 | 17 | 48 | 19 | 106, 602, LOF | 87 | 13 | 87 | 25 | LAY, F, S, R, 403, 32 |
| 48 | 25 | 48 | 25 | | 88 | 2 | 88 | 5 | LAY, F, S, R, 403, 32 |
| 49 | 2 | 49 | 18 | 401, 402, 403, 701, 702 | 89 | 8 | 89 | 13 | LAY, F, S, R, 403, 32 |
| 49 | 21 | 49 | 22 | 401, 402, 403, 701, 702 | 89 | 16 | 89 | 18 | LAY, F, S, R, 403, 32 |
| 50 | 11 | 50 | 17 | 401, 402, 403, 701, 702, V | 89 | 20 | 89 | 21 | LAY, F, S, R, 403, 32 |
| 50 | 20 | 50 | 22 | 401, 402, 403, 701, 702, V | 100 | 21 | 100 | 24 | F, S, R, 403, 32 |
| 51 | 5 | 51 | 15 | 401, 402, 403, 701, 702 | 101 | 22 | 102 | 4 | F, S, R, 403, 32 |
| 55 | 3 | 55 | 16 | | 102 | 10 | 102 | 25 | F, S, R, 403, 32 |
| 56 | 15 | 56 | 21 | 401, 402, 403 | 103 | 2 | 103 | 3 | F, S, R, 403, 32 |
| 58 | 25 | 58 | 25 | 401, 402, 403 | 103 | 17 | 103 | 20 | F, S, R, 403, 32 |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 59 | 2 | 59 | 9 | 401, 402, 403, 602, LOF | 104 | 17 | 104 | 19 | F, S, R, 403, 32 |
| 59 | 12 | 59 | 13 | 401, 402, 403, 602, LOF | 104 | 21 | 104 | 22 | F, S, R, 403, 32 |
| 59 | 19 | 59 | 24 | 106, 401, 402, 403, 602, LOF | 105 | 9 | 105 | 11 | H, F, S, R, 403, 32 |
| 62 | 21 | 62 | 25 | 401, 402, 403, 602, LOF | 109 | 20 | 109 | 21 | F, S, R, 403, 32 |
| 63 | 2 | 63 | 10 | 401, 402, 403, 602, LOF | 109 | 23 | 109 | 24 | F, S, R, 403, 32 |
| 64 | 5 | 64 | 13 | 401, 402, 403, 602, LOF | 111 | 14 | 111 | 17 | F, S, R, 403, 32 |
| 74 | 8 | 74 | 18 | 401, 402, 403, 602, LOF | 118 | 4 | 118 | 5 | LAY, F, S, R, 403, 32 |
| 74 | 20 | 74 | 21 | 401, 402, 403, 602, LOF | 118 | 7 | 118 | 7 | LAY, F, S, R, 403, 32 |
| 74 | 23 | 74 | 25 | 401, 402, 403, 602, LOF, C | 118 | 9 | 118 | 25 | LAY, F, S, R, 403, 32 |
| 75 | 2 | 75 | 3 | 401, 402, 403, 602, LOF, C | 119 | 2 | 119 | 2 | LAY, F, S, R, 403, 32 |
| 75 | 5 | 75 | 5 | 401, 402, 403, 602, LOF, C | 119 | 5 | 119 | 5 | LAY, F, S, R, 403, 32 |
| 75 | 7 | 75 | 11 | 401, 402, 403, 602, LOF | 119 | 8 | 119 | 13 | LAY, F, S, R, 403, 32 |
| 75 | 13 | 75 | 14 | 401, 402, 403, 602, LOF | 121 | 3 | 121 | 6 | LAY, F, S, R, 403, 32 |
| 75 | 24 | 75 | 25 | 602, LOF | 121 | 13 | 121 | 16 | LAY, F, S, R, 403, 32 |
| 76 | 2 | 76 | 2 | 602, LOF | 121 | 19 | 121 | 20 | LAY, F, S, R, 403, 32 |
| 76 | 4 | 76 | 5 | 602, LOF | 122 | 15 | 122 | 17 | LAY, F, S, R, 403, 32 |
| 76 | 16 | 76 | 18 | 401, 402, 403, 602, LOF, 701, 702 | 122 | 20 | 122 | 22 | LAY, F, S, R, 403, 32 |
| 76 | 22 | 76 | 25 | 401, 402, 403, 602, LOF, 701, 702 | 123 | 13 | 123 | 19 | LAY, F, S, R, 403, 32 |
| 77 | 2 | 77 | 2 | 401, 402, 403, 602, LOF, 701, 702 | 123 | 22 | 123 | 24 | LAY, F, S, R, 403, 32 |
| 78 | 24 | 78 | 25 | 401, 402, 403, 602, LOF, 701,702 | 124 | 2 | 124 | 5 | LAY, F, S, R, 403, 32 |
| 79 | 2 | 79 | 2 | 401, 402, 403, 602, LOF, 701,702 | 124 | 7 | 124 | 8 | LAY, F, S, R, 403, 32 |
| 79 | 5 | 79 | 7 | 401, 402, 403, 602, LOF, 701,702 | 124 | 25 | 124 | 25 | F, S, R, 403, 32 |
| 79 | 9 | 79 | 12 | 401, 402, 403 | 125 | 2 | 125 | 7 | F, S, R, 403, 32 |
| 79 | 13 | 79 | 17 | 401, 402, 403, 602, LOF, 701, 702, Legal, V | 126 | 22 | 126 | 23 | LAY, 32, F, S, R, 403 |
| 79 | 19 | 79 | 19 | 401, 402, 403, 602, LOF, 701, 702, Legal, V | 127 | 2 | 127 | 3 | LAY, 32, F, S, R, 403 |
| 79 | 23 | 79 | 25 | 401, 402, 403, 602, LOF, 901 | 127 | 5 | 127 | 11 | LAY, 32, F, S, R, 403 |
| 80 | 2 | 80 | 3 | 401, 402, 403, 602, LOF, 901 | 127 | 13 | 127 | 16 | LAY, 32, F, S, R, 403 |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 80 | 11 | 80 | 22 | 401, 402, 403 | 128 | 3 | 128 | 7 | LAY, F, S, R, 403, 32 |
| 81 | 8 | 81 | 11 | 401, 402, 403 | 129 | 2 | 129 | 5 | LAY, F, S, R, 403, 32 |
| 81 | 19 | 81 | 24 | 401, 402, 403, 602, LOF | 130 | 16 | 130 | 20 | LAY, F, S, R, 403, 32 |
| 85 | 13 | 85 | 17 | 401, 402, 403, 602, LOF, 701, 702 | 150 | 24 | 150 | 25 | LAY, 32, H, F, S, R, 403 |
| 85 | 20 | 85 | 21 | 401, 402, 403, 602, LOF, 701, 702 | 151 | 2 | 151 | 22 | LAY, 32, H, F, S, R, 403 |
| 87 | 4 | 87 | 12 | 401, 402, 403 | 153 | 5 | 153 | 12 | LAY, 32, H, F, S, R, 403 |
| 97 | 8 | 97 | 18 | 401, 402, 403 | 153 | 15 | 153 | 18 | LAY, 32, H, F, S, R, 403 |
| 99 | 22 | 99 | 24 | | 153 | 20 | 153 | 25 | LAY, 32, H, F, S, R, 403 |
| 100 | 5 | 100 | 11 | | 154 | 2 | 154 | 21 | LAY, 32, H, F, S, R, 403 |
| 101 | 3 | 101 | 21 | 401, 402, 403, 602, LOF, 901, 902 | 154 | 24 | 154 | 25 | LAY, 32, H, F, S, R, 403 |
| 103 | 4 | 103 | 5 | | 155 | 3 | 155 | 5 | LAY, 32, H, F, S, R, 403 |
| 103 | 6 | 103 | 9 | | 156 | 5 | 156 | 12 | LAY, 32, H, F, S, R, 403 |
| 104 | 4 | 104 | 16 | 602, LOF | 156 | 15 | 156 | 17 | LAY, 32, H, F, S, R, 403 |
| 107 | 14 | 107 | 17 | 602, LOF, 701, 702 | 156 | 19 | 156 | 21 | LAY, 32, F, S, R, 403 |
| 107 | 20 | 107 | 22 | 602, LOF, 701, 702 | 156 | 24 | 156 | 25 | LAY, 32, F, S, R, 403 |
| 108 | 6 | 108 | 9 | 602, LOF, 701, 702 | 157 | 2 | 157 | 3 | LAY, 32, F, S, R, 403 |
| 108 | 12 | 108 | 14 | 602, LOF, 701, 702 | 157 | 5 | 157 | 6 | LAY, 32, F, S, R, 403 |
| 108 | 16 | 108 | 25 | 602, LOF, 701, 702, MC, AA | 157 | 9 | 157 | 11 | LAY, 32, F, S, R, 403 |
| 109 | 2 | 109 | 13 | 602, LOF, 701, 702, MC, AA | 157 | 13 | 157 | 25 | LAY, 32, F, S, R, 403 |
| 109 | 15 | 109 | 19 | 602, LOF | 158 | 2 | 158 | 20 | LAY, 32, F, S, R, 403 |
| 110 | 4 | 110 | 17 | 106, 701, 702 | 161 | 16 | 161 | 22 | R, 403, 32 |
| 110 | 20 | 110 | 22 | 701, 702 | 163 | 13 | 163 | 21 | R, 403, 32 |
| 110 | 24 | 110 | 25 | C, V | 164 | 19 | 164 | 24 | H, R, 403, 32 |
| 111 | 2 | 111 | 4 | C, V | 166 | 20 | 166 | 25 | H, R, 403, 32 |
| 111 | 18 | 111 | 18 | | 174 | 23 | 174 | 24 | LAY, 32, F, S, R, 403 |
| 111 | 19 | 111 | 25 | | 175 | 17 | 175 | 20 | LAY, 32, F, S, R, 403 |
| 112 | 2 | 112 | 7 | | 175 | 22 | 175 | 22 | LAY, 32, F, S, R, 403 |
| 112 | 9 | 112 | 11 | | 175 | 25 | 175 | 25 | LAY, 32, F, S, R, 403 |
| 114 | 16 | 114 | 19 | 602, LOF, 701, 702 | 176 | 3 | 176 | 6 | LAY, 32, F, S, R, 403 |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 114 | 22 | 114 | 24 | 602, LOF, 701, 702 | 176 | 9 | 176 | 12 | LAY, 32, F, S, R, 403 |
| 115 | 2 | 115 | 6 | 602, LOF, 701, 702 | 177 | 3 | 177 | 5 | LAY, 32, F, S, R, 403 |
| 116 | 11 | 116 | 16 | 602, LOF, 701, 702 | 177 | 8 | 177 | 14 | LAY, 32, F, S, R, 403 |
| 116 | 19 | 116 | 23 | 602, LOF, 701, 702 | 177 | 16 | 178 | 7 | LAY, 32, F, S, R, 403 |
| 117 | 3 | 117 | 5 | 602, LOF, 701, 702 | 182 | 13 | 182 | 18 | F, S, R, 32, 403 |
| 117 | 8 | 117 | 9 | 602, LOF, 701, 702 | 182 | 20 | 182 | 25 | F, S, R, 32, 403 |
| 117 | 11 | 117 | 13 | 602, LOF, 701, 702 | 183 | 2 | 183 | 7 | F, S, R, 32, 403 |
| 117 | 15 | 117 | 17 | 602, LOF, 701, 702 | 183 | 21 | 183 | 23 | F, S, R, 32, 403 |
| 117 | 19 | 117 | 21 | 602, LOF, 701, 702 | 183 | 25 | 183 | 25 | F, S, R, 32, 403 |
| 117 | 23 | 117 | 25 | 602, LOF, 701, 702 | 184 | 2 | 184 | 2 | F, S, R, 32, 403 |
| 118 | 2 | 118 | 2 | 602, LOF, 701, 702 | 184 | 4 | 184 | 7 | F, S, R, 32, 403 |
| 119 | 15 | 119 | 22 | | 184 | 9 | 184 | 11 | F, S, R, 32, 403 |
| 121 | 7 | 121 | 8 | 701, 702 | 184 | 13 | 184 | 20 | F, S, R, 32, 403 |
| 121 | 9 | 121 | 12 | 701, 702 | 184 | 22 | 184 | 25 | F, S, R, 32, 403 |
| 123 | 2 | 123 | 7 | 106, 602, LOF, 701, 702 | 185 | 2 | 185 | 7 | F, S, R, 32, 403 |
| 123 | 10 | 123 | 11 | 106, 602, LOF, 701, 702 | 185 | 10 | 185 | 11 | F, S, R, 32, 403 |
| 124 | 12 | 124 | 16 | | 185 | 13 | 185 | 25 | LAY, F, S, R, 32, 403 |
| 124 | 18 | 124 | 24 | | 186 | 2 | 186 | 7 | LAY, F, S, R, 32, 403 |
| 125 | 8 | 125 | 8 | 401, 402, 403 | 186 | 9 | 186 | 18 | LAY, F, S, R, 32, 403 |
| 125 | 9 | 125 | 17 | 401, 402, 403 | 187 | 7 | 187 | 10 | LAY, F, S, R, 32, 403 |
| 127 | 18 | 127 | 21 | 401, 402, 403, 701, 702 | 187 | 13 | 187 | 20 | LAY, F, S, R, 32, 403 |
| 127 | 23 | 127 | 25 | 401, 402, 403, 701, 702 | 188 | 3 | 188 | 5 | LAY, F, S, R, 32, 403 |
| 128 | 8 | 128 | 19 | 401, 402, 403, 701, 702 | 188 | 8 | 188 | 11 | LAY, F, S, R, 32, 403 |
| 128 | 22 | 128 | 24 | 401, 402, 403, 701, 702 | 209 | 14 | 209 | 19 | 32, F, S, R, 403 |
| 129 | 6 | 129 | 20 | 401, 402, 403 | 209 | 21 | 209 | 25 | 32, F, S, R, 403 |
| 129 | 25 | 129 | 25 | 401, 402, 403, 701, 702 | 210 | 2 | 210 | 7 | 32, F, S, R, 403 |
| 130 | 2 | 130 | 10 | 401, 402, 403, 701, 702 | 210 | 9 | 210 | 10 | 32, F, S, R, 403 |
| 130 | 13 | 130 | 14 | 401, 402, 403, 701, 702 | 210 | 12 | 210 | 16 | 32, F, S, R, 403 |
| 132 | 14 | 132 | 25 | 401, 402, 403 | 210 | 24 | 210 | 25 | 32, F, S, R, 403 |

