Exhibit 1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3
         PAR PHARMACEUTICAL,          :   CIVIL ACTION
 4       INC.,PAR STERILE PRODUCTS,   :
         LLC,and ENDO PAR INNOVATION   :
 5       COMPANY,                      :
                      Plaintiffs,      :
 6                                     :
                                       :
 7           vs.                       :
                                       :
 8       EAGLE PHARMACEUTICALS INC.,   :
                                       :   NO. 18-823-CFC-JLH
 9                 Defendant.          :   (Consolidated)
         --------------------------    :
10       PAR PHARMACEUTICAL, INC.,     :   CIVIL ACTION
         PAR STERILE PRODUCTS, LLC,    :
11       and ENDO PAR INNOVATION       :
         COMPANY, LLC,                 :
12                                     :
                      Plaintiffs,      :
13                                     :
             vs.                       :
14                                     :
         AMNEAL PHARMACEUTICALS OF     :
15       NEW YORK, LLC, et al.,        :
                                       :
16                 Defendants.         :   NO. 18-2032-CFC-CJB

17                              -  -  -

18                                 Wilmington, Delaware
19                                 Wednesday, June 9, 2021
                                   2:00 o'clock, p.m.
20                                 Telephone conference

21                              -  -  -

22       BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

23                              -  -  -

24
                                   Valerie J. Gunning
25                                 Official Court Reporter
```

```
 1    APPEARANCES:

 2
              FARNAN LLP
 3            BY:  BRIAN E. FARNAN, ESQ.

 4
                      -and-
 5

 6         DECHERT LLP
           BY:  MARTIN J. BLACK, ESQ.,
 7              GOLDBERG, ESQ. and
                ROBERT D. RHOAD, ESQ.
 8              (Philadelphia, Pennsylvania)

 9

10              Counsel for Plaintiffs
                Par Pharmaceutical, Inc., Par Sterile
11              Products, LLC, and Endo Par Innovation
                Company, LLC

12

13
              YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
14            BY:  ANNE SHEA GAZA, ESQ.

15
                      -and-
16

17            GOODWIN PROCTER LLP
              BY: HUIYA WU, ESQ.,
18                JOHN BENNETT, ESQ. and
                  LINNEA CIPRIANO, ESQ.
19                (Boston, Massachusetts)

20
                Counsel for Defendants
21              Amneal Pharmaceuticals of New York, LLC,
                et al.

22

23
              POTTER ANDERSON & CORROON LLP
24            BY:  DAVID E. MOORE, ESQ.

25
                      -and-
```

1    APPEARANCES (Continued):

2

3                KIRKLAND & ELLIS LLP
                 BY:  BRYAN S. HALES, ESQ.
                      (Chicago, Illinois)

4

5                        -and-

6

7                KIRKLAND & ELLIS LLP
                 BY:  JEANNA M. WACKER, ESQ.
                      (New York, New York)

8

9                     Counsel for Defendant
                      Eagle Pharmaceuticals Inc.

10

11                        -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2

 3              (The following telephone conference was held in

 4    chambers, beginning at 2:00 p.m.)

 5

 6              THE COURT:  All right.  Good afternoon, counsel.

 7    I want to do a roll call.  I will start with plaintiffs,

 8    please.

 9              MR. FARNAN:  Good afternoon, Your Honor.  Brian

10    Farnan on behalf of the plaintiffs, and with me is Martin

11    Black, Bob Rhoad and Brian Goldberg from Dechert.

12              THE COURT:  Thank you.  And then for Amneal?

13              MS. GAZA:  Good afternoon, Your Honor.  It's

14    Anne Gaza from Young Conaway on behalf of Amneal.  I'm

15    joined today by Huiya Wu, John Bennett and Linnea Cipriano,

16    of Goodwin.

17              THE COURT:  Thank you.  And then for Eagle?

18              MR. MOORE:  Good afternoon, Your Honor.  David

19    Moore from Potter Anderson, and I'm joined by my co-counsel

20    from Kirkland, Bryan Hales and Jeanna Wacker.

21              THE COURT:  All right.  And then we've got only

22    outside counsel.  Right?  We can speak without concern.  Is

23    that right?  Plaintiff, do you agree?

24              MR. BLACK:  Yes, Your Honor.

25              THE COURT:  Great.  How about the two
```

1    defendants?  Do you agree?

2                    MR. BENNETT:  Yes, Your Honor.

3                    MR. HALES:  Yes, Your Honor.

4                    THE COURT:  Okay.  Great.  Thank you.

5                    All right.  And I appreciate you getting back to

6    me with such quick notice.  I just think we need to quickly

7    get to the bottom of what we're doing here because July 7th

8    is fast approaching.

9                    So I've read the letters and where I am is I

10   think we need to go to trial on July 7th.

11                   Amneal, let me hear from you.  You say in your

12   letter you need six hours to present your noninfringement

13   case.  Since I think when we last talked we were talking

14   about a total of twelve-and-a-half hours, that would leave

15   six-and-a-half hours for the noninfringement case with

16   respect to Eagle and invalidity.

17                   So can you please give me a little bit more

18   sense of how you think our time should be allocated at a

19   trial, assuming for the moment that -- and this is assuming

20   for the moment that we were going to trial on both

21   invalidity and infringement.

22                   MS. WU:  Your Honor, I think the way I'm

23   thinking about it, and I hope counsel for Eagle jumps in to

24   correct me if needed, is that it's going to be about half

25   the time on infringement and half the time on invalidity,

1    and I think the estimate we gave Your Honor is an estimate

2    that fits within the agreed-to limits that you provided, but

3    that is a conservative estimate.  We wanted to give you a

4    grounding point.

5            THE COURT:  Okay.  But that's what I'm trying to

6    get a little bit more detail on.  I mean, I will read it

7    into the record.  This is from DI 278.  "Amneal expects that

8    its noninfringement case will take less than six hours to

9    present."

10           Now, you know, you've got less than, so I guess

11   it's conservative, but I need to get a better idea.  What do

12   you think?  What is it going to take for you to present your

13   noninfringement case?

14           MS. WU:  So I think in part, Your Honor, it

15   depends on what we have to rebut, and infringement is an

16   issue of proof regarding live with Par.

17           We currently have three experts that we plan on

18   presenting.  One is a regulatory expert, one is an expert on

19   formulation that can speak very specifically to the pH

20   issue.  And the third expert is a statistician.  ███████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████    So I don't have for you a specific breakdown

25   for each of those three witnesses.

1              In addition, we, of course, counted the time

2    that it would take to cross-examine Par's witnesses on

3    infringement, and that's Dr. Hirsch.  He's their main

4    expert, but there's also a regulatory expert, Mr. Selin.  So

5    it's all of that.

6              I think we can -- I think we can go shorter than

7    that.  I think we have to to fit within the

8    twelve-and-a-half hours, but I don't have the exact number.

9    If you want, I can try to confer with my teammates over text

10   right now to say what are the actual numbers.  It's the

11   three of us on the line which has a different witness and

12   also again going to have to account for cross-examination.

13             I think maybe -- I'm getting some feedback here,

14   Your Honor.  I think about four-and-a-half.

15             THE COURT:  That's to present your

16   noninfringement case, is four-and-a-half?

17             MS. WU:  Yes.  I think some of that is going to

18   be shared with Eagle in the sense of the cross-examination

19   will be, I think, overlapping.

20             THE COURT:  All right.  How did you understand

21   you were going to split the invalidity case with Eagle?

22             MS. WU:  I think for the most part, Eagle, we

23   spent a lot of time coordinating to get our cases aligned

24   because, as you know, Your Honor, we have separate expert

25   discovery, separate experts and conducting expert discovery

1    at different times.

2              So we spent a lot of time trying to coordinate,

3    and I think at this point Eagle is going to be taking the

4    laboring oar with validity and Dr. Winter is going to come

5    in and fill in the gaps because there are going to be

6    different claims being asserted against Eagle versus against

7    Amneal.

8              So I think, again, Eagle is going to take the

9    bulk of that, come in and fill in a bit if they need to with

10   some of the dependent claims that are asserted against

11   Amneal but not against Eagle.

12             THE COURT:  All right.  So Dr. Winter is

13   essentially a fill-in-the-gap witness and otherwise Eagle is

14   bearing the brunt of the work for invalidity.  Is that what

15   you are telling me?

16             MS. WU:  Yes, Your Honor.

17             THE COURT:  Okay.  All right.

18             MR. HALES:  Your Honor, Bryan Hales.  Can I just

19   add one really high level thought?

20             THE COURT:  Well, yes.  I was going to come in

21   and ask you, but you a go can go ahead.  Go ahead.

22             MR. HALES:  Yes.  I think there is some

23   fluidity, as Amneal counsel's notes, because we don't know

24   exactly how Par is going to present it and there are some

25   parts of the noninfringement cases that are similar and some

1    that are a little bit less and we're trying to harmonize

2    witnesses.  But if you wanted some really rough estimation,

3    I think what we were thinking was along the lines of, you

4    know, with twelve-and-a-half hours to work with,

5    six-and-a-half invalidity of which we will be doing the

6    laboring oar like our invalidity expert, Dr. Park, will

7    cover more ground than Dr. Winter.

8              That leaves about six on infringement and the

9    exact breakdown between, you know, which witness takes which

10   amount of time to cover which issues there is a little more

11   fluid, but that was the way we were envisioning.  It's not

12   perfect, obviously, trying to allocate it.

13             THE COURT:  Well, I mean, if I do the math, were

14   you thinking you were going to presenting your infringement

15   case in one-and-a-half hours?

16             MR. HALES:  No, no, which is why --

17             THE COURT:  Well, so you guys are way off.  So,

18   you know, Ms. Wu thinks she needs now what?  It was less

19   than six, we're now down to 4.5.  So what do you think you

20   need?

21             MR. HALES:  Oh, I think we were going to try to

22   make it work in three, assuming that they would have three.

23             THE COURT:  Yes.

24             MR. HALES:  But, again, we have the ability

25   to -- we could shift a little bit more or less to validity

1    if we need to.  We just have to -- those nuances we hadn't

2    worked out, but that was our thinking.

3                    THE COURT:  All right.

4                    MS. WU:  And, Your Honor, this is Huiya Wu

5    again.