| Kenney, Matthew October 18, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 133 | 2 | 133 | 2 | 401, 402, 403 | 211 | 2 | 211 | 15 | 32, F, S, R, 403 |
| 133 | 4 | 133 | 6 | 401, 402, 403 | 211 | 18 | 211 | 25 | 32, F, S, R, 403 |
| 133 | 8 | 133 | 20 | 401, 402, 403 | 212 | 2 | 212 | 4 | 32, F, S, R, 403 |
| 133 | 23 | 133 | 24 | 401, 402, 403 | 213 | 10 | 213 | 13 | 32, F, S, R, 403 |
| 145 | 25 | 145 | 25 | 602, LOF | 213 | 15 | 213 | 15 | 32, F, S, R, 403 |
| 146 | 2 | 146 | 9 | 602, LOF | 213 | 17 | 213 | 20 | 32, F, S, R, 403 |
| 147 | 9 | 147 | 25 | 401, 402, 403 | 214 | 16 | 214 | 20 | 32, F, S, R, 403 |
| 148 | 2 | 148 | 5 | 401, 402, 403 | 215 | 11 | 215 | 15 | R, 403, 32 |
| 161 | 23 | 161 | 24 | 401, 402,403, 602, LOF | 216 | 11 | 216 | 18 | 32 |
| 162 | 2 | 162 | 13 | 401, 402,403, 602, LOF | 218 | 23 | 218 | 25 | LAY, 32, F, S, R, 403 |
| 162 | 15 | 162 | 25 | 401, 402,403, 602, LOF, 701, 702 | 219 | 2 | 219 | 8 | LAY, 32, F, S, R, 403 |
| 163 | 22 | 163 | 25 | | 219 | 10 | 219 | 12 | LAY, 32, F, S, R, 403 |
| 164 | 2 | 164 | 8 | 401, 402,403, 602, LOF, 701, 702 | 222 | 15 | 222 | 24 | R, 403, 32 |
| 171 | 13 | 171 | 25 | 401, 402, 403, 701, 702 | 223 | 24 | 223 | 25 | F, S, R, 403, 32 |
| 172 | 2 | 172 | 6 | 401, 402, 403 | 224 | 2 | 224 | 25 | F, S, R, 403, 32 |
| 172 | 8 | 172 | 9 | 401, 402, 403 | 225 | 2 | 225 | 7 | F, S, R, 403, 32 |
| 172 | 11 | 172 | 19 | 401, 402, 403 | 225 | 8 | 225 | 12 | F, S, R, 403, 32 |
| 173 | 9 | 173 | 11 | 401, 402,403, 602, LOF, 701, 702 | 226 | 25 | 226 | 25 | F, S, R, 403, 32 |
| 173 | 14 | 173 | 14 | 401, 402,403, 602, LOF, 701, 702 | 227 | 2 | 227 | 3 | F, S, R, 403, 32 |
| 173 | 16 | 173 | 19 | 401, 402,403, 602, LOF, 701, 702 | 227 | 6 | 227 | 7 | F, S, R, 403, 32 |
| 173 | 22 | 173 | 25 | 401, 402,403, 602, LOF, 701, 702 | 227 | 9 | 227 | 11 | F, S, R, 403, 32 |
| 174 | 2 | 174 | 3 | 401, 402,403, 602, LOF, 701, 702 | 227 | 14 | 227 | 15 | F, S, R, 403, 32 |
| 174 | 5 | 174 | 7 | 401, 402,403, 602, LOF, 701, 702 | 228 | 19 | 228 | 25 | 32, F, S, R, 403, H |
| 174 | 10 | 174 | 12 | 401, 402,403, 602, LOF, 701, 702 | 229 | 2 | 229 | 25 | 32, F, S, R, 403, H |
| 174 | 16 | 174 | 22 | 401, 402,403 | 230 | 2 | 230 | 25 | 32, F, S, R, 403, C, H |
| 175 | 2 | 175 | 4 | 401, 402,403 | 231 | 2 | 231 | 2 | 32, F, S, R, 403, H |
| 175 | 7 | 175 | 8 | 401, 402,403 | 232 | 7 | 232 | 20 | F, S, R, 403, 32 |
| 214 | 24 | 214 | 25 | | 233 | 10 | 232 | 18 | F, S, R, 403, 32 |
| 215 | 2 | 215 | 4 | | 234 | 3 | 234 | 12 | F, S, R, 403, 32 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| colspan="10" | **Kenney, Matthew** <br> **October 18, 2019** |
| colspan="4" | **Amneal's Initial Designations** | **Par's Objections** | colspan="4" | **Par's Counter Designations** | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 215 | 6 | 215 | 10 | | 236 | 11 | 236 | 13 | F, S, R, 403, 32 |
| 215 | 23 | 215 | 25 | V | 236 | 15 | 236 | 21 | F, S, R, 403, H, LAY, 32 |
| 216 | 2 | 216 | 2 | V | 237 | 11 | 237 | 14 | F, S, R, 403, 32 |
| 217 | 20 | 217 | 25 | | 237 | 16 | 237 | 19 | F, S, R, 403, 32 |
| 218 | 2 | 218 | 3 | | 241 | 4 | 241 | 6 | R, 403, 32 |
| 218 | 5 | 218 | 8 | | 241 | 17 | 241 | 18 | R, 403, 32 |
| 218 | 10 | 218 | 12 | | 241 | 20 | 241 | 24 | R, 403, 32 |
| 219 | 22 | 219 | 25 | 401, 402, 403, 602, LOF, V | 244 | 18 | 244 | 20 | R, 403, 32 |
| 220 | 2 | 220 | 8 | 401, 402, 403, 602, LOF, V | 244 | 23 | 244 | 25 | R, 403, 32 |
| 220 | 11 | 220 | 12 | 401, 402, 403, 602, LOF, 701, 702, V | 246 | 16 | 247 | 8 | R, 403, 32 |
| 220 | 16 | 220 | 20 | 401, 402, 403, 602, LOF, 701, 702, V | 247 | 18 | 247 | 23 | F, LAY, R, 403, 32 |
| 220 | 23 | 220 | 25 | 401, 402, 403, 602, LOF, 701, 702, V | 248 | 2 | 248 | 4 | F, LAY, R, 403, 32 |
| 221 | 2 | 221 | 8 | 401, 402, 403, 602, LOF, 701, 702, V | 255 | 10 | 255 | 12 | R, 403, 32 |
| 221 | 10 | 221 | 12 | 401, 402, 403, 602, LOF, 701, 702, V | 258 | 2 | 258 | 4 | LAY, F, S, R, 403, 32 |
| 221 | 15 | 221 | 18 | 401, 402, 403, 602, LOF, 701, 702, V | 258 | 7 | 258 | 9 | LAY, F, S, R, 403, 32 |
| 221 | 20 | 221 | 23 | 401, 402, 403, 701, 702 | 261 | 20 | 261 | 23 | LAY, F, S, R, 403, 32 |
| 222 | 2 | 222 | 3 | 401, 402, 403, 701, 702 | 262 | 2 | 262 | 4 | LAY, F, S, R, 403, 32 |
| 222 | 5 | 222 | 8 | 401, 402, 403, 602, LOF, 701, 702, V | 262 | 6 | 262 | 13 | LAY, F, S, R, 403, 32 |
| 222 | 11 | 222 | 12 | 401, 402, 403, 602, LOF, 701, 702, V | 262 | 25 | 262 | 25 | 32, LAY, R, 403 |
| 222 | 25 | 222 | 25 | | 263 | 2 | 263 | 3 | 32, LAY, R, 403 |
| 223 | 2 | 223 | 13 | | 263 | 5 | 263 | 10 | 32, LAY, R, 403 |
| 225 | 19 | 225 | 25 | 401, 402, 403 | 271 | 21 | 271 | 25 | 32, R, 403, C |
| 226 | 2 | 226 | 15 | 401, 402, 403, 701, 702, V | 272 | 7 | 272 | 10 | 32, F, S, H, R, 403 |
| 226 | 18 | 226 | 24 | 401, 402, 403, 701, 702, V | 272 | 13 | 272 | 17 | 32, F, S, H, R, 403 |
| 228 | 3 | 228 | 15 | V | 272 | 19 | 272 | 19 | 32, F, S, H, R, 403, FORM |
| 228 | 16 | 228 | 18 | | 273 | 5 | 273 | 7 | 32, F, S, H, R, 403, FORM |
| 231 | 6 | 231 | 19 | | 273 | 9 | 273 | 13 | 32, F, S, H, R, 403, FORM |
| 231 | 24 | 231 | 25 | | 273 | 15 | 273 | 25 | 32, F, S, H, R, 403, FORM |
| 232 | 2 | 232 | 6 | | 274 | 16 | 274 | 20 | 32, F, S, H, R, 403 |

|  | Kenney, Matthew October 18, 2019 |
|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 233 | 3 | 233 | 9 | | 274 | 22 | 274 | 25 | 32, F, S, H, R, 403 |
| 233 | 19 | 233 | 25 | | 275 | 2 | 275 | 10 | 32, F, S, H, R, 403 |
| 234 | 2 | 234 | 2 | | 275 | 20 | 275 | 21 | R, 403, 32 |
| 234 | 13 | 234 | 25 | | 276 | 25 | 276 | 25 | LAY, FORM, H, 32, F, S, R, 403 |
| 235 | 2 | 235 | 25 | | 277 | 2 | 277 | 10 | LAY, FORM, H, 32, F, S, R, 403 |
| 236 | 2 | 236 | 10 | | 277 | 21 | 277 | 23 | LAY, FORM, H, 32, F, S, R, 403 |
| 236 | 23 | 236 | 25 | | 277 | 25 | 277 | 25 | LAY, FORM, H, 32, F, S, R, 403 |
| 237 | 2 | 237 | 6 | V | 278 | 2 | 278 | 2 | LAY, FORM, H, 32, F, S, R, 403 |
| 237 | 8 | 237 | 9 | V | 278 | 4 | 278 | 7 | LAY, 32, F, S, R, 403 |
| 238 | 5 | 238 | 11 | | 278 | 11 | 278 | 14 | 32, F, S, R, 403 |
| 238 | 14 | 238 | 25 | 106 | 278 | 15 | 278 | 17 | R, 403, 32 |
| 239 | 2 | 239 | 25 | | 278 | 22 | 278 | 25 | H, R, 403, 32, F, S |
| 240 | 2 | 240 | 5 | | 279 | 2 | 279 | 8 | H, R, 403, 32, F, S |
| 240 | 7 | 240 | 10 | | 279 | 15 | 279 | 21 | H, R, 403, 32, F, S |
| 240 | 12 | 240 | 16 | | | | | | |
| 240 | 21 | 240 | 25 | | | | | | |
| 241 | 2 | 241 | 3 | | | | | | |
| 246 | 3 | 246 | 7 | | | | | | |
| 246 | 9 | 246 | 15 | | | | | | |
| 248 | 6 | 248 | 7 | 401, 402, 403, 602, LOF, Legal | | | | | |
| 248 | 10 | 248 | 12 | 401, 402, 403, 602, LOF, Legal | | | | | |
| 251 | 16 | 251 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 252 | 2 | 252 | 2 | 401, 402, 403, 602, LOF | | | | | |
| 252 | 4 | 252 | 4 | 401, 402, 403, 602, LOF | | | | | |
| 252 | 22 | 252 | 25 | 401, 402, 403, Legal | | | | | |
| 253 | 2 | 253 | 2 | 401, 402, 403, Legal | | | | | |
| 253 | 6 | 253 | 6 | 401, 402, 403, Legal | | | | | |
| 253 | 25 | 253 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 254 | 2 | 254 | 6 | 401, 402, 403, 602, LOF | | | | | |

| Kenney, Matthew | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| October 18, 2019 | | | | | | | | | |
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 254 | 8 | 254 | 10 | 401, 402, 403 | | | | | |
| 254 | 12 | 254 | 16 | 401, 402, 403, V | | | | | |
| 254 | 18 | 254 | 18 | 401, 402, 403, V | | | | | |
| 254 | 20 | 254 | 25 | 401, 402, 403 | | | | | |
| 255 | 2 | 255 | 4 | 401, 402, 403 | | | | | |
| 257 | 10 | 257 | 12 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 257 | 16 | 257 | 20 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 257 | 22 | 257 | 25 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 260 | 15 | 260 | 17 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 260 | 21 | 260 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 262 | 14 | 262 | 16 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 262 | 19 | 262 | 24 | 106, 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 281 | 7 | 281 | 11 | | | | | | |
| 281 | 23 | 281 | 25 | | | | | | |
| 282 | 2 | 282 | 14 | | | | | | |
| 282 | 16 | 282 | 18 | | | | | | |