6                    We're not -- you know, in terms of the 4.5 I

7    mentioned, we're not stuck on that.  Obviously, we're going

8    to be flexible to make sure we work within the time Your

9    Honor gives us to present the case and certainly to allow

10   Eagle its fair share of time as well.

11                   So, you know, it's a little hard to predict and

12   I don't want to put myself in a corner not knowing what case

13   Par is going to put up on infringement.

14                   THE COURT:  All right.  But you don't dispute

15   that the invalidity case should take six-and-a-half hours.

16   That you're comfortable with.  You think you can try the

17   invalidity case with Eagle in six-and-a-half hours?

18                   MS. WU:  I think that sounds right based on our

19   discussion back in January.

20                   THE COURT:  All right.  Okay.  Now, that's the

21   questions I had.  Now, I will hear the parties if there's

22   anything else anybody wants to raise besides what was raised

23   in the letters.

24                   Do you want to go first, plaintiff?

25                   MR. BLACK:  Sure, Your Honor.  So I just want to

1    make sure that Eagle, that we're not going to have to

2    present proofs on the impurity limitations.  They went

3    through that in the letter.  We can do a stipulation to

4    clarify that.

5                    The only other thing is --

6                    THE COURT:  Well, let's address that before you

7    move off that.

8                    Mr. Hales, do you want to respond?

9                    MR. HALES:  Yes.  Yes, I will, Your Honor.

10   Thank you again.  We will do a stipulation on that as we

11   proposed.

12                    MR. HALES:  Okay.  Great.

13                    The only other issue is just a logistics problem

14   that I and part of my team have which we don't know whether

15   it's a problem or not, but this case is scheduled for

16   July 7th to 9th, the possible fall-on day on the 12th.  I'm

17   also set for the Boston Scientific/Micr-Tech trial, which is

18   not only scheduled for July 12th, which was transferred by

19   you to Judge Bibas.  We don't know from him when jury

20   selection would be that week or whether that case is going

21   to actually go that week or whether there's room in the

22   courthouse, and I just need to figure out how we're going to

23   manage that if the trials ends up overlapping for a day.

24                    THE COURT:  I guess you will.  I don't know what

25   to tell you.

1      MR. BLACK:  I understand.  It's all in the same

2   courthouse.  I just didn't want to tell you about it on

3   July 7th.

4      THE COURT:  Oh, I see, okay.  That sounds fine.

5   Okay.

6      MR. BLACK:  I might have to miss jury selection.

7      THE COURT:  Right.

8      MR. HALES:  I'm sure it's better all in all that

9   I don't end up doing a bench trial and then a jury trial the

10  following week.  You will be quite sick of me by then.

11     THE COURT:   Okay.  All right.  So here's where

12  I am right now then.  So we're not going to try the

13  infringement case against Amneal.  I'm not going to do that

14  on July 7th, but what we're going to do is, we're going to

15  try the invalidity case and the infringement case against

16  Eagle.

17     I'm tempted to just go against Eagle because I

18  think Amneal, it's a moving target.  I think they've been,

19  to put it kindly, overly optimistic in their predictions as

20  to what the FDA would do over the past year-and-a-half and

21  I'm not confident at all that it would make sense to try an

22  infringement case against Amneal.  And in the event Eagle

23  and Par reach a settlement before July 7th, we're not going

24  to have a trial, but assuming, and probably a fair, it's a

25  fair assumption given we've been on the eve of trial at

1   least twice now with Eagle and Par that we are going to

2   trial, that this case is not settling between Eagle and Par.

3               We will have a trial.  We will try invalidity

4   and you'll get six-and-a-half hours each to try invalidity,

5   and then it sounds like, Mr. Hales, you can do your

6   infringement, you can present a noninfringement in three

7   hours.  Is that fair?

8               MR. HALES:  Well, it depends.  That's what we

9   were planning to do because that was the time we thought we

10  had available, so, yes.

11              THE COURT:  All right.  So then what if I gave

12  you ten hours to try invalidity and Eagle noninfringement?

13  That would seem fair, Mr. Hales?

14              MR. HALES:  Yes, Your Honor.

15              THE COURT:  And, Mr. Black, you think you could

16  do the case, right, in ten hours if I gave that to you?

17              MR. BLACK:  Yes.

18              THE COURT:  Okay.  And that's what we'll do.

19  And then we'll save for a later date, if it ever becomes

20  even likely that Amneal is going to have a product, we'll

21  decide what we have to do about infringement with Amneal.

22              Okay.  We'll begin at 8:30 on July 7th.  We've

23  got a pretrial conference scheduled for -- when is it?  June

24  30th, right, at 1:00 o'clock?  Is that right?  Hello?

25              MR. HALES:  Yes, Your Honor.

1            THE COURT:  That's okay.  We're having vicious

2   lightning.

3            MS. GAZA:  Your Honor --

4            THE COURT:  I mean, I've got to tell you, I'm

5   watching this unbelievable lightning storm outside my

6   window.  I thought maybe we lost phone service.  It wouldn't

7   shock me at all.

8            Somebody was speaking up.  Ms. Wu, was it you?

9            MS. GAZA:  I apologize, Your Honor.  It's Anne

10  Gaza.  Is it 1:00 o'clock for the pretrial conference?

11           THE COURT:  Yes.  That's what I have, yes.

12           MR. BLACK:  Yes.

13           THE COURT:  Okay.  Of course, I've already ruled

14  I think was it back in January or February, so I don't

15  anticipate that would be a lengthy conference.

16           Are there any other issues I need to address?

17  Plaintiff?

18           MS. WU:  Your Honor --

19           MR. BLACK:  No, Your Honor.

20           THE COURT:  Okay.  And then I heard, I think it

21  was Ms. Wu.  Yes?

22           MS. WU:  Yes, Your Honor.  That was me.

23           I was -- in terms of the timing I guess of

24  Amneal's trial, are you planning to set it at a later date

25  or --

```
 1              THE COURT:  I am going to wait and see what
 2    happens with the FDA.  I just think it has been a real
 3    moving target and I'm not faulting you, but, you know, your
 4    predictions, your client's predictions have not turned out
 5    to be very accurate in terms of timing and the FDA response
 6    and I'm not at all confident that it will ever be necessary
 7    to have a trial, so we'll wait and see.  You have the
 8    benefit of getting to try invalidity with Eagle on July 7th,
 9    so you're getting that.
10              MS. WU:  Understood, Your Honor.  I think in
11    terms of the -- I just to make sure I say what's going on
12    with Amneal, that their papers will be put in with the FDA.
13              I checked as recently as this morning.  They're
14    putting their papers in with the FDA in August as set forth
15    in the Quinn declaration that was submitted I think two
16    letters ago, so that hasn't changed.
17              Testing is underway, and if FDA is reacting to
18    Covid 19-type drugs, they could respond as early as the end
19    of the year.  So I think would it be a good idea to put in a
20    checkpoint I guess when we put in our FDA --
21              THE COURT:  No.  Well, you can keep us apprised.
22    And, Mr. Black, you've already agreed, right?  If there's a
23    preliminary injunction, you'll agree to have it heard in
24    front of a Magistrate Judge.  Correct?
25              MR. BLACK:  Yes, Your Honor.
```

```
 1                    THE COURT:  Yes.  So I've got that.  I'm not
 2      going to let Par back away from that, and between Magistrate
 3      Judge Hall's and my calendar, we would squeeze it in if
 4      something like that was necessitated.  And, of course, let's
 5      see what happens.  We don't know what's going to happen.
 6                    Ms. Wu, you might be such a powerful advocate
 7      that these patents were declared invalid by August and
 8      you're scot-free, so who knows?
 9                    MS. WU:  That is the hope, Your Honor, yes.  I
10      think Amneal wanted to get resolution on its infringement
11      case with Eagle.  I think in early conversations, there were
12      so many overlapping issues.
13                    THE COURT:  Right.  And what we'll do is this.
14      You know, in the event that Eagle and Par reach a settlement
15      such that we don't have a July 7th trial, I mean, we will
16      schedule a status conference and either you -- this is
17      assuming, you know, there was a settlement with Eagle but
18      not with you.  You know, you can keep us apprised of the FDA
19      and if it looks like there's going to be something favorable
20      to Amneal coming out of the FDA in August, then we'll
21      address that situation when we have to.
22                    MS. WU:  Yes, Your Honor.
23                    THE COURT:  And, Mr. Black, you do need to
24      remind your client, I'm not going to let it back off.  It
25      put in a letter it was willing to stipulate to an injunction
```

1    proceeding held by the Magistrate and all of this is

2    contingent with that understanding.

3              Okay.  Anything else?

4              MR. BLACK:  No, Your Honor.

5              THE COURT:  All right.  Thank you, Mr. Black.

6    Anything else?  Mr. Hales, did you have any issues?

7              MR. HALES:  No, Your Honor.  Thank you.

8              THE COURT:  Okay, everybody.  Have a good day.

9    I look forward to it.  It will be an interesting trial.  I

10   will see you all next 1:00 o'clock on the 30th.  All right?

11             (Counsel respond, "Thank you, Your Honor.")

12             THE COURT:   Take care, everybody.

13             (Telephone conference concluded at 2:18 p.m.)