| | Kenney, Matthew June 26, 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 8 | 8 | 8 | 10 | | 8 | 19 | 8 | 24 | |
| 8 | 13 | 8 | 18 | | 13 | 12 | 13 | 15 | |
| 27 | 4 | 27 | 8 | | 16 | 20 | 17 | 23 | R, 403, S, 32 |
| 39 | 7 | 39 | 15 | 106, 401, 402, 403, 602, LOF, Legal | 18 | 11 | 18 | 17 | R, 403, 32 |
| 42 | 6 | 43 | 3 | 106, 401, 402, 403, 602, LOF, Legal | 18 | 21 | 19 | 2 | R, 403, 32 |
| 46 | 21 | 46 | 23 | 106, 401, 402, 403, 602, LOF, Legal | 19 | 4 | 19 | 6 | R, 403, 32 |
| 47 | 14 | 47 | 17 | 106, 401, 402, 403, 602, LOF, Legal | 19 | 16 | 19 | 20 | R, 403, 32 |
| 47 | 19 | 47 | 19 | 106, 401, 402, 403, 602, LOF, Legal | 19 | 22 | 20 | 5 | R, 403, 32 |
| 58 | 23 | 59 | 3 | LOF | 20 | 11 | 20 | 16 | R, 403, 32 |
| 60 | 24 | 61 | 6 | 401, 402, 403, 602, LOF, 701, 702 | 23 | 25 | 24 | 13 | R, 403, 32 |
| 61 | 9 | 61 | 13 | 401, 402, 403, 602, LOF, 701, 702 | 24 | 17 | 24 | 20 | R, 403, 32, NR |
| 61 | 15 | 61 | 22 | 401, 402, 403, 602, LOF, 701, 702, V | 25 | 21 | 25 | 22 | R, 403, 32, F, S |
| 61 | 25 | 62 | 6 | 401, 402, 403, 602, LOF, 701, 702, V | 25 | 24 | 26 | 5 | R, 403, 32, F, S |
| 65 | 2 | 65 | 4 | 401, 402, 403, 602, LOF | 26 | 7 | 26 | 16 | R, 403, 32, F, S |
| 65 | 7 | 65 | 13 | 401, 402, 403, 602, LOF | 26 | 24 | 27 | 3 | R, 403, 32, F, S |
| 66 | 8 | 66 | 21 | 401, 402, 403, 602, LOF | 36 | 11 | 36 | 13 | R, 403, 32, F, S |
| 67 | 8 | 67 | 13 | 401, 402, 403, 602, LOF, 701, 702 | 36 | 15 | 36 | 21 | R, 403, 32, F, S |
| 67 | 16 | 67 | 17 | 401, 402, 403, 602, LOF, 701, 702 | 36 | 23 | 36 | 24 | R, 403, 32, F, S |
| 68 | 7 | 68 | 9 | 401, 402, 403, 602, LOF | 37 | 23 | 38 | 2 | 32 |
| 68 | 11 | 68 | 14 | 106, 401, 402, 403, 602, LOF | 38 | 8 | 38 | 13 | R, 403, 32 |
| 71 | 17 | 71 | 21 | | 38 | 17 | 39 | 6 | LAY, NR, R, 403, 32, F, S |
| 72 | 4 | 72 | 8 | | 40 | 13 | 40 | 21 | NR, 32, LAY |
| 72 | 10 | 72 | 11 | | 42 | 2 | 42 | 5 | F, R, 403, 32 |
| 72 | 21 | 72 | 23 | 602, LOF | 59 | 18 | 59 | 20 | R, 403, 32, F, LAY |
| 73 | 5 | 73 | 13 | 401, 402, 403, 602, LOF, 701, 702 | 59 | 22 | 60 | 3 | R, 403, 32, F, LAY |
| 73 | 15 | 73 | 17 | 401, 402, 403, 602, LOF, 701, 702 | 60 | 12 | 60 | 18 | R, 403, 32, F, LAY |
| 74 | 5 | 74 | 10 | 401, 402, 403, 602, LOF | 60 | 21 | 60 | 23 | R, 403, 32, F, LAY |
| 77 | 10 | 77 | 22 | 401, 402, 403, 602, LOF | 68 | 18 | 68 | 20 | R, 403, 32 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | **Kenney, Matthew**<br>**June 26, 2020** |
| colspan="4" | **Amneal's Initial Designations** | | colspan="4" | **Par's Counter Designations** | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 97 | 12 | 98 | 5 | | 68 | 23 | 69 | 2 | R, 403, 32 |
| 98 | 21 | 98 | 24 | 401, 402, 403, LOF | 72 | 12 | 72 | 16 | R, 403, S, F, 32 |
| 99 | 11 | 99 | 18 | | 74 | 11 | 74 | 17 | R, 403, 32, H |
| 99 | 22 | 99 | 23 | | 75 | 3 | 75 | 16 | LAY, 403, 32 |
| 100 | 3 | 101 | 2 | 401, 402, 403 | 80 | 6 | 80 | 23 | 403, S, F, 32, H |
| 101 | 4 | 101 | 5 | | 80 | 25 | 81 | 4 | 403, S, F, 32, H |
| 102 | 23 | 103 | 5 | 401, 402, 403, 602, LOF, 701, 702 | 81 | 9 | 81 | 23 | 403, S, F, 32, H |
| 103 | 8 | 103 | 15 | 401, 402, 403, 602, LOF, 701, 702 | 91 | 3 | 91 | 25 | 403, S, F, 32, H |
| 103 | 24 | 104 | 13 | | 92 | 4 | 92 | 7 | 403, S, F, 32 |
| 104 | 15 | 105 | 2 | | 94 | 17 | 95 | 13 | 403, S, F, 32 |
| 105 | 25 | 106 | 10 | | 98 | 13 | 98 | 20 | 403, S, F, 32, H |
| 106 | 12 | 106 | 24 | 401, 402, 403, 602, LOF, 701, 702 | 98 | 25 | 99 | 2 | LAY, S, F, 403, 32 |
| 107 | 2 | 107 | 23 | 401, 402, 403, 602, LOF, 701, 702 | 99 | 4 | 99 | 10 | LAY, S, F, 403, 32 |
| 107 | 25 | 108 | 15 | 401, 402, 403, 701, 702 | 101 | 11 | 101 | 14 | LAY, S, F, 403, 32 |
| 109 | 9 | 109 | 16 | 401, 402, 403, 602, LOF | 101 | 17 | 102 | 10 | LAY, S, F, 403, 32 |
| 115 | 23 | 115 | 25 | | 102 | 12 | 102 | 22 | LAY, S, F, 403, 32 |
| 116 | 4 | 116 | 13 | | 103 | 16 | 103 | 18 | LAY, S, F, 403, 32 |
| 123 | 10 | 123 | 14 | | 103 | 21 | 103 | 23 | LAY, S, F, 403, 32 |
| 124 | 2 | 124 | 4 | | 105 | 13 | 105 | 24 | R, 403, 32, LAY |
| 124 | 11 | 124 | 13 | | 126 | 3 | 126 | 4 | R, 403, 32, S, F |
| 124 | 22 | 124 | 23 | | 126 | 7 | 126 | 7 | R, 403, 32, S, F |
| 125 | 2 | 125 | 6 | | 136 | 9 | 136 | 13 | R, 403, H, 32 |
| 125 | 18 | 125 | 20 | | 138 | 6 | 138 | 8 | R, 403, 32, S, F |
| 125 | 24 | 126 | 2 | | 138 | 10 | 138 | 13 | R, 403, 32, S, F |
| 127 | 22 | 128 | 4 | | 139 | 13 | 139 | 21 | 403, 32, S, F, H, LAY |
| 135 | 19 | 135 | 25 | 401, 402, 403, 602, LOF | 139 | 25 | 140 | 6 | 403, 32, S, F, H, LAY |
| 136 | 5 | 136 | 8 | 401, 402, 403, 602, LOF | 140 | 8 | 140 | 21 | 403, 32, S, F, H, LAY |
| 136 | 14 | 137 | 5 | 401, 402, 403, 602, LOF | 147 | 22 | 147 | 25 | 32 |

| Kenney, Matthew June 26, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 137 | 7 | 138 | 5 | 401, 402, 403, 602, LOF | 148 | 4 | 148 | 5 | 32 |
| 144 | 22 | 145 | 15 | 401, 402, 403, 602, LOF, 701, 702 | 148 | 8 | 148 | 16 | LAY, 403, 32 |
| 151 | 16 | 151 | 19 | 401, 402, 403, LOF | 152 | 17 | 152 | 20 | R, 403, 32, S, F |
| 151 | 21 | 151 | 25 | | 153 | 24 | 154 | 2 | R, 403, 32, S, F, LAY |
| 152 | 7 | 152 | 16 | 401, 402, 403, LOF | 154 | 5 | 154 | 15 | R, 403, 32, S, F, LAY |
| | | | | | 154 | 17 | 154 | 25 | R, 403, 32, S, F, LAY |
| | | | | | 179 | 8 | 179 | 9 | R, 403, 32 |
| | | | | | 179 | 14 | 179 | 20 | R, 403, 32 |
| | | | | | 179 | 21 | 179 | 23 | R, 403, 32 |
| | | | | | 209 | 13 | 209 | 19 | R, 403, 32, FORM, S |
| | | | | | 209 | 21 | 209 | 24 | R, 403, 32, FORM, S |
| | | | | | 210 | 2 | 211 | 13 | R, 403, 32, LAY |
| | | | | | 211 | 15 | 214 | 13 | R, 403, 32, LAY, H, F |
| | | | | | 214 | 19 | 215 | 15 | R, 403, 32, LAY, H, F |
| | | | | | 215 | 18 | 216 | 14 | R, 403, 32, LAY, H, F |
| | | | | | 216 | 18 | 217 | 17 | R, 403, 32, LAY, H, F |
| | | | | | 217 | 19 | 217 | 25 | R, 403, 32, LAY, H, F |
| | | | | | 218 | 3 | 218 | 4 | R, 403, 32, LAY, H, F |
| | | | | | 218 | 6 | 218 | 9 | R, 403, 32, LAY, H, F |
| | | | | | 218 | 19 | 219 | 5 | R, 403, 32, LAY, H, F |
| | | | | | 219 | 7 | 219 | 10 | R, 403, 32, LAY, H, F |
| | | | | | 219 | 12 | 219 | 24 | R, 403, 32, LAY, H, F |
| | | | | | 220 | 20 | 221 | 7 | 403, 32, LAY, F |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Rennwald, Michelle** <br> **October 1, 2019** | | | | | | | | | |
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 7 | 6 | 7 | 8 | | 117 | 21 | 117 | 25 | F, S, R, 403, 32 |
| 60 | 2 | 60 | 15 | 401/402, 403, 602/LOF | 118 | 2 | 118 | 20 | F, S, R, 403, 32 |
| 60 | 17 | 60 | 19 | 401/402, 403, 602/LOF | 118 | 24 | 118 | 25 | F, S, R, 403, 32 |
| 197 | 5 | 197 | 10 | | 119 | 2 | 119 | 6 | F, S, R, 403, 32 |
| 198 | 5 | 198 | 19 | | 119 | 8 | 119 | 16 | F, S, R, 403, 32 |
| 198 | 21 | 198 | 22 | | 197 | 11 | 197 | 25 | F, S, R, 403, 32 |
| 199 | 6 | 199 | 8 | | 198 | 2 | 198 | 4 | F, S, R, 403, 32 |
| 199 | 10 | 199 | 12 | | 198 | 24 | 198 | 25 | F, S, R, 403, 32, H |
| 199 | 14 | 199 | 15 | | 199 | 2 | 199 | 5 | F, S, R, 403, 32, H |
| 199 | 17 | 199 | 18 | | 199 | 20 | 199 | 25 | F, S, R, 403, 32 |
| 200 | 21 | 200 | 25 | 401/402, 403, 602/LOF, OS | 200 | 2 | 200 | 7 | F, S, R, 403, 32 |
| 201 | 1 | 201 | 8 | 401/402, 403, 602/LOF, OS | 200 | 10 | 200 | 12 | F, S, R, 403, 32 |
| 201 | 10 | 201 | 16 | 401/402, 403, 602/LOF | 202 | 10 | 202 | 17 | F, S, R, 403, 32, LAY |
| 201 | 17 | 201 | 24 | 401/402, 403, 602/LOF, OS | 213 | 10 | 213 | 15 | F, S, R, 403, 32, LAY |
| 202 | 3 | 202 | 8 | 401/402, 403, 602/LOF, OS | 214 | 2 | 214 | 25 | H, F, S, R, 403, 32 |
| 202 | 21 | 202 | 25 | 401/402, 403, 602/LOF | 215 | 2 | 215 | 10 | H, F, S, R, 403, 32 |
| 203 | 1 | 203 | 13 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 203 | 16 | 203 | 21 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 203 | 23 | 203 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 204 | 2 | 204 | 5 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 204 | 8 | 204 | 11 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 204 | 15 | 204 | 23 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 205 | 2 | 205 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 205 | 5 | 205 | 7 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 205 | 10 | 205 | 12 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 205 | 14 | 205 | 19 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 205 | 22 | 205 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 206 | 2 | 206 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |

| Rennwald, Michelle | | | | | | | | | |
| October 1, 2019 | | | | | | | | | |
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
|---|---|---|---|---|---|---|---|---|---|
| 206 | 5 | 206 | 10 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 206 | 13 | 206 | 15 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 206 | 17 | 206 | 24 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 207 | 2 | 207 | 4 | 401/402, 403 | | | | | |
| 207 | 6 | 207 | 10 | 401/402, 403 | | | | | |
| 207 | 12 | 207 | 18 | 401/402, 403 | | | | | |
| 207 | 20 | 207 | 24 | 401/402, 403, 602/LOF | | | | | |
| 208 | 3 | 208 | 3 | 401/402, 403, 602/LOF | | | | | |
| 208 | 6 | 208 | 8 | 401/402, 403, 602/LOF | | | | | |
| 208 | 10 | 208 | 15 | 401/402, 403, 602/LOF | | | | | |

| Sanghvi, Suketu October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | **Par's Objections** | **Par's Counter Designations** | | | | **Amneal's Objections** |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 10 | 21 | 10 | 24 | | 21 | 3 | 21 | 7 | R, 403 |
| 13 | 3 | 13 | 10 | | 25 | 10 | 25 | 17 | H, R, F, 32, 403, S |
| 13 | 21 | 13 | 25 | | 25 | 22 | 26 | 15 | 32, R, 403 |
| 19 | 22 | 19 | 25 | | 28 | 4 | 28 | 6 | |
| 20 | 2 | 20 | 7 | | 28 | 23 | 28 | 25 | |
| 20 | 9 | 20 | 10 | | 29 | 2 | 29 | 3 | |
| 20 | 21 | 20 | 25 | 401, 402, 403 | 30 | 5 | 30 | 7 | NQP, R, 403, C, 32 |
| 21 | 2 | 21 | 2 | 401, 402, 403 | 31 | 4 | 31 | 9 | NQP, R, 403, C, 32 |
| 26 | 20 | 26 | 24 | 401, 402, 403, LOF | 39 | 20 | 40 | 7 | H, R, F, 403 |
| 26 | 25 | 27 | 6 | LOF | 44 | 4 | 44 | 9 | R, 403 |
| 28 | 7 | 28 | 10 | 106, 401, 402, 403, LOF | 47 | 3 | 47 | 7 | 32, NQP, R, 403 |
| 29 | 15 | 29 | 25 | 801, 802 | 67 | 11 | 67 | 21 | F, S, R, 403 |
| 30 | 2 | 30 | 4 | | 68 | 2 | 68 | 4 | S, F, R, 403 |
| 30 | 8 | 30 | 17 | | 78 | 2 | 78 | 8 | |
| 30 | 19 | 30 | 21 | | 78 | 12 | 78 | 16 | |
| 36 | 11 | 36 | 19 | 602, LOF | 79 | 12 | 79 | 23 | 32, F, S, 403 |
| 36 | 24 | 36 | 25 | | 80 | 2 | 80 | 3 | 32, F, S, 403 |
| 37 | 2 | 37 | 4 | | 80 | 9 | 80 | 13 | 32, F, R, S, 403, H |
| 37 | 6 | 37 | 8 | 801, 802 | 80 | 17 | 80 | 25 | 32, F, R, S, 403, H |
| 37 | 22 | 37 | 25 | 801, 802 | 81 | 8 | 81 | 9 | 32, F, R, S, 403 |
| 38 | 2 | 38 | 16 | 801, 802 | 81 | 11 | 81 | 25 | 32, F, R, S, 403, H |
| 39 | 9 | 39 | 19 | 401, 402, 403, 801, 802 | 98 | 18 | 98 | 23 | F, S, R, 403 |
| 43 | 14 | 43 | 25 | 401, 402, 403, 602, LOF | 111 | 12 | 111 | 18 | 32, F, S, R, 403 |
| 44 | 2 | 44 | 3 | 401, 402, 403 | 113 | 11 | 113 | 12 | 32, F, S, R, 403 |
| 47 | 8 | 47 | 16 | 106, 602, LOF, V | 121 | 21 | 121 | 25 | |
| 47 | 18 | 47 | 19 | 602, LOF, V | 122 | 2 | 122 | 6 | |
| 47 | 21 | 47 | 25 | 602, LOF, V | 126 | 14 | 126 | 19 | LAY, 32, R, F, 403, S |
| 49 | 25 | 49 | 25 | 602, LOF, 801, 802, 901 | 126 | 22 | 126 | 24 | LAY, 32, R, F, 403, S |