14                         -  -  -

15

16

17

18

19

20

21

22

23

24

25

**1**

12th [2] – 11:16, 11:18
18-2032-CFC-CJB [1] - 1:16
18-823-CFC-JLH [1] - 1:8
19-type [1] - 15:18
1:00 [3] - 13:24, 14:10, 17:10

**2**

2021 [1] - 1:19
278 [1] - 6:7
2:00 [2] - 1:19, 4:4
2:18 [1] - 17:13

**3**

30th [2] - 13:24, 17:10

**4**

4.5 [2] – 9:19, 10:6

**7**

7th [9] - 5:7, 5:10, 11:16, 12:3, 12:14, 12:23, 13:22, 15:8, 16:15

**8**

8:30 [1] - 13:22

**9**

9 [1] - 1:19
9th [1] - 11:16

**A**

ability [1] - 9:24
account [1] - 7:12
accurate [1] - 15:5
ACTION [2] - 1:3, 1:10
actual [1] - 7:10
add [1] - 8:19
addition [1] - 7:1
address [3] - 11:6, 14:16, 16:21
advocate [1] - 16:6
afternoon [4] - 4:6, 4:9, 4:13, 4:18
ago [1] - 15:16
agree [3] - 4:23, 5:1, 15:23
agreed [2] - 6:2, 15:22

agreed-to [1] - 6:2
ahead [2] - 8:21
al [2] - 1:15, 2:21
aligned [1] - 7:23
allocate [1] - 9:12
allocated [1] - 5:18
allow [1] - 10:9
Amneal [16] - 2:21, 4:12, 4:14, 5:11, 6:7, 8:7, 8:11, 8:23, 12:13, 12:18, 12:22, 13:20, 13:21, 15:12, 16:10, 16:20
AMNEAL [1] - 1:14
Amneal's [1] - 14:24
amount [1] - 9:10
AND [1] - 1:2
Anderson [1] - 4:19
ANDERSON [1] - 2:23
Anne [2] - 4:14, 14:9
ANNE [1] - 2:14
anticipate [1] - 14:15
apologize [1] - 14:9
APPEARANCES [2] - 2:1, 3:1
appreciate [1] - 5:5
apprised [2] - 15:21, 16:18
approaching [1] - 5:8
asserted [2] - 8:6, 8:10
assuming [5] - 5:19, 9:22, 12:24, 16:17
assumption [1] - 12:25
August [3] - 15:14, 16:7, 16:20
available [1] - 13:10

**B**

based [3] - 6:22, 6:23, 10:18
bearing [1] - 8:14
becomes [1] - 13:19
begin [1] - 13:22
beginning [1] - 4:4
behalf [2] - 4:10, 4:14
bench [1] - 12:9
benefit [1] - 15:8
BENNETT [2] - 2:18, 5:2
Bennett [1] - 4:15
better [2] - 6:11, 12:8
between [3] - 9:9, 13:2, 16:2
Bibas [1] - 11:19
bit [5] - 5:17, 6:6, 8:9, 9:1, 9:25
black [4] - 13:15,

15:22, 16:23, 17:5
BLACK [10] - 2:6, 4:24, 10:25, 12:1, 12:6, 13:17, 14:12, 14:19, 15:25, 17:4
Black [1] - 4:11
Bob [1] - 4:11
Boston [2] - 2:19, 11:17
bottom [1] - 5:7
breakdown [2] - 6:24, 9:9
Brian [2] - 4:9, 4:11
brunt [1] - 8:14
BRYAN [1] - 3:3
Bryan [2] - 4:20, 8:18
bulk [1] - 8:9
BY [7] - 2:3, 2:6, 2:14, 2:17, 2:24, 3:3, 3:7

**C**

calendar [1] - 16:3
care [1] - 17:12
case [21] - 5:13, 5:15, 6:8, 6:13, 6:22, 7:16, 7:21, 9:15, 10:9, 10:12, 10:15, 10:17, 11:15, 11:20, 12:13, 12:15, 12:22, 13:2, 13:16, 16:11
cases [2] - 7:23, 8:25
certainly [1] - 10:9
chambers [1] - 4:4
changed [1] - 15:16
checked [1] - 15:13
checkpoint [1] - 15:20
Chicago [1] - 3:3
Cipriano [1] - 4:15
CIPRIANO [1] - 2:18
CIVIL [2] - 1:3, 1:10
claims [2] - 8:6, 8:10
clarify [1] - 11:4
client [1] - 16:24
client's [1] - 15:4
co [1] - 4:19
co-counsel [1] - 4:19
COLM [1] - 1:22
comfortable [1] - 10:16
coming [1] - 16:20
Company [1] - 2:11
COMPANY [2] - 1:5, 1:11
CONAWAY [1] - 2:13
Conaway [1] - 4:14
concern [1] - 4:22
concluded [1] - 17:13
conducting [1] - 7:25
confer [1] - 7:9

conference [7] - 1:20, 4:3, 13:23, 14:10, 14:15, 16:16, 17:13
confident [2] - 12:21, 15:6
CONNOLLY [1] - 1:22
conservative [2] - 6:3, 6:11
consolidated [1] - 1:9
contingent [1] - 17:2
Continued [1] - 3:1
conversations [1] - 16:11
coordinate [1] - 8:2
coordinating [1] - 7:23
corner [1] - 10:12
correct [2] - 5:24, 15:24
CORROON [1] - 2:23
Counsel [2] - 2:10, 2:20
counsel [6] - 3:9, 4:6, 4:19, 4:22, 5:23, 17:11
counsel's [1] - 8:23
counted [1] - 7:1
course [3] - 7:1, 14:13, 16:4
COURT [40] - 1:1, 4:6, 4:12, 4:17, 4:21, 4:25, 5:4, 6:5, 7:15, 7:20, 8:12, 8:17, 8:20, 9:13, 9:17, 9:23, 10:3, 10:14, 10:20, 11:6, 11:24, 12:4, 12:7, 12:11, 13:11, 13:15, 13:18, 14:1, 14:4, 14:11, 14:13, 14:20, 15:1, 15:21, 16:1, 16:13, 16:23, 17:5, 17:8, 17:12
Court [1] - 1:25
courthouse [2] - 11:22, 12:2
cover [2] - 9:7, 9:10
Covid [1] - 15:18
cross [3] - 7:2, 7:12, 7:18
cross-examination [2] - 7:12, 7:18
cross-examine [1] - 7:2
crux [1] - 6:21

**D**

date [2] - 13:19, 14:24
David [1] - 4:18

DAVID [1] - 2:24
Dechert [1] - 4:11
DECHERT [1] - 2:6
decide [1] - 13:21
declaration [1] - 15:15
declared [1] - 16:7
defendant [1] - 1:9
Defendant [1] - 3:9
defendants [1] - 5:1
Defendants [2] - 1:16, 2:20
DELAWARE [1] - 1:2
Delaware [1] - 1:18
dependent [1] - 8:10
detail [1] - 6:6
DI [1] - 6:7
different [3] - 7:11, 8:1, 8:6
discovery [2] - 7:25
discussion [1] - 10:19
dispute [1] - 10:14
DISTRICT [2] - 1:1, 1:2
down [1] - 9:19
Dr [5] - 7:3, 8:4, 8:12, 9:6, 9:7
drugs [1] - 15:18

**E**

Eagle [25] - 3:9, 4:17, 5:16, 5:23, 7:18, 7:21, 7:22, 8:3, 8:6, 8:8, 8:11, 8:13, 10:10, 10:17, 11:1, 12:16, 12:17, 12:22, 13:1, 13:2, 13:12, 15:8, 16:11, 16:14, 16:17
EAGLE [1] - 1:8
early [2] - 15:18, 16:11
either [1] - 16:16
ELLIS [3] - 3:2, 3:6
end [2] - 12:9, 15:18
ENDO [1] - 1:4, 1:11
Endo [1] - 2:11
ends [1] - 11:23
envisioning [1] - 9:11
ESQ [11] - 2:3, 2:6, 2:7, 2:7, 2:14, 2:17, 2:18, 2:18, 2:24, 3:3, 3:7
essentially [1] - 8:13
estimate [3] - 6:1, 6:3
estimation [1] - 9:2
et [2] - 1:15, 2:21
eve [1] - 14:25
event [2] - 12:22, 16:14
exact [2] - 7:8, 9:9
exactly [1] - 8:24

**examination** [2] - 7:12, 7:18
**examine** [1] - 7:2
**expects** [1] - 6:7
**expert** [8] - 6:18, 6:20, 7:4, 7:24, 7:25, 9:6
**experts** [2] - 6:17, 7:25

## F

**fair** [5] - 10:10, 12:24, 12:25, 13:7, 13:13
**fall** [1] - 11:16
**fall-on** [1] - 11:16
**Farnan** [1] - 4:10
**FARNAN** [3] - 2:2, 2:3, 4:9
**fast** [1] - 5:8
**faulting** [1] - 15:3
**favorable** [1] - 16:19
**FDA** [9] - 12:20, 15:2, 15:5, 15:12, 15:14, 15:17, 15:20, 16:18, 16:20
**February** [1] - 14:14
**feedback** [1] - 7:13
**figure** [1] - 11:22
**fill** [3] - 8:5, 8:9, 8:13
**fill-in-the-gap** [1] - 8:13
**fine** [1] - 12:4
**first** [1] - 10:24
**fit** [1] - 7:7
**fits** [1] - 6:2
**flexible** [1] - 10:8
**fluid** [1] - 9:11
**fluidity** [1] - 9:11
**following** [2] - 4:3, 12:10
**FOR** [1] - 1:2
**formulation** [1] - 6:19
**forth** [1] - 15:14
**forward** [1] - 17:9
**four** [2] - 7:14, 7:16
**four-and-a-half** [2] - 7:14, 7:16
**free** [1] - 16:8
**front** [1] - 15:24

## G

**gap** [1] - 8:13
**gaps** [1] - 8:5
**Gaza** [2] - 4:14, 14:10
**GAZA** [4] - 2:14, 4:13, 14:3, 14:9
**given** [1] - 12:25
**Goldberg** [1] - 4:11
**GOLDBERG** [1] - 2:7

**Goodwin** [1] - 4:16
**GOODWIN** [1] - 2:17
**great** [3] - 4:25, 5:4, 11:12
**ground** [1] - 9:7
**grounding** [1] - 6:4
**guess** [4] - 6:10, 11:24, 14:23, 15:20
**Gunning** [1] - 1:24
**guys** [1] - 9:17

## H

**Hales** [6] - 4:20, 8:18, 11:8, 13:5, 13:13, 17:6
**HALES** [14] - 3:3, 5:3, 8:18, 8:22, 9:16, 9:21, 9:24, 11:9, 11:12, 12:8, 13:8, 13:14, 13:25, 17:7
**half** [14] - 5:14, 5:15, 5:24, 5:25, 7:8, 7:14, 7:16, 9:4, 9:5, 9:15, 10:15, 10:17, 12:20, 13:4
**Hall's** [1] - 16:3
**hard** [1] - 10:11
**harmonize** [1] - 9:1
**hear** [2] - 5:11, 10:21
**heard** [2] - 14:20, 15:23
**held** [2] - 4:3, 17:1
**hello** [1] - 13:24
**high** [1] - 8:19
**Hirsch** [1] - 7:3
**Honor** [31] - 4:9, 4:13, 4:18, 4:24, 5:2, 5:3, 5:22, 6:1, 6:14, 7:14, 7:24, 8:16, 8:18, 10:4, 10:9, 10:25, 11:9, 13:14, 13:25, 14:3, 14:9, 14:18, 14:19, 14:22, 15:10, 15:25, 16:9, 16:22, 17:4, 17:7, 17:11
**HONORABLE** [1] - 1:22
**hope** [2] - 5:23, 16:9
**hours** [13] - 5:12, 5:14, 5:15, 6:8, 7:8, 9:4, 9:15, 10:15, 10:17, 13:4, 13:7, 13:12, 13:16
**HUIYA** [1] - 2:17
**Huiya** [2] - 4:15, 10:4