| Sanghvi, Suketu October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 50 | 2 | 50 | 9 | 602, LOF, 801, 802, 901 | 133 | 2 | 133 | 2 | |
| 50 | 11 | 50 | 15 | 602, LOF, 801, 802, 901 | 135 | 6 | 135 | 12 | R, 32, F, 403, NR |
| 52 | 2 | 52 | 6 | 401, 402, 403, V | 143 | 4 | 143 | 8 | F, S, R, 403 |
| 52 | 8 | 52 | 10 | 401, 402, 403, V | 147 | 7 | 147 | 13 | NR, F, S, R, LAY, 403, 32 |
| 52 | 12 | 52 | 15 | 401, 402, 403, V | 147 | 16 | 147 | 17 | NR, F, S, R, LAY, 403, 32 |
| 52 | 17 | 52 | 19 | 401, 402, 403, V | 147 | 19 | 148 | 12 | NR, F, S, R, LAY, 403, 32 |
| 52 | 21 | 52 | 25 | 801, 802 | 152 | 10 | 152 | 18 | 32, LAY, F, S, R, 403 |
| 53 | 2 | 53 | 22 | 801, 802 | 153 | 19 | 153 | 21 | NR, F, S, R, LAY, 403, 32 |
| 54 | 9 | 54 | 25 | 801, 802 | 153 | 23 | 154 | 4 | NR, F, S, R, LAY, 403, 32 |
| 55 | 2 | 55 | 3 | 801, 802 | 154 | 6 | 154 | 8 | NR, F, S, R, LAY, 403, 32 |
| 55 | 6 | 55 | 12 | 801, 802 | 154 | 15 | 154 | 21 | R, 403, S, F |
| 55 | 13 | 55 | 25 | 801, 802 | 155 | 2 | 155 | 6 | |
| 56 | 2 | 56 | 2 | 801, 802 | 155 | 8 | 155 | 14 | |
| 57 | 15 | 57 | 25 | 602, LOF | 156 | 24 | 157 | 6 | |
| 58 | 2 | 58 | 21 | 602, LOF | 159 | 9 | 159 | 15 | |
| 58 | 22 | 58 | 25 | | 159 | 18 | 159 | 20 | R, 403, 32, S, F |
| 59 | 2 | 59 | 25 | | 159 | 23 | 160 | 2 | R, 403, 32, S, F |
| 60 | 2 | 60 | 25 | 401, 402, 403, 701, 702, 801, 802 | 174 | 23 | 175 | 3 | R, 403, 32, S, F |
| 61 | 2 | 61 | 3 | 401, 402, 403 | 175 | 7 | 175 | 10 | R, 403, 32, S, F |
| 61 | 18 | 61 | 22 | 602, LOF, 801, 802 | 175 | 13 | 175 | 15 | R, 403, 32, S, F |
| 61 | 25 | 61 | 25 | 602, LOF, V | 182 | 17 | 183 | 8 | H, 32, R, F, 403 |
| 62 | 2 | 62 | 6 | 602, LOF, V | 192 | 11 | 192 | 12 | F |
| 62 | 8 | 62 | 12 | 602, LOF, V | 192 | 15 | 192 | 16 | F |
| 62 | 14 | 62 | 21 | 401, 402, 403, 602, LOF | 193 | 20 | 193 | 23 | F |
| 62 | 24 | 62 | 25 | 401, 402, 403, 602, LOF | 194 | 3 | 194 | 4 | F |
| 63 | 2 | 63 | 3 | 401, 402, 403, 602, LOF | 195 | 25 | 195 | 25 | F |
| 63 | 13 | 63 | 20 | 401, 402, 403, 602, LOF | 196 | 2 | 196 | 11 | F |
| 64 | 4 | 64 | 9 | 401, 402, 403, 602, LOF | 202 | 12 | 202 | 16 | H, 32, R, 403, F |

| Sanghvi, Suketu<br>October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 64 | 23 | 64 | 25 | | 202 | 18 | 202 | 19 | H, 32, R, 403, F |
| 65 | 2 | 65 | 12 | 602, LOF | 202 | 21 | 202 | 24 | 32, R, 403, F, S |
| 65 | 15 | 65 | 17 | 602, LOF | 203 | 4 | 203 | 19 | 32, R, 403, F, S |
| 65 | 19 | 65 | 25 | | 203 | 22 | 203 | 23 | 32, R, 403, F, S |
| 66 | 11 | 66 | 22 | 602, LOF | 206 | 6 | 206 | 9 | F, S, R, 403 |
| 67 | 22 | 67 | 25 | 106, 602, LOF | 212 | 22 | 213 | 5 | 32, NR, F, R, 403 |
| 68 | 10 | 68 | 25 | 801, 802 | 216 | 10 | 216 | 15 | 32 |
| 69 | 2 | 69 | 3 | 801, 802 | 218 | 3 | 218 | 6 | 32, F, S, R, 403 |
| 69 | 16 | 69 | 20 | LOF, 801, 802 | 218 | 22 | 219 | 10 | LAY, 32, F, S, R, 403 |
| 70 | 12 | 70 | 16 | 602, LOF, OS | 221 | 8 | 221 | 22 | LAY, 32, F, S, R, 403 |
| 70 | 21 | 70 | 25 | 602, LOF, OS | 226 | 12 | 226 | 18 | |
| 71 | 2 | 71 | 7 | OS | 226 | 22 | 226 | 25 | |
| 71 | 19 | 71 | 25 | 602, LOF, MC, OS | 227 | 2 | 227 | 2 | |
| 72 | 2 | 72 | 5 | 602, LOF, OS | 229 | 9 | 229 | 13 | 32, R, F, S, 403, LAY |
| 72 | 10 | 72 | 14 | 602, LOF, OS, V | 229 | 16 | 229 | 20 | 32, R, F, S, 403, LAY |
| 72 | 20 | 72 | 22 | 602, LOF, OS | | | | | |
| 73 | 9 | 73 | 20 | 602, LOF, OS | | | | | |
| 73 | 23 | 73 | 25 | 602, LOF, OS | | | | | |
| 74 | 2 | 74 | 3 | 602, LOF, OS | | | | | |
| 74 | 5 | 74 | 8 | 403, V | | | | | |
| 75 | 7 | 75 | 12 | 602, LOF, OS | | | | | |
| 75 | 18 | 75 | 25 | 602, LOF, OS | | | | | |
| 76 | 2 | 76 | 6 | 602, LOF, OS | | | | | |
| 76 | 9 | 76 | 10 | 602, LOF, OS | | | | | |
| 76 | 12 | 76 | 25 | 602, LOF, OS | | | | | |
| 77 | 2 | 77 | 19 | 403, OS | | | | | |
| 78 | 18 | 78 | 25 | 401, 402, 403, 602, LOF, OS | | | | | |
| 79 | 2 | 79 | 2 | 401, 402, 403, OS | | | | | |

| Sanghvi, Suketu October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 79 | 4 | 79 | 6 | 401, 402, 403, OS | | | | | |
| 82 | 9 | 82 | 24 | OS | | | | | |
| 91 | 3 | 91 | 7 | OS, V | | | | | |
| 91 | 15 | 91 | 17 | OS | | | | | |
| 91 | 19 | 91 | 24 | 401, 402, 403, OS, C | | | | | |
| 92 | 3 | 92 | 4 | 401, 402, 403, OS, C | | | | | |
| 92 | 6 | 92 | 8 | | | | | | |
| 92 | 16 | 92 | 24 | OS | | | | | |
| 93 | 3 | 93 | 5 | OS | | | | | |
| 98 | 15 | 98 | 17 | 106, 602, LOF | | | | | |
| 98 | 24 | 98 | 25 | | | | | | |
| 99 | 2 | 99 | 5 | 401, 402, 403 | | | | | |
| 99 | 10 | 99 | 25 | 401, 402, 403 | | | | | |
| 100 | 2 | 100 | 6 | 401, 402, 403 | | | | | |
| 100 | 7 | 100 | 15 | 401, 402, 403, 602, LOF, OS | | | | | |
| 101 | 23 | 101 | 25 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 102 | 2 | 102 | 3 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 102 | 7 | 102 | 10 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 102 | 12 | 102 | 18 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 102 | 21 | 102 | 22 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 103 | 3 | 103 | 7 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 103 | 10 | 103 | 13 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 103 | 19 | 103 | 22 | | | | | | |
| 104 | 2 | 104 | 20 | 401, 402, 403 | | | | | |
| 105 | 20 | 105 | 24 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 106 | 3 | 106 | 6 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 106 | 8 | 106 | 14 | 401, 402, 403 | | | | | |
| 108 | 14 | 108 | 20 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |

| | Sanghvi, Suketu<br>October 11, 2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 108 | 23 | 108 | 25 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 109 | 2 | 109 | 2 | 401, 402, 403, 602, LOF, 701, 702, OS | | | | | |
| 109 | 4 | 109 | 25 | 401, 402, 403 | | | | | |
| 110 | 2 | 110 | 2 | 401, 402, 403 | | | | | |
| 110 | 11 | 110 | 15 | 401, 402, 403 | | | | | |
| 110 | 17 | 110 | 19 | 401, 402, 403 | | | | | |
| 111 | 24 | 111 | 25 | 602, LOF | | | | | |
| 112 | 2 | 112 | 8 | 602, LOF | | | | | |
| 112 | 16 | 112 | 21 | | | | | | |
| 113 | 13 | 113 | 16 | 602, LOF | | | | | |
| 113 | 18 | 113 | 19 | 602, LOF | | | | | |
| 113 | 21 | 113 | 25 | 602, LOF | | | | | |
| 114 | 2 | 114 | 25 | 602, LOF | | | | | |
| 115 | 2 | 115 | 3 | 602, LOF | | | | | |
| 115 | 6 | 115 | 7 | 602, LOF | | | | | |
| 115 | 9 | 115 | 11 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 115 | 14 | 115 | 18 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 115 | 20 | 115 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 116 | 2 | 116 | 11 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 116 | 14 | 116 | 15 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 117 | 16 | 117 | 25 | | | | | | |
| 118 | 3 | 118 | 4 | | | | | | |
| 118 | 6 | 118 | 13 | 401, 402, 403 | | | | | |
| 118 | 15 | 118 | 20 | 401, 402, 403 | | | | | |
| 118 | 22 | 118 | 25 | 401, 402, 403 | | | | | |
| 119 | 3 | 119 | 8 | 401, 402, 403 | | | | | |
| 119 | 18 | 119 | 25 | 401, 402, 403, V | | | | | |
| 120 | 3 | 120 | 7 | 401, 402, 403, V | | | | | |

| | | | | Sanghvi, Suketu<br>October 11, 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | |
| 120 | 9 | 120 | 12 | 401, 402, 403, V | | | | | |
| 121 | 11 | 121 | 20 | 401, 402, 403, V | | | | | |
| 122 | 9 | 122 | 14 | 401, 402, 403 | | | | | |
| 123 | 5 | 123 | 13 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 123 | 16 | 123 | 18 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 123 | 20 | 123 | 23 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 124 | 2 | 124 | 4 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 127 | 3 | 127 | 6 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 127 | 9 | 127 | 12 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 127 | 14 | 127 | 18 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 127 | 21 | 127 | 24 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 128 | 3 | 128 | 11 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 128 | 14 | 128 | 15 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 128 | 17 | 128 | 20 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 128 | 23 | 128 | 24 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 129 | 12 | 129 | 16 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 129 | 19 | 129 | 21 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 129 | 23 | 129 | 24 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 130 | 3 | 130 | 5 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 130 | 7 | 130 | 15 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 130 | 19 | 130 | 21 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 130 | 23 | 130 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 131 | 4 | 131 | 5 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 131 | 7 | 131 | 18 | | | | | | |
| 131 | 20 | 131 | 21 | | | | | | |
| 132 | 19 | 132 | 22 | 106, 602, LOF | | | | | |
| 132 | 25 | 132 | 25 | 106, 602, LOF | | | | | |
| 133 | 8 | 134 | 10 | 401, 402, 403, 602, LOF | | | | | |

| Sanghvi, Suketu October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 134 | 16 | 134 | 22 | 401, 402, 403, 801, 802 | | | | | |
| 137 | 21 | 137 | 25 | | | | | | |
| 138 | 2 | 138 | 10 | | | | | | |
| 138 | 12 | 138 | 13 | | | | | | |
| 138 | 15 | 138 | 24 | | | | | | |
| 141 | 7 | 141 | 25 | | | | | | |
| 142 | 2 | 142 | 25 | | | | | | |
| 143 | 2 | 143 | 3 | | | | | | |
| 143 | 12 | 143 | 23 | 401, 402, 403 | | | | | |
| 144 | 5 | 144 | 14 | 106, 401, 402, 403 | | | | | |
| 144 | 17 | 144 | 20 | 106, 401, 402, 403 | | | | | |
| 145 | 9 | 145 | 12 | 401, 402, 403 | | | | | |
| 145 | 14 | 145 | 16 | 401, 402, 403 | | | | | |
| 146 | 16 | 146 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 147 | 4 | 147 | 5 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 148 | 14 | 148 | 20 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 148 | 23 | 148 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 149 | 1 | 149 | 3 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 149 | 5 | 149 | 8 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 150 | 13 | 150 | 14 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 150 | 16 | 150 | 18 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 150 | 20 | 150 | 25 | 401, 402, 403 | | | | | |
| 151 | 2 | 151 | 10 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 151 | 13 | 151 | 14 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 151 | 16 | 151 | 18 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 151 | 21 | 151 | 22 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 151 | 24 | 151 | 25 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 152 | 2 | 152 | 2 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |

| | | | | Sanghvi, Suketu<br>October 11, 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 152 | 4 | 152 | 5 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 152 | 7 | 152 | 9 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 152 | 19 | 152 | 21 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 152 | 23 | 152 | 24 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 153 | 3 | 153 | 6 | 401, 402, 403, 602, LOF | | | | | |
| 153 | 8 | 153 | 10 | 401, 402, 403, 602, LOF | | | | | |
| 154 | 9 | 154 | 14 | 401, 402, 403 | | | | | |
| 155 | 16 | 155 | 20 | 401, 402, 403, 602, LOF | | | | | |
| 155 | 22 | 155 | 24 | 401, 402, 403, 602, LOF | | | | | |
| 156 | 3 | 156 | 6 | 401, 402, 403, V | | | | | |
| 156 | 8 | 156 | 9 | 401, 402, 403, V | | | | | |
| 157 | 8 | 157 | 16 | 401, 402, 403, V | | | | | |
| 157 | 22 | 157 | 25 | | | | | | |
| 158 | 2 | 158 | 7 | | | | | | |
| 158 | 15 | 158 | 20 | 801, 802 | | | | | |
| 159 | 2 | 159 | 8 | 801, 802 | | | | | |
| 160 | 4 | 160 | 21 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 162 | 23 | 162 | 25 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 163 | 2 | 163 | 10 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 170 | 12 | 170 | 25 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 171 | 2 | 171 | 12 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 171 | 19 | 171 | 25 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 172 | 2 | 172 | 10 | 401, 402, 403, 602, LOF, 801, 802 | | | | | |
| 174 | 14 | 174 | 22 | 401, 402, 403, 602, LOF | | | | | |
| 175 | 23 | 175 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 176 | 2 | 176 | 2 | 401, 402, 403, 602, LOF | | | | | |
| 176 | 3 | 176 | 18 | 401, 402, 403, 602, LOF | | | | | |
| 177 | 17 | 177 | 23 | 401, 402, 403, 602, LOF | | | | | |