## I

**idea** [2] - 6:11, 15:19

**Illinois** [1] - 3:3
**impurity** [1] - 11:2
**IN** [2] - 1:1, 1:2
**Inc** [2] - 2:10, 3:9
**INC** [2] - 1:8, 1:10
**INC.,PAR** [1] - 1:4
**infringement** [14] - 5:21, 5:25, 6:15, 6:22, 7:3, 9:8, 9:14, 10:13, 12:13, 12:15, 12:22, 13:6, 13:21, 16:10
**injunction** [2] - 15:23, 16:25
**Innovation** [1] - 2:11
**INNOVATION** [2] - 1:4, 1:11
**interesting** [1] - 17:9
**invalid** [1] - 16:7
**invalidity** [14] - 5:16, 5:21, 5:25, 7:21, 8:14, 9:5, 9:6, 10:15, 10:17, 12:15, 13:3, 13:4, 13:12, 15:8
**issue** [3] - 6:16, 6:20, 11:13
**issues** [4] - 9:10, 14:16, 16:12, 17:6

## J

**January** [2] - 10:19, 14:14
**Jeanna** [1] - 4:20
**JEANNA** [1] - 3:7
**John** [1] - 4:15
**JOHN** [1] - 2:18
**joined** [2] - 4:15, 4:19
**Judge** [3] - 11:19, 15:24, 16:3
**July** [10] - 5:7, 5:10, 11:16, 11:18, 12:3, 12:14, 12:23, 13:22, 15:8, 16:15
**jumps** [1] - 5:23
**June** [2] - 1:19, 13:23
**jury** [3] - 11:19, 12:6, 12:9

## K

**keep** [2] - 15:21, 16:18
**kind** [1] - 6:23
**kindly** [1] - 12:19
**Kirkland** [1] - 4:20
**KIRKLAND** [1] - 3:2
**kIRKLAND** [1] - 3:6
**knowing** [1] - 10:12
**knows** [1] - 16:8

## L

**laboring** [2] - 8:4, 9:6
**last** [1] - 5:13
**least** [1] - 13:1
**leave** [1] - 5:14
**leaves** [1] - 9:8
**lengthy** [1] - 14:15
**less** [5] - 6:8, 6:10, 9:1, 9:18, 9:25
**letter** [3] - 5:12, 11:3, 16:25
**letters** [3] - 5:9, 10:23, 15:16
**level** [1] - 8:19
**lightning** [2] - 14:2, 14:5
**likely** [1] - 13:20
**limitations** [1] - 11:2
**limits** [1] - 6:2
**line** [1] - 7:11
**lines** [1] - 9:3
**LINNEA** [1] - 2:18
**Linnea** [1] - 4:15
**live** [1] - 6:16
**LLC** [6] - 1:10, 1:11, 1:15, 2:11, 2:11, 2:21
**LLC,and** [1] - 1:4
**LLP** [7] - 2:2, 2:6, 2:13, 2:17, 2:23, 3:2, 3:6
**logistics** [1] - 11:13
**look** [1] - 17:9
**looks** [1] - 16:19
**lost** [1] - 14:6

## M

**Magistrate** [3] - 15:24, 16:2, 17:1
**main** [2] - 6:21, 7:3
**manage** [1] - 11:23
**Martin** [1] - 4:10
**MARTIN** [1] - 2:6
**Massachusetts** [1] - 2:19
**math** [1] - 9:13
**mean** [4] - 6:6, 9:13, 14:4, 16:15
**mentioned** [1] - 10:7
**MICHAEL** [1] - 2:3
**might** [2] - 12:6, 16:6
**miss** [1] - 12:6
**moment** [2] - 5:19, 5:20
**MOORE** [2] - 2:24, 4:18
**Moore** [1] - 4:19

**morning** [1] - 15:13
**most** [1] - 7:22
**move** [1] - 11:7
**moving** [2] - 12:18, 15:3
**MR** [25] - 4:9, 4:18, 4:24, 5:2, 5:3, 8:18, 8:22, 9:16, 9:21, 9:24, 10:25, 11:9, 11:12, 12:1, 12:6, 12:8, 13:8, 13:14, 13:17, 13:25, 14:12, 14:19, 15:25, 17:4, 17:7
**MS** [14] - 4:13, 5:22, 6:14, 7:17, 7:22, 8:16, 10:4, 10:18, 14:3, 14:9, 14:22, 15:10, 16:9, 16:22

## N

**necessary** [1] - 15:6
**necessitated** [1] - 16:4
**need** [10] - 5:6, 5:10, 5:12, 6:11, 8:9, 9:20, 10:1, 11:22, 14:16, 16:23
**needed** [1] - 5:24
**needs** [1] - 9:18
**NEW** [1] - 1:15
**New** [2] - 2:21, 3:7
**next** [1] - 17:10
**NO** [2] - 1:8, 1:16
**noninfringement** [8] - 5:12, 5:15, 6:8, 6:13, 7:16, 8:25, 13:6, 13:12
**notes** [1] - 8:23
**notice** [1] - 5:6
**nuances** [1] - 10:1
**number** [1] - 7:8
**numbers** [1] - 7:10

## O

**o'clock** [4] - 1:19, 13:24, 14:10, 17:10
**oar** [2] - 8:4, 9:6
**obviously** [2] - 9:12, 10:7
**OF** [2] - 1:2, 1:14
**Official** [1] - 1:25
**one** [4] - 6:18, 8:19, 9:15
**one-and-a-half** [1] - 9:15
**optimistic** [1] - 12:19
**otherwise** [1] - 8:13

**outside** [2] - 4:22, 14:5
**overlapping** [3] - 7:19, 11:23, 16:12
**overly** [1] - 12:19

## P

**p.m** [3] - 1:19, 4:4, 17:13
**papers** [2] - 15:12, 15:14
**Par** [11] - 2:10, 2:11, 6:16, 8:24, 10:13, 12:23, 13:1, 13:2, 16:2, 16:14
**PAR** [5] - 1:3, 1:4, 1:10, 1:10, 1:11
**Par's** [1] - 7:2
**Park** [1] - 9:6
**part** [3] - 6:14, 7:22, 11:14
**parties** [1] - 10:21
**parts** [1] - 8:25
**past** [1] - 12:20
**patents** [1] - 16:7
**Pennsylvania** [1] - 2:8
**perfect** [1] - 9:12
**pH** [2] - 6:19, 6:22
**PHARMACEUTICAL** [2] - 1:3, 1:10
**Pharmaceutical** [1] - 2:10
**PHARMACEUTICAL S** [2] - 1:8, 1:14
**Pharmaceuticals** [2] - 2:21, 3:9
**Philadelphia** [1] - 2:8
**phone** [1] - 14:6
**plaintiff** [3] - 4:23, 10:24, 14:17
**plaintiffs** [3] - 1:5, 4:7, 4:10
**Plaintiffs** [2] - 1:12, 2:10
**plan** [1] - 6:17
**planning** [2] - 13:9, 14:24
**point** [2] - 6:4, 8:3
**possible** [1] - 11:16
**POTTER** [1] - 2:23
**Potter** [1] - 4:19
**powerful** [1] - 16:6
**predict** [1] - 10:11
**predictions** [3] - 12:19, 15:4
**preliminary** [1] - 15:23
**present** [8] - 5:12, 6:9,

6:12, 7:15, 8:24, 10:9, 11:2, 13:6
**presenting** [2] - 6:18, 9:14
**pretrial** [2] - 13:23, 14:10
**problem** [2] - 11:13, 11:15
**proceeding** [1] - 17:1
**PROCTER** [1] - 2:17
**product** [1] - 13:20
**PRODUCTS** [2] - 1:4, 1:10
**Products** [1] - 2:11
**proof** [1] - 6:16
**proofs** [1] - 11:2
**proposed** [1] - 11:11
**provided** [1] - 6:2
**put** [7] - 10:12, 10:13, 12:19, 15:12, 15:19, 15:20, 16:25
**putting** [1] - 15:14

## Q

**questions** [1] - 10:21
**quick** [1] - 5:6
**quickly** [1] - 5:6
**Quinn** [1] - 15:15
**quite** [1] - 12:10

## R

**raise** [1] - 10:22
**raised** [1] - 10:22
**reach** [2] - 12:23, 16:14
**reacting** [1] - 15:17
**read** [2] - 5:9, 6:6
**real** [1] - 15:2
**really** [3] - 8:19, 9:2
**reason** [1] - 6:20
**rebut** [1] - 6:15
**recently** [1] - 15:13
**record** [1] - 6:7
**regarding** [1] - 6:16
**regulatory** [2] - 6:18, 7:4
**remind** [1] - 16:24
**Reporter** [1] - 1:25
**resolution** [1] - 16:10
**respect** [1] - 5:16
**respond** [2] - 11:8, 15:18, 17:11
**response** [1] - 15:5
**RHOAD** [1] - 2:7
**Rhoad** [1] - 4:11
**ROBERT** [1] - 2:7
**roll** [1] - 4:7
**room** [1] - 11:21

**rough** [1] - 9:2
**ruled** [1] - 14:13

## S

**save** [1] - 13:19
**schedule** [1] - 16:16
**scheduled** [3] - 11:15, 11:18, 13:23
**Scientific/Micr** - 11:17
**Scientific/Micr-Tech** [1] - 11:17
**scot** [1] - 16:8
**scot-free** [1] - 16:8
**see** [5] - 12:4, 15:1, 15:7, 16:5, 17:10
**seem** [1] - 13:13
**selection** [2] - 11:20, 12:6
**Selin** [1] - 7:4
**sense** [3] - 5:18, 7:18, 12:21
**separate** [2] - 7:24, 7:25
**service** - 14:6
**set** [3] - 11:17, 14:24, 15:14
**settlement** [3] - 12:23, 16:14, 16:17
**settling** [1] - 13:2
**share** [1] - 10:10
**sheet** [1] - 7:18
**SHEA** [1] - 2:14
**shift** [1] - 9:25
**shock** [1] - 14:7
**shorter** [1] - 7:6
**sick** [1] - 12:10
**similar** [1] - 8:25
**situation** [1] - 16:21
**six** [9] - 5:12, 5:15, 6:8, 9:5, 9:8, 9:19, 10:15, 10:17, 13:4
**six-and-a-half** [5] - 5:15, 9:5, 10:15, 10:17, 13:4
**sounds** [3] - 10:18, 12:4, 13:5
**speaking** [1] - 14:8
**specific** [1] - 6:24
**specifically** [1] - 6:19
**specification** [1] - 6:23
**spent** [2] - 7:23, 8:2
**split** [1] - 7:21
**squeeze** [1] - 16:3
**STARGATT** [1] - 2:13
**start** [1] - 4:7
**STATES** [1] - 1:1