| Sanghvi, Suketu October 11, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 178 | 19 | 178 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 179 | 2 | 179 | 14 | 401, 402, 403, 602, LOF | | | | | |
| 179 | 17 | 179 | 18 | 401, 402, 403, 602, LOF | | | | | |
| 179 | 25 | 179 | 25 | 401, 402, 403, 602, LOF | | | | | |
| 180 | 2 | 180 | 21 | 401, 402, 403, 602, LOF | | | | | |
| 181 | 6 | 181 | 18 | 401, 402, 403, 602, LOF, 701, 702, 801, 802 | | | | | |
| 181 | 21 | 181 | 24 | 401, 402, 403, 602, LOF, 701, 702, 801, 802 | | | | | |
| 182 | 3 | 182 | 7 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 182 | 10 | 182 | 11 | 401, 402, 403, 602, LOF, 701, 702 | | | | | |
| 187 | 16 | 187 | 22 | 602, LOF | | | | | |
| 187 | 25 | 187 | 25 | 602, LOF | | | | | |
| 188 | 2 | 188 | 4 | 602, LOF | | | | | |
| 188 | 11 | 188 | 13 | 401, 402, 403 | | | | | |
| 188 | 18 | 188 | 24 | 401, 402, 403 | | | | | |
| 192 | 5 | 192 | 10 | 401, 402, 403 | | | | | |
| 192 | 24 | 193 | 9 | 401, 402, 403, 602, LOF, Legal | | | | | |
| 193 | 11 | 193 | 13 | 401, 402, 403, 602, LOF, Legal | | | | | |
| 193 | 15 | 193 | 19 | 401, 402, 403 | | | | | |
| 194 | 6 | 194 | 12 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 194 | 15 | 194 | 17 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 195 | 6 | 195 | 24 | 401, 402, 403, 701, 702 | | | | | |
| 197 | 13 | 198 | 4 | 401, 402, 403 | | | | | |
| 198 | 15 | 198 | 19 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |

| | | | | Sanghvi, Suketu October 11, 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 198 | 21 | 198 | 25 | 401, 402, 403, 602, LOF, 701, 702, Legal | | | | | |
| 203 | 25 | 203 | 25 | 401, 402, 403 | | | | | |
| 204 | 2 | 204 | 25 | 401, 402, 403 | | | | | |
| 205 | 2 | 205 | 4 | 401, 402, 403 | | | | | |
| 205 | 12 | 205 | 25 | 602, LOF | | | | | |
| 206 | 2 | 206 | 5 | 602, LOF | | | | | |
| 209 | 22 | 209 | 25 | | | | | | |
| 210 | 2 | 210 | 25 | | | | | | |
| 211 | 2 | 211 | 12 | | | | | | |
| 211 | 14 | 211 | 25 | | | | | | |
| 212 | 2 | 212 | 16 | | | | | | |
| 212 | 17 | 212 | 21 | | | | | | |
| 213 | 6 | 213 | 24 | | | | | | |
| 214 | 6 | 214 | 9 | | | | | | |
| 214 | 12 | 214 | 12 | | | | | | |
| 214 | 15 | 214 | 17 | | | | | | |
| 214 | 19 | 214 | 25 | | | | | | |
| 215 | 2 | 215 | 3 | | | | | | |
| 223 | 7 | 223 | 9 | 401, 402, 403 | | | | | |
| 223 | 14 | 223 | 16 | 401, 402, 403 | | | | | |
| 223 | 18 | 223 | 24 | 401, 402, 403, 501, 502, AA | | | | | |
| 224 | 3 | 224 | 16 | 401, 402, 403, 501, 502, AA | | | | | |
| 224 | 18 | 224 | 25 | 401, 402, 403, 501, 502, AA | | | | | |
| 225 | 2 | 225 | 2 | 401, 402, 403, 501, 502, AA | | | | | |
| 225 | 23 | 225 | 25 | 401, 402, 403 | | | | | |
| 226 | 2 | 226 | 2 | 401, 402, 403 | | | | | |
| 226 | 4 | 226 | 6 | 401, 402, 403 | | | | | |

| Sanghvi, Suketu<br>October 11, 2019 | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 230 | 20 | 230 | 25 | | | | | | |
| 231 | 2 | 231 | 10 | | | | | | |
| 231 | 21 | 231 | 25 | | | | | | |
| 232 | 2 | 232 | 5 | 701, 702 | | | | | |
| 232 | 8 | 232 | 11 | 701, 702 | | | | | |

| Sanghvi, Suketu March 12, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 6 | 12 | 6 | 13 | | 11 | 9 | 11 | 23 | |
| 6 | 24 | 7 | 6 | LOF | 16 | 23 | 17 | 1 | |
| 8 | 18 | 9 | 13 | | 24 | 22 | 26 | 8 | R, H, F |
| 11 | 24 | 12 | 2 | 401, 402, 403, LOF | 26 | 16 | 27 | 3 | |
| 14 | 24 | 15 | 3 | 401, 402, 403, 602, LOF | 28 | 25 | 29 | 1 | 32, R, Lay |
| 16 | 7 | 16 | 12 | 106, 401, 402, 403, 602, LOF, 801, 802 | 29 | 4 | 30 | 7 | 32, R, Lay |
| 17 | 9 | 18 | 6 | 401, 402, 403, 602, LOF, 701, 702, 801, 802,OS | 32 | 8 | 32 | 24 | R, F |
| 31 | 18 | 32 | 7 | 401, 402, 403, 602, LOF, 701, 702 | 33 | 2 | 33 | 7 | R, F |
| 33 | 17 | 34 | 1 | | 37 | 24 | 38 | 5 | 32, R, F, Form |
| 34 | 21 | 35 | 1 | | 38 | 11 | 38 | 15 | 32, R, F, Form |
| 48 | 24 | 49 | 18 | 401, 402, 403 | 38 | 18 | 39 | 3 | 32, R, F, Form |
| 50 | 1 | 50 | 5 | 401, 402, 403 | 39 | 5 | 39 | 10 | 32, R, F, Form |
| 50 | 11 | 50 | 15 | 401, 402, 403 | 39 | 12 | 39 | 15 | 32, R, F, Form |
| 52 | 15 | 52 | 22 | 401, 402, 403 | 39 | 17 | 39 | 18 | 32, R, F, Form |
| 53 | 8 | 53 | 19 | 401, 402, 403, 801, 802 | 49 | 19 | 49 | 19 | |
| 54 | 12 | 54 | 24 | 401, 402, 403, 602, LOF, 801, 802 | 49 | 22 | 49 | 24 | |
| 56 | 6 | 56 | 16 | 401, 402, 403, 801, 802 | 50 | 6 | 50 | 10 | F |
| 57 | 11 | 58 | 9 | 401, 402, 403, 602, LOF, 701, 702, 801, 802 | 50 | 16 | 50 | 20 | F |
| 60 | 15 | 60 | 24 | 401, 402, 403, 602, LOF | 51 | 20 | 51 | 24 | F |
| 61 | 15 | 62 | 3 | 401, 402, 403, 602, LOF, 701, 702 | 52 | 5 | 52 | 7 | |
| 62 | 20 | 63 | 7 | 401, 402, 403, 602, LOF, 701, 702 | 54 | 25 | 56 | 2 | R, H, F |
| 107 | 14 | 107 | 22 | | 57 | 4 | 57 | 7 | H, F |
| 109 | 24 | 110 | 9 | 401, 402, 403, LOF | 59 | 1 | 59 | 6 | R, H |
| 110 | 22 | 110 | 24 | 401, 402, 403, LOF | 59 | 21 | 60 | 5 | R |

| Sanghvi, Suketu March 12, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 111 | 7 | 111 | 24 | 401, 402, 403, 602, LOF, 701, 702 | 62 | 4 | 62 | 19 | F |
| 121 | 8 | 121 | 22 | 401, 402, 403, 602, LOF, 701, 702 | 72 | 5 | 72 | 8 | Lay |
| 122 | 20 | 123 | 5 | 401, 402, 403, 602, LOF, 701, 702, Legal | 72 | 12 | 72 | 14 | Lay |
| 126 | 22 | 127 | 9 | | 110 | 25 | 111 | 2 | F |
| 128 | 1 | 128 | 20 | 401, 402, 403, 602, LOF, 701, 702, Legal | 111 | 4 | 111 | 5 | F |
| 135 | 16 | 136 | 3 | 401, 402, 403, 602, LOF | 115 | 25 | 116 | 1 | R, Lay |
| 137 | 23 | 138 | 3 | | 116 | 4 | 116 | 5 | R, Lay |
| 141 | 21 | 142 | 2 | 401, 402, 403, LOF | 116 | 10 | 116 | 16 | R, Lay |
| 142 | 15 | 142 | 22 | 401, 402, 403 | 121 | 23 | 122 | 3 | |
| | | | | | 122 | 5 | 122 | 11 | |
| | | | | | 127 | 10 | 127 | 19 | F, Lay |
| | | | | | 127 | 22 | 127 | 25 | F, Lay |
| | | | | | 139 | 7 | 139 | 14 | |
| | | | | | 176 | 17 | 176 | 25 | 32 |
| | | | | | 177 | 10 | 177 | 13 | 32, H |
| | | | | | 177 | 15 | 178 | 4 | 32, H |
| | | | | | 178 | 6 | 178 | 7 | 32 |
| | | | | | 178 | 10 | 178 | 21 | 32 |
| | | | | | 179 | 16 | 179 | 20 | 32 |
| | | | | | 180 | 4 | 180 | 8 | 32 |
| | | | | | 180 | 10 | 180 | 11 | 32 |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 10 | 21 | 10 | 23 | | 11 | 10 | 11 | 15 | |
| 19 | 9 | 19 | 12 | | 34 | 8 | 34 | 12 | |
| 22 | 7 | 22 | 16 | | 84 | 1 | 84 | 11 | |
| 22 | 25 | 22 | 25 | | 90 | 3 | 90 | 7 | |
| 23 | 2 | 23 | 6 | | 90 | 10 | 90 | 19 | F, S, R, 403 |
| 26 | 9 | 26 | 18 | | 100 | 6 | 100 | 12 | R, 403, 32 |
| 27 | 3 | 27 | 8 | | 100 | 14 | 100 | 25 | R, 403, 32, F, S |
| 35 | 5 | 35 | 20 | 602/LOF, 701/702 | 101 | 2 | 101 | 8 | R, 403, 32, F, S, LAY |
| 35 | 23 | 35 | 25 | 602/LOF, 701/702 | 101 | 11 | 101 | 12 | R, 403, 32, F, S, LAY |
| 40 | 20 | 40 | 24 | | 101 | 14 | 101 | 16 | R, 403, 32, F, S, LAY |
| 42 | 23 | 42 | 25 | 401/402, 403 | 103 | 12 | 103 | 25 | LAY, F, S, R, 403 |
| 43 | 2 | 43 | 5 | 401/402, 403 | 104 | 2 | 104 | 16 | LAY, F, S, R, 403 |
| 43 | 8 | 43 | 10 | 401/402, 403 | 105 | 13 | 105 | 25 | LAY, F, S, R, 403 |
| 44 | 3 | 44 | 13 | 401/402, 403 | 106 | 2 | 106 | 25 | LAY, F, S, R, 403 |
| 46 | 8 | 46 | 11 | | 107 | 4 | 107 | 19 | C, LAY, F, S, R, 403 |
| 46 | 14 | 46 | 22 | | 123 | 14 | 143 | 20 | |
| 47 | 3 | 47 | 14 | 401/402, 403 | 143 | 15 | 143 | 25 | |
| 48 | 4 | 48 | 15 | 401/402, 403 | 144 | 2 | 144 | 9 | 32, R, 403, S, F |
| 50 | 16 | 50 | 16 | 401/402, 403 | 146 | 14 | 146 | 25 | LAY, F, S, R, 403 |
| 50 | 17 | 50 | 25 | 401/402, 403 | 147 | 2 | 147 | 15 | LAY, F, S, R, 403 |
| 51 | 2 | 51 | 2 | 401/402, 403 | 148 | 15 | 148 | 19 | LAY, F, S, R, 403 |
| 53 | 3 | 53 | 12 | 401/402, 403 | 148 | 22 | 148 | 25 | LAY, F, S, R, 403 |
| 69 | 4 | 69 | 17 | 401/402, 403 | 149 | 2 | 149 | 14 | LAY, F, S, R, 403 |
| 69 | 20 | 69 | 23 | 401/402, 403 | 149 | 17 | 149 | 25 | LAY, F, S, R, 403 |
| 69 | 25 | 69 | 25 | 401/402, 403 | 152 | 3 | 152 | 9 | INC, NQP, 32, F, S, R, 403 , LAY |
| 70 | 2 | 70 | 25 | 401/402, 403 | 152 | 12 | 152 | 25 | 32, F, S, R, 403 , LAY |
| 71 | 2 | 71 | 12 | 401/402, 403 | 153 | 2 | 153 | 15 | 32, F, S, R, 403 , LAY |
| 71 | 15 | 71 | 23 | 602/LOF, 801-802 | 154 | 18 | 154 | 24 | 32, F, S, R, 403 , LAY |
| 72 | 17 | 72 | 20 | 401/402, 403, 602/LOF, 801-802 | 155 | 3 | 155 | 25 | 32, F, S, R, 403 , LAY |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 72 | 23 | 72 | 24 | 401/402, 403, 602/LOF, 801-802 | 156 | 2 | 156 | 2 | 32, F, S, R, 403 , LAY |
| 73 | 6 | 73 | 9 | 401/402, 403, 602/LOF, 801-802 | 159 | 17 | 159 | 25 | |
| 73 | 15 | 73 | 25 | 401/402, 403, 602/LOF, 801-802 | 160 | 2 | 160 | 12 | |
| 74 | 12 | 74 | 25 | 401/402, 403, 602/LOF, 801-802 | 161 | 11 | 161 | 15 | 32, F, S, R, 403 , LAY |
| 75 | 2 | 75 | 25 | 401/402, 403, 602/LOF, 801-802 | 161 | 18 | 161 | 23 | 32, F, S, R, 403 , LAY |
| 81 | 24 | 81 | 25 | | 162 | 15 | 162 | 20 | 32, F, S, R, 403 , LAY |
| 82 | 2 | 82 | 23 | | 162 | 22 | 162 | 25 | 32, F, S, R, 403 , LAY |
| 83 | 2 | 83 | 4 | | 163 | 2 | 163 | 2 | 32, F, S, R, 403 , LAY |
| 85 | 13 | 85 | 16 | 401/402, 403, 602/LOF | 176 | 17 | 176 | 21 | LAY, F, S, R, 403 |
| 85 | 19 | 85 | 22 | 401/402, 403, 602/LOF | 176 | 24 | 176 | 25 | LAY, F, S, R, 403 |
| 86 | 23 | 86 | 25 | 401/402, 403, 602/LOF | 177 | 2 | 177 | 7 | LAY, F, S, R, 403 |
| 87 | 2 | 87 | 19 | 401/402, 403, 602/LOF | 177 | 12 | 177 | 18 | LAY, F, S, R, 403 |
| 87 | 23 | 87 | 23 | 401/402, 403, 602/LOF | 177 | 21 | 177 | 25 | LAY, F, S, R, 403 |
| 89 | 17 | 89 | 20 | 401/402, 403, 602/LOF | 178 | 2 | 178 | 6 | LAY, F, S, R, 403 |
| 89 | 23 | 89 | 25 | 401/402, 403, 602/LOF | 179 | 17 | 179 | 22 | LAY, F, S, R, 403 |
| 90 | 22 | 90 | 25 | 401/402, 403, 602/LOF | 179 | 25 | 179 | 25 | LAY, F, S, R, 403 |
| 91 | 4 | 91 | 5 | 401/402, 403, 602/LOF | 180 | 2 | 180 | 23 | LAY, F, S, R, 403 |
| 91 | 8 | 91 | 12 | 401/402, 403, 602/LOF | 189 | 20 | 189 | 25 | LAY, F, S, R, 403 |
| 91 | 17 | 91 | 25 | | 190 | 2 | 190 | 25 | H, LAY, F, S, R, 403 |
| 92 | 2 | 92 | 9 | 401/402, 403, 602/LOF | 191 | 2 | 191 | 11 | LAY, F, S, R, 403 |
| 92 | 12 | 92 | 18 | 401/402, 403, 602/LOF | 199 | 14 | 199 | 23 | |
| 92 | 20 | 92 | 25 | 401/402, 403, 602/LOF, 701/702 | 202 | 6 | 202 | 25 | R, 403, F, S |
| 93 | 4 | 93 | 9 | 401/402, 403, 602/LOF, 701/702 | 203 | 2 | 203 | 3 | R, 403, F, S |
| 93 | 11 | 93 | 21 | 401/402, 403, 701/702 | 206 | 20 | 206 | 25 | 32, F, S, R, 403 |
| 94 | 2 | 94 | 7 | 401/402, 403, 602/LOF, 701/702 | 207 | 2 | 207 | 2 | 32, F, S, R, 403 |
| 94 | 10 | 94 | 13 | 401/402, 403, 602/LOF, 701/702 | 207 | 5 | 207 | 21 | 32, F, S, R, 403 |
| 94 | 17 | 94 | 25 | 401/402, 403, 701/702 | 208 | 2 | 208 | 3 | 32, F, S, R, 403 |
| 95 | 2 | 95 | 6 | 401/402, 403, 701/702 | 210 | 6 | 210 | 9 | 32, F, S, R, 403 , H, LAY |
| 95 | 9 | 95 | 14 | 401/402, 403, 701/702 | 210 | 12 | 210 | 25 | 32, F, S, R, 403 , H, LAY |