**status** [1] - 16:16
**Sterile** [1] - 2:10
**STERILE** [2] - 1:4, 1:10
**stipulate** [1] - 16:25
**stipulation** [2] - 11:3, 11:10
**storm** [1] - 14:5
**stuck** [1] - 10:7
**submitted** [1] - 15:15

## T

**target** [2] - 12:18, 15:3
**TAYLOR** [1] - 2:13
**team** [1] - 11:14
**teammates** [1] - 7:9
**Tech** [1] - 11:17
**Telephone** [1] - 1:20
**telephone** [2] - 4:3, 17:13
**tempted** [1] - 12:17
**ten** [2] - 13:12, 13:16
**terms** [4] - 10:6, 14:23, 15:5, 15:11
**testing** [1] - 15:17
**text** [1] - 7:9
**THE** [41] - 1:1, 1:2, 4:6, 4:12, 4:17, 4:21, 4:25, 5:4, 6:5, 7:15, 7:20, 8:12, 8:17, 8:20, 9:13, 9:17, 9:23, 10:3, 10:14, 10:20, 11:6, 11:24, 12:4, 12:7, 12:11, 13:11, 13:15, 13:18, 14:1, 14:4, 14:11, 14:13, 14:20, 15:1, 15:21, 16:1, 16:13, 16:23, 17:5, 17:8, 17:12
**they've** [1] - 12:18
**thinking** [4] - 5:23, 9:3, 9:14, 10:2
**thinks** [1] - 9:18
**third** [1] - 6:20
**three** [6] - 6:17, 6:25, 7:11, 9:22, 13:6
**timing** [2] - 14:23, 15:5
**today** [1] - 4:15
**total** [1] - 5:14
**transferred** [1] - 11:18
**trial** [14] - 5:10, 5:19, 5:20, 11:17, 12:9, 12:24, 12:25, 13:2, 13:3, 14:24, 15:7, 16:15, 17:9

**trials** [1] - 11:23
**try** [10] - 7:9, 9:21, 10:16, 12:12, 12:15, 12:21, 13:3, 13:4, 13:12, 15:8
**trying** [4] - 6:5, 8:2, 9:1, 9:12
**turned** [1] - 15:4
**twelve** [3] - 5:14, 7:8, 9:4
**twelve-and-a-half** [3] - 5:14, 7:8, 9:4
**twice** [1] - 13:1
**two** [2] - 4:25, 15:15

## U

**U.S.D.C.J** [1] - 1:22
**unbelievable** [1] - 14:5
**understood** [1] - 15:10
**underway** [1] - 15:17
**UNITED** [1] - 1:1
**up** [4] - 10:13, 11:23, 12:9, 14:8

## V

**Valerie** [1] - 1:24
**validity** [2] - 8:4, 9:25
**versus** [1] - 8:6
**vicious** [1] - 14:1
**vs** [2] - 1:7, 1:13

## W

**wACKER** [1] - 3:7
**Wacker** [1] - 4:20
**wait** [2] - 15:1, 15:7
**wants** [1] - 10:22
**watching** [1] - 14:5
**Wednesday** [1] - 1:19
**week** [3] - 11:20, 11:21, 12:10
**willing** [1] - 16:25
**Wilmington** [1] - 1:18
**window** [1] - 14:6
**Winter** [3] - 8:4, 8:12, 9:7
**witness** [3] - 7:11, 8:13, 9:9
**witnesses** [3] - 6:25, 7:2, 9:2
**Wu** [6] - 4:15, 9:18, 10:4, 14:8, 14:21, 16:6
**WU** [13] - 2:17, 5:22, 6:14, 7:17, 7:22, 8:16, 10:4, 10:18,

14:18, 14:22, 15:10, 16:9, 16:22

## Y

**year** [2] - 12:20, 15:19
**year-and-a-half** [1] - 12:20
**YORK** [1] - 1:15
**York** [3] - 2:21, 3:7
**Young** [1] - 4:14
**YOUNG** [1] - 2:13

Exhibits 2a-3b
Redacted in the entirety

Exhibit 4





## Eagle Pharmaceuticals Announces FDA Maintains Prioritization of ANDA for Vasopressin

-- Assigned GDUFA date of December 15, 2021, and expects commercial launch prior to year-end --

June 24, 2021 06:50 AM Eastern Daylight Time

WOODCLIFF LAKE, N.J.--(BUSINESS WIRE)--Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) ("Eagle" or the "Company") today announced that the U.S. Food and Drug and Administration ("FDA") has maintained Priority Review for the Company's Abbreviated New Drug Application ("ANDA") for vasopressin. The Company's response to the CRL was submitted on June 15, 2021. The FDA has assigned a GDUFA date of December 15, 2021, and the Company expects a commercial launch prior to year-end.

"Vasopressin is an important program for us, and in light of the Priority Review, as well as its being flagged as a COVID priority, we continue to believe that we can bring this product to market this year. The trial is set to commence on July 7, and we look forward to providing updates in the near future," stated Scott Tarriff, Chief Executive Officer of Eagle Pharmaceuticals.

Eagle is first to file an ANDA referencing Vasostrict, which had total U.S. sales of $786 million in 2020.

**About Eagle Pharmaceuticals, Inc.**

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include RYANODEX®, BENDEKA®, BELRAPZO®, and its oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states. Additional information is available on Eagle's website at www.eagleus.com.

**Forward-Looking Statements**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "may," "remain," "potential," "prepare," "expected," "believe," "plan," "near future," "belief," "guidance," and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements concerning the Company's ability to address the questions raised in the CRL for its ANDA for vasopressin and to communicate with FDA regarding the same; the Company's ability to obtain and maintain regulatory approval of its products and product candidates, including vasopressin; the timing, progress and results of the Company's clinical trials, including potential timing of commercial

launch of vasopressin; and the ability of the Company's product candidates, including vasopressin, to deliver value to stockholders. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the impacts of the ongoing COVID-19 pandemic, including interruptions or other adverse effects on clinical trials and delays in regulatory review or further disruption or delay of any pending or future litigation; delay in or failure to obtain regulatory approval of the Company's product candidates and successful compliance with FDA and other governmental regulations applicable to product approvals; whether the Company will successfully implement its development plan for its product candidates; whether the Company can successfully market and commercialize its product candidates; the outcome of litigation involving any of its products or that may have an impact on any of its products; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; the risks inherent in drug development and in conducting clinical trials; and those risks and uncertainties identified in the "Risk Factors" section of the Company's Annual Report on Form 10-K for the year ended December 31, 2020 filed with the Securities and Exchange Commission (the "SEC") on March 5, 2021, as updated by the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, filed with the SEC on May 10, 2021, and its other subsequent filings with the SEC. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

Contacts

**Investor Relations for Eagle Pharmaceuticals, Inc.:**

Lisa M. Wilson

In-Site Communications, Inc.

T: 212-452-2793

E: lwilson@insitecony.com

Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PAR PHARMACEUTICAL, INC., *et al.*,

              *Plaintiffs*,

    v.

AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, *et al.*,

              *Defendants*.

C.A. No. 18-2032-CFC-CJB

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER

FILED UNDER SEAL

## STIPULATED [PROPOSED] ORDER REGARDING INFRINGEMENT

NOW, THEREFORE, IT IS HEREY STIPULATED AND AGREED by Defendants ("Amneal"), through their undersigned counsel and subject to the approval of the Court, as follows:

1.    In the event that Amneal were to amend the highest permissible pH in the release and stability pH specifications of ANDA No. 212944 and/or ANDA No. 212945 to meet or exceed a pH of 3.65, then the proposed products of those ANDAs would infringe all valid asserted claims of U.S. Patent Nos. 9,744,209 and 9,750,785 in this action; and

2.     During the life of the asserted patents in this action, Amneal shall notify the FDA, Plaintiffs, and the Court of any change in Amneal's release or stability pH specifications which include a pH level of 3.65.

Dated:  November 4, 2021

|  |  |
|---|---|
| *Of Counsel*: | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| MADDOX EDWARDS, PLLC | */s/ Anne Shea Gaza* |
| Steven A. Maddox | Anne Shea Gaza (No. 4093) |
| Jeremy J. Edwards | Robert M. Vrana (No. 5666) |
| Kaveh V. Saba | Samantha G. Wilson (No. 5816) |
| 1900 K Street NW, Suite 725 | Rodney Square |
| Washington, D.C. 20006 | 1000 North King Street |
| (202) 830-0707 | Wilmington, DE 19801 |
| smaddox@meiplaw.com | (302) 571-6600 |
| jedwards@meiplaw.com | agaza@ycst.com |
| ksaba@meiplaw.com | rvrana@ycst.com |
|  | swilson@ycst.com |

*Counsel for Defendants Amneal Pharmaceuticals Of New York, LLC, Amneal Biosciences LLC, Amneal Pharmaceuticals Pvt. Ltd., and Amneal EU, Limited*

SO ORDERED this ___ day of _____, 202__.


_____

The Honorable Colm F. Connolly
Chief, United States District Judge

Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BIODELIVERY SCIENCES )
INTERNATIONAL, INC. and ARIUS )
TWO, INC., )
          )
         Plaintiffs, )      REDACTED - PUBLIC VERSION
          )
         v. )      Civil Action No. 19-444-CFC-CJB
          )
CHEMO RESEARCH, S.L., INSUD )
PHARMA S.L., INTELGENX CORP. )
and INTELGENX TECHNOLOGIES )
CORP., )
          )
         Defendants. )

## <u>MEMORANDUM ORDER</u>

At Wilmington, Delaware this **11th day of June, 2021**.