| | | | | Vandse, Sunil September 13, 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 95 | 18 | 95 | 25 | 401/402, 403, 701/702 | 211 | 2 | 211 | 8 | 32, F, S, R, 403 , H, LAY |
| 96 | 2 | 96 | 13 | 401/402, 403, 701/702 | 234 | 19 | 234 | 25 | 32, F, S, R, 403 |
| 97 | 5 | 97 | 25 | 401/402, 403, 701/702 | 235 | 2 | 235 | 17 | 32, F, S, R, 403 |
| 98 | 2 | 98 | 3 | 401/402, 403, 701/702 | 240 | 19 | 240 | 20 | F, S, R, 403 |
| 98 | 6 | 98 | 7 | 401/402, 403, 701/702 | 240 | 23 | 240 | 24 | F, S, R, 403 |
| 98 | 9 | 98 | 17 | 401/402, 403, 602/LOF, 701/702 | 241 | 2 | 241 | 8 | F, S, R, 403 |
| 98 | 20 | 98 | 25 | 401/402, 403, 602/LOF, 701/702 | 251 | 22 | 251 | 25 | F, S, R, 403, LAY |
| 99 | 4 | 99 | 12 | 401/402, 403, 602/LOF, 701/702 | 252 | 2 | 252 | 6 | F, S, R, 403, LAY |
| 99 | 14 | 99 | 21 | 401/402, 403, 602/LOF, 701/702 | 252 | 25 | 252 | 25 | F, S, R, 403, LAY |
| 99 | 24 | 99 | 25 | 401/402, 403, 602/LOF, 701/702 | 253 | 2 | 253 | 7 | F, S, R, 403, LAY |
| 100 | 2 | 100 | 4 | 401/402, 403, 602/LOF, 701/702 | 253 | 10 | 253 | 24 | F, S, R, 403, LAY |
| 102 | 12 | 102 | 16 | 401/402, 403, 701/702 | 254 | 4 | 254 | 15 | F, S, R, 403, LAY |
| 102 | 19 | 102 | 20 | 401/402, 403, 701/702 | 270 | 4 | 270 | 9 | FORM, F, S, R, 403, LAY |
| 102 | 22 | 102 | 25 | 401/402, 403, 701/702 | 270 | 13 | 270 | 17 | FORM, F, S, R, 403, LAY |
| 103 | 2 | 103 | 2 | 401/402, 403, 701/702 | 270 | 19 | 270 | 25 | H, LAY, F, S, R, 403 |
| 103 | 3 | 103 | 11 | 401/402, 403, 701/702 | 271 | 2 | 271 | 25 | H, LAY, F, S, R, 403 |
| 104 | 19 | 104 | 24 | 401/402, 403, 701/702 | 272 | 2 | 272 | 24 | FORM, H, LAY, F, S, R, 403 |
| 105 | 3 | 105 | 5 | 401/402, 403, 701/702 | 273 | 3 | 273 | 4 | FORM, H, LAY, F, S, R, 403 |
| 105 | 7 | 105 | 12 | 401/402, 403, 701/702 | | | | | |
| 112 | 15 | 112 | 17 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 112 | 20 | 112 | 24 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 113 | 2 | 113 | 5 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 113 | 16 | 113 | 23 | 401/402, 403, 602/LOF | | | | | |
| 113 | 25 | 113 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 114 | 2 | 114 | 6 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 114 | 9 | 114 | 10 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 115 | 21 | 115 | 25 | | | | | | |
| 116 | 2 | 116 | 3 | | | | | | |
| 118 | 16 | 118 | 19 | | | | | | |

| | | | | Vandse, Sunil September 13, 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 118 | 21 | 118 | 21 | | | | | | |
| 119 | 14 | 119 | 25 | 401/402, 403, 602/LOF | | | | | |
| 120 | 3 | 120 | 12 | 401/402, 403, 602/LOF | | | | | |
| 122 | 11 | 122 | 25 | | | | | | |
| 123 | 3 | 123 | 13 | | | | | | |
| 124 | 2 | 124 | 14 | | | | | | |
| 125 | 15 | 125 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 126 | 2 | 126 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 126 | 6 | 126 | 7 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 127 | 7 | 127 | 25 | | | | | | |
| 128 | 2 | 128 | 9 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 128 | 12 | 128 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 129 | 2 | 129 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 129 | 6 | 129 | 9 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 130 | 19 | 130 | 25 | 701/702 | | | | | |
| 131 | 2 | 131 | 3 | 701/702 | | | | | |
| 131 | 6 | 131 | 11 | 701/702 | | | | | |
| 131 | 14 | 131 | 22 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 131 | 24 | 131 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 132 | 3 | 132 | 12 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 132 | 15 | 132 | 19 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 132 | 21 | 132 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 133 | 2 | 133 | 9 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 133 | 13 | 133 | 24 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 134 | 2 | 134 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 134 | 5 | 134 | 8 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 142 | 17 | 142 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 143 | 2 | 143 | 13 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 144 | 11 | 144 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 145 | 2 | 145 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 146 | 2 | 146 | 3 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 146 | 6 | 146 | 11 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 167 | 21 | 167 | 25 | | | | | | |
| 168 | 2 | 168 | 4 | | | | | | |
| 168 | 14 | 168 | 25 | | | | | | |
| 169 | 2 | 169 | 5 | | | | | | |
| 169 | 21 | 169 | 25 | 602/LOF | | | | | |
| 170 | 2 | 170 | 9 | 602/LOF | | | | | |
| 170 | 12 | 170 | 13 | | | | | | |
| 170 | 15 | 170 | 19 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 170 | 22 | 170 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 171 | 3 | 171 | 15 | | | | | | |
| 175 | 25 | 175 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 176 | 1 | 176 | 13 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 178 | 9 | 178 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 179 | 2 | 179 | 4 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 183 | 13 | 183 | 20 | 401/402, 403, 701/702 | | | | | |
| 183 | 23 | 183 | 24 | 401/402, 403, 701/702 | | | | | |
| 184 | 2 | 184 | 19 | 401/402, 403, 701/702 | | | | | |
| 184 | 22 | 184 | 25 | 401/402, 403, 701/702 | | | | | |
| 185 | 2 | 185 | 4 | 401/402, 403, 701/702 | | | | | |
| 185 | 6 | 185 | 25 | 801/802 | | | | | |
| 186 | 2 | 186 | 25 | 401/402, 403, 602/LOF, 801/802 | | | | | |
| 187 | 2 | 187 | 8 | 401/402, 403, 602/LOF, 701/702, 801/802 | | | | | |
| 187 | 11 | 187 | 17 | | | | | | |
| 187 | 20 | 187 | 25 | | | | | | |
| 188 | 2 | 188 | 4 | | | | | | |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Amneal's Initial Designations** | | | | | **Par's Counter Designations** | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 188 | 8 | 188 | 20 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 188 | 23 | 188 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 189 | 12 | 189 | 19 | 401/402, 403 | | | | | |
| 191 | 12 | 191 | 25 | 401/402, 403, 602/LOF | | | | | |
| 192 | 2 | 192 | 10 | 401/402, 403, 602/LOF | | | | | |
| 192 | 15 | 192 | 17 | 401/402, 403, 602/LOF | | | | | |
| 192 | 20 | 192 | 25 | 401/402, 403, 602/LOF | | | | | |
| 193 | 2 | 193 | 3 | 401/402, 403, 602/LOF | | | | | |
| 193 | 18 | 193 | 21 | 401/402, 403, 602/LOF | | | | | |
| 196 | 14 | 196 | 25 | | | | | | |
| 197 | 2 | 197 | 25 | | | | | | |
| 198 | 1 | 198 | 5 | | | | | | |
| 198 | 15 | 198 | 23 | 401/402, 403, 602/LOF | | | | | |
| 200 | 2 | 200 | 25 | 401/402, 403 | | | | | |
| 201 | 2 | 201 | 25 | 401/402, 403 | | | | | |
| 202 | 2 | 202 | 5 | | | | | | |
| 203 | 4 | 203 | 25 | 401/402, 403, P, AA | | | | | |
| 204 | 2 | 204 | 18 | 401/402, 403, NR, AA | | | | | |
| 205 | 2 | 205 | 5 | 401/402, 403, MC | | | | | |
| 205 | 8 | 205 | 12 | 401/402, 403, MC | | | | | |
| 208 | 5 | 208 | 25 | | | | | | |
| 209 | 2 | 209 | 10 | | | | | | |
| 209 | 13 | 209 | 25 | | | | | | |
| 210 | 2 | 210 | 5 | 401/402, 403 | | | | | |
| 211 | 11 | 211 | 25 | 401/402, 403, P, AA | | | | | |
| 212 | 2 | 212 | 3 | 401/402, 403, P, AA | | | | | |
| 212 | 5 | 212 | 11 | 401/402, 403, P, AA | | | | | |
| 212 | 13 | 212 | 19 | 401/402, 403 | | | | | |
| 238 | 5 | 238 | 15 | 401/402, 403, 602/LOF | | | | | |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | | Par's Counter Designations | | | | |
| Start Page | Start Line | End Page | End Line | Par's Objections | Start Page | Start Line | End Page | End Line | Amneal's Objections |
| 239 | 4 | 239 | 9 | 401/402, 403, 602/LOF | | | | | |
| 240 | 7 | 240 | 18 | 401/402, 403, 602/LOF | | | | | |
| 241 | 10 | 241 | 20 | 401/402, 403, 602/LOF | | | | | |
| 241 | 23 | 241 | 25 | | | | | | |
| 242 | 2 | 242 | 25 | | | | | | |
| 243 | 2 | 243 | 22 | 401/402, 403, 602/LOF | | | | | |
| 247 | 4 | 247 | 25 | | | | | | |
| 248 | 2 | 248 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 249 | 1 | 249 | 13 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 249 | 16 | 249 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 250 | 2 | 250 | 6 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 250 | 9 | 250 | 10 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 250 | 22 | 250 | 25 | | | | | | |
| 251 | 2 | 251 | 21 | 401/402, 403, 602/LOF | | | | | |
| 252 | 7 | 252 | 23 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 254 | 16 | 254 | 22 | 401/402, 403, 602/LOF | | | | | |
| 255 | 12 | 255 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 256 | 2 | 256 | 5 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 256 | 8 | 256 | 18 | 401/402, 403 | | | | | |
| 258 | 19 | 258 | 25 | 401/402, 403 | | | | | |
| 260 | 2 | 260 | 25 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 261 | 2 | 261 | 2 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 261 | 5 | 261 | 6 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 261 | 8 | 261 | 14 | 401/402, 403, 602/LOF, 701/702 | | | | | |
| 264 | 5 | 264 | 10 | 401/402, 403, 602/LOF, Legal | | | | | |
| 264 | 13 | 264 | 13 | 401/402, 403, 602/LOF, Legal | | | | | |
| 266 | 11 | 266 | 25 | 401/402, 403, 602/LOF | | | | | |
| 267 | 2 | 267 | 7 | 401/402, 403, 602/LOF, Legal | | | | | |
| 267 | 10 | 267 | 11 | 401/402, 403, 602/LOF, Legal | | | | | |