**WHEREAS**, Plaintiffs BioDelivery Sciences International, Inc. and Arius Two, Inc.

("Plaintiffs") have filed a Renewed Motion to Stay, (D.I. 346) (the "Motion"), the Court has

considered the briefing related thereto, (D.I. 340; D.I. 341; D.I. 342; D.I. 347; D.I. 352; D.I. 354;

D.I. 362; D.I. 368), and the Court has further heard argument on June 8, 2021,[1]

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

1.      As an initial matter, the Court notes that it has considered the three stay-related

factors: (1) whether a stay will simplify the issues and trial of the case; (2) whether discovery is

complete and a trial date has been set; and (3) whether a stay would unduly prejudice or present a

clear tactical disadvantage to the non-moving party. *See CIMA Labs Inc. v. Mylan Pharms., Inc.*,

---

[1]      This case is referred to the Court to resolve all disputes relating to discovery and
the protective order. (D.I. 57)

C.A. No. 10-625-LPS, 2011 WL 1479062, at *2 (D. Del. Apr. 18, 2011). Having taken those factors into consideration, the Court HEREBY DENIES the Motion for the reasons that follow.

2.      It is apparent that much of Plaintiffs' original focus in the Motion was on the fact that, at the time the Motion was filed: (1) Defendants Chemo Research, S.L., Insud Pharma S.L., Intelgenx Corp. and Intelgenx Technologies Corp. (collectively, "Defendants") had reported that although they had previously expected to file their response to an FDA Complete Response Letter ("CRL") and their amended Abbreviated New Drug Application ("ANDA") by the end of the first quarter of 2021, they would not meet those deadlines, and instead now anticipated submitting the documents by May 15, 2021; (2) it was unclear if Defendants would in fact meet the new May 15, 2021 deadline (in light of the fact that Defendants had missed some prior self-imposed deadlines for making these filings); (3) it was unclear if further FDA action would cause Defendants to have to change their specification regarding the pH ranges for certain layers of film in their proposed generic drug product[2]; and (4) Defendants had not produced nearly all of the anticipated document discovery regarding the CRL. (D.I. 340; D.I. 347) Plaintiffs argued that in light of these uncertainties, the currently scheduled November 15, 2021 infringement trial was untenable, and that the case should be stayed until Defendants obtained "tentative approval [of their ANDA] or it appears likely that [they] will obtain tentative approval but for minor deficiencies." (D.I. 347 at 8) However, since the filing of the Motion, Defendants did, in fact, submit the CRL response and the amended ANDA to the FDA on May 14, 2021. (D.I. 362) By May 18, 2021, Defendants also produced the outstanding document discovery to Plaintiffs (this discovery totaled over 100,000 pages). (D.I. 362; D.I. 368 at 1) And Defendants have also now

---

[2]      The pH ranges of those layers of film are relevant to a key infringement issue in the case.

committed that, no matter what the FDA does from here on out, they will "not change the pH specification [regarding their product] above ▮ [, a level below the range claimed in the patents-in-suit]." (D.I. 368 at 3) So much of the uncertainty that bolstered Plaintiffs' request for a stay has since subsided.

3.      Plaintiffs still argue for a stay until the FDA is able to review and weigh in on Defendants' amended ANDA (the FDA has said this will not happen until January 2022 at the earliest). (*See* D.I. 368 at 1; *id.*, ex. 1 at 1) Obviously, if the Court knew that the FDA was likely to (or would in fact) require changes to the pH specification in Defendants' amended ANDA, then that would provide cause for concern. But whether the FDA *will* do that is uncertain. And as Defendants note, there is some level of inherent uncertainty as to the nature of the final accused product in many Hatch-Waxman cases, since the relevant statute provides for pre-FDA approval adjudication of pharmaceutical patent disputes. (D.I. 352 at 6; D.I. 368 at 3 & n.4) Here, the Court is willing to say only that there is *a bit more* uncertainty than in the average case, simply in light of the fact that the FDA has issued a CRL. But the current record does not indicate a level of unpredictability that is so outsized as to warrant a stay. After all, it is not as if in issuing the CRL, the FDA rejected a portion of the original ANDA that set out the proposed pH ranges at issue; instead, the FDA simply asked Defendants to "add a pH specification to its manufacturing process." (D.I. 352 at 1)

4.      Moreover, the two cases that Plaintiffs cite for the proposition that the FDA CRL should result in a stay are really inapposite. In a prior opinion, the Court has explained why one of those cases—*Forest Labs., LLC v. Sigmapharm Labs., LLC*, Civil Action No. 14-1119-MSG CONSOLIDATED, 2019 WL 3574249 (D. Del. Aug. 6, 2019)—is not close to being on all fours. (*See* D.I. 193 at 2 n.2) In *Forest Labs.*, a stay was (1) entered on the eve of trial, (2) only

3

after the district court had extended the case schedule multiple times and (3) only after the defendant had received a *second* CRL from the FDA, which was going to require the defendant to reformulate its drug product in a manner that could impact a key liability issue in the case. 2019 WL 3574249, at *2. As for the other case, *Shire Dev., LLC v. Mylan Pharms., Inc.*, Case No. 8:12-cv-1190-T-36AEP, 2015 WL 10793982 (M.D. Fla. Aug. 11, 2015), the district court stayed the case not only because the generic defendant had received an FDA CRL, but also because just three months before trial that defendant requested a *second and year-long extension* from the FDA in order to respond to the CRL (after having previously pushed back its expected response a number of times). 2015 WL 10793982, at *1-3.

      5.     In light of the above, this case—one that involves a hard-fought dispute between competitors, and one that has already required a great expenditure of Court resources—should not be paused indefinitely. That said, although the Court has denied the request for a stay, Plaintiffs do make a good argument that the case schedule needs to be altered. Indeed, the current schedule was premised on the idea that Defendants' CRL response would be filed no later than the end of March 2021. But that filing was pushed back by a month and a half. And on top of that, Defendants only just produced over 100,000 pages of new, relevant discovery to Plaintiffs—and did so just three days prior to the close of fact discovery (at a time when no depositions have been taken). (D.I. 305; D.I. 368 at 2) The Court has already requested that the parties provide it with proposals for a new case schedule, and it will enter such a schedule soon.

      6.     Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **June 17, 2021** for review by the Court. It should be

accompanied by a motion for redaction that shows that the presumption of public access to

judicial records has been rebutted with respect to the proposed redacted material, by including a

factually-detailed explanation as to how that material is the "kind of information that courts will

protect and that disclosure will work a clearly defined and serious injury to the party seeking

closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir.

2019) (internal quotation marks and citation omitted). The Court will subsequently issue a

publicly-available version of its Memorandum Order.

*Christopher J. Burke*

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

Exhibit 7

**Full docket text:**

ORAL ORDER: I have reviewed Plaintiffs' objections to the Magistrate Judge's Report and Recommendation (D.I. [383]). The Magistrate Judge's ruling was neither clearly erroneous nor contrary to law and therefore I will DENY the objections. Ordered by Judge Colm F. Connolly on 10/4/2021. (nmf)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/27/2021 12:12:50 | | | |
| **PACER Login:** | MEIPLAW_DC | **Client Code:** | vasopressin delaware |
| **Description:** | History/Documents | **Search Criteria:** | 1:19-cv-00444-CFC-CJB |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., *et al.*, | C.A. No. 18-2032-CFC-CJB (consolidated) |
| *Plaintiffs*, | CONTAINS CONFIDENTIAL OR HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY INFORMATION – PURSUANT TO PROTECTIVE ORDER |
| v. | |
| AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, *et al.*, | |
| *Defendants*. | FILED UNDER SEAL |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

*Of Counsel*:

MADDOX EDWARDS, PLLC
Steven A. Maddox
Jeremy J. Edwards
Kaveh V. Saba
1900 K Street NW, Suite 725
Washington, D.C. 20006
(202) 830-0707
smaddox@meiplaw.com
jedwards@meiplaw.com
ksaba@meiplaw.com

Dated:

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendants Amneal Pharmaceuticals of New York, LLC, Amneal Biosciences LLC, Amneal Pharmaceuticals Pvt. Ltd., and Amneal EU, Limited*

# <u>TABLE OF CONTENTS</u>

Introduction ...................................................................................................1

Nature and Stage of Proceedings ....................................................................2

Legal Standard for Summary Judgment ..........................................................5

Summary of Argument ....................................................................................5

Statement of Facts ..........................................................................................6

Argument .......................................................................................................6

    I.    As a Matter of Law, Amneal's ANDA Products Do Not Infringe. ..............6

    II.    ███████████████████████████████████ .............10

Conclusion ...................................................................................................12

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Impax Labs., Inc.*,
  C.A. No. 00-c-7865, 2003 WL 1563426 (N.D. Ill. Mar. 26, 2003) ....................7

*Bayer AG v. Elan Pharm. Res. Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000) ..................................................................*passim*

*Bayer AG v. Elan Pharm. Res. Corp.*,
  64 F. Supp. 2d 1295 (N.D. Ga. 1999)........................................................11, 12

*In re Brimonidine Patent Litigation*,
  643 F.3d 1366 (Fed. Cir. 2011) .................................................................1, 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................................5

*In re Fenofibrate Patent Litig.*,
  910 F. Supp. 2d 708 (2012), *aff'd*, 499 Fed. Appx. 974 (Fed. Cir. 2013) ..........................................................................................................8

*Matsushita Elec. Indus.* Co., *Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................5

*Par Pharm., Inc. v. Eagle Pharm., Inc.*,
  C.A. No. 18-0823, 2021 WL 3886418 (D. Del. Aug. 31, 2021)................*passim*

*Smithkline Beecham Corp., v. Excel Pharms., Inc.*,
  214 F. Supp. 2d 581 (E.D. Va. 2002), *vacated on other grounds* by
  *Smithkline Beecham Corp., v. Excel Pharms., Inc.*, 356 F.3d 1357
  (Fed. Cir. 2004)..............................................................................................8

*Williams v. Borough of West Chester, Pa.*,
  891 F.2d 458 (3d Cir. 1989) ...........................................................................5

**Statutes**

21 U.S.C. § 331(d) ................................................................................11

35 U.S.C. 271(a) ..................................................................................12

**Other Authorities**

Fed. R. Civ. P. 56(a)..............................................................................5

**<u>Introduction</u>**

The Court should enter summary judgment that Defendants' ("Amneal's") proposed ANDA products do not infringe any asserted claim.  Simply put, the proposed ANDA products are *required* to have a non-infringing pH.  Under controlling Federal Circuit precedent, this presents a legal bar to finding infringement in a Hatch-Waxman case such as this.  *E.g., Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1248-50 (Fed. Cir. 2000); *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376-78 (Fed. Cir. 2011).