| Vandse, Sunil September 13, 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Amneal's Initial Designations | | | | Par's Objections | Par's Counter Designations | | | | Amneal's Objections |
| Start Page | Start Line | End Page | End Line | | Start Page | Start Line | End Page | End Line | |
| 267 | 13 | 267 | 25 | 401/402, 403, 602/LOF, Legal | | | | | |
| 268 | 3 | 268 | 13 | 401/402, 403, 602/LOF, Legal | | | | | |
| *Par objects to all designated testimony for this witness pursuant to Fed. R. Evid. 801, 802, and 804, and Fed. R. Civ. P. 45 as the witness is within the subpoena power of the District of Delaware and Amneal has not demonstrated the witness is unavailable. | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| colspan="10" | **Vandse, Sunil**<br>**July 31, 2020** |
| colspan="4" | **Amneal's Initial Designations** | |  | **Par's Counter Designations** | | |
| Start Page | Start Line | End Page | End Line | **Par's Objections** | Start Page | Start Line | End Page | End Line | **Amneal's Objections** |
| 50 | 24 | 51 | 2 | 401/402, 403, 602/LOF, 701-702 | 8 | 22 | 9 | 7 | |
| 51 | 5 | 51 | 8 | 401/402, 403, 602/LOF, 701-702 | 9 | 15 | 11 | 16 | |
| 52 | 14 | 52 | 16 | 401/402, 403, 602/LOF, 701-702 | 12 | 10 | 12 | 16 | |
| 52 | 18 | 52 | 23 | 401/402, 403, 602/LOF, 701-702 | 51 | 13 | 52 | 7 | |
| 53 | 2 | 53 | 21 | 401/402, 403, 602/LOF, 701-702 | 52 | 10 | 52 | 11 | |
| 96 | 14 | 98 | 5 | | 99 | 10 | 99 | 22 | |
| 99 | 23 | 100 | 3 | | 100 | 4 | 100 | 7 | |
| 100 | 10 | 102 | 9 | 401/402, 403 | 153 | 3 | 153 | 17 | H |
| 144 | 3 | 145 | 3 | | 154 | 2 | 154 | 22 | F |
| 152 | 20 | 153 | 2 | 401/402, 403, 602/LOF, 701-702 | 164 | 24 | 165 | 17 | 32 |
| 153 | 18 | 153 | 25 | 401/402, 403, 602/LOF, 701-702 | 179 | 7 | 179 | 25 | 32 |
| 154 | 23 | 155 | 11 | 401/402, 403, 602/LOF, 701-702 | 180 | 21 | 182 | 12 | 32 |
| | | | | | 182 | 18 | 185 | 8 | 32, H |
| | | | | | 185 | 11 | 185 | 18 | 32, H |
| | | | | | 185 | 21 | 188 | 10 | 32, H |
| | | | | | 188 | 13 | 188 | 20 | 32, H |
| | | | | | 188 | 23 | 189 | 14 | 32, H |
| | | | | | 189 | 16 | 190 | 13 | 32, H, Lay |
| | | | | | 190 | 16 | 191 | 4 | 32, H, Lay |
| | | | | | 191 | 25 | 192 | 7 | 32, H, Lay |
| | | | | | 192 | 9 | 192 | 11 | 32, H, Lay |
| | | | | | 195 | 16 | 196 | 2 | 32 |
| | | | | | | | | | |
|  | *Par objects to all designated testimony for this witness pursuant to Fed. R. Evid. 801, 802, and 804, and Fed. R. Civ. P. 45 as the witness is within the subpoena power of the District of Delaware and Amneal has not demonstrated the witness is unavailable. |

| Par's Objection Key | |
|---|---|
| Code | Objection |
| 106 | partial document/lacks context (FRE 106) |
| 401/402 | lacks relevance (FRE 401/402) |
| 403 | unduly prejudicial/confusing/waste of time (FRE 403) |
| 501/502 | Privilege/Work Product (FRE 501/502) |
| 602/LOF | lacks foundation/speculative (FRE 602) |
| 701/702 | improper opinion (FRE 701/702) |
| 801-802 | hearsay (FRE 802) |
| 901/902 | lacks authenticity (FRE 901/902) |
| 1002 | original document required (FRE 1002) |
| 1003 | incomplete/illegible (FRE 1003) |
| 1006 | improper summary (FRE 1006) |
| ID | insufficient/incorrect description |
| L | late/not produced |
| AA | attorney argument improperly offered as evidence; contains counsel colloquy or objections |
| C | compound |
| Legal | calls for a legal conclusion |
| Leading | leading question of a non-hostile witness |
| MC | Mischaracterizes/misstates witness's testimony |
| NR | nonresponsive |
| PMIL | Subject of pending motion in limine |
| P | privilege |
| OS | beyond the scope |
| V | Vague and/or ambiguous |

| Amneal's Objection Key | |
|---|---|
| **Code** | **Objection** |
| R | Fed. R. Evid. 401 and 402. Relevance. |
| 403 | Fed. R. Evid. 403. Any relevance substantially outweighed by confusion, prejudice, or waste of time. |
| AF | Assumes facts not in evidence. |
| C | Attorney colloquy or objection. |
| Form | E.g., vague, compound, argumentative, asked and answered, misstates, leading. |
| F | Fed. R. Evid. 602. Lack of foundation. |
| H | Fed. R. Evid. 801 & 802. Hearsay |
| Inc | Incomplete. |
| Lay | Fed. R. Evid. 701. Lay opinion testimony. |
| NA | No answer. |
| NQP | No question posed. |
| NR | Non-responsive. Witness's answer not responsive to the question asked. |
| NS | Nonsensical. |
| S | Speculation |
| 32 | Fed. R. Civ. Pro. 32. Improper Counter Designation. |
| OS | beyond the scope |

EXHIBIT 13

EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | **C.A. No. 18-cv-2032-CFC-CJB (Consolidated)**<br><br>██████████████ |

## BRIEF STATEMENT OF WHAT PLAINTIFFS INTEND TO PROVE

Pursuant to Local Rule 16.3(c)(8), Plaintiffs Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (collectively "Par" or "Plaintiffs") submit the following brief statement of the principal matters Plaintiffs intend to prove at trial. This statement is not exhaustive, and Plaintiffs reserve the right to prove any matter identified in its pleadings, discovery responses, expert reports, and the accompanying statement of issues of facts and issues of law that remain to be litigated at trial. Plaintiffs may also provide additional proof to rebut any proof offered by Defendants before and during trial, in response to rulings by the Court, or for other good cause. Plaintiffs reserve the

1

EXHIBIT 13

right to modify or amend this Statement to the extent necessary to reflect any

future rulings by the Court, to supplement or amend this Statement to fairly

respond to any new issues that Defendants may raise, to address any new discovery

produced by Amneal, or to address any further amendments to Amneal's ANDAs.

Plaintiffs incorporate by reference their expert reports in support of any proof to be

presented by expert testimony.

## I.    ISSUES ON WHICH PLAINTIFFS BEAR THE BURDEN OF PROOF

1.      On June 9, 2021, Judge Connolly severed issues of infringement from

the July 7, 2021 trial, such that Par's allegations of infringement will be tried, if

necessary, at a later date to be determined.  Accordingly, Par will set forth its

statement of what it intends to prove with respect to Amneal's infringement of the

Asserted Patents, the relief Par seeks to address Amneal's infringement, and the

exceptional nature the case against Amneal at the appropriate time.

## II.   ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF

### A.    Invalidity

2.      Amneal bears the burden of proof by clear and convincing evidence

on the invalidity of the Asserted Claims of the '209 and '785 patents.  Amneal

cannot meet that burden with respect to any Asserted Claim.

3.      Par will show that Amneal has not met that burden of proof with

respect to any of its asserted grounds of invalidity.  Par will, to the extent

EXHIBIT 13

necessary, introduce evidence to rebut each of Amneal's invalidity contentions, which include anticipation, obviousness, lack of written description, and lack of enablement.

4.      Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim is invalid as anticipated.

5.      Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim is invalid as anticipated by the prior sale and public use of Original VASOSTRICT with its prescribing information.

6.      Par will show that Amneal has failed to demonstrate that any Original VASOSTRICT product that was on sale or in public use before the effective filing date of the Asserted Claims satisfied every limitation of any Asserted Claim.

7.      Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim is invalid as obvious.

8.      Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim is invalid as obvious in view of any of the following grounds:

| Patent | Claims | Obviousness Grounds |
|---|---|---|
| '209 patent | 1-2, 4-8 | Obvious over PITRESSIN, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of Gahart and/or Russell 2008 and the general knowledge in the art |

EXHIBIT 13

| Patent | Claims | Obviousness Grounds |
|--------|--------|---------------------|
| '785 Patent | 1, 5, 8 | Obvious over PITRESSIN, Original VASOSTRICT, Luitpold (American Regent) Vasopressin Product, and/or the Lithuanian Patent in view of Bi 1999, and in further view of the general knowledge in the art |

9.     Par will show that Amneal has failed to demonstrate that any prior art alone or in combination with other prior art and/or in view of the knowledge of a POSA would have rendered obvious the claimed inventions of the Asserted Patents.  Par will show the significant differences between the prior art and the claimed inventions.  Par will also show that Amneal has failed to demonstrate any motivation for a POSA to have thought of either combining two or more references or modifying one reference to achieve the claimed inventions in the manner that Amneal proposes.  Par will further establish that the prior art taught away from the claimed pH 3.7-3.9 range, and will show the criticality of claimed pH range over the prior art pH ranges.  Additionally, Par will show that Amneal has failed to demonstrate that a POSA would have had a reasonable expectation of success in achieving the claimed inventions.

10.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim is invalid as obvious over the prior sale and public use of Original VASOSTRICT with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

EXHIBIT 13

11.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '209 patent is invalid as obvious over the prior sale and public use of PITRESSIN with its prescribing information in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

12.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '785 patent is invalid as obvious over the prior sale and public use of PITRESSIN with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

13.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '209 patent is invalid as obvious over the prior sale and public use of Luitpold (American Regent) Vasopressin Product with its prescribing information in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

14.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '785 patent is invalid as obvious over the prior sale and public use of Luitpold (American Regent)

EXHIBIT 13

Vasopressin Product with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

15.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '209 patent is invalid as obvious over the Lithuanian Patent in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

16.     Par will show that Amneal has failed to demonstrate by clear and convincing evidence that any Asserted Claim of the '785 patent is invalid as obvious over the Lithuanian Patent in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

17.     In its Statement of Intended Proof, Amneal contends that it "will prove that [the Asserted Claims] are invalid as obvious over the April 2014 Vasostrict® Label in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time."  Pretrial Order Ex. 14 ¶¶ 7, 21.  Par objects to this obviousness ground because: (1) Amneal did not identify the April 2014 VASOSTRICT Label when, pursuant to the parties' agreement to narrow the scope of discovery, it identified its narrowed list of lead obviousness references; and (2) it is outside of the scope of invalidity opinions

EXHIBIT 13

expressed by Amneal's expert.  For at least these reasons, Amneal and its

invalidity expert should be precluded from raising this obviousness ground at trial.

18.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of adequate written

description.

19.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of adequate written

description of the full scope of the claimed compositions.

20.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of adequate written

description because a POSA would not understand the patentees of the '209 and

'785 patents to be in possession of the "from about 85% to about 100% sequence

homology to SEQ ID NO.: 1" limitation.

21.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of enablement.

22.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of enablement of

the full scope of the claimed compositions.

23.     Par will show that Amneal has failed to demonstrate by clear and

convincing evidence that any Asserted Claim is invalid for lack of enablement

EXHIBIT 13

because a POSA would not understand how to practice the "from about 85% to about 100% sequence homology to SEQ ID NO.: 1" limitation.

24.     Thus, with respect to each of Amneal's invalidity allegations, Par will show that Amneal has failed to satisfy its burden of proving invalidity by clear and convincing evidence.

### B.     Inequitable Conduct

25.     Amneal has failed to prove by clear and convincing evidence that any Asserted Claim of the patents-in-suit is unenforceable.

26.     Par will demonstrate that Amneal has not met its burden in proving that Vinayagam Kannan, Craig Kenesky, and/or Michelle Bonomi-Huvala committed inequitable conduct during the prosecution of U.S. Patent No. 9,744,239 (the "'239 patent").

27.     Par will demonstrate that Amneal has not met its burden in proving that Vinayagam Kannan, Craig Kenesky, and/or Michelle Bonomi-Huvala committed affirmative egregious misconduct through submission of declarations to the U.S. Patent & Trademark Office ("PTO") during the prosecution of the '239 patent.

28.     Par will demonstrate that Amneal has not met its burden in proving that the Kannan and Bonomi-Huvala declarations are material to patentability.

EXHIBIT 13

29.      Par will demonstrate that Amneal has not met its burden in proving that the Kannan and Bonomi-Huvala declarations were submitted with specific intent to deceive the PTO.

30.      Par will demonstrate that Amneal has not met its burden in proving that Vinayagam Kannan, Craig Kenesky, and/or Michelle Bonomi-Huvala acted with the specific intent to mislead or deceive the PTO.

31.      Par will demonstrate that Amneal has not met its burden in proving that the April 2014 VASOSTRICT Label was material to the patentability of the Asserted Patents or related patents.

32.      Par will demonstrate that Amneal has not met its burden in proving that the Asserted Patents are unenforceable under the doctrine of infectious unenforceability.

33.      Par will demonstrate that Amneal has not met its burden in proving that the Asserted Patents are unenforceable as a result of alleged non-disclosure of the properties of the prior art PITRESSIN product.

34.      Par will demonstrate that Amneal has not met its burden in proving that the information allegedly not disclosed to the PTO by the named inventors regarding the prior art PITRESSIN product was material to the patentability of the Asserted Patents.

EXHIBIT 13

35.     Par will demonstrate that Amneal has not met its burden in proving that the named inventors failed to disclose the prior art PITRESSIN product with specific intent to deceive the PTO.

36.     Par will demonstrate that Amneal has not met its burden in proving that the named inventors withheld or misrepresented information relevant to the criticality of the pH limitations of the Asserted Patents or related patents, that such alleged non-disclosure was but-for material to the patentability of the Asserted Patents or related patents, or that such alleged non-disclosure was conducted with the specific intent to deceive the PTO.[1]

37.     Par will demonstrate that Amneal has not met its burden in proving that the Asserted Patents are unenforceable based on submitting the pH declarations to the PTO during prosecution of the Asserted Patents and related patents.

**C.     Exceptional Case**

38.     Par will demonstrate that Amneal has not met its burden in proving that this is an exceptional case under 35 U.S.C. § 285, such that Defendants should not be awarded attorneys' fees.

---

[1] Amneal has provided no statement of fact and no expert testimony with respect to its statements of intended proof at Paragraphs 44-48 of Exhibit 14 to this Pretrial Order, and thus cannot meet its burden of proof with respect to those paragraphs.

EXHIBIT 13

**D.      Other Affirmative Defenses and Counterclaims**

39.      Par will, to the extent necessary, introduce evidence to rebut any other

affirmative defenses and counterclaims presented by Amneal.

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., PAR STERILE PRODUCTS, LLC and ENDO PAR INNOVATION COMPANY, LLC,<br><br>Plaintiffs,<br>v.<br><br>AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, et al.<br><br>Defendants. | C.A. No. 18-cv-2032-CFC-CJB (Consolidated)<br><br>██████████ |

## DEFENDANTS' STATEMENT OF INTENDED PROOF

Pursuant to Local Rule 16.3(c)(9), Defendants Amneal EU, Limited, Amneal Pharmaceuticals of New York, LLC, Amneal Biosciences LLC, and Amneal Pharmaceutical Pvt. Ltd. ("Defendants" or "Amneal") (collectively, "Amneal") respectfully submits the following brief statement of what it intends to prove at trial. Amneal may prove the matters set forth in its pleadings, contentions, written discovery responses, experts' reports, and experts' depositions. In addition, in support of such proofs, Amneal may provide background testimony in connection with such proofs. Amneal also intends to offer proof on the issues of fact and law identified in this Pretrial Order as well as proof to rebut items on which Plaintiffs Par Pharmaceuticals, Inc., Par Sterile Product, LLC., and Endo Par Innovation Co., LLC (collectively, "Plaintiffs") offer proof.

In this action, Plaintiffs are currently asserting U.S. Patent No. 9,744,209 ("the '209 patent") and U.S. Patent No. 9,750,785 ("the '785 patent") (collectively, the "Patents-in-Suit").[1]  Specifically, Plaintiffs are asserting claims 1-8 of the '209 patent and claims 1, 5, and 8 of the '785 patent (the "Asserted Claims").