This case-dispositive motion is focused, simple, and based on Plaintiffs' ("Par's") own positions.  Specifically, all asserted claims require a product with pH values between 3.7 and 3.9.  According to Par, pH values between 3.65 and 3.94 satisfy this claim limitation.  But Amneal's ANDA specifications require the ANDA products to have pH values between ███████ (*i.e.*, outside the claimed range) both at release and throughout their entire shelf life.  ███████ ████████████████████████████████  Because the ANDA specification prohibits a pH in the claimed range, Amneal's ANDA products cannot literally infringe as a matter of law.

Further simplifying the matter, this Court has recently decided this precise issue in a companion case involving the same claim limitation in the same patents. *See Par Pharm., Inc. v. Eagle Pharm., Inc.*, C.A. No. 18-0823, 2021 WL 3886418

1

(D. Del. Aug. 31, 2021) ("Eagle Opinion").  To grant Amneal's motion, this Court need do no more than apply its own conclusions of law in the *Eagle* Opinion to the same operative facts here.

### Nature and Stage of Proceedings

This Hatch-Waxman patent litigation arises from Amneal's submission of Abbreviated New Drug Applications Nos. 212944 and 212945 ("Amneal's ANDAs" or "the Amneal ANDAs").  (D.I. 282, Amended Joint Proposed Pretrial Order at 3; D.I. 1, Case No. 19-cv-712 at pp. 9-10, ¶¶ 32, 35.)  Amneal's ANDAs seek approval of generic versions ("the Amneal ANDA Products" or Amneal's ANDA Products") of a drug product called Vasopressin®.  Both ANDAs are being reviewed by the FDA.

Par sued Amneal, asserting infringement of U.S. Patent Nos. 9,744,209 ("the '209 patent") and 9,750,785 ("the '785 patent") (collectively, the Asserted Patents).[1]  Par asserts claims 1-2 and 4-8 of the '209 patent and claims 1, 5, and 8 of the '785 patent (the "Asserted Claims").  (D.I. 282, Amended Joint Proposed Pretrial Order, Ex. 1, Statement of Admitted Facts at 8-10.)

---

[1] Par had asserted additional patents. ████████████████████████████
████████████████████████ (D.I. 282, Amended Joint Proposed Pretrial Order at 20.)

All asserted claims require a "unit dosage form that has a pH of 3.7-3.9" ("the pH Limitation"). (*Id*.) Par asserts only that this limitation is *literally* met; Par is not asserting the doctrine of equivalents. (Ex. A at 79:22-82:19[2]; D.I. 247 at 2 (Dec. 31, 2020 Letter from Par to the Court stating that "Dr. Kirsch's supplemental report presents no new infringement theory, such as doctrine of equivalents….").).) Amneal does not dispute that its proposed ANDA products satisfy any other claim limitations. (D.I. 246, Joint Proposed Pretrial Order, Ex. 1, Statement of Admitted Facts at p. 16, ¶ 55.)

Par requested, and the Court ordered, that the pH Limitation be given its ordinary meaning. (D.I. 105 at 2.) In a related case involving the Asserted Patents, Par asserted (and defendant Eagle Pharmaceuticals Inc. ("Eagle") agreed) that the pH Limitation "is met when the pH is greater than or equal to 3.65 and less than or equal to 3.94." Eagle Opinion at *3. Par has offered the same interpretation in this case. (Ex. B at p. 4.) For purposes of this motion, Amneal agrees to Par's articulation of the scope of the pH limitation.

Discovery has been completed. On June 9, 2021, the Court severed Amneal's non-infringement defense from the scheduled July trial. (Ex. C, June 9, 2021 Telephone Conference Transcript at 12:11-13:7.) On July 7-9, 2021, the

---

[2] Unless otherwise indicated, all references herein to "Ex. __" refer to exhibits to the Declaration of Kaveh V. Saba, filed concurrently herewith.

Court held a bench trial on Amneal's and Eagle's invalidity and unenforceability defenses, and on Eagle's defense of non-infringement.  On August 31, 2021, the Court issued the *Eagle* Opinion holding that Eagle did not infringe the Asserted Patents.  The Court has not yet issued any opinion regarding invalidity or unenforceability of the Asserted Claims.  The Court has not yet scheduled a trial date for Amneal's non-infringement defense.

Further, Amneal has stipulated that if it does change its release or stability pH specifications to overlap with the pH range of the claims, Amneal's ANDA product would literally infringe the asserted claims.  (Ex. D at 1.)

## Legal Standard for Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the burden of persuasion at trial would be on the non-movant, then the movant may satisfy its burden of production by pointing to an absence of evidence supporting the non-movant's case, after which the burden of production then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus.* Co., *Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 460-61 (3d Cir. 1989).

## Summary of Argument

*First*, the pH specifications in Amneal's ANDAs indisputably require a pH that is outside the pH range of the Asserted Claims.  As a matter of law under binding Federal Circuit precedent, there can be no literal infringement.  Because

Par does not assert infringement under the doctrine of equivalents, the Court should enter summary judgment of non-infringement.

***Second***, —does not present a material issue of fact capable of defeating summary judgment. *Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1250 (Fed. Cir. 2000).

## Statement of Facts

The relevant facts are set forth in the Concise Statements of Facts.

## Argument

### I.      As a Matter of Law, Amneal's ANDA Products Do Not Infringe.

As this Court recently acknowledged, under unequivocal, binding precedent, "an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry." *Eagle* Opinion at *9-10 (*citing In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1378 (Fed. Cir. 2011) and *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002)).  Further, "if the product that an ANDA applicant is asking the FDA to approve falls outside the scope of an asserted patent, a judgment of noninfringement must follow." *Id*. at *8.

As this Court recognized in the *Eagle* Opinion, "[t]he infringement analysis in an ANDA case is most straightforward when the ANDA's specification directly addresses the elements of the asserted claims that are at issue." *Id*. This Court also recognized that "if an ANDA specification describes a product that . . . necessarily does not infringe the patent, the specification dictates the outcome of the infringement analysis." *Id*. (citing *Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1409 (Fed. Cir. 2014) and *Bayer AG v. Elan Pharm. Res. Corp.*, 212 F.3d 1241, 1249 (Fed. Cir. 2000)).

Summary judgment is an appropriate vehicle to decide non-infringement in cases like this where the ANDA controls the inquiry. *Bayer* affirmed precisely such a decision on summary judgment, explaining that the ANDA specification at issue "mandates a finding of no literal infringement" because it "directly addresses the question of infringement" and "the only drug [defendant] can produce upon approval of the ANDA at issue is a drug that does not literally infringe….". *Bayer*, 212 F.3d 1241, 1249-50 (Fed. Cir. 2000).

Accordingly, district courts grant summary judgment of non-infringement where the ANDA describes a non-infringing product. *See, e.g.*, *Abbott Labs. v. Impax Labs., Inc.*, C.A. No. 00-c-7865, 2003 WL 1563426, at *6-8 (N.D. Ill. Mar. 26, 2003) (no literal infringement "as a matter of law" where claims required two components to be processed together, but the ANDA required one of them to be

processed by itself); *In re Fenofibrate Patent Litig.*, 910 F. Supp. 2d 708, 714-15 (2012) (no literal infringement where claims required certain ingredients, but the ANDA described product lacking those ingredients), *aff'd*, 499 Fed. Appx. 974 (Fed. Cir. 2013); *Smithkline Beecham Corp., v. Excel Pharms., Inc.*, 214 F. Supp. 2d 581, 587 (E.D. Va. 2002) (no literal infringement where claims required two ingredients to be in admixture, but the ANDA did not describe those ingredients in admixture), *vacated on other grounds* by *Smithkline Beecham Corp., v. Excel Pharms., Inc.*, 356 F.3d 1357, 1365 (Fed. Cir. 2004) (acknowledging no literal infringement).

Here, as in *Bayer*, Amneal's ANDA specification "defines its product in a way that directly addresses the question of infringement." *Bayer*, 212 F.3d at 1249. Indeed, all Asserted Claims require the product to have a pH between 3.65 and 3.94, but the ANDA specification expressly and directly prohibits that. This is quintessential non-infringement as a matter of law.

Notably, the Court would not be breaking new ground in granting Amneal's motion. Indeed, the Court need only apply its recent analysis from the *Eagle* Opinion to the operatively identical facts of this case. The *Eagle* case involved the same asserted patents and same non-infringement issue at play here. There, as here, to literally infringe, Eagle's ANDA product had to have a pH of 3.65-3.94.

*Eagle* Opinion at *3.  But Eagle's ANDA release and stability specifications required a pH of 3.4 to 3.6.  *Id*. at *4.

Relying on Par's own admissions and the applicable regulations as to the meaning of "release specification" and "stability specification," this Court found that:

- the "ANDA product cannot lawfully be released for distribution unless, at the time of release, the product has a pH of . . . between 3.35 and 3.64…."  *Id*. at *4; and

- the "ANDA product cannot lawfully be distributed for use and would not be approved for distribution by the FDA unless, at all periods during the product's shelf life, the product's pH is between . . . 3.35 and 3.64…."  *Id*. at *5.

Because the pH range permitted by the release and stability specifications of the Eagle ANDA was outside the claimed range, the Court found no infringement, because the Eagle ANDA "defines a noninfringing product."  *Id*. at *10.

Here, to reach the same conclusion of non-infringement as to the Amneal ANDAs, the Court need only hold Par to its admissions and apply the same analysis from the *Eagle* case.  Indeed, ███████████████████████████

███████████████████████████████████████████████████████████

███ This is even further outside of the claimed range than the specifications in the

*Eagle* case.  Applying these indisputable facts ████████████████████████████████

to governing precedent and this Court's own prior analysis on all fours, Amneal's

ANDA defines a non-infringing product.  This compels a judgment of no literal

infringement.