---

[1] The Patents-in-Suit name two common inventors and share a common chain of priority to U.S. Patent No. 9,744,239 ("the '239 patent"), and therefore may be referred to as "the '239 family." Each of these patents also claims priority to U.S. Application 14/610,499. Par has not disputed that the Patents-in-Suit are not entitled to priority dates earlier than their own filing dates, based on their claims of priority to the '239 patent and '499 application.

Amneal's following statement is based, in relevant part, on its current understanding of Plaintiffs' positions and the prior proceedings in this litigation. Amneal reserves the right to amend or supplement this statement to fairly respond to any new positions or evidence Plaintiffs raise or any future ruling of this Court. Amneal expressly reserves the right to amend or supplement this statement in response to Plaintiffs' Pretrial Order submissions, pretrial proceedings, trial proceedings, or post-trial briefing.

To the extent Amneal asserts that Plaintiffs have failed to meet their burden of proof on any issue, such statement does not constitute an admission that Amneal has any obligation to prove or disprove any element or any part of any claim or defense on which Plaintiffs bear the burden of proof or production. Amneal does not assume the burden of proof or production as to any matter set forth below unless required to do so by law.

In addition to the below statement, Amneal incorporates by reference its experts' reports regarding those matters to be proved by or in part by expert testimony.

## I.    CONSTRUCTION OF THE ASSERTED CLAIMS

1.    Amneal will prove that a person of ordinary skill in the art (POSA) would have understood that the plain and ordinary meaning of "a pH of 3.7-3.9"

would exclude any pH value below 3.7 or above 3.9 in view of the intrinsic evidence.

## II.  NONINFRINGEMENT

2.    Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that the submission of Amneal's ANDA Nos. 212944 and 212945 to the FDA constitutes infringement of the Patents-in-Suit pursuant to 35 U.S.C. § 271(e)(2).

3.     Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that, if Amneal's ANDA Nos. 212944 and 212945 were to be approved by the FDA, the manufacture, use, offer for sale, sale, or importation of the drug products that are the subject of these ANDAs would constitute direct infringement of any of the Asserted Claims by Amneal.

4.    Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that, if Amneal's ANDA Nos. 212944 and 212945 were to be approved by the FDA, the manufacture, use, offer for sale, sale, or importation of the drug products that are the subject of these ANDAs would constitute direct infringement of any of the Asserted Claims by any third parties.

5.     Amneal will show that, to the extent Plaintiffs prove direct infringement of the Asserted Claims by a third party (rather than by Amneal),

Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that, if Amneal's ANDA Nos. 212944 and 212945 were to be approved by the FDA, Amneal will actively induce infringement of any of the Asserted Claims of the Patents-in-Suit.

### A.   '209 Patent

6.       Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that the drug products that are the subject of Amneal's ANDA Nos. 212944 and 212945 will, if approved, literally meet the pH limitation of claims 1-8 of the '209 patent.

7.       Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that the use of the drug products that are the subject of Amneal's ANDA Nos. 212944 and 212945 will, if approved, literally infringe claims 1-8 of the '209 patent.

8.       Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that Amneal has the specific intent to induce others to literally infringe claims 1-8 of the '209 patent using the drugs that are the subject of Amneal's ANDA Nos. 212944 and 212945, if approved.

### B.   '785 Patent

9.       Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that the drug products that are the

subject of Amneal's ANDA Nos. 212944 and 212945 will, if approved, literally meet the pH limitation of claims 1, 5, and 8 of the '785 patent.

10.    Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that the use of the drug products that are the subject of Amneal's ANDA Nos. 212944 and 212945 will, if approved, literally infringe claims 1, 5, and 8 of the '785 patent.

11.    Amneal will show that Plaintiffs cannot satisfy their burden of proving by a preponderance of the evidence that Amneal has the specific intent to induce others to literally infringe claims 1, 5, and 8 of the '785 patent using the drugs that are the subject of Amneal's ANDA Nos. 212944 and 212945, if approved.

## III.    INVALIDITY

### A.    '209 Patent

12.    Amneal will prove by clear and convincing evidence that claims 1-8 of the '209 patent are invalid as anticipated.

13.    Amneal will prove by clear and convincing evidence that claims 1-8 of the '209 patent are invalid because the claimed inventions would have been obvious to a POSA as of the effective filing date of that claim, in light of the scope and content of the prior art, the differences between the claim and the prior art, and the level of ordinary skill in the art at the time.

14.     Specifically, Amneal will prove by clear and convincing evidence that claims 1-8 of the '209 patent are invalid as obvious in light of various combinations of prior art references and/or the knowledge and skill in the art as of the effective filing date of that claim.  Amneal will prove by clear and convincing evidence that the combinations of these prior art references disclose, either expressly or inherently, every limitation of claims 1-8 of the '209 patent, that a POSA would have had a reasonable motivation to combine the teachings of the references to obtain the subject matter of those claims, and that a POSA would have had a reasonable expectation of success.

15.     Amneal will prove that claims 1-8 of the '209 patent are invalid as anticipated by the prior sale and public use of Original Vasostrict® with its prescribing information, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

16.     Amneal will prove that claims 1-8 of the '209 patent are invalid as obvious over the prior sale and public use of Original Vasostrict® with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

17.     Amneal will prove that claims 1-8 of the '209 patent are invalid as obvious over the April 2014 Vasostrict® Label in view of Bi 1999, in light of the

full scope and content of the prior art and the level of ordinary skill in the art at the
time.

18.     Amneal will prove that claims 1-8 of the '209 patent are invalid as
obvious over the prior sale and public use of Pitressin® with its prescribing
information in view of Bi 1999, Gahart, and/or Russell 2008, in light of the full
scope and content of the prior art and the level of ordinary skill in the art at the
time.

19.     Amneal will prove that claims 1-8 of the '209 patent are invalid as
obvious over the prior sale and public use of American Regent Vasopressin
Injection with its prescribing information in view of Bi 1999, Gahart, and/or
Russell 2008, in light of the full scope and content of the prior art and the level of
ordinary skill in the art at the time.

20.     Amneal will prove that claims 1-8 of the '209 patent are invalid as
obvious over LT '487 in view of Bi 1999, Gahart, and/or Russell 2008, in light of
the full scope and content of the prior art and the level of ordinary skill in the art at
the time

21.     The specific obviousness combinations listed above do not include the
background references Amneal may rely on for establishing the state of the art,
motivation, or expectation of success.  Amneal may rely on additional references
to establish the state of the art, motivation, or expectation of success.  Amneal may

also rely on additional references to rebut non-obviousness arguments raised by Plaintiffs.  Amneal may also rely on any obviousness combination disclosed in its experts' reports.

22.     Amneal will prove by clear and convincing evidence that claims 1-8 of the '209 patent are invalid for lack of adequate written description.

23.     Amneal will prove that claims 1-8 of the '209 patent are invalid for lack of adequate written description of the full scope of the claimed compositions.

24.     Amneal will prove by clear and convincing evidence that claims 1-8 of the '209 patent are invalid for lack of enablement.

25.     Amneal will prove that claims 1-8 of the '209 patent are invalid for lacking enablement of the full scope of the claimed compositions.

**B.     '785 Patent**

26.     Amneal will prove by clear and convincing evidence that claims 1, 5, and 8 of the '785 patent are invalid as anticipated.

27.     Amneal will prove by clear and convincing evidence that claims 1, 5, and 8 of the '785 patent are invalid because the claimed inventions would have been obvious to a POSA as of the effective filing date of that claim, in light of the scope and content of the prior art, the differences between the claim and the prior art, and the level of ordinary skill in the art at the time.

28.      Specifically, Amneal will prove by clear and convincing evidence that claims 1, 5, and 8 of the '785 patent are invalid as obvious in light of various combinations of prior art references and/or the knowledge and skill in the art as of the effective filing date of that claim.  Amneal will prove by clear and convincing evidence that the combinations of these prior art references disclose, expressly or inherently, every limitation of claims 1, 5, and 8 of the '785 patent, that a POSA would have had a reasonable motivation to combine the teachings of the references to obtain the subject matter of those claims, and that a POSA would have had a reasonable expectation of success.

29.      Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as anticipated by the prior sale and public use of Original Vasostrict® with its prescribing information.

30.      Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as obvious over the prior sale and public use of Original Vasostrict® with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

31.      Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as obvious over the April 2014 Vasostrict® Label in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

10

32.     Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as obvious over the prior sale and public use of Pitressin® with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

33.     Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as obvious over the prior sale and public use of American Regent Vasopressin Injection with its prescribing information in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

34.     Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid as obvious over LT '487 in view of Bi 1999, in light of the full scope and content of the prior art and the level of ordinary skill in the art at the time.

35.     The specific obviousness combinations listed above do not include the background references Amneal may rely on for establishing the state of the art, motivation, or expectation of success.  Amneal may rely on additional references to establish the state of the art, motivation, or expectation of success.  Amneal may also rely on additional references to rebut non-obviousness arguments raised by Plaintiffs.  Amneal may also rely on any obviousness combination disclosed in its experts' reports.

36.     Amneal will prove by clear and convincing evidence that claims 1, 5, and 8 of the '785 patent are invalid for lack of adequate written description.

37.     Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid for lack of adequate written description of the full scope of the claimed compositions.

38.     Amneal will prove by clear and convincing evidence that claims 1, 5, and 8 of the '785 patent are invalid for lack of enablement.

39.     Amneal will prove that claims 1, 5, and 8 of the '785 patent are invalid for lacking enablement of the full scope of the claimed compositions.

## IV.    INEQUITABLE CONDUCT

40.     Amneal will prove that Vinayagam Kannan, Craig Kenesky, and Michelle Bonomi-Huvala committed inequitable conduct during the prosecution of U.S. Patent No. 9,744,239 ("the '239 patent"), which renders that patent unenforceable.

41.     Amneal will prove that Vinayagam Kannan, Craig Kenesky, and Michelle Bonomi-Huvala committed affirmative egregious misconduct through submission of false declarations to the U.S. Patent & Trademark Office ("PTO") during the prosecution of the '239 patent.

42.     Specifically, facing an anticipation and obviousness rejection by the Examiner over the prior art April 2014 Vasostrict® Label, the declarations falsely

represented to the Examiner that the named inventors of the '239 patent Vinayagam Kannan and Matthew Kenney-invented the subject matter set forth in the April 2014 Vasostrict® Label relied on by the Examiner, and that the named inventors had provided that subject matter to Par's Regulatory Group for submission to the FDA.

43.     Based on the false representations, Par's prosecution counsel Craig Kenesky asked the Examiner to remove the April 2014 Vasostrict® Label from her consideration as prior art pursuant to Title 35, Section 102(b)(l)(A) of the America Invents Act.

44.     Amneal will prove that the named inventors did not in fact invent the subject matter set forth in the April 2014 Vasostrict® Label, and that the declarants and Mr. Kenesky knew that the named inventors did not in fact invent the subject matter set forth in the April 2014 Vasostrict® Label.

45.     Amneal will prove that the Examiner accepted the false representations set forth in the Kannan and Bonomi-Huvala declarations, and as a result, the Examiner proceeded to remove the April 2014 Vasostrict® Label from her consideration as prior art and withdrew her anticipation and obviousness rejections based on that reference.

46.     Par does not dispute that the April 2014 Vasostrict® Label is prior art to the '239 patent or the Patents-in-Suit.

47.    The unmistakably false Kannan and Bonomi-Huvala declarations are presumed to be material and submitted with intent to deceive.  However, to the extent necessary, Amneal will prove that the submission of the false declarations during the prosecution of the '239 patent, and the Examiner's subsequent withdrawal of her anticipation rejection based on the April 2014 Vasostrict® Label, were material to the patentability of the patent.

48.    Further, to the extent necessary, Amneal will prove that Vinayagam Kannan, Craig Kenesky, and Michelle Bonomi-Huvala submitted the false declarations with the specific intent to mislead or deceive the PTO.

49.    Amneal will prove that the Patents-in-Suit, which are continuations-in-part of the '239 patent, are also unenforceable due to the inequitable conduct committed during the prosecution of the '239 patent, under the doctrine of infectious unenforceability.

50.    Amneal will prove that the Patents-in-Suit are also unenforceable because the named inventors committed inequitable conduct by withholding information regarding the prior art Pitressin® product from the PTO.

51.    Amneal will prove that the information withheld from the PTO by the named inventors regarding the prior art Pitressin® product was material to the patentability of the Patents-in-Suit.

14

52.     Amneal will prove that the named inventors withheld the information regarding the prior art Pitressin® product from the PTO with specific intent to mislead or deceive the PTO.

53.     Amneal will prove that the Patents-in-Suit are further unenforceable because the named inventors committed inequitable conduct by intentionally withholding and misrepresenting information relevant to their assertions of criticality of the pH limitations set forth in the claims of the '239 patent and the Patents-in-Suit.

54.     Specifically, the named inventors only secured the issuance of the '239 patent and the Patents-in-Suit by submitting a series of declarations during prosecution alleging that three distinct pH values and ranges (*i.e.*, 3.5-4.1, 3.7-3.9, and 3.8) are critical to stability of vasopressin formulations, and therefore are nonobvious.

55.     Amneal will prove that the named inventors misrepresented to the PTO that the stability data for their vasopressin formulations demonstrated the criticality of the claimed pH values and ranges.

56.     Amneal will prove that the inventors' misrepresentations regarding the alleged criticality of the claimed pH values and ranges was material to the patentability of the Patents-in-Suit.

57.     Amneal will prove that the named inventors misrepresented the criticality of the claimed pH values with specific intent to mislead or deceive the PTO.

## V.     REMEDIES

58.     Amneal will show that it is entitled to judgment that it has not infringed any of the Patents-in-Suit and that the Asserted Claims are invalid and unenforceable.

59.     Amneal will show that Plaintiffs are not entitled to an order, pursuant to 35 U.S.C. § 271(e)(4)(A), that the effective date of any approval of Amneal's ANDA Nos. 212944 and 212945 shall not be earlier than the last expiration date of the Patents-in-Suit.

60.     Amneal will show that Plaintiffs are not entitled to injunctive relief and cannot satisfy their burden for obtaining an injunction. Amneal may introduce evidence to rebut any assertion by Plaintiffs that they are entitled to injunctive relief.

61.     Amneal will show that Plaintiffs are not entitled to judgment against Amneal for infringement of any Asserted Claim. Amneal may introduce evidence to rebut any assertion by Plaintiffs that they are entitled to judgment against Amneal for infringement of any Asserted Claim.

62.     Amneal will show that Plaintiffs are not entitled to damages or other monetary relief.  Amneal may introduce evidence to rebut any assertion by Plaintiffs that they are asserted to damages or other monetary relief.

63.     Amneal will show that this case is exceptional under 35 U.S.C. § 285 and the Court should award reasonable attorney fees to Amneal.

64.     Amneal will show that the Court should award costs to Amneal.

65.     Amneal will show that Plaintiffs are not entitled to costs or attorney fees.