**II.**   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████   *In re Brimonidine*, 643 F.3d 1366,

1376-1378 (Fed. Cir. 2011).  *Eagle* Opinion at *10.  The Court should reject it

again here for the same reasons.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████

██████████████████████████████████   The ANDA specification

in *Bayer* required the drug substance to have a surface area outside of the claimed

range. *Bayer AG v. Elan Pharm. Res. Corp.*, 64 F. Supp. 2d 1295, 1300 (N.D. Ga.

1999).  In opposing summary judgment, the patentee offered evidence that over

time, the surface area of the drug substance would, on its own, drift into the

claimed range.  *Id*.  The district court rejected that evidence and granted summary

judgment of noninfringement.  *Id*.

　　The Federal Circuit affirmed, holding that "[a]lthough there may be factual

issues as to whether Elan can comply with its specification, **they are not material**

**factual issues**, because 21 U.S.C. § 331(d) prohibits [defendants] from selling any

product that does not meet its ANDA's requirements."  *Bayer*, 212 F.3d at 1250

(emphasis added).  The panel explained that such evidence was "not material,"

because the ANDA filer could not legally sell any product that did not meet the

ANDA requirements.  *Id*. at 1250.  █████████████████████████

████████   Thus, there is no material fact dispute, and summary judgment is

appropriate.

　　Finally, while a judgment of non-infringement in this ANDA case is

warranted as a matter of law, Par is not without recourse if it later determines that

Amneal's ANDA Products, when marketed, somehow do meet the pH limitation.

Par could, for example, bring a separate infringement action under 35 U.S.C. 271(a).  *See Bayer*, 64 F. Supp. 2d at 1301.  But such a possibility of a future infringing product, outside of the specifications of the ANDA, has no bearing on *this* case and the judgment of non-infringement that must result.

## Conclusion

For the foregoing reasons, Amneal respectfully requests that the Court grant Amneal's Motion for Summary Judgment of Non-Infringement.

Dated:

*Of Counsel*:

MADDOX EDWARDS, PLLC
Steven A. Maddox
Jeremy J. Edwards
Kaveh V. Saba
1900 K Street NW, Suite 725
Washington, D.C. 20006
(202) 830-0707
smaddox@meiplaw.com
jedwards@meiplaw.com
ksaba@meiplaw.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Anne Shea Gaza

Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
rvrana@ycst.com
swilson@ycst.com

*Attorneys for Defendants*
*Amneal Pharmaceuticals of*
*New York, LLC, Amneal Biosciences*
*LLC, Amneal Pharmaceuticals Pvt.*
*Ltd., and Amneal EU, Limited*

12

Exhibit 9
Redacted in the entirety

Exhibit 10

# FDA Seeks a New Way to Review Old Drugs Without Causing Prices to Soar

**By Harris Meyer**
APRIL 15, 2021



(ISTOCK / GETTY IMAGES)

Chuck Peterson of Omaha, Nebraska, recently experienced a swollen, painful knuckle caused by arthritis. He got a prescription for colchicine.

USE OUR CONTENT

It can be republished for free.

Doctors have used the drug for treating gout and other rheumatic conditions for well over two centuries.

When Peterson went to the pharmacy, he was shocked to discover that a two-month supply of 120 pills, distributed by Par Pharmaceutical, would cost him $225 out-of-pocket on his Medicare Part D drug plan. Taking it for an additional three months, as his rheumatologist wanted him to do, would cost him nearly $600 under his drug plan.

A dozen years ago, the drug cost about a dime per pill.

"My reaction was 'goodness gracious,' or maybe something I couldn't say in polite company," he said.

EMAIL SIGN-UP

Subscribe to KHN's free Weekly Edition.

Your email address                                    SIGN UP

The startling price hike was precipitated by a well-intentioned federal government program, called the Unapproved Drugs Initiative, that created unforeseen consequences. It was supposed to protect the public by ensuring that older drugs went through a Food and Drug Administration approval process to determine their safety and efficacy and that older versions were taken off the market.

In November, the departing Trump administration unexpectedly <u>ended the FDA program</u> that led to a price spike for colchicine and other older drugs, saying it drove up drug costs and in some cases caused shortages. Now the FDA is considering whether and how to replace it, while advancing the Biden administration's goal of reducing prescription drug prices overall. An announcement is expected soon.

But health care policy analysts and executives fear drugmakers still will find ways to maintain high prices for drugs already approved through the program, and to jack up prices for remaining unapproved drugs on the market, estimated to number at least 1,500. They note that the manufacturers of drugs that were granted FDA approval and market exclusivity through the UDI program, including colchicine, <u>have aggressively used the courts</u> to block other drug companies from marketing cheaper generic alternatives, often for many years.

Colchicine was one of many drugs that were <u>sold before the FDA was created in 1938</u>. No manufacturer ever took it through the agency's approval process for determining safety and efficacy, but its approval for wide use was effectively grandfathered in.

Then the FDA, under the UDI program it launched in 2006, <u>approved a branded version</u> of colchicine in 2009, gave the manufacturer seven years of exclusivity and ordered previous versions off the market. With no competition, the price soared to about $4.50 a pill. That has since dipped to less than $2 a pill since generic competitors were approved by the FDA and entered the market in the past few years. However, the price is still much higher than before.

Price increases of drugs approved through UDI have boosted U.S. health spending by $3.2 billion so far, and will increase costs by tens of billions more in coming years, according to <u>a study last year by Vizient</u>, a purchasing firm serving hospitals.

Drug policy experts would like to see the Biden administration develop alternatives to UDI for reviewing the safety and efficacy of unapproved drugs that don't lead to big price hikes. One way, especially for common drugs that physicians and hospitals have used safely for decades, is having the FDA work with health care providers to collect and analyze data on their own through patient registries.

"If other entities collect the data, thus minimizing the research expense, it would perhaps be more appropriate for the manufacturers not to take enormous price increases," said Steven Lucio, a vice president at Vizient.

Other older drugs whose prices skyrocketed after drugmakers won exclusive rights to sell branded versions include selenium, a common mineral supplement used in patients who need feeding through a stomach tube. It soared 1,190% after American Regent gained FDA approval for branded "Selenious Acid" in 2019.

Belcher Pharmaceuticals hiked the price of branded "Dehydrated Alcohol 99%," used to treat severe heart disease, 668% after it won FDA approval in 2018.

Hospital executives are particularly vexed about the price hike for Vasostrict — formerly known as vasopressin and first developed in 1928 — because that drug, used to increase a patient's blood pressure, has been widely used in intensive care units to treat covid-19 patients. From 2019 to 2020, hospital spending for the drug rose 56%, to nearly $600 million, according to the American Society of Health-System Pharmacists.

The price of the drug increased 1,644% after Par Pharmaceutical won FDA approval in 2014, according to Vizient. It received market exclusivity through 2035. And Par Pharmaceutical has hiked the price 7% to 10% each year, said Eric Tichy, vice chair of supply chain management at the Mayo Clinic.

"I don't mind paying a lot for innovative drugs, but vasopressin has been around much longer than I've been alive," he said. "Par has made a windfall from covid. That's just gaming the system. It's outrageous."

Two other drugmakers have sought, unsuccessfully so far, to develop and market a generic alternative to Vasostrict. A German drug company, Fresenius Kabi, sued Par in a New Jersey federal court for alleged antitrust violations in blocking its access to information about the drug's active ingredients. Par sued Sandoz for patent infringement to block that drugmaker from marketing a generic version of vasopressin. Par recently reached confidential settlements with both companies, Tichy said.

None of the three companies would comment on the settlements.

Heather Zoumas-Lubeski, vice president of corporate affairs for Endo International, which owns Par, justified Vasostrict's price by saying the company "invested significant time and resources in the formulation, approval, and manufacturing" and "continues to invest in efforts that benefit patients."

Drug manufacturers, including makers of generics, opposed the elimination of the UDI program and have urged the FDA to continue to grant approvals and market exclusivity to branded versions of previously unapproved older drugs.

They particularly oppose the Trump administration's proposal to let the FDA determine that some older, non-patented drugs are "generally recognized as safe and effective," known as having GRASE status, and don't need to go through a new drug approval process.

Broadly granting GRASE status would "allow potentially unsafe, ineffective, or poor-quality drugs to enter the U.S. market, and put patients at risk," the Pharmaceutical Research and Manufacturers of America warned in December in response to the Trump administration's request for comments on what should replace the UDI program. The trade group stressed that the FDA is not allowed under law to consider drug prices in making approval decisions.

But drug policy researchers say <u>drugmakers generally have done little or no original research</u> to improve the safety and efficacy of old unapproved drugs or expand clinical uses for these products. They also say there's no justification for the much higher prices of the FDA-approved branded versions.

One exception they cite is L-cysteine, an amino acid used in intravenous nutrition for preterm infants, which Exela Pharma Sciences improved by removing potentially harmful metals. The company won FDA approval for its new branded version, Elcys, in 2019. Its wholesale price is $8.24 per milliliter, compared with $0.24 per milliliter for the previous generic product.

"That company did a lot of work to bring a new and improved formulation to market," said Soumi Saha, vice president of advocacy for Premier, which does group purchasing for health care providers. "That's different than taking the same recipe, slapping a different label on it and seeking market exclusivity."

This isn't just an abstract policy issue. The higher prices resulting from the branding of cheap old drugs can significantly affect patient care.

Colchicine's higher price prompted Dr. Marcus Snow, a rheumatologist in Omaha, to switch some of his gout patients to more affordable anti-inflammatory drugs. But those drugs can elevate blood sugar and affect kidney function, so he has to be vigilant.

The drug's price also could become a bigger issue as its use expands. <u>Recent studies have shown</u> that colchicine is effective in preventing complications after heart attacks, and that it may be effective in reducing heart problems in covid patients. If demand soars for these new uses, Par and other colchicine distributors might seek further price hikes for this <u>ancient drug</u>.

"I would love to see colchicine drop to the old days of pennies per pill through generic availability," said Snow, who heads the American College of Rheumatology's Committee on Rheumatic Care. "But I'm not expecting that."

Case 1:18-cv-02032-CFC-CJB Document 313-1 Filed 11/12/21 Page 63 of 63 PageID #:
108612

Harris Meyer: @Meyer_HM

**RELATED TOPICS**

HEALTH CARE COSTS        HEALTH INDUSTRY        PHARMACEUTICALS        BIDEN ADMINISTRATION        DRUG COSTS

FDA        PRESCRIPTION DRUGS        TRUMP ADMINISTRATION

✈ CONTACT US        ✎ SUBMIT A STORY TIP